# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

```
FILED

Aug 20 2021

SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO
```

# CRIMINAL COVER SHEET

***Instructions:*** *Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case.*

| | |
|---|---|
| **CASE NAME:** USA v. MANISH LACHWANI | **CASE NUMBER:** 3:21-mj-71316 MAG CR |
| **Is This Case Under Seal?** | Yes ✔   No |
| **Total Number of Defendants:** | 1 ✔   2-7   8 or more |
| **Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326?** | Yes   No ✔ |
| **Venue (Per Crim. L.R. 18-1):** | SF ✔   OAK   SJ |
| **Is this a potential high-cost case?** | Yes   No ✔ |
| **Is any defendant charged with a death-penalty-eligible crime?** | Yes   No ✔ |
| **Is this a RICO Act gang case?** | Yes   No ✔ |
| **Assigned AUSA (Lead Attorney):** William Frentzen and Lloyd Farnham | **Date Submitted:** 08/19/2021 |
| **Comments:** | |

Form CAND-CRIM-COVER (Rev. 11/16)

[RESET FORM]   [SAVE PDF]

AO 91 (Rev. 11/11)  Criminal Complaint

# UNITED STATES DISTRICT COURT
for the
Northern District of California

| United States of America | ) | |
|---|---|---|
| v. | ) | |
| MANISH LACHWANI | ) | Case No.  3:21-mj-71316 MAG |
| | ) | |
| *Defendant(s)* | ) | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of   Nov. 1, 2019 to Jan. 30, 2020   in the county of   San Francisco   in the   Northern   District of   California  , the defendant(s) violated:

| *Code Section* | | *Offense Description* |
|---|---|---|
| 18 U.S.C. § 1343; | Wire Fraud | Securities Fraud |
| 15 U.S.C. §§ 78j(b) and 78ff; and Title 17 C.F.R. § 240.10b-5 | Count One -<br>Maximum penalties:<br>-20 years of imprisonment<br>-3 years of supervised released<br>-$250,000 fine<br>-$100 special assessment | Count Two -<br>Maximum penalties:<br>-20 years of imprisonment<br>-3 years of supervised released<br>-$5,000,000 fine<br>-$100 special assessment |

This criminal complaint is based on these facts:

See attached Affidavit of Special Agent David Dahle, Federal Bureau of Investigation.

☑ Continued on the attached sheet.

Approved as to form   /s/ William Frentzen
                AUSA William Frentzen

_____
*Complainant's signature*
Sworn via Telephone

FBI SA David Dahle
*Printed name and title*

Sworn to before me by telephone.

Date:   8/20/2021

_____
*Judge's signature*

City and state:   San Francisco, California     Hon. Joseph C. Spero, Chief U.S. Magistrate Judge
*Printed name and title*

# AFFIDAVIT OF SPECIAL AGENT DAVID DAHLE
# IN SUPPORT OF CRIMINAL COMPLAINT

I, David Dahle, a Special Agent of the Federal Bureau of Investigation ("FBI"), being duly sworn, hereby declare as follows:

## OVERVIEW AND AGENT BACKGROUND

1. I make this affidavit in support of a two-count Criminal Complaint against MANISH LACHWANI ("LACHWANI"):

    a. <u>Count One</u>: Wire Fraud for utilizing interstate and foreign wire communications in furtherance of a scheme to provide false and fraudulent information regarding HEADSPIN, INC. ("HEADSPIN") from at least 2018 to early 2020, in order to secure Series B and Series C Preferred Stock Purchase Agreements and investments from several investors, in violation of 18 U.S.C. § 1343;

    b. <u>Count Two</u>: Securities Fraud for making false, fraudulent, and misleading statements and promises, from at least 2018 to early 2020, in connection with the purchase or sale of securities in HEADSPIN, in violation of 15 U.S.C. § 78j(b) and 78ff, 17 C.F.R. § 240.10b-5.

For the reasons set forth below, I believe there is probable cause to believe LACHWANI has committed each of the foregoing violations of federal law.

2. The statements contained in this affidavit come from my personal observations, my training and experience, information from records and databases, and information obtained from other agents and witnesses. This affidavit summarizes such information in order to show that there is probable cause to believe that LACHWANI has committed the violations listed above. This affidavit does not purport to set forth all of my knowledge about this matter, or to name all of the persons who participated in these crimes.

