# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

**FILED**

Aug 04 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COVER SHEET

*__Instructions:__ Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case.*

| | |
|---|---|
| **CASE NAME:** USA v. Manish Lachwani | **CASE NUMBER:** CR 21-cr-00353 CRB |
| **Is This Case Under Seal?** | Yes    No ✔ |
| **Total Number of Defendants:** | 1 ✔    2-7    8 or more |
| **Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326?** | Yes    No ✔ |
| **Venue (Per Crim. L.R. 18-1):** | SF ✔    OAK    SJ |
| **Is this a potential high-cost case?** | Yes    No ✔ |
| **Is any defendant charged with a death-penalty-eligible crime?** | Yes    No ✔ |
| **Is this a RICO Act gang case?** | Yes    No ✔ |
| **Assigned AUSA (Lead Attorney):** Noah Stern | **Date Submitted:** August 3, 2022 |
| **Comments:** | |

Form CAND-CRIM-COVER (Rev. 11/16)

[RESET FORM]   [SAVE PDF]

# United States District Court

## FOR THE
## NORTHERN DISTRICT OF CALIFORNIA

VENUE: SAN FRANCISCO

FILED

Aug 04 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES OF AMERICA,

V.

Manish Lachwani

DEFENDANT(S).

## INDICTMENT

18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 1957 – Money Laundering;
15 U.S.C. § 78j(b) and 78ff, 17 C.F.R. § 240.10b-5- Securities Fraud
18 U.S.C. § 2 – Aiding and Abetting;
18 U.S.C. §§ 981(a)(1)(C), 982, & 28 U.S.C. § 2461(c) – Criminal Forfeiture

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this 3rd day of

August, 2022.

Clerk

Bail, $ No Process

Magistrate Judge Sallie Kim

STEPHANIE M. HINDS (CABN 154284)
United States Attorney

FILED

Aug 04 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>MANISH LACHWANI<br><br>    Defendant. | CASE NO. 21-CR-00353 CRB<br><br>VIOLATIONS:<br>18 U.S.C. § 1343 – Wire Fraud;<br>18 U.S.C. § 1957 – Money Laundering;<br>15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 – Securities Fraud;<br>18 U.S.C. § 2 – Aiding and Abetting;<br>18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(1) – Forfeiture Allegation<br><br>SAN FRANCISCO VENUE |

S U P E R S E D I N G   I N D I C T M E N T

The Grand Jury charges:

<u>Introductory Allegations</u>

At all times relevant to this Superseding Indictment:

1.    The defendant, Manish Lachwani ("LACHWANI"), resided in Los Altos, California, in the Northern District of California. In 2015, LACHWANI founded HeadSpin, Inc. ("Headspin"), a company based in Palo Alto, California, in the Northern District of California. From 2015 until in or about May 2020, LACHWANI was Headspin's Chief Executive Officer.

2.    Headspin is a corporation organized under the laws of the State of Delaware with its principal place of business in Palo Alto, California. Headspin opened and maintained corporate bank

SUPERSEDING INDICTMENT

accounts in Mountain View, California at Wells Fargo Bank and brokerage accounts at LPL Financial. When Headspin solicited and received financial investments from investors, the money was deposited in its Wells Fargo or LPL Financial accounts.

3. The entity identified in this Superseding Indictment as "Investor 1," was an investment firm located in San Francisco, California, in the Northern District of California. Investor 1 maintained a bank account in San Francisco, California at First Republic Bank.

4. The entity identified in this Superseding Indictment as "Investor 2," was an investment firm based in Texas.

5. The entity identified in this Superseding Indictment as "Investor 3," was an investment firm with an office in San Francisco, California. Investor 3 maintained a bank account at Silicon Valley Bank.

6. The investors identified as "Investor 4," "Investor 5," and "Investor 6" were persons that made investments in Headspin.

<u>Headspin's Business</u>

7. Headspin provided its corporate clients with software and access to remote devices around the world that allowed the clients to remotely test mobile applications on different devices and networks in those locations.

