1  ISMAIL J. RAMSEY (CABN 189820)
   United States Attorney
2
   THOMAS A. COLTHURST (CABN 99493)
3  Chief, Criminal Division

4  LLOYD A. FARNHAM (CABN 202231)
   NOAH STERN (CABN 297476)
5  Assistant United States Attorneys

6      450 Golden Gate Avenue, Box 36055
       San Francisco, California 94102-3495
7      Telephone: (415) 436-7200
       FAX: (415) 436-7234
8      Noah.Stern@usdoj.gov

9  Attorneys for United States of America

10                 UNITED STATES DISTRICT COURT

11               NORTHERN DISTRICT OF CALIFORNIA

12                   SAN FRANCISCO DIVISION

13

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) **CASE NO. CR 21-353-CRB** |
| Plaintiff, | ) **DECLARATION OF SANA OKMYANSKAYA** |
| v. | ) |
| MANISH LACHWANI, | ) |
| Defendant. | ) |

I, Sana Okmyanskaya, declare and state as follows:

1.      In 2004, I received a Bachelor of Science degree in financial services from San Francisco State University.  Since approximately 2007, I have operated a sole proprietorship called WeLoveStartups, through which I provide bookkeeping services to startup companies.  The bookkeeping services I provide typically include recording corporate transactions in QuickBooks (or other accounting software) and preparing financial statements.

2.      In 2015, Manish Lachwani reached out to me to ask that I provide bookkeeping services to HeadSpin, Inc., a company that he had founded.  I had met Mr. Lachwani before 2015 because I had previously provided bookkeeping services to Appurify, a company at which Mr. Lachwani served as

1   Chief Technology Officer.  In 2015, I began providing bookkeeping services to HeadSpin, Inc. on a

2   part-time basis.  The time I spent working for HeadSpin increased over time, but it was less then 7% of

3   my work until 2019, when I transitioned to working for HeadSpin as a full-time contractor with the title

4   Head of Finance.

5          3.      Before joining HeadSpin full-time, my work for HeadSpin involved making journal

6   entries in QuickBooks and, after each quarter, preparing financial statements.  The information I used to

7   do my work came either from Mr. Lachwani or from HeadSpin financial account information that Mr.

8   Lachwani allowed me to access.  For the purpose of making revenue-related journal entries, I used

9   information provided to me by Mr. Lachwani.

10         4.      At the end of each quarter, Mr. Lachwani would provide me information about

11  HeadSpin's contracts with customers.  For example, Mr. Lachwani would send me an email stating that

12  certain companies had entered contracts to use HeadSpin's services and tell me the value of those

13  contracts.  Mr. Lachwani generally did not send me final contracts for the transactions he said HeadSpin

14  entered into with customers, even though I had repeatedly requested such contracts.  I often asked Mr.

15  Lachwani follow up questions about the contracts with customers for purposes of determining how to

16  make the journal entries.  Based on conversations with Mr. Lachwani, I understood that HeadSpin was

17  offering software as a service to its customers, that customers would purchase subscriptions to

18  HeadSpin's services, and that subscription revenue was to be recognized ratably over the course of the

19  subscription.  We also both understood that HeadSpin sometimes charged customers non-subscription

20  fees, such as startup costs, revenue from which would be recognized in the quarter that the services were

21  provided.  With respect to the contracts Mr. Lachwani said HeadSpin had entered into with customers,

22  Mr. Lachwani would tell me how much revenue to recognize on a quarterly basis.

23         5.      After I completed revenue journal entries in QuickBooks based on the information Mr.

24  Lachwani provided me after each quarter, I generated a spreadsheet listing revenue per customer, and

25  the total revenue for the quarter.  Mr. Lachwani would either approve the revenue entries by telling me

26  they were correct or would provide me additional information, such as telling me that I was missing

27  revenue from a company that Mr. Lachwani said was a customer.  If that were the case, I would make

28  additional journal entries and then resend the revenue spreadsheet to Mr. Lachwani for approval.  On at

DECLARATION OF SANA OKMYANSKAYA          2
CR 21-353-CRB

least one occasion, Mr. Lachwani told me that a customer had paused its subscription with HeadSpin and that I should not record revenue from that customer for the quarter.  I followed Mr. Lachwani's instructions.  Mr. Lachwani later told me to resume recognizing revenue for that company.  I used the revenue information that Mr. Lachwani provided me to prepare HeadSpin's financial statements.  I now recognize that I should have required Mr. Lachwani to provide me with supporting documentation for the revenue he instructed me to recognize.  At the time, I believed that Mr. Lachwani had the contracts but was too busy to provide me with the documentation because, based on my interactions with him, he seemed very busy and seemed often to work late into the night.

