ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

LLOYD A. FARNHAM (CABN 202231)
NOAH STERN (CABN 297476)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Noah.Stern@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| UNITED STATES OF AMERICA, | ) CASE NO. CR 21-353-CRB |
|---|---|
| Plaintiff, | ) DECLARATION OF NIKESH ARORA |
| v. | ) |
| MANISH LACHWANI, | ) |
| Defendant. | ) |

I, Nikesh Arora, declare and state as follows:

1.    I am currently the Chairman of the Board of HeadSpin, Inc. ("HeadSpin" or the "Company"). I have served in this role since approximately February 2018 when I first joined HeadSpin's board of directors ("Board").

2.    I was first introduced to Manish Lachwani, the former Chief Executive Officer of HeadSpin, by Karim Faris in approximately late 2017. Mr. Faris is a partner at GV (an investment fund affiliated with Google). GV was an early investor in HeadSpin, and Mr. Faris served as a member of HeadSpin's Board at the time.

3.    Prior to joining HeadSpin's Board, Mr. Lachwani provided me with information

regarding (among other things) HeadSpin's products and services, how those products and services were received by customers, the Company's finances, including representations regarding the Company's current, historical, and projected revenue, the Company's annual recurring revenue ("ARR"), the number of devices in the Company's device network, the Company's growth in sales, and the acquisition and retention of notable customers. I relied on the information Mr. Lachwani provided me and trusted it to be accurate. Based on the information Mr. Lachwani provided me, I was optimistic about HeadSpin's prospects and the potential for additional growth. Based largely on the information Mr. Lachwani provided me, I decided to invest my time and money in HeadSpin and agreed to become the Chairman of the Board.

4. I later learned that much of the information Mr. Lachwani provided me was false. Among other things, I eventually learned that Mr. Lachwani had overstated the Company's ARR, revenue, the number of customer contracts, and the number of devices in its network. The false information misrepresented the then-existing scope of the Company's business and customer base, and gave a false impression regarding the adoption of HeadSpin's products and services by various companies. If I had known the true information at the time, I would not have agreed to invest in the Company, nor would I have agreed to join HeadSpin's Board. Furthermore, I would not have introduced Mr. Lachwani to any of my friends or contacts for potential investments and would not have provided positive feedback about the Company to potential investors.

5. Based on my discussions with Mr. Lachwani, both before and since becoming Chairman of the Board, it appeared that Mr. Lachwani had full visibility into HeadSpin's business. Mr. Lachwani was involved in every aspect of the business, including its customers and sales. In my role as a director, I observed that Mr. Lachwani was doing much of the work across numerous functions at HeadSpin himself and that he was not delegating effectively. I advised Mr. Lachwani to hire more high-level employees and put more structure in place around him so that he could devote more of his time to the tasks typically performed by CEOs. I advised Mr. Lachwani to build a finance function and hire a CFO, in part so that he would not have to spend time invoicing customers and keeping track of contracts himself. I provided Mr. Lachwani names of potential CFO candidates. Mr. Lachwani interviewed multiple candidates, but never hired a CFO. HeadSpin had a part-time bookkeeper, Sana Okmyanskaya;

Mr. Lachwani brought on Ms. Okmyanskaya full time in approximately mid-2019.

[Redacted]

7. In March 2020, a senior HeadSpin employee, Stefanos Loukakos, came to my house and delivered a presentation alleging (among other things) that Mr. Lachwani had substantially overstated HeadSpin's ARR and revenue, that he had overstated the number of devices in its network, and that he misrepresented that certain companies were customers when in fact they were not. After receiving Mr. Loukakos's presentation, Mr. Faris and I formed a special committee of the Board to conduct an investigation into the allegations. At the direction of the special committee, HeadSpin's outside corporate counsel hired Guidepost Solutions to assist the special committee in conducting the investigation. Guidepost, in turn, engaged Hemming Morse, a forensic accounting firm, to assist with the investigation. The investigation revealed facts consistent with the allegations made by Mr. Loukakos. Some of the facts identified in the investigation are set forth in the following paragraph.

8. Among other things, the investigation identified the following facts: Mr. Lachwani was aware of or personally involved in HeadSpin's relationships with customers; Mr. Lachwani was aware of the sales HeadSpin made, but provided false information about HeadSpin's sales and customer relationships to Ms. Okmyanskaya, which resulted in false and inflated financial statements; Mr. Lachwani personally tracked the Company's ARR and created a tracking document that falsely inflated HeadSpin's ARR and misrepresented HeadSpin's relationships with customers, former customers, and entities that were not in fact customers; and Mr. Lachwani misrepresented the number of devices in HeadSpin's device cloud.

9. In approximately May 2020, Mr. Faris and I asked Mr. Lachwani to step down as CEO. Based on our request, he did step down from this role. In July 2020, Mr. Lachwani resigned as a member of the Board.

10. In May 2020, Mr. Faris and I did not know whether it made sense from a business and

financial perspective for HeadSpin to continue to operate as a business on the one hand, or liquidate on the other. We focused our efforts on getting an accurate picture of HeadSpin's product, its existing business, and its future prospects. As part of this effort, HeadSpin retained KPMG's services. KPMG was asked to "recast" HeadSpin's revenue and net income, among other things. It was important for KPMG's work to accurately report HeadSpin's business and financial condition so that the Board and investors could determine the best path forward for the Company. KPMG analyzed HeadSpin's sales and contracts and determined that HeadSpin's revenue and net income was significantly lower than what Mr. Lachwani told investors in connection with HeadSpin's fundraising efforts. KPMG's work also indicated that HeadSpin had a valuable business, but this business was not as mature or scaled as Mr. Lachwani had represented. The results of KPMG's recast of HeadSpin's revenue and net income were included in the Information Statement provided to investors in connection with the Company's request to investors to decide whether to participate in a recapitalization of the Company.

11. In 2020, once it had been determined that Mr. Lachwani had misrepresented the state and scale of the Company's business, I spent a considerable amount of time communicating with HeadSpin's investors and other stakeholders about the future of the Company. Several of HeadSpin's investors told me that they were angry, that they felt betrayed by Mr. Lachwani, and they wanted their money back. I was concerned that if all the investors demanded their money back immediately, it would result in lawsuits and force HeadSpin into bankruptcy. I was also concerned that the Company might spend all its capital dealing with potential lawsuits and bankruptcy proceedings and that, as a result, the Company's investors could receive no return of their capital whatsoever. I explored and helped negotiate a path forward for the Company that involved the return to investors of a significant portion of the funds raised in the Series B and C financings while leaving the Company with sufficient capital to continue to operate.

12. After extensive negotiations, the investors ultimately agreed to a recapitalization of the Company, which, among other things, repriced the Series B and C Preferred Stock to amounts that valued the Company at approximately $150 million and $300 million at the time of those offerings, respectively; returned a considerable amount of capital to the Series B and C investors; and unwound certain secondary stock transactions. The repricing calculations took into account a variety of factors,

including the revised ARR, KPMG's recast of revenue and net income, and a new prospective business plan for the Company, as developed by its new CEO with input from the Board. The proposed prices were intended to approximate the value that a reasonable investor might have determined the Company to be worth based on true facts, putting aside the contingencies related to the Company's uncertain legal situation.

    I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge. Signed this 23rd day of October 2023, in <u>Atherton</u>, California.

DATED:     October 23, 2023

*Nikesh Arora*
NIKESH ARORA