COOLEY LLP
JOHN HEMANN (165823)
(jhemann@cooley.com)
MAX A. BERNSTEIN (305722)
(mbernstein@cooley.com)
ELEANOR W. BARCZAK (329180)
(ebarczak@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone:     +1 415 693 2000
Facsimile:      +1 415 693 2222

COOLEY LLP
ELIZABETH H. SKEY (267852)
(eskey@cooley.com)
3175 Hanover Street
Palo Alto, CA 94304-1130
Telephone: (650) 843-5000
Facsimile: (650) 849-7400

Attorneys for Defendant
MANISH LACHWANI

CLARENCE & DYER LLP
NANCI L. CLARENCE (122286)
(nclarence@clarencedyer.com)
899 Ellis Street
San Francisco, California 94109
Telephone:     +1 415 749 1800
Facsimile:      +1 415 749 1694

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>MANISH LACHWANI,<br><br>Defendant. | Case No. 3:21-CR-00353 CRB<br><br>**DEFENDANT MANISH LACHWANI'S MEMORANDUM RE SENTENCING GUIDELINES**<br><br>Judge:                      Charles R. Breyer<br>Trial Date:               None Set<br>Date Action Filed:   August 20, 2021 |

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ......................................................................................... 1

II.   BACKGROUND ........................................................................................... 4

    A.   Mr. Lachwani and the Founding of HeadSpin ..................................... 4

    B.   Mr. Lachwani's Conduct and the KPMG "Recast" .............................. 7

        1.   ARR ........................................................................................... 7

        2.   Revenue .................................................................................. 10

    C.   The "Recap." ...................................................................................... 11

III.  LEGAL STANDARD .................................................................................. 12

IV.   THERE WAS NO ACTUAL LOSS. ........................................................... 13

    A.   The Government Must Meet its Burden with Clear and Convincing
        Evidence. ............................................................................................ 13

    B.   There Was No Actual Loss. ................................................................. 14

    C.   The Series B and C Investors Had the Option to Have Their Investments
        Returned. ............................................................................................ 16

    D.   The Government Has Not Shown That Mr. Lachwani's Conduct Resulted
        in an Inflated Share Price. ................................................................... 18

        1.   There is No Reason to Believe that the Inaccuracies that Mr.
            Lachwani's Conduct Caused Changed the Series B or C Share
            Pricing. .................................................................................... 18

        2.   Investors Doubted the Accuracy of HeadSpin's Financial
            Reporting, but Invested Anyway. ............................................ 21

    E.   The Government's Loss Calculations and Methodology are Fundamentally
        Flawed. ............................................................................................... 23

        1.   The Government's 100% Loss Theory is Nonsensical. ............ 23

        2.   The Government's Alternative Valuation Methods are Untimely
            and Invalid Regardless. ........................................................... 24

            a.   The Hart Report is untimely. ........................................ 25

            b.   The methods in the Hart Report are invalid. ................ 26

                (1)   The recap "repricing" is not a proxy for share value
                     in the series B or C. .......................................... 27

                (2)   An ARR "multiple" is a grossly oversimplified
                     valuation method. ............................................. 28

V.    NO ENHANCEMENT FOR 10 OR MORE VICTIMS IS PROPER. ........... 30

VI.   MR. LACHWANI HAS ACCEPTED RESPONSIBILITY. ......................... 31

VII.  MR. LACHWANI IS A ZERO POINT OFFENDER. ................................. 31

VIII. CONCLUSION ........................................................................................... 32

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Davis v. Carroll*,
   937 F. Supp. 2d 390 (S.D.N.Y. 2013)................................................................................. 29

*United States v. Ameline*,
   409 F.3d 1073 (9th Cir. 2005).......................................................................................... 12

*United States v. Armstead*,
   552 F.3d 769 (9th Cir. 2008)...................................................................................... 30, 31

*United States v. Berger*,
   587 F.3d 1038 (9th Cir. 2009)................................................................................... 16, 18

*United States v. Burnett*,
   16 F.3d 358 (9th Cir. 1994)............................................................................................. 12

*United States v. Conner*,
   537 F.3d 480 (5th Cir.2008)............................................................................................ 31

*United States v. Egge*,
   223 F.3d 1128 (9th Cir. 2000).......................................................................................... 13

*United States v. George*,
   949 F.3d 1181 (9th Cir. 2020).......................................................................................... 32

*United States v. Holmes*,
   No. 5:18-CR-00258-EJD-1, 2023 WL 149108 (N.D. Cal. Jan. 10, 2023)................. 24, 26, 27

*United States v. Hussain*,
   No. 16-CR-00462-CRB-1, 2019 WL 1995764 (N.D. Cal. May 6, 2019)........................ 23, 24

*United States v. Kise*,
   369 F.3d 766 (4th Cir. 2004)........................................................................................... 31

*United States v. Lonich*,
   23 F.4th 881 (9th Cir. 2022) ............................................................................... 13, 14, 18

*United States v. Ortland*,
   109 F.3d 539 (9th Cir. 1997).................................................................................... 17, 18

*United States v. Stein*,
   846 F.3d 1135 (11th Cir. 2017)....................................................................................... 23

*United States v. Yagar*,
   404 F.3d 967 (6th Cir.2005)............................................................................................ 31

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

*United States v. Zolp*,
   479 F.3d 715 (9th Cir. 2007)........................................................................................ 24

*Zhu v. Li*,
   No. 19-CV-02534-JSW, 2023 WL 1111507 (N.D. Cal. Jan. 30, 2023) ................................ 29

**Statutes**

USSG
   § 2B1.1 ........................................................................................................... 2, 30, 32
   § 3E1.1(a)................................................................................................................. 31
   § 4C1.1 ..................................................................................................................... 32

**Other Authorities**

Crim. L.R.
   32-3(c)..................................................................................................................... 25
   32-4 ................................................................................................................... 25, 26
   32-5(5)..................................................................................................................... 25

Fed. R. Crim. P. 32(i)(3)(B)............................................................................................. 12

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT'S SENTENCING MEMORANDUM
3:21-CR-00353 CRB

## I.   INTRODUCTION

This is not the usual criminal securities fraud case prosecuted in federal court.

The company formed by Manish Lachwani, HeadSpin, Inc. ("HeadSpin"), was and is a successful business. The technology is not only real, but groundbreaking and commercially successful. The company has real customers who to this day are using products invented by Mr. Lachwani and sold by the company across the globe. HeadSpin is, by all accounts, a success story.

Mr. Lachwani did not steal or embezzle any money from HeadSpin or its investors to enrich himself. He did not use HeadSpin or investor money to buy fancy vacation homes or cars or boats. He never took more than a $250,000 annual salary during his time at HeadSpin. He lives in a normal house in the Bay Area with his wife of 20 years and daughter. He worked tirelessly to make HeadSpin a success, through significant personal hardships and health issues.

The investors in HeadSpin are among the most sophisticated and successful investors and executives in the world. The lead investors were among the world's most renowned venture capitalists. The board members are prominent, experienced Silicon Valley titans. Mr. Lachwani was a first-time CEO who grew up in a poor family in India and came to the United States with no money to pursue an education. He put himself through school to become a computer scientist. He has no experience in anything other than technology and invention. He had no background in finance, accounting, human resources, operations, sales, or management when he became HeadSpin's CEO.

But this criminal prosecution is most unusual because *no investor lost any money*, which is the subject of this brief and the first issue to be addressed by the Court. No investor has asserted that it lost any money. The government has proffered no evidence that any investor lost any money. As the Final Presentence Report acutely conveys: "No requests for restitution have been received." (Final Presentencing Report ("PSR") ¶ 100.) The government submits declarations from at least three of the largest investors in connection with sentencing; none of those declarations say that the investor-declarant lost any money, let alone specifically states how much money was lost. Actual loss[1] is "the reasonably foreseeable pecuniary harm *that resulted from* the

---

[1] This is not an intended loss case.

