COOLEY LLP
JOHN HEMANN (165823)
(jhemann@cooley.com)
MAX A. BERNSTEIN (305722)
(mbernstein@cooley.com)
ELEANOR W. BARCZAK (329180)
(ebarczak@cooley.com)
3 Embarcadero Center, 20th Floor
San Francisco, California 94111-4004
Telephone:      +1 415 693 2000
Facsimile:      +1 415 693 2222

COOLEY LLP
ELIZABETH H. SKEY (267852)
(eskey@cooley.com)
3175 Hanover Street
Palo Alto, California   94304-1130
Telephone:      +1 415 495 5000
Facsimile:      +1 415 495-7400

CLARENCE & DYER LLP
NANCI L. CLARENCE (122286)
(nclarence@clarencedyer.com)
899 Ellis Street
San Francisco, California 94109
Telephone:      +1 415 749 1800
Facsimile:      +1 415 749 1694

Attorneys for Defendant
MANISH LACHWANI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>               Plaintiff,<br><br>    v.<br><br>MANISH LACHWANI,<br><br>             Defendant. | Case No. 21-cr-00353-CRB<br><br>**DEFENDANT MANISH LACHWANI'S RESPONSE TO UNITED STATES' SENTENCING MEMORANDUM RE LOSS** |

**REDACTED**

**PURSUANT TO PROTECTIVE ORDERS DKTS. NOS. 27 AND 90.**

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

**DEFENDANT LACHWANI'S RESPONSE TO US
SENTENCING MEMORANDUM RE LOSS
21-CR-353-CRB**

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION ................................................................................................. 1

II.   ARGUMENT ...................................................................................................... 2

    A.   There Was No Loss.................................................................................... 2

        1.   The government misleads the Court on the law.......................... 2

        2.   Investors received something of value in exchange for their investments.............................................................................. 4

        3.   The declarations submitted by the government support the conclusion that there was no loss........................................... 6

        4.   The comment cited by the government does not apply............................. 8

    B.   The Government's Memo Shows the Government's Measurements of Loss are Invalid and Unsupported. .................................................... 10

        1.   The government should be required to support this methodology by clear and convincing evidence. ............................................... 10

        2.   The government offers no defense of Mr. Hart's flimsy methods.......... 11

        3.   Mr. Hart's reliance on KPMG's Recast ARR is unreliable for the reasons explained in Mr. Lachwani's Memo. .......................... 13

    C.   The Government's References to Logos and Device Counts are Misleading and Diversionary. .............................................................................. 16

    D.   Mr. Lachwani Made Money Investing the Company's Funds, Rendering the Government's "Risky Investments" Arguments Misplaced in a Loss Briefing. ..................................................................................... 17

III.  CONCLUSION ................................................................................................ 19

**Cases**

*United States v. Allison,*
  86 F.3d 940 (9th Cir. 1996) ................................................................................................ 9

*United States v. Balwani,*
  No. 18-CR-00258 EJD (N.D. Cal. Nov. 30, 2022), ECF No. 1661 ................................ 2, 3, 4

*United States v. Bryson,*
  101 F. Supp. 3d 147 (D. Conn. 2015) .................................................................................. 3, 5

*United States v. Byors,*
  586 F.3d 222 (2d Cir. 2009) ................................................................................................. 3, 5

*United States v. Garro,*
  517 F.3d 1163 (9th Cir. 2008) .............................................................................................. 11

*United States v. Holmes,*
  No. 18-CR-00258 EJD (N.D. Cal. Nov. 16, 2022), ECF No. 1649 ................................ 2, 3, 4

*United States v. Leonard,*
  529 F.3d 83 (2d Cir. 2008) .................................................................................................... 5, 7

*United States v. Lonich,*
  23 F.4th 881 (9th Cir. 2022) ................................................................................................. 11

*United States v. Ortland,*
  109 F.3d 539 (9th Cir. 1997) ................................................................................................ 1, 10

*United States v. Stoddard,*
  150 F.3d 1140 (9th Cir. 1998) .............................................................................................. 9

*United States v. Turk,*
  626 F.3d 743 (2d Cir. 2010) .................................................................................................. 3, 5

**Statutes**

USSG §2B1.1, note 3(D)(ii) .................................................................................................... 8

## I.    INTRODUCTION[1]

The government plants its flag on the tallest peak it can find, prioritizing a big number over all else, including the applicable law and relevant facts. The number is so extreme that one must presume that the government does this to manufacture some sort of high/low bracket that will lead the Court to a landing place in the middle.

To get there, the government ignores fact-based common sense that no investor actually lost any money, and selectively relies on certain Second Circuit authority without advising the Court of related authority that requires a finding in favor of Mr. Lachwani's position. The "total investment" as either the basis or a starting point for a loss enhancement is only appropriate when investors are left with nothing. As discussed below, the government omits this rule from its sentencing memorandum.

When investors are left with something, as here, the question is whether they are left with more or less than their initial investment. If it is more (or equal), there is no actual loss. If it is less, the actual loss is the delta between what the investors are left with versus what they put in. Actual means actual. The government cites no securities or investor fraud cases in which investors lost no money, but the court found loss under the Guidelines.

The government disingenuously asserts that "giving the money back" should not count in Mr. Lachwani's favor. The government misreads the Guidelines comment on which it relies and ignores the Ninth Circuit investment fraud case that clearly applies. HeadSpin's shareholders voted to reorganize and recapitalize the company. In doing so, some shareholders elected to take distributions, some elected to retain their equity, and many elected to do both. Mr. Lachwani had no control over the process whatsoever; he neither returned money to shareholders nor had any ability to do so. The government fails to cite *United States v. Ortland*, where the Ninth Circuit affirmed that the value in a company distributed to investors after a fraud is discovered does not count toward loss. *Ortland*, however, applies and requires a finding of no loss here.

---

[1] Defined terms use the meaning defined in Mr. Lachwani's Sentencing Memorandum re Loss. Citations to record evidence use the format explained in footnote 1 to the same. In addition, Mr. Lachwani submits certain further materials in connection with this response attached as exhibits to the supporting declaration of Eleanor W. Barczak ("Barczak Declaration"). Such materials are cited herein as "Barczak Decl. Ex. X."

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

1

DEFENDANT LACHWANI'S RESPONSE TO US
SENTENCING MEMORANDUM RE LOSS
21-CR-353 CRB

The government's sentencing memorandum also fails to support the "expert" methodology it uses to come up with its alternative loss calculation. Any approach to measuring a "but-for" value of shares is appropriate only when built upon the foundation of an actual loss, which does not exist in this case. But the methods used by Mr. Hart, the government's expert, are not only unnecessary given no loss has been shown, but they are also makeshift, unreliable, and inconsistent with standard practice for valuing private companies. These analyses are a poor shadow of what the government's expert performed in Theranos.

Moreover, the inputs Mr. Hart used are mere supposition. The government makes clear that it relies in full on KPMG's Recast. This means the government *assumes* that any ARR KPGM found lacking in support was included fraudulently by Mr. Lachwani to mislead investors. This assumption is as vast as it is unsupported. The government cannot bypass its burden of showing fraudulent conduct by asserting it without evidence.

The Government's Memorandum does not improve the government's position in any respect, indeed it profoundly undermines it. The Court should find that the government has not sustained its burden to show loss to any victim and decline to enhance the offense level.

## II.    ARGUMENT

### A.    There Was No Loss.

#### 1.    The government misleads the Court on the law.

The government begins by reciting its version of the law on actual loss, relying heavily on two cases from the Second Circuit, and concludes "the loss amount is the amount that Lachwani and HeadSpin obtained from investors through the criminal scheme—$92.73 million." (ECF No. 103 ("Government Memo" or "Gov. Memo") at 14.) Let us put aside for the moment that Mr. Lachwani, of course, did not "obtain" any money from the Series B and C investors (HeadSpin did, Mr. Lachwani did not) and focus first on the legal analysis that leads the government to its "total investment" conclusion, for it bears careful scrutiny.

The government's legal analysis is lifted, *almost* verbatim, from the sentencing memoranda filed by the U.S. Attorney's Office in the recent Elizabeth Holmes and Sunny Balwani cases. (*See* United States' Sentencing Memorandum, *United States v. Holmes*, No. 18-CR-00258 EJD (N.D.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT LACHWANI'S RESPONSE TO US
SENTENCING MEMORANDUM RE LOSS
21-CR-353 CRB

Cal. Nov. 16, 2022), ECF No. 1649 ("Appendix A"); United States' Sentencing Memorandum, *United States v. Balwani*, No. 18-CR-00258 EJD (N.D. Cal. Nov. 30, 2022), ECF No. 1661.)[2] After copying some legal definitions and caselaw involving public companies from memoranda filed by the U.S. Attorney's Office in those cases, the prosecutors here cut-and-paste the following:

> Conversely, the "pecuniary harm" to an investor induced to invest by fraud is the amount of the investment. *See, e.g.*, *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) ("[T]he crux of [defendant's] offense is that she obtained loans by fraudulently leading unsecured creditors to believe they were secured creditors. Without this deceit, she could not have obtained her victims' money."); *United States v. Bryson*, 101 F. Supp. 3d 147, 155 (D. Conn. 2015) ("[F]or those investors who were fraudulently induced to invest following the onset of the conspiracy, a reasonable estimate of the actual loss attributable to the offense conduct is the total value of the investment.").

(Gov. Memo at 11 (quoting without attribution Holmes and Balwani memos); *see* Appendix A at 17; *United States v. Balwani*, ECF No. 1661 at 18.)

This statement of the law relied upon by the U.S. Attorney's Office in the Theranos cases, is then used by the prosecutors here to support the conclusion that the "loss" is the total "amount of the investment." However, the government only "almost" copied this language verbatim from the *Holmes* and *Balwani* briefs, as in both of those cases the government included an *additional* sentence and case citation strategically omitted when addressing the Court here. The U.S. Attorney's Office in the Theranos cases provided Judge Davila with this critical part of the analysis: "*Where a defendant's victims are 'left with nothing of value when the fraud was uncovered,' a court may find 'loss based on the victims' total . . . investment.' United States v. Byors*, 586 F.3d 222, 226 (2d Cir. 2009)." (*See* Appendix A at 17 (emphasis added).) In *Holmes* and *Balwani*, this was helpful to the government because the Theranos investors indeed were left with nothing. In the case of HeadSpin, of course, the contrary is true. As the government well knows, when investors are left with something of value when the fraud is uncovered, courts have ruled that loss is ***not*** the total investment—the opposite of the government's position.

Because it is unhelpful to its cause, when the government cut-and-pasted from the *Holmes* and *Balwani* memoranda into its memorandum for this Court, it intentionally deleted this key

---

[2] Mr. Lachwani appends this memorandum and the expert report submitted in the case, with highlighting of relevant language, to the present brief for the ease of the Court's review.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT LACHWANI'S RESPONSE TO US
SENTENCING MEMORANDUM RE LOSS
21-CR-353 CRB

language and authority, which goes directly to the critical issue in this sentencing. (*See* Appendix A at 17; *United States v. Balwani*, ECF No. 1661 at 18.) The government did not do this inadvertently—the government has known since at least the early stages of the PSR process that Mr. Lachwani intends to argue that a 100% Loss Theory is improper because the company continues to have value. That is, knowing this was a critical issue of law in the present sentencing, the government deleted this highly relevant language from what they put before Judge Davila. Not only does this violate the venerable "hard-but-not-foul blows rule," it demonstrates that the government knows the weakness of its position and is trying to prevent this Court from figuring it out. Indeed, the authority omitted by the government proves Mr. Lachwani's point: The key inquiry for the loss calculation in a securities case is the delta between what investors put in and what they are able to get out, not the "total investment," *unless* the total investment was lost (as it was in Theranos).

The Second Circuit authority on which the government relies and presented to Judge Davila supports Mr. Lachwani's position. (Gov. Memo at 13, 15.) The government's knowing and misleading omission should not be countenanced.

## 2. Investors received something of value in exchange for their investments.

The government's argument takes the "actual" out of "actual loss." Nothing in the Government's Memorandum demonstrates that HeadSpin investors actually lost (or will lose) any money. No investor has claimed any loss, through victim impact statements, declarations to the Court, or in any other way of which Mr. Lachwani is aware.

In exchange for their investment in HeadSpin, investors received shares of HeadSpin stock. That stock had value as it represented an ownership interest in the assets of a successful company. When the shareholders decided to reorganize ownership of the company through the Recap, some took distributions of cash from the company, others decided to remain invested in the company, others ███████████████████████████████████████████████████████ ██████████████████████████████████████████████ Because the company had so much value (including in cash) at the time of the Recap, none of the investors lost any money on their investments.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT LACHWANI'S RESPONSE TO US
SENTENCING MEMORANDUM RE LOSS
21-CR-353 CRB

The importance of the caselaw the government omitted from its memo is clear. In *Byors*, the case the government strategically deleted here, the defendant raised $9 million for a marble quarry business. The Second Circuit rejected the defendant's argument that loss should be reduced by the amount of the "legitimate expenses" he paid from investment funds.[3] The court explained that "defendant's victims were left with nothing of value when the fraud was uncovered." 586 F.3d 226, citing *United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008). In other words, the full amount of the investment equaled the loss only because the company had lost all value.

In *Leonard*, cited by the court in *Byors*, 586 F.3d at 226, the district court "computed the loss amount as equal to the entire cost of the securities sold by the appellants, on the ground that the members would not have invested had they realized the true size of the sales commissions." *United States v. Leonard*, 529 F.3d 83, 93 (2d Cir. 2008). This is exactly what the government argues for here—because investors claim they would not have invested in the counterfactual world, the government says they lost their full investment. But *the Second Circuit rejected this argument*, and held that even if the investors would not have invested, "this does not, in and of itself, mean that the securities the investors received in exchange for their contributions were entirely without

---

[3] Unlike Mr. Lachwani, defendant Byors "used substantial amounts of the borrowed funds to make the down payments on houses in Florida and Main, to purchase automobiles and horses, and for a variety of other personal expenditures." *Byors*, 586 F.3d at 224. [4] The Second Circuit cases taken from the Theranos briefs and which the government *does* cite in its memorandum are easily distinguishable. (Gov. Memo at 13, 15.) In both cases, the defendants lied about what sort of property interests the victims received in exchange for their investment. *Turk* is a loan fraud case, not a securities case. *Turk*, 626 F.3d at 745. For loss calculation purposes, the Second Circuit specifically distinguished securities cases in which shareholders receive equity and have "upside benefit." "A loan cannot be compared to a stock because a stock is owned outright, with the assumption of upside benefit and downside risk, while a loan is merely the exchange of money for a promise to repay, with no assumption of upside benefit." *Id*. at 751. Again, that is the point here: HeadSpin had, and has, significant value, which the investors received and "owned outright" in the form of their preferred shares. Similarly, in *Bryson*, the "total investment" loss enhancement was driven by the structure of the investment. *Bryson*, 101 F. Supp. 3d at 156-57. The investors were fraudulently led to believe that they were purchasing full equity interests and not investing in "a position junior to over $300 million of senior debt." and "did not intend to take on the 'risks and benefits of the market' associated with a junior investment; rather the investment they thought they were making was fundamentally and materially different than what they actually received." *Id*. Here, the victims identified by the government were preferred shareholders with senior distribution rights. Unlike in *Turk* and *Bryson*, Mr. Lachwani did not sell a phony product; he did not create a fake company. The investors in this case received preferred shares in exchange for their investments and those shares had value at the time of the investments and still do now—as even the government's own expert witness, Mr. Hart, found.

Cooley LLP
Attorneys at Law
San Francisco

5

Defendant Lachwani's Response to US
Sentencing Memorandum re Loss
21-CR-353 CRB

value. After all, the investors did obtain an interest in a company engaged in producing and distributing a motion picture." *Id.*

And so it is here. The investors obtained an interest in HeadSpin, a "global omnichannel digital experience testing platform that helps enterprises optimize application performance with its data science capabilities"—a real company with a real product and real customers. https://www.headspin.io/company. That investment had value. In fact, at the time of the Recap, the company had $109 million in ***liquid*** assets, which does not include untold (and uncalculated by the government) millions in accounts receivables, intellectual property, and other assets. The victims identified by the government—the Series B and C shareholders—were the preferred shareholders with senior distribution rights—*i.e.*, they had preferred claims on the company's cash, which exceed the amount of their investments. Under this caselaw, as well as under binding Ninth Circuit caselaw in *Ortland*, there can be no loss in these circumstances.[4]

### 3. The declarations submitted by the government support the conclusion that there was no loss.

In connection with its memorandum, the government submits eight declarations. These declarations were not provided to the Probation Office during the presentence investigation, and

---

[4] The Second Circuit cases taken from the Theranos briefs and which the government *does* cite in its memorandum are easily distinguishable. (Gov. Memo at 13, 15.) In both cases, the defendants lied about what sort of property interests the victims received in exchange for their investment. *Turk* is a loan fraud case, not a securities case. *Turk*, 626 F.3d at 745. For loss calculation purposes, the Second Circuit specifically distinguished securities cases in which shareholders receive equity and have "upside benefit." "A loan cannot be compared to a stock because a stock is owned outright, with the assumption of upside benefit and downside risk, while a loan is merely the exchange of money for a promise to repay, with no assumption of upside benefit." *Id.* at 751. Again, that is the point here: HeadSpin had, and has, significant value, which the investors received and "owned outright" in the form of their preferred shares. Similarly, in *Bryson*, the "total investment" loss enhancement was driven by the structure of the investment. *Bryson*, 101 F. Supp. 3d at 156-57. The investors were fraudulently led to believe that they were purchasing full equity interests and not investing in "a position junior to over $300 million of senior debt." and "did not intend to take on the 'risks and benefits of the market' associated with a junior investment; rather the investment they thought they were making was fundamentally and materially different than what they actually received." *Id.* Here, the victims identified by the government were preferred shareholders with senior distribution rights. Unlike in *Turk* and *Bryson*, Mr. Lachwani did not sell a phony product; he did not create a fake company. The investors in this case received preferred shares in exchange for their investments and those shares had value at the time of the investments and still do now—as even the government's own expert witness, Mr. Hart, found.

therefore are improper at this juncture. (ECF No. 105 ("Lachwani Memo") at 25.) But the declarations actually support the conclusion that there was no loss.

The government appears to rely on the declarations for two purposes: (1) to show that Mr. Lachwani was responsible for everything that happened at the company; and (2) to establish that certain investors would not have invested had they known the truth about the ARR. As to the former, the declarations offer only conclusory (and self-serving) statements that Mr. Lachwani can be blamed for all the issues the company had with ARR. For the reasons discussed in Section II.B.3, *infra*, these declarations cannot carry the government's burden, even on this point.

As to the assertions that these investors would not have invested "but for" the inflated financial metrics, the point is dubious because (a) one lead investor and declarant had significant concerns at the time regarding ARR, but invested anyway, (Lachwani Memo at 22) and (b) the other lead investor and declarant commented after Mr. Lachwani's conduct was discovered that they wished they had invested more (*id*. at 16). These after-the-fact assertions by investors that they would not have invested are irrelevant regardless, because, as the Second Circuit pointed out in the line of cases omitted by the government, the claim by investors that they "would not have purchased the investment had they known" about the alleged fraud "does not, in and of itself, mean that the securities the investors received in exchange for their contributions were entirely without merit." *Leonard*, 529 F.3d at 93. In short, simply asserting that certain investors "would not have invested" does not show *actual loss*.

Instead, the declarations tacitly show that the investors did *not* suffer actual loss. Each of the investor declarations is utterly silent as to loss. These declarations would have been the place to state with clarity (1) that these preferred shareholders suffered a loss and (2) the amount of such loss. The declarations say nothing of the sort, nor has any investor submitted a victim impact statement seeking restitution for losses. The silence on this point should be dispositive—surely the government would have had these investors claim loss in these declarations (or in victim impact statements) *if the investors had suffered a loss*. That investors were unwilling to say, under oath, that they lost any money speaks volumes. The government relies on the much weaker assertion

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT LACHWANI'S RESPONSE TO US
SENTENCING MEMORANDUM RE LOSS
21-CR-353 CRB

that the investors "would not have invested"[5] because no victim was willing to say they suffered *loss*.[6] The government's effort to read the word "actual" out of "actual loss" should be rejected.

### 4. The comment cited by the government does not apply.

#### a. The comment does not apply on its face.

The government relies on a Guidelines comment focused on what can be credited against loss. The comment on which the government relies, USSG §2B1.1, note 3(D)(ii)), simply does not apply for two reasons. First, there is no loss to be credited against, as discussed above.

Second, *Mr. Lachwani* never *returned* any money. The government asserts, quoting the comment, that "[l]oss is reduced by '[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim ***before the offense was detected***.'" (*See* Gov. Memo at 13 (emphasis added).) The government emphasizes the wrong words. The parts that should be emphasized are "[1] ***returned . . .*** [and 2] ***by the defendant or other persons acting jointly with the defendant***," for those are the parts that matter here.

To start, money was not "returned" to shareholders. The shareholders agreed to the Recap and assets were distributed by the company to shareholders who made the affirmative election to receive the distribution. Critically, the money did not flow from Mr. Lachwani back to investors, rather the private company the *investors owned* decided to undertake a liquidity event in which shares were exchanged for cash, notes, reclassified shares, or a combination of the three.

Moreover, money was not distributed "by the defendant (Mr. Lachwani) or other persons acting jointly with the defendant," to quote the language of the Guidelines comment. The money

---

[5] (*See* Investor 1 Decl. ¶¶ 9, 11; Investor 2 Decl. ¶ 9.)

[6] There are many other reasons an investor's (retroactive assessment of) willingness to invest in a counterfactual world is not a proxy for loss. Even an investor that "would not have invested" if provided with different financial metrics, might nonetheless profit (even immensely) if the company sees significant success. "Actual loss" considers loss, nothing else. Moreover, as discussed in Section II.B.3, *infra*, the investors were not asked, and did not state, that they would not have invested but for the inflation of ARR *caused by Mr. Lachwani's criminal conduct*. That is, these investors knew only that KPMG found a significant delta between reported and supported ARR—they took no position in the declarations on whether they would have invested, but for the (small) subcomponent of that delta that the government has shown was the result of Mr. Lachwani's wrongdoing.

was distributed *by the company* to its shareholders—after Mr. Lachwani had resigned by then. This distribution was pursuant to the terms of a heavily-negotiated agreement approved by vote of the shareholders. At the time of the Recap, Mr. Lachwani was not acting jointly with the company, indeed the company was vigorously adverse to Mr. Lachwani, as the declarations from the company's board members submitted by the government amply demonstrate.

The government fails to apprehend, or at least recognize these key facts. Mr. Lachwani did not control the money invested in HeadSpin. The money belonged to the company and always was in the possession of the company. Mr. Lachwani had no ability to disperse those funds through the Recap (or any other way) and did not play any part in doing so. The distribution of funds following a recapitalization, change-of-control, or exit event, such as the one to which the HeadSpin investors agreed, happens in every private company when it goes public, merges with or is acquired by another company, goes out of business and is liquidated, or decides (as HeadSpin did) to change is capital structure.

> **b.      The caselaw cited by both parties shows the government's argument is wrong.**

The two cases cited by the government on this issue are easily and clearly distinguishable—they certainly are not "binding Ninth Circuit precedent" that proves the government's point, as the government claims. In *United States v. Stoddard*, the defendant intended to and did steal escrow funds, and converted those funds for his own use. 150 F.3d 1140, 1143 (9th Cir. 1998). The victim did not receive anything of value in exchange. The Ninth Circuit considered only whether the defendant had returned these stolen funds before or after discovery of the fraud. *Id.* at 1146-47. In *United States v. Allison*, the defendants caused unauthorized credit cards to issue and used them to make purchases for their personal use. 86 F.3d 940, 941 (9th Cir. 1996). The court looked to whether the loss calculation should include payments the defendants made to the bank to pay down the balance of the unauthorized credit cards, finding that such payments should be counted against the loss, if made before detection of the fraud. *Id.* at 944. But in both cases, the defendants converted the funds at issue to their own purposes and the Ninth Circuit considered whether the return of funds *from the defendants to the victims* should be credited in the loss calculation. In each

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

9

DEFENDANT LACHWANI'S RESPONSE TO US
SENTENCING MEMORANDUM RE LOSS
21-CR-353 CRB

of these cases the defendant took money for personal use, intended for the victim to lose the money, and personally gave the money back to the victim to try to avoid trouble.

This case has none of those features. Mr. Lachwani never embezzled any funds from the Series B or C or otherwise used such funds for his own purposes. Rather, and unlike in *Stoddard* and *Allison*, the Series B and C funds were at all times kept by the company that the Series B and C shareholders partially owned—in fact, HeadSpin was so cash-rich that these funds were not even spent, but rather were sitting in the company's bank accounts as late as the 2020 Recap. Mr. Lachwani could not give this money back to investors because he never took it.

The case that applies here is *United States v. Ortland*, in which the court concluded that, to calculate loss, the amount of money returned to investors by the company's appointed receiver following the discovery of the defendant's fraud should be subtracted from the amount of money invested. 109 F.3d 539, 547 (9th Cir. 1997). As explained in Mr. Lachwani's Sentencing Memorandum, had HeadSpin gone into receivership as in *Ortland*, the Series B and C investors would have received their full investments back in light of HeadSpin's ample liquid assets and highly valuable IP. (Lachwani Memo at 17.) The government does not contest this fact, but rather tries to ignore the issue altogether. Thus, under *Ortland*, there would be no cognizable loss. 109 F.3d at 548.

    **B.**    **The Government's Memo Shows the Government's Measurements of Loss are Invalid and Unsupported.**

        **1.**    **The government should be required to support this methodology by clear and convincing evidence.**

It is beyond debate that the loss enhancement urged by the government would have an "extremely disproportionate impact on the sentence." Without the enhancement, Mr. Lachwani falls in Zone A; with the enhancement the government contends he should be sentenced to over five years in prison.

As explained in Mr. Lachwani's Memorandum, the Ninth Circuit requires that the government prove loss by "clear and convincing evidence" where, as here, the enhancement would have so severe a consequence on sentencing. (Lachwani Memo at 13-14.) This is especially so

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT LACHWANI'S RESPONSE TO US
SENTENCING MEMORANDUM RE LOSS
21-CR-353 CRB

given the premises of the government's loss arguments go far beyond the factual basis for conviction. (*Id*.)

