1   COOLEY LLP
    JOHN HEMANN (165823)
2   (jhemann@cooley.com)
    MAX A. BERNSTEIN (305722)
3   (mbernstein@cooley.com)
    ELEANOR W. BARCZAK (329180)
4   (ebarczak@cooley.com)
    HANNAH POLLACK (336599)
5   (hpollack@cooley.com)
    3 Embarcadero Center, 20th Floor
6   San Francisco, California 94111-4004
    Telephone:    +1 415 693 2000
7   Facsimile:    +1 415 693 2222

8   COOLEY LLP
    ELIZABETH H. SKEY (267852)
9   (eskey@cooley.com)
10  3175 Hanover Street
    Palo Alto, CA 94304-1130
11  Telephone:    +1 650 843 5000
    Facsimile:    +1 650 849 7400
12
    Attorneys for Defendant
13  MANISH LACHWANI

    CLARENCE & DYER LLP
    NANCI L. CLARENCE (122286)
    (nclarence@clarencedyer.com)
    899 Ellis Street
    San Francisco, California 94109
    Telephone:    +1 415 749 1800
    Facsimile:    +1 415 749 1694

14

15                  UNITED STATES DISTRICT COURT

16                NORTHERN DISTRICT OF CALIFORNIA

17                    SAN FRANCISCO DIVISION

18

19   UNITED STATES OF AMERICA,

20              Plaintiff,

21        v.

22   MANISH LACHWANI,

23              Defendant.

Case No. 3:21-CR-00353 CRB

**DEFENDANT MANISH LACHWANI'S 3553(A) SENTENCING MEMORANDUM AND MOTION FOR DOWNWARD DEPARTURE**

Judge:              Charles R. Breyer
Sentencing Date:    January 17, 2024
Date Action Filed:  August 20, 2021

24

25                          **REDACTED**

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

# TABLE OF CONTENTS

**Page**

I.  INTRODUCTION ................................................................................................ 1

II.  MR. LACHWANI'S PERSONAL HISTORY ................................................... 3

    A.  Childhood in India ................................................................................. 4

    B.  Education ................................................................................................ 5

    C.  Professional Career ............................................................................... 7

    D.  Founding of HeadSpin .......................................................................... 8

    E.  Family and Medical Issues .................................................................... 9

    ██  ████████████████████████████ ................................................ 11

    G.  Support Letters and Pretrial Conduct ................................................. 12

    H.  Family Life and Employment Prospects Going Forward .................... 14

III.  A PRISON SENTENCE IS NOT WARRANTED UNDER 18 U.S.C. § 3553(A) ........... 15

    A.  The Nature and Circumstances of the Offense Do Not Support a Prison Sentence ................................................................................................ 15

        1.  The Offense Conduct ................................................................ 15

        2.  Mr. Lachwani's Motivations ..................................................... 16

        3.  HeadSpin is a Success Because of Mr. Lachwani and No Investor has Lost Money as a Result ....................................................... 17

    B.  Mr. Lachwani's Personal History and Characteristics Do Not Support a Prison Sentence ...................................................................................... 19

    C.  Incarceration is Not Necessary to Afford Adequate Deterrence of Protect the Public ................................................................................................... 20

        1.  Incarceration is Not Necessary for Specific Deterrence ........... 20

        2.  Incarceration is Not Necessary for General Deterrence ............ 21

    D.  Just Punishment and Respect for the Law are Not Served by Incarcerating Mr. Lachwani ......................................................................................... 22

    E.  The Guidelines Recognize Imprisonment is Not Appropriate for Non-Violent First-Offenders Like Mr. Lachwani ........................................ 23

    F.  If the Court Determines that There Was a Loss, A Downward Departure Is Warranted ............................................................................................. 23

    G.  If the Court Determines that the Guideline Range Is in Zone A or B, Neither an Upward Departure Nor an Upward Variance Is Warranted .............. 24

IV.  CONCLUSION ................................................................................................. 26

1

# TABLE OF AUTHORITIES

2

Page(s)

3

**Cases**

4

*United States v. Adelson,*
   441 F. Supp. 2d 506 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008) ...................... 24

5

6

*United States v. Autery,*
   555 F.3d 864 (9th Cir. 2009) ................................................................................................. 21

7

*United States v. Chin Chong,*
   No. 13-CR-570, 2014 WL 4773978 (E.D.N.Y. Sept. 24, 2014) ........................................... 23

8

9

*United States v. Edwards,*
   595 F.3d 1004 (9th Cir. 2010) .............................................................................................. 20

10

**Statutes**

11

28 U.S.C.A. § 994(j) .................................................................................................................. 24

12

13

18 U.S.C.
   § 3553(a) .................................................................................................... 15, 24, 26

14

   § 3553(a)(2) ............................................................................................................. 22

15

USSG
   § 2B1.1 ....................................................................................................................... 25

16

   § 4A1.3(a)(1) .............................................................................................................. 25
   § 4C1.1 ....................................................................................................................... 23

17

   § 5C1.1 .................................................................................................................... 4, 23
   § 5C1.1, Application Note 10 .................................................................................... 3

18

19

   § 5K2.0 *et seq* ........................................................................................................... 25

20

**Other Authorities**

21

Bachi Karkaria, *How the 1993 blasts changed Mumbai forever* (Jul. 30, 2015) ...................... 5, 6

22

23

Frank O. Bowman*, III, Sentencing High-Loss Corporate Insider Frauds After
   Booker*, 20 Fed. Sent'g Rep. 167 (2008) ................................................................................ 24

24

Richard S. Frase, *Punishment Purposes*, 58 Stanford L. Rev ................................................... 23

25

John F. Burns, *Riot Scars Are Gone, but Bombay Is Still Healing* (Apr. 17, 1994) ...................... 5

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DEFENDANT'S SENTENCING MEMORANDUM
**3:21-CR-00353 CRB**

I.      **INTRODUCTION**

This is an unusual federal criminal fraud case, and Manish Lachwani is an uncommon defendant.  Vanishingly rare is the investment fraud case in which the victims not only lost no money, but stand to realize significant gains from the investments at issue.   Equally rare is the fraud case in which evidence of sophistication, greed, and avarice are entirely lacking.   And in almost no case is the defendant facing deportation and permanent separation from his wife, daughter, and the adopted country to which he has contributed greatly.  But all of that – together – is this case.  This Court has long recognized that not every case and not every defendant call for a sentence of imprisonment.  This is such a case and such a defendant.

Manish Lachwani was born and raised in India, where he lived in or near poverty.  He was a poor immigrant to the United States who worked tirelessly to make something of himself and he was, indisputably, successful in developing technology and creating innovative products, including at HeadSpin.  He has been a consistent, productive, and generous contributor to society, his family, and his community.

