ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

LLOYD FARNHAM (CABN 202231)
NOAH STERN (CABN 297476)
Assistant United States Attorneys

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-7200
    FAX: (415) 436-7234
    Lloyd.Farnham@usdoj.gov
    Noah.Stern@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 21-353 CRB |
| Plaintiff, | UNITES STATES' SUPPLEMENTAL SENTENCING SUBMISSION |
| v. | Sentencing Dates: April 19, 2024 |
| MANISH LACHWANI, | Time: 10:00 a.m. |
| Defendant. | Judge: Hon. Charles R. Breyer |

US SUPP. SENTENCING MEMORANDUM
CR 21-353 CRB

The United States submits this supplemental sentencing memorandum, in accordance with time limits under Local Criminal Rule 35-2, to address the Court's order dated March 12, 2024. The government does not agree that the Court should impose a shorter prison sentence in conjunction with a larger fine. Doing so would undermine the interest of specific and general deterrence and could appear to be a two-track system of justice, where wealthy defendants able to pay the maximum fines get more lenient prison sentences. It risks sending a message that the worst Silicon Valley fraudsters have to fear are monetary penalties, and risks incentivizing victims of fraud to pursue civil remedies rather than providing information to the government. Further, while a $1 million fine would certainly be warranted in this case given Lachwani's financial status and apparent effort to shield his assets, it is unlikely to have a meaningful impact if not paired with a significant custodial sentence. A minimal or non-custodial sentence is particularly unwarranted here given Lachwani's repeated and forceful efforts to push a false narrative of his conduct on the Court and minimize his own responsibility for his fraud scheme. Finally, the sentence in this case should be consistent with sentences imposed for other similarly situated defendants, and should reflect the seriousness of the offense, promote general deterrence, and account for Lachwani's history and characteristics.

**A.     A One Million Fine Would Have a Minimal Impact on Lachwani and is Not Likely to Deter Similar Criminal Conduct**

A $1 million fine would have minimal impact on Lachwani, and the Court should not impose such a fine in place of prison. A fine in this case is not likely to effectively support general deterrence. Instead, using a fine in place of prison risks sending a clear message that the wealthy are subject to a different justice system in our country; one in which the ability to pay a large fine decreases either time in prison or the likelihood of prison.

According to the most recent account documents obtained by the government, Lachwani's wife held approximately $39,730,000 in her brokerage accounts as of March 31, 2021, assets that prior to the discovery of the fraud were in Lachwani's own brokerage account.[1] PSR ¶ 85. The Probation Office's financial analysis identified about $24,364,000 in total assets belonging to Lachwani and his wife and

---

[1] Lachwani transferred the assets to an account in his wife's name as "separate property" after the fraud was discovered. PSR ¶¶ 85-86.

US SENTENCING MEMORANDUM                    1
CR 21-353 CRB

concluded Lachwani's total net worth to be $20,426,300. PSR ¶ 86.[2] Taking the most conservative number, a 4% return on assets based on Lachwani's net worth of $20,426,300.19 equates to passive income of $817,052 annually. If the Court were to fine Lachwani $1 million and reduce his net worth to $19,426,300.19, a 4% return equates to would be $777,052 annually. Therefore, such a fine is nothing more than a slap on the wrist—it would have minimal impact, at most, on Lachwani's life—leaving him with a passive annual income (conservatively measured) of $777,052, a reduction of only $40,000 per year, even if he never works again.[3] Further, if the consequences of criminal prosecution of "fake-it-'til-you-make-it" fraud are primarily monetary, this may incentivize victims to pursue their own civil remedies in lieu of reporting crime to the government. A fine of $1 million is also considerably less than the "upside" that Lachwani pursued with this fraud scheme, in the course of which he successfully turned his startup into a "unicorn" valued at more than $1 billion by his duped investors. The government's ability to deter fraud in Silicon Valley, one of the nation's most important economic markets, depends on the courts appropriately punishing large fraud schemes.