3. I am a Special Agent of the FBI and have been so employed for approximately twelve years. I am currently assigned to a Complex Financial Crime Squad out of the FBI's San

1

Francisco Field Office. As part of my assigned duties, I investigate possible violations of federal criminal law, specifically investigations involving white collar crime.

## APPLICABLE LAW

4. Title 18, U.S.C. § 1343 prohibits wire fraud. The essential elements of this offense are: 1) the defendant knowingly participated in, devised or intended to devise a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; 2) the statements made or facts omitted as part of the scheme were material, that is they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; 3) the defendant acted with the intent to defraud, that is, the intent to deceive or cheat; and 4) the defendant used, or caused to be used, a wire communication to carry out, or attempt to carry out an essential part of the scheme. See Ninth Circuit Instruction 8.124.

5. Title 15, U.S.C. §§ 78j(b) and 78ff; and Title 17 C.F.R. § 240.10b-5 prohibits fraud and false representations or omissions in connection with the purchase or sale of securities. The essential elements of this offense are: 1) the defendant knowingly and willfully used or employed a manipulative or deceptive device, 2) the manipulation or deception was in connection with the sale of a security, 3) the manipulation or deception constituted a false statement or misleading omission of material fact. *See United States v. Jenkins*, 633 F.3d 788 (9th Cir. 2011).

6. The remainder of this affidavit will lay out the facts supporting each Count in detail. This affidavit is based on FBI interviews, information from other law enforcement officers and regulators, and the review of financial and business records.

## FACTS SUPPORTING PROBABLE CAUSE

**Summary of the Scheme**

7. From at least 2018 to early 2020, HEADSPIN co-founder LACHWANI falsely overstated the company's key financial metrics to overstate the past and future revenue and inflate the value of the company. LACHWANI controlled virtually all of the sales records and

financial information that were used to create the reported financial information presented to investors and potential investors. LACHWANI was able to conceal the scheme to defraud by creating fake invoices and altering real invoices which he then provided to a HEADSPIN employee who did accounting and financial recordkeeping for the company ("EMPLOYEE 1"). Those fake and altered invoices formed the basis for some aspects of the false and overstated financial metrics. LACHWANI provided records containing the overstated financial metrics to potential investors in connection with HEADSPIN's fundraising efforts.

**Background**

8. LACHWANI is a 45-year-old male living in Santa Clara County, California.

9. In 2015, LACHWANI co-founded HEADSPIN, a Delaware corporation, with its principal place of business in Palo Alto, California. From HEADSPIN's inception until approximately May 2020, LACHWANI was HEADSPIN's Chief Executive Officer ("CEO").

10. HEADSPIN is a technology company that provides its customers a remote service that allows the customers to access mobile devices around the world. Customers are able to use HEADSPIN's software to remotely test their applications on these devices across different networks and in different locations. HEADSPIN earns revenue by charging customers fees for a subscription to its services.

11. HEADSPIN sells its products both directly to end users and indirectly through partners that will in turn sell to end users. For direct sales, HEADSPIN contracts directly with an end customer (i.e., companies that deploy applications in different countries). For indirect sales, an end customer purchases HEADSPIN products and services through a channel partner also known as a re-seller.

12. From 2015 until about March 2020, HEADSPIN raised millions of dollars from investors during four major rounds of financing as follows:

   a. Series A Preferred – Approximately $11 million raised during the time period of August to September 2015.

    b. Convertible Notes – Approximately $24.7 million raised in a series of issuances of convertible promissory notes that were convertible into a future Series B Preferred Stock financing at different discounts depending on the timing of the investments into the notes, raised during a period of April 2017 to May 2018.

    c. Series B Preferred – Approximately $20 million raised during the period of September to October 2018, in exchange for shares of HEADSPIN stock.

    d. Series C Preferred – Approximately $60 million raised during the time period of November 2019 to early 2020, in exchange for shares of HEADSPIN stock.

13. In the fall of 2018, ahead of HEADSPIN's Series B fundraising round, HEADSPIN sought and obtained investors to purchase shares at prices that would value the company at approximately $500 million dollars. When LACHWANI sold some of his personal stock in or around May 2019 to an existing HEADSPIN investor for approximately $2.5 million, he sold those shares at a price that would value the company at approximately $750 million. In late 2019, around HEADSPIN's Series C fundraising round, LACHWANI sought and obtained investors to purchase shares at prices that would value the company at approximately $1.1 billion.