8. Headspin provided customers access to its software and services on a subscription model, charging customers based on the number of remote devices the customer could use to remotely test its mobile applications using Headspin software. By subscribing, customers gained access to Headspin's software for a particular length of time. Headspin sold its software and services both directly to end users and indirectly through resellers which, in turn, sold Headspin's software to end users. For direct sales, Headspin contracted directly with an end user. For indirect sales, an end user purchased Headspin's software and services through a reseller.

9. To fund its operations, Headspin completed four major rounds of financing. Between approximately August and September 2015, Headspin raised approximately $11 million in a Series A preferred stock offering. Between approximately April 2017 and May 2018, Headspin raised approximately $24.7 million in a series of issuances of convertible promissory notes. Between

approximately September and October 2018, Headspin raised approximately $20 million in a Series B preferred stock offering. The Series B stock offering valued Headspin at approximately $500 million. Between approximately November 2019 and April 2020, Headspin raised approximately $60 million from investors in a Series C preferred stock offering. The Series C stock offering valued Headspin at approximately $1.1 billion. In total, Headspin raised more than $110 million.

10. Headspin used the software-as-a-service ("SaaS") revenue model, which is when an end user licenses software on a subscription basis and revenue is recognized ratably over the period of the subscription. As with most SaaS businesses, annual recurring revenue, or "ARR," was an important metric for HEADSPIN investors. ARR is a measure of the total revenue expected per year from committed customers with signed contracts. The goal of the metric is to give investors insight into a company's future revenue performance based on its current subscriptions.

11. LACHWANI maintained close control over Headspin's operations, sales, and record-keeping. LACHWANI controlled and was aware of significant aspects of the company's financial information, including financial figures, sales and customer information, and restricted employees from speaking with each other about the company's finances.

12. Headspin did not have formal accounting controls, policies, procedures, or a Chief Financial Officer. LACHWANI was the final decision-maker regarding when, how, and whether the company would record sales and revenue.

### The Scheme to Defraud

13. From a time unknown but no later than in or about December 2016 and through in or about April 2020, LACHWANI engaged in a scheme, plan, and artifice to defraud Headspin investors as to a material matter, and obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, by making materially false and misleading statements, and failing to disclose material facts with a duty to disclose.

14. Beginning in or about December 2016, LACHWANI knowingly and intentionally made materially false and misleading statements to investors and failed to disclose material facts, using the following manner and means, among others: (1) causing Headspin to record revenue and include in ARR tabulations amounts from purported customers that had not agreed to purchase Headspin's

SUPERSEDING INDICTMENT        3

software and services or to pay for software and services, (2) falsely inflating Headspin's revenue and ARR from real Headspin customers and resellers, including continuing to include in ARR tabulations amounts from customers that previously terminated their Headspin contracts, (3) causing false invoices to be created and sent to Headspin finance staff in order to reduce Headspin's unbilled receivables and conceal the false and inflated revenue LACHWANI had caused Headspin to record, (4) communicating false financial and sales information to investors, (5) communicating materially false information about Headspin's product and customer adoption to investors, and (6) using significant amounts of company and investor funds to make unauthorized, high-risk investments in the stock market and failing to disclose the risky investment of company funds to investors, shareholders, and the board of directors.

15. Beginning no later than in or about December 2016, LACHWANI sent a Headspin accountant false and inflated sales information that he instructed her to record as revenue in Headspin's financial statements. LACHWANI sent Headspin's accountant purchase orders he knew the customer had not agreed to pay and unsigned contracts he knew had not been finalized or approved by the customer. This caused Headspin's financial metrics to be materially overstated in its financial statements, including Headspin's revenue, revenue growth, and profit metrics. LACHWANI also sent Headspin's accountant forged and altered invoices to decrease Headspin's unbilled receivables in an effort to conceal the fake revenue numbers LACHWANI had previously caused Headspin's accountant to record. LACHWANI knowingly and intentionally transmitted these false financial statements to potential investors to obtain their investments in Headspin and to inflate Headspin's valuation in connection with Headspin's capital raises.