6.    Once revenue was booked, it would be recorded against one of three different accounts - unbilled receivable, accounts receivable, or cash.  The unbilled receivable account was for revenue that I thought could be recognized because Mr. Lachwani told me there was a contract, and HeadSpin was providing services, but the customer had not been invoiced.  Once HeadSpin sent an invoice to the customer for payment, the amount would be credited to the unbilled receivable account and debited to accounts receivable.  When the customer had paid, the amount would be credited from accounts receivable and debited to cash.  I would generally credit unbilled receivable and debit accounts receivable when I received a copy of an invoice demonstrating that HeadSpin had sought payment from the customer.

7.    I prepared financial statements for HeadSpin that showed a high unbilled receivable balance.  Over time, Mr. Lachwani gave me various explanations for this high balance.  At first, Mr. Lachwani told me that the balance was high because HeadSpin wanted to hold off sending invoices to certain customers until it had finished building certain features for them.  In approximately mid-2019, investors raised concerns about the high balance in HeadSpin's unbilled receivable account.  In connection with responding to those concerns, Mr. Lachwani told me that a large portion of that balance related to amounts that ended up being withheld by resellers because they provided support services in connection with HeadSpin's software.  Specifically, Mr. Lachwani told me that resellers completed large deals with end customers for HeadSpin's services for which the reseller was supposed to receive a 20% commission.  Mr. Lachwani told me that HeadSpin was supposed to provide support to the end customers, but HeadSpin did not have enough bandwidth to provide the support, and the reseller was

providing the support to the customers instead.  Mr. Lachwani said that the reseller invoiced the end customer directly, deducted the 20% commission and the cost of the customer support fees, and then remitted the balance to HeadSpin.  Mr. Lachwani instructed me to decrease the amounts in unbilled receivable for reseller transactions and book these amounts as an expense.

8.     I reached out to HeadSpin's CPA firm about what Mr. Lachwani told me and about how this practice impacted HeadSpin's tax returns.  The CPA firm told me that approach of booking an expense and reducing net profit was acceptable from a tax perspective.

9.     I would later learn that what Mr. Lachwani told me about the reseller arrangements was not true.  Based on the investigation of HeadSpin contracts and customer relationships after Mr. Lachwani left the company, I learned that there was no such arrangement with resellers where they would provide support services if HeadSpin did not have the bandwidth.   I also learned that Mr. Lachwani had often asked me to book as HeadSpin revenue the entire amount of a contract between the reseller and an end customer even though HeadSpin was only to be paid a small portion of the contract value for subscription fees, and the remainder of the contract was either unrelated to HeadSpin or not payable to HeadSpin.

10.    Between approximately May and July 2020, I assisted KPMG in its work to prepare accurate historical revenue and ARR statements for HeadSpin.  During that process, KPMG requested documents and information relating to companies that were listed in HeadSpin documents as customers. I worked in conjunction with other HeadSpin employees to locate and provide all relevant documents that HeadSpin had in its possession to KPMG.  As part of this process, I sent emails to Mr. Lachwani requesting any relevant documents he had in his possession.  He sent me contracts, purchase orders, and invoices.  I provided the documents Mr. Lachwani sent me to KPMG.  I also provided HeadSpin's bank statements to KPMG.

11.    Based on my work collecting documents for KPMG and assisting with HeadSpin's financial reporting after Mr. Lachwani left the company, I learned that Mr. Lachwani had provided me false information about HeadSpin's relationships with customers in connection with my bookkeeping work.  I learned that the contract and revenue numbers Mr. Lachwani provided me were significantly higher than the reality of HeadSpin's relationships with its customers, assuming a customer relationship

1  actually existed.  There were some companies that Mr. Lachwani told me HeadSpin had contracts with

2  that were not HeadSpin customers.  In total, about three quarters of the revenue in the financial

3  statements I prepared was not included in the revenue amounts in the corrected historical financial

4  records because the information Mr. Lachwani gave me was false.

5        12.     As part of my work with KPMG, I had visibility into KPMG's revenue and ARR

6  calculations.  Based on my personal knowledge working at HeadSpin and my work with KPMG, I

7  believe that KPMG's work presents an accurate picture of HeadSpin's revenue and ARR during the time

8  period the calculations cover.  I am not aware of any actual large agreements HeadSpin entered into with

9  customers, or any large payments received from customers, that KPMG did not record as revenue based

10  on applicable accounting rules.  In other words, based on my knowledge, I do not believe KPMG's

11  calculations were substantially lower than the metrics provided to investors because of accounting

12  technicalities. I believe they were substantially lower because customers had not agreed to buy

13  HeadSpin's software services in the amounts and instances that Mr. Lachwani told me.

14        13.     After Mr. Lachwani was terminated from the company, I continued to work with

15  HeadSpin, and HeadSpin adopted the work done by KPMG and built on top of KPMG's work to

16  maintain accurate accounting records.

17        I swear under penalty of perjury that the foregoing is true and correct to the best of my

18  knowledge.  Signed this 1st day of December 2023, in _____San Mateo_____, California.

19

20  DATED:     December 1, 2023

                                            _____

21                                           SANA OKMYANSKAYA

22

23

24

25

26

27

28