**DEFENDANT'S SENTENCING MEMORANDUM**
**3:21-CR-00353 CRB**

offense." USSG §2B1.1, comment (emphasis added). Pecuniary harm is "harm that is monetary or that otherwise is readily measurable in money." *Id.* There is no evidence in this case that any investor suffered any monetary harm as a result of its investment in HeadSpin. This is a no-loss fraud case, and should be treated as such.

We are here because in the course of building HeadSpin, Mr. Lachwani made false statements about certain financial metrics to investors and caused the company bookkeeper to improperly record certain entries regarding receivables in the financial statements. Not everything Mr. Lachwani said to investors or did as CEO was false or misleading—indeed only a few things were. As we will more fully address at sentencing in January, Mr. Lachwani was gilding the lily. HeadSpin was a great company that was doing extremely well—certainly for a then-3-year-old startup. For reasons that have everything to do with Mr. Lachwani's life and background, he wanted to be perceived as earning an A+ from his audience; nothing else would do. HeadSpin did not need the money that it raised from investors in 2018 and 2019, though investors were clamoring to invest because of HeadSpin's superb product and talented team. Mr. Lachwani did not need to say false or misleading things in order to create a successful company, but he did.

The life that has been destroyed by Mr. Lachwani's conduct is his and his alone. Mr. Lachwani's lily-gilding did not cause any other investor to lose any money or cause the company to fail, because the company was functioning and successful, with a real product and real customers—it was then and it is now. So, when the dust settled in 2020 after Mr. Lachwani's misstatements were revealed, the company's sophisticated, professional investors and board members (not including Mr. Lachwani) voted to reorganize the company. The company had several million dollars more in liquid capital (not including valuable intellectual property, other assets, etc.) than the total amount of the investments at issue in this case. The investors agreed that those who wanted out could leave by turning in their shares in exchange for cash and notes, and those who wanted to stay in could stay in with equity. Some took their money out, some stayed in. Not one has reported that they exited with less than their entry investment; none have lost money.

The government rushes past this crucial fact in its hurry to lock up Mr. Lachwani.  It skips the need to show "actual loss" that "resulted from the offense" and offers a range of sensationalist numbers that have no serious, reliable methodology behind them.  The government theorizes its way into a few possible approaches; *but it does not count dollars actually lost*.  The government first experimented with saying that the loss is the entire amount of the investments at issue:  $92 million—in fact this was the only theory the government timely submitted.  But after advocating for this with the Probation Office and failing to object to the number when Probation agreed to it, the government now appears to realize just how preposterous it is.  So the government pivots (improperly and too late) to other sloppy, superficial approaches that, in addition to ignoring that no investor actually lost any money, are not based on any recognized, accepted methodology.  At bottom, the government is feinting at the approach it used with a proper expert in the Elizabeth Holmes prosecution, but does not (and cannot) follow the methodologies used by that expert or account for the fact that in Theranos the record showed investors lost *everything* and here investors lost *nothing*.  We demonstrate in detail below and in the accompanying rebuttal report from John Ciancanelli that the government's attempt to posit some proxy for actual loss is fundamentally flawed.  Guesswork and theorizing are no substitute for providing a "reasonable estimation"—particularly, whereas here, there is no evidence of actual loss to measure.

This is not the usual criminal securities fraud case prosecuted in federal court.  For that reason, Mr. Lachwani waived his right to a jury trial and wished to proceed by bench trial in order to put the entire record before the Court for its consideration, but the government refused to consent.  Now the government seeks to rush the Court past the significant distinctions and treat this case like it is Theranos.  But it is not:  HeadSpin is a real company with a real, valuable product, and the world's most sophisticated investors who suffered no actual loss.  The Theranos glove does not fit the HeadSpin hand.

The purpose of this brief and the proceedings before the Court on December 13 are to calculate the appropriate offense level (the criminal history category is I).  The government cannot demonstrate any investor loss because there was none.  There are not 10 or more victims, because there is no evidence that anyone suffered a loss as a result of the offense.  Mr. Lachwani is entitled

to acceptance of responsibility and a downward adjustment under the new Zero Point Offender guideline.  Beginning with a base offense level of 7, the Court should find the final offense level to be 3.

## II.    BACKGROUND[2]

Two preliminary observations about the facts in this brief:

*First*, the facts below are offered as relevant to the Sentencing Guidelines (the "Guidelines") analysis.  Mr. Lachwani will provide additional information to the Court regarding § 3553(a) factors in advance of the sentencing hearing in January.

*Second*, the information below is presented chronologically, because that is the clearest way to tell the story.  However, this way of proceeding should not be allowed to bury the lead:  HeadSpin was (and is) a real company with superior and lasting technology created by Mr. Lachwani, and investors have not lost any money in connection with their investments in HeadSpin.  There is no actual loss.

### A.    Mr. Lachwani and the Founding of HeadSpin

As will be described in more detail in connection with sentencing, Mr. Lachwani had a successful career in Silicon Valley as an inventor and technologist, with 20 patents in his name.[3] While at Amazon, Mr. Lachwani played a significant role in developing the renowned line of Kindle products.  He then served as the Chief Technology Officer at Zygna.  (PSR ¶¶ 81-82.)  After that, he started his own company, Appurify, a cloud software testing platform that was acquired by Google in 2014.  (PSR ¶ 80.)

---

[2] The government submitted, in full, its proposed trial exhibit list to Probation.  To avoid providing duplicate documents to the Court, and to streamline, all citations to exhibits in the governments exhibit list are cited herein as "Gov. Ex. X" and use the numbering the government has assigned therein.  Mr. Lachwani submitted additional materials to Probation as attachments to a September 15, 2023 letter from John Hemann to Officer Moy (the September 15 Letter).  Citations to materials submitted with the September 15 Letter are cited herein as "Letter Ex. X" and use the attachment lettering assigned in the September 15 Letter.  Finally, Mr. Lachwani's counsel submit certain further materials in connection with this memorandum and attached as exhibits to the supporting declaration of John Hemann (the "Hemann Declaration").  Such materials are cited herein as "Hemann Decl. Ex. X." Mr. Lachwani has filed the Hemann Declaration and portions of this memorandum conditionally under seal as required under the Protective Orders.  Dkts. Nos. 27, 90.  Mr. Lachwani takes no position as to whether the sealed information is in fact protected under the Protective Order, and he has notified or will notify shortly the parties that may be interested in keeping the information sealed.

[3] *See* https://patents.justia.com/search?q=Manish+lachwani.

1    Mr. Lachwani founded HeadSpin in 2015 and served as the company's CEO until May

2    2020.  This was the first time in his career that Mr. Lachwani had any corporate job that did not

3    involve developing technology.  He had no business experience other than as related to invention

4    and product development.  He did not have the knowledge or the skills to perform the job of the

5    CEO, and the company (through his fault and the Board's) did not have adequate staff or

6    appropriate systems to operate properly from an administrative perspective.

7    But the HeadSpin product was a revelation.   HeadSpin is a software-as-a-service company

8    that provides software tools and access to remote devices around the world.  It allows customers to

9    test their mobile applications and browsers on these devices and in the geographies they are

10   maintained.  (PSR ¶ 7.)  HeadSpin's technology was revolutionary and the company remains

11   successful to this day, largely due to the sheer demand for the technology HeadSpin invented.

12   After Mr. Lachwani and his co-founder started HeadSpin, he hired Sana Okmyanskaya to

13   be the company's accountant and bookkeeper; she remained at the company until after Mr.

14   Lachwani departed.  Mr. Lachwani had previously worked with Ms. Okmyanskaya at Appurify and

15   had grown to trust her there.  (Hemann Decl. Ex. 4 (Okmyanskaya May 21, 2021 302) at 1.)  Ms.