The cases the government cites only reinforce this point. For example, in *United States v. Lonich*, the Ninth Circuit explained that it would violate due process to show loss through only a preponderance of the evidence if the loss amounts were not established by the conviction itself. 23 F.4th 881, 915 (9th Cir. 2022) ("due process concerns . . . are satisfied by a preponderance of the evidence standard because the enhancements are based on criminal activity for which the defendant has already been convicted"); *see also United States v. Garro*, 517 F.3d 1163, 1169 (9th Cir. 2008) (similar).[7] But Mr. Lachwani did not plead guilty to intentionally misleading investors as to every ARR entry that KPMG found to be unsupported. Indeed, the language of the Plea makes clear just the opposite. In the Plea, the parties reach no agreement regarding the loss amount. Mr. Lachwani admitted that he "knew that the [ARR] spreadsheet overstated the subscription fees and contractions for *certain* customers," not all customers or all entries identified by KPMG. Nor is there agreement in the Plea as to the amount ARR was overstated. As such, Mr. Lachwani has not plead that the full amount of KPMG's Recast of ARR reflected his knowledge or intentional wrongdoing.

This is not meant to suggest that Mr. Lachwani is not guilty or is not admitting guilt—he is. It is meant to convey that while Mr. Lachwani is guilty of some things, he is not guilty of *everything* that went wrong at HeadSpin, a company with no controls or accounting systems, over the four years in question. And he has certainly not plead guilty to all of the many issues HeadSpin's financials had, which issues were wide-spread and involved (and were caused by) multiple other actors at the company.

Nonetheless, the Government's Memorandum relies on allegations of all manner of things for which Mr. Lachwani has not plead guilty in connection with. Given that Mr. Lachwani has not

---

[7] The government ignores where the "real action is" in the analysis. *Lonich*, 23 F.4th at 911. The Ninth Circuit has "repeatedly recognized that our cases commonly turn on the last two factors: whether the enhanced sentence is four or more offense levels higher (factor 5) and more than double the initial sentencing range (factor 6)." *Id*. As to these, there is no doubt that the higher standard should apply.

Cooley LLP
Attorneys at Law
San Francisco

11

Defendant Lachwani's Response to US
Sentencing Memorandum re Loss
21-CR-353 CRB

1  been convicted of the conduct on which the government relies, due process requires that it prove

2  that conduct at sentencing by clear and convincing evidence.[8]

3  **2.  The government offers no defense of Mr. Hart's flimsy methods.**

4  The Lachwani Memorandum and Ciancanelli Report explain why Mr. Hart's two attempts

5  to measure "but-for" Series B and C share value are fundamentally inadequate. (Lachwani Memo

6  at 26-27.)  The Government's Memorandum only shows the same.

7  *First*, the government doubles down on the "repricing" in the Recap.  But the government's

8  assertion that because investors agreed to the Recap, the repricing is a fair estimate of but-for value

9  (Gov. Memo at 16) fails for multiple reasons:  (1) the Recap looked to set a price for shares in late

10  2020, not at the time of the Series B and C; (2) the Recap paperwork itself explained that no

11  objective methods had been employed to determine appropriate share repricing; (3) the Recap in

12  no way resembled the market dynamics in play at the time of the series investments; and (4) the

13  Recap was not a collective effort to determine a "but-for" price, but rather involved a settlement of

14  the investors' claims.  (Lachwani Memo at 27.)  This last fact is critical:  The Recap's requirement

15  that investors release claims was of significant value to the company and the leverage of those

16  claims allowed investors to put downward pressure on the share pricing they were negotiating.[9]

17  (*Id.*)  This dynamic renders any "repricing" distorted, relative to the pricing dynamics that were

18  present during the Series B and C, when investors had no legal claims to leverage.

19  *Second*, the government's ARR multiple approach is based entirely on a single investor's

20  calculation of an ARR multiple (amongst many other metrics the investor calculated).  This is so

21  despite the fact there is no evidence that any investor used an ARR multiple to determine whether

---

[8] Seeming to recognize that it is on thin ice (and anticipating the need to preserve arguments for appeal), the government drops a note asserting that the Ninth Circuit has gotten this issue wrong in finding that such enhancements must be supported by clear and convincing evidence.  (Gov. Memo. at 14 n.4.)  But luckily for the rule of law, federal prosecutors cannot overturn binding precedent by footnote.

[9] Notably, the released claims included claims against ████████████████

████████████████████████████████████

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

12

**DEFENDANT LACHWANI'S RESPONSE TO US
SENTENCING MEMORANDUM RE LOSS
21-CR-353 CRB**

to invest in HeadSpin or at what price. (*See* Gov. Memo at 17.)[10] The Government's Memorandum tries to shore up this unsound approach to determining valuation by citing investor declarations the government mustered at the eleventh hour. But not one of these declarations states that any investor used an ARR multiple to determine the company's valuation. The methodology is flawed for multiple other reasons set out in the Lachwani Memorandum (at 28-30) and the Ciancanelli Report (at 18-20). And even beyond these various flaws, the ARR multiple approach Mr. Hart uses fails because the input—the Recast ARR—is not appropriate here, for the reasons discussed below.

> **3.** **Mr. Hart's reliance on KPMG's Recast ARR is unreliable for the reasons explained in Mr. Lachwani's Memo.**

The Government's Memorandum demonstrates the very issues Mr. Lachwani raised with regard to Mr. Hart's reliance on the Recast ARR: The government has not shown by any evidentiary standard that the entire amount of ARR that KPMG discounted in the Recast was caused by Mr. Lachwani's criminal conduct.



---

[10] Even the cited investor declaration states only that ARR was "important"—a notably vague assertion that falls far short of a statement that the investor used an ARR multiple alone to determine the appropriate price to invest at.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

13

DEFENDANT LACHWANI'S RESPONSE TO US
SENTENCING MEMORANDUM RE LOSS
21-CR-353 CRB

That is, the company was open with investors about the approach KPMG later identified as incorrect. There is no reasonable argument that Mr. Lachwani is criminally responsible for the millions of dollars that make up this component of KPMG's analysis.

Even putting aside this significant component of the ARR issue, the government also does not prove that the remaining ARR removed in the Recast was the result of Mr. Lachwani's criminal conduct. In fact, the government does not even attempt to make such a showing. Instead, the government points to three "examples" of ARR entries (among the dozens in the Spreadsheet KPMG found unsupported) that were misstated—and even these examples are indicated in conclusory fashion and without an evidentiary showing of fraud. (Gov. Memo at 5-6.) The government then later asserts that, as to the other "false" ARR entries that it does not bother to identify, Mr. Lachwani made them up out of "whole cloth." (Gov. Memo at 21.) In short, the government shifted to KPMG its burden of showing Mr. Lachwani criminally caused each false ARR entry and assumed, seemingly without investigation, that if KPMG was unable to find documentation for an ARR entry that means Mr. Lachwani fraudulently included the entry to mislead investors.

This approach falls short of meeting the government's burden. As an initial matter, KPMG never sought to prove that any entry was *false*, but rather only sought to determine which entries could be supported by then-available documentation. (*See* Lachwani Memo at 8-9.) Moreover, KPMG was not investigating Mr. Lachwani and therefore made no attempt to show that any unsupported entry was included as a result of criminal conduct *by* Mr. Lachwani. The government apparently also did not engage in such an investigation and instead asserts generally that because Mr. Lachwani controlled the ARR Spreadsheet the Court can assume that any false entry in it was a result of his intentional misconduct. (Gov. Memo at 21.) But this is an Olympic leap of logic and Mr. Lachwani should not be imprisoned on mere assumption.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

14

DEFENDANT LACHWANI'S RESPONSE TO US
SENTENCING MEMORANDUM RE LOSS
21-CR-353 CRB

The government alone carries the burden of showing its loss calculations were caused by the criminal conduct of the defendant and fails to do so for the reasons discussed above. That should end the inquiry. But to demonstrate just how unreasonable the government's assumptions are, Mr. Lachwani provides the following (non-exhaustive) examples of ARR entries in the Spreadsheet that KPMG found to be unsupported, but that were caused not by any criminal intent on Mr. Lachwani's part, but rather by information provided to Mr. Lachwani by salespeople and account mangers that later proved incorrect or unreliable. That is, while Mr. Lachwani may have manually entered items he received from others in the ARR Spreadsheet, it was the broader dysfunction at HeadSpin that cumulatively resulted in the problems with ARR tracking:



While Mr. Lachwani understands KPMG found defects or failures of documentation in these entries, and discounted them, the above evidence shows Mr. Lachwani did not make them up "whole cloth"—and instead made these entries based on information provided to him by the relevant executives. The government has oversimplified to avoid its burden of showing that in each case Mr. Lachwani knowingly and criminally included a false entry to defraud investors.

To be clear, this is not a defense of Mr. Lachwani's competence as a business executive. That the CEO of the company was manually inputting revenue numbers into a spreadsheet based on abbreviated explanations of salespeople or contracts not reviewed by a lawyer, and that there

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

were not controls in place to police salespeople from overstating the status of deals, speak poorly of Mr. Lachwani's management (not to mention the Board of Directors' oversight). Nor is this a defense of the entries in the ARR Spreadsheet Mr. Lachwani knew were incorrect. But what these examples do show is that the government's approach to proving that Mr. Lachwani is *criminally* liable for *every* ARR entry KPMG was unable to document is so abridged and conjectural as to make a mockery of due process. The sentence-dispositive assumptions made by the government and its expert without a corresponding evidentiary basis should not be allowed.

### C. The Government's References to Logos and Device Counts are Misleading and Diversionary.

The government points to other statements from investor decks, unrelated to financial metrics, that it claims are misrepresentations (Gov. Memo at 7-9), but these have no bearing on the loss calculation. The government raises these alleged misrepresentations not to show any loss— the government does not even pretend that these issues factor into its loss calculations or were important to investors—but rather to bolster its false narrative that Mr. Lachwani was generally dishonest. However, these statements were not false, and there is no evidence they led to actual loss for any investor.[11]

The government claims that HeadSpin inflated the number of devices that were deployed and the number of locations the devices were deployed to. (Gov. Memo at 8.) But the government fundamentally misunderstands how HeadSpin works.

---

[11] For example, the investors do not even mention them in their declarations.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT LACHWANI'S RESPONSE TO US
SENTENCING MEMORANDUM RE LOSS
21-CR-353 CRB

███████████████████████████████████████████████████

███████████████████████████████████████ More

importantly however, the government even bother to explain how this representation is tied to any

theory of loss the government puts forward—it is not.

The government also alleges that HeadSpin inflated the number of customers it had and lied

on investor decks about which customers actually used the service. (Gov. Memo at 8.) But the

government ignores that the referenced slides did not state that ██████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████

███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

17

DEFENDANT LACHWANI'S RESPONSE TO US
SENTENCING MEMORANDUM RE LOSS
21-CR-353 CRB

[BLACK REDACTION BAR]

[BLACK REDACTION BAR] Further, the government has again failed to identify a single investor that even considered these statements, let alone lost money as a result. The government's expert notably also did not view these statements as relevant to any measure of loss.

**D.**  **Mr. Lachwani Made Money Investing the Company's Funds, Rendering the Government's "Risky Investments" Arguments Misplaced in a Loss Briefing.**

The government tries to tarnish Mr. Lachwani further by pointing to supposedly "risky" investments he caused the company to make with company funds (Gov. Memo at 8-9), but ignores (1) that these investments returned *significant profits to the company* and (2) that there was no company policy to avoid such investments or related representation to investors. To be clear, these investments were for the company and held in the company's name. Mr. Lachwani did not ever stand to profit personally from these investments in any way, and there is no allegation, evidence, or remote supposition that he did.

Notably, the government's own exhibits show that the investments made through the

[BLACK REDACTION BAR]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR]

(*Id.*) The government's brief is silent on the outcomes of these investments because far from causing "actual loss," they made the company millions. That the government briefs this issue at this juncture says much about the way the government is arguing "actual" loss in this case: The government thinks it enough to point to alleged misconduct (not even convicted conduct) and then declare loss, regardless of whether the conduct caused investors any "actual" loss. The government has taken this approach with such blinders on that it affirmatively brings before the court conduct that made investors in HeadSpin [BLACK REDACTION] in a brief on *loss* calculation.

Moreover, the government does not show that the "risky" investments Mr. Lachwani caused the company to make were against any company policy—they were not. [BLACK REDACTION]

[BLACK REDACTION BAR]

[BLACK REDACTION BAR] (Gov. Memo at 8-9.) The government may have

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

18

DEFENDANT LACHWANI'S RESPONSE TO US
SENTENCING MEMORANDUM RE LOSS
21-CR-353 CRB

included this episode not to show loss, but to show that Mr. Lachwani misled the board member in question. (*Id.*) But Mr. Lachwani was not charged with or convicted of defrauding board members, but rather investors, and the government provides no evidence that Mr. Lachwani misled any Series B or C investors on this issue, a still further reason that this investing is irrelevant in the present context.[12]

### III.  CONCLUSION

The government has not shown any actual loss.  The Court should not enhance the base offense level either by loss or by number of victims.

Dated: December 11, 2023

Respectfully submitted,

COOLEY LLP

By: */s/ John Hemann*
    John Hemann
    Elizabeth H. Skey
    Max A. Bernstein
    Eleanor W. Barczak

Attorneys for Defendant
MANISH LACHWANI

295047109

---

[12] To the extent the government contends that Mr. Lachwani's investing is part of the "scheme" from which they purport to show loss, then the significant profits earned through this investing should be deducted from any loss finding the Court makes.

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# APPENDIX A

STEPHANIE M. HINDS (CABN 154284)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

JEFF SCHENK (CABN 234355)
JOHN C. BOSTIC (CABN 264367)
ROBERT S. LEACH (CABN 196191)
KELLY I. VOLKAR (CABN 301377)
Assistant United States Attorneys

 150 Almaden Boulevard, Suite 900
 San Jose, California 95113
 Telephone: (408) 535-5061
 Fax: (408) 535-5066
 Email:  Robert.Leach@usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Case No. 18-CR-00258 EJD |
| Plaintiff, | ) UNITED STATES' SENTENCING |
| | ) MEMORANDUM |
| v. | ) |
| | ) Date: November 18, 2022 |
| ELIZABETH A. HOLMES, | ) Time: 10:00 a.m. |
| | ) Court: Hon. Edward J. Davila |
| Defendant. | ) |
| | ) |

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................1

INTRODUCTION .............................................................................................................1

FACTS .............................................................................................................................2

I.      THE OFFENSE CONDUCT ......................................................................................2

        A.      The Investor Fraud .......................................................................................2

        B.      The Impact on Patients.................................................................................8

        C.      The Cover Up...............................................................................................13

II.     PROCEDURAL HISTORY......................................................................................15

THE SENTENCING GUIDELINES CALCULATION ..........................................................15

I.      LOSS MORE THAN $550,000,000 .......................................................................16

II.     OFFENSE INVOLVING 10 OR MORE VICTIMS ....................................................20

III.    OFFENSE INVOLVING CONSCIOUS OR RECKLESS RISK
        OF DEATH OR  SERIOUS BODILY INJURY .........................................................21

        A.      Defendant's Conduct Created a Risk of Serious Harm to Theranos Patients...................21

        B.      Holmes' Treatment of Theranos Patients is Relevant Conduct ........................................24

IV.     ROLE IN THE OFFENSE.......................................................................................26

        A.      Holmes Was a Leader and Organizer .........................................................26

        B.      Holmes' Fraud Was "Otherwise Extensive"..................................................27

ARGUMENT ..................................................................................................................31

I.      LEGAL STANDARD...............................................................................................31

II.     GOVERNMENT RECOMMENDATION ...................................................................32

        A.      The Nature and Circumstances of Holmes' Crimes (18 U.S.C. § 3553(a)(1))...................32

        B.      The History and Characteristics of Holmes (18 U.S.C. § 3553(a)(1)) ..............................34

        C.      The Need to Reflect the Seriousness of the Offense, Promote Respect for the
                Law, and Provide Just Punishment for the Offense (18 U.S.C.
                § 3553(a)(2)(A))..........................................................................................35

        D.      The Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C.
                § 3553(a)(2)(B))..........................................................................................35

E.      The Need to Protect the Public From Future Crimes by Holmes (18 U.S.C.
        § 3553(a)(2)(C))................................................................................................36

F.      The Properly Calculated Sentencing Guideline Range and Pertinent Policy
        Statements Provided by the Sentencing Commission (18 U.S.C. §§ 3553(a)(4)
        & 3553(a)(5))...................................................................................................37

G.      The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(a)(6))...........38

H.      The Need to Provide Restitution to Any Victim...............................................40

III.    RESTITUTION AND FINE ...............................................................................................40

CONCLUSION.............................................................................................................................41

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# <u>TABLE OF AUTHORITIES</u>

Page(s)

**Cases**

*Gall v. United States*,
   552 U.S. 38 (2007)............................................................................................................ 31

*United States v. Bakhit*,
   218 F. Supp. 2d 1232 (C.D. Cal. 2012) ........................................................................... 16

*United States v. Berger*,
   587 F.3d 1038 (9th Cir. 2009) ......................................................................................... 16

*United States v. Booth*,
   309 F.3d 566 (9th Cir. 2002) ..................................................................................... 28, 29

*United States v. Bright*,
   353 F.3d 1114 (9th Cir. 2004) ......................................................................................... 17

*United States v. Bryson*,
   101 F. Supp. 3d 147 (D. Conn. 2015).............................................................................. 17

*United States v. Byors*,
   586 F.3d 222 (2d Cir. 2009)............................................................................................. 17

*United States v. Carty*,
   520 F.3d 984 (9th Cir. 2008) ........................................................................................... 31

*United States v. George*,
   949 F.3d 1181 (9th Cir. 2020) ......................................................................................... 20

*United States v. Goffer*,
   721 F.3d 113 (2nd Cir. 2013)........................................................................................... 36

*United States v. Govan*,
   152 F.3d 1088 (9th Cir.1998) .......................................................................................... 30

*United States v. Henderson*,
   893 F.3d 1338 (11th Cir. 2018) ........................................................................... 21, 22, 23

*United States v. Johansson*,
   249 F.3d 848 (9th Cir. 2001) ........................................................................................... 21

*United States v. Laurienti*,
   611 F.3d 530 (9th Cir. 2010) ........................................................................................... 17

*United States v. Leung,*
  35 F.3d 1402 (9th Cir. 1994) .................................................................................. 28

*United States v. Martin,*
  796 F.3d 1101 (9th Cir. 2015) ................................................................................ 19

*United States v. Moran,*
  778 F.3d 942 (11th Cir. 2015) ................................................................................ 22

*United States v. Musgrave,*
  761 F.3d 602 (6th Cir. 2014) .................................................................................. 36

*United States v. Pham,*
  545 F.3d 712 (9th Cir. 2008) .................................................................................. 20

*United States v. Popov,*
  555 F. App'x 671 (9th Cir. 2014)............................................................................ 22

*United States v. Ressam,*
  679 F.3d 1069 (9th Cir. 2012) ................................................................................ 31

*United States v. Rose,*
  20 F.3d 367 (9th Cir.1994) ..................................................................................... 30

*United States v. Turk,*
  626 F.3d 743 (2d Cir. 2010).................................................................................... 17

*United States v. Watts,*
  519 U.S. 148 (1997)........................................................................................... 24, 33

*United States v. Zolp,*
  479 F.3d 715 (9th Cir. 2007) .................................................................................. 16

**Statutes**

18 U.S.C. § 3553.................................................................................................... 2, 7
18 U.S.C. § 3553(a) .................................................................................... 31, 32, 38
18 U.S.C. § 3553(a)(1) ................................................................................ 32, 33, 34
18 U.S.C. § 3553(a)(2)(A) ........................................................................................ 35
18 U.S.C. § 3553(a)(2)(B) ........................................................................................ 35
18 U.S.C. § 3553(a)(2)(C) ........................................................................................ 36
18 U.S.C. § 3553(a)(6).................................................................................... 38, 39
18 U.S.C. § 3663A(a)(1).......................................................................................... 40
18 U.S.C. § 3664(d)(5) ............................................................................................ 41

# INTRODUCTION

Over the course of many years, Elizabeth Holmes defrauded dozens of investors of hundreds of millions of dollars.  Time and again, she chose deceit over candor.  She forged her own endorsements.  She preyed on hopes of her investors that a young, dynamic entrepreneur had changed healthcare.  She leveraged the credibility of her illustrious board.  And, through her deceit, she attained spectacular fame, adoration, and billions of dollars of wealth.

When a journalist dared to ask questions about Theranos' actual achievements, she tried to dupe him and then attacked him, along with his sources.  After her fraud was revealed, she lied, obfuscated, and concealed.  At trial, she blamed her COO (and longtime boyfriend), her board, her scientists, her business partners, her investors, her marketing firm, her attorneys, the media—everyone, that is, but herself.

She also put patients at risk.  As money was drying up, she went to market with an unproven and unreliable medical device.  When her lead assay developer quit as Theranos launched, she chillingly told the scientist: "she has a promise to deliver to the customer, she doesn't have much of a choice but to go ahead with the launch."  Trial Transcript ("Tr.") at 1216.  As her lab director kept encountering issues with Theranos' device and tests, she chose "PR and fundraising" over patient care.  Tr. at 1703.  During her fraud scheme, women received wrong tests about their pregnancies, Theranos generated wrong results for cancer tests, and one victim was led to believe she had the virus that causes AIDS.  Even after Theranos itself concluded that there was a possible patient impact for every single test run for patients on its "Edison" device and voided all Edison tests, Holmes minimized its primary regulator's findings of immediate jeopardy and condition-level deficiencies as not "major."  Tr. at 4709.

Holmes speaks eloquently about her desire to innovate and improve healthcare.  She has demonstrated a strong work ethic, charisma, and ambition.  But she is blinded by that ambition.  Her reality distortion field put, and will continue to put, people in harm's way.  She stands before the Court remorseless.  She accepts no responsibility.  Quite the opposite, she insists she is the victim.

She is not.  Holmes was the CEO and the Chairperson of Theranos.  She repeatedly chose lies, hype, and the prospect of billions of dollars over patient safety and fair dealing with investors.  Elizabeth

1  Holmes' crimes were not failing, they were lying—lying in the most serious context, where everyone

2  needed her to tell the truth.

3       The Sentencing Guidelines appropriately recognize that Holmes' crimes were extraordinarily

4  serious, among the most substantial white collar offenses Silicon Valley or any other District has seen.

5  According to the Presentence Investigation Report ("PSR"), they yield a recommended custodial

6  sentence beyond the statutory maximum.  The factors set forth in 18 U.S.C. § 3553—notably the nature

7  and circumstances of the offense, the need for the sentence to reflect the seriousness of the offense and

8  promote respect for the law, and the need for both specific deterrence and general deterrence—demand a

9  significant custodial sentence.  With these factors in mind, the government respectfully recommends a

10 sentence of 180 months in custody.  The Court should also order Holmes to serve a three-year term of

11 supervised release, pay full restitution to her investors (including Walgreens and Safeway), and pay the

12 required special assessment for each count.

**FACTS**

13

14 **I.    THE OFFENSE CONDUCT**

15       **A.    The Investor Fraud**

16       Through numerous misrepresentations and half-truths, Holmes sold investors on the fact that

17 Theranos had a customer-ready device—proven through its use and validation by several large

18 pharmaceutical companies, the Department of Defense, and Walgreens—that analyzed tiny drops of

19 blood taken from the finger to produce better, faster, cheaper, more accurate laboratory test results.

20 Specifically, Holmes secured dozens of investors in Theranos over several years by falsely claiming that

21 Theranos had manufactured one single, proprietary blood analyzer device that could run any blood test

22 that was run by conventional labs, all from a blood sample drawn via a fingerstick rather than the

23 traditional draw from a vein, with higher accuracy and less variability than traditional methods, due in

24 part to its more automated process that reduced human error inherent in running blood tests in a

25 laboratory.  To support her bold claims, Holmes repeatedly told potential investors that Theranos'

26 technology had been comprehensively validated by multiple major pharmaceutical companies and was

27 being used in the battlefield by the Department of Defense to treat wounded soldiers.  Holmes also

28 asserted that Theranos was a profitable company and had a healthy ongoing relationship with retail

1    pharmacy company Walgreens, through which it provided blood tests to patients beginning in

2    September 2013.  Not only did several representatives of investors testify that Holmes made these

3    statements to them in meetings, Holmes also began providing written materials and binders to investors

4    in 2014 and 2015 that contained these false statements.

5           In truth, scientists who had worked at Theranos testified that Theranos' proprietary device could

6    never complete more than 12 types of blood tests, often with less accuracy, less automation, and more

7    variability than traditional "predicate" machines manufactured by third-party companies, such as

8    Siemens AG.  Because of these shortcomings, pharmaceutical companies did very little work with

9    Theranos and did not validate its technology, and the Department of Defense never used Theranos'

10   analyzer to clinically treat soldiers.  Theranos had zero revenue in 2012 and 2013 and desperately

11   needed new sources of cash.  Holmes hid the shortcomings of Theranos' proprietary device by using—

12   without telling potential investors—modified and unmodified third-party machines to fulfill the

13   remainder of Theranos' available blood test menu to patients at Walgreens stores.  As a result, Theranos'

14   relationship with Walgreens was faltering because the percentage of traditional venous draws was too

15   high.  But none of this information was shared with investors in Theranos.

16          As but a few examples of misrepresentations made by Holmes to Theranos investors:

17   •      In April 2010, Holmes emailed executives of Walgreens reports with favorable

18   conclusions about Theranos' technology that were emblazoned with logos of large pharmaceutical

19   companies Pfizer, GlaxoSmithKline, and Schering Plough (now Merck) and Holmes described the

20   attached reports as "three independent due diligence reports on Theranos systems" that were "from"

21   those companies.  However, at trial, Holmes admitted that she added the logos of the pharmaceutical

22   companies to reports written by Theranos and enhanced the conclusions shortly before sending to

23   Walgreens.  And, while a Pfizer representative testified at trial that he told Holmes directly that Pfizer

24   did not see a use for Theranos' technology in 2009, Holmes continued to send the doctored Pfizer report

25   to investors throughout 2014 and 2015.

26   •      In 2010, Holmes told Steve Burd, then-CEO of Safeway, that Theranos was cash flow

27   neutral and projected revenue for 2011 of $223 million when, in truth, Theranos' revenue was steadily

28   declining from approximately $2.8 million in 2009 to less than $600,000 in 2011.  Despite Theranos

1   earning *zero* revenue in 2012 and 2013, Holmes and COO Ramesh Balwani provided investors with

2   projections that Theranos would earn $140 million in revenue for 2014 and nearly $1 billion in 2015.