Mr. Lachwani was unqualified to be HeadSpin's CEO, and it is clear from the record that Mr. Lachwani was over his head from the start.  He knew only technology and had zero education or experience in finance, accounting, or management prior to founding HeadSpin.  The government agrees that Mr. Lachwani's misleading conduct was not sophisticated and that he did not involve others in it.  He mislead investors in entirely *un*sophisticated ways about certain financial metrics, but he never lied about the core technology and patents about which investors cared most.

Mr. Lachwani also never used company or investor funds for his own purposes.  Indeed, this case is notable for the lack of evidence of greed and avarice.  Mr. Lachwani's highest annual salary at HeadSpin was $250,000, much *less* than the salary he gave up at Google to start HeadSpin.  Mr. Lachwani was modest in his lifestyle and expenses, and not just in comparison to Silicon Valley CEOs.  His focus was on building technology that was useful, not on lining his own pockets.

Mr. Lachwani was wrong to be anything less than fully and carefully truthful with investors, but there is no evidence of loss arising from Mr. Lachwani's conduct.  The government agrees that he intended no harm.  More importantly, investors likely will reap significant profits from their

investments when HeadSpin goes public or is acquired in the future.  The government has been silent throughout the sentencing process as to the value of the HeadSpin investments being held by the very investors the government calls victims.  If the Court sentences Mr. Lachwani to prison, he may well languish there while the investors at issue in this case realize millions in profits from the technology Mr. Lachwani built.

More generally, this case does not involve the integrity of the public markets or investments by vulnerable or unsophisticated victims.  HeadSpin's investors were significantly more sophisticated than Mr. Lachwani was about financial metrics—and the lead investors realized that the metrics at issue in this case were off.  They invested anyway because the most valuable thing about HeadSpin was its technology—technology that is real and in use today by leading app developers.

Mr. Lachwani already faces significant consequences for what he did wrong.  He was deposed as CEO and terminated from the company he built.  There are frontpage news articles read by his neighbors and friends that call him a cheat and a fraud.  His family has been devastated by his conviction, ██████████████████████████████████████████████████████ ████████████████████████

Mr. Lachwani is also facing deportation as a result of his conviction.  Mr. Lachwani has been in the United States since 1997.  He and his wife are permanent legal residents, and his daughter is a citizen.  He has an estranged brother in India, but no other family or friends.  Facing deportation and separation from his wife and daughter—or forcing them to move with him—is a consequence that definitively removes this case from the regular run of fraud cases considered by this Court.

Mr. Lachwani intended no harm.  Mr. Lachwani caused no loss to others, yet lost massively himself.  Mr. Lachwani came from modest circumstances and has never behaved immodestly.  Mr. Lachwani built a business that, anomalously, will likely make others a great deal of money after he is sentenced. ████████████████████████████████████████████████████ ████████████████████████████████ Mr. Lachwani will be deported to a place he left over 25 years ago, and his sentence will thus have severe consequences that last forever.

Cooley LLP
Attorneys at Law
San Francisco

The Sentencing Guidelines now formally acknowledge that certain zero-point defendants should not be sentenced to prison.  USSG § 5C1.1, Application Note 10.  Mr. Lachwani is one of those defendants.  We respectfully request that the Court consider the information described in detail below and impose a sentence that does not include a term of imprisonment.

## II.    MR. LACHWANI'S PERSONAL HISTORY

All but the most recent chapter of Mr. Lachwani's story is an inspiration.  Despite growing up in poverty in India and living through periods of massive civil upheaval that traumatized the people of the city he lived in, Mr. Lachwani managed to become an incredible technologist that has designed the systems behind many of the devices we all use today.  He accomplished this feat by calling on the values taught to him by his parents, including hard work, dedication, and always striving to be the best.  For his family, nothing less was permissible, and throughout his childhood Mr. Lachwani's mother stopped at nothing to make sure he focused on his studies.

When times were good, this drive helped Mr. Lachwani succeed.  But when life became overwhelming, this "A+ only" philosophy led him to make mistakes.  When Mr. Lachwani founded HeadSpin, he had zero experience as a business executive, and he struggled under the pressure. █
█████████████████████████████████████████████████████████████████████████████████
██████████████████  This led to his own health problems and eventual gallbladder removal surgery during the midst of the events in this case.  All of this while trying to build a company, for the first time, and to do it without disappointing any board members or investors.  He was in over his head.

Further, despite the strong bonds between himself, his wife, and his daughter, the stress of his indictment has put stress on the family. ███████████████████████████████████
█████████████████████████████████████████████████████████████████████████████████
█████████████████████████████████████████████████████████████████████████████████
████████████████████

Mr. Lachwani still has so much to offer.  While business is not his strength, technology is.  Mr. Lachwani is one of the leading chipset, processor, and computer architecture technology experts in the world, and he is already brimming with ideas to help improve our technology.

1
2
3

### A.    Childhood in India

4        [REDACTED] Mr. Lachwani's father immigrated to Mumbai at the age of 17 in order to send money

5 home.  He found a job with the Indian railway as a low-level engineer, and, through hard work and

6 dedication, moved up through the ranks until he was a Senior Officer within the railway system.

7 (Final Presentence Report ("PSR") ¶ 59.)  Mr. Lachwani's mother initially worked for the Indian

8 Navy. (*Id*.; Declaration of Max A. Bernstein ("Bernstein Decl."), Ex. A (Lachwani Letter) at 1.)

9        Mr. Lachwani was born in 1975 and his younger brother was born in 1977.  Mr. Lachwani's

10 father's salary was low and the government provided housing as part of his compensation.

11        Knowing that they would eventually need to leave government housing when Mr.

12 Lachwani's father retired, in 1986 the Lachwanis decided to move into an apartment they had

13 purchased.  But the only housing they could afford was a 450 square foot apartment in a 16 unit

14 building on the outskirts of Mumbai.  (PSR ¶ 60; Bernstein Decl., Ex. A at 1.)  Mr. Lachwani's

15 mother retired to care for the children, further contributing to the family's financial troubles.  There

16 was no room for beds in the tiny space, leaving Mr. Lachwani to sleep on the kitchen floor.  (PSR

17 ¶ 60.)  In addition to being a cramped space for two adults and two adolescent boys, the apartment

18 itself was falling apart.  It had cracks through the walls—some of them five inches wide—which

19 led to leaks during heavy rains, and eventually mold.  (*Id*.)  The water leaks made the floor and

20 walls damp, and the mold made the family sick.  The Lachwanis' friends, family, and neighbors

21 rarely visited the apartment because everyone was worried the walls would collapse.

22        Mr. Lachwani's parents—his mother in particular—wanted a better life for him.  His mother

23 was unwavering in her dedication to ensuring he could focus on his studies.  As was accepted in

24 Indian culture at the time, it was not uncommon for Mr. Lachwani's mother to resort to physical

25 punishment as a means of instilling discipline and motivation.  (*Id*.; Bernstein Decl., Ex. A at 1.)