### B. Lachwani's Lack of Remorse and Presentation of False Narrative to the Court

A fine in exchange for a shorter prison sentence is particularly unwarranted here because Lachwani has failed to take full responsibility for his actions; instead, presenting himself as the primary victim of his own crime. In these sentencing proceedings, Lachwani continues to assert that the government has not presented evidence of the full extent of his fraud scheme. This is not true. The government submitted declarations from nine witnesses. Most significantly, the government submitted a declaration from the person who worked hand-in-hand with Lachwani on Headspin's financial information, and who continued at the company after Lachwani was forced to leave and thereby witnessed the extent of what Lachwani had done. The Court should give this declaration and the others submitted by the government their proper weight. In her sworn declaration, Sana Okmyanskaya

---

[2] This government suspects that this analysis substantially undervalues Lachwani's net worth given the fact that the S&P 500 index has gained approximately 31% in value between March 31, 2021 and the present. Further, Lachwani's financial records show he invested heavily in companies like Advanced Micro Devices, which has gained approximately 117% over the same time period. In other words, the $40 million Lachwani held on March 31, 2021 has likely grown, not shrunk by over $15 million, in that time frame.

[3] If the $40 million Lachwani held on March 31, 2021 were used, a 4% annual passive income of $1.6 million would decrease to $1.56 million.

CR 21-353 CRB

explained that Lachwani told her directly how much revenue to recognize quarterly for Headspin customers, ¶ 4, failed to provide supporting documentation despite multiple requests, ¶¶ 4-5, and that what Mr. Lachwani told her about channel partner relationships to discuss with a CPA was "not true," ¶ 9.  Ms. Okmyanskaya also declared that she was involved in KPMG's restatement of the company's revenue and ARR, that during this process Mr. Lachwani was afforded the opportunity to provide information and documents relating to customer relationships, that based on her knowledge of company information she believes KPMG's restatement presented an accurate picture of Headspin's revenue and ARR, and "about three quarters of the revenue in the financial statements [Okmyanskaya] prepared was not included in the revenue amounts in the corrected financial records because the information Mr. Lachwani gave [her] was false." *Id.* ¶¶ 10-12.  This was not an issue of controls and internal dysfunction.  Lachwani provided information he knew was false to Okmyanskaya and purposefully withheld documentary evidence of customer relationships.  If Lachwani had simply provided Okmyanskaya the customer contracts, Headspin's financial records would have been accurate, and would have shown less than a quarter of the revenue Lachwani instructed Okmyanskaya to recognize. *See* White Decl. Exs. A & B.

Lachwani has submitted no declarations in response to or rebutting the facts in Okmyanskaya's declaration.  Instead, he has invented a bogeyman of innocent errors in Headspin's finances based on nothing more than assertions in his brief and citations to stray documents that do not support the conclusion—directly contrary to Okmyanskaya's declaration—that there were financial errors unrelated to his lies.  Lachwani seeks to impose this false narrative on these proceedings.

To underscore the extent Lachwani is unremorseful and has presented a false narrative to the Court of his conduct, the government provides the following examples, including through submission of limited additional evidence (long ago produced to Lachwani) and cited below:

- Lachwani asserts (in his unsworn briefing) that the ARR spreadsheet he kept was intended to be a forecasting spreadsheet and he made false representations by allowing the spreadsheet to be used to populate representations to investors.  This is not an accurate description of his conduct.  It was Lachwani—who had sole control over the ARR spreadsheet—who provided the spreadsheet to investors and told them that ARR was based on signed contracts with customers.  Stern Decl. [4] Ex. CC (Lachwani sharing

---

[4] Stern Decl. refers to the Declaration of AUSA Noah Stern in Support of the United States'