14. In March 2020, a then-current employee raised concerns to HEADSPIN board members that HEADSPIN had made misrepresentations to its investors and customers. In response, the board formed a Special Committee to investigate the issues.

15. In May 2020, an auditing firm was retained by HEADSPIN to review the company's unaudited financial statements for 2018, 2019, and the first two quarters of 2020. The review determined that HEADSPIN's cumulative revenues from inception through the first half of 2020 totaled approximately $26.3 million compared to the $95.3 million originally reported by the company. Likewise, the review determined that HEADSPIN's cumulative net loss from inception through the first half of 2020 totaled approximately $15.9 million compared to the $3.7 million net income originally reported by the company.

16. The Special Committee determined that LACHWANI provided investors with overstated direct revenue and channel revenue figures and overstated Annual Recurring Revenue ("ARR") numbers and projections.

17. LACHWANI resigned as CEO and HEADSPIN refunded some investment funds and recapitalized the company's existing investors. This process resulted in a revaluation of the company, and its valuation dropped from $1.1 billion to approximately $300 million.

**The Scheme to Defraud**

18. LACHWANI's fraudulent scheme involved reporting revenue from sales that did not exist, greatly exaggerating revenue from sales that did exist, and overstating the company's key financial metrics in an effort to attract investment and grow HEADSPIN's valuation.

19. LACHWANI accomplished this by maintaining tight and close control over significant aspects of operations, sales, and record-keeping at HEADSPIN, including operational decisions, customer interactions, sales efforts, invoicing, and major and minor company expenditures. LACHWANI siloed information, including financial figures, sales and customer information, and routinely restricted employees from speaking with each other or customers about the company's finances.

20. During the scheme, HEADSPIN did not have formal accounting controls, policies, procedures, or full-time finance professionals such as a Chief Financial Officer. There was no centralized file for customer contracts, purchase orders, or invoices, or standardized methods for tracking invoices or purchase orders.

21. LACHWANI was the final decision maker regarding when, how, and whether the company would record sales and revenue. He created a spreadsheet that purportedly tracked revenue by customer. Using that spreadsheet and through direct communication of purported revenue, LACHWANI provided EMPLOYEE 1 the revenue numbers each quarter, often providing little or no backup documents such as contracts, invoices, or proof of payment. At the close of each quarter, LACHWANI instructed EMPLOYEE 1 to book and record revenue amounts, purportedly based on his own calculations.

22. LACHWANI also discouraged and restricted EMPLOYEE 1 from seeking documents or information from employees in the sales department or from HEADSPIN customers, and instructed at least one salesperson not to respond to requests for information. As such, EMPLOYEE 1 had little visibility into customer contracts, purchase orders, invoices, accounts receivables, accounts payable, or projections, which prevented EMPLOYEE 1 from being able to produce an accurate accounting of HEADSPIN's finances.

23. EMPLOYEE 1 repeatedly requested LACHWANI provide documentary support such as contracts, purchase orders, and invoices. Despite these requests, LACHWANI often provided incomplete documentation, and in some instances LACHWANI provided invoices which were later determined to be falsified and had not been issued by the purported customer.

24. As the company grew, LACHWANI resisted changes designed to improve corporate practices and procedures. At one point, a HEADSPIN senior manager wanted to standardize processes such as paying bills, expense accounts, security, and compliance, but LACHWANI showed little interest and did not instruct company employees to improve corporate or financial procedures.

**LACHWANI Overstated HEADSPIN's Direct Revenue Figures**

25. One aspect of the scheme to defraud HEADSPIN investors involved the overstatement of HEADSPIN's direct annual and quarterly revenue in financial documents provided to existing and potential investors. One cause of the overstatement was that LACHWANI directed EMPLOYEE 1 to record revenue for non-existent customers and former customers that were no longer using or paying for HEADSPIN services.

**Non-Customer**

26. In 2016, LACHWANI instructed EMPLOYEE 1 to book revenue from a purported agreement between HEADSPIN and a company that creates and markets video games ("NON-CUSTOMER"). LACHWANI showed EMPLOYEE 1 an unexecuted agreement between HEADSPIN and NON-CUSTOMER that EMPLOYEE 1 assumed was legitimate.