16. In or about October 2017, LACHWANI asked a Headspin employee to prepare a template that LACHWANI could use to record and forecast Headspin's ARR. The employee created a shared spreadsheet that LACHWANI subsequently controlled and used to track Headspin's sales and ARR, including at the customer level. LACHWANI falsified the spreadsheet by (1) indicating that Headspin was receiving ARR from certain companies that did not subscribe to Headspin's software and services, (2) overstating ARR from certain customers and resellers who were Headspin customers at lower dollar amounts than was represented in the spreadsheet, and (3) leaving customers (and corresponding ARR) in the spreadsheet after those customers had terminated their Headspin

SUPERSEDING INDICTMENT          4

subscriptions and thus were no longer paying Headspin. LACHWANI used the information and calculations in the spreadsheet in investor decks that were communicated to potential investors, and also shared the spreadsheet itself with certain investors.

17. For example, LACHWANI caused the following false sales, revenue, and ARR information to be incorporated into Headspin's financial statements, information, and forecasts:

    a. In or about December 2016, LACHWANI instructed Headspin's accountant to record revenue in connection with a purported $1.355 million deal between Headspin and a company that creates and markets video games ("Non-Customer 1") even though LACHWANI knew that Non-Customer 1 was not a Headspin customer and never became a customer. LACHWANI also provided Headspin's accountant an unsigned service agreement purportedly between Non-Customer 1 and Headspin and Headspin's accountant subsequently recorded revenue.

    b. LACHWANI caused Headspin to record $92,000 of ARR from a national media company ("Non-Customer 2") even though he knew that Non-Customer 2 was not a Headspin customer.

    c. LACHWANI caused Headspin to record $225,000 of revenue in 2018 from a major Silicon Valley technology company ("Non-Current Customer 1") even though LACHWANI knew Non-Current Customer 1 ended its subscription in approximately July 2017 and only ever purchased a total of approximately $144,900 of software and services from Headspin.

    d. LACHWANI caused Headspin to record $1.44 million of ARR from a major technology company based in San Francisco ("Non-Current Customer 2") even though LACHWANI knew the company ended its subscription and only ever purchased a total of approximately $720,000 of software and services from Headspin. LACHWANI created three fake invoices that were never issued to Non-Current Customer 2 and submitted them to Headspin's accountant.

    e. LACHWANI caused Headspin to record $250,000 of ARR from a major credit card company ("Non-Current Customer 3") even though LACHWANI knew

SUPERSEDING INDICTMENT            5

Non-Current Customer 3 canceled its subscription after less than a year and the annual value of Non-Current Customer 3's contract prior to cancellation was only $132,000.

    f.   LACHWANI caused Headspin to record over $20 million of ARR from a reseller based in India ("Reseller 1") even though LACHWANI knew that actual ARR from Reseller 1 was materially less.

    g.   LACHWANI caused Headspin to record over $10 million of ARR from a reseller based in Australia ("Reseller 2") even though LACHWANI knew that actual ARR from Reseller 2 was materially less. LACHWANI altered or caused to be altered invoices that had been issued to Reseller 2 before sending them to Headspin's accountant. For example, on approximately March 26, 2019, Headspin issued Reseller 2 an invoice for $81,600 Australian Dollars (AUD) that was subsequently paid. LACHWANI received a copy of the invoice. On approximately June 28, 2019, LACHWANI sent Headspin's accountant an altered version of the same invoice in the amount of $381,600 United States dollars (USD). On the same day, LACHWANI sent three other altered invoices to Headspin's accountant. These invoices had been changed from $21,250 USD to $212,400 USD, $64,100 USD to $300,500 USD, and $243,150 USD to $1,187,150 USD. These falsified invoices were never submitted to Reseller 2 and Headspin never received payment for the falsified amounts.

18.    In 2017, in connection with soliciting interest in convertible promissory notes, LACHWANI sent potential investors decks that contained false and overstated revenue and profit figures, false and overstated ARR figures, and false product information. These metrics were material to the valuation of Headspin and to investors' decisions to purchase convertible notes in Headspin. For example, one investor deck provided to Investor 3 falsely stated that Headspin's ARR was $8,336,000 at the end of 2016 and $17,640,500 at the end of the third quarter of 2017. The deck also included slides on Headspin's financials that materially overstated Headspin's revenue and profit.