16   Okmyanskaya was responsible for maintaining the company's financials, including recording

17   product sales into the company's financial software, QuickBooks.  (*Id* at 2-3.)  Ms. Okmyanskaya

18   first started at HeadSpin as a consultant and then joined the company full-time in 2019 as Head of

19   Finance.  (*Id* at 2; Hemann Decl. Ex. 1 (Okmyanskaya Depo. Tr.) 63:7-14.)  Notably, while Ms.

20   Okmyanskaya made many important decisions regarding how the company recorded and reported

21   its financials, she was not a CPA.  Nor did she have an MBA or other formal training in corporate

22   finances.  (Hemann Decl. Ex. 4 (Okmyanskaya May 21, 2021 302) at 1.).

23   In 2015, HeadSpin had three directors—Mr. Lachwani, his co-founder Brien Colwell, and

24   Karim Faris, who represented Google Ventures, an early investor in HeadSpin and prior investor

25   in Appurify.  Mr. Faris's role at HeadSpin was to coach and advise the founders and to assist Mr.

26   Lachwani in growing the company's presence in the industry.  (Hemann Decl. Ex. 5 (Faris 302) at

27   2.)  As the company matured, Mr. Faris introduced Mr. Lachwani to Nikesh Arora, the CEO of

28   Palo Alto Networks, and in early 2018, Mr. Arora joined HeadSpin's Board of Directors as

1    Chairman.  Throughout his tenure with the company, Mr. Arora advised Mr. Lachwani on

2    fundraising, investor relations, hiring decisions, and scaling the company in the market.  (Hemann

3    Decl. Ex. 6 (Arora 302) at 2, 9.)  Mr. Arora quickly took on an outsized role and Mr. Lachwani

4    looked up to, and regularly deferred to, Mr. Arora.

5           In Spring 2018, Mr. Arora introduced Mr. Lachwani to Rohini Sadarangani.  (*Id.* at 8.)

6    HeadSpin hired Ms. Sadarangani as the company's Head of Corporate and Company Strategy.

7    (Hemann Decl. Ex. 7 (Sadarangani 302) at 2.)  In this role, Ms. Sadarangani assisted in finding new

8    business channels, crafting messaging to investors—including creating sections of the investor

9    presentations for the Series B and C funding rounds—and standardizing internal processes at the

10   company such as Salesforce automation, customer support, and security- and compliance-related

11   workflows.  (*Id.*)

12          Together with Ms. Okmanskaya, in summer 2019, Ms. Sadarangani undertook an effort to

13   review and reconcile the company's finances, specifically related to channel-partner revenue and

14   unbilled receivables, with advice and assistance from an outside certified public accountant.  (*Id.*

15   at 18.) This review and reconciliation effort is important because the government seeks to hold Mr.

16   Lachwani criminally responsible for mistakes in accounting for channel revenue—the single-

17   largest component of misstated revenue—even though Mr. Lachwani was no responsible for the

18   accounting, supported the review and reconciliation, and agreed to the recommendations of Ms.

19   Okmanskaya and Ms. Sadarangani as to correcting the accounting.

20          More generally, the company's finances were error-filled because of the highly irregular

21   and decentralized system for documenting customer contracts, deals, and revenue—and a lack of

22   any internal controls or qualified accountant.  Under this system, each *salesperson* was responsible

23   for securing and maintaining customer contacts, preparing their own invoices to customers, and

24   reporting account activity to Ms. Okmanskaya.  (*See* Hemann Decl. Ex. 1 (Okmyanskaya Depo.

25   Tr.) 146:3-150:9, 235:12-238:18.).)   The salespeople were notoriously bad at keeping Ms.

26   Okmyanskaya informed on these items.  (*Id.*)  For example, this haphazard approach led to a

27   problem the company termed "homeless payments" where Ms. Okmayanskaya would receive

28   payments and not know what contract or deal they were associated with, having to then track down

individual salespeople to try to understand the account details.  (*Id.*)  Other invoices would not get issued and Ms. Okmanskaya would have to go to individual salespeople to ask them why.  (*Id.*)  In short, HeadSpin's contracting, invoicing, and accounting functions were disastrously run.[4]

### B.   Mr. Lachwani's Conduct and the KPMG "Recast"

Mr. Lachwani engaged in two types of conduct that led to inaccuracies in disclosures to HeadSpin's prospective investors.  First, Mr. Lachwani used a tracking spreadsheet that included all HeadSpin product deployments as the source for the annual recurring revenue ("ARR") figures that were provided to certain investors during the Series B and C fundraising rounds.  (ECF 88 ("the Plea") at 4).  Mr. Lachwani knew the spreadsheet contained overstated revenue figures for certain customers and included revenue figures for customers who had not entered into contracts with HeadSpin.  (*Id.*)  Second, Mr. Lachwani sent several customer invoices to Ms. Okmanskaya which he knew were altered to show amounts that were not actually invoiced.  (*Id.*)  Certain HeadSpin investors ultimately received HeadSpin financial statements that were impacted by certain of the altered invoices.

As discussed below, while Mr. Lachwani takes full responsibility for these intentional actions, his intentional wrongdoing did not have the impact on HeadSpin's financial reporting the government claims that it did.  Just because some of the things that Mr. Lachwani did were fraudulent does not mean that everything the company did while he was CEO was criminal or fraudulent.

### 1.   ARR

ARR is a non-GAAP[5] metric that refers to revenue a company expects to receive from existing customers on a recurring basis, such as from subscriptions, over a twelve-month period.[6] Early in the company's history, a HeadSpin employee created a template to both track deals in the

---

[4] Many people other than Mr. Lachwani contributed to this disfunction and the Board of Directors was either so uninterested as to be unaware or was simply indifferent (at least until these issues came to a head and required the Board of Directors to defend itself to shareholders).
[5] Generally accepted accounting principles, or GAAP, are standards established by the Financial Accounting Standards Board that encompass a set of standardized, approved accounting methods and practices.
[6] *See*, *e.g.*, https://corporatefinanceinstitute.com/resources/valuation/annual-recurring-revenue-arr/.  Note that ARR is not a defined accounting concept and is calculated in different ways by different companies.

"pipeline" and to track ARR (the "Spreadsheet"). Mr. Lachwani added customers and contracts to the Spreadsheet as HeadSpin grew. Mr. Lachwani explained in the Plea Agreement:

> Starting no later than October 2017, I sent, or directed HeadSpin employees to send, potential investors financial information that overstated HeadSpin's revenue and ARR. I knew that ARR and revenue provided to investors were overstated because they included revenue regarding certain customers that had not entered contracts or agreements to pay subscription fees to HeadSpin, amounts that were more than certain customers had agreed to pay in subscription fees, and revenue for at least one customer I knew had stopped using and paying for HeadSpin services. (Plea at 3.)

The government's May 26, 2023 submission to Probation (the "Government's Submission") sets out specific entries the government contends Mr. Lachwani improperly included in the Spreadsheet. Using the government's numbers, these entries resulted in an overstatement of ARR of approximately $1.5 million.[7] For context, this represents ███████████ in ARR that the Series C investor deck reported. (*See* Gov. Ex. 170.2 (Investor Deck and Attachment) at HS00014996.)

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████ The Government's Submission suggests, and the government is likely to again argue, that Mr. Lachwani has admitted to conduct that resulted in this large discrepancy and is therefore responsible for that ███████████ ███████████ That is not the case. While Mr. Lachwani did include certain customers in the Spreadsheet that should not have been included or reported to investors as ARR, there is no evidence to support that he is responsible for the number that the government asserts. This is because the ███████████ is disconnected from evidence of misconduct by Mr. Lachwani in two key ways:

**First**, ███████████████████████████████████████

---

[7] ███████████████████████████████████████████
███████████████████████████████████████████
███████████████████████████████████████████

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**DEFENDANT'S SENTENCING MEMORANDUM**
**3:21-CR-00353 CRB**

**2.     Revenue**

Mr. Lachwani also admitted to causing HeadSpin's financial officer to report revenue that was inconsistent with the executed contracts with customers or that related to customers that had not yet entered contracts.