3   Indeed, Holmes told one investor in December 2013 that Theranos had historically earned over $200

4   million from its work with the Department of Defense and pharmaceutical companies, when, in reality,

5   Theranos had never earned more than $10 million from both sources combined.

6   •   In August and September 2013, internal Theranos scientists, including long-time

7   employee Surekha Gangakhedkar and then-laboratory director Dr. Adam Rosendorff warned Holmes

8   that Theranos' proprietary device was not able to reliably test patient samples.  They both testified that

9   Holmes pressured and rushed the scientists to quickly validate assays for clinical use in advance of the

10  launch with Walgreens.  Ms. Gangakhedkar and other scientists ultimately resigned shortly before the

11  Walgreens launch because of concerns with reliability of running patient tests on Theranos' proprietary

12  device, but when Ms. Gangakhedkar informed Holmes of her concerns, Holmes responded that she had

13  made a promise to deliver to the customer (Walgreens) that she must fulfill.  Despite these internal

14  concerns being voiced repeatedly to Holmes, Holmes reviewed and approved an article in *The Wall*

15  *Street Journal* claiming Theranos' device could run 1,000 laboratory tests with more accuracy than

16  conventional methods.  Holmes shared the article with investors.

17  •   In 2013 and 2014, Holmes repeatedly told investors that the Department of Defense was

18  using Theranos' proprietary analyzer on medevac helicopters, in the battlefield, or to treat soldiers in

19  Afghanistan or Iraq.  In truth, the Department of Defense never used Theranos' device to clinically treat

20  patients, nor did it ever move out of initial testing phases.  One investor victim impact statement

21  captures the depravity of Holmes' lies in this respect as follows: "I feel strongly that the sentencing

22  should take into account Defendants' intentional decision to prey upon investors' reverence for our

23  servicemen and servicewomen in the Armed Forces.  Our country's freedom is protected everyday by

24  the courageous and selfless service of these men and women, and the Defendants took advantage of

25  investors' patriotic feelings for selfish gain through deceit.  Indeed, Elizabeth Holmes lied to me about

26  saving soldiers' lives through military contracts and Theranos' use of 'proprietary technology' on

27  military helicopters.  Simply put, Holmes's actions were loathsome and un-American."  Victim Impact

28  Statement of Craig Hall dated Sept. 6, 2022, at p.1.

- In August 2014, Balwani forwarded to Holmes an email from Walgreens executives expressing a desire to reduce venous draws to below 10% (whereas they had been hovering around 40% for most of the year) before expanding further.  Nevertheless, Holmes presented financial projections to at least one investor in October 2014 that projected Theranos would increase from being in a few dozen Walgreens stores to being in 900 locations by 2015.

Holmes exploited investors' altruistic motives to dupe investors of all experience levels to invest in Theranos.  Holmes fooled investors who were new to the healthcare investment sphere as well as investors with deep sophistication and experience in the healthcare and bio-tech sector, such as PFM, a regulated investment entity, led by managing partner and chief investment officer Brian Grossman, who had over twenty years of experience analyzing or investing in companies like Theranos.  Mr. Grossman testified that he sent lengthy due diligence questions to Holmes and Balwani to ensure there was no ambiguity about the limitations of Theranos' proprietary technology, and yet he was shocked to learn more than eighteen months after his investment that Theranos used third-party commercial machines and not exclusively Theranos' proprietary device as Holmes had previously led him to believe.  Former Secretary of State George Shultz invested in Theranos on behalf of his family members and, as his son and daughter-in-law described in their victim impact statement, "[Holmes] succeeded by using my father (and others) and played him for the fool."  Victim Impact Statement of Alex & Janel Shultz at p.1. Holmes often seized upon investors' desire to make the world a better place in order to lure them into believing her lies.  For example, Lisa Peterson, a representative of investor RDV Corporation, was moved by Holmes' pitch because she could envision the benefits Holmes promised Theranos could deliver on her husband's health condition.  Holmes and Balwani knew this and even sent text messages to each other such as "[t]hey also care about our mission to do good because they are a religious org" to which Holmes responds "Good[.]"  TX 5387D at 21.

While Holmes was publicly touting Theranos as a revolution in healthcare, she and Balwani quietly and repeatedly acknowledged the dark reality within Theranos to each other.  For example, they texted as follows:

| Date | Exchange | TX 5387D page |
|---|---|---|
| 5/9/2012 | EAH: "We have to work together on the rev piece" | 7 |

| | | SB: "you are the company.  we need revenue . . . ." | |
|---|---|---|---|
| | 11/20/2013 | SB: "Pissing me off we don't have anyone managing PSC, ctn production, cart production, elisa assays, TSH"<br><br>EAH: "I know." | 14-15 |
| | 11/19/2014 | SB: "Need to focus on ops. . . . Lab, customer service, tat, all need director level people . . . . We need. The lab and call center fixed. . . . Rebuild."<br><br>EAH: "Fundamentally we need to stop fighting fires by not creating them . . . Need to fix root cause here . . . Yes" | 23-24 |
| | 11/19/2014 | SB: "We can't scale with wag." | 24 |
| | 11/28/2014 | SB: "Normand lab is a fucking disaster zone." | 29 |
| | 4/10/2015 | SB: "The point about narrowing down menu to hit high fs % came to me like gift of God. . . . We must hit our volume goals now.  We need to make it a matter of life and death. Survival.  We must not lose" | 43 |
| | 4/25/2015 | SB: "I am worried about over exposure without solid substance which is lacking right now.  We can talk tomorrow about over exposure."<br><br>EAH: "Agree." | 54 |
| | 4/28/2015 | SB: "It is most maddening there is no focus in any chem teams and no product coming out."<br><br>EAH: "I know." | 58 |
| | 5/6/2015 | SB: "We need our heads down and execute.  Bring billion equity and billion revenue."<br><br>EAH: "I know.  Thinking same." | 68 |
| | 5/13/2015 | SB: "We need a better strategy for Normandy.  For a long time to come we will have hybrid solutions. . . ."<br><br>EAH: "I agree." | 78 |
| | 6/3/2015 | SB: "We need to focus on being a technology company.  We spend all our time with CLIA morons."<br><br>EAH: "Yes"<br><br>SB: "I deal with CLIA everyday and I hate the low quality of people in lab . . . ."<br><br>EAH: "I was thinking about the exact same." | 83 |

| 7/28/2015 | SB: "We need to commit to each other and get out of this hell so we can live in paradise we both have."<br><br>EAH: "I have literally been meditating on exact same. Whole time I was running was thinking that. . . ."<br><br>SB: "We need to commit to focusing and getting in paradise."<br><br>EAH: "Product company.  Winning" | 90 |
|---|---|---|
| 9/22/2015 | SB: "Our validation reports are terrible.  Really painful going thru this process.  Same issues fda pointed out. . . . Going bad so far.  Pray.  Daniel has nothing ready . . . ."<br><br>EAH: "Praying" | 107 |

In a note to herself, Holmes said Balwani was "[c]onvinced never happen ever.  Not thanksgiving not ever."  TX 7534.  Balwani, Holmes wrote, bemoaned there was "[n]o product" and the "[f]ucking mediocre quality of this piece of shit company."  *Id.*  When they drew government scrutiny, Holmes and Balwani bragged about their ability to "run circles around others and fda by manipulating their game." TX 5387D at 102; *id.* (EAH: "We can definitely run circles.").

Holmes' fraud was spectacularly successful.  At the peak, she was "one of the richest and most celebrated woman leaders in our [country's] history."  Victim Impact Statement of Alex and Janel Shultz at 2.  By the end of 2014, Holmes' shares in Theranos were valued at more than **$4 billion**.  Tr. at 8014.  She took home hundreds of thousands of dollars in annual salary.  PSR ¶ 162.  She traveled in a Theranos-paid private jet.  Tr. at 721-22; TX 5387D at 3 (Holmes and Balwani musing about "get[ting] a plane for these short journeys after C2 [a reference to the C-2 investment round]").  She and Balwani ruled Theranos from a $15 million mansion in Atherton.  PSR ¶ 166 at p. 44.  She donned the cover of *Fortune*, *Forbes*, *Inc.*, *Glamour*, and *T: The New Your Times Style Magazine*. *See* https://www.nytimes.com/2015/10/30/business/the-narrative-frays-for-theranos-and-elizabeth-holmes.html.  She dined at the White House; she gave the commencement address at Pepperdine University; she joined the Board of Fellows of Harvard Medical School; and at the peak of the fraud was named by *Time* as one of the 100 Most Influential People in the World.  *Id.*; TX 5387D at 34;

1   https://blogs.bmj.com/bmj/2019/04/12/jeffrey-flier-elizabeth-holmes-and-harvard-medical-school-
2   board-of-fellows-a-cautionary-tale/.

3       Between 2010, when she induced Walgreens and Safeway to invest based on false
4   pharmaceutical company endorsements and fantastical revenue projections, and March 2015, Holmes
5   raised hundreds of millions of dollars.  As the PSR notes, $730,840,309 came from "Series C-1" and
6   "Series C-2" investors who invested subsequent to Theranos' public relations push in September 2013
7   during the conspiracy.  Representatives of seven such investors testified in the trials: Alan Eisenman,
8   Brian Grossman (Partner Investments LP/PFM Healthcare), Chris Lucas (Black Diamond Ventures XII-
9   B, LLC), Pat Mendenhall (Mendenhall TF Partners), Daniel Mosley (Mosley Family Holdings LLC),
10  Lisa Peterson (RDV Corporation/Dynasty Financial II/Lakeshore Capital Management), and Bryan
11  Tolbert (Hall Black Diamond II LLC).  At least eight additional investor/investor representatives
12  (including three board members) were interviewed by the government, testified before the SEC, or
13  submitted victim impact statements:  David Boies (Boies, Schiller & Flexner LLP), Kendra Fadil, Frank
14  Gordon (Crofton Capital/Gordon Family Trust), Henry Kissinger, Richard Kovacevich, Don Lucas Jr.
15  (Lucas Venture Group), Mark Campbell and Jared Hutchings (Peer Ventures Group), and Natalie Ravitz
16  (Rupert Murdoch).  *See* 11/11/2022 Decl. of AUSA Robert S. Leach in Support of U.S.' Sentencing
17  Memorandum, Exhibits B-L, filed concurrently.  The $730,840,309 in C-1 and C-2 investments does *not*
18  include an additional $70 invested by Walgreens and Safeway on account of convertible promissory
19  notes and $3 million invested by director George Shultz, who testified in PFM's civil action against
20  Holmes and whose family also submitted a victim impact statement.

21      **B.      The Impact on Patients**

22      Throughout the relevant time period, Holmes touted Theranos as a company that would
23  revolutionize blood testing, making health information more reliable and more accessible.  Beginning in
24  late 2013, Theranos actually offered clinical blood testing services to the public, first in the Bay Area,
25  then in Arizona.  To jumpstart the process of making its tests available to the public, and to reach as
26  many patients as it could, Theranos partnered with retail pharmacy chain Walgreens—a company with a
27  nationwide footprint that could make Theranos' product accessible to most of the country's population.
28  In so doing, Holmes and Balwani benefitted from goodwill and credibility associated with the

Walgreens name.  There can be no doubt that, as with investors, patients were more comfortable trusting Theranos because they assumed that an established business like Walgreens would not promote a service that was not similarly legitimate and reputable.  Thus, Walgreens was not only Theranos' launchpad but also its de facto ambassador.  Throughout the partnership with Walgreens, Defendants pushed for wider and faster expansion, with Walgreens holding back and expressing concerns over Theranos' inability conduct much of its testing using its vaunted fingerstick method, among other things.  Despite Walgreens' hesitations about expanding the Theranos partnership more rapidly, thousands of patients ended up receiving blood test services from Theranos between 2013 and 2015.

The evidence at trial revealed something Holmes and Balwani worked hard to hide from those patients:  Theranos' proprietary testing was not reliable.  Theranos' homegrown "TSPU" device—used for several important tests including HCG (to assess the presence and stage of a pregnancy), PSA (to check for potentially lethal prostate cancer), and TSH (a measure of thyroid health) (TX 4533)—was plagued by issues.  It broke down frequently and, when it did return results, it suffered from serious accuracy problems.  *See* TX 1587, 1633.  Erika Cheung, a Theranos employee who operated the TSPU to generate patient test results, had the following to say about her faith in the technology:

> I was really stressed and uncomfortable with what was going on because I had at that point amassed a lot of evidence to suggest that the technology, the Edison device specifically, were not adequate to test on patients, and I did not feel comfortable running patient samples.

9/15/21 Tr. at 968.  Ms. Cheung went on to explain that she was concerned about patients, who "think that they're getting accurate results, and they're making very important medical decisions about what their treatments are, what their diagnoses are, what medications they take…." *Id.* at 969.  Dr. Rosendorff agreed that the Edison device was flawed, explaining that he resigned from his job as Theranos lab director partly because he was being asked to vouch for tests that he did not have confidence in, and he felt that the testing platform "was not allowing [him] to function effectively as a lab director."  9/24/21 Tr. at 1703.  Similar problems arose when Theranos used modified third-party devices to test finger-stick samples.  *See* 10/6/21 Tr. at 2810 (Dr. Rosendorff testifying that the Theranos modifications to third-party devices made them less

accurate).

Erika Cheung and Dr. Rosendorff were not alone in their concerns about the reliability of Theranos technology. Surekha Gangakhedkar was a senior scientist who resigned from Theranos upon learning of the company's plan to use its Edison 3.0 and 3.5 devices to conduct clinical testing for patients. 9/17/21 Tr. at 1149-50. She explained that she knew of "reliability issues" with those devices that were not fully resolved, affecting their ability to return consistent results. *Id.* at 1186-87.

Given the dim view that Theranos' own scientists took of its technology, it is no surprise that a number of Theranos patients received results that were suspicious or demonstrably incorrect. For example, Dr. Mark Burnes testified at trial about a patient named Mehrl Ellsworth, who sought PSA (prostate specific antigen) testing from Theranos in advance of an international trip. 11/18/21 Tr. at 6836. Theranos reported Dr. Ellsworth's PSA levels to be extremely elevated compared to his previous results—a change that could have indicated prostate cancer if accurate. TX 4938, 4415; 11/18/21 Tr. at 6882. Dr. Ellsworth's next test from Theranos, however, showed normal PSA levels. TX 4938, 4415; 11/18/21 Tr. at 6842-6856. The third test from Theranos was once again dramatically elevated, but subsequent testing returned normal results. *Id.* It turned out that the two unexpectedly elevated PSA results from Theranos had something in common: they were both run on a Theranos proprietary system, whereas the normal results had been generated by traditional, FDA-approved methods. *Id.* Dr. Burnes was able to conclude that the elevated PSA levels indicated by the Theranos-specific tests were not valid. 11/18/21 Tr. at 6858. Theranos' repeated failure to return an accurate PSA test result after multiple attempts using its proprietary equipment speaks volumes about the reliability of Theranos technology.

Theranos patients also experienced problems with the company's PT/INR test, which relates to blood clotting. Patient "AT" suffered from atrial fibrillation (AFib) and her doctor instructed her to obtain a PT/INR test from Theranos. PSR ¶ 55. Although her PT/INR level was normally between two and three, Theranos returned an unusually low level of 0.08. *Id.* "AT's" doctor did not believe the Theranos results could be accurate, and sent her to a traditional lab for confirmatory testing, which yielded a result of 2.8—in her typical range for that assay. *Id.* "AT" told government investigators that, had she adjusted her medication in response to the erroneously low Theranos PT/INR value, she would

have been at risk for internal bleeding, a common complication of AFib.  *Id.*  Theranos' own employees
were not immune from questionable results.  "EG" was a Theranos phlebotomist who had been on
blood-thinning medication for years due to a history of blood clots.  *Id.* at 56.  When she went to
Theranos for a PT/INR test, her results came back markedly different from her usual levels, and her
doctor adjusted her medication in response.  *Id.*  Due to skepticism over the validity of the Theranos
results, "EG" had confirmatory testing performed at a traditional lab and received results matching her
usual values, showing that the adjustment to her medication had been unnecessary.  *Id.*

Several Theranos patients received erroneous HCG tests providing inaccurate information about
the status of their pregnancies.  Brittany Gould and her treating nurse practitioner, Dr. Audra Zachman,
testified at trial about multiple dubious HCG results provided by Theranos in October 2014.  *See* TX
5410, 2044, 4242, 3305, 5411.  Ms. Gould, who had suffered multiple miscarriages in the past, obtained
a series of HCG values from Theranos and traditional lab Quest Diagnostics over the course of a week.
The Theranos results—which included a dramatic drop in HCG value—strongly indicated that Ms.
Gould was having another miscarriage, but confirmatory testing by Quest indicated a viable pregnancy,
and Ms. Gould went on to deliver a healthy baby.  9/21/21 Tr. at 1396-1403.  Dr. Zachman testified that
she doubted the accuracy of both Theranos test results received by Ms. Gould, and stated that she had
never had accuracy issues with HCG tests from other labs the way she did with the results for Ms.
Gould.  *Id.*  Unfortunately, Ms Gould's experience with Theranos' HCG test was not unique.  In May
2014, a physician had called Theranos about HCG results that turned out to be unexpectedly low and
would have suggested a miscarriage if accurate, prompting the company to collect another sample and
rerun the test.  TX 4145.  Five months later, a provider contacted Theranos to complain about Theranos
HCG tests that had suggested that a pregnant patient was miscarrying.  TX 4222.  In response to that
Theranos test value, the patient's doctor had her discontinue pregnancy medications and get ready for
her next cycle.  *Id.*  When the patient was tested again for HCG, however, her value was over 2000 and a
subsequent scan detected a fetal heartbeat.  *Id.*  When Holmes learned about this erroneous test result,
she asked Balwani, "How did that happen?"—a strange question from someone who had been aware of
problems with Theranos' HCG test for months.

/ /

1        It is impossible to know exactly how many times frightening scenarios like these played out in

2   the lives of patients who trusted their blood testing to Theranos.  The government's investigation of

3   Theranos did not reveal a centralized, comprehensive log of customer complaints.  Instead, that

4   information was apparently stored in multiple places and compiled as needed.  *See* Balwani TX 4520.

5   (complaint log selections provided to Balwani in connection with Adam Rosendorff).  Equally alarming

6   is the high likelihood that numerous patients relied on inaccurate blood test results from Theranos

7   without ever realizing that they were unreliable.  It is likely that some portion of Theranos patients

8   experienced harm to their health as a result of invalid Theranos test results without ever realizing the

9   cause.

10       The evidence available paints a bleak picture of Theranos' ability to return valid results using its

11  TSPU analyzer.  Internal quality control checks at Theranos provided a valuable objective measure of

12  how accurate the analyzer was.  Analyzing standardized samples, with known concentrations of the

13  substance being tested, the Theranos machines would either pass or fail daily checks of individual

14  assays.  In March of 2014, records indicate that nearly 26% of quality control checks on the TSPU

15  resulted in failures, i.e., inaccurate results.  TX 1633.  Some of the individual assays performed even

16  worse.  Theranos' PSA test failed quality control nearly 30% of the time, and the company's test for

17  triiodothyronine failed more than 50% of the time.  *Id.*  Because there is no guaranteed way to identify

18  inaccurate patient test results, Theranos' poor QC numbers are the best available method to estimate

19  how frequently Theranos was sending incorrect values to patients.  *See* 9/15/21 Tr. at 967.

20       When Centers for Medicare and Medicaid Services (CMS) inspected Theranos in the late

21  summer and fall of 2015, the agency found systemic issues with quality control for the Theranos

22  miniature analyzer or TSPU.  PSR ¶ 58.  In particular, CMS put Theranos on notice of "multiple and

23  recurrent time periods (across all analytes tested) of abrupt shifts in [quality control] means, high rates

24  of 1-2s QC rule failures, and QC CVs far exceeding limits for a stable testing process."  *Id.*  In other

25  words, Theranos' own quality control data revealed severe reliability problems with its testing systems,

26  just as employees had warned Defendants years earlier.  Faced with CMS's findings, Theranos itself

27  admitted that there had been "a global and long-term failure of the quality control program for this

28  instrument," and further concluded that "there is a possible patient impact for every test reported from

1    the laboratory's TPS 3.5 instruments." *Id.*  Based on the scale of the problems highlighted by CMS,

2    Theranos voided every patient test result ever run on its Edison device in the clinical lab.  Of course, this

3    step did nothing to mitigate the harm patients would already have suffered due to their reliance on

4    inaccurate medical test information.

5          **C.**      **The Cover Up**

6          In April 2015, Holmes learned that a *Wall Street Journal* reporter was working on a negative

7    story about Theranos.  *See* TX 5387D at 50 ("Wsj guy might show up tomorrow").  She and Balwani

8    scrambled to have the Phoenix store prepared to perform only fingerstick tests rather than vein draws –

9    hoping to avoid the possible impression Theranos was doing ordinary blood testing.  *Id.* (SB: "We need

10    tomorrow to test and then the team can push production tomorrow night. . . . So Wednesday it will

11    trigger fs for gc18 [general chemistry] . . . [s]o if he comes it may be 3 fs.").  Ultimately, Balwani told

12    Holmes "[t]he team is not confident about pushing out fingerstick tonite . . . we don't want to rush this.

13    We went thru hell." *Id.* at 52.  Unable to dupe the reporter, they then hired David Boies to try to get him

14    to drop the story.  Tr. at 7998.  When that failed, Holmes personally appealed to the owner of *The Wall*

15    *Street Journal*, who also was a significant investor in Theranos, to quash the story.  Tr. at 7999; TX

16    5704.

17          Holmes also attacked those she believed to be the reporter's sources.  *See* Victim Impact

18    Statement of Alex & Janel Shultz at 1 ("[S]he sure did her best to intimidate and silence the truth

19    tellers.").  In June 2015, she had a man sit all day outside of Erika Cheung's new workplace to serve a

20    letter from Boies Schiller Flexner LLP threatening her with legal action.  Tr. at 982-985, 7974-77; TX

21    2567; TX 5387D at 85 (SB: "I am ok sending letter to Erika as in [General Counsel] heather [King's]

22    email").  After the reporter published a negative story, Holmes tried to dismiss Cheung as a low-level

23    disgruntled employee.  Tr. at 7978.  She also had Boies Schiller lawyers surprise Tyler Shultz at his

24    grandfather George Shultz's house to have him sign an affidavit identifying himself as a source for the

25    reporter.  Tr. at 7995-97; Leach Decl. Ex. L at 55-58; TX 5387D at 76 (EAH: "If Tyler thinking abt

26    George fyi at right time"); *id.* at 82 (SB: "You not calling George back also sends a message that we are

27    about to suit").  The incident enraged George Shultz, which he described as "one of the worst little

28    things he had seen anybody try to do."  Tr. at 7995-96; Leach Decl. Ex. L at 57; TX 5387D at 84

1  ("George wants to know what Tyler has done. Would you ask David if I should say or tell him we'll let

2  him know la[t]er and txt me back").  During this time period, Holmes and Balwani also discussed

3  "nail[ing] this mother fucker" "in CLIA" who they believed to be spreading negative information, and at

4  various times contemplated action against "Tyler [Shultz],", "Erika [Cheug]," "Adam [Rosendorff],"

5  and "Rochelle [Gibbons]," the wife of a Theranos scientist who committed suicide in 2013.  TX 5387D

6  at 76-78, 86; Tr. at 1468-71, 8474; Balwani Trial Transcript at 6531.

7          When the negative *Wall Street Journal* story broke, Holmes lied and dissembled.  On October

8  15, 2015, when confronted on Jim Cramer's *Mad Money* with the *Journal*'s claim that Edison could

9  only do 15 out of 240 tests, Holmes falsely stated "every test that we offer in our laboratory can run on

10  our proprietary devices."  TX 2851.  At the time, Theranos was not using Edison (or any future iteration

11  of its device) for *any* tests, and had never used Edison for more than 12.  On October 21, 2015, she

12  falsely stated at a public conference that Theranos "never used commercially available lab equipment for

13  finger-stick based tests."  ECF No. 588 at 14; https://www.wsj.com/video/elizabeth-holmes-discusses-

14  theranos-at-wsjdlive-2015/20CE68A0-CAEE-48E0-BAB4-FD6C47D283BE.html.  The comment so

15  concerned Balwani that he texted: "Worried about your 'all fingersticks on our technology' comment."

16  TX 5387D at 117.

17          Months later, Holmes "continued to withhold information from [RDV] and other investors,

18  which . . . made it impossible to make informed decisions about the status and value of our investment."

19  *See* Victim Impact Statement of RDV Corporation dated Aug. 26, 2022 at p.4.  She insisted the issues

20  CMS identified were not major and downplayed their significance.  Tr. at 4709.

21          Holmes' coverup had lasting and devastating effects.  According to one victim impact statement,

22  Holmes "intentionally lied to [George Shultz] about Tyler to discredit him to prevent [George Shultz]

23  from learning the truth," creating a "permanent rift" within the family.  *See* Victim Impact Statement of

24  Alex & Janel Shultz at p.2 (describing how Holmes "[took] a wrecking ball to [Shultz's] family" and

25  stating "[t]he most heart breaking of all is to hear your son describe that he contemplated suicide

26  because he felt abandoned, isolated, threatened and hopeless, for doing the right thing.").

27  / /

28

## II.     PROCEDURAL HISTORY

On July 28, 2020, the government filed the Third Superseding Indictment, charging Holmes and Balwani with ten counts of wire fraud (Counts 3-12) and two counts of conspiracy to commit wire fraud (Counts 1-2).  ECF No. 469.  The Court severed the case in March 2020.  ECF No. 362.  Beginning on August 31, 2021, Holmes' trial spanned four months, during which over 900 exhibits were admitted and 32 witnesses testified.  *See* ECF No. 1395.  On January 3, 2022, the jury found Holmes guilty of four counts charging conspiracy to commit wire fraud during the period 2010 to 2015 and wire fraud against three specific investors in Theranos (Mosley, RDV, and PFM).  ECF No. 1235.  The jury did not reach a unanimous verdict with respect to the remaining investor-related counts and acquitted Holmes on the patient-related counts.  *Id.*  Balwani's separate trial began in March 2022 on the same twelve counts. Following a comparably lengthy trial, the jury found Balwani guilty of all twelve counts.  ECF No. 1507.

### THE SENTENCING GUIDELINES CALCULATION

The government calculates the total offense level as follows:

| | | | |
|---|---|---|---|
| a. | Base Offense Level, U.S.S.G. § 2B1.1(a)(1) | | 7 |
| b. | Specific offense characteristics, U.S.S.G. § 2B1.1(b) | | |
| | Loss more than $550,000,000, U.S.S.G. § 2B1.1(b)(1)(P) | | +30 |
| | Offense involving 10 or more victims, U.S.S.G. § 2B1.1(b)(2)(A) | | +2 |
| | Offense involving the conscious or reckless risk of death or serious bodily injury, U.S.S.G. § 2B1.1(b)(16) | | +2 |
| c. | Adjustment for Role in the Offense, U.S.S.G. § 3B1.1(c) | | +4 |
| d. | Total Offense Level | | 43[1] |

Holmes falls within Criminal History Category I.  Thus, for Offense Level 43, the Guidelines recommend a sentence beyond the statutory maximum of 80 years.  The PSR omits the 2B1.1(b)(16) enhancement; the government objects to the omission.  The PSR recommends that the Court vary from Guidelines and impose a sentence of 108 months.  *See* PSR Sentencing Recommendation at p.1.