26 Indeed, Mr. Lachwani's mother would not accept anything less than an A+.  (*Id*.)  Excellence was

27 an imperative, and she was determined to push Mr. Lachwani to be the best any way she could,

28 including through strict study routines.  Their small apartment provided limited space for studying,

1  so she arranged for her sons to use a neighbor's house or nearby office building when they were

2  vacant. (*Id.*) Mr. Lachwani remembers waking up at 2:30 am to study in the office building. (*Id.*;

3  Bernstein Decl., Ex. A at 1.)

4      While the Lachwanis were facing the grim realities of poverty, India was going through a

5  period of civil unrest and upheaval. In 1992-93, India experienced a wave of major riots over the

6  course of several weeks, fueled by inter-Indian ethnic strife. Violence swept through the streets of

7  Mumbai, where Mr. Lachwani lived, turning the city into a battleground, with the streets full of

8  police, soldiers, and rioters. It was a time of immense fear and uncertainty for everyone in Mumbai,

9  including the Lachwanis. ██████████████████████████ Mr. Lachwani recalls the

10  communal tensions in the area where he lived only heightened the anxiety he experienced during

11  that time. (*Id.* ¶ 61); *see, e.g.*, John F. Burns, *Riot Scars Are Gone, but Bombay Is Still Healing*,

12  NYTIMES.COM (Apr. 17, 1994), https://www.nytimes.com/1994/04/17/world/riot-scars-are-gone-

13  but-bombay-is-still-healing.html.

14      Shortly thereafter, the March 1993 bombings of Mumbai added another layer of trauma to

15  Mr. Lachwani's life. He was in 12th grade, and the bombings created immense pressure and stress

16  for everyone in the city, including his family. Again, the infrastructure was disrupted, and residents

17  could not reach their loved ones. Mr. Lachwani's father was traveling at the time, and Mr.

18  Lachwani recalls anxiously waiting for news about his father. Mr. Lachwani describes the feelings

19  of helplessness and uncertainty as overwhelming during this period. (PSR ¶ 61); *see, e.g.*, Bachi

20  Karkaria, *How the 1993 blasts changed Mumbai forever*, BBC.COM (Jul. 30, 2015),

21  https://www.bbc.com/news/world-asia-india-33713846.

22      **B.    Education**

23      Mr. Lachwani pursued his undergraduate degree in computer science at the University of

24  Mumbai. (PSR ¶ 62.) His mother's drastic efforts to ensure excellence succeeded, as he ranked in

25  the top 2% of his university class. This academic success at the University of Mumbai provided

26  him the opportunity to obtain a masters' degree in Computer Science at Colorado State University.

27  (*Id.*) CSU offered him a Teaching Assistantship, which helped support Mr. Lachwani financially

28  during his studies. With only $50 in his pocket, Mr. Lachwani traveled to Colorado in the summer

1    of 1997 to begin his graduate program.  (*Id*.; Bernstein Decl., Ex. A at 1.)  While his role as a TA

2    helped him get by, he survived on the bare minimum.  Mr. Lachwani lived in an overcrowded house

3    with five other students and spent most nights sleeping on a used couch in his TA's office.  He

4    lived off Cup-of-Noodles, pizzas, and free burritos from a friend who worked at the campus café.

5           Mr. Lachwani was academically successful during his first year at CSU, achieving a 4.0 his

6    first semester.  Due to his budding expertise in chipset, processor, and computer architecture

7    technology, one of his professors selected him for a prestigious position at a technology company

8    in Silicon Valley.  Mr. Lachwani began working full time as an intern at Silicon Graphics (SGI) in

9    May 1998, with a starting wage of $25 per hour.  (Bernstein Decl., Ex. A at 1.)  At the age of 22,

10   he again lived in houses crowded with other young Indian engineers but was able to financially

11   support his family in Mumbai.  This was a major achievement for Mr. Lachwani, and he decided

12   to prioritize his family's financial stability over his own academic pursuits.  He received permission

13   from CSU to postpone the start of his second year in order to stay at SGI longer.  Mr. Lachwani

14   loved his job at SGI.  He built operating systems, focusing on graphics for Stephen Spielberg

15   movies such as Back to the Future.

16          Mr. Lachwani lived with his cousin in Sunnyvale.  Similar to his homes in Mumbai and

17   Colorado, the apartment ran afoul of various housing codes.  Because the apartment was loud, dirty,

18   and crowded, he spent most of his time at the office.  He even showered at SGI, as the shower at

19   home was unusable.

20          Unfortunately, Mr. Lachwani's father abruptly passed away of a heart attack in November

21   1998.  (PSR ¶¶ 58, 63.)  The Lachwanis were devastated.  Compounding the grief, his father's

22   government pension, which had provided some financial support to the family, was significantly

23   reduced.  As his brother was attending the University of Mumbai at the time and was therefore

24   unable to work, Mr. Lachwani felt a deep sense of responsibility to ensure his family was financially

25   stable.  He made the difficult choice to suspend his studies at CSU in order to continue working at

26   SGI so that he could support his family.

27

28

### C.   Professional Career

Over the next several years, Mr. Lachwani worked at a series of technology companies in Silicon Valley, such as OTM Software Professionals, Agami Systems, Zambeel, PMC Sierra, Zynga, and Monta Vista.  (*Id.* ¶ 84.)  He became more and more financially stable and was eventually able to buy a car, rent an apartment by himself, and even fly his mother to the United States to visit him for three months.

Mr. Lachwani's expertise was and is in designing the behind-the-scenes systems that support various groundbreaking technologies.  For example, he has made (and continues to make) significant contributions to the Linux Operating Systems Community, particularly in the ARM processor domain.  These open-source contributions formed the foundation of the Android operating system, transforming the landscape of mobile technology.  During his tenure at PMC-Sierra, his work focused on optimizing networking equipment that utilized the MIPS processor.  Using his Linux work, Mr. Lachwani successfully implemented near Gigabit speed networking capabilities, revolutionizing the efficiency and performance of networking equipment powered by PMC-Sierra processors.  Mr. Lachwani has filed and been granted over 50 patents, each representing a unique solution or invention in the field of technology.[1]

One of Mr. Lachwani's most notable achievements occurred during his tenure as a system designer for Amazon Kindle from 2008 to 2010.  Mr. Lachwani played a pivotal role in creating an innovative power management architecture that allowed the Kindle to operate for 30 days on a single charge.  (PSR ¶ 83.)  Collaborating closely with the Kindle Hardware team, he crafted a specialized eInk reader screen, effectively eliminating the need for power-hungry LED screens.  Mr. Lachwani also designed the system that introduced predictive reading, the program that wakes up the next page before turning to it.  (Bernstein Decl., Ex. A at 1-2.)