- access to ARR spreadsheet with Investor 1); Ex. DD (Email from Investor 2 stating "I have attached the latest financial[s] that we received from Manish.  We also received access to a google docs sheet with the customer names and revenues a while ago.  I have attached the Excel form of that.").  Lachwani's unsworn argument to the contrary is belied by the spreadsheet itself, which included the purported customers on a tab entitled "Committed Customers,"[5] included an amount for the "ACV signed" for each customer, and listed the "% likelihood of full deployment" for each customer as 100%.  *See* Investor 2 Decl. Ex. A.  It was not somebody else who chose these words, it was Lachwani.[6]  Further, Lachwani directly and explicitly told investors that ARR reflected customers with "signed contracts."  *See, e.g.*, Stern Decl. Ex. EE at 2184 & 2210 (investor presentation sent by Lachwani stating "Signed contracts worth $50M+ as of Q2 2018" and displaying graph of ARR);  Stern Decl. Ex. FF (notes of Investor 1 call with Lachwani stating "ARR will be counted only when a deployment is done . . . ARR = deployed ACV"); Stern Decl. Ex. GG at 1259 (Investor 1 notes describing Lachwani explanations for ARR to revenue lag all of which appear to relate to Headspin beginning to recognize revenue in the next calendar month (or more) from when "contract is signed"); Barczak Decl. Ex. 4 (Investor 2 notes indicating Okmyanskaya representation that ARR is recognized after contract signing, but before deployment).  Lachwani's unsworn rationalization of his conduct should be rejected by the Court.

- Lachwani argues that the government has "declare[d] . . . by fiat" that when KPMG was unable to find documentation for a deal this was because no deal existed.  Def. Reply Mem. at 7.  Far from that, the government presented sworn evidence that Headspin employees worked to "locate and provide all relevant documents . . . to KPMG," Lachwani sent "contracts, purchase orders, and invoices" that were provided to KPMG, and Headspin's bank statements were provided to KPMG.  Okmyanskaya Decl. ¶ 10.  Further, Okmyanskaya was "not aware of any actual large agreements HeadSpin entered into with customers, or any large payments received from customers, that KPMG did not record as revenue based on applicable accounting rules."  *Id.* ¶ 12.  KPMG also described, in a sworn declaration, how it conducted its review, including the review of bank statements.  White Decl. ¶¶ 4-5.  The evidence Lachwani submits, a statement in an email from White stating "we are not able to accept any more information," Def. Loss Mem. at 9, does nothing to contradict Okmyanskaya's assertion that KPMG's analysis reflected Headspin's financial reality or the fact that KPMG *reviewed bank statements*, White Decl. ¶ 5, and there were no large sums of cash that were not accounted for based on accounting rules, Okmyanskaya Decl. ¶ 12.

- Lachwani provides an incomplete and misleading narrative to the Court with respect to the American Express and Uber deals.   With respect to American Express, Lachwani says he inserted $250,000 in the spreadsheet based on a text he received in November

---

Supplemental Sentencing Memorandum, filed herewith.

[5] In some versions of this spreadsheet, this tab was entitled "Pipeline," but in the version shared with Investor 2, it was entitled "Committed Customers."  *See* Investor 2 Decl. ¶ 5 & Ex. A.

[6] As Loukakos explained, only Lachwani had edit access to the spreadsheet.  Loukakos Decl. ¶ 5. Underscoring this, as the government has previously explained, Dkt. No. 103 at 21, Headspin produced lengthy videos of the version history of the spreadsheet showing that Lachwani was the only person making edits during the relevant time period.