However, there are no records of an agreement between HEADSPIN and NON-CUSTOMER, no purchase orders, no invoices, and no payments from NON-CUSTOMER to HEADSPIN.

27.     In March 2020, a HEADSPIN manager ("EMPLOYEE 2") reviewed HEADSPIN's financial records, which were approved by LACHWANI, and noticed that NON-CUSTOMER was listed as a HEADSPIN customer, and that LACHWANI had recorded approximately $300,000 in revenue from a sale to NON-CUSTOMER.

28.     EMPLOYEE 2 knew NON-CUSTOMER and HEADSPIN did not have a business relationship because EMPLOYEE 2 had met with senior executives from NON-CUSTOMER multiple times in September and November 2019 trying to work out a potential deal between NON-CUSTOMER and HEADSPIN.

**Non-Current Customer 1**

29.     Another reason why HEADSPIN's revenue was overstated was because LACHWANI directed EMPLOYEE 1 to book and record non-existent revenue from former HEADSPIN customers.

30.     For example, a major Silicon Valley technology company ("NON-CURRENT CUSTOMER 1") was a HEADSPIN customer between July 2016 and July 2017, and submitted a single purchase order to HEADSPIN for $144,900.

31.     There are no other contracts, purchase orders, invoices, or payments that support the booking of any amount of revenue from NON-CURRENT CUSTOMER 1 to HEADSPIN after July 2017.

32.     However, even after NON-CURRENT CUSTOMER 1 ceased being a HEADSPIN customer, LACHWANI directed EMPLOYEE 1 to book $225,000 worth of revenue on an annual basis from NON-CURRENT CUSTOMER 1.

**Non-Current Customer 2**

33.     LACHWANI created fake invoices regarding former customers in an effort to inflate HEADSPIN'S revenue.

7

34. For example, a major technology company based in San Francisco ("NON-CURRENT CUSTOMER 2") made a single HEADSPIN purchase for $720,000, in 2018.

35. LACHWANI falsely claimed that NON-CURRENT CUSTOMER 2 agreed to pay HEADSPIN approximately $1.44 million per year starting in 2018.

36. In order to conceal this fact, LACHWANI created a fake invoice to cover the remaining amount of approximately $720,000, in 2018.

37. And in 2019, LACHWANI created two more fake invoices to represent a supposed renewal of the full $1.44 million deal, which did not exist.

38. LACHWANI sent the fake invoices to EMPLOYEE 1 and told EMPLOYEE 1 that they were active invoices.

**Customer**

39. LACHWANI altered legitimate invoices regarding a current HEADSPIN customer in order to purportedly document revenue he had included in the revenue numbers provided to EMPLOYEE 1.

40. For example, HEADSPIN had a deal with a telecommunications company based in Australia ("CUSTOMER"). CUSTOMER was a channel partner or re-seller of HEADSPIN's products. In June 2019, while closing HEADSPIN's books for the 1st quarter of 2019, LACHWANI sent EMPLOYEE 1 four invoices which he appears to have altered.

Invoice 1

41. On March 26, 2019, HEADSPIN invoiced CUSTOMER for $81,600 Australian Dollars (AUD), which CUSTOMER subsequently paid. LACHWANI received a copy of the invoice. On June 28, 2019, LACHWANI sent EMPLOYEE 1 an altered version of the invoice for $381,600 United States dollars (USD). It appears that LACHWANI altered the invoice by adding a "3" to the front of the total dollar amount, and changing AUD to USD. Metadata from the original invoice and the altered invoice showed that they were "created" on the same day suggesting that LACHWANI doctored the original invoice and created the altered one.

Invoice 2

42. On March 29, 2019, HEADSPIN invoiced CUSTOMER for $21,240 USD. LACHWANI received a copy of the invoice. On June 28, 2019, LACHWANI sent EMPLOYEE 1 an altered version of the invoice for $212,400 USD. It appears that LACHWANI altered the amount and certain quantities on the invoice by multiples of "10". Metadata from the original invoice and the altered invoice showed that they were "created" on the same day suggesting that LACHWANI doctored the original invoice and created the altered one.

Invoice 3

43. On June 11, 2019, HEADSPIN invoiced CUSTOMER for $64,100 USD. LACHWANI received a copy of the invoice. On June 28, 2019, LACHWANI sent EMPLOYEE 1 an altered version of the invoice for $300,500 USD. It appears that LACHWANI altered certain quantities on the invoice by multiples of five.