19.    The decks sent to potential investors in connection with Headspin's convertible notes

SUPERSEDING INDICTMENT         6

offerings included materially false representations about Headspin's customers and services. For example, one deck provided to investors represented that Headspin operated over 22,000 devices on its remote testing network in 150 cities and 80 countries, when in fact, Headspin operated fewer than 3,000 devices on its network in fewer cities and countries. The deck also stated that Headspin was "trusted" by more than 1,000 companies worldwide when Headspin, in fact, had far fewer customers. In communicating these false statements to potential investors, LACHWANI knowingly misrepresented Headspin's customer success and adoption.

20. In or about the Summer and Fall of 2018, in connection with soliciting interest in the Series B financing round, LACHWANI sent potential investors decks that contained false and overstated revenue and profit figures, false and overstated ARR figures, and false product information. These metrics were material to the valuation of Headspin and to investors' decisions to purchase stock in Headspin. For example, one version of the deck sent to potential investors falsely stated that Headspin's ARR was $33,775,997 as of the second quarter of 2018, when in fact Headspin's actual ARR at that time was less than half that amount. The deck also contained false and misleading ARR projections for future quarters and years. Further, the deck provided purported total revenue figures from certain customers and resellers, some of which was materially overstated. The deck also included a slide on Headspin's financials that materially overstated Headspin's revenue and profit.

21. The decks sent to investors in connection with the Series B offering also included materially false representations about Headspin's customers and services. For example, one deck provided to investors represented that Headspin operated over 25,000 devices on its remote testing network, when in fact, Headspin operated fewer than 3,000 devices on its network. The deck also included logos of companies that either had never subscribed to Headspin's services or had previously terminated Headspin's services. The deck further falsely claimed that Headspin had "No Customer Loss," which was not true. In communicating these false statements to potential investors, LACHWANI knowingly misrepresented Headspin's customer success and adoption.

22. On April 10, 2019, LACHWANI emailed Investor 1 Headspin's 2018 financial statements. These financial statements contained materially false representations, including materially false and inflated revenue and profit metrics. In May 2019, LACHWANI sold 68,000 of his personal

1  Headspin shares to Investor 1 for approximately $2.5 million. The price per share of the transaction
2  valued Headspin at approximately $750 million.
3       23.    In or about the Summer and Fall of 2019, in connection with soliciting interest in the
4  Series C financing round, LACHWANI sent potential investors decks containing false and overstated
5  revenue and profit figures, false and overstated ARR figures, and false product information. For
6  example, one of the decks sent to investors falsely stated that Headspin's ARR was $54,658,095 as of
7  the second quarter of 2019, when Headspin's actual ARR was less than a quarter of that amount. The
8  deck also contained false and misleading ARR projections for future quarters and years. A different
9  deck sent to Investor 3 prior to its Series C investment falsely stated that Headspin had revenues of over
10 $35 million over the first three quarters of 2019 when, in fact, Headspin's revenues for that time period
11 were less than $8 million.
12      24.    The decks sent to investors in connection with the Series C offering also expanded the
13 materially false representations about Headspin's customers and services. For example, one of the decks
14 sent to investors represented that Headspin operated over 32,000 devices, when in fact, Headspin
15 operated fewer than 3,000 devices on its network. The deck also included logos of additional companies
16 that had never contracted for Headspin's services or had terminated Headspin's services. In
17 communicating these false statements to potential investors, LACHWANI continued to knowingly
18 misrepresent Headspin's customer success and adoption.
19      25.    After receiving false and misleading statements, misrepresentations, and omissions from
20 LACHWANI and Headspin, persons and entities known to the Grand Jury as Investors 1, 2, 3, 4, 5, and
21 6 initiated electronic wire transfers for the purpose of investing money in Headspin. These wires,
22 specifically alleged below, used a domestic electronic funds transfer system known as the Fedwire
23 system, which is owned and operated by the United States Federal Reserve system. All Fedwire wire
24 transfers were electronically routed through Fedwire centers outside of California and into Headspin's
25 bank account in the Northern District of California, or, with respect to Count 1, from Investor 3's bank
26 account in the Northern District of California to Headspin's LPL Financial brokerage account, or with
27 respect to Count 6, from Investor 1's bank account in the Northern District of California to
28 LACHWANI's personal brokerage account at LPL Financial. All of the wire transfers alleged in this