[8]



C.     The "Recap."

On July 29, 2020, HeadSpin sent its shareholders a letter explaining that improprieties in the company's financials had been identified and that the company had engaged KPMG to conduct the Recast.   HeadSpin reported that it had **_$109 million in cash on hand_** and proposed a

---

[9] The government separately asserts that Mr. Lachwani, in connection with the █████████ caused the company's financial officer to improperly move revenue from the "unbilled receivables" to "accounts receivables" buckets by causing the financial officer to believe invoices had been submitted to customers that had not been.  However, because both unbilled receivable and accounts receivables are included in revenue, this had no effect on the total revenue reported.

recapitalization plan (the "Recap") under which Series B and Series C investors could elect to have their investments distributed in full, in the form of cash and interest-bearing notes. (Gov. Ex. 263 (July 29, 2020 N. Arora Letter to Shareholders) at 1.) On October 19, 2020, HeadSpin formalized this offer in a tender document (the "Offer to Purchase and Exchange"). (*See generally* Hemann Decl. Ex. 9 (Offer to Purchase and Exchange).) The company again explained that Series B and C investors could receive a ***full payout*** from their investment in the company, in the form of 70% cash and 30% interest-bearing notes. (*Id*. at HS00032316.)[10] Series B and C investors could alternatively elect to retain their equity position, with certain favorable modifications to their rights, but were under no obligation to do so. (*Id*. at HS00032316-17.) HeadSpin represented that: "As of the date of this Offer to Purchase and Exchange, the Company *has the financial resources* to pay the Purchase Price for the shares sold to the Company in the Purchase Offers." (*Id*. at HS00032335 (emphasis added).) That is, HeadSpin had sufficient cash available to distribute to Series B and C investors. Some investors decided to exit the company while many others remained in full or in part invested in the company.

Importantly, Mr. Lacwhani had no decision-making power at this time and did not participate in the design of the Recap. He had already stepped down from the board and as CEO. (Gov. Ex. 263 (July 29, 2020 N. Arora Letter to Shareholders).) Mr. Lachwani understands the remaining board members were the architects of the Recap. The shareholders voted to approve it.

## III.   LEGAL STANDARD

The government bears the burden of proving the facts necessary to enhance a defendant's offense level under the Guidelines. *United States v. Burnett*, 16 F.3d 358, 361 (9th Cir. 1994); *accord United States v. Ameline*, 409 F.3d 1073, 1086 (9th Cir. 2005) (*en banc*) ("[W]hen the government seeks an upward adjustment, it bears the burden of proof."). While "the district court may rely on undisputed statements in the PSR at sentencing," if the defendant objects to those statements "the district court is obligated to resolve the factual dispute, and the government bears the burden of proof to establish the factual predicate. . . . The court may not simply rely on the

---

[10] Investors could also elect to receive 70% of their investment back in cash and receive newly issued shares of greater value in place of interest-bearing notes.

1  factual statements" in that report.  *Id.* at 1085-86 (citation omitted); *see also* Fed. R. Crim. P.

2  32(i)(3)(B).  In making factual determinations, "inadmissible evidence cannot be considered [at

3  sentencing] if it lacks sufficient indicia of reliability to support its probable accuracy.'"  *United*

4  *States v. Egge*, 223 F.3d 1128, 1132 (9th Cir. 2000) (citation omitted, alternation in original).

5  **IV.    THERE WAS NO ACTUAL LOSS.**

6      **A.    The Government Must Meet its Burden with Clear and Convincing Evidence.**

7      The government is tasked with showing a basis for any enhancement under the Guidelines

8  by at least a preponderance of the evidence.  *United States v. Lonich*, 23 F.4th 881, 910 (9th Cir.

9  2022).  However, where, as here, the government's sought-after enhancement would have a

10  "disproportionate impact" on the ultimate sentence suggested under the Guidelines, the

11  government's standard of proof may shift to clear and convincing evidence.  *Id.* (citation omitted).

12  The Ninth Circuit looks principally to whether the enhancement would add 4 or more levels and

13  would double the sentence otherwise recommended under the Guidelines.  *See id.* at 911.  There is

14  no doubt that the government's requested loss enhancement would have such a disproportionate

15  impact—the government seeks a *26 level* enhancement from the base level of 7, which would

16  multiply Mr. Lachwani's otherwise recommended sentence many times over.  (*See* PSR ¶¶ 38-39.)

17      The Ninth Circuit's recent decision in *Lonich* is instructive.  The court there explained that

18  where a significant enhancement is based not just on convicted conduct, but goes beyond the guilty

19  plea or conviction, a clear and convincing standard should apply.  *Lonich*, 23 F.4th at 913.  Here,

20  the government does not seek to determine loss based solely on the agreed-upon factual basis for

21  the plea, but instead on myriad other facts that they did not even present to the Probation Office

22  and seek to bolster with eleventh hour declarations and an expert report served only after the PSR

23  issued.  Indeed, the government seeks to hold Mr. Lachwani criminally responsible for every single

24  accounting entry found unsupported during the Recast—regardless of whether there is evidence

25  that Mr. Lachwani was culpable for each of those accounting entries.  For example, the government

26  seeks to hold Mr. Lachwani liable for inaccuracies in channel-revenue reporting, which drives most

27  of the overall error in HeadSpin's reporting.  (*See* Section II.B.1, *supra*.)  But Mr. Lachwani never

28  pleaded guilty to this conduct—and the record shows he is *not culpable for it*.  (*Id.*)  As this conduct

is not part of the Plea, the government must at least show culpability by clear and convincing evidence because of the overwhelming impact it might have on his ultimate sentence. Similarly, under the government's approach, Mr. Lachwani would be assumed guilty in connection with any other improper accounting or failure of documentation, even if these omissions or errors were the fault of the company's financial officer or salespeople and had nothing to do with Mr. Lachwani.

Moreover (and most importantly), Mr. Lachwani did not plead guilty to, and no jury or judge found him guilty of, causing losses to any investors. Rather, the parties agreed that the Plea Agreement would *not* include agreement regarding loss amount and the factual basis of his plea contains no support for the excessive loss amount the government advocates. Under these circumstances, where the conduct the government contends gives rise to the loss is not coextensive with a conviction, due process requires the government to prove the facts supporting enhancement by clear and convincing evidence. *Lonich*, 23 F.4th at 915 (requiring clear and convincing evidence where "there is a notable mismatch between the scope of the criminal convictions and the losses that supposedly drove the bank's failure").

**B.     There Was No Actual Loss.**

No investor suffered an actual loss in this case. Full stop. There is no evidence before the Court, either in the PSR or in the declarations that have been filed, that any investor lost money investing in HeadSpin. The declarations executed by the lead investors are echoingly silent as to loss—they could easily have, but did not, report the amount of their investment they lost or that they lost money at all. The Probation Officer reported that there is no basis upon which to recommend restitution. (PSR ¶¶ 32, 100.) In the depositions taken and documents produced in the parallel SEC case, no investor reported losing money in HeadSpin. ***There is no actual loss***.

Mr. Lachwani pleaded guilty because he is guilty. He misled investors in certain respects to make the company look better than it was, but the company's product—Mr. Lachwani's technology—was so good that when the dust settled, the company was doing quite well and none of the investors lost anything. *Why* Mr. Lachwani did what he did is a subject for the next phase of sentencing, but for today: There is no actual loss.

The Series B and C investors were highly sophisticated venture capitalists that sought to

invest in an early-stage, high-risk start-up.  They were drawn to HeadSpin by the exceptional nature of its technology and the scale of its "total addressable market."  (*See* Hemann Decl. Ex. 3 (Singh Depo. Tr.) at 26:3-9.)  HeadSpin's product was and is real and the company is still thriving to this day.  In fact, since the Series B and C investments, and even after Mr. Lachwani's misleading conduct was disclosed, HeadSpin expanded its product offering, patented *multiple* new technologies, built out its C-suite, and continues to hire across functions.[11]  HeadSpin has not yet had an "exit" (*i.e.*, an IPO or acquisition), so there is no way to determine at this time how much HeadSpin's investors eventually will profit from their investment.  There is **no** evidence in the record that suggests HeadSpin investors will ultimately lose any of the value of their investment, or even fail to receive an appreciable return.  These sophisticated investors, who calculate gains and losses for a living, have had ample opportunity to tell the Court and Probation precisely how much they have lost or will lose, and none of them have done so—or even claimed to have lost money at all.