---

[1]     The Guidelines provide that "[a]n offense level of more than 43 is to be treated as an offense level of 43."  U.S.S.G. Ch. 5, Part A applic. note 2.

1   The government agrees with the Probation Office that the total offense level is 43.  Holmes

2   objects to the application of certain adjustments.  The government thus addresses them in turn.

3   **I.     LOSS MORE THAN $550,000,000**

4   Under the Guidelines, loss "is the greater of actual or intended loss."  U.S.S.G. § 2B1.1(b)

5   applic. note 3(A).  "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from

6   the offense."  *Id.* note 3(A)(i).  "'Intended loss' . . . [includes] the pecuniary harm that the defendant

7   purposely sought to inflict."  *Id.* note 3(A)(ii).  "'[R]easonably foreseeable pecuniary harm' means

8   pecuniary harm [i.e., harm that is monetary or otherwise readily measurably in money] that the

9   defendant knew or, under the circumstances, reasonably should have known, was a potential result of the

10  offense."  *Id.* notes 3(A)(iii & iv).

11  "The guidelines do not present a single universal method for loss calculation under

12  § 2B1.1 . . . ."  *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007).  The Court "need only make a

13  reasonable estimate of the loss."  U.S.S.G. § 2B1.1(b) note 3(C).  Because the Court is in a unique

14  position to assess the evidence and estimate the loss, its determination is entitled to appropriate

15  deference.  *Id.*  In estimating loss, the Guidelines direct the Court to consider "the cost to the victim of

16  replacing [the unlawfully taken] property," "[t]he approximate number of victims," and "reduction that

17  resulted from the offense in the value of equity securities or other corporate assets."  *Id.*

18  In the context of public company securities, the Ninth Circuit has expressly rejected the need to

19  show "loss causation."  *United States v. Berger*, 587 F.3d 1038, 1044-45 (9th Cir. 2009).  In the public

20  company context, the Ninth Circuit has observed:

21      Measurement of loss becomes considerably more complex, however, when the court
        confronts a "pump-and-dump" scheme involving an otherwise legitimate company.  In
22      such a case, because the stock continues to have residual value after the fraudulent
        scheme is revealed, the court may not assume that the loss inflicted equals the full pre-
23      disclosure value of the stock; rather, the court must disentangle the underlying value of
        the stock, inflation of that value due to the fraud, and either inflation or deflation of that
24      value due to unrelated causes.

25  *Zolp*, 479 F.3d at 719 (citing cases involving public company securities and efficient markets); *United*

26  *States v. Bakhit*, 218 F. Supp. 2d 1232, 1236-37 (C.D. Cal. 2012) (cited by *Zolp* with approval and

27

28

1   noting "after the fraud was fully disclosed and absorbed by the market, [the] stock continued to trade at

2   around $5.00 per share.").

3        Conversely, the "pecuniary harm" to an investor induced to invest by fraud is the amount of the

4   investment.  *See, e.g.*, *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) ("[T]he crux of

5   [defendant's] offense is that she obtained loans by fraudulently leading unsecured creditors to believe

6   that they were secured creditors.  Without this deceit, she could not have obtained her victims'

7   money."); *United States v. Bryson*, 101 F. Supp. 3d 147, 155 (D. Conn. 2015) ("[F]or those investors

8   who were fraudulent induced to invest following the onset of the conspiracy, a reasonable estimate of

9   the actual loss attributable to the offense conduct is the total value of their investment.") (citing *Turk*,

10  626 F.3d at 750).  Where a defendant's victims are "left with nothing of value when the fraud was

11  uncovered," a court may find "loss based on the victims' total . . . investment."  *United States v. Byors*,

12  586 F.3d 222, 226 (2d Cir. 2009).

13       "Because [Holmes] was convicted of conspiracy, and because the losses were incurred because

14  of that conspiracy, the 'preponderance of the evidence' standard applies."  *See United States v.*

15  *Laurienti*, 611 F.3d 530, 556 (9th Cir. 2010); *id.* at 557 (noting a court may infer in the conspiracy

16  context all investors who purchased a particular security were duped by the conspiracy).

17       Here, Holmes was convicted of three counts of wire fraud relating to investments by Mosley,

18  RDV, and PFM.  Mosley and representatives of RDV testified at length in both trials about the

19  misrepresentations and half-truths that induced their investments.  Mosley invested $5,999,997 on

20  October 31, 2014.  PSR ¶ 47.  He lost his entire investment.  RDV invested $99,999,984 on October 31,

21  2014.  *Id.*  It also lost its entire investment.  *See* Victim Impact Statement of RDV Corporation dated

22  Aug. 26, 2022.  PFM invested $96,139,998 in three separate wires on February 4, 2014.  *See* Victim

23  Impact Statement of PFM dated Sept. 6, 2022; PSR ¶ 46-47.  Although $43,500,00 was returned on May

24  1, 2017, as settlement of a civil lawsuit, this does not offset the loss.  *See* U.S.S.G. § 2B1.1 applic. Note

25  (E)(i) ("Loss shall be reduced by . . . [t]he money returned . . . by the defendant or other persons acting

26  jointly with the defendant, to the victim before the offense was detected."); *United States v. Bright*, 353

27  F.3d 1114, 1118 (9th Cir. 2004) (the defendant is only "entitled to credit for refunds paid prior to the

28

1  discovery of the offense").  The Mosley, RDV, and PFM investments *alone* account for $202,139,979 in

2  loss.[2]

3        Holmes also was convicted of conspiracy to commit wire fraud against Theranos investors

4  during the period 2010 to 2015.  ECF No. 1235 at 1; ECF No. 469.  Between September 2013, when

5  Theranos publicly launched its partnership with Walgreens, and 2015, Holmes raised $730,840,309 from

6  investors in the Series C round – Series C-1 and C-2 (including Mosley, RDV, and PFM).  According to

7  Daniel Edlin, who reported to Holmes, he prepared binders to investors based on an approved checklist.

8  Tr. at 3993-94.  He authenticated a "typical investment related binder" that went to one specific investor.

9  *See* Tr. 3996 & TX 1940, 4869.  He explained that a confidential Theranos briefing "was included in all

10  of the investment binders to my knowledge."  Tr. at 4001; *see also* Tr. at 3997-4000.  The government

11  also presented evidence of a recorded call between Holmes and a group of C-1 investors in advance of

12  investments by Chris Lucas' and Bryan Tolbert's firms.  Because investors were generally provided

13  similar information, and because they were exposed to similar public information (e.g., the September

14  2013 *Wall Street Journal* promotion, the September 2013 press release regarding Walgreens, the June

15  2014 Roger Parloff article), it is reasonable to conclude for sentencing purposes that they too are victims

16  of the scheme to defraud the jury found.  But for settlements of lawsuits after the fraud was exposed,

17  there is no evidence the C-1 or C-2 investors received any money or property or return on account of

18  their investments.  They too lost the entirety of their investment when Theranos declared bankruptcy

19  through an assignment for the benefit of creditors.

20        The trial also included evidence that Safeway and Walgreens invested $30 million and $40

21  million respectively on account of convertible promissory notes.  None of these investments yielded a

22  return.  *See, e.g.*, ECF No. 517-1.

23        Holmes appears to suggest that the "loss" is somehow not the money investors actually lost.  She

24  appears to argue that the loss is not reasonably estimable because Theranos was a real company with

25  cash and patent rights at certain periods of time, and that the actual loss must be reduced by some

26  hypothetical fair market value of Theranos when the fraud was discovered, or some other date.  This

27

28  [2]    The Guidelines provide for a 26-level increase for losses more than $150,000,000.  *See* U.S.S.G. § 2B1.1(b)(1)(N).

defies logic and is unsupported by Ninth Circuit authority.  *Zolp* applies in the *public company* context, which makes sense: when a fraud is revealed in a public and efficient market, one can determine through the price change what the impact is to investors.  Here, by contrast, there is no dispute: the C-1 and C-2 investors received nothing of value from their Theranos investment (save for some amounts returned through lawsuits after the fraud was revealed that cannot be a credit against loss).  There were no sales of Theranos securities after the October 2015 *Wall Street Journal* article from which a fair market value could be derived; indeed, there was no market for Theranos shares at all.  Holmes' victims were induced to invest in Theranos based on the premise that its technology was market ready and comparable to Quest and LabCorp; after the truth was revealed, they found themselves stuck in a market-less investment with nothing but a hope (never realized) that it would some day be market-ready.

The Ninth Circuit has said that "district courts should 'take a realistic, economic approach to determine what losses the defendant truly caused or intended to cause, rather than the use of some approach which does not reflect the monetary loss.'"  *United States v. Martin*, 796 F.3d 1101, 1110 (9th Cir. 2015).  Here, any realistic approach must recognize that, except for lawsuit settlements, the victim investors in this case have never received any monetary payment from Holmes or Theranos.

To the extent the Court nonetheless concludes that it is necessary to ascribe some hypothetical value to Theranos at the time victims invested or when the fraud revealed, the government has engaged and proffers the opinions of Carl Saba, a partner with the Forensic Consulting Group at Hemming Morse, LLP, and a Certified Valuation Analyst and Accredited Senior Appraiser with decades of experience in the valuation of businesses.  Leach Decl. Ex. A.  At the government's request, Mr. Saba attempted to estimate the fair market value of Theranos' equity on October 15, 2015 (when the fraud first started to come to light) and other valuation dates based on available information, and to calculate the loss to Theranos Series C-1 and C-2 investors based on those valuations.  *Id.* ¶ 6.  Mr. Saba was asked to define a minimum range of loss to investors and to apply assumptions that provide a favorable interpretation of the equity value of Theranos on October 15, 2015, and other valuation dates, including adoptions of optimistic management forecasts that assume Theranos' significant technology challenges would be resolved and Theranos would realize high revenue growth.  *Id.* ¶¶ 7-8.

1    Applying widely accepted valuation methods, and based on assumptions favorable to Holmes,

2    Mr. Saba determined that the loss to C-1 and C-2 investors – i.e. the loss measured by the difference

3    between the price paid by the investors and his estimated value as of the valuation date of October 15,

4    2015 – to be between $237.323 million and $273.646 million, depending on the valuation method used.

5    *Id.* ¶ 15 & Ex. A-1.  Mr. Saba's report, which was provided to the defense and Probation in advance of

6    the draft presentence report, demonstrates by any standard of proof that Holmes inflicted hundreds of

7    millions of losses on her investors.  *Id.*

8    For the reasons set forth above, the 30-point enhancement for a loss of more than $550 million is

9    warranted.  In no event is the loss less than $150 million.

10   **II.    OFFENSE INVOLVING 10 OR MORE VICTIMS**

11   The PSR applies a two-point enhancement for the number of victims.  This enhancement also is

12   warranted.

13   The Guidelines provide for a two-level increase if the offense "involved 10 or more victims."

14   U.S.S.G. § 2B1.1(b)(2)(A)(i).  For purposes of Section 2B1.1, "victim" means "any person who

15   sustained any part of the actual loss determined under subsection (b)(1)."  U.S.S.G. § 2B1.1 applic. note

16   1.  As with loss, estimating the number of victims does not require absolute precision, and the Court

17   may make a reasonable estimate based on available information.  *See United States v. George*, 949 F.3d

18   1181, 1186 (9th Cir. 2020) ("It [is] 'sufficient for the government to produce evidence for enough of the

19   [victims] to allow the sentencing court reasonably to infer a pattern." (quoting *United States v. Pham*,

20   545 F.3d 712, 720 n.3 (9th Cir. 2008) (alteration in original))).

21   The PSR correctly finds that this enhancement applies.  PSR ¶¶ 93, 107.  More than 10

22   individuals and entities invested in Theranos in the C-1 and C-2 rounds subsequent to September 2013,

23   when Theranos issued a press release announcing its launch and induced *The Wall Street Journal* to

24   falsely tout Theranos' capabilities.  Seven of those investors testified in the trials to the

25   misrepresentations and half-truths they were told.  An additional nine provided statements to the

26   government or the SEC or submitted a victim impact statement.  *See generally* Leach Decl. Exs. B-L.

27   Representatives of Walgreens and Safeway also testified in the trial to how they were deceived into

28

investing in Theranos.  Under any measure, more than 10 individuals or entities sustained a loss as a result of Holmes' conspiracy and wire fraud offenses.

## III.   OFFENSE INVOLVING CONSCIOUS OR RECKLESS RISK OF DEATH OR SERIOUS BODILY INJURY

### A.   Defendant's Conduct Created a Risk of Serious Harm to Theranos Patients

The Guidelines provide for a two-level increase in offense level if the conduct involved "the conscious or reckless risk of death or serious bodily injury."  U.S.S.G. § 2B1.1(b)(16)(A).  The evidence in this case establishes that this enhancement is warranted.  Holmes could have founded any kind of business when she dropped out of Stanford.  She chose to create a startup operating in the medical field, where the stakes are inevitably high.  As described above, Holmes caused Theranos to market and perform blood tests that were not sufficiently accurate or reliable for clinical use.  Despite knowing of the serious flaws in Theranos' testing, Holmes continued to promote and offer those tests to patients with the knowledge that those patients and their physicians would rely on the Theranos tests to make medical decisions.  Her conduct created a significant risk of death or serious injury as a result of misdiagnosis; an inaccurate test result could cause a patient to undergo an unnecessary treatment that could harm them, or to forego a necessary treatment that could save them.  As Dr. Rosendorff testified at trial, "Accuracy is critical.  Physicians and other health care providers depend on the accuracy of a test to make medical decisions, sometimes life and death medical decisions."  9/24/21 Tr. at 1706.

The obvious danger associated with inaccurate and unreliable medical tests is sufficient to warrant application of U.S.S.G. § 2B1.1(b)(16)(A), regardless of whether the government can show how much harm resulted.  Courts recognize that this two-level enhancement "focuses on the defendant's disregard of risk, rather than on the result." *United States v. Henderson*, 893 F.3d 1338, 1351 (11th Cir. 2018) (quotation omitted).  In other words, the government "need not show actual injury to any particular victim." *Id.*  Additionally, under Ninth Circuit law, a defendant cannot escape this enhancement by claiming ignorance of the risk created by his conduct. *United States v. Johansson*, 249 F.3d 848, 859 (9th Cir. 2001) (interpreting similar provision in U.S.S.G. § 2F1.1, now consolidated with Section 2B1.1).  "[A] defendant does not have to subjectively know that his conduct created the risk." *Id.*  Nor does the enhancement require that the defendant take some violent or direct action toward

—

1   victims.  Thus, in *Henderson*, it was enough that the government presented evidence that false entries in

2   a computerized patient record system "could have delayed and influenced patient care."  *Henderson*, 893

3   F.3d at 1352.  In *United States v. Moran*, the enhancement was applied where defendants ran a

4   healthcare facility and admitted elderly patients with dementia although the facility and staff were not

5   equipped to meet those patients' needs.  *United States v. Moran*, 778 F.3d 942, 978 (11th Cir. 2015).  In

6   *Popov*, the Ninth Circuit affirmed application of the standard where a doctor signed patient charts and

7   Medicare reimbursement forms indicating he had supervised medical examinations when he had not.

8   *United States v. Popov*, 555 F. App'x 671, 676 (9th Cir. 2014).  The risk to Theranos patients created by

9   Holmes' conduct is at least as serious and certain as the dangers posed by the criminal conduct in the

10   above cases.

11         Moreover, the evidence shows that Holmes was fully conscious of the risks caused by Theranos'

12   unreliable tests—starting years before the company launched its testing service and continuing through

13   the point when they finally discontinued it.  As early as 2010, Holmes laughed off a dire warning she

14   received from an outside consultant evaluating Theranos technology.  Kevin Hunter was hired by

15   Walgreens in May or June 2010 as a laboratory consultant to advise Walgreens on its incipient

16   partnership with Theranos.  *See* 12/6/21 Kevin Hunter 302 (Leach Decl. Ex. K).  Hunter participated in

17   regular meetings with Holmes and Balwani, during which they told him that the Theranos Edison

18   analyzer could perform approximately 193 tests.  *Id.*  Hunter's team wanted to perform comparison

19   testing of Theranos against a lab at Stanford, but Holmes and Balwani would not agree.  *Id.*  Nor would

20   Holmes allow Hunter to take a tour of the Theranos lab.  *Id.*  As Hunter asked more pointed questions,

21   Holmes and Balwani began to take him out of the loop in conversations with Walgreens.  *Id.*

22   Eventually, Hunter's frustration with the lack of substantiation for Theranos' claims moved him to

23   confront Holmes during a video teleconference.  *Id.*  He admonished her that her company was going to

24   offer lab tests that people would use to make medical decisions, and warned her of the risk that she

25   could be responsible for killing someone if the lab put out bad tests, and that she might go to jail as a

26   result.  *Id.*  Holmes reportedly responded with something to the effect of, "They don't put pretty people

27   like me in jail."  *Id.*  Hunter eventually separated from the Theranos-Walgreens project.  *Id.*

28

Holmes's lax attitude toward patient safety continued into 2013 and beyond.  Leading up to the launch of Theranos' testing services, Theranos' lab director spoke to Holmes personally in order to "raise alarm bells" about assays that he "didn't feel were ready for launch."  9/24/21 Tr. at 1725-1730; TX 1049.  During that time period, Holmes and Balwani had set a schedule for assay validation that Dr. Rosendorff viewed as "rushed."  *Id.*  In his communication to Holmes, Dr. Rosendorff suggested that Theranos might need to delay the launch and work on its calibrators or chemistry—essentially returning to the fundamentals to identify and solve "a basic problem" with the company's equipment.  *Id.*  Dr. Rosendorff testified that Holmes did not seem surprised to hear of problems with Theranos' tests, but that the conversation seemed to make her very nervous.  *Id.* at 1731-32.  Ultimately, she refused to delay the launch as he recommended, suggesting instead that certain tests could be performed on traditional equipment.  *Id.*

While Theranos' clinical lab was in operation, Holmes received reports of serious problems with the company's tests.  In April 2014, Balwani received an email from a senior scientist at Theranos reporting that the company's proprietary potassium results were running high as a result of sample hemolysis, forcing the lab to review images of all samples to determine whether to rerun—a practice Balwani told Holmes was "not scalable."  TX 4124.  Earlier in that email chain, Balwani had questioned the accuracy of the test "given this is an ISE," indicating awareness of preexisting accuracy problems with Theranos' ion-selective-electrode blood tests.  *Id.*  Also in April, employee Tyler Shultz sent Holmes a detailed email to alert her to several ways in which Theranos was overstating the accuracy of its tests and potentially masking problems.  TX 1660.  The points raised by Mr. Shultz gained no traction with Holmes.  In late May 2014, Dr. Rosendorff halted all testing of HCG (a pregnancy hormone) on Theranos analyzer in light of inaccurate results, and Balwani immediately passed along that news to Holmes.  TX 4147.  Dr. Rosendorff testified that the company resumed HCG testing on the Edison despite the fact that issues with that test persisted.

In August of that year, Dr. Rosendorff emailed Balwani to inform him that Theranos' bicarbonate test had lost all diagnostic value "and probably also reliability" due to the fact that the company voided all abnormal results in response to accuracy problems with this test.  TX 4189.  Balwani forwarded that notice to Holmes.  Around that same time, another email exchange

1    memorialized Balwani asking another Theranos scientist about the company's PT/INR test reporting

2    inaccurately low numbers.  TX4181.  When the scientist provided a theoretical explanation and

3    proposed an internal study to address the problem, Balwani emailed Holmes complaining, "Always

4    another study after the fact."  *Id.*  In September 2014, Defendant's brother Christian Holmes sent her an

5    individual email seeking a "candid conversation" because it was "pretty obvious" the company was

6    having issues with the accuracy of its calcium, potassium, and sodium tests.  TX 1953.  In that message,

7    Christian went so far as to suggest Theranos stop offering those tests until the problem was identified

8    and solved.  *Id.*  By late November 2014, Defendants' collective faith in their lab still had not improved,

9    with Balwani texting Holmes that the Normandy lab (where Theranos conducted its proprietary testing)

10   was a "f___ing disaster zone."  TX 5387D at 29.  Despite ample notice of serious issues plaguing

11   Theranos' technology, Holmes and Balwani stubbornly continued to send out clinical test results from

12   their "disaster zone" of a laboratory, forcing Theranos' patients to unknowingly incur a risk of death or

13   injury.  Ultimately, they had to void every single Edison test following extremely negative CMS

14   findings and their own assessment of possible patient impact.

15          **B.      Holmes' Treatment of Theranos Patients is Relevant Conduct**

16          Holmes' acquittal on the counts relating to her scheme to defraud patients does not prevent this

17   enhancement from applying.  The Supreme Court has held that a sentencing court may consider facts

18   underlying acquitted counts as relevant conduct for sentencing purposes as long as the conduct is proven

19   by a preponderance of the evidence.  *United States v. Watts*, 519 U.S. 148 (1997).  In this case, it is

20   impossible to know the precise reasons why the jury did not return guilty verdicts on the patient-focused

21   counts, and the Court should disregard any speculation proffered by the defense on this question.  The

22   Court is well aware, though, of the evidence presented at trial demonstrating Holmes' role in the scheme

23   to defraud Theranos patients.  Even if the jury concluded that at least one element of those charged

24   counts was not proven beyond a reasonable doubt, the Court should still conclude that Holmes' conduct

25   toward patients has been proven by a preponderance.  Indeed, the jury in the Balwani trial convicted on

26   all counts based on substantially overlapping evidence, including Count 2 of the Third Superseding

27   Indictment alleging a conspiracy between Holmes and Balwani to defraud patients.  ECF No. 1507

28

Given that Holmes' actions toward patient victims have been shown by a preponderance of the evidence, they easily qualify as relevant conduct for sentencing purposes. Guidelines ranges are to be determined based on, in pertinent part, "all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant," as well as certain acts of coconspirators, that "occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense." U.S.S.G. § 1B1.3(a)(1). The Guidelines go on to include as "relevant conduct" any such acts that were "part of the same course of conduct or common scheme or plan as the offense of conviction." *Id.* at § 1B1.3(a)(2).

Holmes' actions directed toward Theranos patients are undoubtedly part of the same course of conduct and scheme or plan as their fraud on investors. In order to attract investors and induce them to purchase Theranos stock, Holmes and Balwani sought to portray Theranos' technology as advanced, novel, and, critically, mature without any significant research and development remaining. As victims explained at trial, investing in a company whose key device was already market-ready carried significantly less risk than investing in an earlier-stage startup still working to develop its technology. 11/10/21 Tr. at 6081-83. With Theranos short on money in the second half of 2013, Defendants were motivated to show that their technology could actually be used for clinical patient testing—or at least to give the public that impression. With the commercial launch of Theranos testing services in September 2013, Holmes and Balwani sent a message to the world—and the pool of potential investors—that Theranos' technology could be trusted and there was nothing standing in the way of the company's expansion. Holmes made that message explicit in communications celebrating the launch. *See* TX 1113 (press release); TX 1334 (email to investors claiming Theranos is "rapidly scaling" following commercial launch). This method worked, igniting a wave of interest among investors that led to Theranos raising approximately $730 million between fall of 2013 and 2015. PSR ¶ 47. From 2013 on, the operation of Theranos' clinical lab furthered Defendant's goal of defrauding investors, constituting part of the same plan or scheme or course of conduct as the offenses of conviction.

Accordingly, a two-level increase is warranted under U.S.S.G. § 2B1.1(b)(16)(A), reflecting the fact that Holmes' conduct involved a conscious or reckless risk of death or serious bodily injury

1    imposed on Theranos patients.  Alternatively, the Court should account for Holmes' conduct toward

2    patients under U.S.S.G. § 1.4, which allows the Court to consider, "without limitation," any information

3    concerning the conduct of the defendant, in order to determine the sentence to impose within the

4    guideline range or whether to depart from the guidelines.

5    **IV.    ROLE IN THE OFFENSE**

6        Holmes should also receive an additional enhancement due to her role as a manager and leader of

7    the extensive criminal activity that occurred in connection with the company she founded.  Under the

8    Guidelines, a four-level increase is warranted if a defendant was an "organizer or leader" of criminal

9    activity that either (1) involved five or more participants or (2) was otherwise extensive.  U.S.S.G.

10   § 3B1.1(a).  The commentary for that section of the Guidelines defines "participant" as "a person who is

11   criminally responsible for the commission of the offense," although that person "need not have been

12   convicted."  *Id.* applic. note 1.  In this case, the Court need not determine whether the offense involved

13   five or more participants.  Section 3B1.1(a) applies because, regardless of the number of culpable

14   participants, the criminal activity here was "otherwise extensive."  The Guidelines commentary advises

15   that, in determining whether criminal activity was extensive under this provision, a court should

16   consider "all persons involved during the course of the entire offense."  *Id.* applic. note 3.  Even if a

17   fraud involves fewer than five participants, it still can qualify as extensive under section 3B1.1(a) if it

18   "used the unknowing services of many outsiders."  *Id.*  That language perfectly describes the way

19   Holmes and Balwani used the many employees of Theranos—along with Walgreens personnel,

20   marketing experts, journalists, and others—to carry out their scheme to defraud investors.

21       **A.    Holmes Was a Leader and Organizer**

22       First, there can be no dispute that Holmes was an organizer and leader of the criminal activity

23   charged in this case, satisfying the first requirement for this four-level enhancement.  The Guidelines

24   instruct that, in identifying defendants with a leadership or organizational role, courts should consider

25   factors including "the exercise of decision making authority," "the claimed right to a larger share of the

26   fruits of the crime," "the degree of participation in planning or organizing the offense," and "the degree

27   of control and authority exercised over others."  U.S.S.G. § 3B1.1 applic. note 4.  Here, the evidence at

28   trial revealed the unsurpassed level of authority that Holmes wielded inside her company.  In terms of

1   reporting relationships at Theranos, Holmes acknowledged that all roads ultimately led to her as Chief

2   Executive Officer.  11/30/21 Tr. at 8007.  Holmes' power at Theranos was enhanced by her role as

3   President of the Board of Directors and the fact that she was by far the company's largest shareholder.

4   And because she held far more Theranos stock than anyone else, she stood to gain the most from the

5   inflated share price caused by her false and misleading statements about the company.