While at Zynga as Chief Technology Officer ("CTO") of Quality Assurance, Mr. Lachwani conceptualized a revolutionary idea—a technology company that would use mobile cloud testing to improve the quality of mobile applications ("apps").  In 2012 he took a leap of faith and left Zynga to co-found his first startup, Appurify, and served as the company's CTO.  Appurify was a

---

[1] These patents are viewable at: https://patents.justia.com/inventor/manish-lachwani?page=3.

success, and it transformed the mobile app testing landscape.  Two years later, Google acquired Appurify and offered Mr. Lachwani and his co-founder, Jay Srinivasan, positions at the technology giant, which both accepted.  (PSR ¶¶ 80-81; Bernstein Decl., Ex. A at 2.)  A few months later, Mr. Lachwani achieved another goal—he was granted legal permanent resident status in the United States.

Up until this point, Mr. Lachwani was extremely successful at accomplishing whatever he put his mind to, living up to his mother's dream of earning only an A+.  During this time, Mr. Lachwani also began his own family.  ██████████████████████████████████████████ ████████████████████████████████████████████████████ ███████████████████)  Their daughter, ████ was born in 2007, the year Mr. Lachwani purchased his first home.  These were foundational years for Mr. Lachwani as he developed his expertise, formed his family, and established a real sense of financial security for the first time in his life.

### D.    Founding of HeadSpin[2]

In 2014, Mr. Lachwani had a loving wife and daughter, he had just sold his first company to Google, and he was earning enough money to feel secure and support his family in India.  While he wanted to ensure his family never experienced the poverty of his childhood, once the family's needs were met, he turned his efforts towards building a company that used the technology he created.

Mr. Lachwani took another huge leap of faith in 2015 by leaving Google to co-found HeadSpin.  He did not make this change for financial reasons—Mr. Lachwani left his ████████ salary at Google to start a company that would pay him ███████████ for the first two years.  Rather, it was Mr. Lachwani's drive for excellence and desire to build something useful that pushed him to take this risk and embark on this new journey.

---

[2] A detailed explanation of the founding of HeadSpin and Mr. Lachwani's admitted conduct can be found in Mr. Lachwani's first sentencing memorandum regarding loss ("Lachwani Loss Memo"), Dkt. No. 105, at 4–12, and Mr. Lachwani's letter demonstrating acceptance of responsibility (Bernstein Decl., Ex. A).

1   Mr. Lachwani attempted to convince Mr. Srinivasan to leave Google to be the CEO of
2   HeadSpin, but Mr. Srinivasan declined.  Instead, Mr. Lachwani became the CEO of HeadSpin and
3   his co-founder, Brien Colwell, served as the CTO.

4   HeadSpin was (and is) a success.  HeadSpin, a software-as-a-service company, provides
5   software tools and access to remote devices around the world that customers can use to test their
6   mobile applications on numerous devices and in different geographies that have varying network
7   capabilities.  (PSR ¶ 8).  HeadSpin's "boxes" enable multiple devices (e.g., mobile phones) and
8   operating systems to run tests through one box.  A single phone in a HeadSpin "box" in one
9   geography could have different operating system versions loaded to allow testing a mobile
10  application on different device-operating system permutations in the geography.  Customers love
11  the technology, and it is still widely used today.

12  **E.       Family and Medical Issues**

1

2

3

4

5

6

7

8

9

10

11

12

13 ████████████████████████ coupled with mounting pressure at work, also impacted

14 Mr. Lachwani's own health.  During the year 2018, ██████████████████████████, Mr.

15 Lachwani began developing unhealthy habits, including eating greasy and unhealthy meals, and

16 sleeping just three to four hours each night.  As time progressed, Mr. Lachwani's body began to

17 show signs of distress.  He started gaining weight and experiencing excruciating and unrelenting

18 stomach pain, particularly after eating.  Each meal often triggered headaches, nausea, and

19 migraines, causing his life to feel like a cycle of pain.  (*Id.* ¶ 71.)  Mr. Lachwani disregarded these

20 symptoms and kept pushing through.  If he stopped to deal with the pain, he might not receive an

21 "A+," the only acceptable outcome.

22       Eventually, Mr. Lachwani could no longer ignore his physical condition.  One day in late

23 summer 2019, after dropping his daughter off at school and on his way to work, the intensity of the

24 pain in his stomach reached an unbearable level.  Unable to continue driving, he pulled his car over

25 and waited for what seemed like an eternity for the pain to pass.  This incident forced Mr. Lachwani

26 to recognize that he needed to take care of himself.  He was diagnosed with significant gallstones,

27 which he attributes to stress and reckless dietary choices.  (*Id.*)  In the months that followed, Mr.

28 Lachwani embarked on a mission to rectify the damage to his body.  He meticulously curated a

menu composed of wholesome, nourishing foods.  But his efforts were thwarted by the persistent

lack of proper rest, including because of the extreme demands HeadSpin placed on him.  Finally,

in October 2019, Mr. Lachwani decided to undergo gallbladder removal surgery.  (*Id.*)  His surgery

took place in December 2019, and he took off a month to recover.  Again, this illness and surgery

coincides with the events at issue in this case.

1



10        **G.      Support Letters and Pretrial Conduct**

11        The media coverage of Mr. Lachwani's indictment and the criminal process has caused

12   many members of Mr. Lachwani's community to turn their backs on him.  (*Id.* ¶ 69.)  But a few of

13   Mr. Lachwani's friends and neighbors have stuck by his side during these trying times, and several

14   submitted letters of support.  The letters are a testament to Mr. Lachwani's integrity, generosity,

15   and kindness to those around him.  For example, one of his neighbors noted Mr. Lachwani's

16   "genuine caring nature," and called him a "exceptional family friend."  (*See* Bernstein Decl., Ex. C

17   at 1, U. Subramanian Ltr.)  Another neighbor called him "an honest reliable person of good moral

18   character" and said they had "no questions as to his honesty and integrity."  (*Id.* at 2, U. D. Bergman

19   Ltr.)  A longtime friend and neighbor praised Mr. Lachwani for his positive contributions to the

20   community, explaining that Mr. Lachwani goes out of his way to help others.  (*Id.* at 6, S. Sridharan

21   Ltr.)  A family friend called Mr. Lachwani and his wife "very engaged parents" and noted Mr.

22   Lachwani's dedication to his family through his participation in school activities with his daughter

23   and regular visits to India to see his mother when she was alive.  (*Id.* at 7, L. Tadikona Ltr.)

24        Besides supporting members of his community, Mr. Lachwani makes a positive impact by

25   contributing to organizations and causes that align with his values.  (PSR ¶ 66.)  His family has

26   regularly supported to various charities for years.  For example, the Lachwanis donate to the

27   following organizations and types of organizations:

28

- Alzheimer's organizations, as they have witnessed the devastating impact of this disease on individuals and their families.  (Bernstein Decl., Ex. B at 9, 22-24.)

- Goodwill, which helps empower individuals through job training and employment opportunities.  The Lachwanis believe in their mission of creating economic independence and strive to support their efforts.

- Organizations dedicated to assisting veterans.