US SENTENCING MEMORANDUM              4
CR 21-353 CRB

2018 from the salesperson, Laurent Cordier, projecting the deal would "land" around that amount. Def. Reply at 8-9. Lachwani, however, leaves out the subsequent history and fails to explain why Lachwani kept this deal on the ARR spreadsheet for $250,000 after (1) Cordier clearly informed Lachwani that the deal closed at $132,000, (2) Okmyanskaya raised the discrepancy between the deal size Lachwani provided and the amount of the actual invoice sent to Amex, and (3) Amex terminated the contract. Specifically, on December 21, 2018, Laurent Cordier emailed Lachwani that Amex was in the contract stage for "132 k$" with "expansion possible . . . for an additional (90k$)." Stern Decl. Ex. HH. On January 21, 2019, Cordier emailed Lachwani stating, "Amex – closed : 132 k$ with potential extension of 95 k$ - 1 year contract." Id. Ex. II. On February 24, 2019, Lachwani emailed Okmyanskaya in regard to 2018 Q4 revenue, stating that Q4 was the same as Q3 and then listing additions to revenue, including "Annual Deal size . . . AMEX - $220K (To be paid)." Id. Ex. JJ. On June 27, 2019, after receiving Amex invoices, Okmyanskaya noted a discrepancy between the invoices and the deal size Lachwani had told her: "Amex – we had them booked at 55K quarterly but actual invoice tracks at 33K quarterly. Which is correct?" Lachwani responded, "yes the first two are small invoices, next two are larger one." Id. Ex. KK. On October 6, 2019, Cordier emailed Lachwani, writing "Amex (lost): . . . [t]hey confirmed the termination at this stage." Id. Ex. LL. Lachwani responded, "OK on AMEX. Was bound to happen." Id. Despite this, in late October 2019, in advance of the Series C, Lachwani had "AMEX" listed on his ARR spreadsheet as a "Committed Customer" with an "ACV signed" of "$250,000" and "ARR" of "$250,000." Investor 2 Decl. Ex. A (row 111). This entry for Amex remained on Lachwani's ARR spreadsheet until the fraud was discovered. Tomeno Decl. Ex. BB (March 10, 2020 version of ARR tracking spreadsheet, row 138).[7] The evidence is clear, Lachwani knew the size of the Amex deal and lied about it to inflate Headspin's ARR. He then knowingly kept the false and inflated figure in Headspin's ARR after the deal was terminated. There were no innocent mistakes.

- Lachwani also misleads the Court with respect to the Uber relationship. Lachwani omits the fact that Ameet Suri clearly told Lachwani the size of the Uber contract in August 2019, yet Lachwani continued to lie about the contract size to Okmyanskaya and investors. On August 16, 2019, after Okmyanskaya had stated that Headspin was booking $360,000 of quarterly revenue for Uber on an email chain involving Lachwani and Ameet Suri, Suri removed Okmyanskaya from the chain and asked Lachwani why Okmyanskaya referred to $360 per quarter. Id. Ex. MM. He continued, "Just as FYI . . . Our total billing to uber is $480 for the complete year. In 2018, we billed them $720K, which was $480 for 2018 and 240 for 6 months of 2017." Id. Lachwani responded, "i will discuss with [Okmyanskaya], np." Id. Nevertheless, on September 9, 2019, when Okmyanskaya again asked Lachwani about recognizing $360,000 in quarterly revenue from Uber and if the $480K invoice she had was an annual invoice, Lachwani lied and said "480K is one invoice for UBER. [S]econd invoice coming up in Q3." Ex. NN at 2024. He also said the invoice "covered 4 months" and ideally they would send three 480K invoices during the year but "i feel they will prune some devices in Q4." Id. at 2024-25. Despite clear knowledge of the actual deal size, Lachwani also continued lying

---

[7] According to metadata produced for this document by Headspin, it is entitled 202003100004-Internal - HeadSpin Revenue _ Customer Forecast Model (CONFIDENTIAL).xlsx.

US SENTENCING MEMORANDUM          5
CR 21-353 CRB

to investors. In late October 2019, in advance of the Series C financing, Uber remained listed on Lachwani's ARR spreadsheet as a "Committed Customer" with an "ACV signed" of $1,440,000 and "ARR" of $1,440,000. Investor 2 Decl. Ex. A (row 47). This entry for Uber remained on Lachwani's ARR spreadsheet until the fraud was discovered. Tomeno Decl. Ex. BB (row 64). It is clear that Lachwani was knowingly lying about the Uber deal—he did not make an innocent mistake. Indeed, his unsworn contention that he initially did not know the real size of the deal—one of the most substantial for Headspin—or that one of the purchase orders was canceled the day after it had been issued is simply not credible. Most significantly, Lachwani omits the fact that he forged an invoice to match the cancelled purchase order. Tomeno Decl. ¶ 14 & Ex. J (showing same create date as real invoice sent to Uber but different modified date). This forgery shows Lachwani's knowledge the cancelled purchase order was not active; if it had been active, Lachwani could have obtained a real invoice sent to Uber and provided it to Okmyanskaya. Lachwani's credibility with respect to his unsworn argument is also undermined by the fact that he forged two additional Uber invoices that were never sent to Uber representing a renewal period that did not, in fact, exist. *Id.* ¶ 15 & Exs. K & L.