Invoice 4

44. On June 11, 2019, HEADSPIN invoiced CUSTOMER for $243,150 USD. LACHWANI received a copy of the invoice. On June 28, 2019, LACHWANI sent EMPLOYEE 1 an altered version of the invoice for $1,187,150 USD. Indicia that the original invoice had been doctored include the fact that certain quantities on the invoice appear to have been multiplied by five, and decimals were not aligned.

45. Based on the falsified invoices EMPLOYEE 1 received from LACHWANI, EMPLOYEE 1 moved amounts out of HEADSPIN's unbilled receivables column and into HEADSPIN's accounts receivables column. LACHWANI knew that the invoices he provided to EMPLOYEE 1 were false because he was aware of the actual revenue HEADSPIN received or expected to receive from CUSTOMER, and was aware that certain of the false invoices related to business deals that he knew CUSTOMER and HEADSPIN did not close.

**LACHWANI Overstated HEADSPIN's ARR Numbers**

46. HEADSPIN used the software-as-a-service ("SaaS") revenue model, which is when an end user licenses software on a subscription basis and revenue is recognized ratably

over the period of the subscription. As with most SaaS businesses, annual recurring revenue, or ARR, was an important metric for HEADSPIN investors.

47. ARR is a measure of the total revenue expected per year from committed customers with signed contracts. The goal of the metric is to give investors insight into a company's future revenue performance based on its current subscriptions.

48. In October 2017, LACHWANI asked a HEADSPIN manager to prepare a template that LACHWANI could use to record and forecast HEADSPIN's ARR. A spreadsheet titled "HeadSpin Deployment Forecast Model" was created. It tracked HEADSPIN's sales and ARR forecasts. Once the spreadsheet was set up, LACHWANI took control over it. The ARR calculations and projections from that point on were performed almost exclusively by LACHWANI.

49. As determined by the auditor review, HEADSPIN overstated ARR figures to investors by approximately $51 to $55 million. The overstatement was a direct result of LACHWANI's actions because the overstated ARR figures were based on LACHWANI's false and overstated direct and channel (re-seller) revenue figures.

**LACHWANI Provided False Information to Investors**

50. LACHWANI prepared, reviewed, and/or approved information HEADSPIN provided to investors. LACHWANI routinely communicated with investors in the following ways: (1) investor decks sent to prospective investors in connection with financing rounds; (2) due diligence provided to prospective investors in connection with financing rounds; (3) quarterly financial statements provided to certain investors; (4) historical and projected ARR provided to certain investors; and (5) communications with investors to discuss specific questions.

51. LACHWANI provided the investor decks to potential investors knowing that ARR was an important metric for them. LACHWANI knew ARR was supposed to be calculated based on signed contracts with committed customers. LACHWANI told investors that HEADSPIN's ARR figures reflected signed customer agreements with customers that had

already been sent HEADSPIN products and were able to use them. These statements were false and misleading.

52. In connection with soliciting interest in the Series B financing round, LACHWANI sent potential investors an investor deck with false and overstated direct and channel revenue figures, and false and overstated ARR figures.

53. The Series B investor deck included a slide addressing HEADSPIN's year over year growth. The slide reported that HEADSPIN's total 2018 1st quarter revenue was $6,043,369 and net income was $1,758,032. However, the auditor review and financial recast in 2020 determined that the actual 2018 1st quarter revenue was $1,300,381 and that HEADSPIN actually suffered a net loss of $274,250 for that period.

54. The Series B investor deck included a slide projecting HEADSPIN's ARR as $50.5 million for 2018 and $100-$130 million for 2019. However, the ARR projections were based on incorrect underlying financial data and did not account for customer attrition and other loss of business.

55. In connection with soliciting interest in the Series C financing round, LACHWANI sent potential investors an investor deck that included false information regarding HEADSPIN's historical financials and ARR projections.

**Investor 1**

56. INVESTOR 1 is an investment firm with an address in San Francisco, California.

57. In 2018, INVESTOR 1 made a Series B investment in HEADSPIN, and during that time LACHWANI communicated frequently with INVESTOR 1 representatives. Like other investors, INVESTOR 1 used ARR as a metric to assess the past and potential future financial success of HEADSPIN.