SUPERSEDING INDICTMENT                  8

Superseding Indictment travelled between one state and another state.

26. LACHWANI maintained and controlled a brokerage account held in the name of Headspin from at least in or about April 2017 until in or about April 2020. LACHWANI transferred large amounts of Headspin funds into that brokerage account, including funds obtained from investors in the Series B and Series C financing rounds, and the brokerage account held the majority of the Headspin's cash on hand. The Headspin cash on hand was intended to fund the company's continued operation, and investors, shareholders, and board members expected these funds to be invested in conservative and safe investment vehicles such as money market funds and certificates of deposit. Instead, contrary to earlier instructions and guidance from a Headspin board member that investor funds should be held in conservative instruments, LACHWANI used those funds to make risky bets in the stock market including purchasing technology company stocks and stock options. For example, on or about December 31, 2018, the brokerage account held assets valued at approximately $35,164,318, and approximately 97.38 percent of that amount was allocated to shares of stock and stock options of technology and financial companies, with only approximately 2.62 percent in cash or cash equivalents. At another point, on or about March 31, 2020, the brokerage account held assets valued at approximately $54,038,192, and approximately 93.58 percent of that amount was allocated to shares of stock and stock options of technology and financial companies, with only approximately 6.42 percent in cash or cash equivalents. These risky investments exposed Headspin and its investors and shareholders to risks inconsistent with LACHWANI's statements and contrary to his fiduciary duty to the company and its shareholders. LACHWANI had a duty to disclose these investments to Headspin's directors and investors, but he concealed these risky investments from them.

27. The convertible promissory notes purchased by Headspin's investors were investment contracts and constitute securities under the provisions of Title 15, United States Code, Section 78j(b) and Title 17, Code of Federal Regulations, Section 240.10b-5.

28. Investors in Headspin's Series B and C offerings were issued shares of Headspin stock, and those shares of Headspin constitute securities under the provisions of Title 15, United States Code, Section 78j(b) and Title 17, Code of Federal Regulations, Section 240.10b-5. LACHWANI's misrepresentations alleged were in connection with the purchase and sale of Headspin shares and

SUPERSEDING INDICTMENT                    9

convertible promissory notes.

COUNTS ONE THROUGH ELEVEN: (18 U.S.C. §§ 1343 and 2 – Wire Fraud)

29. Paragraphs 1 through 30 of this Superseding Indictment are re-alleged and incorporated as if fully set forth here.

30. From a time unknown but no later than in or about December 2016 through in or about April 2020, within the Northern District of California and elsewhere, the defendant,

MANISH LACHWANI,

knowingly and with the intent to defraud participated in, devised, and intended to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts, and for the purpose of executing the aforementioned scheme and artifice to defraud, did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of wire communications, certain writings, signs, signals, pictures, and sounds, that is electronic funds transfers and payments, or stock purchase orders transmitted in interstate commerce, as set forth below:

| COUNT | DATE | AMOUNT | WIRE TRANSMISSION |
|---|---|---|---|
| 1 | 1/19/2018 | $1,000,000.00 | Wire transfer from Investor 3's Silicon Valley Bank account to Headspin's LPL Financial brokerage account |
| 2 | 9/12/2018 | $1,033,115.69 | Wire transfer from Investor 1's First Republic Bank account to Headspin's Wells Fargo account |
| 3 | 9/18/2018 | $1,000,000.00 | Wire transfer from Investor 4's JP Morgan Chase account to Headspin's Wells Fargo account |
| 4 | 10/15/2018 | $199,980.13 | Wire transfer from Investor 5's Charles Schwab account to Headspin's Wells Fargo account |
| 5 | 10/15/2018 | $1,664,997.70 | Wire transfer from Investor 3's Silicon Valley Bank account to Headspin's Wells Fargo account |
| 6 | 5/30/2019 | $1,291,756.36 | Wire transfer from Investor 1's First Republic Bank account to LACHWANI's LPL Financial brokerage account |
| 7 | 11/1/2019 | $7,748,401.27 | Wire transfer from Investor 1's First Republic Bank account to Headspin's Wells Fargo account |
| 8 | 11/1/2019 | $14,999,988.43 | Wire transfer from Investor 2's JP Morgan Chase account to Headspin's Wells Fargo account |
| 9 | 1/30/2020 | $1,999,962.76 | Wire transfer from Investor 3's Silicon Valley Bank account to Headspin's Wells Fargo account |

| COUNT | DATE | AMOUNT | WIRE TRANSMISSION |
|---|---|---|---|
| 10 | 2/24/2020 | $3,462,120.00 | Stock purchase order for 100,000 shares of Virgin Galactic Holdings Inc., public company traded on the New York Stock Exchange, executed a price of $34.6212 per share |
| 11 | 2/25/2020 | $49,997.86 | Wire transfer from Investor 6's JP Morgan Chase account to Headspin's Wells Fargo account |

All in violation of Title 18, United States Code, Sections 1343 and 2.

COUNT TWELVE:   (18 U.S.C. § 1957 – Money Laundering)

31.   Paragraphs 1 through 32 of this Superseding Indictment are re-alleged and incorporated as if fully set forth here.

32.   On or about the date listed in the table below, such dates being approximate, in the Northern District of California and elsewhere, the defendant,

MANISH LACHWANI,

knowingly engaged in the following monetary transaction, in and affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity in excess of $10,000, specifically wire fraud, in violation of 18 U.S.C. § 1343, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity as follows:

| COUNT | DATE | DESCRIPTION OF THE MONETARY TRANSACTION |
|---|---|---|
| 12 | 6/6/2019 | Purchase of Advanced Micro Devices Inc. stock for $2,002,469.05. |

All in violation of Title 18, United States Code, Sections 1957.

COUNTS THIRTEEN THROUGH SIXTEEN:   (15 U.S.C. § 78j(b) and 78ff; 17 C.F.R. § 240.10b-5 – Securities Fraud)

33.   Paragraphs 1 through 34 of this Superseding Indictment are re-alleged and incorporated as if fully set forth here.

34.   Beginning at an unknown date, but no later than in or about December 2016, and continuing to in or about April 2020, both dates being approximate and inclusive, in the Northern District of California and elsewhere, the defendant,

MANISH LACHWANI,

SUPERSEDING INDICTMENT                    11

willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, specifically, the use of the above devices, schemes and artifices to defraud, false statements and omissions of material facts, and acts of fraud and deceit in connection with the following securities offerings to investors conducted during the following approximate time periods:

| COUNT | DATE | OFFERING |
| --- | --- | --- |
| 13 | December 2017 to January 2018 | Convertible promissory notes issued to Investor 3 and others |
| 14 | August to September 2018 | Series B Preferred Stock Offering |
| 15 | May 2019 | LACHWANI secondary sale of 68,000 Headspin shares to Investor 1 |
| 16 | November 2019 to April 2020 | Series C Preferred Stock Offering |

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of Federal Regulations, Section 240.10b-5.

FORFEITURE ALLEGATION:   (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(1))

35.   The allegations contained in this Superseding Indictment are re-alleged and incorporated by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

36.   Upon conviction for any of Counts One through Eleven, and Counts Thirteen through Sixteen, as set forth in this Superseding Indictment, the defendant,

MANISH LACHWANI,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461(c), all property, real or personal, constituting, or derived

from proceeds the defendant obtained directly and indirectly, as the result of those violations, including, but not limited to, a forfeiture money judgment.