Indeed, the government did not submit *a single victim impact statement* to Probation to support their loss theory.[12]  The only conclusion one should reach from this void is that these investors—who the government has identified and been in touch with—did not suffer any loss.  Indeed, certain investors have admitted they did not suffer a loss. ███████████

███████████████████████████████████████

██████████████████████████████████

---

[11]  *See*  https://www.headspin.io/audio-visual-platform;  https://www.headspin.io/our-leadership-team;  https://www.headspin.io/careers;  https://patents.google.com/patent/US11650263B1/en?assignee=headspin&oq=headspin;  https://patents.google.com/patent/US11386663B1/en?assignee=headspin&oq=headspin;  https://patents.google.com/patent/US11770458B1/en?assignee=headspin&oq=headspin;  https://patents.google.com/patent/WO2022178466A1/en?assignee=headspin&oq=headspin&page=1;  https://patents.google.com/patent/US11442849B1/en?assignee=headspin&oq=headspin&page=1;  https://patents.google.com/patent/US20220206912A1/en?assignee=headspin&oq=headspin&page=1;  https://patents.google.com/patent/WO2022241335A1/en?assignee=headspin&oq=headspin&page=1;  https://patents.google.com/patent/US11531613B1/en?assignee=headspin&oq=headspin&page=1;  https://patents.google.com/patent/US20230308284A1/en?assignee=headspin&oq=headspin&page=1.

[12]  The government identified ███████ in its pretrial witness list.  None of them submitted victim impact statements to Probation.

1

2 ████████████████████████████████████████

3 ████████████████████████████

4 ████████████████████████████████████████████████

5 ████████████████████████████

6 ████████████████████████████████████████████████████████████████

7 ████████████████████████████████████████████████████████████████

8 ████████████████████████████████████████████████████████████████

9 ████████████████████████████████████████████████████████████████

10 ████████████████████████████████████████████████████████████████

11 ████████████████████████████████████████████████████████████████

12 ████████████████████████████████████████████████████████████████

13 ██████████████████████████████████████████████   This point is

14 emphasized by the PSR's admission that there is no basis for a restitution award.  (PSR ¶ 100.)

15      The Ninth Circuit has held that it is the government's burden, as a threshold matter, to show

16 "that actual, defendant-caused loss occurred."  *See United States v. Berger*, 587 F.3d 1038, 1045

17 (9th Cir. 2009).  That is, the Court should not move directly to attempting to measure loss when the

18 government has not first shown there *was* loss.  *Id.* at 1046 ("The court's method appears to have

19 assumed that defendant-caused shareholder loss existed, and only then purported to measure that

20 loss.").  The government is attempting to lead the Court quietly past the first and essential step of

21 the analysis—was there an actual loss?—and onto what it believes are greener pastures of

22 measuring loss.  As demonstrated below, the government's arguments on measuring loss are also

23 deficient, but the Court need never reach them.  There is no evidence before the Court that any

24 investor suffered an actual loss, ending the inquiry without more.  *Id.*

25      **C.    The Series B and C Investors Had the Option to Have Their Investments**
            **Returned.**

26

27      The amount of company assets distributed to shareholders as part of a recapitalization or

28 dissolution— even after fraud is discovered—are not counted as losses.  In *United States v. Ortland*,

the Ninth Circuit explained that the appropriate loss calculation started with the amount investors had invested and then subtracted the amount an appointed receiver had returned to investors during a post-fraud receivership.  109 F.3d 539, 548 (9th Cir. 1997).  That is, if investors were able to extract a portion of their investment from the company following the disclosure of the fraud, that extracted value must be subtracted from any loss calculation.  *Id*.

In 2020, HeadSpin had well over $100 million in liquid assets, not to mention highly valuable IP[13] and other assets.  (*See* Section II.C, *supra*).  Had the company gone into receivership as in *Ortland*, the Series B and C investors would have received their full investments back, given the company's ample cash holdings and the Series B and C investors' preferences—and not even considering the IP and other asset value the company carried.  (*See* Hemann Decl. Ex. 10 (Rebuttal Expert Report of John D. Ciancanelli ("Ciancanelli Report") at 23-24.)  This would have resulted in no cognizable loss under *Ortland*.  109 F.3d at 548.

Because HeadSpin remained a successful enterprise, the Series B and C investors fared even better —they were given the *option* of a distribution of their investment or of a continued equity stake.  (*See* Section II.C, *supra*.)  The fact that many investors chose to remain invested in HeadSpin suggests these investors viewed their equity as having greater value than their investment funds, and as having long-term upside.  Given investors were *better situated* than they would have been if the company was liquidated by a receiver, they suffered no cognizable loss under the straightforward principle the Ninth Circuit set out in *Ortland*.

At bottom, through the Recap, shareholders voted to reorganize the ownership of the company and allowed shareholders to convert shares to cash, or keep the shares.  This was not a

---

[13] For example, HeadSpin has numerous patents for its technology, and did at the time of the Recap. *See*, *e.g.*, https://patents.google.com/patent/US9749888B1/en?assignee=headspin&oq=headspin; https://patents.google.com/patent/US10098026B1/en?assignee=headspin&oq=headspin; https://patents.google.com/patent/US10729038B1/en?assignee=headspin&oq=headspin; https://patents.google.com/patent/US11366738B2/en?assignee=headspin&oq=headspin; https://patents.google.com/patent/US10178569B1/en?assignee=headspin&oq=headspin; https://patents.google.com/patent/US11159416B1/en?assignee=headspin&oq=headspin; https://patents.google.com/patent/US11019129B1/en?assignee=headspin&oq=headspin; https://patents.google.com/patent/US11442849B1/en?assignee=headspin&oq=headspin&page=1; https://patents.google.com/patent/US11372744B1/en?assignee=headspin&oq=headspin&page=1; https://patents.google.com/patent/US11625506B1/en?assignee=headspin&oq=headspin&page=1; https://patents.google.com/patent/US10855789B1/en?assignee=headspin&oq=headspin&page=1.

return by Mr. Lachwani of ill-gotten gains, this was a decision voted on by sophisticated shareholders, many of whom (like ███████████████████████ kept significant investments in the company—a decision made after Mr. Lachwani had stepped down.

### D. The Government Has Not Shown That Mr. Lachwani's Conduct Resulted in an Inflated Share Price.

For the reasons discussed in Sections B and C above, there was no actual loss caused by the Mr. Lachwani's conduct and investors could have (and many did) receive their investments back in full, while many kept their shares in the company.  Rather than grapple with these issues, the government ignores them entirely and skips directly to measuring the alleged amount that the price of the Series B and C shares were ostensibly inflated by Mr. Lachwani's conduct.  This is improper: because there was no actual loss, and as investors were able to recoup the entirety of their investments or choose to keep their shares through the Recap, any measure of alleged price inflation is irrelevant.  *See Berger*, 587 F.3d at 1045; *Ortland*, 109 F.3d at 548.

However, even if the government's framework is assumed, the government has not shown, let alone through clear and convincing evidence, that Mr. Lachwani's conduct (as compared to other causes Mr. Lachwani is not culpable for) inflated the price of shares in the Series B or C. This is so because (1) Mr. Lachwani's conduct had only marginal impact on the company's financial reporting that was too minimal to affect the round valuation numbers used to price the Series B and C and (2) investors in the Series B and C already doubted the accuracy of the company's financial reporting and invested anyway.

#### 1. There is No Reason to Believe that the Inaccuracies that Mr. Lachwani's Conduct Caused Changed the Series B or C Share Pricing.