6          Holmes was a hands-on leader at Theranos, working long hours in the office.  10/15/21 Tr. at

7   3854.  Throughout the trial, documentary evidence and witness testimony highlighted Holmes' control

8   over many of Theranos' business.  While Holmes restricted the flow of information among employees at

9   Theranos, she and Balwani were unique in that they had access to all information about the company's

10  activities.  *Id.* at 3855-57.  As CEO, Holmes had the authority to:  approve the training program for the

11  personnel who would staff Theranos Wellness Centers at Walgreens stores (10/15/21 Tr. at 3862-63);

12  give or withhold permission for an individual outside Theranos to receive a tour of specific areas inside

13  company facilities (*id.* at 3865-66); order demonstrations of Theranos technology (*id.* at 3869); review

14  and weigh in on the content of demo reports (TX 860); and control communications between Theranos

15  and outside entities like pharmaceutical companies (TX 528), the U.S. military (10/19/21 Tr. at 4018-

16  19), and potential investors (TX 1940; 10/19/21 Tr. at 3994), among many other things.  Holmes herself

17  confirmed at trial that she was the founder and owned a majority of the company.  11/30/21 Tr. at 8005.

18  She understood that her status gave her the power to terminate anyone at the company, including

19  second-in-command Balwani, the lab directors, and even members of the board.  *Id.* at 8005-06.

20         Holmes was clearly a leader and organizer at Theranos.  When it came to carrying out the

21  scheme to defraud investors, the evidence at trial showed that she stayed true to that role, as explained

22  below.

23     **B.      Holmes' Fraud Was "Otherwise Extensive"**

24         This case satisfies the second requirement for the four-point enhancement under section 3B1.1(a)

25  because Holmes used her authority to direct many others in furtherance of the scheme to defraud

26  Theranos' investors.  Therefore, her criminal activity was "otherwise extensive" as contemplated by the

27  Guidelines.  The Ninth Circuit has made clear that this enhancement is not limited to cases where the

28  defendant is aided by multiple people with criminal intent.  Instead, criminal activity can be "otherwise

extensive" where it involves the *unknowing* participation of people who were simply doing their jobs. *See United States v. Leung*, 35 F.3d 1402, 1406 (9th Cir. 1994) (affirming application of enhancement in case where defendant rented a warehouse to store drugs and hired shipping and transport companies to move the drugs). In the case of Theranos, Holmes' efforts to attract investors were supported by the hard work of hundreds of employees and outside partners who were doing their jobs in good faith: designing and manufacturing Theranos' analyzers, managing Theranos' finances, securing Theranos' intellectual property and other legal rights, and outfitting and maintaining Theranos' facilities. The fact that those individuals had no idea their efforts were furthering a fraudulent scheme is no barrier to this four-level enhancement. *See United States v. Booth*, 309 F.3d 566, 577 (9th Cir. 2002) (affirming four-level enhancement under Section 3B1.1(a) "because of the involvement, albeit unknowing, of more than ten employees and the geographical reach of the scheme").

The evidence at trial included additional specific examples of Holmes and Balwani's reliance on others' services within Theranos to further the fraud. For example, several groups of employees at Theranos were involved in setting up and running technology demonstrations for potential investors, including personal assistants, engineers, lab personnel, and phlebotomists. 10/15/21 Tr. at 3869-70. Those demonstrations directly furthered their scheme to defraud investors in that they left victims with an unrealistic image of the capabilities of Theranos' proprietary analyzer and the extent to which the company was using it for clinical testing. *See* TX 957; Balwani 4/19/22 Tr. at 2919-20 (testimony of Walgreens representative Nimesh Jhaveri that he was not aware the sample collected from him during a Theranos demo was tested on a third-party device). Similarly, multiple Theranos employees—along with outside consultants and contractors—were involved in creating and maintaining the Theranos company website. Holmes stayed involved and in charge, receiving input from several employees and outside lawyers regarding claims on the website that might be difficult to defend. *See, e.g.*, TX 3965, 3981, 5438. Holmes evidently decided to ignore much of that guidance, and the Theranos website ended up containing a number of materially misleading claims about Theranos technology. *See* Balwani TX 5805 (Theranos website pages). The work done by Holmes' agents on the Theranos website unwittingly furthered her scheme to defraud investors, as the website was an effective tool to spread misinformation that induced victims to invest.

1       Holmes and Balwani's scheme to defraud investors also relied on the use of members of the

2  media.  Journalists who obtained information from Holmes and Balwani and their agents unknowingly

3  passed along false and misleading information about the company's achievements and abilities,

4  embellishing Theranos' reputation and fueling investor excitement about the opportunity to buy a stake

5  in the company.  The evidence at trial included several articles repeating and amplifying Holmes' false

6  statements, including articles published in *The Wall Street Journal* and *Fortune* magazine.  TX 1106,

7  1776.  In connection with the *Fortune* article, several Theranos employees answering to Holmes worked

8  together to provide journalist Roger Parloff with requested information presenting a favorable image of

9  Theranos.  *See* TX 1753 (email including action item list with assigned employees).

10       As discussed in Section III above, Holmes and Balwani's scheme to defraud investors also

11  depended on the successful operation of Theranos' blood testing business.  Holmes had ultimate

12  authority over that part of Theranos' operations just as she did for every other aspect of the company's

13  activity.  An org chart presented to CMS by Theranos displayed Holmes at the top of the CLIA lab

14  operation, overseeing a group comprised of more than sixty Theranos employees including her

15  coconspirator Ramesh Balwani.  TX 4528 at 9.

16       The success of Holmes and Balwani's scheme turned on their ability to contain bad news about

17  Theranos' accuracy problems.  If word had gotten out about the poor reliability of Theranos' blood tests,

18  prospective investors surely would have hesitated to part with the large sums that they did, and current

19  investors would have asked questions Defendants did not want to answer.  Defendants' efforts to

20  suppress the truth depended on the participation of the Theranos employees who interacted with doctors

21  and patients.  Theranos' customer service group included more than twenty individuals who responded

22  to questions about Theranos' test results.  Complaint records document the ways in which Defendants

23  used these employees to quell doubts about Theranos' test accuracy.  For example, in connection with

24  potentially erroneous results in April and August 2015, one Theranos customer representative assured a

25  doctor that he believed the test results were accurate.  TX 4520.  In the log of that call, the employee

26  noted, "When I talk to physicians or guests I try to offer them different variables or scenarios to consider

27  when they question our results.  *Of course none of them have to do with our testing methods*."  *Id.*

28  (emphasis added).

1   This use of other employees to appease doctors and patients troubled by dubious test results was

2   an important part of Holmes and Balwani's plan.  Indeed, when employees refused to spin Theranos'

3   flawed test results as Defendants demanded, significant conflict arose.  For example, Dr. Rosendorff,

4   Theranos' lab director, testified that he felt pressured him to vouch for and explain away test results that

5   he viewed as questionable, leading to heated internal exchanges over how to respond to inquiries from

6   Theranos' customers.  *See* 9/28/21 Tr. at 1940-1946; TX 4323, 4314.  Ultimately, Dr. Rosendorff

7   resigned partly out of unwillingness to keep "endorsing results that [he] essentially didn't have faith in."

8   10/5/21 Tr. at 2733; TX 4330.  In addition to all the other ways Holmes' fraud depended on the work of

9   numerous others, her exploitation of unknowing—and sometimes unwilling—employees to help cover

10   up problems at Theranos certainly qualifies her for the offense level increase in Section 3B1.1(a).

11   Finally, even if this case did not involve the unknowing participation of so many people, the

12   "otherwise extensive" requirement under Section 3B1.1(a) would still be satisfied.  As the Ninth Circuit

13   has instructed, "[w]hether criminal activity is 'otherwise extensive' depends on such factors as (i) the

14   number of knowing participants and unwitting outsiders; (ii) the number of victims; and (iii) the amount

15   of money fraudulently obtained or laundered."  *United States v. Rose*, 20 F.3d 367, 374 (9th Cir.1994)

16   (citations omitted); *see also United States v. Govan*, 152 F.3d 1088, 1096 (9th Cir.1998) (finding that a

17   conspiracy was "clearly 'otherwise extensive'" because it "involved interstate travel, a large number of

18   victims… as well as nearly $100,000 in robbery proceeds").  Here, the large number of investor victims,

19   the fact that Theranos' activities stretched across state and national borders, and the nine-figure loss

20   amount all weigh heavily in favor of a finding that Holmes organized a led criminal activity that was

21   "otherwise extensive" under the Guidelines.

22   In sum, the facts of this case compel application of U.S.S.G. § 3B1.1(a).[3]

23   / /

24

25

26

27   ───────────────
   [3]      Even if Section 3B1.1(a) were not satisfied, subsection (c) undoubtedly applies.  *See* U.S.S.G.

28   § 3B1.1(c) ("If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by 2 levels.").

# ARGUMENT

## I.   LEGAL STANDARD

The overarching goal of a sentencing court is to impose a sentence that is sufficient to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d 1069, 1088-89 (9th Cir. 2012) (*en banc*); *see United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); 18 U.S.C. § 3553(a). The Court should begin the sentencing process by correctly calculating the applicable Guidelines range and must "remain cognizant of them throughout the sentencing process." *Gall v. United States*, 552 U.S. 38, 50 n.6 (2007). The Court should then consider the factors outlined in Section 3553(a) to determine the appropriate sentence. *Ressam*, 679 F.3d at 1089. If the Court determines that a sentence outside of the Guidelines range is warranted, it must ensure that the "justification is sufficiently compelling to support the degree of the variance." *Id.* (internal quotation omitted). "[A] major departure should be supported by a more significant justification than a minor one." *Gall*, 552 U.S. at 50

The Section 3553(a) factors are:

(1)     the nature and circumstances of the offense and the history and characteristics of the defendant;

(2)     the need for the sentence imposed (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; (C) to protect the public from further crimes of the defendant; and (D) to provide the defendant with needed educational or vocations training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established in the Guidelines;

(5)     any pertinent policy statement by the Sentencing Commission;

(6)     the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct; and

(7)     the need to provide restitution to any victims.

*See* 18 U.S.C. § 3553(a)(1)-(7).

## II.      GOVERNMENT RECOMMENDATION

With these principles in mind, the government respectfully recommends a sentence of 180 months in custody.

The factors the Court should consider in determining the appropriate sentence include (i) the nature and circumstances of the offense and the history and characteristics of the defendant, (ii) the need for the sentence imposed to reflect the seriousness of the offense, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed correctional treatment, (iii) the Sentencing Guidelines and related Sentencing Commission policy statements, (iv) the need to avoid unwarranted sentence disparities among similarly-situated defendants, and (v) the need to provide restitution to the victim of the crime.  18 U.S.C. § 3553(a).

As described above, Holmes' Total Offense Level (43) and Criminal History Category (I) yield a sentence within Zone D.  PSR ¶¶ 114, 118, and 176.  Zone D sentences shall be satisfied with a custodial sentence.  *Id.* and § 5C1.1(f).  The applicable sentencing custodial range is capped at 960 months' imprisonment.  PSR ¶ 170.  This range assumes a sentence of 240 months' imprisonment (the statutory maximum) would be imposed for each of the four counts of conviction, run consecutively.  *Id.*  Considering the extensiveness of Holmes' fraud, the sentencing factors support a sentence of 180 months' imprisonment, as it would reflect the seriousness of the offenses, promote respect for the law, provide for just punishment for the offenses, and deter Holmes and others.

### A.      The Nature and Circumstances of Holmes' Crimes (18 U.S.C. § 3553(a)(1))

Elizabeth Holmes' charged conduct was extremely serious.  The Indictment in this case lays out the key events in the story of Holmes' company Theranos, focusing on the fraudulent schemes that Holmes and Balwani devised and executed to benefit themselves and attract business and investment capital to Theranos.  PSR ¶¶ 10-84.  As detailed in the Indictment, one of Holmes' fraud schemes targeted investors in Theranos—individuals and entities who entrusted defendants with hundreds of millions of dollars based on representations made by Holmes and Balwani.  *Id.*  In a separate but closely related fraud, defendants targeted patients who paid for and relied upon Theranos' testing services to investigate and diagnose health conditions and make high-stakes decisions about medical care.  *Id.*  In

1  each of these fraudulent schemes, Holmes and Balwani misled victims regarding material facts about

2  Theranos and the capabilities of its blood-testing technology.  *Id.*  The effects of Holmes and Balwani's

3  fraudulent conduct were far-reaching and severe:  dozens of investors lost over $700 million and

4  numerous patients received unreliable or wholly inaccurate medical information from Theranos' flawed

5  tests, placing those patients' health at serious risk.  PSR ¶¶ 49, 106

6       Holmes was convicted at trial of four counts related to her scheme to defraud investors (Counts 1

7  and 6 through 8 of the Third Superseding Indictment, ECF. No. 469).  PSR ¶ 5.  Holmes was acquitted

8  of the four counts related to her scheme to defraud patients (Counts 2, 10 through 12).  PSR ¶ 6.

9  Nevertheless, the Court should consider Holmes' role in each scheme to defraud when evaluating the

10  nature and circumstances of the offenses and to determine the appropriate sentence.  *See United States.*

11  *v. Watts*, 519 U.S. 148 (1997) (Sentencing court may consider conduct of which defendant has been

12  acquitted, so long as that conduct has been proved by a preponderance of the evidence).

13       As alleged in the Indictment and proven at trial, Theranos was founded by Holmes in

14  approximately 2003, and drew little public attention for its first ten years.  PSR ¶¶ 10-84.  The

15  company's stated goal was to develop innovative methods for testing tiny blood samples obtained from

16  a fingertip with a small lancet without the need for traditional venous blood draws.  *Id.*  In or around

17  2013, Theranos began to publicize its technology and tout its purported advantages, all while soliciting

18  massive contributions from investors and gearing up toward the public launch of its testing services.  *Id.*

19  Beginning in September 2013, Theranos offered blood testing to patients at its "Wellness Centers" in

20  various locations in California and Arizona.  *Id.*

21       Unbeknownst to those outside the company, defendants were presenting investors with a

22  deceptive picture of their company and its technology, overstating Theranos' achievements, promising

23  unrealistically favorable developments on the horizon, and misrepresenting the abilities of its proprietary

24  analyzer.  *Id.*  In dealing with doctors and patients, defendants promoted the company's blood-testing

25  services through explicit and implicit representations that Theranos' test results were reliable and

26  accurate although they knew that was not the case.  *Id.*

27       The nature and circumstances of Holmes' crimes are aggravating factors for several reasons.

28  First, Holmes' crimes were not isolated events.  They were not the result of poor choices on a single day.

1    They were not limited to her interactions with one investor or a single patient.  Instead, Holmes

2    developed a complex scheme, and executed it over the course of many years.  Holmes presented a fake

3    story about Theranos' technology day after day in meeting after meeting.  Holmes maintained this

4    façade of accomplishments, after making the calculated decision that honesty would destroy her

5    company.  She ignored innumerable opportunities to chose a lawful path.

6        Second, each investment in Theranos came with opportunity cost.  Money invested with Holmes'

7    company was money not invested in legitimate, promising technology.  Holmes' scheme not only

8    diverted valuable funding to her fraudulent purposes, but it also has the effect of discouraging

9    investments generally in new technologies, as investors reasonably remain skeptical that the next

10   investment pitch is too good to be true.  In short, Holmes' criminal activities were serious, extended, and

11   extremely damaging.  The nature and circumstances of Holmes' criminal activity are significant

12   aggravating factors in determining an appropriate sentence.

13   **B.      The History and Characteristics of Holmes (18 U.S.C. § 3553(a)(1))**

14       In addition to the nature of the offenses, Holmes' history and characteristics militate in favor of a

15   significant custodial sentence.  Some defendants have difficult childhoods filled with obstacles that must

16   be overcome.  Holmes did not.  PSR ¶¶ 122-125.  Some defendants have few formal educational

17   opportunities, and instead are left to receive their educations informally, where they can find them.

18   Holmes had many educational opportunities.  PSR ¶¶ 122-126, 158-160.  Some defendants have no

19   support networks, and instead must fend for themselves.  Holmes had and continues to have a substantial

20   one.  PSR ¶¶ 144-148.  While some defendants certainly deserve consideration from a sentencing court

21   for the obstacles they have overcome and the regrettable criminal motivations they adopt, Holmes does

22   not.  Holmes, with strong family support, exceptional educational opportunities, and financial stability,

23   chose to commit fraud, repeatedly.  Holmes' history and characteristics are aggravating factors that

24   should lead this Court to impose a significant custodial sentence.  Similarly, the presence of these

25   aggravating factors should discourage the Court from varying substantially from the applicable

26   Guidelines range.

27   / /

28

### C.   The Need to Reflect the Seriousness of the Offense, Promote Respect for the Law, and Provide Just Punishment for the Offense (18 U.S.C. § 3553(a)(2)(A))

This Court should send a clear message to the community that white collar crime is serious and deserving of significant punishment.  Through this sentencing proceeding, the public will observe the law, through this Court, treat fraudsters fairly for significant crimes.  Statements from victims in this prosecution provide additional support for the argument that a significant custodial sentence is needed to promote respect for the law.  In his statement, investor Craig Hall wrote, "…I urge you, first and foremost, to consider the broader and more significant impact this sentencing will have on our society moving forward.  Given the high-profile nature of this case, the sentencing will undoubtedly send a message to the community at large.  That messaging should, in my opinion, clearly and unequivocally communicate that there is no justification for or tolerance of fraud in the business world.  Deterring similar debacles is critical to avoid society's future loss of hundreds of millions of dollars, amounts which could otherwise be used to aid in the entrepreneurial efforts of hard-working, honest Americans, bolstering the economy and fostering the American Dream."  PSR ¶ 95; Craig Hall Letter, dated Sept. 6, 2022, at p. 1.  In Brent Bingham's victim impact statement, he wrote, "I feel sentencing should reflect a standard that medical related technology shouldn't be Beta tested by patients without consent.  Medical technology companies should receive a very clear message that placing finance and 1st to market considerations above engineering and science is not acceptable."  In Elizabeth R. Daoust's victim impact statement, she wrote, "Penalties for white collar crime seem too often to be slap[]s on the wrist.  People/companies perpetuating financial fraud often get light, if any, sentences in a minimum security prison and keep most of the stolen money.  This system of 'justice' has alienated a large swath of our citizens, weakened values, and turned more people against our government.  It is a serious problem that both the courts and legislatures need to remedy."  These, and many other, victim impact statements demonstrate the need for this sentence to reflect the seriousness of the offenses and promote respect for the law.

### D.   The Need to Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B))

A sentence of 180 months in custody will serve to deter others from committing or contemplating committing white collar crimes, especially those who might consider taking advantage of

1   investors or vulnerable patients.  General deterrence is of particular importance in white collar cases

2   such as this one because would-be offenders need to be put on notice that there are severe consequences

3   for engaging in this type of criminal conduct.  *See, e.g.*, *United States v. Musgrave*, 761 F.3d 602, 609

4   (6th Cir. 2014) ("Because economic and fraud-based crimes are more rational, cool, and calculated than

5   sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence.")

6   (citation and internal quotation omitted); *United States v. Goffer*, 721 F.3d 113, 132 (2nd Cir. 2013)

7   (addressing the need for general deterrence for those who might otherwise feel that some white-collar

8   crimes are "game[s] worth playing").

9        Holmes' criminal scheme was committed in Silicon Valley.  This region is known for

10   innovation, where companies rely upon investments to fund ideas before they become profitable.  This

11   investment relationship is built, at least in part, on trust.  The relationship between innovators and

12   investors generates tremendous good far beyond this community.  Unfortunately, Holmes' crimes

13   damaged the trust and integrity that are necessary for this community to thrive.  A significant custodial

14   sentence will serve not only to deter future startup fraud schemes, but it will also serve to rebuild the

15   trust investors must have when funding innovators.

16   ### E.    The Need to Protect the Public From Future Crimes by Holmes (18 U.S.C. § 3553(a)(2)(C))

17

18        Specific deterrence, due to the brazenness of Holmes' conduct, coupled with the lack of any

19   discernable economic need that might have motivated her, also counsels in favor of a sentence that is

20   sufficiently punitive to deter Holmes from ever contemplating committing fraud again.  There is a need

21   for this Court's sentence to deter Holmes from future criminal conduct.  First, Holmes has not accepted

22   responsibility for her criminal conduct.  PSR ¶ 98.  Rather than acknowledge her role in this fraud,

23   Holmes continues to view herself as one of Theranos' victims.  PSR ¶ 99.  Moreover, Holmes'

24   experiences at Theranos apparently have not deterred her from similar employment.  Holmes continues

25   to work on new patents involving chemistry within the health care space.  PSR ¶¶ 138-139.  Likewise,

26   Holmes' settlement with the Securities and Exchange Commission allows her to return as an officer or

27   director in the future.  *Securities and Exchange Commission v. Elizabeth Anne Holmes and Theranos*

28   *Inc.*, 18-CV-01602-EJD, ECF. No. 9 at 3.

1    Finally, during her trial testimony, the following exchange occurred during her cross

2  examination:

3    Q:    Okay.  And holding a patent does not necessarily mean the invention described in the

4  patent works; correct?

5    A:    Yes.

6    Q:    For example, you don't have an ingestible pill that enables you to, to measure lipids in

7  the blood, correct?

8    A:    **Not yet**.

9  12/7/21 Tr. at 8484. (emphasis added).  Approaching sentencing, this Court cannot be confident that

10  Holmes has been deterred from future fraud.  Therefore, the Court must deter future criminal fraud,

11  especially in the health care space, by Holmes through a significant custodial sentence.

12    **F.    The Properly Calculated Sentencing Guideline Range and Pertinent Policy**
      **Statements Provided by the Sentencing Commission (18 U.S.C. §§ 3553(a)(4) &**

13    **3553(a)(5))**

14    Holmes' Total Offense Level (43) and Criminal History Category (I) yield a sentence within

15  Zone D.  PSR ¶¶ 114, 118, and 176.  Zone D sentences shall be satisfied with a custodial sentence.  PSR

16  ¶¶ 169, 170, and 176.  The applicable sentencing range is capped at 960 months' imprisonment.  PSR

17  ¶ 70.  This range assumes a sentence of 240 months' imprisonment (the statutory maximum) would be

18  imposed for each of the four counts of conviction, run consecutively.  *Id.*

19    The Sentencing Commission makes clear that the focus on loss amount in federal fraud

20  sentencing hearings is reasonable and appropriate.  In particular, the Sentencing Commission states,

21  "The Commission has determined that, ordinarily, the sentences of defendants convicted of federal

22  offenses should reflect the nature of magnitude of the loss caused or intended by their crimes.

23  Accordingly, along with other relevant factors under the guidelines, loss serves as a measure of the

24  seriousness of the offense and the defendant's relative culpability and is a principal factor in determining

25  the offense level under this guideline."  *See* U.S. Sentencing Guidelines Manual, 2021, p. 102.

26    The government agrees with the Commission's assessment of the importance of loss amount as a

27  measure of the gravity of a fraud conviction.  Here, Holmes' loss number is so high that a portion of it is

28  not accounted for within the Section 2B1.1 table, as there is no additional increase for any loss amount

1   above $550 million.  This provides an additional basis to conclude that a sufficient sentence is 180

2   months' imprisonment.

3       **G.**    **The Need to Avoid Unwarranted Disparities (18 U.S.C. § 3553(a)(6))**

4          The government recommends the Court impose a custodial sentence of 180 months'

5   imprisonment.  This sentence would amount to a variance of 60 months from the statutory maximum

6   sentence applicable to each count of conviction.  The basis for this five-year variance request is found in

7   the 3553(a) factors.  First, this variance request acknowledges the gap that exists between the losses

8   sustained by victim-investors and Holmes' realized financial gain through this fraud.  Through this

9   variance request, the government also acknowledges that the Holmes' crimes were not motivated by a

10  short-term desire for financial gain.  Second, this recommended sentence satisfies the "sufficient but not

11  greater than necessary" standard found in 18 U.S.C. § 3553(a).  Finally, the Court will achieve the

12  important sentencing goal of providing adequate deterrence to criminal conduct through a 15-year

13  custodial sentence.

14         The United States Probation Office agrees that a variance is appropriate.  PSR Addendum.

15  Certain of Holmes' history and characteristics persuaded Probation to make this recommendation,

16  including her family and social support, collateral punishments, and her experience with trauma.  *Id*.

17  While the government agrees that a variance is appropriate and agrees that her history and

18  characteristics are relevant factors this Court should weigh at sentencing, a variance of eleven years

19  from the statutory maximum sentence, and a significantly greater variance from the applicable Guideline

20  range, is not justified.  Even more, a significant variance also fails to achieve important sentencing

21  goals, such as general deterrence and promoting respect for the law.

22         The determination that a custodial sentence is or is not reasonable should not be based upon its

23  absolute number alone, that is, their number of years.  Instead, custodial sentences are reasonable

24  through the process that is followed to arrive at them.  And if the process includes too significant a

25  variance, general deterrence and respect for the law suffer.  In the government's view, a nine-year

26  custodial sentence would be the result of too significant a variance, especially when based upon factors

27  such as the collateral consequences of Holmes' trial and conviction.  The Probation Office is correct that

28  this case has garnered significant national media attention.  *Id*.  The Probation Office is also correct that

1    this causes significant collateral consequences for Holmes.  *Id*.  And in many cases, the defendant

2    cannot control which cases draw media coverage and which do not.  This case is different.  As the Court

3    knows from the trial, Holmes not only sought out media attention for her company, but she made false

4    statements to the media and used false stories in the press to corroborate false statements she had made

5    to investors.  Therefore, not only should this Court discount the collateral consequences of Holmes' trial

6    and conviction, the Court also should feel comfortable emphasizing the significant general deterrence

7    opportunity presented by this sentencing hearing.