- No Kid Hungry, an organization that works to provide meals and support to children in need, ensuring they have access to nutritious food.

- Heifer International, an organization dedicated to ending hunger and poverty.  (*Id.* at 1.)

- Local organizations like City Team and Second Harvest, which focus on community development and providing food assistance to vulnerable populations.

- St. Jude Hospital, which provides life-saving treatments to children battling serious illnesses.

- St. Labre Indian School, which provides quality education to Native American children.  (*See id.* at 12, 15, 29; *see also id.* at 6-8 (letter from St. Joseph's Indian School), 11 (Certifications of Appreciation of various schools).)

- Yellowstone Boys and Girls Ranch Foundation, an educational and religious organization dedicated to supporting children and adults with special needs.  (*Id.* at 9.)

- Conservation organizations such as The Nature Conservancy (*id.* at 11, 15) and Ocean Conservancy (*id.* at 13.)

- As a family with a strong connection to their Hindu faith, the Lachwanis contribute to their local Hindu temple, supporting its maintenance and community programs.

- During the COVID-19 outbreak, the Lachwanis made donations to several organizations through GoFundMe campaigns to provide relief to individuals and communities affected by the pandemic.

- Sankara Eye Foundation, the world's largest free eye care program.

These are only some of the organizations to which the Lachwanis donate.  (*See generally* Bernstein Decl. Ex. B for a compilation of recognitions and certificates from various charitable organizations thanking Mr. Lachwani for his contributions.)

Mr. Lachwani's pretrial conduct has been without incident.  He has cooperated with pretrial services and the probation office and shown respect to the Court.  Further, Mr. Lachwani does not drink alcohol or consume any illicit substances, and he has no history of such consumption.

**H.     Family Life and Employment Prospects Going Forward**

Despite his long and successful life in the United States, Mr. Lachwani is facing deportation to India as a result of this conviction.  He has almost no remaining connections to India beyond his brother, with whom he does not have a close relationship.  More devastating, he is facing separation from his wife and daughter.

As noted above, Mr. Lachwani currently lives with his wife and daughter in Los Altos in a house that he purchased before he founded HeadSpin.  (PSR ¶ 68.) ███████████████████ ██████████████████████████  (*Id*. ¶ 65.)  The Lachwanis are particularly supportive of each other during these difficult times.  (*Id*. ¶ 69.)  Mr. Lachwani describes his wife as "an unwavering pillar of support and inspiration" who has demonstrated level-headedness throughout the decision to plead guilty.  █████████████████████████████████████████████████ ██████  (Bernstein Decl., Ex. A at 3.) ██████████████████████████████ ████████████████████████████████████████████████.  (PSR ¶ 69.)

In his free time, Mr. Lachwani loves spending time with family.  (*Id*. ¶ 66.)  The Lachwanis enjoy various outdoor activities, including hiking, spending time at the beach, and traveling.  (*Id*.)  Mr. Lachwani is also an avid learner, soaking up as much as he can through books and online courses.  He has recently completed various courses on artificial intelligence and its potential implications.  Mr. Lachwani also actively contributes to the coding community through platforms like Github.  By sharing his expertise and collaborating with others, he not only contributes to the development of innovative projects but also enhances his own skills and knowledge.  (*Id*. ¶ 67.)

Mr. Lachwani is a brilliant technologist who has the capacity to contribute greatly to the world in the future.  (*See* Bernstein Decl., Ex. C at 5-6, 9.)  He has already made critical contributions to the systems we use every day, and he continues to brainstorm ways to revolutionize the technological world.  For example, Mr. Lachwani is already thinking about ways to reduce the cost of graphics processing units ("GPUs") used in artificial intelligence ("AI"), which are currently extremely expensive.  Mr. Lachwani has started investigating how to develop and release open-source optimization of AI GPUs that can benefit the wider AI community.  This would allow

1    additional parameter processing with the need for additional hardware, saving companies thousands

2    and thousands of dollars.

3    **III.    A PRISON SENTENCE IS NOT WARRANTED UNDER 18 U.S.C. § 3553(A)**

4        **A.    The Nature and Circumstances of the Offense Do Not Support a Prison Sentence**

5            **1.    The Offense Conduct[3]**

6        HeadSpin was a private company and Mr. Lachwani was its founder and CEO.  The

7    company's investors were the among the most savvy venture capitalists and technology investors

8    in the world.  Mr. Lachwani's conduct did not impact the capital markets.  HeadSpin did not seek

9    or obtain investments from unqualified investors.  Mr. Lachwani did not make false or misleading

10   statements regarding the company's valuable and successful technology.  The government agrees

11   that his misconduct was not sophisticated.

12       Mr. Lachwani made misstatements in two ways.  First, he maintained a spreadsheet to

13   calculate the ARR reported to potential investors in investor presentations.  Mr. Lachwani included

14   certain entries in this spreadsheet that corresponded to deals HeadSpin salespeople indicated were

15   likely, but that had not yet been executed, and therefore should not have been included under a

16   concept of "contracted ARR."  In this way, Mr. Lachwani inflated the ARR numbers investors saw.

17   As discussed extensively in Mr. Lachwani's brief on loss calculations, the government points to

18   entries of this type that amount to a 2-3% overstatement of ARR in the Series B and C investment

19   decks.  (Lachwani Loss Memo at 8.)

20       Second, Mr. Lachwani provided invoices to HeadSpin's bookkeeper that were not sent to

21   HeadSpin customers.  By doing so, Mr. Lachwani caused the company to shift revenue from the

22   "unbilled receivables" bucket to the "accounts receivables bucket," although this did not change

23   the total revenue the company reported.  Mr. Lachwani did this because an existing investor put

24   pressure on Mr. Lachwani and the company's bookkeeper to reduce the amount of "unbilled

25   receivables" and Mr. Lachwani believed causing revenue to be moved (improperly) from unbilled

26   receivables to accounts receivables would appease this investor.  No investor has identified this

27

28   [3] A more detailed description of Mr. Lachwani's admitted conduct can be found in the Lachwani Loss Memo at 7-12.

issue as important to their decision to invest in HeadSpin.

Mr. Lachwani understands that these decisions were both wrong, and pled guilty accordingly.  Mr. Lachwani should never have made misstatements to investors.  While no investor suffered any financial loss as a result, Mr. Lachwani's conduct still demonstrated a lack of regard for accounting rules and management controls, as well as a lack of transparency.  He should have done better as a CEO and leader.  However, while his conduct was wrong, it should be understood in context, as provided below.

### 2.     Mr. Lachwani's Motivations

This is not a case in which the defendant was motivated by personal greed or gain.  Mr. Lachwani is not accused of improperly taking a single dollar from HeadSpin.  He never received more than a modest salary from the company and lives an upper-middle class life (largely due to his pre-HeadSpin business successes) without vacation homes or luxury goods.  As discussed above, Mr. Lachwani gave up a highly lucrative career at Google to build something at HeadSpin— he was never interested in using HeadSpin to make money in an improper way.