- Lachwani argues the government cited no evidence to carry its burden that Lachwani forged several invoices related to a reseller for which Lachwani inflated ARR by over $10 million. This is wrong. *See* Tomeno Decl. ¶¶ 4-12 & Exs. A-H. As an initial matter, Lachwani *admitted in his plea agreement* that he "sent HeadSpin's accountant invoices I knew were altered to show amounts that were not actually invoiced." Dkt. No. 88 ¶ 2. The government submitted to the Court four real invoices emailed to an Australian reseller, Tomeno Decl. Exs. A-D, and four edited PDFs that Lachwani sent to Okmyanskaya that were never submitted to the reseller. Tomeno Decl. Exs. E-H. For example, on March 25, 2019, a real invoice, entitled INV-0008 was emailed to the reseller—the document metadata shows identical created and modified dates, 3/25/2019 12:25:10 p.m. *Id.* ¶ 4 & Ex. A. On June 18, 2019, Lachwani sent a modified version of this invoice to Okmyanskaya. *Id.* ¶ 9. The modified document has the exact same create date as the real invoice, but has a separate modified date of 6/28/2019 at 10:30:42 a.m., indicating that Lachwani took the PDF for the real invoice and modified it. *Id.* ¶ 11. The modified invoice, also entitled INV-0008, is identical except "AUD" was changed to "USD" and a "3" was placed in front of the amount that appeared on the real invoice, making "81,600" into "381,600."[8] *Id.* Ex. G. The fact that Lachwani emailed this false and altered invoice to Okmyanskaya is sufficient to prove that Lachwani was the person who altered it. In another example, Lachwani took real INV-0019, Ex. D, in the amount of $243,150.00, and edited it to create fake INV-0016 (never sent to the reseller), in the amount of $1,187,150.00. Ex. E. The description of items on the invoices are identical, but the altered invoice has a quantity of 50 for device license fees and support fees, instead of 10, which corresponds in the increase in dollar amount of the fake invoice. *Id.* The fact that it was Lachwani who altered the invoices is underscored by the fact that he blocked Okmyanskaya from directly accessing these invoices. At first, Lachwani told Okmyanskaya that he would give her access to the invoicing system the Australian sales team used, but then claimed technical difficulties, before blocking her request for access from the Australian team by asserting that he had already sent her the invoices. *See* Stern Decl. Ex. OO. Nor was there anyone else at Headspin who had a motive to create

---

[8] The due date was also modified.

- fake/altered invoices. The evidence is clear and Lachwani's insistence that the government has failed to submit sufficient evidence on this point makes little sense.

- Further, the evidence is clear that Lachwani's representations about ARR from reseller Wipro in his ARR spreadsheet were knowingly false. Lachwani's ARR spreadsheet in advance of the Series C offering recorded approximately $25.5 million of ARR from Wipro. *See* Investor 2 Decl. Ex. A (rows 6-9, 13-18, 20). Lachwani knew this was false. Indeed, in Summer 2018, Lachwani hired a Wipro employee, Madhu Laxmanrao, to be responsible for Headspin's Wipro relationship. Stern Decl. Ex. PP at 3. According to Laxmanrao, Wipro committed to generating $5.5 million for Headspin, but Wipro was not meeting this target in early 2019 and Lachwani complained to Laxmanrao that Wipro was not meeting its targets. *Id.* at 4-5. Laxmanrao said that Wipro paid Headspin between $2.5 and $3 million over two and a half years. *Id.* at 8. Laxmanrao also told the government that several other deals he was involved in were substantially smaller than what was represented on Lachwani's ARR spreadsheet. For example, Infosys Ally Bank was $25,000,[9] Infosys EON was $120,000,[10] and Wipro Microsoft was less than $400,000.[11] *Id.* at 10-11. Lachwani's complaints to Laxmanrao that Wipro was not meeting targets clearly demonstrate that Lachwani knew that what he recorded in his ARR spreadsheet and provided to investors was false.