58. On or about July 29, 2019, LACHWANI met with INVESTOR 1 representatives and discussed, amongst other things, market landscape and HEADSPIN's 2019/2020 ARR forecast. The statements made by LACHWANI and the information he provided regarding HEADSPIN's revenue and ARR led INVESTOR 1 representatives to believe that HEADPSIN

11

had already achieved $65 million in ARR and that HEADSPIN expected to achieve between $74 million and $80 million in ARR by the end of 2019.

59. On or about July 31, 2019, LACHWANI emailed a HEADSPIN investor deck to a representative of INVESTOR 1. The investor deck contained a chart titled "Our Evolution is Consistent with Q-ON-Q Revenue Growth". The chart falsely claimed HEADSPIN's 2018 ARR was $42,084,253 and based on that false past claim of ARR, falsely projected HEADSPIN's 2019 ARR as $75 million.

60. On or about August 16, 2019, LACHWANI emailed an updated HEADSPIN investor deck to a representative of INVESTOR 1. The investor deck contained similar false information as the previous version but changed the projected ARR for 2019 to $76 million.

61. On or about September 30, 2019, LACHWANI emailed a HEADSPIN investor deck to several representatives of INVESTOR 1. The investor deck contained similar false information as the previous version and still had the false projected ARR for 2019 as $76 million.

62. On or about November 1, 2019, INVESTOR 1 wired approximately $15 million to HEADSPIN in connection with its HEADSPIN Series C investment.

63. In January 2020, INVESTOR 1 asked a HEADSPIN representative for further details regarding HEADSPIN's financial representations, including the company's methods for accounting for revenues. In addition, INVESTOR 1 asked that HEADSPIN conduct an audit of its financial statements.

64. In response to INVESTOR 1's request, LACHWANI became highly agitated, refused to provide the information INVESTOR 1 asked for, and refused to allow an audit. Moreover, LACHWANI sought to delay the close of the Series C investment round altogether in an effort to replace INVESTOR 1 with another investor.

**Investor 2**

65. INVESTOR 2 is an investment firm based in Texas.

66. LACHWANI communicated frequently with INVESTOR 2 representatives. Like other investors, INVESTOR 2 used ARR as a metric to gauge success.

67. On or about August 29, 2019, LACHWANI emailed INVESTOR 2's Managing Director an investor deck. The investor deck contained a chart titled "Our Evolution is Consistent with Q-ON-Q Revenue Growth". The chart falsely claimed HEADSPIN's 2018 ARR was $42,084,253 and falsely projected HEADSPIN's 2019 ARR as $76 million.

68. On or about September 5, 2019, LACHWANI spoke with representatives at INVESTOR 2 regarding HEADSPIN financials. LACHWANI falsely told them that HEADSPIN was at "67M ARR" and that he was quite confident of hitting "80M ARR" this year.

69. On or about September 10, 2019, INVESTOR 2 emailed LACHWANI a summary of proposed investment terms including an investment amount between $12.5 million and $15 million.

70. On or about September 19, 2019, LACHWANI and INVESTOR 2's Managing Director signed a "Memorandum of Terms" regarding the Series C funding round.

71. On or about October 17, 2019, LACHWANI emailed INVESTOR 2's Managing Director financial documents regarding HEADSPIN's 2019 2nd quarter revenue and HEADSPIN's forecasted 2019 3rd quarter revenue. LACHWANI wrote, "Dear (Name Omitted), Please see the full financial statements attached below.

1) The Q2 revenue came at $11.465m with a Net Income of $1.4m.

2) This was 30.55% QoQ growth.

3) We ended Q2 with ARR $54,640,595 – 70% YoY

4) For Q3, Revenue expected to be $14.5 - $15.1m

5) ARR Exiting Q3 = $66,836,755 – 84.37% YoY

6) For 2019, exit ARR forecasted (early) to be $81-$85m, this is 95-100% YoY"

72. As discussed above, the historical ARR figures LACHWANI provided were false.

73. On or about November 1, 2019, INVESTOR 2 wired approximately $15 million to HEADSPIN in connection with its HEADSPIN Series C investment.

**Investor 3**

74. INVESTOR 3 is a venture capital firm which has an office in San Francisco, CA.

75. INVESTOR 3 made a Series C investment in HEADSPIN based on the information HEADSPIN provided throughout 2019.

76. According to INVESTOR 3's General Partner, INVESTOR 3 focused on ARR because it is the most relevant metric. ARR shows evidence of traction and is the leading indicator of how many customers a business is signing up.