37. Upon conviction for the offense set forth in Count Twelve of this Superseding Indictment, the defendant,

MANISH LACHWANI,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real or personal, involved in said violations, or any property traceable to such property, including, but not limited to, all Advanced Micro Devices Inc. stock purchased on June 6, 2019, and a forfeiture money judgment.

If any of the property described above, as a result of any act or omission of the defendant:

    a. cannot be located upon exercise of due diligence;
    b. has been transferred or sold to, or deposited with, a third party;
    c. has been placed beyond the jurisdiction of the court;
    d. has been substantially diminished in value; or
    e. has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

//
//
//
//
//
//
//
//
//
//

1  All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States
2  Code, Section 2461(c); Title 18, United States Code, Section 982(a)(1); and Federal Rule of Criminal
3  Procedure 32.2.

5  DATED:    August 3, 2022                              A TRUE BILL.

7                                                              /s/
                                                          FOREPERSON

9  STEPHANIE M. HINDS
   United States Attorney

11        /s/
   LLOYD FARNHAM
12 NOAH STERN
   ROSS WEINGARTEN
13 Assistant United States Attorneys

SUPERSEDING INDICTMENT            14

# DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

**BY:** ☐ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT  ☒ SUPERSEDING

**Name of District Court, and/or Judge/Magistrate Location**
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

## OFFENSE CHARGED

18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 1957 - Money Laundering
15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 – Securities Fraud;
18 U.S.C. §§ 981(a)(1)(C), 982, & 28 U.S.C. § 2461(c) – Criminal Forfeiture

☐ Petty
☐ Minor
☐ Misdemeanor
☒ Felony

**PENALTY:** See attachment

**DEFENDANT - U.S**
Manish Lachwani

**DISTRICT COURT NUMBER**
21-CR-00353 CRB

**FILED**
Aug 04 2022
Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## PROCEEDING

**Name of Complaintant Agency, or Person (& Title, if any)**
FBI Special Agent James Burstein

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY  ☐ DEFENSE

**SHOW DOCKET NO.**

☒ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

**MAGISTRATE CASE NO.**

**Name and Office of Person Furnishing Information on this form**
Stephanie M. Hinds
☒ U.S. Attorney  ☐ Other U.S. Agency

**Name of Assistant U.S. Attorney (if assigned)**
Noah Stern

## DEFENDANT

**IS NOT IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☐ If not detained give date any prior summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☒ Is on Bail or Release from (show District)
NDCA

**IS IN CUSTODY**
4) ☐ On this charge
5) ☐ On another conviction  ☐ Federal  ☐ State
6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  ☐ No
If "Yes" give date filed

**DATE OF ARREST** ▶ Month/Day/Year

Or... if Arresting Agency & Warrant were not
**DATE TRANSFERRED TO U.S. CUSTODY** ▶ Month/Day/Year

☐ This report amends AO 257 previously submitted

## ADDITIONAL INFORMATION OR COMMENTS

**PROCESS:**
☐ SUMMONS  ☒ NO PROCESS*  ☐ WARRANT    Bail Amount:

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

**Defendant Address:**

* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time:    Before Judge:

Comments:

# Penalty Sheet Attachment

# United States v. Lachwani, 21-cr-00353 CRB

**Counts 1-11: Wire Fraud, 18 U.S.C. § 1343**

- Maximum Sentence: 20 years
- Maximum Fine: $250,000 or twice the gross gain or loss
- Maximum Length of Supervised Release: 3 years
- Restitution
- Special Assessment of $100 per felony count
- Forfeiture

**Count 12: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, 18 U.S.C. § 1957**

- Maximum Sentence: 10 years
- Maximum Length of Supervised Release: 3 years
- Maximum Fine: $250,000 or twice the amount of the criminally derived property involved in the transaction
- Restitution
- Special Assessment of $100
- Forfeiture

**Counts 13-16: Securities Fraud, 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5**

- Maximum Sentence: 20 years
- Maximum Fine: $5,000,000
- Maximum Length of Supervised Release: 3 years
- Restitution
- Special Assessment of $100 per felony count
- Forfeiture