To support an enhancement, the government must show not only loss, but loss *caused by* the culpable conduct.  *See Lonich*, 23 F. 4th at 916 ("The term 'resulted from' establishes a causation requirement, which includes both cause-in-fact (but for causation) and proximate cause. These basic requirements apply to loss enhancements." (internal quotations omitted)(citation omitted)).  But there is no evidence that Mr. Lachwani's conduct resulted in a higher Series B or C share price.

As discussed in Section II.B, *supra*, the information provided by the government to Probation showed that Mr. Lachwani's conduct resulted in ███████████████████████ ████████████████  The government has not shown that Mr. Lachwani is criminally culpable for any other inaccuracies in the company's financial reporting and therefore no such inaccuracies can be considered in determining loss here.  There is no evidence supporting the leap of logic that because Mr. Lachwani's conduct increased ARR and revenue reporting marginally, the Series B and C share prices were measurably higher than they otherwise would have been.

To start, the record shows investors were drawn to HeadSpin not because of granular ARR or revenue numbers,[14] but rather because of the company's leadership, technology, and total addressable market. ████████████████████████████████

---

14 The government has flooded the record with eleventh hour declarations that suggest that ████
████████████████.  As we describe elsewhere, their single-minded focus on ARR appears now at the behest of the government at sentencing, rather than in the contemporaneous record of internal communications amongst the investors.  As such, they largely should be ignored.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

19

DEFENDANT'S SENTENCING MEMORANDUM
3:21-CR-00353 CRB

Cooley LLP
Attorneys at Law
San Francisco



2.   **Investors Doubted the Accuracy of HeadSpin's Financial Reporting, but Invested Anyway.**

HeadSpin's financial statements contained many inaccuracies and were flawed in numerous respects.  This cannot be overstated.  Mr. Lachwani had no finance or accounting experience at all, and the company's complicated accounting was being performed by a bookkeeper (not an

accountant) who was using QuickBooks.  (*See* Section II.A, *supra*.)  Some of the inaccuracies were the result of Mr. Lachwani's intentional conduct; most were the result of the fact that the company's financial processes and internal controls were somewhere between immature and non-existent.

However, the leading investors in both the Series B and C *knew* that the company's financial reporting was not accurate at the time they invested, but invested anyway, further establishing that the marginal inaccuracies introduced by the Mr. Lachwani's misconduct did not drive valuations and share pricing.

[15]

1    ███████████████████████████████████

2         This record makes it implausible that these leading investors would have negotiated

3    materially different Series B and C share prices based on different ARR and revenue figures, ████

4    ████████████████████████████████████████████████████.[16]   *See United States v. Stein*,

5    846 F.3d 1135, 1154 (11th Cir. 2017) (remanding because government failed to prove that investors

6    relied upon fraudulent information).  More importantly, the government, which at all times retains

7    the burden, has offered ***no*** evidence suggesting that such share pricing would have varied absent

8    Mr. Lachwani's conduct, particularly given the eagerness with which venture capitalists sought to

9    invest in HeadSpin.

10        E.    **The Government's Loss Calculations and Methodology are Fundamentally**
11              **Flawed.**

12        Even if the fact of loss was assumed, and for all the reasons discussed above it cannot be,

13   the government has failed to show a valid *measure* of that loss and therefore has failed to carry its

14   burden of showing any enhancement is proper for a still further reason.  *See United States v.*

15   *Hussain*, No. 16-CR-00462-CRB-1, 2019 WL 1995764, at *5 (N.D. Cal. May 6, 2019) (finding no

16   loss cognizable where the government failed to show methodology through which loss could be

17   "reasonably determined").  Lacking confidence, the government presents not one measure of loss,

18   *but three*.  The output of these measures varies from ████████████████ in alleged losses

19   (Hart Report at 8), a range that shows the crude nature of the government's approach.  *See Hussain*,

20   2019 WL 1995764, at *5 ("a range is not an amount").  discussed below, each of the methods

21   proposed by the government is deeply flawed and none bears any relationship to actual losses

22   suffered by investors.  This failure of proof also requires a finding of no loss enhancement.  *Id.*

23        1.    **The Government's 100% Loss Theory is Nonsensical.**

24        The government successfully argued to Probation that the loss amount was the *full* amount

25   of the investments made in the Series B and C (the "100% Loss Theory")—and this loss calculation

26

27   ——————————————
     [16] ████████████████████████████████████████████████

28   ████████████████████████████████████████████████████████████

is included in the PSR.  (PSR ¶ 29.)  The 100% Loss Theory was the *only* theory the government timely submitted and therefore the only one this Court should evaluate.  (*See* Section IV.E.1, *infra*.)  It is, however, nonsensical and precluded by caselaw.

Investors in HeadSpin of course did not lose the entire amount of their investment, as they retained the value of their equity in the company.  (*See* Hemann Decl. Ex. 10 (Ciancanelli Report) at 7-9.)  The government's argument that investors may not have invested had they known of Mr. Lachwani's conduct does not alter this.  Take for example a diamond retailer that markets a diamond ring as 3 karats.  The purchaser that buys the ring for $10,000, but would not have had he known the ring was instead only 2.8 karats, has not lost 100% of $10,000—*he still has a 2.8 karat diamond ring*.

Courts have repeatedly rejected such 100% Loss Theory calculations in investor fraud cases for this obvious reason, most prominently and recently in the Theranos cases.  *See United States v. Holmes*, No. 5:18-CR-00258-EJD-1, 2023 WL 149108, at *4 (N.D. Cal. Jan. 10, 2023) (internal quotations omitted) (citation omitted) ("In the context of fraud cases involving induced stock purchases of an otherwise legitimate company, this principle has been interpreted to mean that district courts may not assume that the loss inflicted equals the full pre-disclosure value of the stock."); *see also United States v. Zolp*, 479 F.3d 715, 719 (9th Cir. 2007) ("because the stock continues to have residual value after the fraudulent scheme is revealed, the court may not assume that the loss inflicted equals the full pre-disclosure value of the stock").  This means the only loss theory the government advocated to Probation (and did not object to) is folly and rejected by applicable and binding caselaw.  In these circumstances, the Court should find the government has failed to meet its burden and therefore determine cognizable loss was zero for Guidelines purposes.  *See Hussain*, 2019 WL 1995764, at *5.

## 2. The Government's Alternative Valuation Methods are Untimely and Invalid Regardless.

The government's Hart Report purports to offer two further methodologies for determining loss by allegedly ascertaining the true value of the shares sold in the Series B and C.  But these methods should be rejected for at least two reasons.  First, the Hart Report was served on Defendant

only *after* the final PSR issued and is therefore untimely and not properly before the Court. Second, the methodologies included fall far short of providing a reliable measure of loss.

### a.   The Hart Report is untimely.

The government has been cavalier with the rules about what must be provided to the Probation Office in connection with the preparation of the PSR. One example is the Hart Report, which came after the final PSR was provided to the Court. It should not be considered by the Court because it was not provided to Probation.

The Local Rules required the government to submit any evidence relevant to sentencing to Probation prior to the draft PSR. Crim. L.R. 32-3(c) provides: "**(c) Deadline for Submission of Material Regarding Sentence.** Any material a party wishes the Probation Officer to consider for purposes of the proposed presentence report shall be submitted to the Probation Officer at least 45 days before the date set for sentencing. The party shall serve a copy of the material on opposing counsel, except for material already in the possession of opposing counsel." Thereafter, the final PSR is required to contain certain specifically-identified information, as well as "[a]ny other matter for consideration by the Court which pertains to sentencing." Crim. L.R. 32-5(5). Finally, the government must object to Probation's loss calculation in the final PSR, or waive any competing calculation. "Parties should be aware that the objections not raised to the Probation Officer may not be considered by the Court absent a showing of good cause." Crim. L.R. 32-4, cmt.