8            Additional support for the government's sentencing recommendation is found in similar cases.

9    The Judiciary Sentencing Information (JSIN) data supports the government's sentencing

10   recommendation.  PSR ¶ ¶ 188-191.  Holmes' primary guideline will be § 2B1.1, with a Total Offense

11   Level of 43 and a Criminal History Category of I.  *Id*.  According to the JSIN data, during the last five

12   fiscal years (FY2017-2021), there were 29 offenders whose primary guideline was § 2B1.1, with a Final

13   Offense Level of 43 and a Criminal History Category of I, after excluding offenders who received a

14   §5K1.1 substantial assistance departure.  *Id*.  For the 29 offenders (100%) who received a sentence of

15   imprisonment in whole or in part, the average length of imprisonment imposed was 226 months and the

16   median length of imprisonment imposed was 180 months.  *Id*.  While one may think this prosecution is

17   unique, the data suggests otherwise.  Roughly six fraud defendants each year face sentencing at the very

18   top of the Guidelines.  And it appears that a variance is common.  This is not surprising, since the

19   Guidelines in each case are likely higher than the statutory maximum sentence.

20           Furthermore, a review of certain specific sentences imposed in similar cases demonstrate the

21   wide range of custodial sentences imposed in large-dollar fraud cases.  While each case is different,

22   there is precedent for Courts to impose significant custodial sentences in white collar cases.

| Defendant | Case No. | Approximate Loss Amount | Sentence |
|---|---|---|---|
| Charles W. McCall (McKesson-HBOC Chairman of the Board) | 00-CR-505 WHA (N.D. Cal.) | $8.6 billion | 120 months (no cooperation) |
| Walter A. Forbes (Cendant CEO) | 02-CR-264 AHN (D. Conn.) | More than $1 billion | 151 months (no cooperation) |
| Timothy J. Rigas (Adelphia CFO) | 02-CR-1236 LBS (S.D.N.Y) | More than $100 million | 204 months (no cooperation) |

| John Rigas (Adelphia CEO) | 02-CR-1236 LBS (S.D.N.Y) | More than $100 million | 144 months (no cooperation) |
|---|---|---|---|
| Bernard J. Ebbers (WorldCom CEO) | 02-CR-1144 BSJ (S.D.N.Y) | More than $1 billion | 300 months (no cooperation) |
| Sanjay Kumar (Computer Associates CEO) | 04-CR-846 ILG (E.D.N.Y.) | More than $400 million | 144 months (no cooperation) |
| Jeffrey K. Skilling (Enron CEO) | 04-CR-025 (S.D. Tex.) | More than $80 million | 168 months (no cooperation) |
| Samuel "Mouli" Cohen | 10-CR-547 CRB (N.D. Cal.) | $31 million | 264 months (no cooperation) |
| Ebrahim Shabudin (United Commercial Bank Chief Credit Officer) | 11-CR-664 JSW (N.D. Cal) | $677 million | 97 months (no cooperation) |
| John Geringer | 12-CR-888 EJD (N.D. Cal) | Approx. $45 million | 140 months (with cooperation) |
| Christopher Luck | 12-CR-888 EJD (N.D. Cal) | Approx. $45 million | 130 months (no cooperation) |
| Sean Clark Cutting (Sonoma Valley Bank CEO) | 14-CR-139 SI (N.D. Cal) | $47 million | 100 months (no cooperation) |

## H.     The Need to Provide Restitution to Any Victim

The Court should order Holmes to pay restitution as further described below.

## III.    RESTITUTION AND FINE

The Mandatory Victims Restitution Act of 1996 (the "MVRA") provides that "when sentencing a defendant convicted of an offense described in [§ 3663A(c)], the court shall order . . . that the defendant make restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). A "victim" is "a person directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered." *Id.* § 3663A(a)(2). The MVRA applies to cases of an offense resulting in damage to or loss or destruction of property of a victim. *Id.* § 3663A(b)(1). "In each order of restitution, the court shall order restitution to each victim in the full amount of each victim's losses as determined by the court and without consideration of the economic circumstances of the defendant." *Id.* § 3664(f)(1)(A).

1   Any dispute as to the proper amount or type of restitution shall be resolved by the court by the

2   preponderance of the evidence. *Id.* § 3664(e).

3          Here, the preponderance of evidence shows that Theranos C-1 and C-2 investors, Walgreens,

4   Safeway, and George Shultz suffered a loss of $803,840,309.  This amount was fully foreseeable by

5   Holmes.  Although the amount of restitution may dwarf Holmes' ability to pay, those factors simply are

6   not relevant to the Court's determination of the restitution amount.  The Court should order restitution as

7   required by the MVRA.  Alternatively, if the Court determines that the victims' losses are not fully

8   ascertainable at this time, the Government requests that the Court postpone a final determination of the

9   restitution amount for 90 days.  *See* 18 U.S.C. § 3664(d)(5).

10         Based on the PSR, it appears that Holmes has modest assets outweighed by $450,000 in "loan[s]

11  for SEC Settlement" and a liability for legal fees in excess of $30 million.  The PSR notes it is unknown

12  whether any third parties, guarantors, or others are also liable on or expected to pay the legal fees.  The

13  PSR also notes that Holmes' family appears to have substantial assets and that Holmes is managing her

14  affairs to avoid subjecting their assets to any judgment in this case.  Before foregoing a fine, the Court

15  should assure itself that such liabilities are current and genuine and consider whether Holmes'

16  management of her affairs reflects a genuine desire to make her investors whole.

17                                       **CONCLUSION**

18         For these reasons, the government recommends the Court sentence the defendant to 180 months

19  in custody and order her to pay $803,840,309 in restitution and a $400 special assessment.

20

21  DATED:  November 11, 2022                        Respectfully submitted,

22                                                   STEPHANIE M. HINDS
23                                                   United States Attorney

24                                                     __/s/ Robert S. Leach_____
25                                                   ROBERT S. LEACH
26                                                   JEFF SCHENK
                                                     JOHN C. BOSTIC
27                                                   KELLY I. VOLKAR
                                                     Assistant United States Attorneys
28

# APPENDIX B

**EXHIBIT A to 11/11/2022 Declaration of AUSA
Robert S. Leach in Support of United States'
Sentencing Memorandum (ECF No. 1644)**

United States v. Holmes, et al.

Case # 18-CR-00258

Expert Report of Carl S. Saba, MBA, CVA, ASA, ABV

Confidential

# Table of Contents

I.   Qualifications ................................................................................................................ 1

II.  Assignment ................................................................................................................... 2

III. Evidence Relied Upon .................................................................................................. 5

IV.  Summary of Opinions .................................................................................................. 5

V.   Introduction ................................................................................................................. 8

    A.   Standard and Premise of Value ............................................................................. 8

    B.   Statement of Scope and Limitations .................................................................... 10

    C.   Statement of Disinterest ....................................................................................... 11

VI.  Theranos Background ................................................................................................ 11

VII. Industry Analysis ....................................................................................................... 14

VIII. Economic Conditions ............................................................................................... 15

IX.  Financial Review ........................................................................................................ 16

    A.   Adjustments to Reported Financial Statements .................................................. 17

    B.   Balance Sheet Review .......................................................................................... 18

    C.   Income Statement Review .................................................................................... 19

    D.   Financial Ratios Review ........................................................................................ 19

X.   Estimate of Value ....................................................................................................... 20

XI.  Value of Theranos at February 7, 2014 .................................................................... 29

    A.   Income Approach – Discounted Cash Flow Method ............................................. 29

    B.   Asset Approach – Adjusted Net Asset Value ...................................................... 39

    C.   Conclusion of 100% Equity Value ........................................................................ 42

    **D.   Equity Allocation Models** ...................................................................................... 42

XII. Value of Theranos at December 31, 2014 ................................................................ 44

XIII. Value of Theranos at October 15, 2015 .................................................................. 45

XIV. Conclusion of Values ............................................................................................... 46

XV.  Appendix .................................................................................................................... 47

    A.   Investor Financings – Back-solve Methods ......................................................... 47

B.     Investor Forecasts – DCF Models ................................................................................ 48

C.     Assumptions and Limiting Conditions ......................................................................... 51

D.     Certifications and Representation .............................................................................. 53

**XVI. Exhibits ................................................................................................................................. 55**

### I.     Qualifications

1.    I am a Partner in the Financial and Forensic Consulting Group at Hemming Morse, LLP. I received a Bachelor of Science degree in Business Administration and Finance from The Haas School of Business at the University of California (Berkeley) in 1995. I received an M.B.A. with an emphasis in Finance from the Marshall School of Business at the University of Southern California, where I graduated with honors in 2003. I have been designated as a Certified Valuation Analyst (CVA) by the National Association of Certified Valuators and Analysts (NACVA).  I am an Accredited Senior Appraiser ("ASA") by the American Society of Appraisers and Accredited in Business Valuation ("ABV") by the American Institute of Certified Public Accountants. Prior to Hemming Morse, I was the Partner in Charge of the valuation and financial Consulting Practice at Burr Pilger Mayer, Inc., a regional certified public accounting firm with approximately 400 employees.

2.    I have twenty-six years of experience in the valuation of businesses, analyzing the financial condition of businesses, and consulting to businesses and business owners. The last eighteen years of my experience have focused on business valuation, economic damages analyses, transaction due diligence support, and fraud and forensic investigations. In that period, I have been retained to prepare over eight hundred valuations of businesses, intellectual property, debt instruments, and complex derivatives. These valuations have been prepared for litigation, tax reporting, financial reporting, and transaction support purposes, including bankruptcy. The majority of my valuations have focused on my expertise

with technology, life sciences, and medical device companies, from very early stages of development through late stage publicly traded companies.

3.   I am the Co-Founder and Chair of the Fair Value Forum, a San Francisco Bay Area based business valuation expert group that meets periodically to discuss technical issues and best practices in the profession. I was formerly on the Board of the Valuation Roundtable of San Francisco for several years and served a term as President of that organization. I have presented in a number of national conferences on the topic of business valuation and have authored articles and publications on the same. Many of my presentations and publications are focused on the valuation issues specific to technology, life sciences, and medical device companies. As an example, in 2013 I co-authored the valuation section of *The 409A Administration Handbook, Compliance and Company Valuation*, published by Thomson Reuters. My current curriculum vitae is attached to this report as Appendix Exhibit H and provides additional details.

4.   My employer Hemming Morse, LLP is being compensated at an hourly rate of $560 for my time, and at hourly rates ranging from $280 to $400 for employees who assisted me on this assignment.

**II.   Assignment**

5.   I have been retained through my employer, Hemming Morse, LLP, Certified Public Accountants and Financial and Forensic Consultants by the U.S. Attorney's Office, Northern District of California ("USAO" or "Counsel") in the matter of United States v. Holmes, et al.,

to estimate the fair market values of 100% of the equity in Theranos, Inc. (referred to as
"Theranos" or "Company"), on a controlling, marketable basis as of the following dates:

- February 7, 2014 (the "2/7/2014 Valuation Date");

- December 31, 2014 (the "12/31/2014 Valuation Date"); and

- October 15, 2015 (the "10/15/2015 Valuation Date"); (collectively, the
  "Valuation Dates").

6.    My assignment included allocating the above equity values of Theranos to all of the
securities in the Company's capital structure. I have also been asked to calculate the loss to
Theranos Series C-1 and Series C-2 Preferred Stock investors resulting from the difference
between my concluded values for their shares and their initial investment purchase price of
$15.00 and $17.00 per share, respectively.

7.    In carrying out my assignment, my objective was to define a minimum range of loss to
investors, and I have applied several assumptions that provide a favorable interpretation of
the equity value of Theranos on the Valuation Dates. These assumptions include adopting
optimistic management forecasts that assume Theranos' significant technology challenges
will be successfully resolved, that the Company will realize high revenue growth in the near
term, and that it will earn significantly above industry margins. I have further applied target
investor rates of return that are on the low end of the applicable range for these forecasts.

8.    Another favorable set of assumptions I have made is that Theranos' historical
expenditures were primarily directed towards research and development efforts, that such
expenditures were productively spent and created value, and the large majority of such

expenditures do not relate to technology that is obsolete on the Valuation Dates. Wherever I have faced limitations in information available to conduct this assignment, I have applied an interpretation that is most favorable to the value of Theranos, and that leads to a minimum range of investor loss. My significant valuation assumptions are more fully explained throughout this report.

9.   This report summarizes my current opinions given the information available to me to date; I may consider any additional materials that become available and amend or supplement my opinions and this report, if appropriate.

10.  In connection with my anticipated testimony, I may be asked to create, from various documents produced in this litigation and obtained through independent research, demonstrative schedules which refer or relate to the matters discussed in this report.  I have not yet created such demonstrative schedules.

11.  In my work I have been assisted by others in my firm who have acted under my direction and control. However, the opinions in this report are my own.

12.  I understand that this report may be made available to other parties in this litigation, to their counsel and experts, as well as to the Court in connection with sentencing. It has been prepared for use in this action. In all other respects, this report is confidential. It should not be used, reproduced or circulated for any other purpose, in whole or in part, without my prior written consent. No other party is entitled to rely on this report for any purpose whatsoever.

### III.     Evidence Relied Upon

13.   My understanding of the relevant facts comes from the documents provided by Counsel, transcripts of interviews and trial testimony, and materials I gathered through my research[1]. I have been provided internal Company and investor communications, transcripts of trial testimony by employees, investors, prospective and actual business partners to Theranos, and significant documents with regards to the Company's assets and liabilities, historical and future performance, and business operations. I was not able to interview Theranos' management or employees directly.  The documents I considered or relied upon are identified in Appendix Exhibit I.

### IV.     Summary of Opinions

14.   My opinions of value are based on consideration and application of the three categories of widely accepted valuation methods; the income, market, and asset / cost approaches. I applied the discounted cash flow method (income approach) in combination with the guideline public company method (market approach) to define the upper bound of Theranos' value on the three Valuation Dates. I also applied the adjusted net asset value method and the cost to recreate method[2] to define the lower bound of Theranos' value on the Valuation Dates, resulting in a range of value. Finally, I applied the back-solve method (market approach) to infer the value of Theranos based on the price paid by investors for their Series C-2 Preferred Stock. This back-solve method value is not my opinion of Theranos' fair market value, it was prepared to demonstrate the implied value placed on the Company

---

[1] My research includes information available through a subscription to the S&P Capital IQ database.
[2] Also referred to as "reproduction cost new" in business valuation guidance.

by investors.   A summary of my estimated fair market values is outlined below, and these

include the Company's substantial cash balances:

| 100% Company Equity Value Range (In Thousands) | | | Cash Balance Included in Equity Value (Thousands) | Series C-1 Per Share Value Range | | | Series C-2 Per Share Value Range | | | Valuation Date | Report Exhibit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $   378,000 | - | $   431,000 | $   151,912 | $   8.77 | - | $   9.39 | $   9.90 | - | $ 10.59 | 02-07-14 | Exhibit A.3 |
| $   827,000 | - | $   951,000 | $   465,933 | $   9.61 | - | $ 10.36 | $ 10.80 | - | $ 11.63 | 12-31-14 | Exhibit A.4 |
| $ 1,051,000 | - | $ 1,184,000 | $   496,919 | $ 10.14 | - | $ 10.81 | $ 11.37 | - | $ 12.11 | 10-15-15 | Exhibit A.5 |

15.   One method to calculate the loss to Theranos investors is to determine the difference

between their initial investment price and their ultimate recovery in the dissolution of the

Company[3]. The method I applied is based on my estimates of the above fair market values

for Theranos' equity, which leads to a smaller loss figure. I have calculated the aggregate

Series C-1 and C-2 investor losses to range between **$277.965 million** and **$315.884 million**

per Exhibit A.1 to this report. This loss is measured as the difference between the price paid

by investors and my estimated value above on the date closest to when the investment was

made. I have been asked to prepare an alternate calculation of investor loss based on my

estimated values as of only the 10/15/2015 Valuation Date, which results in a range of

aggregate loss between **$237.323 million** and **$273.646 million**.

16.   The above equity values and investor loss calculation are based on the favorable

premise that Theranos will continue to operate as a going concern, as explained in the next

section of this report. If the Company were facing near term dissolution on the Valuation

---

[3] I understand that many investors did not recover any portion of their initial purchase price. The method discussed here is not meant to reflect any specific legal guidance on loss calculations.

Dates, its recoverable equity value would be substantially lower. In such a scenario, the Company would be forced to sell its technology assets under distressed sale conditions. In addition, the Company's Edison device capabilities were still far behind that of conventional laboratory equipment[4].

17.  One data point that is informative as to the value of Theranos' technology under such a scenario is a loan extended to the Company by Fortress Credit Corporation in December 2017. The loan totaled $65 million in initial funds disbursed, with the remaining $35 million contingent on the Company achieving development milestones. The loan was secured with all assets of the Company including its patents and patent applications[5]. Fortress made this loan based on their consideration of the value of Theranos' intellectual property collateral in a potential default scenario.[6]

18.  Under a liquidation premise and if the maximum loan amount of $100 million were assumed to be the recoverable value of Theranos' technology in a dissolution, the Company's resulting equity values would be approximately $138 million, $416 million, and $448 million respectively on 2/7/14, 12/31/14, and 10/15/15[7]. This would result in larger investor losses than my calculations above.

19.  Because I am using a going-concern premise, it is important to note that even if the value of the Company exceeds the liquidation preference of the Series C-1 and C-2 shares,

---

[4] Refer to Theranos Background section of this report for discussion on state of the Company's technology.
[5] Exhibit 191 to Deposition of Erez Levy, Fortress Credit Corp Investment Memorandum, December 2, 2017.
[6] Deposition of Erez Levy, Managing Director at Fortress, September 24, 2019, p.31:7-14, p. 68:16-25.
[7] These values are based on my adjusted net asset value methods on Exhibits E.1, H.1, and K.1, with a substitution of intangible asset value in those methods with $100 million.

that does not mean the Series C-1 and C-2 investors have not incurred losses as of the

Valuation Dates.  This is because, as a going concern, there are a wide range of possible

future outcomes for the Company.  Some outcomes may be extremely favorable and some

may result in no return for any of the investors.  The standard way of valuing specific classes

of stock is to use option pricing theory which is what I have done. This makes it is possible to

consider the range of outcomes and derive a value for each class of stock.  This is more fully

described in the "Equity Allocation Models" section of this report.

### V.    Introduction

#### A.  Standard and Premise of Value

20.  As the standard of value for this report, I have employed a definition of fair market

value used in appraisal practice,[8] originally found in Section 20.2031-1(b) of the Estate Tax

Regulations and Section 25.2512-1 of the Gift Tax Regulations and incorporated into Section

2.02 of Revenue Ruling 59-60. That definition is:

> *"The price at which the property would change hands between a willing buyer*
>
> *and a willing seller when the former is not under any compulsion to buy and*
>
> *the latter is not under any compulsion to sell, both parties having reasonable*
>
> *knowledge of relevant facts."*

---

[8] This definition, or one very similar, has been adopted by The Institute of Business Appraisers, The National Association of Certified Valuation Analysts, The American Society of Appraisers, and The Appraisal Foundation.

21.  Court decisions frequently state[9] in addition that the hypothetical buyer and seller are assumed to be able, as well as willing, to trade and to be well informed about the property and concerning the market for such property. Fair market value is defined in the U.S. tax regulations, and it is a widely used standard of value for non-tax related matters. Although I assume a buyer of Theranos was accurately informed as to its financial condition, its state of development, and the capabilities of its technology, I ignore for purposes of my valuation the occurrence of misrepresentations made by Company management to investors and other third parties. Such misrepresentations can damage a company's brand image, its ability to raise capital and continue operating as a going concern, and may result in significant litigation related liabilities. These negative factors are excluded from my estimates of value[10].

22.  I have appraised Theranos's stock under a going concern premise. This premise assumes that the Company is an ongoing business enterprise with management operating in a rational way with a goal of maximizing owner value[11]. This will be discussed more fully in the valuation section of this report.  And, as mentioned above, using a liquidation premise as of the Valuation Dates would result in a substantially lower values for Theranos' equity and the Series C-1 and C-2 shares.

---

[9] In the *Estate of Kaufman*, TCM 1999-119, the court noted that "[t]he hypothetical willing buyer and the hypothetical willing seller both aim to maximize their profit from the hypothetical sale of the property."
[10] Excluding these factors results in a higher estimated value, and a lower investor loss calculation.
[11] A going concern premise assumes the business is not about to be dissolved or liquidated.

**B.  Statement of Scope and Limitations**

23.  This Summary Report was prepared, and my analyses, opinion and conclusions were developed, in conformity with the American Institute of Certified Public Accountants' Statement on Standards for Valuation Services No. 1 ("SSVS") and USPAP of the Appraisal Foundation.

24.  This report was prepared subject to certain Assumptions and Limiting Conditions included in the appendix to this report. My Certifications and Representations are also included in the appendix to this report.

25.  I obtained a variety of financial, operational, economic, and industry documents and information from Counsel as well as from outside sources. I have assumed all information is accurate and complete. I was unable to have direct communication with management and employees of Theranos in this assignment.

26.  This report reflects my understanding of facts and conditions existing at the Valuation Dates. Subsequent events have not been considered unless they were known or knowable on the Valuation Dates[12], and I have no obligation to update my report for such events and conditions. However, I reserve the right to update my report for new information that is provided to me.

---

[12] I have also considered subsequent events that provide evidence of facts and conditions existing as of the valuation date.

### C.  Statement of Disinterest

27.  I have no present or contemplated future interest in the subject property of this Appraisal Report. I have no interest in or bias with respect to the subject property or the owners thereof.

### VI.   Theranos Background

28.  On the Valuation Dates, Theranos operated clinical laboratories in Newark, California, and Scottsdale, Arizona. In addition, Theranos was in continued development of its immunoassay blood testing device (the Edison), with the objective of providing faster, more accurate results at a lower price point to patients than traditional laboratories, while requiring patient samples with only a few drops of blood. Historically, Theranos had entered into contracts with pharmaceutical companies to provide testing services in support of clinical trials. On the Valuation Dates, these agreements and related revenues had terminated.

29.  Theranos' business model on the Valuation dates encompassed a vision for its Edison device to provide a wide variety of tests to patients in the retail market with the following advantages over reference labs such as Labcorp and Quest Diagnostics[13]:

- *Faster Results* – four hours for test results in a retail setting and one hour in a hospital setting

---

[13] Trial testimony of Brian Grossman, November 16, 2021, 6379:8 – 6382:1, 6392:16 – 6395:10, 6404:19 -6406:24

- *Higher Accuracy* – less variability in test results than conventional lab, due to higher automation of processes within the device and less exposure to human error.

- *Lower Pricing* – at 50% of Medicare reimbursement rates.

- Ability to run a large array of tests, and to match the broad menu of tests offered by Labcorp and Quest Diagnostics.

- Use of few drops of blood obtained through a finger prick rather than a traditional venipuncture procedure requiring larger blood draw from patients.

- A processing device that was much smaller than traditional lab equipment and that could eventually be placed in locations outside a laboratory[14] such as retail pharmacies.

30.  As of the Valuation Dates, Theranos had not achieved the above capabilities for its technology, and significant development and operational risks faced the company. Ms. Holmes testified that only 12 assays were offered when the analysis was performed on the miniaturized Theranos device, in the CLIA laboratory,[15] and that this was one of the central issues raised by the Wall Street Journal regarding the state of development of Theranos' technology.[16] Ms. Holmes also testified that its newest device the Minilab, which was part of the 4 series, was never used for patient testing, was never put in use in the CLIA laboratory in California, and as of October 15, 2015, had been approved by the FDA in use for a single

---

[14] Placing the Company's device outside of its laboratory would have required FDA approval, which Theranos had not obtained on the Valuation Dates.
[15] Trial Cross-examination of Elizabeth Holmes, November 30, 2021, 8003:7-15.
[16] Cross-examination of Elizabeth Holmes, 8003:16-8004:21.

assay, the Herpes test assay.[17]  Ms. Holmes also testified that the only Theranos

manufactured analyzer that was ever used in the CLIA laboratory in California was the Edison

3.5, which was used for immunoassays only, rather than for general chemistry, cytometry or

nucleic acid amplification.[18]

31.  Ms. Holmes further testified that it was the Edison 3.5, one of Theranos' earlier models,

rather than the Minilab, that was used to perform 12 assays in the CLIA laboratory in

California between September 2013 and June 2015, and that by the time of the CMS

inspection in September 2015, Theranos was not using any of its manufactured analyzers in

the CLIA laboratory.[19]  Similarly, Ms. Holmes testified that Theranos did not use its own

technology, including the Minilab, to run tests at its Arizona Moderate Complexity

Laboratory, but rather used commercially available equipment.[20] Mrs. Holmes further

explained that in order to perform the majority of the 200-some tests on its menu (beyond

the 12 tests discussed above), Theranos was dependent on machines from third parties such

as Siemens, Beckman Coulter or Becton Dickinson.[21]

32.  Testimony from Surekha Gangakhedkar and Erika Cheung was similar regarding the

state of the Company's technology. Ms. Gangakhedkar testified that the Edison 3.0 and the

Minilab 4.0 was not ready due to reliability issues that were unresolved[22]. Ms. Cheung

testified that the Edison could only run one type of assay on one patient at a time while third

---

[17]Trial cross-examination of Elizabeth Holmes, November 30, 2021, 8014:24-8015:20 and 8018:6-8.
[18] Cross-examination of Elizabeth Holmes, 8015:21-8016:11.
[19] Cross-examination of Elizabeth Holmes, 8016:12-8017:25.
[20] Cross-examination of Elizabeth Holmes, 8019:4-8020:13.
[21] Cross-examination of Elizabeth Holmes, 8018:9-8019:3
[22] Trial testimony of Surekha Gangakhedkar, September 17, 2021, 1185:5-1188:12.

party machines could process 30-40 patients at one time while conducting several different tests for each patient[23]. In addition, the Edison could run "between 4 and max 12"[24] immunoassay tests, not the hundreds management had envisioned.

33.  Starting in February 2014, and ending in April 2015, Theranos raised $734 million in capital from various investors through the sale of Series C-2 Preferred stock. In addition, the Company raised $112.5 million in Series C-1 Preferred stock capital between August 2011 and January 2014[25]. Because it is my understanding that these capital raises were based on misrepresentations to investors regarding the capabilities of the Company's technology and progress with the Company's business model, I did not rely on these transactions to estimate the fair market value of Theranos on the Valuation Dates.

## VII.    Industry Analysis[26]

34.  Theranos operates in the Scientific Research and Development industry in the US which includes companies and organizations that are involved in physical, engineering or life sciences research and development (R&D).

35.  Over the past five years, the industry has performed well despite challenging conditions presented by the recession, which have caused many industries to decline.  Indeed, industry growth is expected to be limited in the next two years, before strengthening in the second half of the next five-year period as falling federal funding for defense and weak government

---

[23] Trial testimony of Erika Cheung, September 14, 2021, 807:19-809:9
[24] Trial testimony of Erika Cheung, September 14, 2021, 805:21-24, 812:10-11
[25] This figure includes promissory notes convertible to Series C-1 Preferred Stock. The majority of C-1 sales occurred in calendar year 2013.
[26] IBISWorld, *IBISWorld Industry Report 54171, Scientific Research & Development in the US*, December 2014.

investment will mitigate industry growth. That said, improving private investment from

major industries, such as oil and health, will help long-term growth. The industry is projected

to continue to grow at an average annual rate of 2.4%[27] to $147.3 billion over the five years

to 2019.

### VIII.    Economic Conditions[28]

36.  The relevant time periods for a review of the state of the U.S. economy are the

Valuation Dates. Throughout 2014, the majority of U.S. economic indicators continued to

improve.