Instead, Mr. Lachwani was dedicated to building an amazing company by developing in-demand technology and by all accounts did so—HeadSpin is still to this day a successful enterprise. But Mr. Lachwani was in over his head when it came to accounting and internal controls.  HeadSpin had no financial officer or even a CPA.  The Board of Directors exercised no oversight of the company's controls or financial reporting, and they never met to review the company's financial statements or accounting metrics.  Mr. Lachwani, who has no background in accounting or finance, quickly became overwhelmed, as the company scaled immensely.  The company's internal accounting was, as a result, a mess, with individual salespeople responsible for keeping client documentation and issuing invoices, and an underqualified bookkeeper running the company's books.

When an important investor was concerned about unbilled receivables that were rapidly accruing as a result of this financial immaturity, Mr. Lachwani made poor decisions motivated not by an intent to solicit further investments (the company had no shortage of interested investors) but by a strong desire for this investor's approval, despite the company's sloppy bookkeeping and

invoice practices (of which investors were aware).  In fact, Mr. Lachwani did not even encourage the two investment rounds at issue—the Series B and C—which were instead the idea of Mr. Arora, HeadSpin's Chairman of the Board.  The company did not need the money.  Mr. Lachwani utilized these invoices for altogether different, very narrow, reasons.

With regard to ARR, Mr. Lachwani used an oversimplified spreadsheet that served the dual purposes of tracking "pipeline" deals and committed contracts.  When Mr. Lachwani understood that certain deals with high profile clients were in the pipeline, he included them in the spreadsheet which he then included in investor presentations.  Mr. Lachwani should not have allowed these ARR figures to go to investors, as they overstated ARR, rendering the figures inaccurate.  But the evidence shows that this was a rote process, rather than a devious one.  Mr. Lachwani was cutting and pasting in an entirely unsophisticated and sloppy manner—showing his lack of knowledge and inexperience with private company fundraising.

To be clear:  Mr. Lachwani was wrong to overstate accounts receivable and ARR.  He knew enough to know that these representations to investors were inaccurate.  But his motivations were to give the impression of perfection and to appease the powerful investors and board members involved with HeadSpin, including many prominent members of Silicon Valley's Indian community that Mr. Lachwani looked up to.  Mr. Lachwani always believed—and continues to believe—in the real promise and value of HeadSpin.  He did not sell a fake product or convince investors to invest that were not already clamoring for the opportunity on just the strength of the technology and the total addressable market.  Mr. Lachwani gilded the lily and overstated the metrics at issue when there was no need to do so.  One of the shames of this story is that had Mr. Lachwani not made these poor and unnecessary decisions, he would still be the proud CEO of a remarkably successful company.  Mr. Lachwani never intended to cause any investor to lose money or believed that they would—and none did.

**3.      HeadSpin is a Success Because of Mr. Lachwani and No Investor has Lost Money as a Result**

Mr. Lachwani worked tirelessly to make HeadSpin the success it is today.  He worked nights and weekends, through severe medical issues (*see* Section II.E, *supra*), at the expense of time with

his family ████████████████████.  He was as committed as a CEO could be and believed, as do so many other HeadSpin investors and employees even today, in the promise of HeadSpin's technology.  It is in no small part because of Mr. Lachwani's dedication and efforts that HeadSpin has over 20 patents, counts some of the world's most important technology companies as customers, and continues to grow and hire.

It is also because of these efforts that far from experiencing any loss, investors in HeadSpin stand to make significant returns on their investments.  Mr. Lachwani has briefed extensively why there was no loss under the Sentencing Guidelines.  (*See generally* Lachwani Loss Memo.)  The government proposes a competing loss theory that is detached from reality.  (*Id*.; *see also* Dkt. 113 ("Lachwani Reply").)  But even if the Court accepts the government's loss theory for purposes of conducting the Sentencing Guidelines calculation (it should not), the Court should consider real-world facts when imposing a sentence.  Those facts are straightforward:

- *No investor reports that they lost any money as a result of the admitted conduct*;

- The company is vibrant and successful to this day and engaged in a new round of funding as recently as April 2023 (at a valuation the government has not revealed or does not know); and

- Investors in the Series B and C rounds (the rounds related to Mr. Lachwani's admitted conduct) will make a considerable return on investment, given HeadSpin's ongoing success.

The Court should consider these real-world facts when comparing Mr. Lachwani to other criminal defendants that marketed fake products or caused investors to lose millions or even billions of dollars.

The Court should also consider who the HeadSpin investors were: some of the most sophisticated venture capitalists in the world.  Mr. Lachwani did not bamboozle seniors or steal from pension funds.  These were the glitterati of Silicon Valley and they performed due diligence on HeadSpin, found its financial reporting to be broken and data to be unreliable, but decided to invest anyway for fear of missing out on the chance to be in at the bottom floor of game-changing technology.  (*See, e.g.*, Lachwani Loss Memo at 19-20.)  The parties agree that Mr. Lachwani did not use sophisticated means or enlist others in a scheme to defraud.  (*See* Plea Agreement, Dkt. No. 88 ¶ 7; PSR ¶¶ 37-43.)  Far from being led astray by Mr. Lachwani, who was outclassed by the

1  sophistication of these investors in every way, these Silicon Valley titans made a calculated
2  decision to invest despite knowledge of HeadSpin's lack of reliable financial reporting.  *And they*
3  *stand to make a healthy profit from that decision.*

4      Justice will not be well served if these savvy investors make a profit from the company Mr.
5  Lachwani built while he sits in prison for mispresenting a subset of financial metrics that investors
6  doubted anyway.

7      **B.    Mr. Lachwani's Personal History and Characteristics Do Not Support a Prison
            Sentence**
8

9      Mr. Lachwani respectfully requests that the Court consider the following characteristics and
10 factors from his personal history when deciding a sentence:

11 • Mr. Lachwani grew up in poverty, in an overcrowded apartment, and slept on the kitchen
12   floor for much of his childhood.  He lived through violent riots and bombings that left him
     traumatized and hoping for a better, more peaceful life.

13 • At times, Mr. Lachwani's mother used physical force to teach him that only an "A+" was
14   acceptable.  This lesson taught him to fear disappointing those above him, and the fear
     permeated everything he did, including while at HeadSpin.

15 • Despite these childhood traumas, Mr. Lachwani has led an incredibly constructive life,
16   including by designing some of the most groundbreaking aspects of Amazon's Kindle.  He
17   has accomplished these achievements through his dedicated work ethic and brilliant mind.