- Lachwani accuses the government of providing the Court untrue information when the government stated in its sentencing memorandum that investors may have surrendered restitution claims as part of the recapitalization transaction. Def. Reply Mem. at 10. This is not correct. The release releases Lachwani from, among other things, "all claims" or "damages" under "any . . . theory of recovery" based on "federal law or any rule, regulation or authority." Stern Decl. Ex. QQ ¶ 2.3. Restitution is not excluded as an exception to the released claims, although Lachwani is correct that the release does not prohibit victims from providing the government with information. *Id.* ¶ 2.4 & 2.5. The government has not conducted a full legal analysis of whether the language releases claims for restitution; however, the government expects that victims may be concerned that the language does prevent them from seeking restitution in this criminal case.

**C.   A 63-Month Sentence Would Avoid Unwarranted Sentencing Disparities**

Lachwani argues that a 63-month sentence finds no analogy in cases involving similar circumstances. The government disagrees. While every case has its own unique circumstances, the government has identified numerous cases that demonstrate that a 63-month sentence is in line with the

---

[9] Lachwani's pre-Series C ARR spreadsheet listed it at $1 million. Investor 2 Decl. Ex. A (row 10).

[10] Lachwani's pre-Series C ARR spreadsheet listed it at $2.5 million. Investor 2 Decl. Ex. A (row 12).

[11] Lachwani's pre-Series C ARR spreadsheet listed it at $4.5 million. Investor 2 Decl. Ex. A (row 17).

US SENTENCING MEMORANDUM  7
CR 21-353 CRB

seriousness of Lachwani's offense conduct. For example, the following sentences were imposed in cases after the defendant pleaded guilty:

| Case Name (Date of Sentence) | Summary of Offense Conduct | Guidelines | Sentence |
|---|---|---|---|
| *United States v. Joey Stanton Dodson*, No. 19-cr-00703-BLF (N.D. Cal. Jan. 24, 2013) | Defendant raised approximately $15 million in funding for oil and gas companies from more than 50 investors based on false representations and misdirected approximately $1.3 million to pay back earlier investors or for personal expenses. | 78 – 97 months | 60 months |
| *United States v. John McEwan*, 17-cr-00545-BLF (N.D. Cal. July 24, 2018) | Defendant kept payroll processing company he operated afloat by misapplying client funds to pay disbursements of other clients, misspending approximately $7 million from more than 10 customers. | 63 – 78 months | 63 months |
| *United States v. Lebnitz Tran*, 21-cr-00269-WHO (N.D. Cal. Nov. 3, 2022) | Defendant submitted false information and documents to obtain approximately $8.5 million in disaster relief funds (PPP and EIDL), receiving $3.6 million and personally netting $1.7 million. | 63 – 78 months | 63 months |
| *United States v. Min Jin Zhao*, 21-cr-00181-VC (N.D. Cal. (Apr. 19, 2023) | Defendant defrauded two individuals of approximately $2.46 million. | 63 – 78 months | 63 months |
| *United States v. Adam Rogas*, 20-cr-539-JPC (S.D.N.Y. Nov. 3, 2022) | Defendant CEO raised $123 million for his company, NS8, by providing false information about customers, revenue, and assets, including false spreadsheets purporting to show customers who were paying for NS8's services, false bank statements, and providing fake documents to auditor. Defendant also personally obtained $17.5 million through secondary tender offer. | 121 – 151 months | 60 months |
| *United States v. Richard Randolph*, 21-cr-00118-SDG (N.D. Ga. Aug. 6, 2021) | Defendant CEO of two companies that merged provided false asset and other financial information for one of the companies, obtaining a $33 million valuation for the company and obtaining $1.4 million from 14 investors. | 78 – 97 months | 78 months |
| *United States v. Daniel Boice*, 20-cr-00167-TSE (E.D. Va. Mar. 26, 2021) | Defendant CEO raised $18 million from over 250 investors for his company, Trustify, through lies about the company's revenues, finances, and business relationships, as well as the use of a fake e- | 97 – 121 months | 97 months |