77. On or about June 18, 2019, INVESTOR 3's General Partner emailed LACHWANI the following question, "Hey Manish, Hope you're doing well. I'm giving our LPs our mid-year fund update in a couple days. Can you let me know roughly what you think we'll end Q2 and 2019 at in terms of ARR?" In response, LACHWANI emailed INVESTOR 3's General Partner a snippet of a chart which falsely claimed that HEADSPIN's 2019 2nd quarter ARR was $51,937,845. In addition, attached to the email was a HEADSPIN Investor Deck which falsely claimed HEADSPIN's 2019 2nd quarter ARR was $51,979, 665.

78. On or about January 5, 2020, LACHWANI emailed an INVESTOR 3 representative HEADSPIN's 2019 3rd quarter financial numbers. LACHWANI falsely stated, "ARR exiting Q3 was $66,743,755. This is 84.12% YoY Growth". LACHWANI also falsely forecasted, "ARR exiting 2019 expected to be $84 - $85m. This is ~ 100% YoY growth".

79. Notes from an INVESTOR 3 committee discussion prior to making a Series C investment in HEADSPIN state, "HeadSpin continues to perform very well by all information we've seen. The company raised and then beat its forecast for 2019 ARR multiples times during the year, and the growth rate seemed to accelerate during the year. We have full financial statements as of Q3'19 and forecasts for Q4'19."

80. On or about January 30, 2020, INVESTOR 3 wired approximately $2 million to HEADSPIN in connection with its HEADSPIN Series C investment.

14

81. According to INVESTOR 3, it trusted that HEADSPIN's financial information was correct and felt comfortable making the investment because ARR was the most important metric and HEADSPIN's numbers appeared very strong.

82. In February 2020, HEADSPIN successfully completed its Series C fundraising and raised $60 million, at share prices ostensibly making it worth over one billion dollars—a so-called "unicorn" in Silicon Valley parlance.

83. The grossly overstated ARR and revenues were important to investors who participated in HEADSPIN's offerings because those metrics were directly related to the growth and success of HEADSPIN's business and the likelihood that investors would see a return on their investments in the company.

**Use of Interstate Wires and the Purchase and Sale of Securities**

84. As part of the scheme to defraud described above, LACHWANI caused the following interstate wire transmissions:

   a. On or about November 1, 2019, INVESTOR 1 paid HEADSPIN a total of about $15 million in connection with the Series C investment round, using the Fedwire fund transfer system, including one wire from an account held at First Republic Bank to a Wells Fargo Bank account in the amount of $7,748,401.27.

   b. On or about January 30, 2020, INVESTOR 3 paid HEADSPIN a total of approximately $2 million in connection with the Series C investment round, using the Fedwire fund transfer system, including a wire from an account held at Silicon Valley Bank to a Wells Fargo Bank account in the amount of $1,999,962.76.

85. In exchange for investments in the Series B and Series C rounds, investors were issued shares of HEADSPIN stock. Based on my training and experience, I believe that stock is considered a security under the provisions of 15 U.S.C. § 78j(b) and 17 C.F.R. § 240.10b-5, and that therefore the misrepresentations to existing and potential investors were in connection with the purchase and sale of securities.

## CONCLUSION

86. Based on the foregoing, it is my opinion that there is probable cause to believe that LACHWANI committed Wire Fraud, in violation of 18 U.S.C. § 1343, and Securities Fraud, in violation of 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5. Accordingly, I respectfully request that a warrant for the arrest of LACHWANI be issued.

## REQUEST FOR SEALING

87. I respectfully request that the Court issue an order sealing, until further order of the Court, the Criminal Complaint and all papers submitted in support of this Criminal Complaint, including this affidavit. I believe that sealing is necessary in order to effectuate the orderly arrest of LACHWANI and in order to guard against flight and destruction of evidence.

I declare under penalty of perjury that the above is true and correct to the best of my knowledge.

/s/ David Dahle
Dahle, David (SF) (FBI)
Special Agent
Federal Bureau of Investigation

Sworn to before me over the telephone and signed by me pursuant to Fed.R.Crim.P 4.1 and 4(d) on this 20th day of August 2021.

HON. JOSEPH C. SPERO
Chief United States Magistrate Judge