The government did not submit the Hart Report to Probation before the draft PSR, did not submit the Hart Report to Probation before the final PSR, and did not even submit the Hart Report in connection with an objection to the final PSR. In fact, *the government did not object at all to the final PSR's determination that loss was 100% of the Series B and C investments*, thereby waiving the right to introduce a competing loss calculation absent a showing of good cause—a showing the government has not made. *See Id*. Instead, the government waited until *all* these deadlines had passed, and the hearing on the loss Guidelines was just weeks away, to surface the Hart Report—and the two new methodologies for calculating loss within it—for the first time. This was so despite later representing to Mr. Lachwani's counsel that the government had retained Mr. Hart back in June 2023.

The *Holmes* case shows the government knew how to go about this process the right way. In *Holmes*, the government advised the Court that it had provided an expert report in the draft PSR. *See United States v. Holmes*, Gov't Sentencing Mem. at 19 ("Mr. Saba's report, which was provided to the defense and Probation in advance of the draft presentence report, demonstrates by any standard of proof that Holmes inflicted hundreds of millions of losses on her investors."). The government chose not to do so here, either to sandbag the defense or because the government only realized **after** the final PSR that the loss calculation it had been advocating for (the 100% Loss Theory) was frivolous and likely to be rejected. Either way, the Hart Report is untimely and should not be considered.

### b.   The methods in the Hart Report are invalid.

Regardless, the Hart Report is deeply flawed methodologically. The *Holmes* matter again shows there is no question the government knows how to conduct a "but-for" valuation of a venture-backed start-up for purposes of determining whether shares were overpriced due to fraud. In the *Holmes* case, the government relied on its expert Mr. Carl Saba (the "Saba Report"). The Saba Report turned to well-known methods of private company valuation, namely the discounted cash flow method[17] and the adjusted net asset method.[18]   *See Holmes*, 2023 WL 149108, at *5. The court explained that these methods were "generally recognized by the appraisal profession." *Id*. The Saba Report then used a further-known methodology called an "option price equity allocation"[19] to model the exit-price value of Theranos shares, so as to arrive at a defensible "but-for" valuation of those shares in the counterfactual world where there was no fraud. *Id*. Only then did the government assert a loss amount based on the difference between the value of Theranos shares these methods assigned and the price investors actually paid. *Id*.

But the government's expert here, Mr. Hart, used *none* of these methods. His flimsy report employs two highly oversimplified approaches to but-for valuation that are not based on any known

---

[17] *See* https://www.investopedia.com/terms/d/dcf.asp.
[18] *See* https://www.investopedia.com/terms/a/adjusted-net-asset-method.asp#:~:text=The%20adjusted%20net%20asset%20method%2C%20also%20called%20the%20asset%20accumulation,scenarios%20or%20going%2Dconcern%20assessments.
[19] *See* https://www.finrofca.com/startup-qa/what-is-equity-allocation#:~:text=The%20Option%20Pricing%20Method%20(OPM)%20adds%20another%20layer%20of%20sophistication,as%20preferred%20and%20common%20stock.

or accepted methodologies.  Instead, these methods appear reverse-engineered to generate large loss figures to shore up the government's untenable positions on loss, which position the government arrived at **before** the Hart Report was drafted—a proverbial cart before the horse, and a lame horse at that.

**(1)     The recap "repricing" is not a proxy for share value in the series B or C.**

Mr. Hart looks to the "repricing" conducted in connection with the Recap and uses that it to calculate alleged loss.  (Hart Report at ¶¶ 18, 29.)  But this "repricing" exercise conducted in 2020 was in no way a methodologically sound attempt to determine a "but-for" price for the Series B or C shares in the counterfactual world in which no fraud occurred.  As an initial matter, the Recap did not even purport to assign a revised "price" for the Series B or C shares *at the time of these investment rounds* (the only time relevant to the present analysis).  (Hemann Decl. Ex. 9 (Offer to Purchase and Exchange) at HS00032330-31); *see also USA v. Holmes*, 2023 WL 149108, at *6 ("In identifying the proper valuation date, the Court selected the date closest in time to the last of the Series C investments[.]").  The Recap assigned a compromise, contemporaneous value to the shares based on a multi-party negotiation between interested parties.  Moreover, the exercise was not premised on any valuation method, expert input, or market activity, as HeadSpin explained to investors at the time:

> [T]he Company has not undertaken any effort to determine or seek a third-party valuation or appraisal of the Company's capital stock in connection with the Offer. Further, no investment banking firm was retained to conduct an auction or engage in a formal process designed to broadly search for interested buyers of the Company's capital stock and maximize the price offered for Purchase-Eligible Shares in the Purchase Offers.

(Hemann Decl. Ex. 9 (Offer to Purchase and Exchange) at HS00032330.)

More generally, the Recap did not recreate the context and dynamics of the original investment rounds.  To start, the investors participating in the Recap had substantial leverage in the form of threatened legal claims that they did not have when deciding to participate in the Series B or C.  The Recap's repricing was therefore under downward pressure, in favor of the investors, due to threatened litigation leverage not present at the time of the investments.  (Hemann Decl. Ex. 10

(Ciancanelli Report) at 10-12.)  Similarly, these series investments were raised at a time when HeadSpin's technology and reputation made it a darling of the venture capital community and meant HeadSpin was fending off eager investors—this dynamic allowed HeadSpin to set its own fundraise valuations.  By the October 2020 Recap, this dynamic abated, the broader economy had shifted, and the repricing occurred in a much different atmosphere.  These material differences in dynamics mean that the "repricing" in the Recap was not—and was not intended to be—a recreation of a "but-for" pricing during the Series B and C themselves, but rather a far different exercise with little bearing on how HeadSpin would have been valued by investors months and years earlier, even absent Mr. Lachwani's conduct.

> **(2)    An ARR "multiple" is a grossly oversimplified valuation method.**

Mr. Saba, the government's valuation expert in the Holmes case, laid out in detail the science behind private company valuation.  Mr. Saba explained:  "The value of a closely held business is derived not from a formula, but from the relevant facts and circumstances of a company[.]"  (Saba Report at 20.)  Mr. Saba went on to explain that: "The appraisal profession generally recognizes three primary approaches to determine value: the income approach, the market approach, and the asset approach."  (Saba Report at 22.)[20]  Mr. Saba explained in detail why, for purposes of determining Theranos's valuation, he made use of both the income and market approaches (specifically, the discounted cash flow method form of an income approach and the guidelines public company form of a market approach).  (Saba Report at 22-26.)

Here, Mr. Hart did not use *any* of these known and accepted valuation methods.  He did not

---

[20] *See also* https://www.fairmarketvaluations.com/business-valuation-methods/ (recognizing the same three approaches to valuation of private companies); https://analystprep.com/study-notes/cfa-level-2/private-company-valuation-approaches/ (same); https://www.marcumllp.com/insights/income-asset-market-why-different-valuation-approaches-matter#:~:text=The%20income%20approach%20is%20often,benefits%20into%20a%20single%20amount (same); https://www.smithschafer.com/blog/business-valuation-approaches-as-easy-as-1-2-3/ (same); https://www.innp.com/business-valuation-approaches (same); https://www.versaillesgroup.com/m-and-a-blog/valuation-approaches-for-ma/ (same); https://www.seldenfox.com/tax/articles/which-business-valuation-method-should-be-used-for-your-company/(same); https://www.businessvaluations.net/methods (same); https://shawdivorce.com/how-to-value-a-business-in-divorce-income-approach-asset-approach-and-market-approach/ (same).

calculate, for example, the discounted cash flow of HeadSpin, nor did he compare HeadSpin to other similar companies, as Mr. Saba did for Theranos.  In fact, without explanation, Mr. Hart did not use an income, asset, or market approach *at all*, defying well-established industry standards. (Hemann Decl. Ex. 10 (Ciancanelli Report) at 15-24.)  Instead, Mr. Hart used a far more crude, oversimplified approach seemingly of his own design and not recognized in the literature or the caselaw: he simply took the valuation implied in the Series B and C and reduced it proportionally to the reduction in ARR KPMG found in the Recast—without considering any other financial metrics or facts about HeadSpin.   (Hart Report at 33.)   Mr. Hart appears to have used this methodology because it is particularly favorable for the government, insofar as it suggests a significant loss.   However, the Court should ignore this unscientific and undeveloped approach without more. *See Zhu v. Li*, No. 19-CV-02534-JSW, 2023 WL 1111507, at *2 (N.D. Cal. Jan. 30, 2023) (excluding undeveloped expert valuation of private company lacking in foundation).