37.  Although growth in gross domestic product ("GDP") declined slightly in the first quarter

of 2014, by year end GDP growth had rebounded to 2.6% following two quarters of rapid

growth (4.6% and 5.0%, respectively). Health care spending as a share of GDP remained

stable for the past two years. Unemployment which wavered around 6.7% in February

continued to decline through December to 5.6%. Construction starts, manufacturing activity

and productivity were improved in both periods and throughout 2014. Personal income and

consumer spending improved  in February which continued through December. Despite

some intra-year fluctuation, all major stock market indices ended 2014 higher than at the

end of 2013. Inflation remained subdued and these trends were expected to remain steady

through 2015.

---

[27] This represents an inflation adjusted real growth figure. Forecasts in an income approach to valuation make use of nominal figures that include inflation.

[28] KeyValueData, "National Economic Report", February 2014 and December 2014; JT Research LLC, "Overview of the U.S. Economy", Fourth Quarter 2014; and Federal Reserve Bank of Philadelphia Research Department, "Survey of Professional Forecasters", Fourth Quarter 2014.

IX.    **Financial Review**

38.  In valuing Theranos, it is useful to examine the financial position of the company. This allows the appraiser to review the history of Theranos, compare it to its industry, and use the analysis to assist in assessing the future prospects of the company.

39.  I have analyzed Theranos's financial statements for the years ended December 31, 2007, to December 31, 2015, the period closest to the last of my three Valuation Dates.[29] Interim financial statements between calendar year ends 2013 and 2015 were not available.

40.  Theranos's historical financial statements are presented in Exhibits B.1 through B.6 which include common size presentations and comparative industry metrics. My analysis includes a comparison of Theranos to industry averages of a guideline public company peer group, and industry data published by RMA and Bizminer as shown in Exhibits B.4 – B.6.[30]  I have used data for companies defined in Exhibit D.3 as a peer group to Theranos.

41.  I note that because Theranos was not a mature company and had not reached profitability or meaningful revenues from core services on the Valuation Dates, future results were expected to deviate from past results.  In the valuation section of this report, I discuss in greater detail the financial projections used for valuing Theranos.

---

[29] The 2007 – 2008 financial statements were audited, the remainder are internally prepared [KPMG_Theranos_000164-000188].
[30] The guideline public company data was obtained from S&P Capital IQ, and the selection of these companies is discussed in the estimate of value section of this report.
https://www.spglobal.com/marketintelligence/en/solutions/sp-capital-iq-platform

### A.  Adjustments to Reported Financial Statements

42.  In analyzing a company's historical earnings as a guide to estimating the company's earnings base, it is important to make the distinction between past earnings that represent ongoing earning power and those that do not.  Financial statements should be adjusted to eliminate the effect of past items that would tend to distort the company's current and future earning power, such as items that are unusual or non-recurring in nature, occur infrequently, are discretionary, or are derived from non-operating sources, such as interest income.

43.  Based on my review, I identified items that require adjustments in Theranos's financial statements.  These adjustments to the income statement were related to removing non-recurring or non-operating expenses, and included interest and other income. These adjustments provide a consistent basis (by only considering operating income) by which to compare Theranos to other publicly traded companies whose financials were reported by Capital IQ using the same method.   It is noted that these adjustments to the financial statements were very small in relation to the total revenues and expenses for each period, and are shown in Exhibit B.3.

44.  In addition to the above adjustments, I also adjusted out a "miscellaneous receipts liability", that equals a portion of proceeds from the 2013 and 2014 capital raises, and compensation of service providers with preferred stock, for which I understand the stock was not yet issued.  Since Theranos would satisfy the miscellaneous receipts liability by issuing the corresponding stock, and such stock was included the capitalization tables as of

my Valuation Dates, I removed these liabilities. The amount of these liabilities totaled

$45.187 million as of 12/31/13 and $390.375 million as of 12/31/14.[31]

### B. Balance Sheet Review

45.  Theranos's adjusted historical balance sheet is shown in Exhibit B.4.

46.  *Assets*.  Theranos's assets were primarily comprised of cash generated by proceeds from

the sale of preferred and common shares. Compared to its peer group, Theranos was far

heavier in its cash holdings, at $424 million at 12/31/15.  Theranos also carried low levels of

inventory on its balance sheet, similar to its peer group.  Adding non-current receivables of

$27 million, Theranos' assets summed to $535 million at 12/31/15.

47.  *Liabilities and Equity*.  Theranos had little current liabilities in relation to its cash

holdings.  Theranos did carry significant amounts of long term liabilities in the form of

customer deposits / deferred revenue of $136 million, notes payable in the amount $41

million and other non-current liabilities of $35 million at 12/31/15, for total liabilities of $250

million.  As a result, Theranos' equity was significantly positive at 12/31/14 and 12/31/15.

For a company that was not mature and still investing in growth, this conservatively levered

balance sheet appears appropriate.  Compared to its peer group, Theranos was similarly

heavy on equity versus both current liabilities and debt.

---

[31] The $45.187 liability as of 12/31/13 reconciles closely to the proceeds of 2.683 million Series C-1 shares issued between 8/1/13 and 12/31/13 at $15 per share, plus additional shares issued to directors and legal service providers [THPFM0004648099, lines 82-88 of Excel KPMG auditor workpaper]. The $390.375 million liability as of 12/31/14 reconciles closely to the proceeds of 22.838 million Series C-2 shares issued 10/31/14 through 12/31/14 at $17 per share and marked as "subscribed" in Theranos capitalization tables.

### C.   Income Statement Review

48.  Theranos's historical income statement, adjusted as described above, is shown in Exhibit B.5.

49.  *Sales and Cost of Goods Sold*.  Theranos' revenue was minimal in the years leading to 12/31/14 and 12/31/14, in keeping with the fact that Theranos was a near pre-revenue and pre-profit company.  Revenues in the period 2009-2011, at under $3 million per annum, resulted from contracts with pharmaceutical companies such as Celgene to provide testing services that would support clinical trials. These revenues terminated in 2011 and did not recur thereafter.

50.  *Operating Expenses*.  Operating expenses were significant and increasing in the years leading up to 12/31/14 and 12/31/15, with research & development, and general and administrative costs of $97 million and $76 million in 2015, respectively.

51.  *Net Income*.  Like many growing and young companies, Theranos had incurred significant losses through 2015, with losses of $184 million in 2015.

### D.   Financial Ratios Review

52.  I have reviewed Theranos's financial ratios shown in Exhibit B.6 and compared them to a peer group.[32] The purpose of financial ratios review is to compare Theranos' historic financial performance with benchmark data available in the marketplace, i.e., the peer group I have selected.  The financial ratios reflect the fact that Theranos was a near pre-revenue

---

[32] The peer group is comprised of public companies identified as having similar characteristics to Theranos, as shown in Exhibit D.3.

and pre-profit company as of 12/31/14 and 12/31/15 and that it retained large amounts of cash proceeds from investor financings.  Its current ratio was well above that of its peers. Certain other metrics were not meaningful, as Theranos had negative earnings and operational metrics, and low levels of fixed assets.

53.  **Summary:** In conclusion, Theranos's financial metrics and financial condition at the Valuation Dates are in keeping with the fact that it was an early stage near pre-revenue and pre-profit company.

### X.  Estimate of Value

54.  The value of a closely held business is derived not from a formula, but from the relevant facts and circumstances of a company and is based on informed judgment with regard to those facts. In determining fair market value, I considered available financial data, as well as all relevant factors affecting the fair market value.  One of the first issues to address in valuing an interest is whether that interest has control and is marketable.  As discussed directly below, the 100% equity interests I valued in Theranos were considered both controlling and marketable at the Valuation Dates.

**Controlling Interest Consideration**

55.  The 100% interests being valued in Theranos on the Valuation Dates represented majority ownership interests in the entire company, and therefore possessed the ability to control management and financial decisions impacting the entire company or the business segment. These decisions included the ability to elect directors and appoint management, determine management compensation and perquisites, set policy, acquire and liquidate

assets, determine dividend distribution policy, and other significant policies. Accordingly, I have considered valuation methods which yield an estimate of value on a controlling basis.

56.  It is noted that when I allocated Theranos' value to different share classes, the investors in these shares did not hold controlling interests in the Company[33]. I did not discount the preferred shares held by investors for lack of control, which results in a higher fair market value for their shares, and lower calculated investor loss than had I applied such a discount. Preferred stock investors in early-stage companies often collectively exert elements of influence or control over the companies they invest in[34].

**Marketability Consideration**

57.  A major component of a security being valued is its marketability. All other things being equal, an investment is worth more if it is marketable than if it is not, since investors prefer liquidity over lack of liquidity. Investments that lack the inherent liquidity of publicly traded securities are, all else being equal, less attractive investments. Given that the 100% equity interests that I valued in Theranos are controlling interests in the entire company, the owner of such interests would have had control over the decision to sell the entire company to achieve liquidity. As such, I applied valuation methods that yielded an estimate of value on a marketable basis, and no lack of marketability discount was applied.

---

[33] Mrs. Holmes testified that she was the founder of Theranos, the only CEO Theranos had ever had, and that at various points in time before 2016 she owned a majority of the voting shares in Theranos. At the end of 2016, Mrs. Holmes owned more than 51% of the Class B common stock in Theranos [Cross-examination of Elizabeth Holmes, 8004:22-8005:6, 8013:18-8014:15].

[34] AICPA Practice Aid:  Valuation of Privately-Held-Company Equity Securities Issued as Compensation, 2013, Sections 7.08, 7.11 [accessed via Commerce Clearing House Accounting Research Manager Subscription]

58.  The investors in Series C-1 and C-2 shares did not hold controlling interests in the

Company as noted above, and could not make a decision to sell the entire company to

achieve liquidity. Under valuation theory, it is generally accepted that the level of

marketability of senior preferred securities and the entire early-stage enterprise (such as

Theranos) are comparable[35]. The entire early-stage enterprise is less liquid than an

established, profitable company due to negative cash flows and a more limited pool of

prospective buyers. The senior preferred securities such Series C-1 and C-2 shares in

Theranos have significant liquidation preferences in first order of priority ahead of all of

other securities, which render them more marketable. In addition, preferred investors

typically have access to information that would make it easier to access an exit market for

their securities. As such, I have not applied a lack of marketability discount to Series C-1 and

C-2 preferred shares as compared to entire value of Theranos' equity.

**Valuation Methodologies**

59.  The appraisal profession generally recognizes three primary approaches to determine

value: the income approach, the market approach, and the asset approach.  Each approach

is distinctive and contains many variations. While all valuation approaches are generally

considered, not all may be used; which approach or approaches are used depends upon the

specific facts of that engagement.

60.  In valuing the Interest in Theranos, I considered several valuation methods:

---

[35] AICPA Practice Aid:  Valuation of Privately-Held-Company Equity Securities Issued as Compensation, 2013, Sections 7.18 – 7.19 [accessed via Commerce Clearing House Accounting Research Manager Subscription]

**Income Approaches:**

Capitalization of Earnings Method

Discounted Cash Flow Method

**Market Approaches:**

Guideline Public Company Method

Merger and Acquisition Method

Back-Solve Method (Investor Financing)

**Asset and Cost Approaches:**

Net Asset Value Method

Adjusted Net Asset Value Method

Cost To Recreate Method (Technology and Branding Assets)

61.   Income approaches value a company with reference to various measures of the earnings or cash flows generated by that company, with the assumption that such earnings or cash flows sooner or later will be paid out to shareholders in the form of dividends.

62.   Market approaches value a company by comparison with transactions in similar businesses, business interests, or securities.

63.   Asset approaches value a company, often one that is capital-intensive, with reference to the stated or calculated net worth of that company, with the assumption that such net worth sooner or later will be paid out to shareholders in liquidation.

64.  The focus on liquidation value utilized by asset-based approaches tends to limit their applicability to the value of a non-operating business such as a holding company, early stage enterprises with an unproven product or service, or one that will be liquidated.  In the alternative, income and market approaches are most appropriate when valuing ongoing businesses.

### Selection of Valuation Methods

65.  In valuing Theranos, I considered the methods listed above.  I chose the discounted flow method combined with the guideline public company method (to support the Company's exit value), and the adjusted net asset value method combined with the cost to recreate method (for the Company's technology and branding assets) as suitable methods for valuing the Company's equity.

66.  As discussed in the appendix to this report, I explain my use of the back-solve method to infer the value Theranos based on certain Series C-2 financing rounds.  Because it is my understanding that investors were provided inaccurate information regarding Theranos' business operations and capabilities of its technology, I did not rely on this method to define the value of the Company.  The following summarizes the methods considered and my reasoning for my selection.

### Capitalization of Earnings Method

67.  The capitalization of earnings method is an abridged version of the discounted cash flow method.  This method seeks to determine an estimate of value by projecting a single period's expected economic amount and converting that amount to a value by dividing it by a "capitalization rate."  The capitalization rate is a derivative of the discount rate, i.e., the

discount rate minus the annually compounded expected growth rate, in perpetuity, of the variable being capitalized.

68.  This method is appropriate when the projected single period expected economic amount is indicative of future operations, assuming a normal and constant growth rate.  On the Valuation Dates, Theranos was a young pre-profit development stage company that had a small revenue base, and that had not reached long term mature growth levels or margins. The capitalization of earnings method cannot accommodate changing growth rates or margin assumptions in future periods.   Accordingly, I did not consider the capitalization of earnings method an appropriate valuation method for Theranos.

**Discounted Cash Flow Method**

69.  The discounted cash flow method is based on the theory that the total value of a business is the present value of the projected future earnings plus the present value of the terminal value.  This method requires that a terminal value assumption be made.  The amounts of projected earnings and the terminal value are discounted to the present using an appropriate discount rate.  The discounted cash flow method relies on the ability of the appraiser and management to reasonably forecast cash flows and assess the risks associated with those cash flows.

70.  I was provided with detailed forecasts that reflected management's contemporaneous expectations at the Valuation Dates[36]. It is my opinion that at the Valuation Dates the

---

[36] The forecasts spanned the 2014 – 2018 calendar years, and were contained in IRC 409A valuation prepared for Theranos by Aranca. The 409A valuation dates were 9/30/13, 12/15/14, and 3/25/15. Email correspondence between the Theranos management team and Aranca indicated that management provided input regarding forecast expectations that were integrated into the valuation approaches [examples include Trial Exhibits 5206, 5085, 3527]

projections in the Aranca 409(a) Reports provided the best estimate of future anticipated operating results that were available on the Valuation dates, and that the discounted cash flow method is an appropriate method for valuing Theranos. I note that I do not consider the Aranca forecasts to represent a realistic estimate of future results for reasons discussed later in this report, they represented the best choice available of management prepared forecasts.

**Guideline Public Company Method**

71.  The guideline public company method develops an estimate of value based on prices at which stocks of similar companies are trading in a public market.  The estimate of value is derived by value multipliers such as price to earnings and price to cash flow.  These value multipliers are then adjusted and applied to the subject company's fundamental data to reach an estimate of value for the subject company.

72.  Application of the guideline public company method requires the selection of sufficient "comparable companies" to facilitate the determination of a value conclusion for the subject company.  In selecting comparable guideline companies, "the standard sought is usually one of reasonable and justifiable similarity."[37]

73.  I have not used the guideline public company method to value Theranos as of any of the valuation dates.  I did however use this method to estimate the terminal value of Theranos at the end of the projection period in 2018, under the discounted cash flow method.  The 2014-2018 forecasts provided to me assume that Theranos will continue to experience high

---

[37] Frank M. Burke Jr., Valuation and Valuation Planning for Closely Held Businesses (Englewood Cliffs, NJ: Prentice-Hall, 1981), p. 49.

revenue growth in 2018, and a standard perpetuity formula for the terminal value cannot accommodate varying future growth rates. In addition, if Theranos were to achieve its forecasts, it would be significantly more comparable at the end of 2018 to the guideline public companies I selected than it is on the Valuation Dates. Accordingly, the guideline public company method is an appropriate method for valuing Theranos as of 12/31/2018, at the end of management and Aranca's forecast horizon.

**Merger and Acquisition Method**

74.   The merger and acquisition method derives an estimate of value of the subject company based on merger and acquisition transactions involving companies or operating units of companies in similar industries to the subject company.  I did not apply this method because Theranos did not have meaningful revenues or positive earnings to which valuation multiples could be applied on the Valuation Dates.

**The Back-Solve (Investor Transactions) Method**

75.   I applied the back-solve method to infer the value of Theranos' equity based on purchases by investors of Series C-2 Preferred Stock at $17 per share. Because it is my understanding that these capital raises were based on misrepresentations to investors regarding the capabilities of the Company's technology and progress with the Company's business model, I did not consider the back-solve method to provide a reliable indication of the Company's fair market value. The implementation of this method is discussed in the appendix to this report.

**Net Asset Value Method**

76.  The net asset value method values a company at the book value of its stockholders' equity.  The historical cost bases of assets, however, usually bear very little relationship to true market values.  The method only reflects accounting history expressed in nominal dollars and not the potential of a going concern.  Because of this limitation inherent in the net asset value method and because I was able to apply more appropriate methods, I did not use the net asset value method to value Theranos.

**Adjusted Net Asset Method**

77.  Under the adjusted net asset method, the assets and liabilities of Theranos are expressed at their current market values with an offsetting adjustment to equity.  The adjusted net asset method is generally appropriate for businesses that are early stages of development with unproven products or services (such as Theranos), about to be liquidated, or that have substantial capital investments in tangible assets such as real property. I have used the net asset value method to value Theranos.  In applying this method, Theranos' underlying technology and brand intangible assets were adjusted to estimated fair market values by applying the cost to recreate method. This method considers that a buyer of the assets would contemplate the cost of developing such assets as an alternative to purchasing them.[38]

---

[38] AICPA Practice Aid:  Valuation of Privately-Held-Company Equity Securities Issued as Compensation, 2013, Sections 4.42 – 4.44 [accessed via Commerce Clearing House Accounting Research Manager Subscription]

### XI.    Value of Theranos at February 7, 2014

78.  The following discussion describes my process in estimating the fair market value of a 100% equity interest in Theranos as of February 7, 2014.

### A.    Income Approach – Discounted Cash Flow Method

79.  As discussed previously, the discounted cash flow method is based upon the theory that the total value of a business is equal to the present value of the forecast future cash flows plus the present value of the terminal value. The present value determination is based on using a discount rate that reflects the expected rate of return that the market requires in order to attract funds to the particular investment. This rate is often referred to as a company's "cost of capital."

#### *Earnings Base*

80.  My determination of value was calculated using a free cash flow to invested capital[39] earnings base. An invested capital earnings base considers the cash flows of the subject company available to both debt and equity holders, which permits comparability of firms with differing capital structures. For my calculations, I defined debt as all interest-bearing debt, which includes capital leases. These invested capital earnings-based cash flows are calculated for a period through 2018 as shown in Exhibit C.6.

---

[39] Invested Capital is defined as "…the sum of equity and debt in a business enterprise.  Debt is typically either (a) all interest-bearing debt or (b) long-term Interest-bearing debt.  When the term is used, it should be supplemented by a specific definition in the given valuation context." In the International Glossary of Business Valuation Terms as published in Valuing a Business: The Analysis and Appraisal of Closely Held Companies by Shannon P. Pratt and Alina V. Niculita, 5th Edition, Appendix A, p. 1072.

81.   The fair market value of Theranos's invested capital was equal to the present value of Theranos's free cash flow to invested capital. Theranos's free cash flow to invested capital was determined as follows for a five-year period (as shown in Exhibit C.5):

|  | Net Income (after tax, excluding interest expense) |
|---|---|
| + | Depreciation and Amortization |
| +/− | Increases or Decreases in Working Capital |
| − | Capital Expenditures |
| = | Free Cash Flow to Invested Capital |

82.   For the free cash flow to invested calculation, I established a Weighted Average Cost of Capital ("WACC") using the Modified Capital Asset Pricing Model ("CAPM") for the cost of equity component of the WACC. The terminal value was determined by applying a market derived exit multiple to Theranos' projected revenue and earnings before interest, taxes, depreciation, and amortization ("EBITDA"). The guideline public company peer group selection and analysis to support the terminal value is discussed in the next section of this report.

### *Selection of Forecasts*

83.   For purposes of my analysis, I requested from Counsel any available forecasts that the Company prepared in close proximity to the Valuation Dates. The available documents contained forecasts that were provided to investors[40], forecasts that appeared to be

---

[40] Mosley Materials, pp. 370-372, Summary Cap and Projected Income -KRM, pp. 3-5, Theranos Revenue Model_PFM, Trial Exhibit 4859 Projected Statement of Income, 2_SEC-USAO-EPROD-001215410_native

internally prepared for which I did not have record that they were provided to investors[41], and the forecasts contained within the Aranca IRC 409A valuations as of 9/30/13, 12/15/14, and 3/25/15[42].

84.  The forecasts provided to investors who participated in the 2014 and early 2015 financings were much more aggressive in terms of revenue growth than the forecasts applied by Aranca in the same time periods. Because these forecasts are associated with misrepresentations made to investors, and reflect extremely optimistic assumptions regarding near term revenue growth and profitability, I did not consider them reliable for implementing an income approach to the valuation of Theranos.

85.  The internally prepared forecasts that I reviewed and did not have evidence as to whether they were provided to investors, contained revenue growth and operating margin assumptions that were very similar to the investor forecasts. I did not consider these forecasts to be reliable for the same reason as that cited above for investor forecasts.

86.  The Aranca forecasts contained optimistic assumptions of high revenue growth and above industry operating margins, however their growth assumptions were orders of magnitude lower than those in the investor forecasts. A comparison is contained in Appendix Exhibits B.1 through B.3. Management prepared and accepted these forecasts for purposes of determining the fair market value of Theranos stock, and as a basis for Federal tax reporting for compensatory grants made to employees. In addition, I noted that Theranos'

---

[41] Projected Statement on Income_Jan 2015, Projected Statement on Income_Jan 2015-1, SEC-USAO-EPROD-000808915, SEC-USAO-EPROD-000809708, SEC-USAO-EPROD-000875621, SEC-USAO-EPROD-001247904, SEC-USAO-EPROD-001519025, 10.08.13 board docs.
[42] Trial Exhibits 5141, 5190, 5206 Attachment, 5209.

Board of Directors was presented forecasts in October 2013[43] that were very similar to those adopted by Aranca in their 9/30/13 409A[44], and that these forecasts were much lower than those presented to investors in January 2014[45].  Finally, I observed that the Aranca forecasts were relatively consistent across the three IRC 409A reports that I reviewed with valuation dates between September 2013 and March 2015. For all of these reasons, I determined that the Aranca forecasts most closely aligned with management's expectations on the Valuation Dates[46]. I relied on these forecasts as a starting point for applying my discounted cash flow method.

### Key Assumptions

87.  The key assumptions incorporated in the cash flow forecasts are set forth in Exhibit C.1 to C.3. My assumptions are based balance sheet, income, expense, and capital expenditure forecasts that were developed in communications between Theranos management and Aranca[47]. In vetting these forecasts, I considered the historical operations of Theranos, the Company's stage of development, historical and forecast industry growth information, and economic conditions.

88.  My key assumptions as shown in Exhibits C.1 through C.3 and in D.1 are explained as follows:

---

[43] 10.08.13 Board Docs, pp. 15-16, NUNN_THERANOS_0000665 - 0000666
[44] Trial Exhibit 5141, p. 59.
[45] Theranos Revenue Model_PFM (this document contains worksheet tabs that represent the two year forecast provided by Theranos management to PFM in January 2014).
[46] Despite the Aranca forecasts being the best choice available among management prepared projections, I still considered them overly optimistic for reasons explained in the discount rate selection section of this report.
[47] Trial Exhibits 3527, 5190.

89.  **Revenue:** Revenue was forecast to grow significantly through 2018, at which point it would still be higher than a long-term sustainable level, at 55.6% annual growth. Revenues are based on laboratory test services provided through retail pharmacies, physician's offices, and hospitals. Because Theranos' Edison device was not FDA approved, and could not perform many of the tests offered, the ability to generate these revenues in the near term were dependent on operation of Theranos' laboratories in CA and AZ, with significant use of third party purchased equipment[48]. In the long term, Theranos' ability to successfully capture market share from companies such as Quest Diagnostics was highly dependent on successful development of its device, FDA approval, and ability to deliver a superior alternative to conventional laboratory tests.

90.  **Cost of Revenues:** Cost of revenues was forecast to be equal to 35.3% in of revenue in 2014, decreasing to 30% in 2018.

91.  **Operating Expenses:** Operating expense levels were forecast to decrease from being significantly greater than revenue in 2014 to 24.7% of revenue in 2018. The forecasted operated expenses and cost of revenues result in an EBITDA margin of 45.3% in 2018 which is significantly above BizMiner and RMA industry medians of 11.2% and 8.8% respectively (Exhibit B.5). In addition, Theranos' forecasted EBITDA margin is more than twice the upper quartile range of the guideline public companies of 20.7% (Exhibit D.2). I did not alter these very optimistic margin assumptions applied by Aranca and Theranos management, however

---

[48] Cross-examination of Elizabeth Holmes, 8016:12-8017:25, 8019:4-8020:13.

I did consider this variable in determining the appropriate WACC discount rate to apply to the forecasts.

92. ***Capital Expenditures:*** Capital expenditures ("Capex") were forecast to decrease from being significantly greater than revenue in 2014 to 11.8% of revenue in 2018. Over the forecast period, the projected capital expenditures significantly exceed industry metrics as a percentage of revenue. The upper quartile of the public company peer group is 6.5% of revenue (Exhibit D.2). I noted that Theranos appeared to classify its Edison "manufactured device" as a fixed asset rather than as consumable inventory. This along with its large investment in manufacturing equipment for the device may explain why the Company required significantly higher capital expenditures than its peer group. This factor also mitigates to a limited extent the Company's very optimistic EBITDA margins as discussed above.

93. ***Depreciation and Amortization:*** As shown in Exhibit C.3, depreciation was forecast to decrease from significantly greater than revenue to 5.7% in 2018. Projected depreciation is based on an estimated economic life of 7.5 years for new purchases, and 5 years of existing fixed assets. These lives were inferred based on an analysis of historical depreciation and accumulated depreciation relative to cost basis for the Company's fixed assets.

94. ***Income Tax Rate:*** I applied a 40% income tax rate which approximates combined CA State and Federal statutory corporate tax rates on the Valuation Dates.

95. ***Working Capital:*** Theranos' forecasted working capital was based on the projected difference between current operating assets and operating liabilities adopted by Aranca.

Aranca's analysis did not include required operating cash which I added to the forecasts based on 180 days of operating expenses. This results in working capital stabilizing at 18.6% or revenue in 2018, as shown in Exhibit C.3. This is at the lower bound of the 22.8% to 48.7% range based on industry comparable data.