18 • Mr. Lachwani was going through an extremely difficult personal moment while he was
19   building the company and committing the admitted conduct. ███████████████
20   ████████████████████████████████████████████████
21   ████████████████████████████████████████████████

22 • Between ████████████ and building the company, Mr. Lachwani stopped taking
23   care of himself.  His habits were so unhealthy that he developed gallstones.  Throughout
24   the year 2019, Mr. Lachwani experienced excruciating pain on a regular basis.  But he pushed
     down the pain and kept working—which was the only possible path in his mind thanks to
25   his "A+ only" philosophy.  Mr. Lachwani's gallbladder surgery occurred at the end of 2019,
     in the midst of the events in this case.

26 • Mr. Lachwani did not mislead investors due to greed or in pursuit of riches.  His
27   misstatements were made to relieve the pressure put on him by the stresses of inexperience
28   in business, his need for perfection, and his incredibly trying personal issues.  Mr. Lachwani
     has only ever lived a modest, hard-working life.

- HeadSpin is a success.  In the face of his personal issues and lack of experience as a business executive, Mr. Lachwani built something valuable and important that is helping its customers improve their apps, and helping its investors make money, to this day.

- Mr. Lachwani has no previous criminal history, and he never drinks alcohol or consumes illicit drugs.  Throughout the entire criminal process, Mr. Lachwani has demonstrated respect for the law and the justice system, and he has cooperated with the probation office and the Court.

- According to his neighbors and friends, Mr. Lachwani is a generous, kind, and humble man. He values giving back, has made monetary donations to numerous charities, and donates his O+ blood on a regular basis.

- Mr. Lachwani is a loving husband and father, who cares deeply for his family.

These factors show that Mr. Lachwani's personal history and characteristics do not support a prison sentence.  Mr. Lachwani is no criminal mastermind or devious Silicon Valley player—he exhibited bad judgment during an overwhelmingly difficult time in his life.  Courts in other cases have found that probation is an appropriate sentence where the history and characteristics of the defendant do not warrant prison time.  *See, e.g., United States v. Edwards*, 595 F.3d 1004, 1015 (9th Cir. 2010) (no abuse of discretion for probation-only sentence where, "based on [defendant's] history and characteristics, the district court did not feel a sentence of incarceration was appropriate"); *United States v. Autery*, 555 F.3d 864, 874 (9th Cir. 2009) (no abuse of discretion where district judge sentenced defendant to probation only because defendant had no prior criminal history or substance abuse, supported his wife and children, and did not fit the "profile" of a criminal).

### C.    Incarceration is Not Necessary to Afford Adequate Deterrence of Protect the Public

#### 1.    Incarceration is Not Necessary for Specific Deterrence

Incarceration is not necessary to impress on Mr. Lachwani the need to reform.  Rather, Mr. Lachwani has been deterred already, even before serving a single day of a sentence.  In addressing

Probation Officer Moy during his interview, Mr. Lachwani reflected on his conduct, and said that he feels terrible about his poor decisions and that as the CEO of HeadSpin, he should have acted differently.  He accepts responsibility fully for his deception.  (PSR ¶ 34; Bernstein Decl., Ex. A at 2.)

The effect of Mr. Lachwani's conduct has extended to his personal health (Bernstein Decl., Ex. A at 2).  Mr. Lachwani has spent significant time thinking about his actions and trying to understand them, which has increased his self-awareness and causes him to feel deep regret.  (*Id.*)  Further, in accepting responsibility for his conduct, Mr. Lachwani has refocused his energy on caring for his family, ███████████████████.  As noted in his interview with Probation Officer Moy, he has not been employed since August 2020, after having devoted everything to HeadSpin. ████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████
██████████████████████████████████

In light of the remorse Mr. Lachwani feels for his conduct, as well as the severe implications for his family that would occur should incarceration be imposed, there is no doubt that Mr. Lachwani has already been specifically deterred and that he will not re-offend.

### 2.    Incarceration is Not Necessary for General Deterrence

There is no indication that imposing a prison sentence upon Mr. Lachwani will deter others in Mr. Lachwani's position, as there are *no* others in Mr. Lachwani's position.  This is so because unlike cases in which a defendant sold a fake product or created a fake company, Mr. Lachwani built a successful company that continues to be profitable to this day, as well as a real product with real customers.  (Lachwani Reply at 6.)  Further, although Mr. Lachwani has accepted responsibility for his conduct, there is no evidence in the record that his conduct resulted in any measurable loss.  (*See generally* Lachwani Loss Memo.)  While all defendants should be treated as individuals, Mr. Lachwani's circumstances are unlikely to resemble fraud defendants who might be deterred by any

sentence imposed on him.  Because of these unique circumstances, incarceration of Mr. Lachwani will not achieve the goal of general deterrence.

Even if the Court determined that there are others in Mr. Lachwani's unique position, it is clear that this case has already imposed devastating punishment on Mr. Lachwani, including the destruction of his once-thriving, innovative career, profound financial loss, consequences to his health, and severe implications for his family.  As discussed below, Mr. Lachwani's conviction alone will likely lead to his deportation to India.  (*See* Section III.D, *infra*.)  There is little doubt that even without incarceration, the consequences and punishment faced and felt by Mr. Lachwani for his offenses will afford general deterrence.

**D.     Just Punishment and Respect for the Law are Not Served by Incarcerating Mr. Lachwani**

Incarcerating Mr. Lachwani does not serve Section 3553(a)(2)'s twin aims "to promote respect for the law" and "to provide just punishment for the offense."

The consequences of Mr. Lachwani's conviction alone are just punishment for his crimes, including deportation from the United States to India, where he has not lived in 27 years.  If imprisoned, Mr. Lachwani will be transferred to ICE custody following his sentence and then deported—without time with his wife and daughter, and without being able to plan for a life in what is now largely a foreign country to him.  The practical, social, emotional, and familial ramifications of deportation are devastating.  Mr. Lachwani's only contact in India is his brother with whom he is not close.  (Bernstein Decl., Ex. A at 3.)  He has no friends or other family, and no social or professional infrastructure to speak of.  More crucially, deportation means leaving his wife and teenage daughter behind in California along with the social and professional life he has spent nearly three decades building.  This is the "just punishment" the statute envisions.  *United States v. Chin Chong*, No. 13-CR-570, 2014 WL 4773978, at *6 (E.D.N.Y. Sept. 24, 2014) (discussing deportation as a "just punishment under" and stating "[d]eportation is experienced as, and popularly understood to be, a form of punishment. The law does not contend otherwise.").

Neither would Mr. Lachwani's incarceration "promote respect for the law," in fact, quite the opposite.  "Where offenders appear to have been unfairly singled out, respect for the law and

1 law enforcement suffers." Richard S. Frase, *Punishment Purposes*, 58 Stanford L. Rev 67, 80.  The

2 government has sought to prosecute this case as if HeadSpin is another Theranos, and Mr. Lachwani

3 is another high-profile conviction to add to the trophy wall.  But HeadSpin is not Theranos, and the

4 desire for a high-profile conviction does not justify imposing on Mr. Lachwani a sentence that does

5 not fit the crime.  Indeed, a sure-fire way to undermine the respect for the law would be to allow

6 Mr. Lachwani to watch from a jail cell as the investors and board members who oversaw HeadSpin

7 during the relevant time period get rich (or, more accurately, get richer) off of the product,

8 company, and intellectual property he created.  Mr. Lachwani committed fraud—he has taken

9 responsibility for his actions and has accepted that his life in the United States has changed forever.