US SENTENCING MEMORANDUM
CR 21-353 CRB

8

| Case Name (Date of Sentence) | Summary of Offense Conduct | Guidelines | Sentence |
|---|---|---|---|
| | mail account to pose as a prominent potential investors. Defendant spent at least $3.7 million of the funds raised on himself. | | |

Some of the cases described above had aggravating and/or mitigating factors not present here. While a reasonable argument can be made that the 3553(a) factors here warrant a shorter sentence for Lachwani than the defendants in the above cases, there are equally reasonable arguments that the 3553(a) factors require an equal or longer custodial sentence here as compared with multiple of the above cases. All of the cases described above involved higher guidelines ranges for imprisonment than the Court concluded applies here, but the offense conduct here is significantly more serious than the Court's guidelines loss calculation accounts for and the Court should consider that in fashioning its sentence. Apart from the issue of loss amount, in several of the above cases, the guidelines were higher because of enhancements for things such as abuse of position of trust and sophisticated means.[12] The government has not advocated for the technical application of those enhancements here, but that does not mean that the conduct was not similar to the cases above. What respect to position of trust, Lachwani was the CEO of Headspin with fiduciary duties to the shareholders he was defrauding. Whether or not the enhancement technically applies, Lachwani's conduct was more serious because he was CEO and similar to that of defendants in the above cases where the Court applied the enhancement. With respect to sophisticated means, Lachwani created fake documents that he sent to Okmyanskaya in an effort to conceal his scheme and allow it to continue.

In all, Lachwani committed a significant, calculated crime over a number of years. He defrauded investors of $92 million of investments and provided them stock worth less than a quarter of the cash the investors provided the company. Lachwani also proceeded to gamble the majority of the funds investors had infused into Headspin by purchasing stock and options in other technology companies. The fact that Headspin was able to return most of the funds fraudulently obtained from investors was largely because

---

[12] In one of the cases above—*Randolph*—the Court applied a four-point enhancement because the defendant was the CEO of a public company. Lachwani obviously was not—but he was the CEO of a significant privately funded Silicon Valley company with a larger valuation than many public companies.

US SENTENCING MEMORANDUM                    9
CR 21-353 CRB

this gamble paid off and his fraud was discovered shortly after Headspin received the largest influx of investor funds. The fact that Lachwani's risky investments paid off does not significantly diminish Lachwani's culpability. Further, Lachwani personally obtained $2.5 million from an investor through a secondary sale of Headspin stock. This profit is more than the defendants profited in some of the cases described above.[13]

The government's recommended sentence is also in line with other recent sentences handed down in high profile fraud cases. Lachwani has made much in his sentencing briefing of contrasting his case with the Theranos cases. The government agrees with Lachwani that Theranos involved a larger, more serious fraud and the government has recommended a comparatively less significant custodial sentence. Elizabeth Holmes was sentenced to over eleven years in prison and Sunny Balwani was sentenced to over twelve and a half years. The government's recommended sentence in this case—slightly over five years—is less than half the sentence those defendants received and appropriately accounts for the differences in the cases.

## V. CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence Lachwani to 63 months in prison, along with a term of supervised release with the conditions set forth in the PSR.

DATED: April 12, 2024

Respectfully submitted,

ISMAIL J. RAMSEY
United States Attorney

_____/s/_____
LLOYD FARNHAM
NOAH STERN
Assistant United States Attorney

---

[13] JSIN data is difficult to use in this case because the guidelines found by the Court do not adequately account for the seriousness of Lachwani offense. The Court is likely to conclude that Lachwani's total offense level is 20. According to JSIN, the average prison sentence for that offense level for §2B1.1 offenders is 25 months, with a median sentence of 27 months, and 94% of offenders receiving a sentence of imprisonment. Offense level 28, which is more representative of Lachwani's offense conduct, has an average prison sentence of 62 months and a median sentence of 60 months, with 98% of defendants receiving a sentence of imprisonment.