Mr. Hart's ARR approach is particularly problematic in this context for multiple reasons:

**Second**, Mr. Hart does nothing to vet or explore the KPMG approach that provides the underlying inputs for his ARR method. *See Davis v. Carroll*, 937 F. Supp. 2d 390, 418 (S.D.N.Y. 2013) ("Where an appraisal or other expert testimony rests on inadequate factual foundations, problematic assumptions, or a misleadingly partial selection of relevant facts, it must be excluded under Rule 702.").  But the KPMG Recast is ill suited for the purpose Mr. Hart puts it to. ■

1 ██████████████████████████████████████████████████████████

2 ██████████████████████████████████████████████████████████

3 ██████████████████████████████████████████████████████████

4 ██████████████████████████████████████████████████████████

5 ██████████████████████████████████████████████████████████

6 ███████████████████████████████████████   As a result, Mr. Hart's

7 ultimate "loss" calculation based on this ARR method goes far beyond Mr. Lachwani's conduct.

8        **Third**, as Mr. Ciancanelli explains, using a single metric like ARR to determine valuation

9 of a private company is not reliable or an accepted practice.  (Hemann Decl. Ex. 10 (Ciancanelli

10 Report) at 15-24.)  Such single-metric analyses fail to capture context and reduce private company

11 valuation to simple arithmetic—when industry standards call for more.  (*Id*.)

12        Mr. Ciancanelli identifies still further reasons that Mr. Hart's approaches are

13 methodologically unsound.  (*Id*.)

14                                          **\*\*\*\***

15        For all of the foregoing reasons, the government has not proven actual loss.  The offense

16 level should not be enhanced under USSG § 2B1.1(b)(1).

17 **V.**        **NO ENHANCEMENT FOR 10 OR MORE VICTIMS IS PROPER.**

18        Under the Guidelines, a "victim" must suffer a loss.   Indeed, the word "victim" is defined

19 in the commentary as "any person who sustained any part of the actual loss...."  *See* USSG §

20 2B1.1(b)(2), cmt. n. 1.  "Thus, in order to be counted as a victim, a person must have sustained a

21 loss that is 'monetary or that otherwise is readily measurable in money' and that loss must be

22 included in the loss calculation."  *United States v. Armstead*, 552 F.3d 769, 780–81 (9th Cir. 2008)

23        As explained in Section IV, *supra,* the government has not shown that any investor suffered

24 actual loss as a result of Mr. Lachwani's Admitted Conduct.  No victim has reported any loss to the

25 Probation Office or the Court.  No victim testified to or produced documents that show a loss.  The

26 Court would be unable, here, to find that Victim X suffered a loss in the amount of $Y.

27        Courts routinely reject the application of the 10 or more victims sentencing enhancement

28 where the Government fails to provide evidence of actual loss for at least 10 victims.  *See, e.g.,*

*Armstead*, 552 F.3d at 780–81 (rejecting number of victims enhancement where Government failed to show actual loss for certain individual victims); *United States v. Conner*, 537 F.3d 480, 488 (5th Cir.2008) (rejecting two-point enhancement where alleged victims of credit card fraud were reimbursed for loss by their banks); *United States v. Yagar*, 404 F.3d 967, 971 (6th Cir.2005) (individual bank account holders not "victims" in bank fraud case because their banks reimbursed their temporary loss, and because "the account holders ... suffered no adverse effect as a practical matter" from the defendant's conduct.)  This enhancement should not be applied here.

## VI.   MR. LACHWANI HAS ACCEPTED RESPONSIBILITY.

Mr. Lachwani should receive a two-level downward adjustment under § 3E1.1(a) of the Sentencing Guidelines because he has "clearly demonstrate[d] acceptance of responsibility for his offense." USSG § 3E1.1(a).  Mr. Lachwani pled guilty to Counts Three, Seven, and Thirteen of the Superseding Indictment, charging him with wire fraud and securities fraud. (ECF 88.)  For this reason, and because Mr. Lachwani expressed true contrition to Probation Officer Melissa Moy, the PSR recommends the two-level downward adjustment.  (PSR ¶ 46.)   Critically, the Government did not object to Officer Moy's recommendation for a decrease under § 3E1.1(a).  The government has therefore agreed with the reduction and waived any argument to the contrary.   In these circumstances, the downward adjustment is proper.  *See United States v. Kise*, 369 F.3d 766, 770-75 (4th Cir. 2004) (concluding district court's denial of reduction was clearly erroneous where defendant had accepted responsibility, PSR recommended sentencing reduction, and government did not object to reduction).

## VII.   MR. LACHWANI IS A ZERO POINT OFFENDER.

Effective December 1, 2023 (after the Plea Agreement and change of plea), the Sentencing Guidelines were amended to provide for a two-level downward adjustment for "zero point offenders."

Mr. Lachwani meets the criteria for the two-level downward adjustment provided for by the new guideline.  Mr. Lachwani meets the requirement in § 4C1.1(a)(1) as he has no previous criminal

history.[21]  Mr. Lachwani has not "personally cause[d] substantial financial hardship" to anyone as contemplated in § 4C1.1(a)(6).   Section 4C1.1(b)(3) advises the court to, in determining "substantial financial hardship," "consider, among other things, the non-exhaustive list of factors provided in Application Note 4(F) of the Commentary to § 2B1.1 (Theft, Property Destruction, and Fraud)."  There was no substantial financial hardship under these factors, as HeadSpin investors were sophisticated and there is no evidence that, due to Mr. Lachwani's actions, any HeadSpin investor became insolvent; filed for bankruptcy; suffered "substantial loss" of a savings or investment fund; made "substantial changes to his or her employment"; made "substantial changes to his or her living arrangements"; or "suffer[ed] substantial harm to his or her ability to obtain credit."  USSG Application Note 4(F) of the Commentary to § 2B1.1; *see also United States v. George*, 949 F.3d 1181, 1184 (9th Cir. 2020) ("substantial financial hardship" is "loss that was significant in light of [the victims'] individual financial circumstances.").

Accordingly, Mr. Lachwani's sentence should be reduced by two levels because he meets all of the requirements of § 4C1.1(a).

## VIII.   CONCLUSION

There is no evidence that any investor lost any money.   The offense level should be calculated as follows:

| | |
|---|---|
| Base Offense Level (2B1.1(a)): | 7 |
| Enhancement for Loss (2B1.1(b)(1)): | 0 |
| Enhancement for Multiple Victims (2B1.1(b)(2)): | 0 |
| Acceptance of Responsibility: | -2 |
| Zero Point Offender Adjustment (4C1.1): | -2 |
| Total Offense Level: | 3 |

---

[21] Mr. Lachwani has not pled guilty to crimes involving terrorism (§4C1.1(a)(2)); violence or threats of violence (§4C1.1(a)(3)); death or serious bodily injury (§4C1.1(a)(4)); sex offenses (§4C1.1(a)(5)); firearms (§4C1.1(a)(7)); or offenses involving individual rights (§4C1.1(a)(8)) or hate crimes (§4C1.1(a)(9)).  Mr. Lachwani was not involved in a continuing criminal enterprise (§4C1.1(a)(10)).

1    Dated:  September 6, 2022                    COOLEY LLP

2

3                                                 By: */s/John Hemann*
                                                      John Hemann
4                                                     Elizabeth H. Skey
                                                      Max A. Bernstein
5                                                     Eleanor W. Barczak

6                                                 Attorneys for Defendant
                                                  MANISH LACHWANI
7

8

9

10

11

12

13    294764498

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28