96.   **Exit Multiple - Guideline Public Companies:**   The Company's projected high revenue growth rate in 2018 is the reason why I estimated Theranos' terminal value at 12/31/2018 using an exit multiple under the guideline public company method, as shown in Exhibit D.1. Exhibit D.3 outlines the guideline public companies that I deem comparable to Theranos. I selected publicly traded companies that offer medical diagnostic tests in a laboratory setting, or rapid point of care tests outside of laboratory. These selected companies included Quest Diagnostics and Labcorp Diagnostics, which were discussed as comparators in Company management discussions with Mr. Grossman during Partner Fund Management's ("PFM") due diligence for its February 2014 investment in Theranos[49]. I also selected companies that developed diagnostic equipment for medical testing, such as Cepheid or Illumina, which were also discussed as comparators between Mr. Grossman and Theranos management. My selected peer group has a large degree of overlap with the guideline public companies selected by Aranca and Company management for IRC 409A purposes.

97.   **Exit Multiple Selection:**   In Exhibit D.4, I compare Theranos at the end of the forecast period in 12/31/18 to the guideline public companies for a series of financial metrics, as of the 2/7/2014 Valuation Date.  In Exhibit D.2, I have listed financial metrics of the guideline

---

[49] Trial testimony of Brian Grossman, November 16, 2021, 6381:5-11.

public companies as of 2/7/2014 and indicated with bordering those combinations of public guideline company and metrics that I consider most comparable to Theranos.

98.  If Theranos were to meet its forecasts through 2018, it would be of similar revenue size to the guideline public companies, it would have experienced higher growth in the historical period, it would be expected to realize modestly higher growth in the near future, it would generate higher profit margins than the peer group, and it would require significantly larger capital expenditures to sustain the Company compared to the peer group. I selected a MVIC (market value of invested capital)/Revenue multiple of 6.10x, which is near the mean of the peer group, and significantly above the median and upper quartile. This recognizes the higher assumed profitability and growth of Theranos in 2018 compared to the peer group, while accounting for the higher required capital expenditures of the Company. I selected 12.60x MVIC/EBITDA multiple that is between the median and lower quartile of the peer group. Theranos' higher profitability is inherent in the EBITDA figure, and should not be reflected in the multiple. In addition, the higher capital expenditure requirements for Theranos have a negative impact on the applicable multiple.

### Discount Rate

99.  When considering any investment, an investor is exposed to various risks. These include company, industry, economic, market, interest rate, and credit risks. The riskier the investment, the higher the return expected. Discount and capitalization rates, as used in an Income Approach to value a business, represent the return an investor would require in order to choose a particular investment. It represents anticipated future return; past returns, however, are often used to help determine a reasonable future rate.

100. In order to determine the appropriate discount rate that equity investors in Theranos required - the cost of equity of Theranos – I considered several commonly accepted approaches. Two widely used approaches for privately held companies are the Modified Capital Asset Pricing Model ("Modified CAPM"), and the Ibbotson's Build-Up Model.  Given the level of risk, and the resulting required rate of return of investor for an early-stage investment such as Theranos, I did not use either of the above methods, and instead estimated Theranos' WACC using venture capital rates of return from several studies that are widely cited.[50]

101. As shown in Exhibit C.4, I selected a venture capital cost of equity of 45%.  The next step was to develop a WACC.  This was derived by weighting the cost of equity and the after-tax cost of debt by their respective amounts in Theranos's invested capital (based on industry capital structure).  Because the industry use of debt was so low (only 3.0% of invested capital), the WACC ended up being 44% (rounded).

102. Table 1 of Exhibit C.4 presents actual rates of return achieved on venture backed portfolio companies at different stages of development, and over different time horizons. The annual rates of return for a Seed/Early-Stage company such as Theranos are 25.5% to 34.9% over a 10-year period. Such returns are appropriate if a forecast reflects expected value, which is a weighted average of possible future results. The Aranca forecasts I adopted are the most realistic version that was available in the documents that I reviewed, but they do not represent expected value.

---

[50] See footnotes 1 through 7 of Exhibit C.7.

103. The Aranca forecasts do not consider downside risk, and early-stage companies face significant statistical risk of failure or under-performance[51]. In addition, the forecasted revenues are predicated on Theranos' ability to implement on its vision to offer very broad array of faster, lower cost, more accurate tests in a miniaturized device that would displace traditional labs such as Quest Diagnostics. As discussed in the background section to this report, this vision was unrealized on the Valuation Dates and the Company faced significant remaining development risk. I further note that the Edison was not FDA approved, and Theranos lab operations were likely not in compliance with CLIA quality standards on all of the Valuation Dates[52], and the forecasts assumed that Theranos would realize outsized 45% EBITDA margins that were far above industry norms. For all of these reasons, the Aranca forecasts did not reflect expected value, and therefore the applicable rate of return required an upwards adjustment to those demonstrated in Table 1 of Exhibit C.4.

104. Tables 2 and 3 of Exhibit C.4 demonstrate *target* rates of return; the returns expected by Venture Capital investors if the investment is successful. These higher *target* rates of return (compared to *actual* returns) compensate for downside risk that is not included in a "success scenario" forecast such as the one applied by Aranca that I relied upon. The range of most target annual rates of return for Seed, Start-up and "early development" companies such as Theranos on the Valuation Dates is between *28% and 75%*. When I derived the implied

---

[51] AICPA Accounting and Valuation Guide, *Valuation of Portfolio Company Investments of Venture Capital and Private Equity Funds and Other Investment Companies*, May 1, 2019, Part II- Appendixes A-C, B.04.04. Also refer to graphic entitled "Venture Capital is an Unusual Creature" directly following this section.
[52] Therano-no: Key CLIA Compliance Issues, Loyola University Chicago School of Law, May 5, 2022. http://blogs.luc.edu/compliance/?p=4681

annual rates of return that would reconcile forecasts provided by Theranos to investors to prices paid by those same investors in 2014 and 2015[53], the resulting range was similar at *36% to 82%* (Exhibit C.4). Based on this data for target rates of return applicable to Theranos on the Valuation Dates, I selected a cost of equity of 45% with a resulting WACC of 44%. My cost of equity selection is in the low end of the applicable target rates of return, as well as those inferred from investor forecasts. This favorable assumption results in a higher value for a Theranos, and a lower calculated investor loss.

105. Utilizing a discounted cash flow to invested capital method with a WACC of 44.0%, I derived an estimate of value for Theranos of **$431 million** (rounded), on a 100% -controlling, marketable interest basis, as shown in Exhibit C.6.  This is inclusive of Series C-1 and C-2 financing proceeds through 2/7/2014 not included on the 12/31/2013 balance sheet.  This is also net of interest-bearing debt.

### B.  Asset Approach – Adjusted Net Asset Value

106. In Exhibit E.1, I have estimated the value of Theranos using the adjusted net asset value method combined with a cost to recreate approach for Theranos' technology and branding assets.  The basis for application of this method is that Theranos was a near pre-revenue[54], pre-profit early-stage company with largely unproven technology on the Valuation Dates. The Company's stage of development renders going concern income and market approaches

---

[53] Please refer to Appendix for an explanation of reconciliation of discounted cash flow approaches based on forecasts provided to investors, to the $17 per share they agreed to invest at for Theranos Series C-2 Preferred Stock.
[54] Theranos had revenues of $116,000 and $391,000 in calendar years 2014 and 2015, which were far below its near-term management forecast expectations.

to valuation less reliable, as future results may deviate significantly from forecasted expectations, due to development delays, technical failures, inability to obtain regulatory approvals, low market adoption and other factors. For such early-stage companies, adjusted net asset approaches are often applied, which reflect the fair market value of the company's assets less its liabilities. In addition, intangible assets of such early-stage companies are often measured through cost approaches[55], which measure the cost to obtain or reproduce functionally similar or identical assets.

107. I started with Theranos' 12/1/2013 balance sheet and made three adjustments. I have added to cash those Series C-1 and C-2 financing proceeds through 2/7/2014 not included on the 12/31/2013 balance sheet. I have removed from other current liabilities the "miscellaneous receipts" liability that represents proceeds from the 2013 capital raises for which stock was not yet issued (for the reasons explained earlier in this report). Finally, I added the value of Theranos' technology and branding assets, which I have estimated using the cost to recreate method, as shown in Exhibit E.2.

108. In Exhibit E.2, I have categorized Theranos' historical operating expenses based on trial balances prepared by the Company. My objective was to include any historical expenses that related to development of Theranos' technology, and to developing recognition of the Theranos brand[56]. I excluded any expenses that related to capital raising for Theranos, as

---

[55] AICPA *Intangible Asset Valuation Cost Approach Methods and Procedures*, p.25. Reasons to use the cost approach include "if the subject intangible asset is not the type of asset that generates a measurable amount of income".

[56] Inclusion of expenditures related to developing Theranos brand recognition is favorable to the Company's value as it ignores the impact of management misrepresentations made to investors and business partners that would damage the brand and potentially render it worthless.

this would not create an intangible asset, and the cash proceeds of capital raises are included in my adjusted net asset method. Theranos' largest categories of operating expenses such as salaries and wages did not include functional allocations to categories research and development, capital raising and investor relations, and general and administrative support. In such instances, I made a favorable assumption by including all expenses in my cost approach. This results in a higher valuation for Theranos and a lower calculated investor loss.

109. Exhibit E.2 details my allocations of historical costs incurred by Theranos to the value of its technology and brand, and they result in capture of over 95% of Theranos operating expenses between 2004 and the Valuation Dates. I have then grown the allocated expenses at historical inflation rates to the Valuation Dates, deducted a 4% functional obsolescence adjustment which represents 50% of 2004-2006 expenses[57], and added a 14% developer profit margin[58] to result in a cost to recreate value for Theranos' technology and brand of $340.370 million. My valuation of Theranos' technology and brand through a cost approach makes a favorable assumption that the Company's significant historical expenditures into these assets have been productively spent, and that less than 5% of these expenditures are obsolete on the valuation date. The final step was to integrate this value into the adjusted net asset approach in Exhibit E.1 to result in a value of Theranos' equity of **$378 million** (rounded) as of the 2/7/2014 Valuation Date.

---

[57] It is my understanding that Theranos began development of the Edison in 2007, and carried forward some of the technology from the prior version of its device.
[58] This is based on the upper quartile of the guideline public company peer group EBIT margins in Exhibit D.2.

### C. Conclusion of 100% Equity Value

110. My analysis results in a  fair market value of Theranos on the 2/7/2014 Valuation Date in the  range of **$378 million to $431 million** per Exhibit A.3.  Allocation of these values to the different share classes (including Series C-2 Preferred Stock), warrants and options is also shown in Exhibit A.3, based on the equity allocation models developed in Exhibits L.1 and L.2, and Exhibits M.1 and M.2 which explained in the following section.

### D. Equity Allocation Models

111. After I concluded my estimate of Theranos' entire equity value, I allocated the Company's value to its capital structure. The methodology that is commonly applied to allocate value to a complex capital structure for a going concern business is the option pricing equity allocation model ("OPM"), where common stock and each security in a company are treated as a call option on total company value.[59] The OPM will model future possible exit values for the company on a lognormal (bell shaped) distribution curve,[60] based on an estimated current equity value for the company, and an estimated volatility of the company's equity in the future. The key inputs that the OPM requires to estimate a distribution of future possible exit values from a liquidity event include equity value on the valuation date, a risk-free rate of return, an estimated term to a future liquidity event, and an estimated volatility of the underlying equity value of the company. The higher the

---

[59] AICPA Practice Aid:  Valuation of Privately-Held-Company Equity Securities Issued as Compensation, 2013, Sections 6.30 – 6.41. [accessed via Commerce Clearing House Accounting Research Manager Subscription]
[60] The distribution of percentage returns on the stock are normally distributed in the option pricing model, creating a symmetrical bell shaped curve. The distribution of stock prices (or company exit values) are lognormally distributed creating a bell shaped curve that is asymmetrical, with a longer tail on the right side of the curve. This occurs because as stock prices are constrained at zero on the left side of the curve, they cannot become negative.

volatility input and the longer the term to liquidity, the more widely dispersed will be the resulting possible exit values on the bell-shaped distribution curve.

112. The OPM considers the rights and preferences of each security, and at each possible future total exit value (typically from an IPO or sale of the company) it will allocate proceeds from that exit value to each class of securities. At high exit values, preferred stock will convert to common[61].  At low exit values preferred stock will not convert to retain their liquidation preferences that exceed the value of common stock. At very low exit values, there may be zero payout to common stock and the preferred securities may not recover their full liquidation preferences. As a final step, the OPM will aggregate all the payouts to each security under future possible exits to determine the probability weighted present value of each class of securities. All the securities will sum to the total value of the company on the valuation date.

113. I applied the OPM to allocate Theranos' equity value to its securities, taking into account the first priority liquidation preferences of Series C, C-1 and C-2[62], the second priority liquidation preferences of Series A and B[63], and the fact that all preferred stock had participation rights with common stock in a liquidity event[64]. I estimated an approximate 4 year term to a liquidity event from the 2/7/2014 Valuation Date based on observation that

---

[61] In the case of Theranos, preferred stock retains participation rights with common stock. Preferred stock holders receive their liquidation preferences + equal sharing with common stock in any residual exit value that exceeds these preferences.
[62] Series C, C-1, C-2 preferred stock are repaid first in a liquidation or sale of the company, for an amount equal to their initial investment prices of $0.564, $3.00 & $15.00, and $17.00 respectively. [Articles_Jan 2014, pp. 5-6, *Liquidation Rights.* Certificate of Designation of Series C-2 Preferred Stock_2014.02.07, pp. 1-2, *Liquidation Rights*]
[63] Series A, B preferred stock are repaid second in a liquidation or sale of the company, for an amount equal to their initial investment prices of $$0.15 and $0.1846 respectively. [Articles_Jan 2014, pp. 5-6, *Liquidation Rights*]
[64] All preferred stock share in any remaining residual liquidation or sale value equally with common stock without having to convert to common stock. [Articles_Jan 2014, pp. 5-6, *Liquidation Rights*]

the Company's forecasts estimated mature operating profit margins between 2017 and 2018, that the Company would become more attractive and saleable to an industry buyer within that timeframe, that Aranca in their discussions with management had assumed a company exit in 2018, and a 4 year term to liquidity in their 12/15/14 IRC 409A valuation.

114. Another significant input into the OPM is an estimate of Theranos' future equity volatility between the Valuation Dates and the date of the estimated liquidity event. I analyzed the asset and equity volatilities of the same 22 guideline public company peer group discussed earlier in this report. The median and average asset volatility of the peer group was between 39% and 40%, and the upper quartile was 47% per Exhibit R.1. I selected an asset volatility of 50% for Theranos, taking into account that it was earlier stage and significantly smaller than the peer group companies as measured by revenues and market value. Earlier stage companies are generally more volatile due to higher remaining development and implementation risks. This is confirmed by the smallest companies in the public peer group having asset volatilities that range between 47% and 101%. My final step was to calculate the corresponding equity volatility of 55% for Theranos given the proportion of financing debt and equity in its capital structure.

115. My analysis results in a range of per share values on a controlling marketable basis for Theranos securities on the 2/7/14 Valuation Date shown in the lower section of Exhibit A.3.

## XII.    Value of Theranos at December 31, 2014

116. Using the same adjusted net asset value and discounted cash flow methods as those used to value Theranos at the 2/7/2014 Valuation Date, including identical Aranca IRC 409A

forecasts, the resulting fair market value of Theranos's equity on the 12/31/2014 Valuation

Date was in the range **$827 million** to **$951 million** as shown in Exhibit A.4.  Allocation of

these values to the different share classes, warrants and options is also shown in Exhibit A.4,

based on the equity allocation models developed in Exhibits N.1 and N.2, and Exhibits O.1

and O.2.  The volatility used in the equity allocations was developed in Exhibit R.2.

117. The discounted cash flow and guideline public company methods are outlined in

Exhibits F and G respectively. The adjusted net asset method combined with the cost to

recreate method are outlined in Exhibits H.1 and H.2.

### XIII.      Value of Theranos at October 15, 2015

118. Using the same adjusted net asset value and the discounted cash flow methods as those

used to value Theranos at the 2/7/2014 Valuation Date, which included nearly identical

Aranca IRC 409A forecasts[65], the resulting fair market value of Theranos on the 10/15/2015

Valuation Date was in the range of **$1,051 million** to **$1,184 million** as shown in Exhibit A.5.

Allocation of these values to the different share classes, warrants and options is also shown

in Exhibit A.5, based on the equity allocation models developed in Exhibits P.1 and P.2, and

Exhibits Q.1 and Q.2.  The volatility used in the equity allocations was developed in Exhibit

R.3.

[65] I applied the Aranca 3/25/15 IRC 409A forecasts to this valuation date, which are nearly identical to the 12/15/14 IRC 409A forecasts.

119. The discounted cash flow and guideline public company methods are outlined in Exhibits I and J respectively. The adjusted net asset method combined with the cost to recreate method are outlined in Exhibits K.1 and K.2.

### XIV.   Conclusion of Values

120.. A summary of my estimated fair market values is outlined below, and these include the Company's substantial cash balances:

| 100% Company Equity Value Range (In Thousands) | | | Cash Balance Included in Equity Value (Thousands) | Series C-1 Per Share Value Range | | | Series C-2 Per Share Value Range | | | Valuation Date | Report Exhibit |
|---|---|---|---|---|---|---|---|---|---|---|---|
| $  378,000 | - | $  431,000 | $  151,912 | $  8.77 | - | $  9.39 | $  9.90 | - | $ 10.59 | 02-07-14 | Exhibit A.3 |
| $  827,000 | - | $  951,000 | $  465,933 | $  9.61 | - | $ 10.36 | $ 10.80 | - | $ 11.63 | 12-31-14 | Exhibit A.4 |
| $ 1,051,000 | - | $ 1,184,000 | $  496,919 | $ 10.14 | - | $ 10.81 | $ 11.37 | - | $ 12.11 | 10-15-15 | Exhibit A.5 |

121. The aggregate Series C-1 and C-2 investor losses based on the Company values in the tables above range between **$277.964 million** and **$315.884 million** per Exhibit A.1 to this report. I have been asked to prepare an alternate calculation of investor loss based on my estimated values as of only the 10/15/2015 Valuation Date, which results in a range of aggregate loss between **$237.323 million** and **$273.646 million**.

Dated:  September 8, 2022   _____

Carl S. Saba, MBA, CVA, ASA, ABV

XV.     Appendix

A. Investor Financings – Back-solve Methods

122.There are two general processes for establishing the value of an enterprise and its

associated classes of stock.  The first is a top-down process that establishes the fair market

value of the enterprise and then allocates this value among the various classes of equity.

The second, and the way that I used under the back-solve method, is a bottom-up process

that uses the pricing of a recent stock transaction to infer the value of the other classes of

equity. This in turn establishes an implied total equity value for the subject company.

Inferring value from investments in a company is a form of the market approach referred to

as the back-solve method. This approach is frequently applied to early stage companies and

is discussed in the AICPA Practice Aid on *Valuation of Privately-Held-Company Equity*

*Securities Issued as Compensation*.  The back-solve method utilizes the same OPM

framework discussed earlier in this report that I used to allocate my estimated values for

Theranos to its securities.

123.I applied the back-solve method with the same OPM assumptions used for the equity

allocation models previously described on the three Valuation Dates. The primary difference

in this analysis is that I did not have an established value for Theranos' equity. I instead

solved for the implied value of Theranos' equity based on the $17.00 per share paid by

Series C-2 investors throughout 2014. I performed this analysis as of the 2/7/14 Valuation

Date, and 12/31/14 Valuation Date. In addition, I approximated the implied equity value of

Theranos as of 2/13/15, the investment date for Mr. Murdoch, by adding his $125 million

investment amount to the 12/31/14 back-solve value. The resulting implied equity values for

Theranos based on investor pricing of Series C-2 preferred stock is **$1,510 million**, **$2,250 million** and **$2,375 million**[66] as of 2/7/14, 12/31/14, and 2/13/15 respectively (Appendix Exhibit A). The supporting back-solve models are contained in the Appendix Exhibits C.1 – C.3, and D.1 – D.3 respectively for the first two valuation dates.

### B. Investor Forecasts – DCF Models

124. As part of my analysis, I have also reviewed the forecasts provided to investors as part of their due diligence process at various points in time in the period from February 2014 to April 2015.  As discussed earlier in this report, the forecasts provided to investors presented revenue growth rates and thresholds that were orders of magnitude higher than those provided to Aranca for IRC 409A purposes (and also shared with the Theranos Board in October 2013) in the same approximate time frame. The comparison of revenues, gross margin, and EBITDA margin between forecasts provided to investors vs. Aranca is contained in Appendix Exhibits B.1 – B.3. An example of the significant discrepancies is a comparison of projected revenues in Exhibit B.1 for calendar year 2015. Forecasts provided to investors assumed Theranos' revenue would range between $990 million and $1,677 million, which is approximately *9 to 15 times higher* than the forecasts provided to Aranca with revenues of $112 to $113 million.

---

[66] These are not my opinions of the equity value of Theranos, they represent the values assigned to the Company based on investors' willingness to pay the $17 per share for Series C-2 preferred offered by Theranos management. There are a number of references in press articles to a valuation for Theranos of approximately $9 billion in this timeframe. My inferred values are substantially lower due to the back-solve model's recognition of superior economic rights (such as liquidation preferences) to Series C-2 preferred stock as compared to all other inferior securities. The approximate $9 billion figure can be achieved by multiplying *all* shares outstanding for Theranos on these dates by the $17 per share paid for Series C-2. This simplified post-money approach would incorrectly assume that all securities have equal value to the most senior Series C-2 preferred stock.

125. Given that investors reviewed the forecasts provided to them as one of the factors that they considered in their decision to invest in Series C-2 at $17 per share, I considered that it would be informative to estimate the implied annual rates of return that investors placed on those forecasts, and to compare those rates of return to the target VC rates of return study data. This would provide additional information to consider in selecting my discount rate for the income approach described in the main section of this report.

126. I applied income approaches with a market derived exit multiple (similar to that discussed in the main section of this report) using the following investor forecasts:

- Management prepared two-year forecasts provided to PFM in January 2014 for their 2/7/14 investment (Appendix Exhibit E.1 – E.3).

- Financial model developed by PFM based on the management forecasts above, which extend the two-year forecast horizon to a ten year period. I relied on PFM's "base case" version of the model (Appendix Exhibit E.4 – E.5).

- Management prepared two-year forecasts provided to Daniel Mosley and RDV Corporation for their October 2014 investment (Appendix Exhibit F.1 -F.3).

- Management prepared two-year forecasts provided to Rupert Murdoch for his February 2015 investment (Appendix Exhibit G.1 – G.3).

127. In each instance, I translated the investor two-year forecasts into a discounted cash flow method, and estimated a market exit multiple of revenue or EBITDA applicable to Theranos at the end each forecast period (similar to that described in the main section of this report). For the PFM financial model, I did not apply a market exit multiple as the forecast horizon

was extended far enough to allow for Theranos to reach steady state growth rates and margins. This allowed me to apply a standard perpetuity formula to capture all cash flows that would follow the discrete forecast period.

128. My final step was to solve for the rate of return that would be required to reconcile the Theranos equity value resulting from investor forecast discounted cash flow methods to the back-solve values of Theranos from investor pricing discussed earlier. That reconciliation is shown on Exhibit A, and results in annual rates of return on investor proceeds ranging from 36% to 82%. As discussed in the section of this report where I explained my selection of the discount rate under the income approach, these rates of return are generally consistent with target VC rates of return study data for companies at early stages of development (refer to Exhibit C.4 for comparison).

### C.  Assumptions and Limiting Conditions

In addition to those cited elsewhere in this report, other assumptions and limiting conditions pertaining to the estimate of value stated in this report are summarized below.

1.  The estimates of value arrived at herein are valid only for the stated purpose as of the dates of the valuations.

2.  Public information and industry and statistical information have been obtained from sources I believe to be reliable. However, I make no representation as to the accuracy or completeness of such information and have performed no procedures to corroborate the information.

3.  No change of any item in this report shall be made by anyone other than Hemming Morse, LLP, and I shall have no responsibility for any unauthorized change.

4.  I have not conducted interviews with the management of Theranos concerning the past, present, and prospective operating results of the Company. I have instead relied upon materials itemized in Appendix Exhibit I, Evidence Relied Upon in the determination of my opinions of value.

5.  This report reflects facts and conditions existing at the Valuation Dates. Subsequent events have not been considered unless they evidence facts and circumstances that were known or knowable on the Valuation Dates, and I have no obligation to update my report for such events.

6.  This report is designed to give estimates of value. It does not purport to be a comprehensive list of all of the considerations undertaken in order to arrive at my estimates

of value. It is not an accounting report, and it should not be relied on to disclose unreported assets or liabilities, or to verify financial reporting.

7.  This report contains a review and discussion of information contained in trial balances, financial statements, and tax returns prepared by Theranos. The majority of this financial data is not CPA Audited, Reviewed, or Compiled. I have applied some procedures to corroborate financial information on the Company between different sources, and have generally assumed this information to be a reliable representation of Theranos' books and records.

**D.  Certifications and Representation**

I certify and represent that, to the best of my knowledge and belief:

1.  the statements of fact in this report are true and correct;

2.  the reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions;

3.  Hemming Morse, LLP and its employees have no present or prospective interest in or bias with respect to the property that is the subject of this report, and the employees of Hemming Morse, LLP and I have no personal interest or bias with respect to the parties involved;

4.  I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment;

5.  my engagement in this assignment was not contingent upon developing or reporting predetermined results;

6.  my fee for completing this assignment is not contingent upon the development or reporting of a predetermined values or direction in values that favor the cause of the client, the amount of the value opinions, the attainment of stipulated results, or the occurrence of any subsequent events directly related to the intended use of this appraisal;

7.  my analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with Uniform Standards of Professional Appraisal Practice and with the American Institute of Certified Public Accountants' Statement on Standards for Valuation Services No. 1 ("SSVS");

8.  Brian Zacharias, Claudia Stern, and Sacha Zadmehran provided significant business and/or intangible asset appraisal assistance to the person signing this certification/representation;

9.  the analyses, opinions, and conclusions of value included in the valuation report are subject to the specified assumptions and limiting conditions, and they are the personal analyses, opinions, and conclusions of value of the valuation analyst;

10. the economic and industry data included in the valuation report have been obtained from various printed or electronic reference sources that the valuation analyst believes to be reliable. The valuation analyst has not performed any corroborating procedures to substantiate that data;

11. the parties, for whom the information and use of the valuation report is restricted, are identified; the valuation report is not intended to be and should not be used by anyone other than such parties;

12. I have no obligation to update the report or the opinions of value for information that comes to my attention after the date of the report;

Dated: September 8, 2022

Carl S. Saba, MBA, CVA, ASA, ABV