10 This is sufficient "just punishment" that maintains integrity of the rule of law and the addition of a

11 prison sentence does not advance either objective.

12 **E.      The Guidelines Recognize Imprisonment is Not Appropriate for Non-Violent First-Offenders Like Mr. Lachwani**

13

14 The Guidelines offer clear instruction that for non-violent, first-time offenders like Mr.

15 Lachwani, imprisonment is not appropriate.  Comment 10 to § 5C1.1 advises that if a defendant is

16 a Zero Point Offender under § 4C1.1 and the defendant's applicable Guideline range is within Zone

17 A or Zone B of the Sentencing Table, "a sentence other than a sentence of imprisonment" is

18 "generally appropriate."  Mr. Lachwani is a Zero Point Offender under § 4C1.1, and as described

19 extensively in Mr. Lachwani's Loss Memo (at 14-16, 30-31), his total offense level falls within

20 Zone A.  As such, the Court should heed the Guideline's instruction that a sentence other than

21 imprisonment is appropriate.  Even if the Court should find that Mr. Lachwani's applicable

22 Guideline range does not fall within Zone A or Zone B, a departure to "a sentence other than

23 imprisonment" is appropriate given the reasons articulated above.  *See* 28 U.S.C.A. § 994(j).

24 **F.      If the Court Determines that There Was a Loss, A Downward Departure Is Warranted**

25

26 For the reasons discussed in Mr. Lachwani's Loss Memo, there was no actual loss resulting

27 from Mr. Lachwani's criminal conduct.  If, however, the Court accepts the PSR's calculation of

28 loss (and it should not), Mr. Lachwani's total offense level would be 28 and his Guidelines

sentencing range would be 78-87 months.  (*See* PSR ¶¶ 48, 90.)  In this circumstance, a downward departure would not only be proper, but would be necessary to render a fair and just sentence.

Courts have explained that the focus on loss amount can result in unreasonable guidance in fraud cases and that where loss is determined to be high, the guidelines may be of no "help to any judge in fashioning a sentence that is fair, just, and reasonable."  *See United States v. Adelson*, 441 F. Supp. 2d 506, 515 (S.D.N.Y. 2006), *aff'd*, 301 F. App'x 93 (2d Cir. 2008).  As one commentator put it: "For the small class of defendants . . . convicted of fraud offenses associated with very large guidelines loss calculations, the guidelines now are divorced both from the objectives of Section 3553(a) and, frankly, from common sense.  Accordingly, the guidelines calculations in such cases are of diminished value to sentencing judges."  *Frank O. Bowman, III, Sentencing High-Loss Corporate Insider Frauds After* Booker, 20 Fed. Sent'g Rep. 167, 168 (2008).

Here, a downward departure would be warranted for myriad reasons, but first and foremost because no investor has suffered any loss in any "actual" sense—no investor has even claimed to have suffered loss as a result of the admitted conduct or requested restitution.  As such, even if the Court accepts the government's purely theoretical (and inaccurate) loss calculation for purposes of the Guidelines calculation, it should consider these real-world facts when fashioning a sentence.  A downward departure would further be merited for all of the other reasons discussed in this memorandum, Mr. Lachwani's Loss Memo, and Mr. Lachwani's Reply, including the nature of Mr. Lachwani's conduct, the context of his life, and the disproportionate hardships such a sentence would impose on him and his family.  Mr. Lachwani made regrettable and criminal mistakes, but they were not of a scale or a type to justify so draconian of a sentence as the government's Guidelines calculations would suggest.

### G.    If the Court Determines that the Guideline Range Is in Zone A or B, Neither an Upward Departure Nor an Upward Variance Is Warranted

If the Court determines that the applicable guidelines range for Mr. Lachwani's sentence is in Zone A or B, neither an upward departure under § 4A1.3(a)(1), § 2B1.1, Application Note 21, or § 5K2.0 *et seq*, nor an upward variance beyond either Zone is warranted.  To begin with, as noted above and in Mr. Lachwani's Loss Memo (at 31), Mr. Lachwani is a Zero Point Offender; as a

result, there is no "reliable information [that] indicates that the defendant's criminal history category substantially under-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other crimes[,]" such as a prior sentence or similar misconduct. § 4A1.3(a)(1). The Court should thus not upwardly depart from the guideline range under this section.

Similarly, the Court should not apply Application Note 21 to § 2B1.1 to upwardly depart from Mr. Lachwani's offense level, as an offense level within Zone A or B would not "substantially understate[] the seriousness of the offense." *See* USSG § 2B1.1, Note 21.  The list of factors outlined under the note describe bases for upward departure such as acting with a purpose of inflicting emotional harm, a victim suffering substantial harm to their reputation, and creating a risk of a significant disruption of national financial markets, among others. *Id*. These factors consider situations involving "substantial" harm to victims, whereas here, as discussed in Mr. Lachwani's Loss Memo (at 14-16, 30-31), there no evidence Mr. Lachwani caused loss—indeed, investors may make a significant profit from their HeadSpin investments.  With no loss and no victims, an upward departure under Application Note 21 is not warranted or proper.

The other grounds for departure outlined in § 5K2 are similarly inapplicable to the Guideline range here because there are no special factors that the Guideline does not already take into account or that are present to an exceptional degree.  For example, no death, physical or psychological injury, abduction, or unlawful restraint occurred as a result of Mr. Lachwani's conduct; further, his conduct was not usually heinous, cruel, or brutal, and he did not act with criminal purpose.  *See* USSG § 5K2.0 *et seq*.  The application of § 5K2 as a basis to upwardly depart from the Guidelines range is thus inappropriate here.

Finally, the Court should not impose an upward variance based on § 3553(a) factors.  As discussed above, neither the nature and circumstances of Mr. Lachwani's admitted conduct, nor his personal characteristics and history support an upward variance under the section to serve the goals of sentencing.  *See* Sections III.A-B, *supra*.

1

IV.    CONCLUSION

2          Mr. Lachwani respectfully requests that the Court impose a sentence that does not include

3    a term of imprisonment.

4

5    Dated:   January 10, 2024                    COOLEY LLP

6

7                                                 By: */s/John Hemann*
                                                      John Hemann
8                                                     Elizabeth H. Skey
                                                      Max A. Bernstein
9                                                     Eleanor W. Barczak
                                                      Hannah Pollack
10
                                                  Attorneys for Defendant
11                                                MANISH LACHWANI

12

13

14

15
     296482939
16

17

18

19

20

21

22

23

24

25

26

27

28