No. 24-2925

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

MANISH LACHWANI,

Defendant-Appellant.

———————————————

**UNITED STATES' OPPOSITION TO APPELLANT'S MOTION FOR
RELEASE PENDING APPEAL**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 21-CR-00353 CRB
———————————————

**ISMAIL J. RAMSEY**
United States Attorney

**MERRY JEAN CHAN**
Chief, Appellate Section, Criminal Division

**LLOYD A. FARNHAM**
**NOAH STERN**
Assistant United States Attorneys
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-6758
**Attorneys for Plaintiff-Appellee**
**UNITED STATES OF AMERICA**

September 16, 2024

# TABLE OF CONTENTS

BACKGROUND ................................................................................. 2

SUMMARY OF ARGUMENT ............................................................. 8

ARGUMENT ..................................................................................... 9

I.   LACHWANI'S APPEAL RAISES NO SUBSTANTIAL QUESTIONS
     OF LAW OR FACT LIKELY TO REDUCE HIS SENTENCE ................... 9

     A.   Standard of review ..................................................... 9

     B.   Legal principles ........................................................ 10

     C.   Lachwani's motion does not raise a substantial question
          of law or fact ............................................................ 11

     D.   Lachwani's sentence is not likely to be reduced even if his
          legal arguments are accepted ..................................... 17

II.  EXCEPTIONAL CIRCUMSTANCES DO NOT SUPPORT RELEASE .... 21

CONCLUSION ................................................................................. 23

CERTIFICATE OF COMPLIANCE ................................................... 24

# TABLE OF AUTHORITIES

## Federal Cases

*Albanese v. United States*, 75 S. Ct. 211 (1954) ....................................... 9

*Kharana v. Gonzales*, 487 F.3d 1280 (9th Cir. 2007) ........................... 11

*United States v. Bright*, 353 F.3d 1114 (9th Cir. 2004) ........................ 11

*United States v. Garcia*, 340 F.3d 1013 (9th Cir. 2003) .................................... 9, 22

*United States v. Handy*, 761 F.2d 1279 (9th Cir. 1985) ........................ 10

*United States v. Koon*, 6 F.3d 561 (9th Cir. 1993) ................................ 21

*United States v. Lucas*, 101 F.4th 1158 (9th Cir. 2024) (en banc) ....................... 20

*United States v. Mett*, 41 F.3d 1281 (9th Cir. 1994) .............................. 10

*United States v. Miller*, 753 F.2d 19 (3d Cir. 1985) ............................... 10

*United States v. Montoya*, 908 F.2d 450 (9th Cir. 1990) ...................... 10

*United States v. Ortland*, 109 F.3d 539 (9th Cir. 1997) ............................... *passim*

*United States v. Stoddard*, 150 F.3d 1140 (9th Cir. 1998) ....................... 11, 13, 16

*United States v. Wetselaar*, 2017 U.S. Dist. LEXIS 85268
  (D. Nev. June 2, 2017) ..................................................................... 22

*United States v. Zolp*, 479 F.3d 715 (9th Cir. 2007) ............................. 16

## Federal Statutes

18 U.S.C. § 3143 ..................................................................... 10, 21, 22

18 U.S.C. § 3145 ............................................................................ 21, 22

21 U.S.C. § 841 ...................................................................................... 22

## Federal Rules and Sentencing Guidelines

Fed. R. Crim. P. 46 ................................................................ 10

USSG § 2B1.1 ........................................................ 3, 4, 12, 13, 16, 18, 19

No. 24-2925

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

   Plaintiff-Appellee,

         v.

MANISH LACHWANI,

   Defendant-Appellant.

_____

## UNITED STATES' OPPOSITION TO APPELLANT'S MOTION FOR RELEASE PENDING APPEAL

Defendant-Appellant Manish Lachwani pleaded guilty to wire fraud and securities fraud, admitting that he had engaged in a years-long scheme to inflate the financial information of the company he founded, Headspin, for the purpose of misleading investors and tricking them into investing over $90 million in the company.

The district court concluded that a reasonable estimate of the loss amount was $3,149,056, rejecting Lachwani's argument that the loss was zero as well as the government's arguments that the loss was either $92 million or $59 million. The district court sentenced Lachwani to 18 months' imprisonment, well below the advisory range of 33–41 months under the United States Sentencing Guidelines

(Guidelines or U.S.S.G.), and subsequently denied Lachwani's motion for bail pending appeal.

This Court, too, should deny Lachwani bail pending appeal.  Under this Court's binding precedent, money returned after a fraud is discovered does not reduce loss under the Guidelines.  That forecloses Lachwani's contention that the district court erred when it refused to credit money returned to victims after Lachwani's fraud was discovered in a transaction that settled the victims' civil claims.  Lachwani therefore fails to raise a substantial question of law or fact likely to result in a reduced sentence, as required to obtain bail pending appeal.

## BACKGROUND

On August 4, 2022, a grand jury returned the Superseding Indictment, charging Lachwani with thirteen counts of wire fraud and four counts of securities fraud, in connection with Headspin's offerings of convertible notes and Series B and C Preferred Stock, as well as Lachwani's secondary sale of $2.5 million of his Headspin stock.[1]  GA-4–18.[2]

---

[1]  The Superseding Indictment also charged Lachwani with money laundering.

[2]  CR refers to the district court clerk's record for No. 3:21-CR-00353-CRB; PSR to the Presentence Investigation Report; Ex. to alphabetical exhibits submitted with Lachwani's 's Motion ("Mot."); and GA- to the government's appendix submitted herewith.

2

On April 27, 2023, Lachwani pleaded guilty to two counts of wire fraud (Counts Three and Seven) and one count of securities fraud (Count Thirteen) pursuant to a written plea agreement. CR-88. In the plea agreement, Lachwani admitted that, beginning no later than October 2017 while he was the Chief Executive Officer of Headspin, he provided potential investors financial information that he knew overstated Headspin's revenue and annual recurring revenue (ARR). GA-25. Lachwani admitted that, all in furtherance of his scheme to sell Headspin notes and stock and inflate the value thereof, he sent Headspin's accountant false revenue amounts for customers he knew had not entered into contracts with Headspin, that he maintained an ARR spreadsheet containing false ARR entries for customers and purported customers, and that he sent Headspin's accountant invoices he knew were altered. GA-25–26. Lachwani admitted that Headspin raised over $90 million from the offerings charged in the indictment. GA-25. The plea agreement, however, did not contain an agreement on the loss attributable to the scheme under U.S.S.G. § 2B1.1(b)(1). GA-30.

The Presentence Investigation Report (PSR) concluded that Lachwani's crimes resulted in a loss amount of $92.73 million, the amount that Lachwani obtained for Headspin (or, in the case of his $2.5 million secondary sale of Headspin stock, himself) from investors as a result of his lies in the charged offerings, resulting in a 24-level Guidelines enhancement. PSR-¶ 29. The

3

government argued that the district court should adopt the PSR's calculation of
loss because there was no public market for Headspin securities and any actual
value attributable to the highly risky securities was speculative.  GA-53–54.  The
government also offered alternative calculations for a reasonable estimate of loss.
GA-55-57.  The government's expert used two methodologies to calculate a
reasonable estimate of the actual value of Headspin securities the victims received
in exchange for the investments: (1) applying multipliers to Headspin's true, rather
than inflated, ARR and (2) considering the negotiated repricing of the stock that
occurred when the company returned 70% of victims' investments in exchange for
a release of civil claims.  *Id*.  These valuation estimates concluded that investors
had received securities worth between $59 to $61 million less than they had paid.
*Id.*

Lachwani argued that there was no evidence that any investor suffered an
actual loss, asserting that assets distributed as part of a recapitalization or
dissolution are not counted as losses under *United States v. Ortland*, 109 F.3d 539
(9th Cir. 1997), and that investors were likely to profit from their investments.  Ex.
B at 14–18.  Lachwani's argument focused on the recapitalization that occurred
after his fraud was discovered and after he had been removed as CEO, whereby
Headspin settled civil claims.  *Id.*  This recapitalization transaction allowed Series
B and C investors to sell back up to 70% of their preferred stock at the original

purchase price and exchange the remaining 30% for promissory notes that had a 5-year term and accrued 1% annual interest.  GA-127–28.  To participate, however, investors were required to agree to release Headspin, Lachwani, and others from all claims relating to their investments in Headspin.  GA-155, 164–65.

On January 25, 2024, in advance of the final sentencing hearing, the district court (Hon. Charles R. Breyer) issued an order finding that investors had suffered an actual loss and estimating the loss to be $3,149,056, resulting in a 16-level loss enhancement under the Guidelines.  GA-126.  The district court reasoned that investors got "shares in a company with materially worse prospects for future returns than they believed they were getting" and, therefore, the shares were worth less than what they paid.  GA-133.  The district court held that the Guidelines and Ninth Circuit law precluded reducing the loss amount by money returned to investors after the fraud was discovered and that doing so would inappropriately reward Lachwani for actions taken to reduce the consequences of his fraud.  GA-133–34.

To calculate a reasonable estimate of loss, the district court adopted, in part, one of the methodologies proposed by the government.  Specifically, the district court found that performing a valuation estimate using an ARR multiplier was reasonable.  GA-140.  The district court, however, concluded that the government had not proven by clear and convincing evidence that Lachwani's criminal conduct

was responsible for the entire delta between Headspin's real ARR at the time of the securities transactions and Lachwani's inflated versions of it.  GA-142.  The district court, instead, used a much smaller delta, subtracting deals Lachwani conceded he lied about at the time of the Series C offering from the inflated ARR.  GA-143.  The district court then performed the ARR multiplier analysis on the slightly lower ARR metric, resulting in a valuation of the Series C stock worth $3,149,056 less than what the Series C investors paid.  GA-143–45.  The district court acknowledged that this estimate of loss, which it adopted, was likely to understate the loss in Headspin's value that resulted from Lachwani's criminal conduct for several reasons.  GA-145–46.  Among them, the estimate did not account for the inflated value of the Series B stock, Lachwani's lies and concealment relating to metrics other than ARR, and the reduction of value investors would assign to a company whose CEO was committing fraud.  *Id.*

On April 19, 2024, the district court concluded that Lachwani's Guidelines range for imprisonment was 33–41 months and sentenced Lachwani to eighteen months in prison, a significant variance from the guidelines range, and imposed a $1 million fine.  GA-173; Ex. C.

On June 4, 2024, Headspin and all of its assets were acquired for just $28.2 million in a transaction that wiped out Headspin equity with no compensation and paid noteholders approximately half of their principal.  GA-181–82.  After this

acquisition, and in advance of a scheduled hearing on restitution, some of Headspin's investors submitted restitution claims for their investment losses, totaling approximately $6.2 million.  GA-190.

On August 7, 2024, Lachwani moved the district court for bail pending appeal.  CR-153.  At the motions hearing, the district court stated it was "inconceivable" that Lachwani's theory on loss was correct and the only substantial question of law was whether the district court correctly rejected the government's argument that the loss amount was $92 million.  Ex. A at 11–14. The district court also rejected Lachwani's argument that extraordinary reasons warranted his continued release.  Ex. A at 17.

The district court subsequently issued a written order holding that it was not "fairly debatable" that there was no actual loss.  GA-192.  The district court reasoned that Lachwani's position would mean that the Guidelines make no distinction between a defendant who defrauds victims out of $10 and a defendant who defrauds victims out of $1,000,000, so long as there is enough money to repay the victims after the fraud is discovered.  *Id*.  The district court found that this could not be, and that *Ortland* did not make the issue fairly debatable.  *Id*.  The district court also rejected Lachwani's claim that he should receive credit for the recapitalization because he did not have decision-making authority with respect to it.  GA-193.  The district court noted that it had already found as a factual matter

that Lachwani's cooperation was necessary to the success of the transaction and, therefore, crediting him for this amount would reward him for actions taken to reduce the consequences of his fraud after its discovery. *Id*.

## SUMMARY OF ARGUMENT

Lachwani's claim for bail pending appeal rests entirely on his argument that there is a substantial question of law and fact regarding whether the district court was required to credit against loss repayments to victims after the fraud was discovered. This argument is foreclosed by an unbroken line of binding Ninth Circuit precedent, as well as the applicable Guidelines commentary, holding that loss is fixed at the discovery of the fraud and repayments such as these are not credited.

Lachwani relies entirely on a single case—*Ortland*—which provides him no support. That case involved a completely different issue—consequential damages—and, in any event, was decided before the Ninth Circuit cases foreclosing his argument, as well as the adoption of the relevant Guidelines commentary.

Lachwani's motion also fails because his sentence is not likely to be reduced even if his spurious legal theory were adopted. Recent developments relating to the sale of Headspin for pennies on the dollar and the cancellation of remaining equity and debt make clear that Lachwani's loss enhancement would be the same

(and likely higher) if the district court used the loss analysis discussed in *Ortland*.

Further, application of the proper preponderance of the evidence standard on any

remand (rather than the clear and convincing standard the district court applied)

makes it likelier that the district court would adopt the higher loss estimate urged

by the government on remand, than a lower one.  Therefore, Lachwani's sentence

is not likely to be reduced and his motion should be denied for that independent

reason.

Where Lachwani fails to meet the requirement of demonstrating that his

appeal raises a substantial question of law and fact likely to result in a reduced

sentence less than the total of the time already served plus the expected duration of

the appeal process, bail pending appeal may not be granted solely based on

exceptional reasons, which Lachwani, in any case, does not present.

## ARGUMENT

## I.  LACHWANI'S APPEAL RAISES NO SUBSTANTIAL QUESTIONS OF LAW OR FACT LIKELY TO REDUCE HIS SENTENCE

### A.  Standard of review

This Court reviews factual findings underlying the district court's denial of

release pending appeal for clear error, and its legal determinations de novo.  *United

States v. Garcia*, 340 F.3d 1013, 1015 (9th Cir. 2003).  *See Albanese v. United

States*, 75 S. Ct. 211, 211 (1954) (declining to overrule district court's denial of

bail pending appeal "unless the record reveals a clear abuse of discretion").

9

## B.     Legal principles

Detention is the mandatory, routine norm for any defendant following

conviction and the imposition of a custodial sentence.  18 U.S.C. § 3143(b)(1).

After conviction, the Bail Reform Act "shift[s] the burden of proof from the

government to the defendant" to demonstrate entitlement to bail pending appeal.

*United States v. Handy*, 761 F.2d 1279, 1283 (9th Cir. 1985).  The defendant thus

has the burden to overcome the presumption of detention.  *United States v.*

*Montoya*, 908 F.2d 450, 451 (9th Cir. 1990); *see* Fed. R. Crim. P. 46(c).  The

standard is meant to "make[ ] it considerably more difficult for a defendant to be

released on bail pending appeal."  *Handy*, 761 F.2d at 1280–83 (adopting *United*

*States v. Miller*, 753 F.2d 19 (3d Cir. 1985)).

Under the Act, a convicted defendant may only be released pending appeal if

he proves by clear and convincing evidence that he (1) is not a flight risk, (2) does

not pose a danger to anyone else, and (3) that his appeal is not for the purpose of

delay and raises a substantial question of law or fact that is likely to result in (i)

reversal, (ii) an order for a new trial, (iii) a sentence that does not include a term of

imprisonment, or (iv) a reduced sentence less than the total of the time already

served plus the expected duration of the appeal process.  18 U.S.C. § 3143(b)(1);

*accord United States v. Mett*, 41 F.3d 1281, 1282 n.3 (9th Cir. 1994) (listing

requirements).

10

### C. Lachwani's motion does not raise a substantial question of law or fact

The district court followed binding Ninth Circuit law when it held that the loss amount should not be reduced by money returned to victims after the discovery of the fraud. "Repayments do not apply to actual loss if they are made after discovery of the offense but prior to indictment." *United States v. Stoddard*, 150 F.3d 1140, 1146 (9th Cir. 1998). "Fixing actual loss at discovery of the offense comports with the rationale of the economic reality approach." *Id.* While repayments before detection show an "untainted intent to reduce any loss," repayments after detection "may show no more than an effort to reduce accountability." *Id.*; *see also United States v. Bright*, 353 F.3d 1114, 1118 (9th Cir. 2004) (reaffirming principle that "a defendant is not entitled to credit for refunds paid after detection by a victim"); *cf. Kharana v. Gonzales*, 487 F.3d 1280, 1284 (9th Cir. 2007) (noting that "a defendant who returns stolen money only after detection does not receive a so-called credit against loss" under the Guidelines and finding that loss for purposes of determining whether the defendant was convicted of an aggravated felony should not be reduced by amounts repaid after the discovery of the fraud because doing so would "distort the magnitude of [the defendant's] crime and would be inappropriate" (internal quotations omitted)).

This binding precedent is in accord with the applicable Sentencing Guidelines commentary. That commentary provides that loss is reduced by "[t]he

11

money returned, and the fair market value of the property returned and the services

rendered, by the defendant or other persons acting jointly with the defendant, to the

victim *before the offense was detected*." U.S.S.G. § 2B1.1 note 3(E)(i) (emphasis

added). "The time of the detection of the offense is the earlier of (I) the time the

offense was discovered by a victim or government agency; or (II) the time the

defendant knew or reasonably should have known that the offense was detected or

about to be detected by a victim or government agency." *Id.* Therefore, money

returned to victims *after* the fraud was discovered does not decrease the loss

amount.

There is no dispute that the money returned to Headspin's investors was

returned after Lachwani's fraud was discovered. Therefore, the district court

properly did not credit money that investors recouped through the recapitalization

transaction against the loss amount.

Lachwani makes two arguments that this Court's settled law should not

apply to him: (1) he claims he did not direct the repayment so he should be

credited for it, and (2) he argues *Ortland* controls this case rather than the above

cited precedent. Mot. at 11–14. Both arguments fail.

Lachwani's first argument is both factually and legally wrong. The district

court found as a factual matter that Lachwani's cooperation was necessary for the

repayment to proceed. GA-133. Specifically, Lachwani canceled his own shares

in the company, provided a cash refund to one investor, and transferred shares of his own stock to another investor, among other things. GA-133–34. In his motion, Lachwani does not challenge the district court's factual findings other than asserting, without citation, that Lachwani "had no hand in it at all." Mot. at 13.[3] This unsupported assertion does not give rise to a substantial issue of fact. The record is clear that Lachwani acted in concert with Headspin—an entity that also had clear potential liability for fraud—to repay investors a portion of the money they were defrauded. Indeed, Lachwani omits that he was the controlling shareholder of Headspin during the time the transaction was negotiated. GA-114. The repayment could not have occurred without his actions, and he raises no issue of fact that is fairly debatable.

Lachwani's first argument is also legally wrong. Under this Court's precedent, loss is fixed at the time the fraud is discovered. *Stoddard*, 150 F.3d at 1146. And the Guidelines commentary crediting against loss repayments "by the defendant or other persons acting jointly with the defendant" explicitly applies to repayments made "before the offense was detected," not afterwards. U.S.S.G. § 2B1.1 cmt. n. 3(E)(i). Moreover, note 3(E) to § 2B1.1 enumerates circumstances

---

[3] Lachwani cites nothing in the record for his assertion that he "had no decision-making power at this time and did not participate in the design or implementation of the Recap," apart from the fact he had already stepped down from the board and as CEO. Mot. at 6. Nor did he in the district court. Ex. B at 12.

in which loss must be reduced.  None of enumerated circumstances refer to

payments made to victims by people or entities that are not the "defendant or other

persons acting jointly with the defendant."  Therefore, Lachwani's argument that

he had no hand in the repayment through the recapitalization program actually

supports the district court's loss finding.  By the plain terms of application note

3(E)(i), if Lachwani was not involved in the repayment, the repayment cannot be

credited against loss, regardless of its timing.  Lachwani's argument to the contrary

would mean that payments made to victims by their insurance companies to cover

fraud losses would always reduce the Guidelines loss attributable to the

defendant's offenses.  That is clearly not the case, and for good reason.  If that

were the law, the loss Guideline would be completely untethered from measuring

the magnitude and culpability of a defendant's offenses and would provide

defendants random sentencing windfalls.  The return of money to investors does

not reduce the loss amount, and Lachwani's involvement or non-involvement in it

is irrelevant.

       With respect to Lachwani's second argument, as the district court

emphasized, *Ortland* does not control this case, nor support Lachwani's argument.

Ex. A at 12–13; GA-192–93; GA-135.  In *Ortland*, the defendant sold limited

partnership interests in a partnership he created with his wife to develop residential

real estate.  109 F.3d at 541.  The partnership built several homes on previously

undeveloped land, but Ortland also diverted substantial sums of money from the

partnership's accounts to pay for personal expenses. *Id.* at 542. Ortland was

charged with mail fraud and convicted after trial. *Id.* at 542–43. The district court

calculated loss as the amount the victims invested in their limited partnership

interests minus the amount the receiver appointed to manage the partnership

returned to them. *Id.* at 547–48. On appeal, Ortland argued "that the district court

miscalculated the amount of loss his actions caused because the court incorrectly

included consequential damages in the loss calculation." *Id.* Specifically, Ortland

argued that the loss amount should be reduced by the fees the receivership incurred

to obtain and make the repayments. *Id.* This Court rejected Ortland's argument,

concluding that there were no consequential damages at all, "the actual loss to the

investors was simply what they did not recover." *Id.* at 548. The Court reasoned

that the investors' loss was "at least" what the investors put in minus what they got

back: "the fraud was the obtaining of the money for the partnership interest, and

when the dust settled that interest turned out to be worth the lesser net amount."

*Id.*

Ortland's holding goes no further than the consequential damages issue the

case addressed. The Court's reasoning adopting loss to be at least the difference

between the amount invested and the amounts repaid was necessary to its

explanation of why the receiver's fees were part of the direct loss rather than

15

consequential damages and was not a holding that a reasonable estimate of loss in an investment fraud case must always be calculated that way.  Such a holding would be contrary to bedrock principles that the "guidelines do not present a single universal method for loss calculation under § 2B1.1," *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007), and district courts "need only make a reasonable estimate of loss."  U.S.S.G. § 2B1.1(b), cmt. n.3(C).

The issue raised here by Lachwani, and already clearly decided by *Stoddard*, simply was not raised in *Ortland*.  Moreover, Lachwani fails to recognize that, in a case involving a real estate fraud, the most efficient reasonable estimate of the value of the limited partnership shares *at the time the fraud was discovered* may be based on how much money could be repaid to investors after the property was liquidated.  Thus, the district court in *Ortland* may have simply been valuing the partnership shares received by investors using that approach, rather than reducing the loss amount by money paid back after the fraud was discovered.  Finally, even if *Ortland* stood for what Lachwani said it does, it would not raise a substantial issue of law because it was decided before *Stoddard* and before note 3(E)(i) was added to the Sentencing Guidelines commentary for § 2B1.1.  *See* U.S.S.G. § 2B1.1, cmt. n.3(E)(i) (2001 amendments) (explaining that "the amendment resolves a circuit conflict regarding whether and how to credit payments made to victims").

Lachwani's appeal raises no fairly debatable issue of law or fact.  The victims' receipt of a partial repayment of fraud proceeds after the fraud was discovered does not reduce the loss amount under this Court's precedent.  Therefore, Lachwani's motion must be denied.

### D.    Lachwani's sentence is not likely to be reduced even if his legal arguments are accepted

Even if this Court were to agree with Lachwani that money paid back to investors through a civil settlement must be subtracted from loss and remand for resentencing, Lachwani is unlikely to receive a reduced sentence, as required to obtain bail pending appeal.

First, even if this Court were to adopt Lachwani's argument that *Ortland* mandates loss be calculated only one way—the amount investors put in minus the amount they were repaid—the same Guidelines range (or higher) would apply on remand as a result of developments that occurred after the sentencing hearing but before the restitution hearing.  Specifically, Headspin was acquired for $28 million, with the proceeds covering only a portion of the Headspin's outstanding debt, and equity investors receiving nothing.  GA-181–82.  The $28 million sale price was a far cry less than the inflated $1.1 billion valuation at which stock was priced in the Series C offering.  PSR ¶ 10.  Series C investors who elected to receive a repayment of 70% of their investment and a note for the remaining 30%

were paid only approximately half of the note,[4] with the remainder being cancelled. GA-182.  Thus, calculating loss for these investors as the amount they paid minus the amount they received back upon disposition of the company—as Lachwani claims *Ortland* requires—these investors lost approximately 15% of their investments, which is well over $2.5 million.[5]

Indeed, the $2.5 million loss enhancement threshold is met by just two Series C investors under this mode of analysis.  Specifically, investors referred to in the government's restitution filing as Victim 2 and Victim 5 were defrauded and paid Headspin $22,834,705 for Series C Preferred Stock.  GA-186–88.  These investors participated in the recapitalization transaction, released claims against Lachwani and the company, and received $15,984,294.  *Id.*  Headspin, however,

---

[4]  Lachwani claimed at sentencing that Headspin had the capital to return the entirety of the investments the company received by fraud.  But, as the district court found, this claim was not true and the record demonstrated that Headspin had enough capital to return, at most, 63% of the victims' investments in a liquidation. GA-134.

[5]  Lachwani may argue that the recapitalization transaction broke the chain of causation, and that events subsequent to it should not be considered.  It did not. After the fraud was discovered, many investors sought a full return of their investments and an exit of the company.  The company, however, did not have the funds to return investors' full investments and the investors were forced to remain invested in the company, either in the form of equity or a note.  GA-134.  If, as Lachwani urges, the recapitalization transaction must be considered a credit against loss, then the later outcome—some investors losing all of their equity value and some receiving half their remaining note value without ever having a chance to exit their investments—must be considered.

18

did not have the funds to return the full amount of their investments, and Victims 2 and 5 were given a note for the remainder, $6,850,412. *Id.* Headspin was never able to pay back the note and, instead, returned $3,467,599 and cancelled the notes upon the disposition of the company. *Id.* Thus, Victims 2 and 5 sustained a loss of $3,382,813 under the approach Lachwani claims *Ortland* mandates.[6]

Lachwani also admitted to defrauding Headspin's convertible notes investors, who invested over $10 million in the securities fraud count to which he pleaded guilty. PSR ¶ 23; GA-16; GA-21. These convertible notes holders, and earlier convertible notes holders who also received false information, never had the opportunity to receive their money back, held illiquid Headspin shares, and lost the entirety of their investments when Headspin was acquired in June 2024. *See, e.g.*, GA-187–88 (Victim 4 claim). This indicates that any future resentencing would apply a higher Guidelines range to Lachwani.

Second, at sentencing the district court held that the government was required to prove facts relating to the loss enhancement by clear and convincing

---

[6] Confronted with this reality, Lachwani may argue that repayments must be subtracted from the district court's loss estimate of $3.1 million. This would make little sense. The court's estimate was an effort to conservatively estimate the value of the Series C stock purchased by investors *at the time of the fraudulently induced purchases*. If Lachwani is right that loss is not fixed in time and loss must be calculated per *Ortland* (i.e., amount invested minus the amount repaid after the fraud is discovered), there is no reason to perform the district court's valuation analysis, and that discounted amount should not be the starting point for the argued for *Ortland* reduction.

evidence.  GA-129.  Shortly after sentencing, this Court overruled its prior caselaw
and held that the preponderance of the evidence standard applies.  *United States v.*
*Lucas*, 101 F.4th 1158, 1159 (9th Cir. 2024) (en banc).  The lower burden at any
resentencing is likely to result in a higher, not lower, Guidelines range.  The
district court rejected the government's $59 to $61 million loss range primarily on
the basis of its conclusion that the government had failed to prove with reasonable
certainty that Lachwani's inflation of ARR from channel partners was fraudulent.
GA-141–42.  The district court noted its doubts that channel ARR accounting was
innocent, but believed that it was required to find the facts underlying its loss
calculation by clear and convincing evidence.  GA-142.  At resentencing, the
district court is more likely to adopt the government's proposed loss amount than
reduce Lachwani's sentence.

Further, even if this Court were to agree with Lachwani regarding the
repayment, it could also conclude that the loss amount is more than $2.5 million
because the government's other arguments below were correct.  Specifically, in a
case involving illiquid private securities that would not have been purchased by
investors absent the fraud, the loss is either (1) the total amount victims parted with
because the value of these securities at the time of the fraud is speculative or (2) if
valuation of the securities is required, the loss is the amount paid minus the actual
value, without any corollary need to attempt to divine what specific amount of the

overvaluation was due to the "criminal conduct" as opposed to "innocent conduct." Lachwani is not likely to receive a reduced sentence because the same Guidelines range or a higher one will apply if there is any eventual resentencing.

## II.   EXCEPTIONAL CIRCUMSTANCES DO NOT SUPPORT RELEASE

Lachwani's motion for release pending appeal also argues that there are "exceptional reasons" that support his release pending appeal, though Lachwani concedes that the cited provision, 18 U.S.C. § 3145(c), does not apply to him. Mot. at 16.  This analysis is not applicable to this case, because this is not a case where the district court was required to impose detention pending appeal under 18 U.S.C. § 3143(b)(2).  Lachwani makes his motion for bail pending appeal solely under the standard laid out in 18 U.S.C. § 3143(b)(1), and therefore he cannot argue that § 3145(c) applies, or that the question of "exceptional reasons" is relevant at all.  Defendants who must be detained under § 3143(b)(2), including violent offenders and certain drug crime defendants, must meet *both* the requirements of § 3143(b)(1) and § 3145(c) to be released pending appeal; all defendants (including Lachwani) must therefore satisfy the standards of § 3143(b)(1).  *See United States v. Koon*, 6 F.3d 561, 563 (9th Cir. 1993).  Section 3145(c) is not an end-run around the bail pending appeal standard, and since Lachwani does not meet that standard, the "exceptional reasons" analysis is irrelevant.

Lachwani cites two cases purporting to apply the "exceptional reasons" standard, but those cases do not contradict the fact that § 3145(c) does not apply in this case. The unpublished order in *United States v. Wetselaar*, involved a conviction of drug distribution under 21 U.S.C. § 841, and therefore detention pending appeal was mandated under 18 U.S.C. § 3143(b)(2). *See* 2017 U.S. Dist. LEXIS 85268, *5 (D. Nev. June 2, 2017). Similarly, the defendants in *Garcia* had been convicted of crimes of violence, triggering § 3143(b)(2) and the additional requirement to meet the "exceptional reasons" standard of § 3145(c). 340 F.3d at 1015.

In any event, as the district court specifically found, the circumstances Lachwani raises, concerning an almost-adult for whom there are other available caregivers and resources besides Lachwani, even if accepted as true, do not rise to the level of "exceptional," and do not warrant release pending appeal even if this analysis was applicable to the release question at all. Ex. A at 17. Rather, the circumstances are "[h]ardships that commonly result from imprisonment." *Garcia*, 340 F.3d at 1022.

\\

\\

\\

22

# CONCLUSION

For the reasons set forth above, this Court should deny Lachwani's motion for bail pending appeal.

Dated: September 16, 2023                    Respectfully submitted,

                                             ISMAIL J. RAMSEY
                                             United States Attorney

                                             MERRY JEAN CHAN
                                             Chief, Appellate Section, Criminal Division

                                             ___/s/____Noah Stern_____
                                             LLOYD FARNHAM
                                             NOAH STERN
                                             Assistant United States Attorneys

                                             Attorneys for Plaintiff-Appellee
                                             UNITED STATES OF AMERICA

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing complies with the type size and typeface requirements of Fed. R. App. P. 32(a)(5) and (6) and with the 20-page length limit of Ninth Circuit Rule 27-1(1)(d) under the page/word count conversion formula of Circuit Rule 32-3.  The foregoing is 5,192 words.

Dated:  September 16, 2024              /s/ Noah Stern_____
                                       NOAH STERN
                                       Assistant United States Attorneys

**No. 24-2925**

IN THE UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,

     Plaintiff-Appellee,

        v.

MANISH LACHWANI,

     Defendant-Appellant.

_____

**GOVERNMENT'S APPENDIX TO OPPOSITION TO
APPELLANT'S MOTION FOR RELEASE PENDING APPEAL**

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
NO. 21-CR-00353 CRB
_____

**ISMAIL J. RAMSEY**
United States Attorney

**MERRY JEAN CHAN**
Chief, Appellate Section, Criminal Division

**LLOYD A. FARNHAM**
**NOAH STERN**
Assistant United States Attorneys
450 Golden Gate Ave., 11th Floor
San Francisco, CA 94102
(415) 436-6758
**Attorneys for Plaintiff-Appellee**
**UNITED STATES OF AMERICA**

**GA-1**

# TABLE OF CONTENTS

Superseding Indictment
(CR 60, June 4, 2022) ................................................................. GA-003

Plea Agreement
(CR 88, April 27, 2023)............................................................... GA-021

United States' Sentencing Memorandum, Excerpts of Supporting Documents
(CR 103, December 6, 2023) ....................................................... GA-036

Order on Application of Loss Guidelines
(CR 126, January 25, 2024)......................................................... GA-125

United States' Supplemental Sentencing Memorandum, Excerpts
(CR 135, April 12, 2024) ............................................................. GA-148

Judgment in a Criminal Case
(CR 141, April 24, 2024) ............................................................. GA-172

United States' Memorandum Regarding Restitution
(CR 150, August 7, 2024) ............................................................ GA-179

Order on Bail Pending Appeal
(CR 171, August 23, 2024).......................................................... GA-191

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

**FILED**

Aug 04 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

## CRIMINAL COVER SHEET

**Instructions:** *Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case.*

**CASE NAME:**

USA v. **Manish Lachwani**

**CASE NUMBER:**

CR **21-cr-00353 CRB**

| | | |
|---|---|---|
| **Is This Case Under Seal?** | Yes | No ✔ |
| **Total Number of Defendants:** | 1 ✔   2-7 | 8 or more |
| **Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326?** | Yes | No ✔ |
| **Venue (Per Crim. L.R. 18-1):** | SF ✔   OAK | SJ |
| **Is this a potential high-cost case?** | Yes | No ✔ |
| **Is any defendant charged with a death-penalty-eligible crime?** | Yes | No ✔ |
| **Is this a RICO Act gang case?** | Yes | No ✔ |

**Assigned AUSA (Lead Attorney):** Noah Stern

**Date Submitted:** August 3, 2022

**Comments:**

RESET FORM      SAVE PDF

Form CAND-CRIM-COVER (Rev. 11/16)

**GA-3**

# United States District Court

### FOR THE
### NORTHERN DISTRICT OF CALIFORNIA

## VENUE: SAN FRANCISCO

---

UNITED STATES OF AMERICA,

V.

Manish Lachwani

DEFENDANT(S).

---

| FILED |
| --- |
| Aug 04 2022 |
| Mark B. Busby |
| CLERK, U.S. DISTRICT COURT |
| NORTHERN DISTRICT OF CALIFORNIA |
| SAN FRANCISCO |

## INDICTMENT

18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 1957 – Money Laundering;
15 U.S.C. § 78j(b) and 78ff, 17 C.F.R. § 240.10b-5- Securities Fraud
18 U.S.C. § 2 – Aiding and Abetting;
18 U.S.C. §§ 981(a)(1)(C), 982, & 28 U.S.C. § 2461(c) – Criminal Forfeiture

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this 3rd day of

August, 2022.

Clerk

Bail, $ No Process

Magistrate Judge Sallie Kim

**GA-4**

1  STEPHANIE M. HINDS (CABN 154284)
   United States Attorney
2

3

4                                                      **FILED**

5                                              Aug 04 2022

6                                              Mark B. Busby
                                          CLERK, U.S. DISTRICT COURT
7                                     NORTHERN DISTRICT OF CALIFORNIA
                                                SAN FRANCISCO

8                          UNITED STATES DISTRICT COURT

9                       NORTHERN DISTRICT OF CALIFORNIA

10                              SAN FRANCISCO DIVISION

11  UNITED STATES OF AMERICA,              )   CASE NO. 21-CR-00353 CRB
                                           )
12            Plaintiff,                    )   <u>VIOLATIONS</u>:
                                           )   18 U.S.C. § 1343 – Wire Fraud;
13       v.                                )   18 U.S.C. § 1957 – Money Laundering;
                                           )   15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R.
14  MANISH LACHWANI                         )   § 240.10b-5 – Securities Fraud;
                                           )   18 U.S.C. § 2 – Aiding and Abetting;
15            Defendant.                    )   18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18
                                           )   U.S.C. § 982(a)(1) – Forfeiture Allegation
16                                         )
                                           )   SAN FRANCISCO VENUE
17  _____

18

19                      S U P E R S E D I N G   I N D I C T M E N T

20  The Grand Jury charges:

21                          <u>Introductory Allegations</u>

22       At all times relevant to this Superseding Indictment:

23       1.      The defendant, Manish Lachwani ("LACHWANI"), resided in Los Altos, California, in

24  the Northern District of California.  In 2015, LACHWANI founded HeadSpin, Inc. ("Headspin"), a

25  company based in Palo Alto, California, in the Northern District of California.  From 2015 until in or

26  about May 2020, LACHWANI was Headspin's Chief Executive Officer.

27       2.      Headspin is a corporation organized under the laws of the State of Delaware with its

28  principal place of business in Palo Alto, California.  Headspin opened and maintained corporate bank

SUPERSEDING INDICTMENT                                                        **GA-5**

accounts in Mountain View, California at Wells Fargo Bank and brokerage accounts at LPL Financial. When Headspin solicited and received financial investments from investors, the money was deposited in its Wells Fargo or LPL Financial accounts.

3.      The entity identified in this Superseding Indictment as "Investor 1," was an investment firm located in San Francisco, California, in the Northern District of California.  Investor 1 maintained a bank account in San Francisco, California at First Republic Bank.

4.      The entity identified in this Superseding Indictment as "Investor 2," was an investment firm based in Texas.

5.      The entity identified in this Superseding Indictment as "Investor 3," was an investment firm with an office in San Francisco, California.  Investor 3 maintained a bank account at Silicon Valley Bank.

6.      The investors identified as "Investor 4," "Investor 5," and "Investor 6" were persons that made investments in Headspin.

Headspin's Business

7.      Headspin provided its corporate clients with software and access to remote devices around the world that allowed the clients to remotely test mobile applications on different devices and networks in those locations.

8.      Headspin provided customers access to its software and services on a subscription model, charging customers based on the number of remote devices the customer could use to remotely test its mobile applications using Headspin software.  By subscribing, customers gained access to Headspin's software for a particular length of time.  Headspin sold its software and services both directly to end users and indirectly through resellers which, in turn, sold Headspin's software to end users.  For direct sales, Headspin contracted directly with an end user.  For indirect sales, an end user purchased Headspin's software and services through a reseller.

9.      To fund its operations, Headspin completed four major rounds of financing.  Between approximately August and September 2015, Headspin raised approximately $11 million in a Series A preferred stock offering.  Between approximately April 2017 and May 2018, Headspin raised approximately $24.7 million in a series of issuances of convertible promissory notes.  Between

SUPERSEDING INDICTMENT                    2

**GA-6**

approximately September and October 2018, Headspin raised approximately $20 million in a Series B preferred stock offering. The Series B stock offering valued Headspin at approximately $500 million. Between approximately November 2019 and April 2020, Headspin raised approximately $60 million from investors in a Series C preferred stock offering. The Series C stock offering valued Headspin at approximately $1.1 billion. In total, Headspin raised more than $110 million.

10. Headspin used the software-as-a-service ("SaaS") revenue model, which is when an end user licenses software on a subscription basis and revenue is recognized ratably over the period of the subscription. As with most SaaS businesses, annual recurring revenue, or "ARR," was an important metric for HEADSPIN investors. ARR is a measure of the total revenue expected per year from committed customers with signed contracts. The goal of the metric is to give investors insight into a company's future revenue performance based on its current subscriptions.

11. LACHWANI maintained close control over Headspin's operations, sales, and record-keeping. LACHWANI controlled and was aware of significant aspects of the company's financial information, including financial figures, sales and customer information, and restricted employees from speaking with each other about the company's finances.

12. Headspin did not have formal accounting controls, policies, procedures, or a Chief Financial Officer. LACHWANI was the final decision-maker regarding when, how, and whether the company would record sales and revenue.

<u>The Scheme to Defraud</u>

13. From a time unknown but no later than in or about December 2016 and through in or about April 2020, LACHWANI engaged in a scheme, plan, and artifice to defraud Headspin investors as to a material matter, and obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, by making materially false and misleading statements, and failing to disclose material facts with a duty to disclose.

14. Beginning in or about December 2016, LACHWANI knowingly and intentionally made materially false and misleading statements to investors and failed to disclose material facts, using the following manner and means, among others: (1) causing Headspin to record revenue and include in ARR tabulations amounts from purported customers that had not agreed to purchase Headspin's

software and services or to pay for software and services, (2) falsely inflating Headspin's revenue and ARR from real Headspin customers and resellers, including continuing to include in ARR tabulations amounts from customers that previously terminated their Headspin contracts, (3) causing false invoices to be created and sent to Headspin finance staff in order to reduce Headspin's unbilled receivables and conceal the false and inflated revenue LACHWANI had caused Headspin to record, (4) communicating false financial and sales information to investors, (5) communicating materially false information about Headspin's product and customer adoption to investors, and (6) using significant amounts of company and investor funds to make unauthorized, high-risk investments in the stock market and failing to disclose the risky investment of company funds to investors, shareholders, and the board of directors.

15.     Beginning no later than in or about December 2016, LACHWANI sent a Headspin accountant false and inflated sales information that he instructed her to record as revenue in Headspin's financial statements.  LACHWANI sent Headspin's accountant purchase orders he knew the customer had not agreed to pay and unsigned contracts he knew had not been finalized or approved by the customer.  This caused Headspin's financial metrics to be materially overstated in its financial statements, including Headspin's revenue, revenue growth, and profit metrics.  LACHWANI also sent Headspin's accountant forged and altered invoices to decrease Headspin's unbilled receivables in an effort to conceal the fake revenue numbers LACHWANI had previously caused Headspin's accountant to record.  LACHWANI knowingly and intentionally transmitted these false financial statements to potential investors to obtain their investments in Headspin and to inflate Headspin's valuation in connection with Headspin's capital raises.

16.     In or about October 2017, LACHWANI asked a Headspin employee to prepare a template that LACHWANI could use to record and forecast Headspin's ARR.  The employee created a shared spreadsheet that LACHWANI subsequently controlled and used to track Headspin's sales and ARR, including at the customer level.  LACHWANI falsified the spreadsheet by (1) indicating that Headspin was receiving ARR from certain companies that did not subscribe to Headspin's software and services, (2) overstating ARR from certain customers and resellers who were Headspin customers at lower dollar amounts than was represented in the spreadsheet, and (3) leaving customers (and corresponding ARR) in the spreadsheet after those customers had terminated their Headspin

**GA-8**

subscriptions and thus were no longer paying Headspin.  LACHWANI used the information and calculations in the spreadsheet in investor decks that were communicated to potential investors, and also shared the spreadsheet itself with certain investors.

17.     For example, LACHWANI caused the following false sales, revenue, and ARR information to be incorporated into Headspin's financial statements, information, and forecasts:

a.  In or about December 2016, LACHWANI instructed Headspin's accountant to record revenue in connection with a purported $1.355 million deal between Headspin and a company that creates and markets video games ("Non-Customer 1") even though LACHWANI knew that Non-Customer 1 was not a Headspin customer and never became a customer.  LACHWANI also provided Headspin's accountant an unsigned service agreement purportedly between Non-Customer 1 and Headspin and Headspin's accountant subsequently recorded revenue.

b.  LACHWANI caused Headspin to record $92,000 of ARR from a national media company ("Non-Customer 2") even though he knew that Non-Customer 2 was not a Headspin customer.

c.  LACHWANI caused Headspin to record $225,000 of revenue in 2018 from a major Silicon Valley technology company ("Non-Current Customer 1") even though LACHWANI knew Non-Current Customer 1 ended its subscription in approximately July 2017 and only ever purchased a total of approximately $144,900 of software and services from Headspin.

d.  LACHWANI caused Headspin to record $1.44 million of ARR from a major technology company based in San Francisco ("Non-Current Customer 2") even though LACHWANI knew the company ended its subscription and only ever purchased a total of approximately $720,000 of software and services from Headspin.  LACHWANI created three fake invoices that were never issued to Non-Current Customer 2 and submitted them to Headspin's accountant.

e.  LACHWANI caused Headspin to record $250,000 of ARR from a major credit card company ("Non-Current Customer 3") even though LACHWANI knew

GA-9

Non-Current Customer 3 canceled its subscription after less than a year and the annual value of Non-Current Customer 3's contract prior to cancellation was only $132,000.

    f.   LACHWANI caused Headspin to record over $20 million of ARR from a reseller based in India ("Reseller 1") even though LACHWANI knew that actual ARR from Reseller 1 was materially less.

    g.   LACHWANI caused Headspin to record over $10 million of ARR from a reseller based in Australia ("Reseller 2") even though LACHWANI knew that actual ARR from Reseller 2 was materially less. LACHWANI altered or caused to be altered invoices that had been issued to Reseller 2 before sending them to Headspin's accountant. For example, on approximately March 26, 2019, Headspin issued Reseller 2 an invoice for $81,600 Australian Dollars (AUD) that was subsequently paid. LACHWANI received a copy of the invoice. On approximately June 28, 2019, LACHWANI sent Headspin's accountant an altered version of the same invoice in the amount of $381,600 United States dollars (USD). On the same day, LACHWANI sent three other altered invoices to Headspin's accountant. These invoices had been changed from $21,250 USD to $212,400 USD, $64,100 USD to $300,500 USD, and $243,150 USD to $1,187,150 USD. These falsified invoices were never submitted to Reseller 2 and Headspin never received payment for the falsified amounts.

18.    In 2017, in connection with soliciting interest in convertible promissory notes, LACHWANI sent potential investors decks that contained false and overstated revenue and profit figures, false and overstated ARR figures, and false product information. These metrics were material to the valuation of Headspin and to investors' decisions to purchase convertible notes in Headspin. For example, one investor deck provided to Investor 3 falsely stated that Headspin's ARR was $8,336,000 at the end of 2016 and $17,640,500 at the end of the third quarter of 2017. The deck also included slides on Headspin's financials that materially overstated Headspin's revenue and profit.

19.    The decks sent to potential investors in connection with Headspin's convertible notes

GA-10

1   offerings included materially false representations about Headspin's customers and services.  For

2   example, one deck provided to investors represented that Headspin operated over 22,000 devices on its

3   remote testing network in 150 cities and 80 countries, when in fact, Headspin operated fewer than 3,000

4   devices on its network in fewer cities and countries.  The deck also stated that Headspin was "trusted"

5   by more than 1,000 companies worldwide when Headspin, in fact, had far fewer customers.  In

6   communicating these false statements to potential investors, LACHWANI knowingly misrepresented

7   Headspin's customer success and adoption.

8       20.     In or about the Summer and Fall of 2018, in connection with soliciting interest in the

9   Series B financing round, LACHWANI sent potential investors decks that contained false and overstated

10  revenue and profit figures, false and overstated ARR figures, and false product information.  These

11  metrics were material to the valuation of Headspin and to investors' decisions to purchase stock in

12  Headspin.  For example, one version of the deck sent to potential investors falsely stated that Headspin's

13  ARR was $33,775,997 as of the second quarter of 2018, when in fact Headspin's actual ARR at that

14  time was less than half that amount.  The deck also contained false and misleading ARR projections for

15  future quarters and years.  Further, the deck provided purported total revenue figures from certain

16  customers and resellers, some of which was materially overstated.  The deck also included a slide on

17  Headspin's financials that materially overstated Headspin's revenue and profit.

18      21.     The decks sent to investors in connection with the Series B offering also included

19  materially false representations about Headspin's customers and services.  For example, one deck

20  provided to investors represented that Headspin operated over 25,000 devices on its remote testing

21  network, when in fact, Headspin operated fewer than 3,000 devices on its network.  The deck also

22  included logos of companies that either had never subscribed to Headspin's services or had previously

23  terminated Headspin's services.  The deck further falsely claimed that Headspin had "No Customer

24  Loss," which was not true. In communicating these false statements to potential investors, LACHWANI

25  knowingly misrepresented Headspin's customer success and adoption.

26      22.     On April 10, 2019, LACHWANI emailed Investor 1 Headspin's 2018 financial

27  statements.  These financial statements contained materially false representations, including materially

28  false and inflated revenue and profit metrics.  In May 2019, LACHWANI sold 68,000 of his personal

**GA-11**

Headspin shares to Investor 1 for approximately $2.5 million.  The price per share of the transaction valued Headspin at approximately $750 million.

23.     In or about the Summer and Fall of 2019, in connection with soliciting interest in the Series C financing round, LACHWANI sent potential investors decks containing false and overstated revenue and profit figures, false and overstated ARR figures, and false product information.  For example, one of the decks sent to investors falsely stated that Headspin's ARR was $54,658,095 as of the second quarter of 2019, when Headspin's actual ARR was less than a quarter of that amount.  The deck also contained false and misleading ARR projections for future quarters and years.  A different deck sent to Investor 3 prior to its Series C investment falsely stated that Headspin had revenues of over $35 million over the first three quarters of 2019 when, in fact, Headspin's revenues for that time period were less than $8 million.

24.     The decks sent to investors in connection with the Series C offering also expanded the materially false representations about Headspin's customers and services.  For example, one of the decks sent to investors represented that Headspin operated over 32,000 devices, when in fact, Headspin operated fewer than 3,000 devices on its network.  The deck also included logos of additional companies that had never contracted for Headspin's services or had terminated Headspin's services.  In communicating these false statements to potential investors, LACHWANI continued to knowingly misrepresent Headspin's customer success and adoption.

25.     After receiving false and misleading statements, misrepresentations, and omissions from LACHWANI and Headspin, persons and entities known to the Grand Jury as Investors 1, 2, 3, 4, 5, and 6 initiated electronic wire transfers for the purpose of investing money in Headspin.  These wires, specifically alleged below, used a domestic electronic funds transfer system known as the Fedwire system, which is owned and operated by the United States Federal Reserve system.  All Fedwire wire transfers were electronically routed through Fedwire centers outside of California and into Headspin's bank account in the Northern District of California, or, with respect to Count 1, from Investor 3's bank account in the Northern District of California to Headspin's LPL Financial brokerage account, or with respect to Count 6, from Investor 1's bank account in the Northern District of California to LACHWANI's personal brokerage account at LPL Financial.  All of the wire transfers alleged in this

**GA-12**

Superseding Indictment travelled between one state and another state.

26. LACHWANI maintained and controlled a brokerage account held in the name of Headspin from at least in or about April 2017 until in or about April 2020. LACHWANI transferred large amounts of Headspin funds into that brokerage account, including funds obtained from investors in the Series B and Series C financing rounds, and the brokerage account held the majority of the Headspin's cash on hand. The Headspin cash on hand was intended to fund the company's continued operation, and investors, shareholders, and board members expected these funds to be invested in conservative and safe investment vehicles such as money market funds and certificates of deposit. Instead, contrary to earlier instructions and guidance from a Headspin board member that investor funds should be held in conservative instruments, LACHWANI used those funds to make risky bets in the stock market including purchasing technology company stocks and stock options. For example, on or about December 31, 2018, the brokerage account held assets valued at approximately $35,164,318, and approximately 97.38 percent of that amount was allocated to shares of stock and stock options of technology and financial companies, with only approximately 2.62 percent in cash or cash equivalents. At another point, on or about March 31, 2020, the brokerage account held assets valued at approximately $54,038,192, and approximately 93.58 percent of that amount was allocated to shares of stock and stock options of technology and financial companies, with only approximately 6.42 percent in cash or cash equivalents. These risky investments exposed Headspin and its investors and shareholders to risks inconsistent with LACHWANI's statements and contrary to his fiduciary duty to the company and its shareholders. LACHWANI had a duty to disclose these investments to Headspin's directors and investors, but he concealed these risky investments from them.

27. The convertible promissory notes purchased by Headspin's investors were investment contracts and constitute securities under the provisions of Title 15, United States Code, Section 78j(b) and Title 17, Code of Federal Regulations, Section 240.10b-5.

28. Investors in Headspin's Series B and C offerings were issued shares of Headspin stock, and those shares of Headspin constitute securities under the provisions of Title 15, United States Code, Section 78j(b) and Title 17, Code of Federal Regulations, Section 240.10b-5. LACHWANI's misrepresentations alleged were in connection with the purchase and sale of Headspin shares and

**GA-13**

convertible promissory notes.

COUNTS ONE THROUGH ELEVEN: (18 U.S.C. §§ 1343 and 2 – Wire Fraud)

29.    Paragraphs 1 through 30 of this Superseding Indictment are re-alleged and incorporated as if fully set forth here.

30.    From a time unknown but no later than in or about December 2016 through in or about April 2020, within the Northern District of California and elsewhere, the defendant,

MANISH LACHWANI,

knowingly and with the intent to defraud participated in, devised, and intended to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts, and for the purpose of executing the aforementioned scheme and artifice to defraud, did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of wire communications, certain writings, signs, signals, pictures, and sounds, that is electronic funds transfers and payments, or stock purchase orders transmitted in interstate commerce, as set forth below:

| COUNT | DATE | AMOUNT | WIRE TRANSMISSION |
|---|---|---|---|
| 1 | 1/19/2018 | $1,000,000.00 | Wire transfer from Investor 3's Silicon Valley Bank account to Headspin's LPL Financial brokerage account |
| 2 | 9/12/2018 | $1,033,115.69 | Wire transfer from Investor 1's First Republic Bank account to Headspin's Wells Fargo account |
| 3 | 9/18/2018 | $1,000,000.00 | Wire transfer from Investor 4's JP Morgan Chase account to Headspin's Wells Fargo account |
| 4 | 10/15/2018 | $199,980.13 | Wire transfer from Investor 5's Charles Schwab account to Headspin's Wells Fargo account |
| 5 | 10/15/2018 | $1,664,997.70 | Wire transfer from Investor 3's Silicon Valley Bank account to Headspin's Wells Fargo account |
| 6 | 5/30/2019 | $1,291,756.36 | Wire transfer from Investor 1's First Republic Bank account to LACHWANI's LPL Financial brokerage account |
| 7 | 11/1/2019 | $7,748,401.27 | Wire transfer from Investor 1's First Republic Bank account to Headspin's Wells Fargo account |
| 8 | 11/1/2019 | $14,999,988.43 | Wire transfer from Investor 2's JP Morgan Chase account to Headspin's Wells Fargo account |
| 9 | 1/30/2020 | $1,999,962.76 | Wire transfer from Investor 3's Silicon Valley Bank account to Headspin's Wells Fargo account |

GA-14

| COUNT | DATE | AMOUNT | WIRE TRANSMISSION |
|-------|------|--------|-------------------|
| 10 | 2/24/2020 | $3,462,120.00 | Stock purchase order for 100,000 shares of Virgin Galactic Holdings Inc., public company traded on the New York Stock Exchange, executed a price of $34.6212 per share |
| 11 | 2/25/2020 | $49,997.86 | Wire transfer from Investor 6's JP Morgan Chase account to Headspin's Wells Fargo account |

All in violation of Title 18, United States Code, Sections 1343 and 2.

COUNT TWELVE:   (18 U.S.C. § 1957 – Money Laundering)

31.     Paragraphs 1 through 32 of this Superseding Indictment are re-alleged and incorporated as if fully set forth here.

32.     On or about the date listed in the table below, such dates being approximate, in the Northern District of California and elsewhere, the defendant,

MANISH LACHWANI,

knowingly engaged in the following monetary transaction, in and affecting interstate and foreign commerce, which involved the proceeds of specified unlawful activity in excess of $10,000, specifically wire fraud, in violation of 18 U.S.C. § 1343, knowing that the property involved in the financial transaction represented the proceeds of some form of unlawful activity as follows:

| COUNT | DATE | DESCRIPTION OF THE MONETARY TRANSACTION |
|-------|------|------------------------------------------|
| 12 | 6/6/2019 | Purchase of Advanced Micro Devices Inc. stock for $2,002,469.05. |

All in violation of Title 18, United States Code, Sections 1957.

COUNTS THIRTEEN THROUGH SIXTEEN:      (15 U.S.C. § 78j(b) and 78ff; 17 C.F.R. § 240.10b-5 – Securities Fraud)

33.     Paragraphs 1 through 34 of this Superseding Indictment are re-alleged and incorporated as if fully set forth here.

34.     Beginning at an unknown date, but no later than in or about December 2016, and continuing to in or about April 2020, both dates being approximate and inclusive, in the Northern District of California and elsewhere, the defendant,

MANISH LACHWANI,

GA-15

willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate

commerce, and of the mails, and of facilities of national securities exchanges, in connection with the

purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances

by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material

fact and omitting to state material facts necessary in order to make the statements made, in the light of

the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and

courses of business which operated and would operate as a fraud and deceit upon persons, specifically,

the use of the above devices, schemes and artifices to defraud, false statements and omissions of

material facts, and acts of fraud and deceit in connection with the following securities offerings to

investors conducted during the following approximate time periods:

| COUNT | DATE | OFFERING |
|-------|------|----------|
| 13 | December 2017 to January 2018 | Convertible promissory notes issued to Investor 3 and others |
| 14 | August to September 2018 | Series B Preferred Stock Offering |
| 15 | May 2019 | LACHWANI secondary sale of 68,000 Headspin shares to Investor 1 |
| 16 | November 2019 to April 2020 | Series C Preferred Stock Offering |

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of

Federal Regulations, Section 240.10b-5.

FORFEITURE ALLEGATION:        (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(1))

35.     The allegations contained in this Superseding Indictment are re-alleged and incorporated

by reference for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section

981(a)(1)(C) and Title 28, United States Code, Section 2461(c).

36.     Upon conviction for any of Counts One through Eleven, and Counts Thirteen through

Sixteen, as set forth in this Superseding Indictment, the defendant,

MANISH LACHWANI,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and

Title 28, United States Code, Section 2461(c), all property, real or personal, constituting, or derived

GA-16

from proceeds the defendant obtained directly and indirectly, as the result of those violations, including, but not limited to, a forfeiture money judgment.

37. Upon conviction for the offense set forth in Count Twelve of this Superseding Indictment, the defendant,

MANISH LACHWANI,

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(1), all property, real or personal, involved in said violations, or any property traceable to such property, including, but not limited to, all Advanced Micro Devices Inc. stock purchased on June 6, 2019, and a forfeiture money judgment.

If any of the property described above, as a result of any act or omission of the defendant:

      a.    cannot be located upon exercise of due diligence;

      b.    has been transferred or sold to, or deposited with, a third party;

      c.    has been placed beyond the jurisdiction of the court;

      d.    has been substantially diminished in value; or

      e.    has been commingled with other property which cannot be divided without difficulty,

the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

//
//
//
//
//
//
//
//
//
//

GA-17

1       All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States

2 Code, Section 2461(c); Title 18, United States Code, Section 982(a)(1); and Federal Rule of Criminal

3 Procedure 32.2.

4

5 DATED:      August 3, 2022                   A TRUE BILL.

6

7                                                _____/s/_____

8                                           FOREPERSON

9 STEPHANIE M. HINDS
  United States Attorney

10

11  _____/s/_____
  LLOYD FARNHAM

12 NOAH STERN
  ROSS WEINGARTEN

13 Assistant United States Attorneys

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GA-18**

AO 257 (Rev. 6/78)

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT  ☐ INFORMATION  ☐ INDICTMENT  ☒ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

### OFFENSE CHARGED

18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 1957 - Money Laundering
15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 –
Securities Fraud;
18 U.S.C. §§ 981(a)(1)(C), 982, & 28 U.S.C. § 2461(c) – Criminal
Forfeiture

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:  See attachment

┌─ DEFENDANT - U.S ─────────

▶ Manish Lachwani

DISTRICT COURT NUMBER

21-CR-00353 CRB

**FILED**

Aug 04 2022

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

### DEFENDANT

**IS *NOT* IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☐ If not detained give date any prior
summons was served on above charges ▶

2) ☐ Is a Fugitive

3) ☒ Is on Bail or Release from (show District)

NDCA

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction
} ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges

If answer to (6) is "Yes", show name of institution

### PROCEEDING

Name of Complainant Agency, or Person (& Title, if any)

FBI Special Agent James Burstein

☐ person is awaiting trial in another Federal or State Court,
give name of court

☐ this person/proceeding is transferred from another district
per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of
charges previously dismissed
which were dismissed on motion
of:
☐ U.S. ATTORNEY  ☐ DEFENSE
} SHOW DOCKET NO.

☒ this prosecution relates to a
pending case involving this same
defendant
} MAGISTRATE CASE NO.

☐ prior proceedings or appearance(s)
before U.S. Magistrate regarding this
defendant were recorded under
}

Name and Office of Person
Furnishing Information on this form      Stephanie M. Hinds

☒ U.S. Attorney  ☐ Other U.S. Agency

Name of Assistant U.S.
Attorney (if assigned)      Noah Stern

Has detainer ☐ Yes   } If "Yes"
been filed?  ☐ No      give date
                        filed

**DATE OF ARREST** ▶      Month/Day/Year

Or... if Arresting Agency & Warrant were not

**DATE TRANSFERRED TO U.S. CUSTODY** ▶      Month/Day/Year

☐ This report amends AO 257 previously submitted

### ADDITIONAL INFORMATION OR COMMENTS

PROCESS:

☐ SUMMONS  ☒ NO PROCESS*  ☐ WARRANT      Bail Amount: _____

If Summons, complete following:
☐ Arraignment  ☐ Initial Appearance

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment*

Defendant Address:

Date/Time: _____      Before Judge: _____

Comments:

**GA-19**

# Penalty Sheet Attachment

# United States v. Lachwani, 21-cr-00353 CRB

**Counts 1-11: Wire Fraud, 18 U.S.C. § 1343**

- Maximum Sentence: 20 years
- Maximum Fine: $250,000 or twice the gross gain or loss
- Maximum Length of Supervised Release: 3 years
- Restitution
- Special Assessment of $100 per felony count
- Forfeiture

**Count 12: Engaging in Monetary Transactions in Property Derived from Specified Unlawful Activity, 18 U.S.C. § 1957**

- Maximum Sentence: 10 years
- Maximum Length of Supervised Release: 3 years
- Maximum Fine: $250,000 or twice the amount of the criminally derived property involved in the transaction
- Restitution
- Special Assessment of $100
- Forfeiture

**Counts 13-16: Securities Fraud, 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5**

- Maximum Sentence: 20 years
- Maximum Fine: $5,000,000
- Maximum Length of Supervised Release: 3 years
- Restitution
- Special Assessment of $100 per felony count
- Forfeiture

**GA-20**

ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

THOMAS A. COLTHURST (CABN 99493)
Chief, Criminal Division

LLOYD FARNHAM (CABN 202231)
NOAH STERN (CABN 297476)
ROSS WEINGARTEN (NYBN 5236401)
Assistant United States Attorney

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-7200
     lloyd.farnham @ usdoj.gov

Attorneys for United States of America

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>  v.<br><br>MANISH LACHWANI,<br><br>    Defendant. | NO. 21-CR-00353 CRB<br><br>PLEA AGREEMENT |

I, Manish Lachwani, and the United States Attorney's Office for the Northern District of California (hereafter "the government") enter into this written Plea Agreement (the "Agreement") pursuant to Rule 11(c)(1)(A) and 11(c)(1)(B) of the Federal Rules of Criminal Procedure:

The Defendant's Promises

    1.    I agree to plead guilty to Counts Three, Seven, and Thirteen of the captioned Superseding Indictment charging me with Wire Fraud in violation of 18 U.S.C. § 1343 and Securities Fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5.

    I agree that the elements of Wire Fraud are as follows: (1) I knowingly participated in, devised, or intended to devise a scheme or artifice to defraud, or a scheme or artifice for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; (2) the statements made

GA-21

or facts omitted as part of the scheme were material; (3) I acted with the intent to defraud; that is, the

intent to deceive and cheat; and (4) I used, or caused to be used, an interstate wire communication to

carry out or attempt to carry out an essential part of the scheme.

I agree that the maximum penalties for Wire Fraud are as follows:

| | | |
|---|---|---|
| a. | Maximum prison term | 20 years |
| b. | Maximum fine | $ 250,000 |
| c. | Restitution | As determined by the Court |
| d. | Maximum supervised release term | 3 years |
| e. | Mandatory special assessment | $100 per felony count |
| f. | Potential Deportation | |
| g. | Forfeiture | |

I agree that the elements of Securities Fraud are as follows: (1) I willfully used a device or

scheme to defraud, made an untrue statement of a material fact, failed to disclose a material fact that

resulted in making the statements misleading, or engaged in any act, practice, or course of business that

operates or would operate as a fraud or deceit; (2) my acts, statements, or failure to disclose was in

connection with the purchase or sale of a security; (3) I directly or indirectly used a means or

instrumentality of interstate commerce or of the mails, or of any facility of any national securities

exchange; and (4) I acted knowingly.

I agree that the maximum penalties for Securities Fraud are as follows:

| | | |
|---|---|---|
| h. | Maximum prison term | 20 years |
| i. | Maximum fine | $ 5,000,000 |
| j. | Restitution | As determined by the Court |
| k. | Maximum supervised release term | 3 years |
| l. | Mandatory special assessment | $100 per felony count |
| m. | Potential Deportation | |
| n. | Forfeiture | |

I understand that I am pleading guilty to multiple violations and that the Court may order that my

sentence for each violation run consecutively.

I acknowledge that it is virtually certain that pleading guilty will have consequences with respect

to my immigration status if I am not a natural born citizen of the United States. Under federal law, a

broad range of crimes are removable offenses, including the offenses to which I am pleading guilty.

Removal and other immigration consequences are the subject of a separate proceeding, however, and I

understand that no one, including my attorney or the district court, can predict to a certainty the effect of

PLEA AGREEMENT      2
21-CR-00353 CRB

**GA-23**

this conviction on my immigration status. I nevertheless affirm that I want to plead guilty regardless of any immigration consequences that may result from my guilty pleas, even if the consequence is my automatic removal from the United States. I also acknowledge that there are no identical or substantially similar charges to non-removable offenses to which the government would agree.

2. I agree that I am guilty of the offenses to which I am pleading guilty, and I agree that the following facts are true:

I founded HeadSpin, Inc. in 2015, and served as its CEO from 2015 until May 2020. HeadSpin is a software-as-a-service (SaaS) company that provided its clients with software tools and access to remote devices around the world that allow the clients to test mobile applications and browsers on mobile devices, browsers, and networks in those locations. I was one of the inventors on thirteen patents related to mobile device testing that were assigned to HeadSpin while I was with the company. HeadSpin raised investments to fund its operations and growth, including the following funding rounds: Between April 2017 and May 2018, HeadSpin raised a total of $24.7 million by issuing convertible notes; between September and October 2018, HeadSpin raised $20 million in a Series B preferred stock offering; and between November 2019 and April 2020, HeadSpin raised $60 million in a Series C preferred stock offering.

When HeadSpin was raising money from investors in those funding rounds, prospective investors were provided with information about the company's business, customers, revenue, and finances. I knew that one metric to assess the past success and forecasted growth for a SaaS company such as HeadSpin was the calculation of annual recurring revenue, or "ARR." ARR is a measure of a company's subscription revenue rate at a particular point in time, annualized to show revenue the company would expect to make, at that rate, over an entire year.

Starting no later than October 2017, I sent, or directed HeadSpin employees to send, potential investors financial information that overstated HeadSpin's revenue and ARR. I knew that ARR and revenue provided to investors were overstated because they included revenue regarding certain customers that had not entered contracts or agreements to pay subscription fees to HeadSpin, amounts that were more than certain customers had agreed to pay in subscription fees, and revenue for at least one customer I knew had stopped using and paying for HeadSpin

PLEA AGREEMENT
21-CR-00353 CRB

3

**GA-25**

services. HeadSpin's financial records included overstated revenue because in some cases I provided HeadSpin's accountant with revenue amounts for customers I knew had not yet entered contracts.

I also maintained and controlled an internal ARR spreadsheet that purported to include, for each HeadSpin customer, the subscription fees forecasted, owed or paid to HeadSpin. I knew that the spreadsheet overstated the subscription fees and contracts for certain customers and included customers that had not yet agreed to use the service by signing a contract or issuing a purchase order. The ARR spreadsheet was shared with certain potential investors and investors.

In 2018, in connection with the Series B financing round, I sent, or directed HeadSpin employees to send, slide decks to prospective investors that I knew contained overstated ARR. For example, one version of the slide deck sent to investors stated that HeadSpin's ARR was more than $33 million as of the second quarter of 2018, when I knew this number was overstated.

In 2019, in connection with the Series C financing round, I sent, or directed HeadSpin employees to send, slide decks that I knew contained overstated ARR. For example, one of the slide decks sent to investors at this time stated that HeadSpin's ARR was more than $54 million as of the second quarter of 2019, when I knew this number was overstated.

I knew the overstated information about ARR was significant to certain investors and their decisions to invest in HeadSpin. In 2019, as part of the scheme, I sent HeadSpin's accountant invoices I knew were altered to show amounts that were not actually invoiced, and HeadSpin investors thereafter received financial statements that were impacted by certain of the altered invoices.

Some of the investments in the Series B and Series C rounds were sent to HeadSpin accounts by wire transfers, including the investments referred to in Counts Three and Seven of the Superseding Indictment. The Series B and Series C investors obtained shares of HeadSpin. Other investors provided funds to HeadSpin in exchange for convertible notes, contracts that gave those investors certain rights to later obtain shares of HeadSpin, as alleged in Count Thirteen.

PLEA AGREEMENT                                    4
21-CR-00353 CRB

**GA-27**

GA-28

3.    I agree to give up all rights that I would have if I chose to proceed to trial, including the rights to a jury trial with the assistance of an attorney; to confront and cross-examine government witnesses; to remain silent or testify; to move to suppress evidence or raise any other Fourth or Fifth Amendment claims; to any further discovery from the government; and to pursue any affirmative defenses and present evidence.

4.    I agree to give up my right to appeal my conviction, including constitutional challenges to the statutes of conviction. I agree to give up my right to appeal the judgment and all orders of the Court. I also agree to give up my right to appeal any aspect of my sentence, including any orders relating to forfeiture and/or restitution, reserving only my right to claim that my sentence violated this plea agreement, applicable law, or the Constitution. I reserve my right to claim that my counsel was ineffective. I understand that this waiver includes, but is not limited to, any and all constitutional or legal challenges to my convictions and guilty pleas, including arguments that the statutes to which I am pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support my pleas of guilty.

5.    I agree not to file any collateral attack on my conviction or sentence, including a petition under 28 U.S.C. § 2255 or 28 U.S.C. § 2241, except that I reserve my right to claim that my counsel was ineffective.

6.    I agree not to ask the Court to withdraw my guilty pleas at any time after they are entered. In the event I violate any of the terms of the Agreement, I agree that the facts set forth in Paragraph 2 of this Agreement and, if applicable, the fact that I made a sworn admission to them in a previous court proceeding, shall be admissible against me in any subsequent proceeding, including at trial. In any subsequent proceeding conducted after I violate any of the terms of the Agreement, I expressly waive any and all rights under Fed. R. Crim. P. 11(f) and Fed. R. Evid. 410 with regard to the facts set forth in Paragraph 2 of the Agreement and, if applicable, the fact that I made a sworn admission to them at a previous court proceeding.

7.    I understand that the Court must consult the United States Sentencing Guidelines and take them into account when sentencing, together with the factors set forth in 18 U.S.C. § 3553(a). I also understand that the Court is not bound by the agreement of the parties on the calculation of the

1  Guidelines as set forth below; the Court may conclude that the Guidelines shall be calculated differently,

2  and, if it does, I will not be entitled, nor will I ask, to withdraw my guilty pleas.  I further agree that

3  regardless of the sentence that the Court imposes on me, I will not be entitled, nor will I ask, to

4  withdraw my guilty pleas.  I reserve the right to seek a downward variance based on the factors set forth

5  in 18 U.S.C. § 3553(a).  I understand that the government is free to oppose any such request. The parties

6  have reached no agreement regarding my Criminal History Category.

7      The parties agree to the following regarding the Guidelines calculation:

8          The Counts to which the defendant is pleading guilty are grouped under
           USSG § 3D1.2.
9
           The applicable base offense level is 7, under USSG § 2B1.1(a)(1).
10
           A two-level reduction of the offense level applies under USSG § 3E1.1(a),
11         for acceptance of responsibility.

12      The parties have not reached an agreement regarding the loss attributable to the offense conduct

13  in this case under USSG § 2B1.1(b)(1).  The parties agree that there were 10 or more investors involved

14  in the offense, but the defendant disputes that those investors are "victims" as defined in the application

15  notes to USSG § 2B1.1 because they did not suffer an "actual loss," and therefore the parties have not

16  reached an agreement regarding the applicability of a two-level upward adjustment under USSG

17  § 2B1.1(b)(2)(A).

18      If the government determines that the defendant forthrightly admits guilt, cooperates with the

19  Court and the Probation Office in any presentence investigation ordered by the Court, and continues to

20  manifest an acceptance of responsibility through and including the time of sentencing, the government

21  will request an additional one-point reduction of the offense level under USSG § 3E1.1(b).

22      8.      I agree that regardless of any other provision of this Agreement, the government may and

23  will provide the Court and the Probation Office with all information relevant to the charged offenses and

24  the sentencing decision, including Victim Impact Statements.  I agree that, based the nature of the

25  offense, the Court should impose the following special condition of supervised release which is

26  reasonably related to deterrence and rehabilitation:

27          Special Condition (Searches)
           The defendant shall submit his person, residence, office, vehicle, electronic devices and
28         their data (including cell phones, computers, and electronic storage media), and any
           property under defendant's control to a search.  Such a search shall be conducted by a

PLEA AGREEMENT                                6
21-CR-00353 CRB

**GA-30**

1   United States Probation Officer or any federal, state, or local law enforcement officer at
    any time, with or without suspicion. Failure to submit to such a search may be grounds
2   for revocation; the defendant shall warn any residents that the premises may be subject to
    searches.
3

4   9.      I agree that I will make a good-faith effort to pay any fine, forfeiture, or restitution I am

5   ordered to pay. I agree to pay the special assessment at the time of sentencing.

6           I agree to pay full restitution for all losses caused by all the schemes or offenses with which I

7   was charged in this case, and I understand that the amount of restitution will not be limited to the loss

8   attributable to the counts to which I am pleading guilty, pursuant to 18 U.S.C. § 3663(a)(3). I

9   understand that the Court will not consider my economic circumstances in determining the restitution

10  amount. I agree to pay restitution in an amount to be set by the Court at the time of sentencing.

11          Any restitution payments shall be paid through the Office of the Clerk of the District Court by

12  bank or cashier's check or money order made payable to the "Clerk, United States District Court."

13          I understand that the restitution described above creates a lien in favor of the United States on all

14  property and rights to property I may possess upon entry of judgment and continues for the later of 20

15  years from the entry of judgment or 20 years after release from imprisonment or until the debt is paid in

16  full. I further understand the government will record a notice of the lien in any county where I reside or

17  have property. I further understand that this order of restitution cannot be discharged in bankruptcy and

18  that if I default on the payment of a fine or restitution, the Court may revoke probation or a term of

19  supervised release, modify the terms or conditions of probation or supervised release, resentence me,

20  hold me in contempt of court, order the sale of property, enter or adjust a payment schedule, or take any

21  other action necessary to obtain compliance.

22          Within thirty days of the execution of this Plea Agreement, if asked by the Financial Litigation

23  Unit ("FLU") of the United States Attorney's Office, I agree to complete, under penalty of perjury, a

24  financial statement provided by the U.S. Attorney's Office and to update that statement with material

25  changes within seven days of the change. I understand that I must identify all assets and financial

26  interests valued at more than $1,000. I further understand that these assets and financial interests

27  include all assets and financial interests in which I have an interest, direct or indirect, whether held in

28  my own name or in the name of another, in any property, real or personal.

PLEA AGREEMENT                              7
21-CR-00353 CRB

**GA-32**

1    I agree to surrender assets I obtained as a result of my crimes, and release funds and property

2 under my control in order to pay any fine, forfeiture, or restitution. I further agree to notify the FLU

3 before transferring any interest in property owned directly or indirectly by me, including any interest

4 held or owned under any other name or entity, including trusts, partnerships, and/or corporations. I also

5 agree to notify the FLU of any interest in property I may obtain, directly or indirectly, which is valued at

6 more than $1,000, and which includes any interest obtained under any other name, or entity, including a

7 trust, partnership, or corporation, after the execution of this Plea Agreement until the fine or restitution

8 is paid in full.

9    I agree that any fine, forfeiture, or restitution imposed by the Court against me will be due

10 immediately and subject to immediate enforcement by the government as authorized by 18 U.S.C.

11 § 3613. I further understand that the government may seek immediate collection of the entire fine,

12 forfeiture, or restitution from any assets without regard to any schedule of payments imposed by the

13 Court or established by the Probation Office and that monetary penalties imposed by the Court will be

14 submitted to the Treasury Offset Program so that any federal payment or transfer of returned property I

15 receive may be offset and applied to federal debts.

16    10.    I agree not to commit or attempt to commit any crimes before sentence is imposed or

17 before I surrender to serve my sentence. I also agree not to violate the terms of my pretrial release; not

18 to intentionally provide false information to the Court, the Probation Office, Pretrial Services, or the

19 government; and not to fail to comply with any of the other promises I have made in this Agreement. I

20 agree that if I fail to comply with any promises I have made in this Agreement, then the government will

21 be released from all of its promises in this Agreement, including those set forth in The Government's

22 Promises Section below, but I will not be released from my guilty pleas.

23    11.    I agree that this Agreement contains all of the promises and agreements between the

24 government and me, and I will not claim otherwise in the future. No modification of this Agreement

25 shall be effective unless it is in writing and signed by all parties.

26    12.    I agree that the Agreement binds the U.S. Attorney's Office for the Northern District of

27 California only, and does not bind any other federal, state, or local agency.

28

PLEA AGREEMENT                    8
21-CR-00353 CRB

**GA-33**

The Government's Promises

13.     The government agrees to move to dismiss any open charges pending against the defendant in the captioned Superseding Indictment at the time of sentencing.

14.     The government agrees not to file any additional charges against the defendant that could be filed as a result of the investigation that led to the captioned Superseding Indictment.

The Defendant's Affirmations

15.     I confirm that I have had adequate time to discuss this case, the evidence, and the Agreement with my attorney and that my attorney has provided me with all the legal advice that I requested.

16.     I confirm that while I considered signing this Agreement, and at the time I signed it, I was not under the influence of any alcohol, drug, or medicine that would impair my ability to understand the Agreement.

17.     I confirm that my decision to enter guilty pleas is made knowing the charges that have been brought against me, any possible defense, and the benefits and possible detriments of proceeding to trial. I also confirm that my decision to plead guilty is made voluntarily, and no one coerced or threatened me to enter into this Agreement.


Dated: _April 27th, 2023_                    _____
                                             MANISH LACHWANI
                                             Defendant


                                             ISMAIL J. RAMSEY
                                             United States Attorney

Dated: _April 27, 2023_                      _____
                                             LLOYD FARNHAM
                                             NOAH STERN
                                             ROSS WEINGARTEN
                                             Assistant United States Attorney


18.     I have fully explained to my client all the rights that a criminal defendant has and all the

PLEA AGREEMENT                          9
21-CR-00353 CRB

**GA-34**

1 terms of this Agreement. In my opinion, my client understands all the terms of this Agreement and all

2 the rights my client is giving up by pleading guilty, and, based on the information now known to me, my

3 client's decision to plead guilty is knowing and voluntary.

4

5

6 Dated: _4/27/2023_

7 JOHN H. HEMANN
Attorney for Defendant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLEA AGREEMENT                               10
21-CR-00353 CRB

**GA-35**

1  ISMAIL J. RAMSEY (CABN 189820)
   United States Attorney

2

3  MARTHA BOERSCH (CABN 126569)
   Chief, Criminal Division

4  LLOYD FARNHAM (CABN 202231)
   NOAH STERN (CABN 297476)

5  Assistant United States Attorneys

6        450 Golden Gate Avenue, Box 36055
         San Francisco, California 94102-3495

7        Telephone: (415) 436-7200
         FAX: (415) 436-7234

8        Lloyd.Farnham@usdoj.gov
         Noah.Stern@usdoj.gov

9
   Attorneys for United States of America

10
                    UNITED STATES DISTRICT COURT

11
                 NORTHERN DISTRICT OF CALIFORNIA

12
                    SAN FRANCISCO DIVISION

13

14  UNITED STATES OF AMERICA,               )   **CASE NO. CR 21-353 CRB**
                                            )
15           Plaintiff,                     )   **UNITES STATES' SENTENCING**
                                            )   **MEMORANDUM**
16      v.                                  )
                                            )   Sentencing Dates: December 13, 2023
17  MANISH LACHWANI,                        )                     January 17, 2024
                                            )   Time:             10:00 a.m.
18           Defendant.                     )   Judge:            Hon. Charles R. Breyer
                                            )
19  _____)

20

21

22

23

24

25

26

27

28

**GA-36**

**TABLE OF CONTENTS**

I.      INTRODUCTION ................................................................................................. 1

II.     BACKGROUND ................................................................................................... 2

        A.      Overview of Lachwani's Fraud Scheme ................................................. 2

        B.      Lachwani's Misrepresentations Regarding Revenue and ARR ............. 4

        C.      Lachwani Forged Customer Invoices in Support of His Scheme ........... 7

        D.      Lachwani Misrepresented Headspin's Product and Customer Adoption ..... 7

        E.      Lachwani Concealed His Risky Investments of Investor Funds ........... 8

        F.      The Discovery of the Fraud and Return of Fraud Proceeds .................. 9

        G.      Lachwani is Arrested and Charged, then Enters a Guilty Plea ........... 10

III.    SENTENCING GUIDELINES CALCULATIONS .......................................... 11

        A.      Lachwani's Fraud Resulted in a Loss of Over $90 Million, a 24-Level
                Adjustment .......................................................................................... 12

                1.      Legal Standard ......................................................................... 12

                2.      The Court Should Adopt the PSR Calculation of Loss—$92.73 Million
                        ..................................................................................................... 14

                3.      In the Alternative, if the Court Determines that Loss Should be
                        Reduced by the Value of Headspin Stock, a Reasonable Estimate of
                        Loss is $59 Million ................................................................... 16

                4.      The Loss Amount is Not Reduced by the Amount Returned to
                        Investors through the Recapitalization Transaction ................ 18

                5.      The Court Should Reject Lachwani's Other Factual Objections to the
                        PSR ............................................................................................ 20

        B.      Lachwani's Fraud Scheme Had More than Ten Victims ..................... 25

IV.     SENTENCING RECOMMENDATION .......................................................... 25

        A.      Legal Standard .................................................................................... 25

        B.      Lachwani's Brazen and Prolonged Fraud Scheme Warrants a Significant
                Sentence ............................................................................................. 26

**GA-37**

# TABLE OF AUTHORITIES

## CASES

*Gall v. United States*,
  552 U.S. 38 (2007)..................................................................................... 26

*Kharana v. Gonzales*,
  487 F.3d 1280 (9th Cir. 2007) .................................................................. 13

*United States v. Allison*,
  86 F.3d 940 (9th Cir. 1996) ...................................................................... 19

*United States v. Bakhit*,
  218 F. Supp. 2d 1232 (C.D. Cal. 2012) ................................................... 12

*United States v. Berger*,
  587 F.3d 1038 (9th Cir. 2009) ................................................ 12, 15, 18, 25

*United States v. Bright*,
  353 F.3d 1114 (9th Cir. 2004) .................................................................. 13

*United States v. Bryson*,
  101 F. Supp. 3d 147 (D. Conn. 2015)................................................. 13, 15

*United States v. Carty*,
  520 F.3d 984 (9th Cir. 2008) .................................................................... 26

*United States v. Chandia*,
  675 F.3d 329 (4th Cir. 2012) .................................................................... 14

*United States v. Fisher*,
  502 F.3d 293 (3d Cir. 2007)..................................................................... 14

*United States v. Garro*,
  517 F.3d 1163 (9th Cir. 2008) .................................................................. 14

*United States v. Geringer*,
  672 Fed. Appx 651 (9th Cir. 2016)........................................................... 15

*United States v. Geringer*,
  No. 12-cr-00888-EJD, 2016 WL 4791815, (N.D. Cal. Sept. 14, 2016) .......... 15

*United States v. Hussain*,
  No. 16-cr-00462-CRB, 2019 WL 1995764 (N.D. Cal. May 6, 2019) ............. 14

*United States v. Kimbrough*,
  522 U.S. 85 (2007).................................................................................... 26

*United States v. Laurienti*,
  611 F.3d 530 (9th Cir. 2010) .................................................................... 25

*United States v. Lonich*,
  23 F.4th 881 (9th Cir. 2022) ............................................................... 13, 14

*United States v. Lucas,*
    77 F.4th 1275 (9th Cir. 2023) ................................................................. 13

*United States v. McCray,*
    7 F.4th 40 (2d Cir. 2021) ........................................................................ 14

*United States v. Ressam,*
    679 F.3d 1069 (9th Cir. 2012) (en banc) ............................................... 25

*United States v. Stoddard,*
    150 F.3d 1140 (9th Cir. 1998) ................................................. 13, 18, 19

*United States v. Turk,*
    626 F.3d 743 (2d Cir. 2010) ................................................................... 13

*United States v. Walker-Couvertier,*
    860 F.3d 1 (1st Cir. 2017) ...................................................................... 14

*United States v. Zolp,*
    479 F.3d 715 (9th Cir. 2007) ..................................................... 12, 13, 15

**STATUTES**

18 U.S.C. § 3553(a) ........................................................................................ 25

**OTHER AUTHORITIES**

U.S.S.G. § 2B1.1(b) ............................................................................... passim

**GA-39**

## I.    INTRODUCTION

By the time defendant Manish Lachwani began committing fraud to obtain investments in his new start-up Headspin, he was a Silicon Valley veteran and already a success story, having sold his prior company to Google.  But driven by greed and armed with the knowledge of what he needed to say, what he needed to claim to investors, to make it appear that Headspin was already worthy of "unicorn" status, he turned the corner from hype to fraud.  He seized an opportunity to take advantage of venture capital and other technology investors, a system of capital raising that—when not preyed upon by unscrupulous actors like Lachwani—has fueled technology innovation in Silicon Valley and the Bay Area for decades. In many ways the story of Lachwani's fraud is familiar, lies to investors through inflated revenue, but in other ways he added his own personal flair, by falsely building on real sales of a useful product by adding numerous fake customers and adding extra zeros to invoices, among other things.

***Summary of the Argument:***  With respect to the appropriate application of the Sentencing Guidelines, including the adjustment for loss, the Court should adopt the guidelines calculation in the PSR, with a 24-level increase, because Lachwani's crime resulted in loss of more than $92 million.  This loss amount is based on a straightforward application of USSG § 2B1.1, because Lachwani obtained over $92 million from investors through his fraudulent and significant overstatement of Headspin financial performance and business.  The fact that Headspin ultimately returned a significant portion of the fraud proceeds does not reduce the loss amount because binding Ninth Circuit precedent holds that money returned after a fraud is discovered is not creditable against loss.  Similarly, the equity in Headspin investors received at the time of the fraud did not have a secured and recognizable value when they received it because they held equity in a company controlled by Lachwani that was the tool of a major fraud scheme and there was no market in which they could sell their shares.  If Headspin investors had been aware of the fraud permeating the information provided, they would not have invested.

Even if the Court finds that the Headspin equity had some value at the time of the fraud that must be deducted from the loss amount, the Court should find that Headspin's equity was overvalued by $59 million as a result of the fraud, and should apply a 22-level increase.  The government presents two reasonable estimates of the value of the Headspin equity based on the company's actual business in the absence of fraud, and those calculations show that the equity purchased by investors would have been

**GA-40**

worth about 25% of what they paid.  These estimates—one based on the negotiated repricing of the shares to reflect Headspin's actual business, the other based on applying a multiplier to Headspin's true ARR—corroborate each other and confirm that a reasonable estimate of the overvaluation of the equity is approximately $59 million.

This memorandum and accompanying documents lay out the government's view of the facts and circumstances of this case and Lachwani's conduct in advance of the first part of these sentencing proceedings.  Though the Court has indicated that the first hearing will address the loss calculation under the Sentencing Guidelines, the determination of loss is necessarily intertwined with the relevant conduct as defined by the Guidelines and, in order to provide the Court with the full picture of that conduct, this memorandum and supporting declarations and documents tells the story of the fraud, explains the intended and actual economic and financial harm to investors, and proves Lachwani's intent to defraud, because each of these areas is relevant to the application of the Guidelines.

## II.     BACKGROUND

### A.     Overview of Lachwani's Fraud Scheme

In 2015, Manish Lachwani founded HeadSpin, Inc. ("Headspin") and served as the company's CEO until May 2020.  Presentence Investigation Report ("PSR") ¶ 8.  HeadSpin is a software-as-a-service ("SaaS") company that develops software tools and markets access to remote devices around the world to allow the clients to test mobile applications, networks, and devices in those locations.  *Id.*

In order to use the testing and development tools, Headspin provided customers access to its software and services on a subscription model, charging customers based on the number of remote devices the customer could access to remotely test mobile applications using Headspin software.  *Id.* ¶ 9.  Headspin sold its software and services both directly to end customers (companies that wanted to test their own applications) and indirectly through resellers (which would offer Headspin's software to the resellers' end customers).  *Id.*

HeadSpin relied primarily on outside funding from venture capital firms and individuals for its launch and ongoing operations, and Headspin completed four major rounds of financing.  *Id.* ¶ 10.  Between about August and September 2015, Headspin raised $11 million in a "Series A" preferred stock offering.  *Id.*  Between about April 2017 and May 2018, Headspin raised $24.7 million through

1    issuances of convertible promissory notes that investors could "convert" to shares in the company.  *Id.*

2    Between about September and October 2018, Headspin raised $20 million in a "Series B" preferred

3    stock offering.  *Id.*  The price of the stock sold to investors in the Series B stock offering valued

4    Headspin at approximately $500 million.  *Id.*  Between about November 2019 and April 2020, Headspin

5    raised approximately $60 million from investors in a "Series C" preferred stock offering.  *Id.*  The price

6    of the stock sold to investors in the Series C stock offering valued Headspin at approximately $1.1

7    billion.  *Id.*  In total, Headspin raised more than $110 million from investors.  *Id.*  In May 2019, between

8    the Series B and C Preferred offerings, Lachwani personally sold some of his Headspin stock to an

9    existing company investor for $2.5 million, at a price that valued Headspin at approximately $750

10   million.  *Id.*  Headspin was and is a private company, and its shares have not traded on a public market.

11          Lachwani was directly involved in the solicitation of investors for each funding round and was

12   the person at the company primarily responsible for the information provided to potential investors or to

13   existing investors that were considering additional investments.  *Id.* ¶ 11; Arora Decl. ¶¶ 5, 8; Loukakos

14   Decl. ¶ 5.  The funding solicitations targeted well-known Silicon Valley venture capital funds and high-

15   net-worth individuals interested in investments in technology start-ups.  PSR ¶ 11.  A key piece of

16   information provided to all potential investors was the "pitch deck," and the pitch decks included

17   information about Headspin's operations, business plan, historical financial information, existing

18   customers, and revenue forecasts.  *Id.*; Investor 2 Decl. Ex. B.  Lachwani directed the preparation of the

19   pitch decks and had final signoff on the contents of these documents.  PSR ¶ 11.

20          In connection with these fundraising rounds and the secondary sale, Lachwani sent or directed

21   Headspin employees to send potential investors financial information that overstated Headspin's

22   revenue and Annual Recurring Revenue ("ARR").  *Id.* ¶ 14.  Headspin used a revenue model typical for

23   SaaS companies, and when an end user licenses software or services on a subscription basis, revenue is

24   recognized over the period of the subscription.  *See* Okmyanskaya Decl. ¶ 4.  Lachwani knew a critical

25   metric to assess the past success and forecasted growth for a SaaS company such as HeadSpin was the

26   calculation of ARR.  Plea Agmt. ¶ 2.  ARR is a measure of a company's subscription revenue rate at a

27   particular point in time, annualized to show revenue the company would expect to make, at that rate,

28   over an entire year.  *Id.*

**GA-42**

From the founding of the company to his termination in 2020, Lachwani maintained control over Headspin's operations, sales, and record-keeping. *Id.* ¶ 12; Arora Decl. ¶¶ 5, 8; Loukakos Decl. ¶ 5; *see generally* Okmyanskaya Decl. Lachwani controlled and was aware of significant aspects of the company's financial information, including financial figures, sales, and customer information, and he often restricted employees from speaking with each other about the company's finances. PSR ¶ 12. Lachwani often discouraged company sales representatives from discussing sales and revenue with other sales representatives or financial staff. *Id.* Headspin did not have formal accounting controls, policies, procedures, or a Chief Financial Officer. *Id.*; Arora Decl. ¶¶ 5, 8; Faris Decl. ¶ 6; *see generally* Okmyanskaya Decl. Lachwani was the final decision-maker regarding when, how, and whether the company would record sales and revenue. PSR ¶ 12; Okmyanskaya Decl. ¶ 5; Loukakos Decl. ¶ 5. The contract bookkeeper who was retained to keep the company's accounting records reported directly and exclusively to Lachwani. PSR ¶ 12.

Beginning no later than October 2017, Lachwani began knowingly and intentionally misleading investors. *Id.* ¶ 13; Plea Agmt. ¶ 2. Specifically, Lachwani (1) caused Headspin to record revenue and include in ARR tabulations amounts from purported customers that had not agreed to purchase Headspin's software and services or to pay for software and services, (2) falsely inflated Headspin's revenue and ARR from real Headspin customers and resellers, including continuing to include in ARR tabulations amounts from customers that previously terminated their Headspin contracts, (3) caused false invoices to be created and sent to Headspin finance staff in order to reduce Headspin's unbilled receivables and conceal the false and inflated revenue Lachwani had caused Headspin to record, (4) communicated false financial and sales information to investors, (5) communicated materially false information about Headspin's product and customer adoption to investors, and (6) used significant amounts of company and investor funds to make unauthorized, high-risk investments in the stock market and failing to disclose the risky investment of company funds to investors, shareholders, and the board of directors. *Id.* ¶ 13.

## B. Lachwani's Misrepresentations Regarding Revenue and ARR

Lachwani sent potential investors false financial statements and information that substantially overstated revenue and ARR. PSR ¶ 14. Headspin had two primary processes for tracking its revenue

and ARR.  *Id.*  First, Lachwani hired a part time contract bookkeeper, Sana Okmyanskaya, who would compile Headspin's financial statements based on information Lachwani provided her and based on limited account information she could access.  *Id.*; Okmyanskaya Decl. ¶¶ 3-5.  With respect to revenues, Lachwani emailed Okmyanskaya information about purported contracts with customers, including information about the purported value and terms of the contracts.  *Id.*

The information Lachwani provided to Okmyanskaya was often false and inflated.  PSR ¶ 14; Okmyanskaya Decl. ¶¶ 9, 11-12.  Okmyanskaya would make journal entries into Headspin's QuickBooks based on this information.  PSR ¶ 14; Okmyanskaya Decl. ¶ 5.  When working on quarter-end financials, Okmyanskaya would generate a customer-by-customer report of Headspin revenue for the quarter and email the report to Lachwani, who would then either provide Okmyanskaya additional information about revenues for the quarter or confirm the report was correct.  *Id.*  Okmyanskaya incorporated this revenue information into Headspin's financial statements, which were then shared with investors.  *Id.*  In 2019, Okmyanskaya began working full-time for Headspin—still as a contractor—but the process for quarterly revenue reporting remained the same.  Okmyanskaya Decl. ¶ 2.

Headspin financial statements reported to investors the following revenue through 2019:

| Pre-FY2018 | 2018 | 2019 | Total |
|---|---|---|---|
| $21,430,187 | $27,482,124 | $44,420,251 | $93,332,562 |

White Decl. Ex. B at 3; PSR ¶ 14.  KPMG's analysis of contracts and other financial records (discussed more fully below) revealed that Headspin's *actual* revenue over the same time period was:

| Pre-FY2018 | 2018 | 2019 | Total |
|---|---|---|---|
| $4,948,438 | $6,132,672 | $10,129,144 | $21,210,254 |

*Id.*  The revenue metrics in Headspin's financial statements were false as a result of the false information Lachwani provided Okmyanskaya.  Okmyanskaya Decl. ¶ 12.  For example, Lachwani instructed Okmyanskaya to recognize $1.44 million in annual revenue from a San Francisco-based ride-share company, despite the fact that the annual value of the company's contract was less than $500,000.  PSR ¶ 16.  Separately, Lachwani instructed Okmyanskaya to book revenue from Silicon Valley-based videogame company from a contract he claimed was worth over $1 million for a year, despite the fact that videogame company never entered into a contract with Headspin.  PSR ¶ 17.  Additional examples

**GA-44**

include Lachwani instructing Okmyanskaya to record quarterly revenue from a major technology

company and a major entertainment company at times that those companies had no contractual

relationship with Headspin and were not paying Headspin or using its services. *Id.*

In addition to the revenue data, Lachwani maintained a spreadsheet that tracked Headspin's

ARR. PSR ¶ 15; Investor 2 Decl. Ex. A. The spreadsheet listed Headspin's purported customers and

the purported ARR from each customer. *Id.* The information in the spreadsheet was false and inflated.

*Compare* Investor 2 Decl. Ex. A *with* Jolley Decl. ¶¶ 4-5 & Exs. A & B (Customer RF Tabs, Row 15);

*see also* PSR ¶ 15; Okmyanskaya Decl. ¶ 12. Lachwani controlled the ARR spreadsheet, which he

maintained as a Google Sheets document. PSR ¶ 15; Loukakos Decl. ¶ 5. At various points Lachwani

provided a copy of the ARR spreadsheet to potential investors and used the calculations in the

spreadsheet to provide potential investors false information about Headspin's ARR in investor pitch

decks, emails, and telephone calls. PSR ¶ 15; *see also, e.g.*, Investor 2 Decl. ¶ 5.

In the ARR spreadsheet, Lachwani asserted that Headspin's ARR, at the end of the quarters

indicated below, was the following:

| Q1 2018 | Q4 2018 | Q2 2019 | Q3 2019 | Q4 2019 |
|---|---|---|---|---|
| $26,913,441 | $42,096,253 | $54,540,595 | $66,743,755 | $84,530,035 |

Tomeno Decl. Ex. BB.

In contrast, KPMG's analysis of contracts and invoices in order to determine historical quarter-

end ARR resulted in far lower ARR numbers and the end of these quarters:

| Q1 2018 | Q4 2018 | Q2 2019 | Q3 2019 | Q4 2019 |
|---|---|---|---|---|
| $5,064,000 | $7,900,000 | $10,176,000 | $9,984,000 | $10,259,000 |

Jolley Decl. Exs. A & B. A significant number of the customer specific entries Lachwani made in the

ARR spreadsheet were false. PSR ¶¶ 16-17. For example, a version of the ARR spreadsheet Lachwani

provided to Investor 2 in advance of the Series C offering stated that Headspin had $25 million of ARR

from a reseller, despite the fact that real ARR from the reseller never exceeded $1.66 million. *Id.* ¶ 16.

The same version of the ARR spreadsheet also stated that Headspin had over $12 million of ARR from a

different reseller, despite the fact that Headspin's actual ARR from this reseller was never more than $1

million. *Id.* In another example, Lachwani included almost double Headspin's actual ARR from a

1  financial services company and left the ARR on the spreadsheet—to make is appear as if it was

2  continuing revenue—even after the company canceled its subscription.  *Id.*

3  **C.  Lachwani Forged Customer Invoices in Support of His Scheme**

4  Lachwani created and used fake documents in support of his scheme.  PSR ¶ 16.  For example, in

5  2019, investors became concerned with Headspin's high balances of unbilled receivables, which related

6  to amounts that Lachwani said Headspin was contracted to receive but had not yet billed the customer.

7  Okmyanskaya Decl. ¶¶ 6-7.  In reality, much of the balance of the unbilled receivables account was fake

8  revenue that Lachwani had instructed Okmyanskaya to record despite the fact that it did not correspond

9  to a real customer contract.  *See id.* ¶ 9.  To reduce the unbilled receivables account and to conceal the

10  fake revenue, Lachwani created fake invoices or altered real invoices and submitted them to

11  Okmyanskaya.  *See, e.g.*, Tomeno Decl. Exs. A-L.  With respect to a reseller, Lachwani obtained three

12  real invoices that Headspin issued to the reseller and edited them to increase the amounts, before

13  sending them to Okmyanskaya near the end of June 2019:

| Invoice No. | Original Amount | Altered Amount |
|---|---|---|
| INV-0008 | $81,600 AUD (Ex. A)[1] | $381,600 AUD/USD (Ex. G) |
| INV-0009 | $21,240 USD (Ex. B) | $212,400 USD (Ex. H) |
| INV-0020 | $64,100 USD (Ex. C) | $300,500 USD (Ex. F) |

17  Lachwani took what appears to be another real invoice issued to the reseller—INV-0019 (Tomeno Decl.

18  Ex. D)—in the amount of $243,140 USD, changed the name of the invoice to INV-0016 and increased

19  the amount to $1,187,150 USD.  Tomeno Decl. Ex. E.

20  Shortly before that, in March 2019, Lachwani sent two forged invoices to Okmyanskaya that

21  purported to be for the rideshare company discussed above in the amount of $720,000 each, despite the

22  fact that these invoices were never sent to the rideshare company and did not correspond to the financial

23  terms of the relationship between Headspin and the rideshare company.  Tomeno Decl. Exs. K & L.[2]

24  **D.  Lachwani Misrepresented Headspin's Product and Customer Adoption**

25  Lachwani also sent investor decks to potential investors that contained false information about

---

[1] Exhibit citations in this table refer to the exhibits attached to the Tomeno Declaration.

[2] Lachwani had previously sent a different forged Uber invoice to Okmyanskaya in May 2018. Tomeno Decl. Ex. J.

1   Headspin's product and customer adoption.  PSR ¶ 18.  For example, one deck provided to investors in

2   connection with convertible notes offering represented that Headspin operated over 22,000 devices on

3   its remote testing network in 140 cities and 80 countries, when in fact, Headspin operated fewer than

4   3,000 devices on its network in fewer cities and countries.  *Id.*; Loukakos Decl. Ex. A at 8.  The deck

5   also stated that Headspin was "trusted" by more than 1,000 companies worldwide when Headspin, in

6   fact, had far fewer customers.  *Id.*  Lachwani provided this information for the investor decks and

7   reviewed and approved the decks before they were sent to potential investors.  *Id.*  In connection with

8   the Series B offering, one of the investor decks included logos of companies that either had never

9   subscribed to Headspin's services or had previously terminated Headspin's services.  *Id.*  In connection

10  with the Series C offering, an investor deck claimed that Headspin operated over 32,000 devices despite

11  the fact that the actual number remained fewer than 3,000.  *Id.*

12          **E.      Lachwani Concealed His Risky Investments of Investor Funds**

13          Headspin investors expected the money they invested in the company would be used for

14  Headspin's operations and otherwise held as cash or low-risk investments such as money market funds

15  or certificates of deposit.  PSR ¶ 19.  Lachwani concealed from investors that he used the capital

16  contributed by investors to make risky investments in stocks, including by altering brokerage account

17  statements to make it appear that the funds were in cash or cash equivalents.  *Id.*  For example, on or

18  about December 31, 2018, one of Headspin's brokerage accounts—controlled by Lachwani—held assets

19  valued at approximately $35,164,318, and approximately 97.38 percent of that amount was allocated to

20  shares of stock and stock options of technology and financial companies, with only approximately 2.62

21  percent in cash or cash equivalents.  PSR ¶ 20; Tomeno Decl. Ex. M.  At another point, on or about

22  March 31, 2020, the brokerage account held assets valued at approximately $54,038,192, and

23  approximately 93.58 percent of that amount was allocated to shares of stock and stock options of

24  technology and financial companies, with only approximately 6.42 percent in cash or cash equivalents.

25  PSR ¶ 20; Tomeno Decl. ¶ N.

26          Lachwani invested Headspin's investor funds in this manner despite being instructed in 2015 by

27  a board member and investor representative, Karim Faris, that investor funds must be kept in "very

28  conservative and liquid instruments-low rates."  Tomeno Decl. Ex. O.  In January 2018, Faris emailed

Lachwani about Headspin's cash balance and asked who Headspin banked with and whether the investor funds were "in cash and t-bills." Tomeno Decl. Ex. P. Faris then asked Lachwani for a statement showing Headspin's total cash balance. Tomeno Decl. Ex. Q. Lachwani did not provide the statement and, two weeks later, Faris asked Lachwani again for a statement of Headspin's accounts. *Id.* In response, Lachwani sent an LPL financial account statement for account ending 3871 purporting to show a total balance as of December 31, 2017 of almost $29 million, all of which was categorized as either cash and cash equivalents, income, or certificates of deposit. Tomeno Decl. Ex. R.

Statements the government obtained from LPL show that the actual balance of Headspin's account ending in 3871 as of December 31, 2017 was approximately $6.5 million, which was held in certificates of deposit and fixed income. Tomeno Decl. Ex. S. Headspin had another LPL account, ending in 0597, the balance of which was approximately $20.6 million as of December 31, 2017. Tomeno Decl. Ex. T. Approximately eighty-five percent of that balance was held in equities and options, with approximately 15% held in cash and cash equivalents. *Id.* at 2.

### F. The Discovery of the Fraud and Return of Fraud Proceeds

Lachwani's fraud was identified after a senior employee, Stefanos Loukakos, noticed that Headspin had been representing to investors and others that certain entities were customers when, in fact, they were not. PSR ¶ 27; Loukakos Decl. ¶¶ 6-9. In March 2020, Loukakos went to Headspin's two independent directors and provided a presentation outlining his concerns. PSR ¶ 27; Loukakos Decl. ¶ 10 & Ex. A. The independent directors subsequently retained outside legal and forensic firms and initiated an investigation that uncovered evidence of Lachwani's fraudulent scheme. PSR ¶ 27; Arora Decl. ¶ 7; Faris Decl. ¶¶ 10-11. Headspin retained KPMG to analyze Headspin's contracts with customers and calculate Headspin's actual revenues and ARR during the relevant time period. *Id.*; *see also* White Decl. ¶¶ 3-4. KPMG's analysis determined that Headspin's revenues and ARR were substantially less than what Lachwani had reported to potential investors. *Id.*; White Decl. ¶ 7 & Ex. B; Jolley Decl. ¶¶ 4-5 & Exs. A & B. Lachwani was removed as CEO of Headspin in May 2020. PSR ¶ 27; Arora Decl. ¶ 9.

After the fraud was discovered, and the company's reported ARR and revenue was determined to be significantly overstated, Headspin's board of directors (excluding Lachwani) concluded that the

Series B and Series C financings were substantially overpriced.  PSR ¶ 28; Arora Decl. ¶¶ 11-12; Tomeno Decl. Ex. U (Background of Recapitalization).  The board began a complex negotiation with the investors with a goal to return investor money through a recapitalization while leaving enough working capital for the company to continue to operate.  *Id*.  At the conclusion of the negotiations, Headspin agreed to allow full-price purchasers of Series B and Series C preferred stock the option to sell back to the company 70% of their preferred stock at the price they had originally purchased the stock for cash, essentially refunding a portion of the investment.  PSR ¶ 28; Tomeno Decl. Ex. U.  The investors then had the option to retain the remaining 30% of their stock and have it repriced at a lower price per share (resulting in the investor obtaining additional shares), or to accept a promissory note for the value of the remaining 30% of their stock at the price they had originally purchased it.  *Id*.  The promissory note term was five years, with interest accruing at a rate of 1% annually, with the interest amounts due annually and the principal due upon maturity of the note.  *Id*.  During the negotiated recapitalization process the Series B Preferred Stock was repriced from $26.5296 per share to $7.1508 per share and the Series C Preferred Stock was repriced from $48.6834 per share to $10.3501 per share.  *Id*.  Lachwani also agreed to return $1.9 million to Investor 1 (and provide Investor 1 additional stock through the company) to resolve claims relating to Lachwani's secondary sale of stock to Investor 1.  *Id*.

### G.    Lachwani is Arrested and Charged, then Enters a Guilty Plea

On August 20, 2021, the government filed a complaint charging Lachwani with wire fraud, in violation of 18 U.S.C. § 1343, and securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5.  Dkt. No. 1.  On August 25, 2021, Lachwani was arrested and, on August 26, 2021, he was released on bond after an initial appearance.  Dkt. Nos. 10, 12.  On September 7, 2021, a grand jury returned an indictment charging Lachwani with one count of wire fraud and one count of securities fraud.  Dkt. No. 16.  On August 4, 2022, a grand jury returned a Superseding Indictment charging Lachwani with thirteen counts of wire fraud and four counts of securities fraud in connection with Headspin's convertible notes, Series B, and Series C offerings as well as Lachwani's secondary sale to Investor 1, and one count of money laundering, in violation of 18 U.S.C. § 1957.  Dkt. No. 60.

On April 27, 2023, Lachwani pleaded guilty to two counts of wire fraud (Counts Three and Seven) and one count of securities fraud (Count Thirteen) pursuant to a written plea agreement.  Dkt.

No. 88.  In the plea agreement, the parties did not agree to a complete Guidelines calculation but agreed (1) the base offense level is 7, (2) a two-level reduction applies for acceptance of responsibility, (3) there were ten or more investors involved in the offense (but the parties did not agree on whether the investors qualified as victims for purposes of a two-level enhancement), and (4) the government would request an additional one-point reduction for acceptance of responsibility if Lachwani forthrightly admitted guilt, cooperated with the Court and Probation Office in the presentence investigation, and continued to manifest an acceptance of responsibility through the sentencing hearing.  *Id.* ¶ 7.

## III.   SENTENCING GUIDELINES CALCULATIONS

As set forth in the PSR, the Sentencing Guidelines calculation of the offense level is as follows:

| | | |
|---|---|---|
| a. | Base Offense Level, U.S.S.G. §2B1.1(a): | 7 |
| b. | Specific Offense Characteristics, U.S.S.G. §2B1.1(b)(1)(M) (loss more than $65 million but less than $150 million) | +24 |
| c. | Specific Offense Characteristics, U.S.S.G. §2B1.1(b)(2)(A) (more than 10 victims) | +2 |
| d. | Acceptance of Responsibility, U.S.S.G. §3E1.1:[3] | - 3 |
| e. | Adjustment for Certain Zero-Point Offenders, §4C1.1 | -2 |
| f. | Adjusted Offense Level: | 28 |

*See* PSR ¶¶ 37-48.

The Probation Officer concluded that Lachwani has no criminal history and, therefore, falls into Criminal History Category I.  PSR ¶ 53.  As reflected in the PSR, the Guidelines range for imprisonment associated with adjusted offense level 28 and Criminal History Category I is 78 to 97 months prison.  *Id.* ¶ 90.

Lachwani objects to the Guidelines enhancements for loss and more than ten victims.  *See* PSR, Objections.  Lachwani's objections are not based in fact and call into serious question whether he has accepted responsibility for his crimes.  The Court should overrule Lachwani's objections and adopt the

---

[3] With regard to the third point for acceptance of responsibility under § 3E1.1(b), the government reserves its right, as stated in the plea agreement, to determine whether Lachwani continues to manifest an acceptance of responsibility through and including the time of sentencing.

Guidelines calculation set forth in the PSR. In the alternative, if the Court agrees that Headspin stock had some value by which loss must be reduced, the Court should find that Headspin's stock was overvalued by approximately $59 million at the time of the offerings, resulting in a loss enhancement of +22, and a Guidelines range for imprisonment of 63 to 78 months.

### A. Lachwani's Fraud Resulted in a Loss of Over $90 Million, a 24-Level Adjustment

#### 1. Legal Standard

Under the Guidelines, loss "is the greater of actual or intended loss." U.S.S.G. § 2B1.1(b) applic. note 3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." *Id.* note 3(A)(i). "'[R]easonably foreseeable pecuniary harm' means pecuniary harm [i.e., harm that is monetary or otherwise readily measurable in money] that the defendant knew or, under the circumstances, reasonably should have known, was a potential result of the offense." *Id.* notes 3(A)(iii & iv).

"The guidelines do not present a single universal method for loss calculation under § 2B1.1…." *United States v. Zolp*, 479 F.3d 715, 718 (9th Cir. 2007). The Court "need only make a reasonable estimate of loss." U.S.S.G. § 2B1.1(b) note 3(C). Because the Court is in a unique position to assess the evidence and estimate the loss, its determination is entitled to appropriate deference. *Id.* In estimating loss, the Guidelines direct the Court to consider "the cost to the victim of replacing [the unlawfully taken] property," "[t]he approximate number of victims," and "reduction that resulted from the offense in the value of equity securities or other corporate assets." *Id.*

In the context of public company securities, the Ninth Circuit has expressly rejected the need to show "loss causation." *United States v. Berger*, 587 F.3d 1038, 1044-45 (9th Cir. 2009). In the public company context, the Ninth Circuit has observed:

> Measurement of loss becomes considerably more complex, however, when the court confronts a "pump-and-dump" scheme involving an otherwise legitimate company. In such a case, because the stock continues to have residual value after the fraudulent scheme is revealed, the court may not assume that the loss inflicted equals the full pre-disclosure value of the stock; rather, the court must disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes.

*Zolp*, 479 F.3d at 719 (citing cases involving public company securities and efficient markets); *United States v. Bakhit*, 218 F. Supp. 2d 1232, 1236-37 (C.D. Cal. 2012) (cited by *Zolp* with approval and

1   noting "after the fraud was fully disclosed and absorbed by the market, [the] stock continued to trade at

2   around $5.00 per share").

3        Conversely, the "pecuniary harm" to an investor induced to invest by fraud is the amount of the

4   investment.  *See, e.g.*, *United States v. Turk*, 626 F.3d 743, 750 (2d Cir. 2010) ("[T]he crux of

5   [defendant's] offense is that she obtained loans by fraudulently leading unsecured creditors to believe

6   they were secured creditors.  Without this deceit, she could not have obtained her victims' money.");

7   *United States v. Bryson*, 101 F. Supp. 3d 147, 155 (D. Conn. 2015) ("[F]or those investors who were

8   fraudulently induced to invest following the onset of the conspiracy, a reasonable estimate of the actual

9   loss attributable to the offense conduct is the total value of the investment.").

10       Loss is reduced by "[t]he money returned, and the fair market value of the property returned and

11  the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim

12  ***before the offense was detected***."  U.S.S.G. § 2B1.1 note 3(E)(i) (emphasis added).  "The time of the

13  detection of the offense is the earlier of (I) the time the offense was discovered by a victim or

14  government agency; or (II) the time the defendant knew or reasonably should have known that the

15  offense was detected or about to be detected by a victim or government agency."  *Id.*  Therefore, money

16  returned to victims *after* the fraud was discovered does not decrease the loss amount.  *See United States*

17  *v. Bright*, 353 F.3d 1114, 1118 (9th Cir. 2004) (the defendant is only "entitled to credit for refunds paid

18  prior to the discovery of the offense"); *United States v. Stoddard*, 150 F.3d 1140, 1146 (9th Cir. 1998)

19  (same); *see also Kharana v. Gonzales*, 487 F.3d 1280, 1284 (9th Cir. 2007) (noting that "a defendant

20  who returns stolen money only after detection does not receive a so-called credit against loss" under the

21  Guidelines and finding that loss for purposes of determining whether the defendant was convicted of an

22  aggravated felony should not be reduced by amounts repaid after the discovery of the fraud because

23  doing so would "distort the magnitude of [the defendant's] crime and would be inappropriate" (internal

24  quotations omitted)).

25       The government has the burden of proving loss and, in certain circumstances, the Ninth Circuit

26  has held that where the loss has an "extremely disproportionate impact" on the sentence, the government

27  must prove loss by clear and convincing evidence.  *See United States v. Lonich*, 23 F.4th 881, 910 (9th

28

**GA-52**

Cir. 2022); *Zolp*, 479 F.3d at 718.[4]  However, where the loss amount is from charged conduct for which

defendant has been convicted, the Ninth Circuit has only required the government to prove loss amount

by a preponderance of the evidence.  *See Lonich*, 23 F.4th at 913; *United States v. Garro*, 517 F.3d

1163, 1168-69 (9th Cir. 2008) (concluding that loss was based on conduct for which defendant was

charged because indictment alleged defendant raised $37.5 million from scheme and jury found

defendant guilty of conduct alleged in indictment).

### 2. The Court Should Adopt the PSR Calculation of Loss—$92.73 Million

The Probation Officer concluded that Lachwani's crimes resulted in a loss amount of $92.73

million.  PSR ¶ 29.  This is the amount that Headspin and Lachwani obtained from investors as a result

of Lachwani's wire and securities fraud scheme in Headspin's Convertible Notes, Series B, and Series C

financings.  PSR ¶¶ 23-26.  Lachwani pleaded guilty to wire fraud and/or securities fraud with respect to

each of these offerings.  *See* Dkt. No. 60, Superseding Indictment, Count 3 (wire fraud scheme for

Headspin's Series B Preferred Stock Offering), Count 7 (wire fraud scheme for Headspin's Series C

Preferred Stock Offering), Count 13 (securities fraud scheme for Headspin's convertible promissory

notes between December 2017 and January 2018); Dkt. No. 88, Plea Agreement.  Because there was no

public market for Headspin stock and the investors stood to lose the entirety of their investment absent

the company agreeing to return the fraud proceeds, the loss amount is the amount that Lachwani and

Headspin obtained from investors through the criminal scheme—$92.73 million.[5]  It is clear that

Headspin's investors would not have invested in Headspin had they been aware of the fraud.  *See*

Investor 1 Decl. ¶¶ 9, 11; Investor 2 Decl. ¶ 9; Investor 3 Decl. ¶ 5; Arora Decl. ¶¶ 4, 6; *see also United*

*States v. Hussain*, No. 16-cr-00462-CRB, 2019 WL 1995764, *8 (N.D. Cal. May 6, 2019) ("[T]he

---

[4] The Ninth Circuit caselaw requiring clear and convincing evidence for guidelines enhancements is clearly irreconcilable with modern Due Process doctrine.  The Ninth Circuit recently granted *en banc* review of a case presenting this issue.  *See United States v. Lucas*, 77 F.4th 1275 (9th Cir. 2023) (granting rehearing en banc).  Every other circuit to consider the issue has held that the preponderance standard governs all factfinding under the advisory guidelines now that the Guidelines are no longer mandatory.  *See, e.g.*, *United States v. Walker-Couvertier*, 860 F.3d 1, 17 (1st Cir. 2017); *United States v. McCray*, 7 F.4th 40, 49 (2d Cir. 2021); *United States v. Fisher*, 502 F.3d 293, 305 (3d Cir. 2007); *United States v. Chandia*, 675 F.3d 329, 338-30 (4th Cir. 2012).

[5] Because the loss amount calculated by Probation is from charged and convicted conduct, the government has the burden of proving loss by a preponderance of the evidence.  *See Lonich*, 23 F.4th at 913.  However, the government's evidence is sufficient to meet the more stringent clear and convincing evidence standard and the Court should find that the government has met both burdens.

1  inquiry is not whether HP would have purchased Autonomy if it had known the truth of [Autonomy's]

2  hardware sales.  The question is whether HP would have purchased Autonomy if it knew about the

3  fraud").

4          The Court need not reduce the loss amount by an estimate of the value of the Headspin stock at

5  the time it was purchased because, at that time, it was not reasonably probable that stock had any value.

6  This case is unlike *Zolp* and *Berger*, which involved public companies whose securities appear to have

7  traded between third parties on public markets (albeit in a limited fashion) after the fraud was

8  discovered, because no market existed for the resale of Headspin stock after the fraud was discovered.

9  The investors held illiquid equity in a company at the center of a major fraud perpetrated by its founder

10  and CEO, and that was subject to numerous legal claims.  The investors stood to lose the entirety of their

11  investments, *see* Arora Decl. ¶ 11, and were completely dependent on Headspin and Lachwani agreeing

12  to return the proceeds of the fraud.  The victims ultimately received a portion of their money back and

13  the company continued operating, but only because the chairman of the board was able to negotiate a

14  resolution and advocate for its collective acceptance by investor shareholders. *Id.* ¶ 12.  Because there

15  was no market for the Headspin preferred stock after the discovery of the fraud, it had no value apart

16  from what Headspin was willing to return, and the amounts Headspin returned are clearly not creditable

17  against loss, *see infra* Part III.A.4.  Therefore, the total amount Lachwani obtained for Headspin and

18  himself as a result of the fraud—$92.73 million—is the correct measurement of actual loss resulting

19  from the offense.[6]  *See Bryson*, 101 F. Supp. 3d at 156 (finding loss was the full amount of investment

20  reasoning that "the investment [the investors] thought they were making was fundamentally and

21  materially different than what they actually received[,] … [t]he loss to these investors was caused not by

22  the decline in value of … [the] funds, but by their having invested in the first place[,] [and] [i]f the

---

[6] *United States v. Geringer*, 672 Fed. Appx 651 (9th Cir. 2016), is distinguishable.  In that case, in an unpublished dispositional memorandum, the Ninth Circuit held that the district court erred by not considering the value of an investment fund's remaining assets in determining the loss amount.  *Id.* There, the victims were investors in a fund that held certain assets, including an investment in a private company, the valuation of which appears to have been unrelated to the fraud scheme.  *United States v. Geringer*, No. 12-cr-00888-EJD, 2016 WL 4791815, *2 (N.D. Cal. Sept. 14, 2016).  Unlike in *Geringer*, w here it appears the investors had a claim to property with value unaffected by the fraud, here the victims only held an equity investment in a company at the center of a substantial fraud, had no right to claim specific corporate assets, and depended on Headspin and Lachwani to return the proceeds of the fraud out of their own free will.

**GA-54**

defendants had not fraudulently induced the[] investors…., [the investors] would not have been exposed to the market risks of these investments").

### 3. In the Alternative, if the Court Determines that Loss Should be Reduced by the Value of Headspin Stock, a Reasonable Estimate of Loss is $59 Million

If the Court were to agree with Lachwani that Headspin's stock had some value when it was purchased by the victims of his fraud scheme, the Court should find that the stock purchased by Series B and C investors was overvalued by $59 million as a result of the fraud and adopt that amount as the loss. Two separate analyses corroborate each other and support this valuation of Headspin stock based on Headspin's real performance in an alternate reality in which no fraud was committed. These analyses were performed by Jeffrey Hart, a Senior Director at Kroll LLC who is a Certified Public Accountant and Accredited in Business Valuation, and are set forth in his expert report submitted herewith. *See* Exhibit A. The government requests that the Court adopt one of these analyses if it concludes that Headspin stock had some value when it was purchased by investors.

The first analysis by Hart estimates the value of the Series B and Series C stock at the time of purchase to be the reduced price of the Series B and C shares set through then negotiated recapitalization transaction. Ex. A ¶¶ 29-32. In the original offerings, the Series B and Series C stock was priced at $26.53 and $48.68 per share, respectively, based on the false information Lachwani provided to investors. Tomeno Decl. Ex. U. In November 2020, Headspin consummated a transaction to return a significant portion of the fraud proceeds while leaving enough capital in the company for it to continue to operate. *Id.* This transaction repriced the Series B and Series C stock to $7.15 and $10.35 per share, respectively. *Id.* There was collective agreement to this repricing, which was intended to approximate the value a reasonable investor might have determined Headspin to be worth based on true facts. *See* Arora Decl. ¶ 12; Tomeno Decl. Ex. U at 5-6. Headspin's and the investors' agreement to these prices demonstrates that the prices are reasonable estimates of the true value of the Headspin's stock if there had been no fraud. Under this analysis, the false information Lachwani built into Headspin's disclosures inflated the value of the Series B stock by 371% and the value of the Series C stock by 470%. The full-price Series B investors paid $19,979,656 for their Series B stock and received stock that was worth approximately $5,385,325 under this analysis. Ex. A ¶ 32 & Fig. 5. The full-price Series C investors

paid $59,999,964 for their Series C stock and received stock that was worth approximately $12,756,001 under this analysis. *Id.* Combining the two numbers, the Series B and C full-price purchasers paid $79,979,610 and received stock worth approximately $18,141,326, resulting in a loss of $61,838,284. *Id.*

The second analysis by Hart estimates the value of the Series B and Series C stock at the time of the offerings by applying the ARR multiplier used by the Series B and Series C investors in evaluating their investment to Headspin's true ARR, as calculated by KPMG. Ex. A ¶¶ 33-46. ARR was the primary metric that investors used to evaluate the pricing of Headspin's securities offerings. *See, e.g.*, Investor 1 Decl. ¶¶ 7, 11; Investor 2 Decl. ¶ 7; Investor 3 Decl. ¶ 4. Specifically, Headspin's investors calculated the multiple applicable to Headspin's reported (false) ARR to reach the valuation of Headspin implied by the offered stock pricing. *Id.* The Series B offering valued Headspin at 13.7x reported (false) ARR while the Series C offering valued Headspin at 19x reported (false) ARR. Ex. A ¶¶ 43-44. Investors then compared this multiple to comparable transactions and ultimately concluded the multiple was reasonable. *See* Investor 1 Decl. ¶ 11; Investor 2 Decl. ¶ 7; Investor 3 Decl. ¶ 4. Investors would not have found the multipliers reasonable had they known the truth about Headspin's product and finances, and would have concluded that a lower multiple was appropriate. Investor 1 Decl. ¶ 11. However, applying these multiples to Headspin's true ARR provides a reasonable (and defendant friendly) estimate of the value of the Series B and Series C stock at the time of the offerings. Hart used Headspin's true ARR as calculated by KPMG—$5.5 million for the Series B (instead of Lachwani's false $34 million representation) and $9.7 million for the Series C (instead of Lachwani's false $55 million representation)—and then applied these multipliers to calculate a post-money valuation of Headspin. Ex. A ¶¶ 42 & 44. Next, he calculated the value of the Series B and Series C full-price purchasers' stock based on these adjusted post-money valuations. *Id.* ¶ 45. Hart concluded that the Series B full-price purchasers' stock was worth approximately $5,068,151 (compared with the $19,979,656 they paid) and the Series C full-price purchasers' stock was worth approximately $15,622,189 (compared with the $59,999,954 they paid). *Id.* ¶¶ 45-46. Combining the two numbers, the Series B and Series C full-price purchasers paid $79,979,610 and received stock worth approximately $20,690,340, resulting in a loss of $59,289,270. *Id.*

**GA-56**

Both of Hart's approaches are well grounded in economic reality, and the fact that these two distinct approaches result in such similar loss amounts underscores that both are credible, reasonable estimates of the overvaluation of Headspin's stock as a result of Lachwani's fraud. Both of these analyses provide a reasonable valuation of Headspin had it been providing investors with truthful and accurate information about its business. Of course, Headspin and Lachwani were not doing this and, in reality, investors received stock in a company whose underlying business was not only significantly less successful than what was represented but whose CEO was perpetrating a major fraud. The illiquid stock that investors received in Headspin, therefore, did not have the value that its actual business might have had in the absence of fraud and the Court need not find that total amount of investments should be offset by value of Headspin's actual business. Nevertheless, if the Court finds that the Headspin stock purchased by investors had value, Hart's expert analyses provide reasonable estimates of the valuation/overvaluation and the Court should adopt a loss amount of $59 million. *See Berger*, 587 F.3d at 1044 (rejecting civil securities fraud loss causation requirements and finding "where the value of securities have been inflated by a defendant's fraud, the defendant may have caused aggregate loss to society in the amount of the fraud-induced overvaluation, even if various individual victims' respective losses cannot be precisely determined or linked to the fraud").

**4.     The Loss Amount is Not Reduced by the Amount Returned to Investors through the Recapitalization Transaction**

Lachwani argues that the Headspin stock was worth what the investors paid for it because, after the fraud was discovered, Headspin agreed to repurchase the shares "at full price." This conclusion is incorrect because the Guidelines and Ninth Circuit caselaw are clear that money returned after the discovery of the fraud cannot be credited against loss. Here, Lachwani's fraud was detected months after Headspin's Series C financing when a senior Headspin employee discovered that Lachwani was misrepresenting revenue and ARR and reported it to the Board. A subsequent internal investigation revealed the extent of the fraud which was reported to investors. No investor money was returned to investors prior to the reporting of the fraud to investors. Only after the fraud was reported to investors, and after the government's investigation began, did Headspin return some—but, significantly, not all— of the fraud proceeds through the recapitalization transaction. *See* Tomeno Decl. Ex. U.

**GA-57**

The Ninth Circuit's analysis in *Stoddard* confirms that Lachwani may not obtain the benefit of the repayments to investors in the recapitalization transaction. 150 F.3d at 1146. In that case, the defendant, a director of Gold River Savings, directed the company's CFO to make deposits into two separate escrow accounts on behalf of a subsidiary of Gold River in the amount of $30,000. *Stoddard*, 150 F.3d at 1142-43. Stoddard subsequently concealed the fact that he directed the escrow company to release the money to purchase two separate properties in Stoddard's name, not the name of Gold River or its subsidiary, which could not extend credit pursuant to a supervisory agreement with the Office of Thrift Supervision ("OTS"). *Id.* When the CFO of Gold River received an escrow account statement indicating the money was no longer in the accounts, he notified Stoddard and also requested the escrow company return the funds with interest. *Id.* The escrow company notified Stoddard of the CFO's request and Stoddard subsequently instructed the escrow company to return the funds, sending the escrow company two checks totaling $31,000. *Id.*

Stoddard was convicted of concealing and covering up a material fact by trick, scheme, or device of a matter within the jurisdiction of OTS and making a false entry. *Id.* at 1142 n.1. At sentencing, the district court concluded that the loss amount was $30,000 and applied a 4-level loss enhancement. *Id.* at 1145. On appeal, the Stoddard argued that loss should have been reduced by the amount he paid back into escrow, relying on *United States v. Allison*, 86 F.3d 940 (9th Cir. 1996), in which the Ninth Circuit held that loss in a fraud case should be guided by "economic reality" and that the outstanding balance on stolen credit cards was a better measure of loss than the full amount charged to those cards. *Stoddard*, 150 F.3d at 1145-46. The Ninth Circuit rejected Stoddard's argument and clarified *Allison*:

> *Allison* only applies to amounts repaid by defendant to the victim prior to discovery of the offense. Repayments do not apply to actual loss if they are made after discovery of the offense but prior to indictment. Fixing actual loss at discovery of the offense comports with the rationale of the economic reality approach. The "economic reality approach" is designed to "determine what losses the defendant caused or *intended to cause." Allison,* 86 F.3d at 943–44 (emphasis added). Repayments before detection show an untainted intent to reduce any loss. Repayments after detection may show no more than an effort to reduce accountability.

*Id.* at 1146. The court found that Stoddard's crime was discovered the day the CFO wrote to him about the discrepancy in the escrow accounts and held, therefore, that the district court correctly determined the loss to be $30,000. *Id.* at 1146-47.

Like in *Stoddard*, no money was returned to investors until they were aware of the fraud. The fact that Headspin ultimately returned a significant portion of the fraud proceeds cannot be credited against loss. It is clear that the money investors received in the recapitalization transaction was not designed to reflect the actual value of the stock that the investors held, but rather to remedy the fraud and settle civil claims. Therefore, the Court should reject Lachwani's argument that Headspin's repayment of fraud proceeds diminishes the loss amount.

### 5. The Court Should Reject Lachwani's Other Factual Objections to the PSR

Lachwani makes numerous objections to facts described in the PSR in support of his argument that the loss amount is zero. The Court should overrule these objections. Lachwani's arguments include that he was not primarily responsible for the information provided to potential investors; he did not have significant control over Headpin's operations, sales and recordkeeping; he did not provide false product information; there were no expectations about how he should use money received from investors and he did not make risky investments; the misrepresentations he made did not cause investors to invest and the investors did not use or trust Headspin's financial metrics; KPMG's analysis of Headspin's revenue and ARR is unreliable; and he did not commit any fraudulent or deceptive misconduct in connection with Headspin's issuance of convertible notes from December 2017 to March 2018. PSR Objections.

As an initial matter, the government questions whether Lachwani's factual arguments and objections to the PSR are consistent with an acceptance of responsibility and admissions in his plea agreement. For example, contrary to his argument that he did not commit fraud in connection with the convertible notes offering, Lachwani pleaded guilty to Count 13 of the Superseding Indictment, which alleged that he willfully and knowingly engaged in a scheme to defraud and made untrue statements of material fact in connection with the offering of Headspin convertible promissory notes from December 2017 to January 2018. Dkt. 88. Further, in paragraph 2 of his plea agreement, Lachwani admitted that "[s]tarting no later than October 2017, I sent, or directed HeadSpin employees to send, potential investors financial information that overstated HeadSpin's revenue and ARR." Dkt. 88 ¶ 2.

In any event, the government's evidence proves the accuracy of the PSR's description of the offense conduct and the Court should reject Lachwani's factual objections. Most importantly, with respect to the loss calculation, the evidence proves that Lachwani orchestrated a fraud scheme to, at a

1    minimum, falsely quadruple Headspin's performance and Headspin's investors would not have invested

2    if they were aware that Lachwani was committing a fraud.

3         ***First***, the evidence is clear that Lachwani orchestrated a scheme that had a substantial impact on

4    the financial information reported to prospective investors, including Headspin's ARR and revenue.

5    With respect to ARR, which was the lead metric used by investors to evaluate whether or not to invest in

6    the company, Lachwani calculated Headspin's ARR himself, in a spreadsheet to which only he had edit

7    access.  *See* Loukakos Decl. ¶ 5.  The company produced lengthy videos walking through the edit

8    history of this spreadsheet, showing that Lachwani was the only person making changes during the

9    relevant time period.[7]  This spreadsheet was provided to investors, and formed the basis for ARR

10   metrics that was inserted into investor decks.  *See* Investor 2 Decl. Exs. A & B.  The spreadsheet was

11   false because Lachwani inserted lies about deals Headspin had with customers and potential

12   customers—either by substantially overstating the value of actual deals or asserting there was a deal

13   when there was none.  *Compare* Investor 2 Ex. A *with* White Decl. Ex. A.  There was no complex

14   accounting involved.  Lachwani simply made the numbers up out of whole cloth or used multiples of the

15   actual deal sizes.

16        With respect to revenue, the financial statements were false and inflated because Lachwani gave

17   false information about customer deals and purported revenue from Headspin customers to Headspin's

18   bookkeeper, Okmyanskaya.  *See* Okmyanskaya Decl.  There were no other accounting issues identified

19   that led to the inflation of recorded revenues—the inflation of reported revenue was the result of the

20   false information Lachwani was providing to Okmyanskaya about Headspin's relationships with

21   customers and the revenue from those customers.  *Id.* ¶ 12.

22        ***Second***, KPMG's analysis was not unreliable and it provides substantial and clear evidence of

23   Headspin's actual financial performance.  KPMG sifted through the documents showing Headspin's

24   actual deals with customers and Headspin's bank statements to determine Headspin's real revenue and

25   ARR.  *See* White Decl. ¶¶ 4-7; Arora Decl. ¶ 10; Okmyanskaya Decl. ¶¶ 10-13.  Lachwani has argued

26   that KPMG did not speak with Lachwani and that Headspin may have had additional documentation

27

28        [7] Another employee set up the template, but it was Lachwani who inputted the substantive
     information and took exclusive control and access prior to the information being shared with investors.

1    supporting additional revenue. But these arguments make little sense when one considers that (1)

2    Headspin asked Lachwani to provide documents supporting the deals he claimed with customers during

3    KPMG's review and Lachwani provided numerous documents, *see* Okmyanskaya Decl. ¶ 10, (2)

4    documents supporting the customer deals Lachwani claimed did not exist because Lachwani lied about

5    the size of the deal or completely made the deal up, PSR ¶¶ 14-17, and (3) Lachwani has not provided

6    any evidence of real customer deals that KPMG did not recognize, despite the fact that Lachwani had

7    full visibility into sales, did most sales and invoicing himself, and the fact that he refused to return his

8    work computer to the company on his termination (notably, his defense counsel has had access to that

9    computer for years). *See* Dkt. No. 55-1 (Decl. of SA Burstein). Further, it was important for KPMG's

10   work to reflect economic reality because these numbers were important to the significant decisions the

11   board and investors had to make about the future of the company and the millions of dollars of cash

12   reserves (consisting of investor money) the company held. *See* Arora Decl. ¶ 10; Okmyanskaya Decl.

13   ¶ 13. KPMG's analyses are solid and reliable evidence of the impact of Lachwani's misrepresentations

14   on the financial metrics of the company.

15        Lachwani also claims that the overstatement in ARR relating to channel partners was due to a

16   disagreement in accounting methodology between KPMG and Headspin's bookkeeper and not a result

17   of any of his wrongdoing. This argument is also incorrect. Lachwani lied about the size of Headspin's

18   deals that were made through channel partners (i.e., companies that were reselling Headspin's software

19   to end customers). He claimed large million-plus size deals even though Headspin's contract with the

20   channel partner was only for a relatively small amount. *Compare* Investor 2 Ex. A *with* White Decl. Ex.

21   A; PSR ¶ 16. When the money did not come in, he lied to Okmyanskaya about the deals, telling her that

22   Headspin had a contract to receive the entire deal size, minus a commission, but ended up not having the

23   bandwidth to provide support services and, therefore, the reseller provided the support services and kept

24   the money. *See* Okmyanskaya Decl. ¶¶ 7-9. This explanation was false because the contracts never

25   provided for Headspin to receive anything more than the relatively small subscription amount, Headspin

26   was not contracted to provide the end customer support services, and, instead, Lachwani simply guessed

27   at the total size of the contract that the reseller had with the end customer and recognized it all as

28   Headspin revenue despite the fact that most of the reseller's arrangement with its end customer had

1  nothing to do with Headspin.  *See* Okmyanskaya Decl. ¶ 9.  There should be no dispute that if Mr.

2  Lachwani had told the truth, nobody would have told him that he could include these amounts in ARR

3  or recognize them as revenue and it is not believable that he thought this was acceptable.  Indeed, the

4  fact that Lachwani forged invoices with respect to resellers underscores that Lachwani knew that the so-

5  called reseller revenue was not legitimate.  *See* Tomeno Decl. Exs. A-H.

6       **Third**, the evidence in this case establishes that the false information was material to investors

7  and that Headspin would not have obtained the $90.23 million in funding through the relevant offerings

8  absent the fraud, nor would Mr. Lachwani have obtained the $2.5 million he received from selling his

9  stock directly to Investor 1.  Investor 1 Decl. ¶¶ 9, 11; Investor 2 Decl. ¶ 9; Investor 3 Decl. ¶ 5; Arora

10  Decl. ¶¶ 4, 6.  For one, lead investors in Headspin's offerings have stated that they would not have

11  invested had they known of the fraud.  *Id.*  In addition, it is common sense that venture investors would

12  not have invested had they known that Headspin was the center of a major fraud and that its

13  performance in a variety of ways was less than one fourth of what was claimed.  Moreover, the fact that

14  the company returned a portion of investor money after the fraud was discovered and revalued the

15  company at a valuation of less than a third of the valuation in the Series C offering makes clear that the

16  false information Lachwani provided was material and important to investors, and that he substantially

17  inflated the valuation of the company at the time of the relevant offerings.

18       In his objections to the PSR, Lachwani cherry-picks statements from investors (obtained through

19  mostly leading questions during depositions conducted by defense counsel in the civil case brought by

20  the Securities and Exchange Commission) stating that other factors were also important to their decision

21  to invest.  This premise may be partly true, but the fact that there were multiple factors important to

22  these sophisticated investors does not undermine the fact that the financial metrics and past revenue

23  growth were critically important either viewed independently or in conjunction with other information.

24  Lachwani's argument also ignores the fact that he made material misrepresentations about Headspin's

25  product offering—the size of its device cloud was less than 10% of what he claimed, *compare* Loukakos

26  Decl. Ex. A at 8 *with* Investor 2 Decl. Ex. B at 5—and that several of the marquee customers that he

27  claimed were Headspin customers, in fact, were not.  *See* PSR ¶ 18.

28       Lachwani also argues the financial misrepresentations were not material because the investors

**GA-62**

doubted the financial reporting prior to their investments. While it is correct that the investors
understood that the financial reporting was not perfect, they believed that it was generally accurate,
believed that Lachwani was telling them the truth, and relied on the information he was providing them.
*See* Investor 1 Decl. ¶ 7; Investor 2 Decl. ¶ 6; Investor 3 Decl. ¶ 3; Arora Decl. ¶ 3; Faris Decl. ¶ 9; *see
also* Tomeno Decl. Exs. V at 1 (Investor 1 focusing on financial metrics and stating "I do not think they
are BS'ing us"), W (Investor 1 investment memo highlighting financial metrics, growth, and customer
base), X (Investor 2 diligence presentation recognizing disclosed financial imperfections but clearly
relying on false information provided by Mr. Lachwani), Y at 5 (Investor 1 investment memo listing
"strong and accelerating ARR growth" and "recent performance to plan" as primary drivers, among
others, of investment thesis); Z at 2 (Investor 3 discussion: "Can we validate enough that their growth is
real? . . . . I don't think Manish is dishonest . . . regarding Manish's ethics, I don't think he would have
gotten through Appurify and Google so long if he had issues . . . I don't think there's any fraud risk . . .
lot is based on the very strong cust interest and sales growth we've seen, some of what we've
independently validated, enough to believe the excitement is real."); AA (Investor 3 note focusing on
ARR and other financial information in recommending investment).

Lachwani also argues that the fact certain investors' decisions to keep some Headspin stock in
the recapitalized company demonstrates that Headspin stock had value and, therefore, the entire amount
invested by victims is not cognizable as loss. But this argument ignores the fact that the recapitalization
transaction was designed to remedy Lachwani's fraud and return the Series B and C investors' money,
which, is not creditable against sentencing guidelines loss. U.S.S.G. § 2B1.1 note 3(E)(i). A related and
important point: Investors who retained equity owned that equity in a company no longer led by
Lachwani. The recapitalization transaction remedied the fraud by (1) returning cash to the investors and
(2) either providing a note for the remainder or giving the investors more stock, at a significantly lower
valuation than the price at which they invested. It makes sense that many investors would have chosen
to take additional stock instead of a promissory note. The note had minimal upside—paying only 1%
annual interest over five years, and considerable downside—the company might fail and the noteholders
receive nothing. Choosing equity had the same downside, but provided investors upside if Headspin's
new business plan was successful—consistent with the general objectives of venture investors. The

**GA-63**

1  decision to take stock instead of a note when investments were returned after discovery of the fraud does

2  not, therefore, show that the stock investors purchased in a company that was committing fraud had

3  value.

4      ***Fourth***, contrary to Lachwani's argument, Headspin's investors' and board's expectations that

5  the money Headspin received in financing was to be held in liquid, safe investments for operations and

6  were not to be used to gamble in the stock market.  Lachwani was explicitly provided this instruction by

7  an investor and board member.  *See* Faris Decl. ¶ 7; Tomeno Decl. Ex. Q.  Instead, Lachwani used the

8  money Headspin raised from investors to make risky investments in technology stocks and options.

9  Tomeno Decl. Exs. M & N.  Lachwani claims that those investments were not risky, but this argument is

10 clearly belied by the fact that Lachwani falsified an account statement to deliberately conceal the

11 investments and misrepresent to Headspin's board and investors that he was holding the investments in

12 cash or cash equivalents, as he was instructed.  Faris Decl. ¶ 8; Tomeno Decl. Exs. P-T.  The Court

13 should overrule of Lachwani's objections to the factual basis.

14      **B.      Lachwani's Fraud Scheme Had More than Ten Victims**

15      For the foregoing reasons, all Series B and Series C investors, as well as convertible notes

16 investors from December 2017, were victims of Lachwani's fraud scheme.  PSR ¶¶ 23-26 (listing more

17 than 20 investors).  Headspin's investors would not have invested if they had known the company was

18 committing fraud, and they would not have invested at the price that was offered had they known that

19 the scope of Headspin's actual business was less than a quarter of what Lachwani claimed.  Therefore,

20 the Court should apply the two-level enhancement in Guidelines section 2B1.1(b)(2)(A) for more than

21 ten victims.  *See also United States v. Laurienti*, 611 F.3d 530, 557 (9th Cir. 2010) ("[I]t is reasonable to

22 infer that all clients of Defendants who purchased the [] stocks were duped by the conspiracy."); *cf.*

23 *Berger*, 587 F.3d at 1044 (rejecting civil loss causation requirements and finding "various individual

24 victims' respective losses" need not be "precisely determined or linked to the fraud").

25 **IV.    SENTENCING RECOMMENDATION**

26      **A.      Legal Standard**

27      The Court should impose a sentence sufficient to "reflect the seriousness of the offense, promote

28 respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public;

and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d 1069, 1088-89 (9th Cir. 2012) (en banc) (citations omitted); 18 U.S.C. § 3553(a). The United States Sentencing Guidelines serve as "the starting point and initial benchmark" must be considered throughout the sentencing process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). For a sentence outside of the Guidelines range the Court must ensure that the "justification is sufficiently compelling to support the degree of the variance." *Ressam* at 1089 (internal quotation omitted). "[A] major departure should be supported by a more significant justification than a minor one." *Gall v. United States*, 552 U.S. 38, 50 (2007).

**B.      Lachwani's Brazen and Prolonged Fraud Scheme Warrants a Significant Sentence**

Defendant Manish Lachwani is before the Court after having admitted that he defrauded investors with false and inflated financial and customer information, admitted that he acted with the intent to defraud, and admitted that as a result of his lies he obtained money from investors. The guilty plea avoided what would have been a trial with devastating evidence and testimony: The government would have presented financial documents knowingly doctored by Lachwani, fake financial data that at some points more than quadrupled the true size and scope of Headspin's business, lists of "customers" that falsely claimed marquee Silicon Valley and media companies were paying customers, and testimony of the investors, employees, and board members to whom Lachwani repeatedly lied. One unique aspect of this case is that Lachwani appears to have run this multi-year fraud scheme alone, and to do that he needed to take affirmative steps to ensure that he could manipulate the financial information going to investors. He refused to hire a CFO who might have discovered the disconnect between incoming cash, a lack of signed contracts, and the purported ARR and revenue. He instructed bookkeeper Sana Okmyanskaya to enter revenue based on his word alone, and later followed up with fake documentation. He discouraged sales staff from communicating among themselves, and kept control of the document falsely inflating ARR that was later sent to numerous investors. This went on for more than two years, until a newly hired sales executive, Stephanos Loukakos, put various pieces of information together to grow increasingly suspicious of the claims Lachwani made to investors. Loukakos reported the misconduct to the board.

The sentencing guidelines in this case, with the adjustment for loss of more than $65 million, appropriately and reasonably capture the scope of Lachwani's fraud, the seriousness of the offense and intended harm to investors, and the overall culpability of Lachwani. The guidelines call for a sentence of between 78 and 97 months in prison. The circumstances of this particular defendant also support a significant custodial sentence, and Lachwani had significant advantages, including both educational opportunities and significant financial resources. After what Lachwani had accomplished, including numerous patents and highly lucrative and marketable skills and experience he obtained from Silicon Valley technology companies including Google and Amazon, only greed and ego can explain his criminal conduct. The circumstances of the offense, including its timeframe, scope, and the complexity and sophistication of the steps that Lachwani had to take to maintain the fraud for so long, also supports a sentence that provide significant punishment—in complex financial crimes such as this, the Court should consider both the specific and general deterrent effect of the sentence. For these reasons, the government recommends a sentence of 63 months, a variance from the low-end of offense level 28, in order to reasonably but justly punish the defendant for the crimes he committed.

## V.       CONCLUSION

For the foregoing reasons, the government recommends that the Court sentence Lachwani to 63 months in prison, along with a term of supervised release with the conditions set forth in the PSR. The government anticipates making an additional filing in advance of the January 17, 2023 sentencing hearing addressing any remaining sentencing issues and restitution.

DATED:  December 6, 2023                          Respectfully submitted,

                                                  ISMAIL J. RAMSEY
                                                  United States Attorney


                                                  _____/s/_____
                                                  LLOYD FARNHAM
                                                  NOAH STERN
                                                  Assistant United States Attorney

**GA-66**

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 21-CR-00353 |
| v. | |
| MANISH LACHWANI | |

**EXPERT REPORT OF JEFFREY P. HART**

**Kroll, LLC**

**October 19, 2023**

**GA-67**

Expert Report of Jeffrey Hart
October 19, 2023

# TABLE OF CONTENTS

I.     Introduction ........................................................................................................................... 1

II.    Qualifications ...................................................................................................................... 2

III.   Background ........................................................................................................................... 3

IV.   Basis for Opinions and Reasoning ..................................................................................... 6

V.    Summary of Opinions ......................................................................................................... 7

VI.   Analysis Performed ............................................................................................................. 8

    A.    Scenario 1: Amount Invested .................................................................................. 8

    B.    Scenario 2: Amount Invested Minus Estimated Value (Recapitalization Price) ........... 10

    C.    Scenario 3: Amount Invested Minus Estimated Value (ARR Multiple) ........................ 12

## I.  Introduction

1.  I have been retained by the U.S. Attorney's Office for the Northern District of California
    ("USAO") in connection with the matter of United States of America v. Manish Lachwani
    to provide analyses and calculations of the amount of loss suffered by certain investors
    ("Loss") as a result of the fraud committed by Mr. Lachwani, as a means to guide
    sentencing.[1]

2.  This report ("Report") was prepared by me and personnel of Kroll, LLC ("Kroll"), working
    under my supervision. Kroll is being compensated for the services of its personnel on an
    hourly basis. The hourly rates for personnel working on this engagement range from $225
    to $725 per hour. My hourly rate is $575 per hour and payment to my team and me is not
    contingent in any way on the outcome of this litigation.

3.  A summary of my opinions and analyses relating to this matter are set forth in this Report.
    To the extent that additional information is discovered, I may amend or supplement my
    opinion as necessary. If expert testimony is requested, I will serve as an expert witness.

4.  While my testimony may involve reference to valuation reports, offering memorandums
    and agreements, accounting records, and other documents, the analysis is not an audit or
    review in accordance with generally accepted auditing standards ("GAAS") of such
    reports, financial statements, and records.

5.  This Report has been prepared in connection with the litigation matter referenced on the
    cover page hereof. This Report is to be used solely for the purposes of the subject litigation

---

[1] Amendment of Solicitation of Contract between the U.S. Attorney's Office for the Northern District of California
and Kroll, LLC, dated June 14, 2023.

**GA-69**

and is not to be used or relied upon for any other purpose without the express written consent of Kroll.

## II. Qualifications

6.  I am a Senior Director in the Expert Services practice at Kroll, based in Washington, DC. I have over 16 years of professional experience focused on business valuation, economic damages, forensic accounting, and financial fraud in connection with a wide array of complex financial disputes and investigations. My areas of expertise include business valuation disputes, commercial damages/lost profits analyses, forensic accounting and fraud investigations, financial reporting disputes, and post-acquisition disputes.

7.  Throughout my career, I have performed numerous valuation and economic damages analyses across a variety of industries. These analyses have included business valuations in the context of shareholder disputes, as well as economic damages calculations resulting from breaches of contracts, shareholder disputes, partnership disputes, and buyer/seller post-acquisition disputes. As part of these disputes, I have performed valuations of private businesses, calculations of lost profits damages, unjust enrichment damages, and diminution of business value damages.

8.  Prior to joining Kroll, I was a member of the forensic accounting practice at Veris Consulting, Inc., a national forensic accounting firm.

9.  I am a Certified Public Accountant (CPA) in Virginia. I am also Certified in Financial Forensics (CFF) and Accredited in Business Valuation (ABV) by the American Institute of Certified Public Accountants (AICPA). Lastly, I am a Certified Fraud Examiner (CFE) accredited by the Association of Certified Fraud Examiners (ACFE).

GA-70

10.   My curriculum vitae is attached as Appendix A of this Report.

## III. Background[2]

11.   In 2015, Manish Lachwani founded Headspin, Inc. ("Headspin") and served as the

company's CEO until May 2020.  Headspin is a software-as-a-service ("SaaS") company

that provides its clients with software tools and access to remote devices around the world

that allow the clients to test mobile applications and browsers on mobile devices, browsers,

and networks in those locations.

12.   Between approximately August and September 2015, Headspin raised approximately $11

million in a Series A preferred stock offering.[3]  Between approximately April 2017 and

May 2018, Headspin raised approximately $24.7 million in a series of issuances of

convertible promissory notes that investors could "convert" to shares in the company.[4]

Between approximately September and October 2018, Headspin raised approximately $20

million in a Series B preferred stock offering.[5] The price of the stock sold to investors in

the Series B stock offering valued Headspin at approximately $500 million.[6] Between

approximately November 2019 and April 2020, Headspin raised approximately $60 million

from investors in a Series C preferred stock offering.[7] The price of the stock sold to

---

[2] Unless otherwise cited, the information referenced in the Background section was obtained from discussions with Counsel and/or the Factual Background and Guidelines Calculation document that I understand Counsel provided to the Probation Office (Headspin Facts for Probation.docx) and I have assumed it to be true for purposes of this report.

[3] Background of Recapitalization of Headspin, Inc. (HS00032026, at 028).

[4] Background of Recapitalization of Headspin, Inc. (HS00032026, at 028).

[5] Headspin, Inc. Series B Stock Certificate Ledger as of October 25, 2018 [HS00010629 at "Series B" tab].

[6] ▮Redacted▮ Series B Investment Committee Memorandum, dated October 2018, slide 8 [IC0013838 at -846].

[7] Headspin, Inc. Series C Preferred Stock Purchase Agreement, dated November 1, 2019 [HS00187253 at -276 to 280].

investors in the Series C stock offering valued Headspin at approximately $1.1 billion.[8] In total, Headspin raised more than $110 million.[9]  In May 2019, between the Series B and C Preferred offerings, Lachwani personally sold some of his Headspin stock to an existing company investor, ███Redacted███, for $2.5 million, at a price that valued Headspin at approximately $750 million.[10]

13.   In connection with these fundraising rounds and the secondary sale, I understand that Lachwani sent or directed Headspin employees to send potential investors financial information that overstated Headspin's revenue and Annual Recurring Revenue ("ARR").

14.   I further understand that beginning no later than October 2017, Lachwani knowingly and intentionally made materially false and misleading statements to investors and failed to disclose material facts.  Specifically, Lachwani (1) caused Headspin to record revenue and include in calculations of ARR amounts from purported customers that had not agreed to purchase Headspin's software and services or to pay for software and services, (2) falsely inflated Headspin's revenue and ARR from real Headspin customers and resellers by, for example, continuing to include in calculation of ARR amounts from customers that previously terminated their Headspin contracts, (3) caused false invoices to be created and sent to Headspin finance staff in order to reduce Headspin's unbilled receivables and conceal the false and inflated revenue Lachwani had caused Headspin to record, (4) communicated false financial and sales information to investors, (5) communicated

---

[8] ██Redacted██ Series C Investment Committee Memorandum, dated November 2019, slides 3 and 45 [IC0013873 at -876 and 918].

[9] Comprised of approximately $11 million in Series A preferred stock, $24.7 million in convertible promissory notes, $20 million in Series B preferred stock, and $60 million in Series C preferred stock.

[10] ██Redacted██ Secondary Investment Committee Memo, dated May 2019, slides 3 and 9 [IC0013857 at -860, 866].

materially false information about Headspin's product and customer adoption to investors, and (6) used significant amounts of company and investor funds to make unauthorized, high-risk investments in the stock market and failing to disclose the risky investment of company funds to investors, shareholders, and the board of directors.

15.   After the discovery of the fraud, Headspin retained KPMG to analyze Headspin's contracts with customers and calculate Headspin's actual revenues and ARR during the relevant time period.  KPMG's analysis determined that Headspin's revenues and ARR were substantially less than what Lachwani had reported to potential investors.[11] Figure 1 presents a comparison of Headspin's reported ARR and KPMG's recalculation of ARR for a snapshot of the relevant period:

**Figure 1: ARR Calculation Comparison**

| Source | Q2 2018 | 2018 | Q1 2019 | Q2 2019 |
|---|---|---|---|---|
| Original ARR[12] | $ 33,800,000 | $ 43,000,000 | $ 46,400,000 | $ 54,700,000 |
| KPMG ARR[13] | $  5,541,699 | $  7,900,411 | $  9,335,279 | $  9,675,224 |

16.   After the fraud was discovered, and the company's reported ARR and revenue was determined to be significantly overstated, Headspin's board of directors (excluding Lachwani) concluded that the Series B and Series C financings were substantially overpriced.

---

[11] [Redacted] Series B Investment Committee Memorandum, dated October 2018, slide 8 [IC0013838 at -846]; [Redacted] Series C Investment Committee Memorandum, dated November 2019, slide 45 [IC0013873 at -918]; [Redacted] Secondary Investment Committee Memo, dated May 2019, slides 3 and 9 [IC0013857 at -860, 866]; KPMG ARR Analysis MoM.xlsx [HS00195301].

[12] [Redacted] Series B Investment Committee Memorandum, dated October 2018, slide 8 [IC0013838 at -846]; [Redacted] Series C Investment Committee Memorandum, dated November 2019, slide 45 [IC0013873 at -918]; [Redacted] Secondary Investment Committee Memo, dated May 2019, slides 3 and 9 [IC0013857 at -860, 866].

[13] KPMG ARR Analysis MoM.xlsx [HS00195301].

5

17. Headspin agreed to allow full-price purchasers of Series B and Series C preferred stock the option to sell back to the company 70% of their preferred stock at the price they had originally purchased the stock for cash and pay the remaining 30% with promissory notes payable in five years, with interest accruing at a rate of 1% annually.[14]

18. During the negotiated recapitalization process the Series B Preferred Stock was repriced from $26.5296 per share to $7.1508 per share and the Series C Preferred Stock was repriced from $48.6834 per share to $10.3501 per share.[15]  Lachwani also agreed to return $1.9 million to ▮Redacted▮ (and provide ▮Redacted▮ additional stock through the company) to resolve claims relating to Lachwani's secondary sale of stock to ▮Redacted▮.[16]

## IV.  Basis for Opinions and Reasoning

19. The analysis and opinions in this Report are based upon the information and documentation available to me as of the date of this Report, my education, my experience performing similar financial analyses and economic damage calculations, my own research, and accepted damages methodologies and approaches. In the course of my analysis, I requested and received access to information including, but not limited to, documents provided upon my request by Counsel. In addition to documents produced and created during this case, I considered relevant publicly available information. The documents and information I utilize in my analysis and Report are the types of documents and information upon which experts in my field typically rely when performing such analysis. A list of documents I considered informing my opinions is provided in Appendix B.

---

[14] Background of Recapitalization of Headspin, Inc. (HS00032026, at 033).

[15] Background of Recapitalization of Headspin, Inc. (HS00032026, at 034).

[16] Background of Recapitalization of Headspin, Inc. (HS00032026, at 031).

6

20. I have been asked to calculate the amount of Loss suffered by Headspin's full-price Series B and C Preferred purchasers ("Headspin Investors") as a result of the fraud perpetrated by Lachwani. The fraud involved in part overstated financial performance of Headspin in conjunction with the Series B offering, which took place from September through October 2018, and the Series C offering, which took place November 2019 through March 2020 (collectively, the Relevant Timeframe").

21. I calculated the Loss under three scenarios detailed below based on instruction from Counsel regarding the appropriate framework for measuring the Loss as required by the relevant sentencing guidelines. I am not expressing a legal opinion, nor attempting to interpret the relevant sentencing guidelines.

22. I reserve the right to prepare supplemental materials such as summaries, graphical exhibits, or charts, as well as to provide materials in response to any additional expert opinions.

**V. Summary of Opinions**

23. I have calculated the Loss to the Headspin Investors using three different methodologies:

- Scenario #1: Loss to Headspin Investors calculated as the total amount invested by full-price purchasers in the Headspin Series B and Series C Preferred stock offerings. See Section VII.A. below for my calculation.

- Scenario #2: Loss to Headspin Investors calculated as the difference between the total amount invested by full-price purchasers in the Headspin Series B and Series C Preferred stock offerings and the estimated value of shares received by those investors at the time of their investment, using the recapitalization share price as an estimate of value. See Section VII.B. below for my calculation.

- <u>Scenario #3</u>: Loss to Headspin Investors calculated as the difference between the total
  amount invested by full-price purchasers in the Headspin Series B and Series C
  Preferred stock offerings and the estimated value of shares received by those
  investors at the time of their investment based on KPMG's recalculation of ARR for
  the period applicable to Series B and Series C, respectively. See Section VII.C. below
  for my calculation.

24.   The calculation of Loss based on each scenario is summarized below:

**Figure 2: Summary of Loss Scenarios[17]**

| Scenario | Total |
|---|---|
| 1 – Amount Invested | $  79,979,610 |
| 2 – Amount Invested Minus Estimated Value (Recapitalization Price) | $  61,838,284 |
| 3 – Amount Invested Minus Estimated Value (ARR Multiple) | $  59,289,270 |

## VI. Analysis Performed

### A.    Scenario 1: Amount Invested

25.   The Loss calculated under Scenario #1 reflects the total amount invested in Headspin's
      Series B and C Preferred stock offerings by full-price purchasers. To calculate this amount,
      I reviewed Headspin Inc.'s Series B Preferred Stock Purchase Agreement, dated September
      10, 2018,[18] Series C Preferred Stock Purchase Agreement, dated November 1, 2019,[19]
      Headspin's Series B Stock Certificate Ledger as of October 25, 2018, and Headspin's

---

[17] See Schedule 1.

[18] Headspin Inc.'s Series B Preferred Stock Purchase Agreement, dated September 10, 2018 [IC0000877].

[19] Headspin Inc.'s Series C Preferred Stock Purchase Agreement, dated November 1, 2019 [HS000187253].

Series C Stock Certificate Ledger as of April 16, 2021.[20] This measure of Loss is based on the fact that the Headspin Investors invested significant sums of money after receiving false representations about the Company's financial performance and customer growth. I understand that Headspin Investors represented that they would not have invested in those offerings if they knew the true condition of the Company at the time of their investment. Moreover, during the ensuing post-investment period up until the Company attempted to remedy these losses, the Headspin Investors lost access to the entirety of the capital they invested, and all of the invested funds were under the control of Headspin and Lachwani in his capacity as CEO of Headspin.

26. I observed that 753,108 shares were purchased in the Series B investment at a cash purchase price of $26.53 per share.[21]

27. Similarly, I observed that 1,232,452 shares were purchased in the Series C investment at a cash purchase price of $48.68 per share.[22]

28. See Figure 3 for my calculation of Loss based on the total amount invested in Headspin's Series B and C Preferred Stock offering:

---

[20] Headspin, Inc. Series B Stock Certificate Ledger as of October 25, 2018 [HS00010629 at "Series B" tab]; Headspin, Inc. Series B Stock Certificate Ledger as of October 25, 2018 [HS00015380 at "PC Certificate Ledger" tab, filter on "Cash Paid" greater than $0]. For purposes of this loss analysis, I have relied upon Headspin, Inc.'s Series B and Series C Stock Certificate Ledger when calculating the total investment in Headspin's Series B Preferred Stock.

[21] Schedule A to Headspin Inc.'s Series B Preferred Stock Purchase Agreement, dated September 10, 2018 [IC0000877 at -917 to 919]; Schedule 2.

[22] Schedule A to Headspin Inc.'s Series C Preferred Stock Purchase Agreement, dated November 1, 2019 [HS00187253 at -276 to 280]; Schedule 2.

Expert Report of Jeffrey Hart
October 19, 2023

**Figure 3: Series B and C Preferred Stock Offering**[23]

| Offering | No. of Shares Purchased | Cash Purchase Price | Amount Invested |
|---|---|---|---|
| Series B Offering | 753,108 | $ 19,979,656 | $ 19,979,656 |
| Series C Offering[24] | 1,232,452 | 59,999,954 | 59,999,954 |
| **Total** | **1,985,560** | **$ 79,979,610** | **$ 79,979,610** |

**B.  Scenario 2: Amount Invested Minus Estimated Value (Recapitalization Price)**

29.  Scenario #2 is a Loss calculation based on the difference between the amount actually

invested by Headspin Investors and an estimate of the value of the shares received by those

investors at the time of each of the offerings. To arrive at the total amount invested by full-

price purchasers in Headspin's Series B and C Preferred stock offerings I performed the

same calculation as detailed in Scenario #1 above.  I then calculated the Loss incurred as

the difference between the amount Headspin Investors actually invested in conjunction

with each of the stock offerings and an estimate of the value of the shares investors

received at the time of their investment using the adjusted stock price for the

recapitalization transaction as an estimate of fair value.

---

[23] Schedule A to Headspin Inc.'s Series B Preferred Stock Purchase Agreement, dated September 10, 2018 [IC0000877 at -917 to 919]; Schedule A to Headspin Inc.'s Series C Preferred Stock Purchase Agreement, dated November 1, 2019 [HS00187253 at -276 to 280]; Schedule 2.

[24] I understand that the number of shares purchased in conjunction with the Series C offering varies across different sources of information. For example, the Series C Purchase Agreement shows 1,232,695 shares purchased for $59,999,954 in total proceeds, while HEADSPIN_000153380_CONFIDENTIAL.xlsx shows 1,540,565 shares purchased for $59,999,963. I have not been able to reconcile this difference. However, because the total proceeds are virtually identical across sources, this difference does not have a material impact on my analysis. I also note that the number of shares purchased by the ▮▮Redacted▮▮ appears to contain a typo in the Series C Stock Purchase Agreement [HS00187253]. The stock purchase agreement states that 1,270 shares were purchased, whereas the stock certificate ledger [HEADSPIN_00015380 at tab "PC Certificate Ledger] states that 1,027 shares were purchased. I have assumed the stock certificate ledger to be correct, as the implied price per share per the stock certificate ledger is $48.68, consistent with the Series C price paid by the other investors.

Expert Report of Jeffrey Hart
October 19, 2023

30.  It is my opinion that the recapitalization share price for each of those offerings (i.e., the

Series B and Series C) is a reasonable estimate of the value of shares at the time of the

investments.

31.  Based on my review of documents from Headspin's recapitalization transaction,[25] the

recapitalization share price for the Series B and C Preferred Stock were:

**Figure 4: Series B and C Preferred Stock Pricing[26]**

| Offering | Initial Cash Price | Proposed Recapitalization Price |
|---|---|---|
| Series B Offering | $26.53 | $7.15 |
| Series C Offering | $48.68 | $10.35 |

32.  I then calculated the Loss suffered by Headspin Investors as the difference between the

amount invested in Headspin's Series B and C Preferred Stock, less the value of the stock

investors received, estimating the value as the share prices for each series of stock in the

recapitalization transaction.

---

[25] Letter of Transmittal [HEADSPIN_00015385].

[26] See Schedule A to Headspin Inc.'s Series B Preferred Stock Purchase Agreement, dated September 10, 2018 [IC0000877 at -917 to 919]; Schedule A to Headspin Inc.'s Series C Preferred Stock Purchase Agreement, dated November 1, 2019 [HS00187253 at -276 to 280]; and Schedule 2 for the initial cash and debt cancellation price; see Letter of Transmittal Pursuant to the Offer to Purchase and Exchange Dated October 19, 2020 [HEADSPIN_00015385].

11

GA-79

**Figure 5: Series B and C Preferred Stock Adjusted**[27]

| Offering | Total Original Investment | Estimated Value of Stock Received | Loss |
|---|---|---|---|
| Series B Offering | $ 19,979,656 | $ 5,385,325 | $ 14,594,331 |
| Series C Offering | 59,999,954 | 12,756,001 | 47,243,952 |
| **Total** | **$ 79,979,610** | **$ 18,141,326** | **$ 61,838,284** |

### C.   Scenario 3: Amount Invested Minus Estimated Value (ARR Multiple)

33.   Scenario #3 is a Loss calculation based on the difference between the amount actually invested by Headspin Investors and an estimate of the value of the shares received by those investors at the time of each of the offerings. To arrive at the total amount invested in Headspin's Series B and C Preferred stock offerings by full-priced purchasers I performed the same calculation as detailed in Scenario #1 above. I then calculated the Loss incurred as the difference between the amount Headspin Investors actually invested in conjunction with each of the stock offerings and an estimate of the value of the shares investors received at the time of their investment using the ARR metrics calculated by KPMG. Because the valuation of Headspin (which ultimately drove the price per share paid by the Headspin Investors) was analysed as a multiple of the false ARR for the relevant time periods, substituting in KPMG's ARR calculations to perform such multiple analysis is a reasonable estimate of the fair value of Headspin stock at the time of the offerings.

34.   By way of background, investors commonly use multiples to assess the value of a potential investment. Multiples are factors which are multiplied by a fundamental financial variable to calculate an indication of value.[28] Multiples are primarily used when investors employ

---

[27] See Schedule 2 and Figure 3 for the Total Original Investment; see Schedule 3 for the Total Adjusted Investment.

[28] The Market Approach to Valuing Businesses, Second Edition, Shannon Pratt, p. xxxv.

GA-80

the Market Approach to value an investment. Based on my review of the ████████ investment committee memoranda, I understand that the value of Headspin as determined based on a multiple of ARR was a factor in ████████'s investment decision.

35.    ARR is generally considered to be an important and useful metric for purposes of valuing SaaS companies.[29]  ARR is generally understood to be the company's monthly subscription revenue at a particular time, multiplied by twelve months.[30]  ARR thus serves as an annualized estimate of the recurring revenue the company is generating at a certain point in time.[31]

36.    A multiple is the result of dividing a numerator that represents the value, i.e., the Enterprise Value of Headspin, by a denominator that represents the financial variable (i.e., Headspin's ARR).[32] If a variable for an underlying investment is overstated and a multiple is then applied to that variable in a Market Approach analysis (e.g., Headspin's ARR), the resulting valuation of the underlying investment will also be overstated. I reviewed the documentation provided to assess whether investments based on a multiples analysis were impacted by Headspin's overstatement of ARR.

37.    Additionally, investors utilizing a Market Approach analysis would compare their target company (e.g., Headspin) to a set of comparable companies' or industry's financial

---

[29] "The Right Way to Calculate & Use ARR," Driven Insights, SaaS Metrics Playbook, April 14, 2022 (accessed: https://www.driveninsights.com/small-business-finance-blog/the-right-way-to-calculate-and-use-arr-saas-metrics-playbook). *See also*, Early Stage Valuation, A Fair Value Perspective, First Edition, Antonella Puca, Exhibit 11.8 which details that ARR "signals of the company's progress toward profitability and a sustainable business model."

[30] Early Stage Valuation, A Fair Value Perspective, First Edition, Antonella Puca, Exhibit 8.6.

[31] Early Stage Valuation, A Fair Value Perspective, First Edition, Antonella Puca, Exhibit 8.6.

[32] The Market Approach to Valuing Businesses, Second Edition, Shannon Pratt, p. 4.

GA-81

variables. These comparable companies would provide an investor a range of potential multiples to apply in valuing the target company.

38.   If the target company appears stronger than its comparable peers or industry based on specific financial variables such as size, revenue, or growth, among other variables, then an investor may choose to utilize a multiple at the higher end of the observed range to value their target company.[33] Conversely, if the target company appears weaker than its comparable peers or industry based on the same financial variables, then an investor may choose to utilize a multiple at the lower end of the observed range to value their target company.[34] As such, Headspin's falsely portrayed revenue, ARR, and growth may have led investors to consider a higher multiple than was warranted based on the actual financial performance of the Company.

39.   For purposes of this analysis, I have not adjusted the range of multiples utilized in Headspin's Investment Committee Memorandums but note that a downward adjustment to the multiple would compound the loss observed in this scenario.

40.   For Scenario #3, I reviewed the initial valuations within the ███████ Series B and Series C Investment Committee Memorandums.[35] These memorandums included a valuation summary which detailed Headspin's enterprise value and associated ARR multiples for each of the Series B and C Preferred Stock offerings (see, for example, Figure 6 and Figure 7):

---

[33] The Market Approach to Valuing Businesses, Second Edition, Shannon Pratt, p. 88-89.

[34] The Market Approach to Valuing Businesses, Second Edition, Shannon Pratt, p. 88-89.

[35] ████ Series B Investment Committee Memorandum dated October 2018 [IC0013838]; ████ Series C Investment Committee Memorandum, dated November 2019 [IC0013873].

**Figure 6:** Redacted **Series B Investment Memorandum: Valuation Summary**[36]

| Valuation Summary ($M) | |
|---|---|
| Pre-Money Valuation | $500.0 |
| Primary | $20.0 |
| **Post-Money Valuation** | **$520.0** |
| Add: Debt (as of 6/30/18) | $0.0 |
| Less: Cash (as of 6/30/18) | ($36.0) |
| **Enterprise Value ($M)** | **$484.0** |
| 2017A ARR | $23.6 | 20.5x |
| LTM ARR (Q2'18) | $33.8 | 14.3x |
| 2018E ARR | $43.0 | 11.3x |

**Figure 7:** Redacted **Series C Investment Memorandum: Valuation Summary**[37]

| Analysis at Various Prices ($ in M) | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| **Primary Transaction (September 2019)** | | | | | | | | | |
| Pre-Money Equity Value ($M) | | $750.0 | $900.0 | $1,050.0 | $1,150.0 | $1,200.0 | $1,300.0 | $1,400.0 | $1,500.0 |
| Plus: Primary Capital | | $20.0 | $20.0 | $20.0 | $20.0 | $20.0 | $20.0 | $20.0 | $20.0 |
| Post-Money Equity Value ($M) | | $770.0 | $920.0 | $1,070.0 | $1,170.0 | $1,220.0 | $1,320.0 | $1,420.0 | $1,520.0 |
| Less: Primary Capital | | ($20.0) | ($20.0) | ($20.0) | ($20.0) | ($20.0) | ($20.0) | ($20.0) | ($20.0) |
| Less: Cash & Cash Equivalents (as of August 16, 2019) | | ($58.2) | ($58.2) | ($58.2) | ($58.2) | ($58.2) | ($58.2) | ($58.2) | ($58.2) |
| Enterprise Value ($M) | | $691.8 | $841.8 | $991.8 | $1,091.8 | $1,141.8 | $1,241.8 | $1,341.8 | $1,441.8 |
| | | | | | | | | | |
| Multiples (x) | Metric ($M) | Y/Y Growth % | | | | | | | |
| LTM ARR (Q2'19 ending) | $54.7 | 70.6% | 12.7x | 15.4x | 18.1x | 20.0x | 20.9x | 22.7x | 24.5x | 26.4x |
| 2019E ARR - Management | $82.2 | 95.3% | 8.4x | 10.2x | 12.1x | 13.3x | 13.9x | 15.1x | 16.3x | 17.5x |
| 2020E ARR - Management | $123.3 | 50.0% | 5.6x | 6.8x | 8.0x | 8.9x | 9.3x | 10.1x | 10.9x | 11.7x |

41.     The Series B and Series C Investment Committee Memorandums contain various ARR

measurements and ARR multiples of Headpin's Enterprise Value.[38] These ARR

---

[36] Redacted Series B Investment Committee Memorandum, dated October 2018, slide 8 [IC0013838 at -846]. I note that this calculation fails to deduct the primary proceeds received in calculating enterprise value. I have incorporated this additional deduction into my analysis.

[37] Redacted Series C Investment Committee Memorandum dated November 2019, slide 45 [IC0013873 at -918].

[38] Redacted Series B Investment Committee Memorandum dated October 2018 [IC0013838]; Redacted Series C Investment Committee Memorandum, dated November 2019 [IC0013873].

15

GA-83

measurements include prior year actual ARR measurements, current period actual ARR

measurements, and expected ARR measurements for future years. For purposes of this

analysis, I have considered the ARR measurements for the month nearest the relevant

offering, which contain the most recently available actual financial data.

42. I understand that subsequent to the discovery of the fraud, KPMG recalculated Headspin's

ARR on a monthly basis from January 2018 through June 2020.[39] Figure 8 summarizes

KPMG's ARR recalculation compared to the ARR reported to investors as of each of the

Series offerings:

**Figure 8: ARR Calculation Comparison**

| Source | 2018 Q2 | 2018 | 2019 Q1 | 2019 Q2 |
|---|---|---|---|---|
| Original ARR[40] | $ 33,800,000 | $ 43,000,000 | $ 46,400,000 | $ 54,700,000 |
| KPMG ARR[41] | $ 5,541,699 | $ 7,900,411 | $ 9,335,279 | $ 9,675,224 |

43. To calculate the Loss under Scenario #3, I recalculated the implied valuation of Headspin

utilizing the following steps:

- First, I substituted the ARR utilized in the Series B and C Investment Memorandums

  with KPMG's recast ARR using the actual financial information available within

  each memorandum.[42]

---

[39] KPMG ARR Analysis MoM.xlsx [HS00195301].

[40] LTM ARR as of Q2 2018, Redacted Series B Investment Committee Memorandum, dated October 2018, slide 8 [IC0013838 at -846]; LTM ARR as of Q2 2019, Redacted Series C Investment Committee Memorandum, dated November 2019, slide 45 [IC0013873 at -918]; Redacted Secondary Investment Committee Memo, dated May 2019, slides 3 and 9 [IC0013857 at -860, 866].

[41] KPMG ARR Analysis MoM.xlsx [HS00195301].

[42] KPMG's recast ARR as of June 30, 2018 was used for Series B and KPMG's recast ARR as of July 31, 2019 was used for Series C.

- I then multiplied the ARR multiples utilized for each valuation by the updated ARR amounts from KPMG to calculate an adjusted enterprise value.

- Lastly, I added cash and cash equivalent on the balance sheet at the time of each valuation and the primary proceeds from the series to calculate an adjusted post-money valuation for Headspin. This post-money valuation value is the equity value of Headspin, which is an estimated value of the shares that the Headspin Investors owned after each Series closed.[43]

44. Following these steps, I arrived at the following adjusted post-money valuations for Headspin (*see* Figure 9):

### Figure 9: Series B and C Adjusted Post-Money Valuations[44]

| Calculation | Schematic | Series B | Series C |
|---|---|---|---|
| KPMG Recast ARR | [A] | $ 5,541,699 | $ 9,675,224 |
| ARR Multiple | [B] | 13.7x | 19.0x |
| Adjusted Enterprise Value | [C]=[A]*[B] | 75,921,282 | 183,829,251 |
| Plus: Cash | [D] | 36,000,000 | 58,200,000 |
| Plus: Primary | [E] | 19,979,656 | 59,999,954 |
| **Adjusted Post-Money Valuation** | **[F]=[C]+[D]+[E]** | **$ 131,900,938** | **$ 302,029,205** |

45. Next, I calculated the adjusted value of full-price purchasers' stock for each of the Series B and Series C offering assuming that the same percentage ownership would have been offered, but that the amount raised would have been based on the adjusted valuation. (*See* Figure 10 – schematic continued from Figure 9 above)

---

[43] Post-money valuation is defined as "the valuation of a company *after* a new financing round has taken place" and pre-money valuation is defined as "the valuation of a company *before* the new financing round." Early Stage Valuation, A Fair Value Perspective, First Edition, Antonella Puca, Exhibits 4.1 and 4.2.

[44] See Schedule 4.

**Figure 10: Series B and C Adjusted Value[45]**

| Calculation | Schematic | Series B | Series C |
|---|---|---|---|
| Initial Post-Money Valuation | [G] | $ 519,979,656 | $ 1,159,999,954 |
| Value of Ownership Offered | [H] | 19,979,656 | 59,999,954 |
| Ownership Percentage | [I]=[H]/[G] | 4% | 5% |
| Adjusted Post-Money Valuation | [F] | 131,900,938 | 302,029,205 |
| **Adjusted Value of Series** | **[J]=[I]*[F]** | $      5,068,151 | $     15,622,189 |

46.     Lastly, I calculated the Loss as the difference between the amount paid by full-price

purchasers for each Series and the value of stock these investors received based on the

adjusted valuation of Headspin. Figure 11 presents this calculation:

**Figure 11: Series B and C Post-Money Valuations Comparison (in millions)[46]**

| Calculation | Series B | Series C | Total Loss |
|---|---|---|---|
| Value of Ownership Offered | $    19,979,656 | $    59,999,954 | $    79,979,610 |
| Adjusted Value of Stock | 5,068,151 | 15,622,189 | 20,690,340 |
| **Difference** | **$   14,911,505** | **$   44,377,765** | **$   59,289,270** |

_____

By: Jeffrey P. Hart, CPA, ABV, CFF, CFE

---

[45] See Schedule 4.

[46] See Schedule 4.

GA-86

# Appendix A



## Jeffrey P. Hart, CPA, CFF, ABV, CFE

Senior Director – Expert Services Practice

T  +1 202 649 1218
M +1 508 395 9043
E jeffrey.hart@kroll.com



**Jeffrey Hart** is a Senior Director in the Expert Services practice in the Washington, DC office of Kroll. Jeff has over 16 years of experience advising clients and managing engagement teams in the areas of forensic accounting, valuation, economic damages and financial fraud in connection with a wide array of complex financial disputes and investigations. Jeff's areas of expertise include forensic accounting and fraud investigations, post-acquisition disputes, commercial damages analyses, and business valuation disputes.

Prior to joining Kroll, Jeff worked at a national forensic accounting firm on engagements involving compliance with SEC and FINRA regulations, compliance with generally accepted accounting principles, reinsurance disputes, reviews of internal controls, and economic damages analyses.

Jeff holds a B.S. in Business Administration from the University of Richmond.  He is a Certified Public Accountant in Virginia, holds a Certification in Financial Forensics, is Accredited in Business Valuation and is a Certified Fraud Examiner.

### Representative Engagements

#### Forensic Accounting and Fraud Investigations

- Performed investigation of publicly traded manufacturing company for allegations of fraudulent financial reporting related to the company's inventory valuation, revenue and expense recognition practices.  Investigation included analysis of company's accounting practices, assisting counsel with interviews of key individuals, and preparation of a report detailing findings.

- Performed a board-led investigation of auto parts manufacturer for allegation of fraudulent financial reporting related to inventory and deferred tax asset write-downs, as well as improper pressure from management. Investigation included analysis of company's accounting practices, assisting counsel with interviews of key individuals, preparation of a report detailing findings, and advising the board on remediation measures.

- Performed a board led financial reporting investigation regarding the accounting treatment of a receivable from an affiliate and extent to which an affiliate should have been consolidated under IFRS and U.S. GAAP.

- Performed investigation of transportation company for allegations of improper payments made to individuals in order to procure contracts. Analysis included tracing vendor payments, assisting counsel with interviews of key individuals, and preparation of a report detailing findings.

- Performed investigation of commercial real estate development joint venture associated with construction-related cost overruns.

- Performed investigation of ambulance transportation company for allegations of overbilling city government for Medicaid funded transportation.

**GA-88**

- Assisted bankruptcy trustee in investigation of preference payments and fraudulent transfers associated with the bankruptcy of a real estate development firm. Analysis involved tracing the source and uses of cash and evaluating the economic substance of transactions.

- Performed investigation of the books and records of a non-profit foundation for evidence of asset misappropriation.

- Analyzed the adequacy of due diligence procedures and compliance with SEC and FINRA regulations in connection with a dispute between a pension fund and investment advisor over an investment made in the Madoff Ponzi scheme.

- Performed forensic analysis on the extent to which a mortgage insurer materially increased credit risk profiles of insured residential mortgage-backed securities that subsequently experienced a high rate of default.

- Analyzed accounting judgments made by a technology firm for class action securities lawsuit. Analysis involved evaluation of revenue recognition practices, accounting policies, and the internal control environment, as well as whether there was any misconduct or intent to deceive by the company and/or its management.

- Analyzed financial statement disclosures of an investment bank in response to allegations of securities fraud related to timing of disclosure of losses on assets recorded at fair value and goodwill impairment following the merger of two major banking entities.

**Post-Acquisition Disputes**

- Performed post-acquisition dispute damages analysis of a household products manufacturer related to claims of improper revenue and expense recognition practices of previous ownership. Engagement involved assisting the client in identifying and preserving documentary evidence and preparation of the damages claim. Submitted damages analysis to representation and warranties insurer as part of indemnification claim, as well as part of litigation with seller.

- Performed post-acquisition investigation of the revenue recognition practices of a healthcare company to assist buyers in decision of whether to seek indemnification from sellers.

- Performed post-acquisition damages analysis of the impact of certain revenue and expense items on EBITDA immediately prior to the exercise of an option to purchase 100 percent of the joint venture membership interest from the non-operating partner.

- Provided determination as neutral accountant in working capital dispute in the logistics industry related to whether the selling party was required to accrue for a contingent liability under U.S. GAAP.

- Assisted owners of beverage distribution company in dispute with former owners over the extent to which they were entitled to a clawback of proceeds from a merger transaction. Analysis involved analyzing a third-party valuation and assessing the appropriateness of certain items included in the former owners' clawback calculation.

- Assisted private equity buyers across numerous industries with preparation of representation and warranties claim submissions associated with financial statement misrepresentations, failure to transfer certain asset with the company, and information technology system inefficiency and functionality issues.

**GA-89**

- Assisted insurance carriers with evaluation of representation and warranties claim submissions related to alleged financial statement misrepresentations.

- Assisted management of telecommunications company with preparation of working capital dispute claims for submission to neutral accountant for arbitration proceedings.

- Assisted private equity seller of aircraft repair and maintenance services company with preparation of working capital dispute claims for submission to neutral accountant for arbitration proceedings.

- Assisted counsel with preparation of indemnification claim related to failure to disclose material lost customers in a post-acquisition representations and warranties insurance claim submission.

**Commercial Damages/Lost Profits Analyses**

- Calculated lost profits and unjust enrichment damages on behalf of a warehouse logistics company related to breach of an employment contract and misappropriation of trade secrets allegation.

- Calculated lost investment opportunity damages on behalf of an investor in an online pharmacy start-up related to the alleged improper early repayment of a bridge loan prior to the loan's conversion into preferred shares.

- Performed rebuttal damages analysis of Plaintiff's claims of lost profits, impairment to enterprise value, lost acquisition opportunities, and business interruption damages associated with an alleged unlawful corporate campaign by union members in the nursing facility industry.

- Performed unjust enrichment damages analysis related to misappropriation of trade secrets by a former employee of a technology company. Damages estimated based on projected future earnings of the individual.

- Calculated lost profits damages for movie theater manufacturing company related to a breach of contract dispute in international arbitration.  Damages calculation involved "but for" analysis of discounted cash flow comparing breach vs. non-breach alternatives.

- Performed damages analysis associated with the lost future earnings of a doctor related to a claim of wrongful termination.

- Calculated "but for" lost profits damages for leather goods manufacturer related claims of misappropriation of confidential information.

- Performed breach of contract damages analysis on behalf of the U.S. Department of Justice for several engagements defending the Department of Energy against breach of contract claims involving hundreds of millions of dollars of costs associated with the storage of spent nuclear fuel.

- Performed numerous other "but for" economic damages analyses related to lost profits, diminution in value, and unjust enrichment commercial disputes in the financial services, technology, energy, logistics, transportation, manufacturing, retail, healthcare and pharmaceuticals industries.

**Business Valuation Disputes**

- Testified as valuation and damages expert in partnership dispute regarding to the value of live entertainment business and partner's share of historical partnership distributions.

**GA-90**

- Performed valuation of general partner's interest in management fees and carried interest of investments held by private equity firm with $2 billion in assets under management for divorce proceeding.

- Performed valuation of privately held home healthcare franchise business for divorce proceeding.

- Performed valuation of privately held information technology staffing firm for purposes of calculating lost investment opportunity damages.

- Performed valuation of an early-stage Chinese private equity firm to determine the general partner's interest in management fees and carried interest of investments.

- Performed analysis of the allocation of investment proceeds between the general and limit partners of a private equity fund related to allegations of improper distribution of funds.  Analysis included the valuation of a mortgage lender.

- Investigated the books and records of a failing non-profit educational institution to determine the value of the institution if liquidated.

- Performed analysis of the reasonableness of certain valuation methodologies and assumptions applied in a valuation of an oil refiner prepared by third party as part of an ESOP transaction.

- Performed analysis of the reasonableness of certain valuation methodologies and assumptions applied in a valuation of a manufacturing company prepared by third party as part of an ESOP transaction.

### Education and Credentials

- University of Richmond – Bachelor of Science in Business Administration
  - Concentrations in Accounting and Management
- Certified Public Accountant (CPA)
- Certified in Financial Forensics (CFF)
- Accredited in Business Valuation (ABV)
- Certified Fraud Examiner (CFE)

### Professional Associations

- American Institute of Certified Public Accountants
- Virginia Society of Certified Public Accountants
- Association of Certified Fraud Examiners

### Publications

- Seth Fliegler, Lisa Snow and Jeffrey Hart, *4 Ways To Strengthen Deal-Related R&W Insurance Claims*, Law360, February 2021.

### Federal Rule of Civil Procedure Rule 26 – Testimony at Trial/Deposition

- **Dela Yador** v. **Jason Mowatt,** United States District Court for the Eastern District of New York, Case No. 1:19-cv-04128-EK-RML, Deposition: September 26, 2023.

# Appendix B

Case: 24-2925, 09/16/2024, DktEntry: 17.1, Page 121 of 221
Case 3:21-cr-00353-CRB Document 108-1 Filed 09/22/23 Page 227 of 235

Appendix B: Documents Considered
Page 1 of 1

### Appendix B: Documents Considered

I have considered the pleadings in this case, as well as documents and other information produced by the parties and gathered during my research. Accordingly, my Report contains various footnote references and discussions of documents specifically relied upon by me in issuing this Report. The following documents were considered by me in issuing my opinions in this Report. Documents and other materials cited in the report are deemed included in this Appendix B if not already expressly identified below. Documents identified below are to be considered inclusive of any and all exhibits to the particular document.

| Pleadings and Court Filings |
| --- |
| Securities and Exchange Commission v. Headpin, Inc. Complaint dated January 28, 2022. |

| Case Documents |
| --- |
| Amendment of Solicitation of Contract between the U.S. Attorneys Office for the Norther District of California and Kroll, LLC, dated June 14, 2023. |
| ARR Spreadsheet dated October 25, 2019. |
| HeadSpin Customer Deck October 2017. |
| Headspin Facts for Probation. |
| HEADSPIN_00015379, HEADSPIN_00015380, HEADSPIN_00015381, HEADSPIN_00015382, HEADSPIN_00015383, HEADSPIN_00015384, HEADSPIN_00015385, HEADSPIN_00016085, HEADSPIN_00016229, HEADSPIN_00016229, HEADSPIN_00016339, HEADSPIN_00016789, HEADSPIN_00016790. |
| HS00000033, HS00000036, HS00000047, HS00010629, HS00011959, HS00014988, HS00032026, HS00145959, HS00187253, HS00187253, HS00195301, HS00596284. |
| IC0005236, IC0000877, IC0003631, IC0013838, IC0013857, IC0013873. |
| KPMG ARR Annual Analysis. |
| KPMG ARR Trend Analysis. |
| KPMG_HeadSpin_0000023, KPMG_HeadSpin_0000067. |
| NWC_Headspin_0005190, NWC_Headspin_0013246. |
| SEC-USAO-EPROD-000000814, SEC-USAO-EPROD-000010248, SEC-USAO-EPROD-000051967. |

| Public Documents |
| --- |
| "The Right Way to Calculate & Use ARR," Driven Insights, SaaS Metrics Playbook, April 14, 2022 (accessed: https://www.driveninsights.com/small-business-finance-blog/the-right-way-to-calculate-and-use-arr-saas-metrics-playbook). |
| Early Stage Valuation, A Fair Value Perspective, First Edition, Antonella Puca. |
| The Market Approach to Valuing Businesses, Second Edition, Shannon Pratt. |

# Schedules

United States of America, v. MANISH LACHWANI
Schedule 1 - Summary

| Scenario | Series B | Series C | Total | |
|---|---|---|---|---|
| 1 – Amount Invested | $ 19,979,656 | $ 59,999,954 | **$ 79,979,610** | [1] |
| 2 – Amount Invested Minus Estimated Value (Recapitalization Price) | $ 14,594,331 | $ 47,243,952 | **$ 61,838,284** | [2] |
| 3 – Amount Invested Minus Estimated Value (ARR Multiple) | $ 14,911,505 | $ 44,377,765 | **$ 59,289,270** | [3] |

**Notes**

1. See Schedule 2.
2. See Schedule 3.
3. See Schedule 4.

Case 3:21-cr-00353-CRB  Document 103-1  Filed 12/06/23  Page 30 of 35

United States of America, v. MANISH LACHWANI
Schedule 2 - Scenario 1 (Amount Invested)

| Series[1] | Name | Number of Shares Purchased | Cash Purchase Price (Amount Invested) | Price per Share |
|---|---|---|---|---|
| Series B | Redacted | 188,468 | $ 4,999,981 | $ 26.53 |
| Series B | | 36,445 | 966,871 | 26.53 |
| Series B | | 38,942 | 1,033,116 | 26.53 |
| Series B | | 37,693 | 999,980 | 26.53 |
| Series B | | 18,846 | 499,977 | 26.53 |
| Series B | | 9,423 | 249,988 | 26.53 |
| Series B | | 23,111 | 613,123 | 26.53 |
| Series B | | 23,111 | 613,123 | 26.53 |
| Series B | | 895 | 23,750 | 26.54 |
| Series B | | 37,693 | 999,980 | 26.53 |
| Series B | | 9,423 | 249,988 | 26.53 |
| Series B | | 18,846 | 499,977 | 26.53 |
| Series B | | 62,760 | 1,664,998 | 26.53 |
| Series B | | 18,222 | 483,422 | 26.53 |
| Series B | | 19,471 | 516,558 | 26.53 |
| Series B | | 7,538 | 199,980 | 26.53 |
| Series B | | 3,769 | 99,990 | 26.53 |
| Series B | | 1,130 | 29,980 | 26.53 |
| Series B | | 18,846 | 499,977 | 26.53 |
| Series B | | 9,423 | 249,988 | 26.53 |
| Series B | | 37,693 | 999,980 | 26.53 |
| Series B | | 7,538 | 199,980 | 26.53 |
| Series B | | 39,013 | 1,034,999 | 26.53 |
| Series B | | 9,423 | 249,988 | 26.53 |
| Series B | | 9,423 | 249,988 | 26.53 |
| Series B | | 56,540 | 1,499,984 | 26.53 |
| Series B | | 9,423 | 249,988 | 26.53 |
| Series C | | 148,954 | 7,251,587 | 48.68 |
| Series C | | 159,159 | 7,748,401 | 48.68 |
| Series C | | 308,113 | 14,999,988 | 48.68 |
| Series C | | 308,113 | 14,999,988 | 48.68 |
| Series C | | 20,540 | 999,957 | 48.68 |
| Series C | | 2,054 | 99,996 | 48.68 |
| Series C | | 11,475 | 558,642 | 48.68 |
| Series C | | 3,974 | 193,468 | 48.68 |
| Series C | | 10,724 | 522,081 | 48.68 |
| Series C | | 41,081 | 1,999,963 | 48.68 |
| Series C | | 4,200 | 204,470 | 48.68 |
| Series C | | 1,478 | 71,954 | 48.68 |
| Series C | | 20,540 | 999,957 | 48.68 |
| Series C | | 41,081 | 1,999,963 | 48.68 |
| Series C | | 61,622 | 2,999,968 | 48.68 |
| Series C | | 10,270 | 499,979 | 48.68 |
| Series C | | 1,027 | 49,998 | 48.68 |
| Series C | | 513 | 24,975 | 48.68 |
| Series C | | 616 | 29,989 | 48.68 |

Case 3:21-cr-00353-CRB   Document 103-1   Filed 12/06/23   Page 31 of 35

United States of America, v. MANISH LACHWANI
Schedule 2 - Scenario 1 (Amount Invested)

| Series[1] | Name | Number of Shares Purchased | Cash Purchase Price (Amount Invested) | Price per Share |
|---|---|---|---|---|
| Series C | | 308 | 14,994 | 48.68 |
| Series C | | 513 | 24,975 | 48.68 |
| Series C | | 513 | 24,975 | 48.68 |
| Series C | Redacted | 1,027 | 49,998 | 48.68 |
| Series C | | 10,270 | 499,979 | 48.68 |
| Series C | | 2,054 | 99,996 | 48.68 |
| Series C | | 205 | 9,980 | 48.68 |
| Series C | | 513 | 24,975 | 48.68 |
| Series C | | 2,054 | 99,996 | 48.68 |
| Series C | | 1,027 | 49,998 | 48.68 |
| Series C | | 205 | 9,980 | 48.68 |
| Series C | | 58,229 | 2,834,786 | 48.68 |
| | **Series B Offering** | **753,108** | **$ 19,979,656** | |
| | **Series C Offering** | **1,232,452** | **$ 59,999,954** | |
| | **Total** | **1,985,560** | **$ 79,979,610** | |

**Notes**

1. Headspin, Inc. Series B Stock Certificate Ledger as of October 25, 2018 [HS00010629 at "Series B" tab]; Schedule A to Headspin, Inc. Series C Preferred Stock Purchase Agreement, dated November 1, 2019 [HS00187253 at -276 to 280]. For purposes of this loss analysis, I have relied upon Headspin, Inc.'s Series B Stock Certificate Ledger rather than Headspin's Series B Preferred Stock Purchase Agreement [IC0000877] when calculating the total investment in Headspin's Series B Preferred Stock, as I understand the Purchase Agreement is missing some of the share purchased as part of the Series B offering.

2. I note that the number of shares purchased by the Redacted appears to contain a typo in the Series C Stock Purchase Agreement [HS00187253]. The stock purchase agreement states that 1,270 shares were purchased, whereas the stock certificate ledger [HEADSPIN_00015380 at tab "PC Certificate Ledger] states that 1,027 shares were purchased. I have assumed the stock certificate ledger to be correct, as the implied price per share per the stock certificate ledger is $48.68, consistent with the Series C price paid by the other investors.

**GA-97**

Case 3:21-cr-00353-CRB   Document 103-1   Filed 12/06/23   Page 32 of 35

United States of America, v. MANISH LACHWANI
Schedule 3 - Scenario 2 (Amount Invested Minus Estimated Value (Recapitalization Price))

| Series[1] | Name | Number of Shares Purchased | Cash Purchase Price | Initial Price per Share | Proposed Recapitalization Price[2] | Estimated Value of Stock Received |
|---|---|---|---|---|---|---|
| Series B | Redacted | 188,468 | $ 4,999,981 | $ 26.53 | $ 7.15 | $ 1,347,697 |
| Series B | | 36,445 | 966,871 | 26.53 | 7.15 | 260,611 |
| Series B | | 38,942 | 1,033,116 | 26.53 | 7.15 | 278,466 |
| Series B | | 37,693 | 999,980 | 26.53 | 7.15 | 269,535 |
| Series B | | 18,846 | 499,977 | 26.53 | 7.15 | 134,764 |
| Series B | | 9,423 | 249,988 | 26.53 | 7.15 | 67,382 |
| Series B | | 23,111 | 613,123 | 26.53 | 7.15 | 165,262 |
| Series B | | 23,111 | 613,123 | 26.53 | 7.15 | 165,262 |
| Series B | | 895 | 23,750 | 26.54 | 7.15 | 6,400 |
| Series B | | 37,693 | 999,980 | 26.53 | 7.15 | 269,535 |
| Series B | | 9,423 | 249,988 | 26.53 | 7.15 | 67,382 |
| Series B | | 18,846 | 499,977 | 26.53 | 7.15 | 134,764 |
| Series B | | 62,760 | 1,664,998 | 26.53 | 7.15 | 448,784 |
| Series B | | 18,222 | 483,422 | 26.53 | 7.15 | 130,302 |
| Series B | | 19,471 | 516,558 | 26.53 | 7.15 | 139,233 |
| Series B | | 7,538 | 199,980 | 26.53 | 7.15 | 53,903 |
| Series B | | 3,769 | 99,990 | 26.53 | 7.15 | 26,951 |
| Series B | | 1,130 | 29,980 | 26.53 | 7.15 | 8,080 |
| Series B | | 18,846 | 499,977 | 26.53 | 7.15 | 134,764 |
| Series B | | 9,423 | 249,988 | 26.53 | 7.15 | 67,382 |
| Series B | | 37,693 | 999,980 | 26.53 | 7.15 | 269,535 |
| Series B | | 7,538 | 199,980 | 26.53 | 7.15 | 53,903 |
| Series B | | 39,013 | 1,034,999 | 26.53 | 7.15 | 278,974 |
| Series B | | 9,423 | 249,988 | 26.53 | 7.15 | 67,382 |
| Series B | | 9,423 | 249,988 | 26.53 | 7.15 | 67,382 |
| Series B | | 56,540 | 1,499,984 | 26.53 | 7.15 | 404,306 |
| Series B | | 9,423 | 249,988 | 26.53 | 7.15 | 67,382 |
| Series C | | 148,954 | 7,251,587 | 48.68 | 10.35 | 1,541,689 |
| Series C | | 159,159 | 7,748,401 | 48.68 | 10.35 | 1,647,312 |
| Series C | | 308,113 | 14,999,998 | 48.68 | 10.35 | 3,189,000 |
| Series C | | 308,113 | 14,999,988 | 48.68 | 10.35 | 3,189,000 |
| Series C | | 20,540 | 999,957 | 48.68 | 10.35 | 212,591 |
| Series C | | 2,054 | 99,996 | 48.68 | 10.35 | 21,259 |
| Series C | | 11,475 | 558,642 | 48.68 | 10.35 | 118,767 |
| Series C | | 3,974 | 193,468 | 48.68 | 10.35 | 41,131 |
| Series C | | 10,724 | 522,081 | 48.68 | 10.35 | 110,994 |
| Series C | | 41,081 | 1,999,963 | 48.68 | 10.35 | 425,192 |
| Series C | | 4,200 | 204,470 | 48.68 | 10.35 | 43,470 |
| Series C | | 1,478 | 71,954 | 48.68 | 10.35 | 15,297 |
| Series C | | 20,540 | 999,957 | 48.68 | 10.35 | 212,591 |
| Series C | | 41,081 | 1,999,963 | 48.68 | 10.35 | 425,192 |
| Series C | | 61,622 | 2,999,960 | 48.68 | 10.35 | 637,794 |
| Series C | | 10,270 | 499,979 | 48.68 | 10.35 | 106,296 |
| Series C | | 1,027 | 49,998 | 48.68 | 10.35 | 10,630 |
| Series C | | 513 | 24,975 | 48.68 | 10.35 | 5,310 |
| Series C | | 616 | 29,989 | 48.68 | 10.35 | 6,376 |
| Series C | | 308 | 14,994 | 48.68 | 10.35 | 3,188 |

Case 3:21-cr-00353-CRB   Document 103-1   Filed 12/06/23   Page 33 of 35

United States of America, v. MANISH LACHWANI
Schedule 3 - Scenario 2 (Amount Invested Minus Estimated Value (Recapitalization Price))

| Series[1] | Name | Number of Shares Purchased | Cash Purchase Price | Initial Price per Share | Proposed Recapitalization Price[2] | Estimated Value of Stock Received |
|---|---|---|---|---|---|---|
| Series C | Redacted | 513 | 24,975 | 48.68 | 10.35 | 5,310 |
| Series C | | 513 | 24,975 | 48.68 | 10.35 | 5,310 |
| Series C | | 1,027 | 49,998 | 48.68 | 10.35 | 10,630 |
| Series C | | 10,270 | 499,979 | 48.68 | 10.35 | 106,296 |
| Series C | | 2,054 | 99,996 | 48.68 | 10.35 | 21,259 |
| Series C | | 205 | 9,980 | 48.68 | 10.35 | 2,122 |
| Series C | | 513 | 24,975 | 48.68 | 10.35 | 5,310 |
| Series C | | 2,054 | 99,996 | 48.68 | 10.35 | 21,259 |
| Series C | | 1,027 | 49,998 | 48.68 | 10.35 | 10,630 |
| Series C | | 205 | 9,980 | 48.68 | 10.35 | 2,122 |
| Series C | | 58,229 | 2,834,786 | 48.68 | 10.35 | 602,676 |

| | | | | | | |
|---|---|---|---|---|---|---|
| | Series B Offering | 753,108 | $ 19,979,656 | | $ | 5,385,325 |
| | Series C Offering | 1,232,452 | $ 59,999,954 | | $ | 12,756,001 |
| | Total Original Investment | 1,985,560 | $ 79,979,610 | | Total Estimated Value $ | 18,141,326 |

| | | |
|---|---|---|
| Total Original Investment | $ | 79,979,610 |
| Total Estimated Value of Stock Received | $ | 18,141,326 |
| Difference | $ | 61,838,284 |

Notes
  1. Headspin, Inc. Series B Stock Certificate Ledger as of October 25, 2018 [HS00010629 at "Series B" tab]; Schedule A to Headspin, Inc. Series C Preferred Stock Purchase Agreement, dated November 1, 2019 [HS00187253 at -276 to 280]. For purposes of this loss analysis, I have relied upon Headspin, Inc.'s Series B Stock Certificate Ledger rather than Headspin's Series B Preferred Stock Purchase Agreement [IC0000877] when calculating the total investment in Headspin's Series B Preferred Stock.
  2. Letter from Nikesh Arora to Headspin Inc. Shareholders, dated July 29, 2020 [HS00000033 at -034].
  3. I note that the number of shares purchased by the Redacted appears to contain a typo in the Series C Stock Purchase Agreement [HS00187253]. The stock purchase agreement states that 1,270 shares were purchased, whereas the stock certificate ledger [HEADSPIN_00015380 at tab "PC Certificate Ledger] states that 1,027 shares were purchased. I have assumed the stock certificate ledger to be correct, as the implied price per share per the stock certificate ledger is $48.68, consistent with the Series C price paid by the other investors.

United States of America, v. MANISH LACHWANI
Schedule 4 - Scenario 3 (Amount Invested Minus Estimated Value (ARR Multiple))

**Initial Series B Valuation[1]**

| | | |
|---|---|---|
| Pre-Money Valuation | $ | 500,000,000 |
| Plus: Primary[2] | | 19,979,656 |
| Post-Money Valuation | | 519,979,656 |
| Less: Primary[3] | | (19,979,656) |
| Less: Cash as of 6/30/18 | | (36,000,000) |
| Enterprise Value | $ | 464,000,000 |

| ARR Multiples | | ARR | Multiple |
|---|---|---|---|
| 2017A ARR | $ | 23,600,000 | 19.7x |
| LTM ARR (Q2'18) | | 33,800,000 | **13.7x** |
| 2018E ARR | | 43,000,000 | 10.8x |
| Average ARR | | 33,466,667 | 13.9x |

**Adjusted Series B Valuation**

| ARR Multiples | | ARR | Multiple |
|---|---|---|---|
| KPMG Recast ARR as of 6/30/18[4] | $ | 5,541,699 | **13.7x** |
| | | | |
| Adjusted Enterprise Value | $ | 75,921,282 | |
| Plus: Cash as of 6/30/18 | | 36,000,000 | |
| Plus: Primary | | 19,979,656 | |
| Adjusted Post-Money Valuation | | 131,900,938 | |
| Less: Primary | | 19,979,656 | |
| Pre-Money Valuation | $ | 111,921,282 | |

**Loss Calculation**

| | | |
|---|---|---|
| Initial Post-Money Valuation | $ | 519,979,656 |
| Adjusted Post Money Valuation | | 131,900,938 |
| *Difference* | $ | *388,078,718* |
| | | |
| Initial Post-Money Valuation | $ | 519,979,656 |
| Value of Series B Offered | | 19,979,656 |
| Series B Ownership (%) | | 4% |
| | | |
| Adjusted Post Money Valuation | $ | 131,900,938 |
| Series B Ownership (%) | | 4% |
| Series B Adjusted Value | $ | 5,068,151 |
| | | |
| Value of Series B Ownership Offered | $ | 19,979,656 |
| Adjusted Value of Series B | | 5,068,151 |
| ***Series B Difference*** | $ | ***14,911,505*** |

**Notes**

1. ▓▓▓ Series B Investment Committee Memorandum, dated October 2018, slide 8 [IC0013838 at -846].
2. See Schedule 2.
3. I note that the ▓▓▓ Series B Investment Committee Memorandum does not subtract the primary investment in calculating Enterprise Value. I have made an adjustment to subtract this amount in my analysis.
4. KPMG Monthly ARR Analysis.

**GA-100**

United States of America, v. MANISH LACHWANI
Schedule 4 - Scenario 3 (Amount Invested Minus Estimated Value (ARR Multiple))

**Initial Series C Valuation[1]**

| | | |
|---|---|---|
| Pre-Money Valuation | $ | 1,100,000,000 |
| Plus: Primary[2] | | 59,999,954 |
| Post-Money Valuation | | 1,159,999,954 |
| Less: Primary | | (59,999,954) |
| Less: Cash as of 8/16/19 | | (58,200,000) |
| Enterprise Value | $ | 1,041,800,000 |

| ARR Multiples | ARR | | Multiple |
|---|---|---|---|
| LTM ARR (Q2'19) | $ | 54,700,000 | **19.0x** |

**Adjusted Series C Valuation**

| ARR Multiples | ARR | | Multiple |
|---|---|---|---|
| KPMG Recast ARR as of 8/31/19[3] | $ | 9,675,224 | **19.0x** |
| | | | |
| Adjusted Enterprise Value | $ | 183,829,251 | |
| Plus: Cash as of 8/16/19 | | 58,200,000 | |
| Plus: Primary | | 59,999,954 | |
| Adjusted Post-Money Valuation | | 302,029,205 | |
| Less: Primary | | 59,999,954 | |
| Pre-Money Valuation | $ | 242,029,251 | |

**Loss Calculation**

| | | |
|---|---|---|
| Initial Post-Money Valuation | $ | 1,159,999,954 |
| Adjusted Post Money Valuation | | 302,029,205 |
| *Difference* | $ | *857,970,749* |
| | | |
| Initial Post-Money Valuation | $ | 1,159,999,954 |
| Value of Series C Offered | $ | 59,999,954 |
| Series C Ownership (%) | | 5% |
| | | |
| Adjusted Post Money Valuation | $ | 302,029,205 |
| Series C Ownership (%) | | 5% |
| Series C Adjusted Value | | 15,622,189 |
| | | |
| Value of Series C Ownership Offered | | 59,999,954 |
| Adjusted Vale of Series C | | 15,622,189 |
| *Series C Difference* | $ | *44,377,765* |

**Notes**
1. Redacted Series C Investment Committee Memorandum, dated November 2019, slides 3 and 45 [IC0013873 at -876 and 918].
2. See Schedule 2.
3. KPMG Monthly ARR Analysis.

**GA-101**

1  ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

2

3  MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

4  LLOYD A. FARNHAM (CABN 202231)
NOAH STERN (CABN 297476)

5  Assistant United States Attorneys

6      450 Golden Gate Avenue, Box 36055
San Francisco, California 94102-3495

7      Telephone: (415) 436-7200
FAX: (415) 436-7234

8      Noah.Stern@usdoj.gov

9  Attorneys for United States of America

10              UNITED STATES DISTRICT COURT

11             NORTHERN DISTRICT OF CALIFORNIA

12                SAN FRANCISCO DIVISION

13

14  UNITED STATES OF AMERICA,          )   **CASE NO. CR 21-353-CRB**
                                       )
15            Plaintiff,               )   **DECLARATION OF FBI SPECIAL AGENT**
                                       )   **MICHAEL TOMENO IN SUPPORT OF**
16        v.                           )   **UNITED STATES' SENTENCING**
                                       )   **MEMORANDUM**
17  MANISH LACHWANI,                   )
                                       )
18            Defendant.               )
    _____)

19

20         I, Michael Tomeno, declare and state as follows:

21         1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), a position I have

22  held since May 2019.

23         2.      The facts set forth in this declaration are based on my personal knowledge or information

24  I received from other law enforcement personnel.  This declaration does not include everything I know

25  about the investigation of the defendant.

26         3.      In or about August 2020, the FBI began a fraud investigation relating to HeadSpin, Inc.'s

27  business and accounting practices.  During the investigation, Headspin made voluminous document

28  productions to the government, including documents from Manish Lachwani's Headspin email account.

**GA-102**

4.      Attached hereto as Exhibit A is a true and correct copy of a document with filename "Invoice INV-0008.pdf" produced by Headspin at Bates HS00162917, which was attached to an email from Headspin Accounts to telsinfo@au1.ibm.com and Manish Lachwani on or about March 25, 2019. According to the metadata for the PDF document is has identical Created and Modified dates: 3/25/2019 10:25:10 PM.

5.      Attached hereto as Exhibit B is a true and correct copy of a document with filename "Invoice INV-0009.pdf" produced by Headspin at Bates HS00122457, which was attached to an email from Headspin Accounts to TelstraInvoices@team.telstra.com, Manish Lachwani, and one other individual on or about March 28, 2019.  According to the metadata for the PDF document, it has identical Created and Modified dates: 3/28/2019 7:30:29 PM.

6.      Attached hereto as Exhibit C is a true and correct copy of a document with filename "Invoice INV-0020.pdf" produced by Headspin at Bates HS00126569, which was attached to an email from Headspin Accounts to TelstraInvoices@team.telstra.com, Manish Lachwani, and one other individual on or about June 10, 2019.  According to the metadata for the PDF document, it has identical Created and Modified dates: 6/10/2019 10:20:54 PM.

7.      Attached hereto as Exhibit D is a true and correct copy of a document with filename "Invoice INV-0019.pdf" produced by Headspin at Bates HS00162990, which was attached to an email from Headspin Accounts to Manish Lachwani on or about June 10, 2019.  According to the metadata for the PDF document, it has identical Created and Modified dates: 6/10/2019 10:23:23 PM.

8.      Attached hereto as Exhibit E is a true and correct copy of a document with the filename "Invoice INV-0016.pdf" produced by Headspin at Bates HS00128140, which was attached to an email Manish Lachwani sent to Sana Okmyanskaya on or about June 27, 2019.  The metadata for Exhibit E, IN-0016, shows a Created date of 6/19/2019 3:23:21 PM and a Modified date of 6/27/2019 4:42:52 PM.

9.      Attached hereto as Exhibits F, G, and H are true and correct copies of documents with the filenames "Invoice INV-0020.pdf," "Invoice INV-0008.pdf," and "Invoice INV-0009.pdf," respectively produced at Bates HS00128153, HS00128154, and HS00128155, all of which were attached to an email from Manish Lachwani to Sana Okmyanskaya sent on or about June 28, 2019.

10.      The metadata for Exhibit F, INV-0020, shows a Created date of 6/19/2019 3:23:35 PM

1   and a Modified date of 6/28/2019 10:30:03 AM.

2       11.    The metadata for Exhibit G, INV-0008, shows a Created date that is identical to the

3   Created and Modified Dates for Exhibit A.  Exhibit G, however, has a separate Modified date:

4   6/28/2019 10:30:42 AM.

5       12.    The metadata for Exhibit H, INV-0009, shows a Created date that is identical to the

6   Created and Modified Dates for Exhibit B.  Exhibit H, however, has a separate Modified date: 6/28/2019

7   10:27:09 PM.

8       13.    Attached as Exhibit I is a true and correct copy of a document with the filename

9   "Invoice_UBER2018MAR-001.pdf" produced by Headspin at Bates HS00162132, which was attached

10  to an email from Headspin employee Ameet Suri to ap@uber.com, and copying another Uber employee

11  on or about March 20, 2018.  The metadata for Exhibit I shows a Created date of 3/20/2018 10:54:10

12  AM and no Modified date.

13      14.    Attached as Exhibit J is a true and correct copy of the document with the filename

14  "Invoice_UBER2018MAR-002.pdf" produced by Headspin at Bates HS00051189, which was attached

15  to an email from Manish Lachwani to Sana Okmyanskaya on or about May 17, 2018.  The metadata for

16  Exhibit J shows a Created date of 3/20/2018 10:54:10 AM and a Modified date of 5/17/2018 8:31:18

17  PM.

18      15.    Attached as Exhibits K and L are true and correct copies of documents with filenames

19  "Invoice-UBERS2018DEC-003.pdf" and "Invoice_UBER2018December-004.pdf" produced by

20  Headspin at Bates HS00122074 and HS00122075, respectively, which were attached to an email from

21  Manish Lachwani to Sana Okmyanskaya on or about March 24, 2019, along with many other invoices.

22  The metadata for Exhibit K shows a Created date of 3/20/2018 10:54:10 AM and a Modified date of

23  3/24/2019 9:56:36 AM.  The metadata for Exhibit L shows a Created date of 3/20/2018 10:54:10 AM

24  and a Modified date of 3/24/2019 9:57:31 AM.

25      16.    Attached as Exhibit M is a true and correct redacted copy of an LPL Financial account

26  statement for Headspin's account ending in 0597 for the 4th Quarter 2018, produced by LPL Financial

27  at Bates LPL-005882.

28      17.    Attached as Exhibit N is a true and correct redacted copy of an LPL Financial account

GA-104

statement for Headspin's account ending in 0597 for the period ending March 31, 2020, produced by LPL Financial at Bates LPL-006300.

18.     Attached as Exhibit O is a true and correct redacted copy of emails produced by Headspin at Bates HS00228244 between Manish Lachwani and Karim Faris in November 2015.

19.     Attached as Exhibit P is a true and correct redacted copy of an email from Karim Faris to Manish Lachwani on or about January 5, 2018 produced by Karim Faris at FARIS-HSSEC-00000021.

20.     Attached as Exhibit Q is a true and correct redacted copy of an email exchange between Karim Faris and Manish Lachwani on or about January 6, 2018 produced by Karim Faris at FARIS-HSSEC-00000022.

21.     Attached as Exhibit R is a true and correct redacted copy of an email from Manish Lachwani to Karim Faris on or about January 31, 2018 along with one of its attachments, which purports to be a LPL Financial account statement for a Headspin account ending in 3871.  These documents were produced by Karim Faris at FARIS-HSSEC-00000149 and FARIS-HSSEC-00000231.

22.     Attached as Exhibit S is a true and correct redacted copy of an LPL Financial account statement for Headspin's account ending in 3871 for the 4th Quarter 2017, produced by LPL Financial at Bates LPL-004308.

23.     Attached as Exhibit T is a true and correct redacted copy of an LPL Financial account statement for Headspin's account ending in 0597 for the 4th Quarter 2017, produced by LPL Financial at Bates LPL-005784.

24.     Attached as Exhibit U is a true and correct copy of a document entitled "Background for the Recapitalization of Headspin, Inc." dated October 19, 2020 and produced by Headspin at Bates HS00032026.

25.     Attached as Exhibit V is a true and correct copy of a document produced by an entity referred to in the government's sentencing memorandum as Investor 1, an internal email chain within the Investor 1, with the most recent email dated on or about August 2, 2019.

26.     Attached as Exhibit W is a true and correct copy of a document produced by Investor 1, an email dated October 15, 2019 attaching Investor 1's Investment Committee memo for its secondary investment in Headspin.

**GA-105**

27.     Attached as Exhibit X is a true and correct copy of a document produced by an entity referred to in the government's sentencing memorandum as Investor 2, an email dated October 27, 2019 attaching a presentation by Investor 2 entitled Headspin-SeriesC-DiligenceUpdate.

28.     Attached as Exhibit Y is a true and correct copy of a document produced by Investor 1, an email dated February 24, 2020 attaching Investor 1's Investment Committee memo for its Series C investment in Headspin.

29.     Attached as Exhibit Z is a true and correct copy of a document produced by an entity referred to in the government's sentencing memorandum as Investor 3, an email from partner at Investor 3 to himself dated January 12, 2018.

30.     Attached as Exhibit AA is a true and correct copy of a document produced by Investor 3, an email from a partner at Investor 3 to himself dated November 4, 2019.

31.     Attached as Exhibit BB is a true and correct copy of a spreadsheet produced by Headspin at Bates HS00596284.

I swear under penalty of perjury that the foregoing is true and correct to the best of my knowledge.  Signed this 6th day of December 2023, in San Jose, California.

DATED:      December 6, 2023

_____
MICHAEL TOMENO
Special Agent
Federal Bureau of Investigation

**GA-106**

# Exhibit U

October 19, 2020

## Background for the Recapitalization of Headspin, Inc.

The Board of Directors of Headspin, Inc. (the "**Company**") is recommending a recapitalization of the outstanding equity interests in the Company (the "**Recapitalization**") to adjust for what now appear to have been overstated financial metrics of the Company at the times of its Series B Preferred financing in September and October 2018 and its Series C Preferred financing in November 2019 through March 2020.

On March 14, 2020, a senior executive of the Company, Stefanos Loukakos, brought information to the attention of the two non-employee members of the Board, Nikesh Arora and Karim Faris, concerning potentially irregular transactions and accounting entries at the Company. The principal concerns that were brought to their attention related to overstated reporting of annual recurring revenue ("**ARR**"), direct revenue, customers and the number of devices in the Company's device cloud. On advice of outside legal counsel, a Special Committee of the Board (the "**Committee**") consisting of Mr. Arora and Mr. Faris was formed to investigate these matters and determine what actions, if any, should be taken by the Company. Mr. Loukakos has since left the Company on good terms pursuant to a mutual agreement with the Company. The Committee thanks him for bringing these concerns to their attention.

### Initial Investigation by Guidepost

On March 20, 2020, at the direction of Mr. Faris and Mr. Arora, outside legal counsel to the Company engaged Guidepost Solutions, an independent investigation firm ("**Guidepost**"), working together with Hemming Morse, a forensic accounting firm, to investigate the concerns raised by Mr. Loukakos.

After receiving reports on April 24, 2020 and May 12, 2020 from Guidepost on its investigation, the Committee concluded that the Company had overstated direct revenue during 2019 primarily because the Company included unbilled receivables in its revenue where the Company could not bill the customers because it did not have contracts with the customers. Moreover, because the Company did not have a policy or process for writing down aged receivables, it carried a material amount of revenue that was substantially aged and unlikely to be collectible. The Committee also concluded that the Company had overstated channel revenue by reporting as revenue the amount that the channel partner billed the end customer and not the much lower amount that the channel partner remitted to the Company, reporting the difference as commission expense. Similarly, there was an overstatement of ARR primarily because the Company used a calculation that included channel pipeline--where the Company reported as its ARR the gross amounts that the Company estimated would be received by its channel partners from end users of the Company's services, rather than the much lower amounts that the channel partners would remit to the Company. The Committee then immediately restricted the role and responsibilities of the Company's then-serving Chief Executive Officer, Manish Lachwani.

In addition, the Committee learned that Company management had invested a substantial portion of the cash it had raised from investors in high risk investments, including equities and covered call options. Although these investments produced some significant gains, they also produced losses and were highly volatile. Upon learning this, the Committee took steps to ensure that the Company's cash was promptly moved to more conservative investments. There was no indication that any of the Company's funds had been misappropriated.

**GA-108**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material                                                    HS00032026

The Committee then held multiple meetings with the Company's major investors at which the Committee informed the investors of its findings and introduced them to Rajeev Butani, the then Chief Sales Officer of the Company, who presented his plan for the Company. With a consensus of those investors, the Committee appointed Mr. Butani as Chief Executive Officer of the Company, replacing Mr. Lachwani as CEO effective May 22, 2020. Mr. Butani had joined the Company in February 2020 after nearly 27 years in management positions at Accenture, where he most recently served as Group Technology Officer for Communications, Media and Technology. The Committee asked Mr. Butani to rapidly determine the actual revenues and ARR, to assess customer demand for the Company's products and the health of the business, and to prepare a preliminary business plan for the Company going forward.

### Recast of Financial Statements by KPMG

On May 26, 2020, Mr. Butani engaged KPMG to review and recast the Company's unaudited financial statements for 2018 and 2019 and the first two quarters of 2020. On July 10, 2020, KPMG delivered a report summarizing the recast financial statements of the Company. KPMG did not perform an audit of the financial statements, and, as disclosed in connection with the Company's prior financings, the financial results of the Company have never been audited. KPMG merely recast the revenue and costs of revenue based on certain assumptions specified in its report and did not examine other accounts, such as operating expenses and tax expense, accounts payable, accrued expenses, fixed assets, other assets, investments, equity accounts, stock compensation, and deferred tax assets and liabilities, which were not within the scope of its review. Based on its analysis, KPMG determined that the cumulative revenues of the Company from inception through the first half of 2020 totaled approximately $26.3 million compared to the $95.3 million originally reported by the Company. The Company's originally reported revenues and net income and its revenues and net income as recast by KPMG from inception through the first half of 2020 were as follows:

| REVENUE | 2015-2017 | FY 2018 | FY 2019 | 1H 2020 | TOTAL |
|---|---|---|---|---|---|
| Original | $ 21,430,187 | $ 27,482,124 | $ 44,420,251 | $ 1,983,636 | $ 95,316,198 |
| Recast | $ 4,948,438 | $ 6,132,672 | $ 10,129,144 | $ 5,094,785 | $ 26,305,039 |
| Difference | $ 16,481,749 | $ 21,349,452 | $ 34,291,107 | $ (3,111,149) | $ 69,011,159 |

| NET INCOME | 2015-2017 | FY 2018 | FY 2019 | 1H 2020 | TOTAL |
|---|---|---|---|---|---|
| Original | $ 2,976,694 | $ (1,192,723) | $ 2,546,545 | $ (641,047) | $ 3,689,469 |
| Recast | $ (9,425,013) | $ (4,169,010) | $ (4,371,574) | $ 2,021,496 | $ (15,944,101) |
| Difference | $ 12,401,707 | $ 2,976,287 | $ 6,918,119 | $ (2,662,543) | $ 19,633,570 |

*Note that Net Income results in the third quarter of 2019 and the first quarter of 2020 were benefited by extraordinary investment gains of approximately $2.1 million and $8.6 million in those quarters, respectively.*

Following KPMG's confirmation that the revenues and net income of the Company were significantly overstated during 2018 and 2019, the Committee asked Mr. Lachwani to step down from the Board, which he did in July 2020, and he further agreed to relinquish his right to elect a Board member going forward. Mr. Lachwani was formally terminated as an employee in August 2020, and he no longer has any employment, Board or other role with the Company other than as a stockholder.

**GA-109**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material

HS00032027

### Supplemental Investigation by Guidepost

The Committee also asked Guidepost to conduct a supplemental review of the Company's invoices to determine whether there were any irregular financial transactions. Guidepost presented the results of its supplemental investigation to the Committee on August 11, 2020.

In three instances, the Committee determined that invoices submitted by, or journal entry accruals made for payables to, three different vendors to the Company were for services that were not documented or not performed, or they were for amounts in excess of services actually performed. After investigating these matters, the Company recovered from two of those vendors a total of $321,000 in cash. In addition, the Company is in the process of recovering an additional $100,000 from the third vendor and is investigating whether payments of an additional $750,000 to that vendor were for services actually rendered and may be recovered. In the course of this review, the Company eliminated an additional $750,000 of accrued payables to that vendor that were erroneously recorded.

### Investigations by Securities and Exchange Commission and Department of Justice

On August 7, 2020, the Securities and Exchange Commission ("**SEC**") issued a notice to the Company that the SEC is conducting an investigation to determine whether violations of the federal securities laws have occurred with respect to the Company and requested production of a list of categories of documents, and the U.S. Department of Justice ("**DoJ**") notified the Company that it was conducting a parallel investigation and requested a similar list of documents. The Company is cooperating fully with the SEC and DoJ investigations. Members of the Company's outside legal counsel in these investigations, Fenwick & West LLP ("**Fenwick**"), have met with representatives of the SEC and DoJ and have provided them an initial set of requested documents and are in the process of producing additional requested documents. The Company has budgeted for the legal expenses of these investigations but cannot predict the duration of the investigations or their outcome.

### History of the Company's Financings

Headspin was formed by Manish Lachwani and Brien Colwell on July 20, 2015. To date, the Company has raised approximately $117 million from investors as follows:

- Series A Preferred: Approximately $11 million were raised in a Series A Preferred Stock financing at a pre-money valuation of $18.7 million, or $1.78 per share, in August and September 2015;

- Convertible Notes: Approximately $24.7 million were raised in a series of issuances from April 2017 through May 2018 of convertible promissory notes that were convertible into a future Series B Preferred Stock financing at different discounts based on "pre-money valuation caps" of $200 million, $400 million or approximately $450 million, depending on the timing of the investments in the notes;

- Series B Preferred: Approximately $20 million of additional funds were raised in the Series B Preferred Stock financing at a pre-money valuation of $500 million, at the full price of $26.5296 per share, in September and October 2018, and the convertible promissory notes were then converted to Series B Preferred Stock at their respective discounts to that price; and

3

**GA-110**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material

• Series C Preferred: Approximately $60 million were raised in a Series C Preferred Stock financing at a pre-money valuation of $1.1 billion, or $48.6834 per share, from November 2019 through March 2020.

Although the total amount invested in Preferred Stock is approximately $117 million, there is a total of approximately $152 million of Preferred Stock liquidation preferences. Because the $24.7 million of convertible promissory notes converted at various discounts into fully paid shares of Series B Preferred Stock at the time of the Series B financing, the holders of those notes received Series B Preferred shares having a total of $46.4 million in liquidation preferences, resulting in liquidation preferences of approximately $21.7 million more than the cash paid to the Company for those shares (the "**Series B Excess Liquidation Preference**"). In addition, as a result of certain secondary sales by Redacted of some of their Series A and Series B Preferred shares for a total of $15 million at the Series C Preferred price to investment funds affiliated with Redacted the lead investor in the Series C Preferred financing, which was then permitted to exchange those shares for fully paid shares of Series C Preferred Stock from the Company, there are approximately $13 million of Series C Preferred liquidation preferences in excess of the cash received by the Company for those shares (the "**Series C Excess Liquidation Preference**"). In total, there are approximately $34.7 million in excess liquidation preferences.

## Overview of the Recapitalization

On June 13, 2020, the Committee engaged Fenwick to advise the Board with respect to its legal responsibilities and potential alternatives. The alternatives considered included a wind-down of the Company's operations and distribution of its remaining assets to stockholders either privately or through a bankruptcy proceeding, or a recapitalization of the Company in which the Company would return a substantial portion of the cash invested in the Series B and Series C financings and continue to operate the Company for the benefit of the continuing stockholders.

With respect to an orderly wind-down, in the absence of litigation, the Committee initially estimated that, after paying current debt, other liabilities, professional fees and salaries of essential staff during the wind-down, the Company would have a maximum of approximately $96 million remaining to distribute to its preferred stockholders, who had total liquidation preferences of $152 million (assuming no litigation or other legal disputes). That would result in the return of at most 63% of their liquidation preferences, and the holders of common stock and employees holding options would receive nothing. With hindsight, the Committee believes that legal expenses and contingencies would have caused the amount available to distribute to stockholders in a wind-down to have been substantially less. Recognizing the potential risk of litigation by stockholders, which would consume a substantial portion of the Company's cash, the Committee also considered winding the Company down in a formal bankruptcy proceeding, which would stay all litigation. After consulting bankruptcy counsel, the Committee estimated that a bankruptcy proceeding would take two or more years to complete and consume even more of the Company's cash given the disparate preferences and claims of the stockholders, creditors, customers and employees that would be contested.

The Committee also asked Mr. Butani to assess the prospects and product-market fit for the Company to continue its business and asked him to prepare a preliminary business plan for going forward. After reviewing Mr. Butani's assessment and plan, the Committee concluded that the Company has a product and platform that customers value and continue to buy, that the

4

**GA-111**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material                                    HS00032029

Company's sales have continued to grow, although some customers and partners have delayed engagement as a result of the recent publicity about the Committee's investigation, and that the Company has the potential to scale globally and provide investment returns to the stockholders of the Company. The Company added 9 new customers in the third quarter of 2020 to bring its total to over 65, and it grew ARR from $10.3 million at the end of 2019 to $12.17 million, including $1.18M from new customers, in the third quarter of 2020. It has a goal of reaching $15.4 million of ARR by the end of 2020. See the October 2020 Business Plan Update included with this Background and other materials provided through The NASDAQ Private Market online portal in connection with the Recapitalization.

Mr. Butani, Fenwick and KPMG advised the Committee on the anticipated financial needs of the Company going forward, which the Committee considered in structuring the Recapitalization to provide for the Company's anticipated cash requirements for the foreseeable future. There can be no assurance, however, that the Company's sales will continue to grow or that the Company will generate sufficient revenues to meet its future cash needs. See the "Risk Factors" that accompany the Business Plan Update and other materials provided through The NASDAQ Private Market online portal.

During June and July 2020, the Committee had discussions with the major investors in the Company to advise them of the Committee's findings and listen to their concerns that the Series B and Series C Preferred Stock financings had been overpriced and their views on a potential recapitalization to adjust the investors' equity ownership by repurchasing some shares and repricing other shares that had been purchased by Series B and Series C investors. Based on these discussions, the Committee proposed a potential recapitalization plan in a summary term sheet and distributed it, along with KPMG's recast financial statements and an outline of the Company's preliminary business plan, to nearly all investors on July 30, 2020.

After considering the alternatives, and the perspectives of several of the major stockholders of the Company, the Committee is recommending a slightly revised recapitalization plan, in which the Series C Preferred stockholders, and the Series B Preferred stockholders who did not acquire their shares by converting promissory notes at a discount, would be offered two primary choices: (1) to recover up to all of their investments by having the Company repurchase their shares for cash and promissory notes or (2) to have their shares repriced to reflect a more appropriate valuation at the time they invested. The Series B Preferred stockholders who acquired their shares by converting promissory notes at a discount would have their shares repriced to reflect a more appropriate valuation at the time they invested. As a result of the Recapitalization, a substantial portion of the outstanding liquidation preferences would be eliminated, and the Company would continue operating with the opportunity to create value for the remaining Series A, B and C Preferred stockholders as well as the common stockholders and option holders.

**Purposes of the Recapitalization**

The principal purposes of the Recapitalization and ancillary transactions are:

• To address the concerns of investors in the Series C Preferred Stock and Series B Preferred Stock financings by providing the investors who purchased Series C Preferred Stock, and the investors who purchased Series B Preferred Stock at its full original purchase price without a discount, the opportunity to either (a) receive their investments back or (b) have their shares repriced to lower conversion prices that better reflect the pre-money valuations of the Company at

**GA-112**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material                                                              HS00032030

the time of their investments, which have been estimated at $300 million (reducing the conversion price to $10.3501 per share) for the Series C Preferred Stock and $150 million (reducing the conversion price to $7.1508 per share) for the Series B Preferred Stock;

• To address the concerns of the investors who acquired Series B Preferred through conversion of convertible promissory notes at various discounts, by (a) automatically repricing all of their shares of Series B Preferred to a lower conversion price reflecting the value of the Company at the time of their note conversions, which has similarly been determined to be $7.1508 per share, and (b) providing them 50% more shares of common stock upon the conversion of the shares of Series B Preferred Stock they received as a discount, which will be automatically converted to common, thereby eliminating their excess liquidation preferences as described below;

• To position the Company better for future investments from new investors by eliminating the excess liquidation preferences by (a) inducing the Series B investors who acquired Series B Preferred through conversion of convertible promissory notes at discounts to convert the portion of their Series B shares that represents the $21.7 million of Series B Excess Liquidation Preference to common stock and (b) asking Redacted which sold shares of Series A Preferred Stock for approximately $10 million and $2.1 million, respectively, to Redacted at the time of the Series C Preferred Stock financing, to contribute their proceeds to the Company in exchange for the return of their shares of Series A Preferred Stock, thereby eliminating approximately $11.7 million of the $13 million in Series C Excess Liquidation Preference. Redacted have agreed.

• To eliminate approximately $101 million in total liquidation preferences, by repurchasing shares of Series C and Series B Preferred Stock and by eliminating an additional approximately $33.4 million in Series B and Series C Excess Liquidation Preference as described in the preceding paragraph, for the benefit of the holders of Series A Preferred Stock and holders of common stock and options, and to facilitate future financings;

• To resolve potential claims of former stockholders of a company called NimbleDroid, which was acquired by the Company in 2018 in exchange for a total of 213,376 shares of the Company's Class B Common Stock, the Company will pay the former stockholders of NimbleDroid a total $2.3 million in cash and issue to them 485,848 additional shares of common stock to bring their total holdings to 699,224 shares of common stock.

• To resolve potential claims by Redacted with respect to its purchase of secondary shares of common stock from Manish Lachwani, Brien Colwell and eight other employees of the Company for a total of approximately $11.6 million: Mr. Lachwani will pay Redacted $1,905,685 in cash, Mr. Colwell will transfer to ICONIQ 400,354 shares of common stock, and the Company will transfer to Redacted 390,746 shares of common stock that it will recover from Manish Lachwani to resolve potential claims against the eight other employees;

• To resolve potential claims by Redacted with respect to its purchase of secondary shares of stock: Manish Lachwani will transfer 17,994 shares of common stock to Redacted and Brien Colwell will transfer 10,692 shares of common stock to Redacted

• To cancel 90% (4,680,935 shares) of the remaining 5,201,039 shares of Class B Common Stock to be held by Manish Lachwani after his transfer of the 17,994 shares to Redacted The cancelled shares will be used to provide the 485,848 shares to be issued by the Company to the former stockholders of NimbleDroid and the 390,746 shares to be issued by the Company to

6

**GA-113**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material

Redacted as described above, and to provide additional shares for issuance to current and future employees and thereby mitigate the dilution to other stockholders in the Recapitalization. Mr. Lachwani's remaining 520,104 shares will be pledged and held in escrow by the Company to secure the repayment to the Company of defense costs that are advanced to Mr. Lachwani pursuant to his Indemnification Agreement, which he has agreed to cap at $6.4 million. Mr. Lachwani has agreed to cancel 90% of his shares and pledge his remaining shares in return for a full release of all claims against him by the Company and by holders of at least 90 percent of its shares;

• To eliminate all Class B Common Stock, which has 10 votes per share and had given Mr. Lachwani long-term voting control of the Company, by reclassifying all Class B and all Class A Common, which has one vote per share, as "Common Stock," which will also have one vote per share;

• To reprice outstanding option grants to current employees, executives, and other service providers and grant them additional equity awards, subject to future vesting conditions, to adjust for dilution and retain and incentivize them to increase the value of the Company for all equity holders; and

• To position the Company for future operational success by securing releases of claims from substantially all of the investors and other stockholders, thereby reducing the potential for additional reputational harm, legal fees and management distraction that could result from investor and stockholder disputes and lawsuits.

### Initial Non-binding Indications of Interest in the Recapitalization

With the preliminary proposal sent to investors on July 30, 2020, the Committee asked the investors for their non-binding approval of the proposed Recapitalization and, for the holders of Series C and fully paid Series B Preferred shares, asked them to indicate whether they would elect to have their shares repurchased or repriced. Investors holding at least 95% of each of the Series A, fully paid Series B, discounted Series B, and Series C Preferred Stock have indicated support for the proposed Recapitalization, with nearly all eligible Series B and Series C Preferred Stock holders expressing an intent to have their shares repurchased, except for holders of $5 million worth of Series B Preferred Stock who expressed their intent to retain their Series B shares and have them repriced.

Based on the strong stockholder support for the Recapitalization, the Committee is now recommending that the Company implement the Recapitalization both to address the concerns of investors that their shares were overvalued when they were purchased and also to position the Company for growth and success going forward. The terms of the Recapitalization now being proposed are slightly different from the term sheet in the initial proposal that was provided to investors on July 30 requesting their non-binding indications of support, as summarized below.

### Terms of the Currently Proposed Recapitalization

The principal reason for differences between the original proposal and this proposal is that, as a result of the investigations by the SEC and DoJ, the Company expects to incur additional legal expenses in connection with the production of documents and in connection with the Company's obligations to advance legal fees to current and former members of management and the Board with respect to the government investigations, and any resulting legal actions or claims. These

7

**GA-114**

additional expenses cannot be estimated with accuracy at this time. Consequently, the Committee has determined that it is necessary to reserve and retain substantially more cash to provide for those potential expenses and obligations than it originally anticipated.

The original proposed Recapitalization contemplated substantially all of the Company's available cash for a tender offer to repurchase up to $95 million worth of Series C and Series B Preferred Stock as follows: (a) up to all the Series C Preferred Stock at its original purchase price of $48.6834 per share for a potential total of approximately $75 million, plus (b) up to all the approximately $20 million of Series B Preferred Stock that was purchased by investors at its full original purchase price of $26.5296 per share without discount.

The original proposal was to pay 85% of the approximately $95 million total repurchase price, or approximately $81 million, in cash, with the remaining 15% of the purchase price, approximately $14 million, to be paid through promissory notes that would bear interest at the rate of 3% per year with principal and accrued interest payable in one lump sum in five years.

**In light of the need to increase the reserves for legal fees and contingent liabilities, and based on the non-binding indications of interest received from investors, the Company is now offering to pay 70% of the repurchase price, up to a maximum of approximately $66.5 million, in cash; and pay the remaining 30%, up to a maximum of approximately $28.5 million, with promissory notes that are payable in five years. In addition, to help to ensure that the Company will meet applicable solvency tests the promissory notes will bear interest at the rate of 1% per year, and interest will be payable annually to avoid imputed interest to the note holders that would be taxable if it were not paid until maturity.**

Based on the non-binding indications of interest received from the investors, the aggregate cash repurchase price is expected to be approximately $63 million instead of $66.5 million because purchasers of $5 million of Series B Preferred have indicated an intent to have their Series B shares repriced instead of repurchased. Furthermore, the total of promissory notes is expected to be $16.6 million instead of $28.5 million because (a) a large holder of Series C Preferred that has indicated its intent to sell 70% of its Series C shares for cash has indicated an intent to have the remaining 30% of its Series C shares repriced in lieu of accepting $9 million in promissory notes for those shares and (b) certain holders who purchased an aggregate of $5 million of Series B shares have indicated an intent to have all their Series B shares repriced. These indications of intent were taken into account by the Committee in determining the maximum amount of cash the Company could prudently and legally pay out and in determining the 70% cash offer to the stockholders who elect to have their shares repurchased. If investors increase their cash elections, the Company may be required to reduce the percentage of cash it can pay out.

The Company had approximately $100.7 million in cash at September 30, 2020. As part of the Recapitalization, Redacted are expected to unwind their secondary sales of Series A Preferred Stock to Redacted at the time of the Series C financing and contribute their approximately $12 million of proceeds to the Company, in exchange for Series A Preferred shares equal to those they sold.[1] After repurchasing the shares of Series B and C Preferred Stock in the tender offer for approximately $63 million in cash as described above, paying transaction costs and settling or reserving for potential contingent liabilities, the Company is expected to have approximately $30 million of working capital, which management believes will be sufficient to operate the business

---

[1] The General Partners of Redacted which also participated in the secondary sale to Redacted will invest approximately $48,000 in the new Series B-1 Preferred Stock described below after the Recapitalization.

**GA-115**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material                                             HS00032033

based on its current plan for the foreseeable future. To provide additional capital if needed, [Redacted] has agreed to provide the Company a line of credit to borrow up to $6 million at an interest rate of 1% per year, which the Company can draw down between one and three years after the closing of the Recapitalization and must be repaid five years after the closing of the Recapitalization.

The closing of the Recapitalization will be conditioned on, among other things, the receipt of a solvency opinion from a qualified valuation firm, in a form acceptable to the Board, confirming that the Company should have adequate financial resources to pay its obligations as they become due as required by Delaware and California corporate law for stock repurchases. The closing will also be conditioned upon the approval of the Recapitalization by the holders of at least 95% of each of the Common Stock, the Series A Preferred Stock, the full price Series B Preferred Stock, the discounted Series B Preferred Stock and the Series C Preferred Stock, provided that the Board may in its discretion lower the percentage approval required to not less than 90%.

The Company will offer all holders of Series B and Series C Preferred Stock that are eligible to have their shares repurchased in the tender offer the alternative to retain their shares and have them repriced, with the Series C repriced from its initial conversion price of $48.6834 to a new price of $10.3501 (with each share thereby convertible into 4.7 shares of common stock rather than one share), and the Series B repriced to the new conversion price of $7.1508 per share (with each share thereby convertible into 3.71 shares of common stock rather than one share). This repricing will be accomplished by holders exchanging their existing Series B shares for new Series B-1 Preferred Stock that have a conversion price of $7.1508, or by holders exchanging their existing Series C shares for new Series C-1 Preferred Stock that have a conversion price of $10.3501.

The Company will offer the holders of the Series B Preferred who acquired their shares by conversion of promissory notes at a discount, and are therefore not eligible to participate in the repurchase offer, the opportunity reprice their shares by exchanging all of their Series B shares with a conversion price of $26.5296 for new Series B-1 Preferred shares with a conversion price of $7.1508. The effect of this repricing will be that each share of new Series B-1 will be convertible into 3.71 shares of common stock. As a condition of this repricing, the holders will be required to convert to common stock the portion of their new Series B-1 shares that represent the discount they received on the conversion of their promissory notes to eliminate the approximately $21.7 million in excess liquidation preference they received. In return, they will receive 50% more shares of common stock (at a ratio of 5.565 to 1) *upon that conversion of those discount shares*. The Series B-1 shares they receive in exchange for the Series B Preferred they purchased at full price will continue to have a liquidation preference of $26.5296 and a conversion ratio of 3.71.

The Series A Preferred Stock, which was purchased in 2015 at $1.78 per share, will not be repurchased or repriced. The holders of Series A Preferred Stock and holders of common stock will, however, benefit from the elimination of approximately $101 million in liquidation preferences through a combination of the repurchases of Series B and Series C Preferred shares and the elimination of nearly all of the excess liquidation preferences of the shares of Series B and Series C Preferred Stock as discussed above.

Approximately 6.5 million new options will be granted to current employees who hold options and RSUs to provide them incentives to continue to serve the Company. These additional options will vest over the following 48 months. At the closing of the Recapitalization, a total of approximately 8.1 million outstanding options, including these new grants, will be unvested.

9

**GA-116**

Based on the non-binding indications of interest previously received from investors, the fully diluted shares are expected to increase from approximately 24.8 million to approximately 34.4 million shares. The increase is due primarily to an increase of approximately 6.4 million shares from the repricing of the Series B Preferred, the approximately 6.5 million new options to be granted to employees for future services and a pool of approximately 1.7 million shares (5%) reserved for the grant of new options to employees going forward. These increases are partially offset by the approximately 4.7 million shares cancelled by Manish Lachwani, and the repurchases by the Company of approximately 668,000 shares of C Series Preferred Stock. See the Pro Forma Simplified Cap Table Pre and Post Recapitalization below.

| HEADSPIN, INC. PRO FORMA SIMPLIFIED CAP TABLE -- PRE AND POST RECAPITALIZATION | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Shareholder** | **Number of Shares** | | **% Fully Diluted** | | **Amount Distributed Cash (70%)** | **Amount Distributed Note (30%)** | **Liquidation Preference** | |
| | 24,791,094 | 34,353,729 | 100.00% | 99.99% | $ 62,985,954 | $16,631,847 | $ 152,293,659 | $ 51,432,816 |
| | Pre | Post (CSE) | Pre | Post (CSE) | | | Pre | Post |
| Class | | | | | | | | |
| Series C Preferred | 1,540,565 | 872,155 | 6.21% | 2.54% | $ 52,500,130 | $ 13,472,888 | $ 74,999,042 | $ 9,026,851 |
| Series B Preferred Total | 2,502,049 | 8,894,349 | 10.09% | 25.89% | $ 10,485,824 | $ 3,158,959 | $ 66,378,359 | $ 30,997,264 |
| *Series B Preferred New Money Total* | *753,108* | *885,891* | *3.04%* | *2.58%* | *$ 10,485,824* | *$ 3,158,959* | *$ 19,979,654* | *$ 6,334,871* |
| *Series B Preferred Held by NewMoney* | *753,108* | *238,785* | *3.04%* | *0.70%* | *$ 10,485,824* | *$ 3,158,959* | *$ 19,979,654* | *$ 6,334,871* |
| *Additional CSE from Repricing* | | *647,106* | | *1.88%* | | | | |
| *Series B Preferred Note Holders Total* | *1,748,941* | *8,008,458* | *7.05%* | *23.31%* | | | *$ 46,398,705* | *$ 24,662,394* |
| *Series B Preferred Shares* | *1,748,941* | *929,618* | *7.05%* | *2.71%* | | | *$ 46,398,705* | *$ 24,662,394* |
| *Additional CSE from Repricing* | | *2,519,283* | | *7.33%* | | | | |
| *Common from Conversion of Discount* | | *4,559,557* | | *13.27%* | | | | |
| | | | | | | | | |
| Series A Preferred | 6,119,846 | 6,369,363 | 24.69% | 18.54% | | | $ 10,915,357 | $ 11,360,396 |
| Series A Warrants | 375,084 | 375,084 | 1.51% | 1.09% | | | | |
| Class B Common (converts to Common) | 9,043,748 | 4,848,661 | 36.48% | 14.11% | | | | |
| Class A Common (converts to Common) | 125,688 | 516,433 | 0.51% | 1.50% | | | | |
| *Outstanding Options* | *4,289,646* | *10,758,180* | *17.30%* | *31.32%* | | | | |
| *Unissued Option Pool* | *794,468* | *1,717,686* | *3.20%* | *5.00%* | | | | |

*This Pro Forma Cap Table is based on the non-binding indications of interest expressed by stockholders with respect to whether they would have their shares of Series B and/or Series C Preferred Stock repurchased or repriced, and if repurchased whether they would elect to receive a note for the 30% of the shares that are not repurchased for cash or have the remaining 30% of their shares repriced. Actual results may be materially different depending on what elections the stockholders actually make.

*CSE = Common Stock Equivalent

## Examples of Results of the Offers to Holders of Series C and Series B Preferred Stock

The following examples illustrate the expected results of the repurchase offers to all holders of Series C Preferred Stock and to holders of Series B Preferred Stock that was purchased at full price, and the results of the exchange offer to holders of Series B discount shares that will be repriced. All post-Recapitalization ownership percentages are estimates based on the non-binding indications of interest previously received from investors. The results may vary significantly based on the actual elections made by the holders of Series B and Series C Preferred Stock.

**GA-117**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material                    HS00032035

In the following examples, some dollar and share amounts are rounded for simplicity. Actual dollar and share amounts may vary slightly.

**Example 1: Series C Preferred Stock**. Holder purchased $1 million of Series C Preferred Stock at $48.6834 per share:

- Holder invested $1 million to purchase 20,540 shares of Series C Preferred Stock

    - Holder's Series C shares have liquidation preference of $1 million

    - Holder's shares are convertible into 20,540 shares of Class B Common Stock

    - These shares represent 0.083% of the fully diluted shares before Recapitalization

- Holder elects to have Company repurchase all 20,540 shares for $1 million (cash + note)

    - Holder sells 70% (14,378 shares) for $700,000 in cash at closing of tender offer

    - Holder sells 30% (6,162 shares) for $300,000 note payable five years after closing

    - Holder no longer holds any shares of Series C Preferred stock

- Holder elects to have Company repurchase 70% of shares and reprice 30% of shares

    - Holder sells 70% (14,378 shares) for $700,000 in cash at closing of tender offer

    - Holder continues to hold 30% (6,162 shares), which are repriced to $10.3501 and are now convertible into 6,162 x ($48.6834/$10.3501) = 28,984 shares of common stock

    - These shares would represent ~0.08% of fully diluted shares post Recapitalization

- Holder elects not to have Company repurchase any shares but reprice all 20,540 shares

    - Holder sells no shares in the tender offer and receives no cash or notes

    - Holder continues to hold 100% (20,540 shares), which are repriced to $10.3501 per share and are now convertible into 20,540 x ($48.6834/$10.3501) = 96,613 shares

    - These shares would represent ~0.28% of fully diluted shares post Recapitalization

**Example 2: Series B Preferred Stock Purchased at Full Price for Cash**. Holder purchased $1 million of Series B Preferred Stock at $26.5296 per share, reflecting a $500 million pre-money valuation:

- Holder invested $1 million to purchase 37,693 shares of Series B Preferred Stock

    - Holder's Series B shares have liquidation preference of $1 million

    - Holder's shares are convertible into 37,693 shares of Class B Common Stock

    - These shares represent 0.15% of the fully diluted shares before Recapitalization

11

**GA-118**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material                    HS00032036

- Holder elects to have Company repurchase all 37,693 shares for $1 million (cash + note)

  - Holder sells 70% (26,385 shares) for $700,000 in cash at closing of tender offer

  - Holder sells 30% (11,308 shares) for $300,000 note payable five years after closing

  - Holder would no longer hold any shares of Series B Preferred Stock

- Holder elects to have Company repurchase 70% of shares and reprice 30% of shares

  - Holder sells 70% (26,385 shares) for $700,000 in cash at closing of tender offer

  - Holder continues to hold 30% (11,308 shares), which are repriced to $7.1508 and are now convertible into 11,308 x ($26.5296/$7.1508) = 41,952 shares of common stock

  - These shares would represent ~0.12% of fully diluted shares after Recapitalization

- Holder elects not to have Company repurchase any shares but reprice all 37,693 shares

  - Holder sells no shares in the tender offer and receives no cash or notes

  - Holder continues to hold 100% (37,693 shares), which are repriced to $7.1508 per share and are now convertible into 37,693 x ($26.5296/$7.1508) = 139,841 shares

  - These shares would represent ~0.41% of fully diluted shares after Recapitalization

**Example 3:  Series B Preferred Stock Acquired on Conversion of Note at $200M Cap**.  Holder initially invested $1 million in a convertible promissory note that automatically converted into Series B Preferred Stock at a discount based on a $200M pre-money valuation cap

- Holder invested $1 million to acquire 90,108 shares of Series B Preferred Stock, which consist of 37,694 fully paid shares and 52,414 shares issued for free as the "discount"

  - Holder's shares have a total liquidation preference of 90,108 x $26.5296 = $2,390,528, which exceeds Holder's cash investment by $1,390,528

  - Holder's Series B shares are convertible into 90,108 shares of Class B Common

  - Those shares represent 0.36% of the fully diluted shares before Recapitalization

- Holder's shares are automatically repriced to $7.1508 per share in the Recapitalization

  - Holder's fully paid Series B Preferred shares are then convertible into 37,693 x ($26.5296/$7.1508) = 139,844 shares of common stock

  - Holder's "discount" shares of Series B Preferred are then convertible into 52,415 x ($26.5296/$7.1508) = 194,457 shares of common stock

- Holder then automatically converts the 52,415 "discount" shares of Series B Preferred into common stock at an enhanced conversion rate of 1.5 x 194,457 = 291,685 shares of common stock, thereby eliminating the $1,390,528 in excess liquidation preference

12

**GA-119**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material

HS00032037

- Holder owns 37,693 shares of Series B Preferred that are convertible into 139,844 shares of common stock, and Holder also owns 291,685 shares of common stock for a total of 431,529 common stock equivalents ("**CSE**")

- These CSE would represent ~1.26% of the fully diluted shares after Recapitalization

**Example 4: Series B Preferred Stock Acquired on Conversion of Note at $400M Cap**. Holder initially invested $1 million in a convertible promissory note that automatically converted into Series B Preferred Stock at a discount based on a $400 million pre-money cap

- Holder invested $1 million to acquire 45,054 shares of Series B Preferred Stock, which consist of 37,694 fully paid shares and 7,360 shares issued for free as a "discount"

  - Holder's shares have a total liquidation preference of 45,054 x $26.5296 = $1,195,269, which exceeds Holder's cash investment by $195,269.

  - Holder's shares are initially convertible into 45,054 shares of Class B Common Stock

  - Those shares represent 0.18% of the fully diluted shares before Recapitalization

- Holder's shares are automatically repriced to $7.1508 per share in the Recapitalization

  - Holder's fully paid Series B Preferred shares are then convertible into 37,694 x ($26.5296/$7.1508) = 139,844 shares of common stock

  - Holder's "discount" shares of Series B Preferred are then convertible into 7,360 x ($26.5296/$7.1508) = 27,307 shares of common stock

- Holder then automatically converts the 7,360 "discount" shares of Series B Preferred into common stock at an enhanced conversion rate of 1.5 x 27,307 = 40,961 shares of common stock, thereby eliminating the $195,269 excess liquidation preference

  - Holder owns 37,694 shares of Series B Preferred that are convertible into 139,844 shares of common stock, and Holder also owns 40,961 shares of common stock for a total of 180,805 CSE

  - These CSE would represent ~0.52% of the fully diluted shares after Recapitalization.

## Interests of Members of the Special Committee

The members of the Special Committee who have negotiated and recommended the Recapitalization have direct or indirect equity interests in the Company, as described below, that are different from, and could conflict with, the interests of the Series B and Series C Preferred Stock investors in the offers by the Company to repurchase or reprice the investors' shares in the Recapitalization.

Nikesh Arora: Nikesh Arora is the Chief Executive Officer of Palo Alto Networks. Mr. Arora has been a member of the Board of Headspin since February 2018 and has three outstanding grants of options to purchase shares of Class A Common Stock as follows:

13

**GA-120**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material                                                  HS00032038

| Date of Grant | # Shares | Price/Share | Vesting Condition |
|---|---|---|---|



Redacted

*

Redacted

Karim Faris: Karim Faris is a General Partner of GV. GV is a venture capital fund affiliated with Google, which is a significant customer of the Company. GV was the lead investor in the Series A financing of the Company in 2015. Redacted Redacted Mr. Faris has been a member of the Board since August 2015.

Redacted

Redacted

14

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material

**GA-121**

HS00032039

## Governance Matters Going Forward

### Management

The Board has taken and continues to take steps to strengthen the Company's management team. The Board appointed Rajeev Butani as Chief Executive Officer on May 22, 2020. Prior to joining the Company as Chief Sales Officer in February 2020, Mr. Butani spent nearly 27 years in technology management roles at Accenture, where he served most recently as the Group Technology Officer for Communications, Media and Technology. Over the last four months, Mr. Butani has strengthened internal processes and financial controls, stabilized the core employee team and established positive relationships with the customer base. Mr. Butani has recently hired an experienced internal General Counsel and a controller, and he is currently conducting a search for a chief financial officer. He has also engaged an outside audit firm as discussed below. In addition, Co-founder Brien Colwell will continue in his leadership role as Chief Technology Officer of the Company.

### Board of Directors

The Board of Directors currently consists of Nikesh Arora, Karim Faris, and Rajeev Butani, the Chief Executive Officer of the Company. The current Certificate of Incorporation provides for the election of one director by the holders of Common Stock, one director by the holders of Series A Preferred Stock, with any additional directors to be elected by the holders of Common Stock and Preferred Stock voting together. The current Bylaws provide for five members of the Board, which can be changed by the Board at any time or by the stockholders at the annual meeting.

The current Voting Agreement among the Company's stockholders provides for a Board of five directors, where (i) one member is nominated by **Redacted** owns at least 1 million shares of Series A Preferred Stock (the "**Series A Director**") and is elected by the holders of Series A Preferred Stock **Redacted** urrently owns a slight majority of the Series A Preferred Stock), (ii) one director is elected by the holders of a majority of the Common Stock, and (iii) the three remaining directors are elected by the holders of Common Stock and Preferred Stock voting together. Of the three remaining directors, one is to be the Chief Executive Officer and the remaining two must be acceptable to the other then serving directors. As part of the Recapitalization **Redacted** has offered to relinquish its Series A Director seat, and the Company has accepted that offer to give a broader base of stockholders the ability to shape the composition of the Board going forward.

After the Recapitalization, the Board will be a minimum of five members, consisting of: (i) two members who are nominated and elected by a majority of the holders of Preferred Stock voting as a class; and (ii) three or more members who are nominated by the Board of Directors, after consultation with the major stockholders, and elected by holders of a majority of all outstanding shares of Preferred Stock and Common Stock voting as a single class. One of the members nominated by the Board of Directors will be the then sitting Chief Executive Officer of the Company. The other members will be independent of management and at least one of them will be qualified to serve as Chair of the Audit Committee.

The Company will hold a meeting of stockholders within three months after the closing of the Recapitalization to address, among other things, the election of the Board of Directors going forward. Mr. Arora, who has spent a large portion of his time over the last six months speaking with stockholders and working on the Recapitalization, has expressed a desire to step off the Board.

15

**GA-122**

However, to provide a smooth transition following the Recapitalization, he will, if requested by the newly constituted Board members, remain on the Board as a sixth member for a maximum of one term of 12 months.

The Committee is in active conversations with major stockholders regarding potential candidates to propose for nomination to the Board. In the meantime, the Committee has identified and begun discussions with highly qualified independent candidates whom it is considering for nomination to the Board following the Recapitalization.

The newly constituted Board will hold regularly scheduled meetings at least quarterly, with additional meetings to be called as appropriate. Meetings will be attended by outside legal counsel selected by the Board, who will take minutes and document all actions of the Board.

### Audit Committee

The Board will form an Audit Committee of at least two independent Board members, whose charter will include, among other responsibilities:

- interviewing and recommending a Chief Financial Officer and other senior members of the finance staff;

- selecting and recommending to the Board the appointment of an independent auditing firm to perform annual audits of the Company's financial statements;

- meeting periodically with the outside auditing firm separately from management to discuss critical accounting policies and practices;

- reviewing the Company's unaudited quarterly and audited annual financial statements;

- reviewing and monitoring the Company's financial risks and internal financial controls;

- establishing the Company's treasury management policies and reviewing investments;

- reviewing the Company's compliance with applicable laws and regulations;

- reviewing cybersecurity, privacy and other enterprise risks;

- reviewing the compliance with such policies, codes of conduct and other formal guidelines for Company personnel as may be approved by the Board; and

- reviewing and establishing the insurance coverage for the directors and officers.

### Independent Financial Auditing Firm

The Company has retained the independent auditing firm Baker Tilly, US, LLP to audit its financial statements beginning with the year ending in December 2020. Baker Tilly has not yet begun its audit process and has not reviewed the Company's financial results that are being provided to investors in connection with the Recapitalization and cannot provide any assurance with respect to their completeness or accuracy.

16

**GA-123**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material

**Investor Information Rights**

The Investors' Rights Agreement will be expanded to provide investors with greater access to financial and other information. The Company will provide:

(a) To each investor* who requests a copy the year-end financial statements as audited by the Company's independent public accountants within 120 days after the end of each fiscal year;

(b) To each investor, at the end of each quarter of the fiscal year, a letter from the Chief Executive Officer describing the current status of the Company and its business;

(c) To each holder of at least 1,000,000 shares of common stock issued or issuable upon conversion of the preferred stock (a "Major Investor")** within 45 days of the end of each quarter of each fiscal year, an unaudited income statement and statement of cash flows for such quarter and an unaudited balance sheet and a statement of stockholders' equity and detailed cap table as of the end of such quarter;

(d) To each Major Investor within 30 days after the end of each fiscal year, a budget and business plan for the next fiscal year prepared on a monthly basis, including balance sheets, income statements and statements of cash flows for such quarters;

(e) To each Major Investor such other information relating to the financial condition, business or corporate affairs of the Company as such holder may from time to time reasonably request; provided, however, that the Company will not be obligated to provide information that (i) it deems in good faith to be a trade secret or similarly highly confidential information or (ii) the disclosure of which would adversely affect the attorney-client privilege between the Company and its counsel; and

(f) Permit each Major Investor to designate a representative to attend all meetings of the Board in a non-voting observer capacity; provided that the representative shall hold in confidence all information provided, and that the Board may exclude such representative from any meeting or portion thereof if access to such information could adversely affect the attorney-client privilege, result in disclosure of trade secrets, present a conflict of interests or for similar reasons.

---

\* Under the current Investors' Rights Agreement, the only stockholders entitled to receive audited financial statements and the other information in items (c) through (f) above are "Major Investors" that hold at least 1,500,000 total shares ( Redacted ) and the only stockholder entitled to observer rights is Redacted

\*\* After the Recapitalization, all stockholders will receive annual audited financial statements, and the threshold for being a "Major Investor" will be reduced to 1,000,000 shares (representing approximately 3% of the fully diluted shares). The Major Investors after the Recapitalization are expected to be Redacted

17

**GA-124**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material                                     HS00032042

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA | Case No. 3:21-cr-00353-CRB-1 |
| Plaintiff, | |
| v. | **ORDER ON APPLICATION OF SENTENCING GUIDELINES** |
| MANISH LACHWANI, | |
| Defendant. | |

On April 27, 2023, Defendant Manish Lachwani pled guilty to two counts of wire fraud in violation of 18 U.S.C. § 1343 and one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5.

In connection with sentencing, Lachwani has objected to most of the key findings and conclusions in the Presentence Investigation Report ("PSR"), including the probation officer's application of the U.S. Sentencing Guidelines ("U.S.S.G."). See PSR at 29–34.[1] (dkt. 96). The central issue of dispute is the application of the "loss" enhancement under U.S.S.G. § 2B1.1(b)(1). The Government and the probation officer calculate the total loss as more than $65 million, which would result in a 24-level enhancement. Lachwani argues that there was no loss at all, or in the alternative, that the Government has failed to carry its burden to show that any reasonable estimate of loss that resulted from Lachwani's criminal conduct can be made. His position is therefore that there should be no enhancement for loss. Because the loss question will have such a substantial effect on Lachwani's

---

[1] Throughout this Order, the Court cites to the document page numbers assigned by ECF, not any page numbers in the original documents.

1  Guidelines calculation, the Court has postponed sentencing pending its resolution.  In

2  addition to Lachwani's own sentencing memorandum, the Court allowed Lachwani to file

3  a response to the Government's sentencing memorandum that specifically addressed the

4  prosecutors' arguments about loss and related issues.  Def.'s Response to United States'

5  Sentencing Mem. Re: Loss ("Def.'s Response") (dkt. 113).  The Court also held a hearing

6  on January 11, 2024, at which it heard argument specifically on the question of loss.  See

7  Hearing Tr. (dkt. 125).

8       Having considered the parties' sentencing memoranda (dkts. 103, 105), Lachwani's

9  response memorandum, the PSR, the evidence submitted by both parties in connection

10  with sentencing, and the arguments at the loss hearing, the Court finds that a reasonable

11  estimate of the total loss amount under U.S.S.G. § 2B1.1(b)(1) is $3,149,056.  A 16-level

12  loss enhancement therefore applies.  In addition, a 2-level enhancement for offenses

13  involving 10 or more victims will apply under U.S.S.G. § 2B1.1(b)(2)(A).  This Order

14  memorializes the Court's reasoning on these questions, leaving the remainder of the

15  Guidelines and sentencing issues to be resolved at sentencing.  Where the Court makes

16  statements of fact about matters that are the subject of Lachwani's objections to the PSR,

17  the Court has resolved those objections under the applicable evidentiary standard.

18  **I.    BACKGROUND**

19       Lachwani committed fraud between 2017 and 2020 in connection with his efforts to

20  raise funds for HeadSpin, a software company he founded and for which he served as CEO

21  from 2015 until the discovery of his fraud in 2020.  Plea Agmt. (dkt. 88).  In his Plea

22  Agreement, Lachwani admits that he sent or directed HeadSpin employees to send

23  financial information to potential investors that he knew overstated the company's actual

24  revenue and annual recurring revenue ("ARR").[2]  Id. at 5.  Lachwani knew the overall

25  

---

26  [2] "ARR is a measure of a company's subscription revenue rate at a particular point in time,
annualized to show revenue the company would expect to make, at that rate, over an entire

27  year."  Plea Agmt. at 5.  Lachwani knew that ARR was "one metric to assess the past
success and forecasted growth for a SaaS [software-as-a-service] company like Headspin,"

28  and he also "knew the overstated information about ARR was significant to certain
investors and their decisions to invest in HeadSpin."  Id. at 5, 6.

**GA-126**

1    numbers were inflated at least in part because he "maintained and controlled" the

2    spreadsheet where HeadSpin's ARR was tracked, and he knew the spreadsheet both

3    contained overstated entries for "certain customers" and "included customers that had not

4    yet agreed to use the service by signing a contract or issuing a purchase order." Id. at 5–7.

5    The Plea Agreement does not itself reflect which specific customers or entries were

6    misrepresented by Lachwani, or by how much Lachwani overstated given metrics. But

7    Lachwani does admit that he knowingly shared the overstated revenue and ARR figures

8    with investors through a slide deck and the spreadsheet that he controlled. Id. at 7.

9    　　　Lachwani's fraud overlapped with three rounds of investment in HeadSpin. Id. at 5;

10   PSR ¶¶ 23–26. Between December 2017 and May 2018, HeadSpin raised about $10.25

11   million in a series of issuances of promissory notes that were convertible into HeadSpin

12   stock. Between September and October of 2018, HeadSpin undertook a "Series B"

13   financing round in which it raised about $20 million. Plea Agmt. at 5. And between

14   November 2019 and April 2020, HeadSpin undertook a "Series C" financing round that

15   yielded $60 million from investors. Id. Throughout this Order, when the Court refers to

16   "the investors," it refers to the Series B and Series C investors collectively.

17   　　　Lachwani's fraud was discovered in 2020 by another HeadSpin employee, Stefanos

18   Loukakos, who noticed that HeadSpin had been representing to investors that certain

19   entities were customers when in fact they were not. PSR ¶ 27; see also Loukakos Decl.

20   (dkt. 103-2). Loukakos brought this information to HeadSpin's independent directors, who

21   initiated an investigation by outside legal and forensic firms. PSR ¶ 27; see also Loukakos

22   Decl. (dkt. 103-2); Arora Decl. ¶¶ 7–9 (dkt. 103-4); Faris Decl. ¶ 11 (dkt. 103-5).

23   Lachwani was removed as CEO of HeadSpin in May 2020. PSR ¶ 27; Arora Decl. ¶ 8.

24   Thereafter HeadSpin retained accounting firm KPMG to reconstruct HeadSpin's actual

25   revenues and ARR during the relevant period. Id.; see also White Decl. (dkt. 103-6);

26   Jolley Decl. (dkt. 103-7). The KPMG investigation, which the parties refer to as the

27   "Recast," determined that HeadSpin's actual revenues and ARR were much less than the

28

United States District Court
Northern District of California

3

**GA-127**

figures Lachwani had been reporting to potential investors.[3]  HeadSpin's directors then

undertook a complex negotiation with the company's shareholders that, broadly speaking,

was designed to head off the threat of litigation and keep HeadSpin afloat following the

discovery of the fraud and other attendant revelations about poor management at the

company.  PSR ¶ 28; see also Arora Decl. ¶¶ 10–12; Background for the Recapitalization

of HeadSpin, Inc., Tomeno Decl. Ex. U ("Recap Background Mem.") (dkt. 103-8).  In the

resulting set of transactions, which the parties refer to as the "Recap," Series B and Series

C investors were given the opportunity to sell back up to 70% of their preferred stock at

the original purchase price and exchange the remaining 30% for promissory notes.  Id.

The face value of the promissory notes equaled the original share purchase price, but the

notes had a 5-year term and accrued 1% annual interest.  Id.  The investors could also opt

to retain their shares in the company but have them repriced at much lower rates.  Id.

Some investors took the former option, some the latter, and some a combination of the

two.  HeadSpin survived and continues to operate today.

## II.     LEGAL STANDARD

"All sentencing proceedings begin with the district court's calculations of the

applicable Guidelines range."  United States v. Prien-Pinto, 917 F.3d 1155, 1157 (9th Cir.

2019) (citing Gall v. United States, 552 U.S. 38, 49 (2007)).

The government bears the burden of proof on the facts underlying a sentence

enhancement.  United States v. Zolp, 479 F.3d 715, 718 (9th Cir. 2007).  At sentencing,

"the district court may rely on undisputed statements in the PSR," but if the defendant

objects to those statements "the district court is obligated to resolve the factual dispute, and

the government bears the burden of proof to establish the factual predicate[.]"  United

States v. Ameline, 409 F.3d 1073, 1085–86 (9th Cir. 2005); see also Fed. R. Crim. P.

---

[3] As discussed later, the Court agrees with Lachwani that the Recast does not
independently support the conclusion that Lachwani's criminal conduct was responsible
for the entire difference between HeadSpin's actual financial metrics and the overstated
metrics reported by Lachwani.  KPMG was not retained specifically to investigate the
fraud.

4

**GA-128**

1    32(i)(3)(B); United States v. Showalter, 569 F.3d 1150, 1160 (9th Cir. 2009).

2          Generally, the Government must carry its burden by a preponderance of the

3    evidence, but the Government must meet a higher standard—proof by "clear and

4    convincing evidence"—in cases where there is "an extremely disproportionate impact on

5    the sentence." United States v. Valle, 940 F.3d 473, 479 (9th Cir. 2019) (quoting United

6    States v. Jordan, 256 F.3d 922, 930 (9th Cir. 2001)). Here, with respect to the loss

7    enhancement—where the Government seeks an enhancement of 24 levels and the Base

8    Offense Level is 7—the Government must prove the underlying facts by clear and

9    convincing evidence. See United States v. Lonich, 23 F.4th 881, 911–912 (9th Cir. 2022)

10   ("We have repeatedly recognized that our cases commonly turn on the last two [Valensia]

11   factors: whether the enhanced sentence is four or more offense levels higher (factor 5) and

12   more than double the initial sentencing range (factor 6).") (discussing United States v.

13   Valensia, 222 F.3d 1173 (9th Cir. 2000)).[4] Under the clear and convincing evidence

14   standard, "the factfinder must have an 'abiding conviction that the truth of [the] factual

15   contentions' at issue is 'highly probable.'" Lonich, 23 F.4th at 916 (quoting Mondaca-

16   Vega v. Lynch, 808 F.3d 413, 422 (9th Cir. 2015) (en banc)) (alteration in original).

17         In making factual determinations, "a sentencing judge is generally not restricted to

18   evidence that would be admissible at trial. But 'inadmissible evidence cannot be

19   considered [at sentencing] if it lacks sufficient indicia of reliability to support its probable

20   accuracy.'" United States v. Egge, 223 F.3d 1128, 1132 (9th Cir. 2000) (citation omitted,

21   alteration in original).

22   _____

23   [4] The Government briefly suggests that only a preponderance of the evidence standard
     should apply because "[t]he Ninth Circuit caselaw requiring clear and convincing evidence
24   for guidelines enhancements is clearly irreconcilable with modern Due Process doctrine."
     United States' Sentencing Memorandum ("Gov't Mem.") at 18 (dkt. 103). But the Ninth
25   Circuit rule remains good law, reaffirmed as recently as 2022. See Lonich, 23 F.4th at
     911–12. The Government does not argue that the enhancements it seeks would not have
26   "an extremely disproportionate impact on the sentence." Valle, 940 F.3d at 479. The
     Government also suggests that the clear and convincing evidence standard does not apply
27   where "the loss amount is from charged conduct for which the defendant has been
     convicted." Gov't Mem. at 18 (citing Lonich, 23 F.4th at 913). But here the conduct to
28   which Lachwani has pled guilty does not by itself answer all the factual questions
     necessary for the Court to make a reasonable estimate of the loss.

United States District Court
Northern District of California

5

GA-129

## III.   DISCUSSION

### A.   Loss Enhancement Under U.S.S.G. § 2B1.1(b)(1)

Section 2B1.1(b)(1) of the Guidelines imposes an increase in the offense level according to the loss that resulted from the offense.  "The court need not make its loss calculation with absolute precision; rather, it need only make a reasonable estimate of the loss based on the available information."  Zolp, 479 F.3d at 718 (citing U.S.S.G. § 2B1.1, cmt. n. 3(C); United States v. Peyton, 353 F.3d 1080, 1090 n.11 (9th Cir. 2003)).  The commentary to the Guidelines defines "loss" as "the greater of actual loss or intended loss."  Id. (quoting U.S.S.G. § 2B1.1, cmt. n.3(A)).  In turn, "actual loss" is defined as "the reasonably foreseeable pecuniary harm that resulted from the offense."  U.S.S.G. § 2B1.1, cmt. n. 3(A)(i).  "The [G]uidelines do not present a single universal method for loss calculation under § 2B1.1—nor could they, given the fact-intensive and individualized nature of the inquiry."  Zolp, 479 F.3d at 718.  Rather, "the district court's obligation is to 'adopt a reasonable 'realistic, economic' projection of loss based on the evidence presented.'"  United States v. Holmes, No. 5:18-CR-00258-EJD-1, 2023 WL 149108, at *2 (N.D. Cal. Jan. 10, 2023) (quoting United States v. W. Coast Aluminum Heat Treating Co., 265 F.3d 986, 991 (9th Cir. 2001)).

### B.   The Investors Suffered an "Actual Loss"

Before the Court proceeds to measure the loss, it is necessary to resolve the issue of whether there *was* a loss under the meaning of the Guidelines.  See United States v. Berger, 587 F.3d 1038, 1045 (9th Cir. 2009).  Lachwani argues that there was not.  His position is that there is no evidence "that any investor lost money investing in HeadSpin" and that there are even present indications that the investors might ultimately profit over the long term.  Defendant's Sentencing Memorandum ("Def.'s Mem.") at 18–19 (dkt. 105).  In other words, although Lachwani criminally misrepresented the state of HeadSpin to investors in various ways, those investors still received stock in a company that, as it turned out, was able to survive the discovery of the fraud and retain enough capital to offer them most of their money back in the Recap.

6

**GA-130**

The position has some intuitive appeal, and Lachwani argues it forcefully. But it has two fatal problems. First, it cannot account for the nature of Lachwani's fraudulent representations. As defense counsel conceded at the hearing on loss, an investor in a startup like HeadSpin decides whether to invest based on the prospects of a large return. Hearing Tr. at 46:9–47:24; see also Investor 1 Decl. ¶¶ 2, 9–10. (dkt. 104-4) (noting that his investment firm "invests in growth-stage technology companies with the goal of obtaining a significant return on its investment" and that the firm "targets high-growth companies for investment" and "believed that Headspin was achieving significant sales and revenue growth based on the false information that Lachwani provided"); Investor 2 Decl. ¶¶ 2, 10 (dkt. 104-5) (similar). The investor does not simply expect to get her principal back, or she would just put her money in the bank. Nor does she expect to make a small profit at some distant time in the future; on the contrary, the record shows that investors cared about HeadSpin's apparently rapid growth and hoped it would continue. Investor 1 Decl. ¶¶ 9, 11; Investor 1 Internal Emails and Slide Deck, Tomeno Decl. Ex. V (dkt. 104-7); Investor 2 Slide Deck, Tomeno Decl. Ex. X; Investor 1 Investment Memo, Tomeno Decl. Ex. Y. Lachwani's fraudulent representations were designed to attract investment to his company, and as such they were designed to make it seem like HeadSpin had secured more sales and subscription revenue, was growing more quickly, and had secured more lucrative, high-profile customers than it really had. This was plainly why Lachwani inflated the ARR figures to investors, who in internal materials repeatedly remarked on the firm's ARR growth. Investor 1 Decl. ¶¶ 9, 11; Investor 1 Internal Emails and Slide Deck, Tomeno Decl. Ex. V (dkt. 104-7); Investor 2 Slide Deck, Tomeno Decl. Ex. X; Investor 1 Investment Memo, Tomeno Decl. Ex. Y; Investor 3 Emails, Tomeno Decl. Ex. AA. Creating a sense of rapid and impressive growth is also why Lachwani passed other misleading information to investors, such as the slide deck stating that "HeadSpin is Trusted by 1,000+ Companies Worldwide," and displaying the logos of a number of prominent firms that were not, in fact, HeadSpin's customers, or another slide that reported the firm to have deployed 22,000 or 32,000 devices when in fact it had only

GA-131

deployed 2,000.[5]  The record amply supports the conclusion that Lachwani's misrepresentations were intended to boost the appearance that HeadSpin was growing more rapidly and impressively than it really was.  Indeed, there are no other explanations for Lachwani's conduct that are even plausible, despite Lachwani's suggestion that he was merely "gilding the lily" because he is a perfectionist or for some other idiosyncratic reasons.

Importantly, the record also shows that HeadSpin's investors would not have invested in HeadSpin—thus parting with millions of dollars—had they known the truth about HeadSpin's performance. [6]  See Arora Decl. ¶ 4; Investor 1 Decl. ¶¶ 9–11; Investor 2 Decl. ¶¶ 9–10; Investor 3 Decl. ¶¶ 4–5.  Because they invested in HeadSpin, at least some of those investors lost out on chances to make other investments that would have actually matched the high-growth investment profile they were targeting.  See Investor 1 Decl. ¶ 10; Investor 2 Decl. ¶ 10.

In short, the investors were induced to part with their money based on fraudulent

---

[5] Lachwani argues that the customer slide was not misleading because it did not state that HeadSpin had over 1,000 paying customers, or that all the logos on the slide were current paying customers.  See Def.'s Response at 20.  This is an implausible and excessively literal interpretation of the slide.  Just under the header is a line that says that "[a] more comprehensive list can be found at https://www.headspin.io/customers."  Id. (emphasis added).  One of the firm's potential investors emphasized the information contained in that slide in internal emails, referring to the "logos" listed as the firm's "customers."  Tomeno Decl. Ex. AA at 276.  Lachwani also argues that the device count figures were not inaccurate, and that the Government only believes them to be inaccurate because it misunderstands the way HeadSpin's technology worked.  See Def.'s Response at 19–20.  But the record shows that even HeadSpin's own senior employees, including one of its lead engineers, believed this figure was bogus.  See Loukakos Decl. ¶ 7; id. Ex. A at 7, 12.

[6] Lachwani objects that the investor declarations only say that the investors would not have invested had they known about HeadSpin's true financial situation, and that some of the reasons the financial situation was worse than represented to investors did not have to do with the fraud.  The Court overrules this objection for two reasons.  First, this argument comes very close to arguing that Lachwani's misrepresentations were not actually material to the investors.  But that route is closed to Lachwani.  He has pled guilty to three counts of fraud, each of which have a materiality element.  Second, Lachwani's argument assumes that the investors would nevertheless have invested in HeadSpin had they known Lachwani, its CEO, was defrauding them.  That cannot withstand common sense.  Cf. USA v. Hussain, No. 16-CR-00462-CRB-1, 2019 WL 1995764, at *8 (N.D. Cal. May 6, 2019), aff'd sub nom. United States v. Hussain, 818 F. App'x 765 (9th Cir. 2020) ("The question is not . . . whether HP would have purchased Autonomy if it had known about the full extent of Autonomy's hardware sales.  The question is whether HP would have purchased Autonomy if it knew about the fraud.") (citation omitted).

**GA-132**

misrepresentations about HeadSpin's prospects for growth—and thus for future returns—and they would not have parted with their money had they known about the fraud. It is true that the investors got something in return, but what they got in return were shares in a company with materially worse prospects for future returns than they believed they were getting. In other words, at the time of the transaction, the investors got something worth less than what they paid. For that reason, they suffered an actual loss. As discussed in Part III(C) below, Lachwani is entitled to a credit against the loss for the actual value of the shares the investors received at the time of the transaction. But he is not entitled to a finding that there was no actual loss merely because, at some time after the company had absorbed the impact of the fraud, the company had sufficient assets to reimburse investors. It is the Court's task to undertake an "fact-intensive and individualized" inquiry, <u>Zolp</u>, 479 F.3d at 718, and to give a "realistic, economic" account of the loss, <u>W. Coast Aluminum Heat Treating Co.</u>, 265 F.3d at 991. Adopting Lachwani's position would not account for the nature of the fraud and the actual loss it caused the investors at the time of the investment.

Lachwani's argument that the investors suffered no actual loss fails for a second reason. The fact that investors were ultimately able to recover much of their money in the Recap is the product of contingent events that occurred after the discovery of the fraud—events that took place at least in part to reduce the fallout from the discovery of Lachwani's criminal activity. The Guidelines contemplate credit against loss for "[t]he money returned, and the fair market value of the property returned and the services rendered, by the defendant or other persons acting jointly with the defendant, to the victim <u>before the offense was detected</u>." U.S.S.G. § 2B1.1, cmt. n.3(E)(i) (emphasis added). After Lachwani's fraud was discovered, members of the board of directors negotiated the Recap transaction with the investors that helped to head off the threat of litigation and a possible bankruptcy. <u>See</u> Arora Decl. ¶ 11. Despite Lachwani's argument to the contrary, the record shows that Lachwani's cooperation was necessary to the success of the Recap. He agreed to step down as CEO, resign as a member of the Board, cancel his own shares in

GA-133

the company, provide a cash refund to one investor in exchange for a release of that investor's claims against him, and transfer shares of his own stock to another investor. See Recap Background Mem. at 119, 122–23, Tomeno Decl. Ex. U. Crediting Lachwani for the amount returned to investors in the Recap would amount to rewarding him for actions taken to reduce the consequences of his fraud after its discovery. This would be contrary to the guidelines and Ninth Circuit law. See U.S.S.G. § 2B1.1, cmt. n.3(E)(i); United States v. Stoddard, 150 F.3d 1140, 1146 (9th Cir. 1998) ("Repayments before detection show an untainted intent to reduce any loss. Repayments after detection may show no more than an effort to reduce accountability.").

Lachwani argues that the money was not "returned" to the investors, but rather "the private company the investors owned decided to undertake a liquidity event in which shares were exchanged for cash, notes, reclassified shares, or a combination of the three." Def.'s Response at 11. This argument ignores that the Recap was necessary because of the discovery of the fraud, and that Lachwani's cooperation was an integral part of it. Lachwani also seems to assume that the investors would have had ready access to their original funds if the Recap had not been successful. But the record shows that if the Recap had not taken place, HeadSpin would not have had sufficient funds to repay the investors, despite their liquidation preferences.[7]

---

[7] The Recap Background Memorandum notes that the directors considered a possible "wind-down" of the company either privately or through bankruptcy:

> With respect to an orderly wind-down, in the absence of litigation, the Committee initially estimated that, after paying current debt, other liabilities, professional fees and salaries of essential staff during the wind-down, the Company would have a maximum of approximately $96 million remaining to distribute to its preferred stockholders, who had total liquidation preferences of $152 million (assuming no litigation or other legal disputes). That would result in the return of at most 63% of their liquidation preferences, and the holders of common stock and employees holding options would receive nothing. With hindsight, the Committee believes that legal expenses and contingencies would have caused the amount available to distribute to stockholders in a wind-down to have been substantially less. Recognizing the potential risk of litigation by stockholders, which would consume a substantial portion of the Company's cash, the Committee also considered winding the Company down in a formal bankruptcy proceeding, which would stay all litigation. After consulting bankruptcy counsel, the Committee estimated that a bankruptcy proceeding would take two or more

GA-134

United States District Court
Northern District of California

United States District Court
Northern District of California

1    Nor, finally, does United States v. Ortland, 109 F.3d 539 (9th Cir. 1997), help

2 Lachwani's case that there was no loss. Lachwani argues that, at least in fraud cases

3 involving investment in nonpublic companies, Ortland requires sentencing judges to find

4 "that the actual loss to the investors [is] the total amount they did not regain." Id. at 548.

5 But Lachwani reads too much into Ortland, which does not stand for that broad

6 proposition. First, and most importantly, the relevant issue raised on appeal in Ortland was

7 whether "the district court miscalculated the amount of loss his actions caused because the

8 court incorrectly included consequential damages in the loss calculation." Id. at 547. The

9 question was whether a receiver's fees—incurred during the process of winding up the

10 partnership and returning the money to the defrauded investors—counted as consequential

11 damages or "direct loss." See id. at 547–48.

12    That case certainly contains language that describes the unchallenged method by

13 which the district court calculated the loss amount. But the opinion does not describe that

14 method as part of an analysis of the proper way to calculate loss in an investment fraud

15 case. Indeed, the opinion does not even cite Guidelines commentary or case law relevant

16 to the methods of loss calculation. Instead, the case's description of the loss calculations

17 was necessary to its explanation of why the receiver's fees were part of the direct loss

18 rather than consequential damages. To whatever extent the court's description of the

19 method of loss calculation might be read as endorsement of that method in other cases, it

20 would be unnecessary to the decision and, thus, merely dicta. See Cetacean Cmty. v.

21 Bush, 386 F.3d 1169, 1173 (9th Cir. 2004).

22    Second, as already noted, the Ninth Circuit recognizes that "the guidelines do not

23 present a single universal method for loss calculation under § 2B1.1—nor could they,

24 given the fact-intensive and individualized nature of the inquiry." Zolp, 479 F.3d at 718.

25 Accordingly, in a subsequent unpublished decision, the Ninth Circuit declined to read

26    _____

27    years to complete and consume even more of the Company's cash given the
disparate preferences and claims of the stockholders, creditors, customers

28 and employees that would be contested.
Recap Background Mem. at 119, Tomeno Decl. Ex. U.

11

**GA-135**

Ortland as prescribing a universally applicable principle for loss calculation. See United States v. Bickerstaff, 185 F.3d 869, 869 n.4 (9th Cir. 1999) (unpublished) (rejecting appellant's argument that the district court erred by not following the method of loss calculation described in Ortland and noting that the district judge had "sufficiently distinguished Bickerstaff's fraud from the fraud in Ortland" and that "application note 8 to guideline section 2F1.1 specifically authorizes the consideration of the nature and extent of the fraud in calculating the loss amount."). In other words, while Ortland does show that one district court used a method of loss calculation that might be favorable to Lachwani here, it does not follow that this method is required in all investment fraud cases.[8]

In short, then, the Court finds that the investors suffered an actual loss as a result of Lachwani's fraud, and Lachwani is not entitled to credit against the loss for the Recap. Ortland is not to the contrary.

### C. A "Reasonable Estimate" of the Net Loss from Lachwani's Fraud Is Possible

The Court must next endeavor to estimate the value of the loss. The Government advocates two distinct approaches for doing so. While the Court ultimately cannot adopt either of the Government's proposed loss figures, the record nevertheless provides a sufficient basis for the Court to calculate an appropriate loss figure.

The Government's preferred position, which was adopted by Probation in the PSR, is that the actual loss is about $92 million, the full value of the money obtained by HeadSpin during the period of Lachwani's fraudulent scheme. The Government argues that this figure is supported by the fact that no investor would have invested had they known the truth about HeadSpin, that at the time of the stock sales "it was not reasonably probable that the stock had any value," and the lack of a market for HeadSpin shares made them effectively worthless. United States' Sentencing Memorandum ("Gov't Mem.") at

---

[8] Even if Ortland did say what Lachwani suggests, it would not result in a determination that there was no loss because—as the Court has already noted—the record shows that HeadSpin would not have had sufficient assets to completely reimburse investors if the company was dissolved. See note 7 above.

12

**GA-136**

United States District Court
Northern District of California

18 (dkt. 103).

But neither the facts nor the law support the view that HeadSpin stock can or should be judged to have been worthless at the time of the investment. With respect to the facts, the record shows that HeadSpin was not a "sham" company. It had some intrinsic value separate and apart from the fraud—it had a real product, some real customers, and a real market, as the subsequent reconstruction of its finances by KPMG shows. See, e.g., Recap Background Mem., Tomeno Decl. Ex. U; see also Loukakos Decl. Ex. A at 6. HeadSpin was a privately held company, to be sure, and the stocks were not liquid assets. But while this certainly makes it more difficult to value them, it does not follow that the stocks were valueless. See Holmes, 2023 WL 149108 at *4.

With respect to the law, Ninth Circuit precedent requires that, in cases of fraudulently induced investment in a company that is not a complete sham, the district court "may not assume that the loss inflicted equals the full pre-disclosure value of the stock[.]" Zolp, 479 F.3d at 719; see also United States v. Laurienti, 611 F.3d 530, 558 (9th Cir. 2010) ("If the underlying company was worthless or practically worthless, it is reasonable to use the total investment cost as the actual loss. But, if the underlying company has intrinsic value, then the use of the total investment cost is erroneous.") (citing Zolp, 479 F.3d at 719); Holmes, 2023 WL 149108 at *4 ("The fact that the investors did not have—and never will have—an opportunity to liquidate their shares is undoubtedly unfortunate, but illiquidity and resale difficulty does not deprive Defendant of credit for the inherent value of Theranos shares."); United States v. Leonard, 529 F.3d 83, 93 (2d Cir. 2008) (finding that the "district court erred in not deducting from the purchase price the actual value of . . . illiquid securities"). The Government suggests that Zolp's holding should be limited to public companies, but—as the district court also held in Holmes— Zolp does not "provide . . . a basis to distinguish the loss calculations for public securities from those involving private securities." Holmes, 2023 WL 149108 at *4.

The Court's task here will be the same one it would face if HeadSpin were publicly traded: namely, to "disentangle the underlying value of the stock, inflation of that value

13

**GA-137**

due to the fraud, and either inflation or deflation of that value due to unrelated causes." Zolp, 479 F.3d at 719; see also Berger 587 F.3d at 1046–47 (instructing the district court to apply a loss calculation method that "attempt[s] to gauge the difference between [the] share price—as inflated through fraudulent representation—and what that price would have been absent the misrepresentation").

The Government offers an alternative calculation designed to aid the Court in carrying out the more complicated task prescribed in Zolp.[9] Relying on the analysis of its expert Jeffrey Hart, the Government argues that the loss is the total difference between HeadSpin's actual value at the time of the Series B and C offerings and the actual amount HeadSpin acquired in those funding rounds. Hart endeavors to calculate the actual value of HeadSpin's shares at the time of the Series B and Series C offerings using two distinct methods: one based on the share price set in the Recap and the other based on multiples of HeadSpin's actual ARR as calculated by KPMG. See Hart Report ¶¶ 23, 29–46 (dkt. 103-1). Hart then subtracts the actual value of the Series B and C offerings from the amounts paid to HeadSpin by the Series B and C investors. Id. Hart's first method yields an estimate of the combined value of the Series B and Series C offerings of about $18.1 million, while the second method yields an estimate of about $20.7 million. Id. ¶¶ 32, 46 The total amount actually paid for the Series B and C offerings was $79,979,610, so the first method yields a total net loss of about $61.8 million, and the second method yields a total net loss of about $59.2 million. Id.

Lachwani objects to these calculations for two reasons. He first argues that both of Hart's methods for calculating the actual values of the Series B and C offerings are unreliable. Here the Court will confine its discussion to the method involving the ARR multiple, since this is the approach the Court will ultimately adopt. ARR is a metric that is

---

[9] Lachwani objects that the Government disclosed this method of loss calculation, and the evidence underlying it, belatedly. The Government did not propose this method of calculation to the probation officer. But the Court has granted Lachwani ample time and space to respond to the Government's additional arguments based on the Hart Report, including additional briefing and a separate hearing on loss. Lachwani could have sought a further continuance if necessary, but he did not do so.

GA-138

commonly used as part of the valuation of Software-as-a-Service ("SaaS") companies like HeadSpin.  Plea Agmt. at 5; Hart Report ¶¶ 34–35; Jolley Decl. ¶ 3.  It is a metric that Lachwani has admitted to knowing was significant to investors' decisions.  Plea Agmt. at 5.  And it is a metric that several of HeadSpin's largest investors themselves say was especially significant to their decisions to invest in HeadSpin—statements that find support in their internal communications about HeadSpin.  Investor 1 Decl. ¶ 11; Investor 2 Decl. ¶ 7; Investor 3 Decl. ¶ 3–4; Investor 1 Internal Emails and Slide Deck, Tomeno Decl. Ex. V (dkt. 104-7); Investor 2 Slide Deck, Tomeno Decl. Ex. X; Investor 1 Investment Memo, Tomeno Decl. Ex. Y; Investor 3 Emails, Tomeno Decl. Ex. AA.[10]  One central way that HeadSpin's investors evaluated whether the price of the Series B and Series C offerings was a reasonable valuation of the company was by using ARR multiples.  This means dividing the total valuation of HeadSpin implied by the Series B and C offerings by HeadSpin's ARR to calculate the "multiple."  Hart Report ¶¶ 33–38.  That multiple can then be compared with multiples from other firms.  Id.  HeadSpin's investors calculated and evaluated ARR multiples as part of their investment decisions.  Investor 1 Decl. ¶ 11; Investor 2 Decl. ¶ 7; Investor 3 Decl. ¶ 4.

Lachwani, in large part through his expert John Ciancanelli, makes the case that Hart's ARR approach to reconstructing HeadSpin's value is relatively simplistic and would not likely be used, on its own, by one looking to definitively value a private firm.  See Ciancanelli Report at 186–193, Hemann Decl. Ex. 7 (dkt. 107).  Ciancanelli points out that HeadSpin's investors looked to a variety of metrics in determining whether HeadSpin's valuation was reasonable; he argues that Hart failed to perform additional analyses that would have made his estimates more reliable or sophisticated; and he argues that has failed to use other commonly used valuation methods.  But while Ciancanelli is undoubtedly correct that the ARR multiple method does not provide a precise measure of

---

[10] Lachwani is certainly correct that ARR and ARR growth were not the only factors considered by investors, but the evidence that they were of central significance is clear and convincing.

GA-139

United States District Court
Northern District of California

HeadSpin's value, precision is not always equivalent to reliability. That is especially so where, as here, "absolute precision" is not required; "rather, [the Court] need only make a reasonable estimate of the loss based on the available information." Zolp, 479 F.3d at 718 (citing U.S.S.G. § 2B1.1, cmt. n. 3(C); United States v. Peyton, 353 F.3d 1080, 1090 n.11 (9th Cir. 2003)). The Court finds that Hart's analysis can reliably serve this purpose.

Hart's approach has several indicia of reliability. First, Hart's professional experience qualifies him to offer it. Second, the analysis yields a similar reconstructed valuation as that produced by his other method, which is based on the share price agreed to in the negotiated Recap. The fact that the numbers generally agree, despite being produced in quite different ways, adds to their credibility. Third, the analysis has the benefit of reproducing one method of valuing HeadSpin that was used by the investors themselves. Investor 1 Decl. ¶ 11; Investor 2 Decl. ¶ 7; Investor 3 Decl. ¶ 4. Fourth, the ARR multiple calculation contains assumptions favorable to Lachwani, and thus it arguably overstates the actual value of the shares at the time of the Series B and C sales. Hart indicates, for instance, that the inflated figures provided to investors may have led them to value the company using a higher ARR multiple than they otherwise would have. Hart Report ¶ 38; see also Investor 1 Decl. ¶ 11 ("A fair valuation of HeadSpin at the time of [Investor 1's] investments would have been significantly less than the valuation at which [Investor 1] invested because a lower multiple would have applied to HeadSpin's actual ARR."). Hart nevertheless used the same high multiples to estimate the value of the company based on the true ARR figures. Finally, Ciancanelli himself does not deny that ARR multiples were used by HeadSpin's investors as one approach to valuing the company and does not contradict the well-attested view that such multiples are one customary metric used to value SaaS companies like HeadSpin. It is reasonably certain that Hart's ARR multiple method is reliable and can support a reasonable estimate of the loss based on the available evidence.[11]

---

[11] Lachwani argues that the round valuation figures used in the funding rounds ($500 million in Series B and $1.1 billion in Series C) were merely "thrown out" by HeadSpin,

16

**GA-140**

Lachwani's second objection is to Hart's reliance on the KPMG "Recast" data, from which he derives the actual ARR figures used to revalue the Series B and Series C offerings. Lachwani points out, correctly, that the KPMG reconstruction of HeadSpin's finances was not carried out for the purpose of investigating Lachwani's fraud; rather, it was carried out for the purpose of reconstructing the company's finances over a specified period. See Recap Background Mem., Tomeno Decl. Ex. U at 119. In other words, KPMG never claimed that the difference between its reconstructed figures and the original, overstated figures was entirely the product of Lachwani's fraud. KPMG's analysis cannot support that claim.

Nor does other evidence in the record permit the Court to attribute the entirety of the difference between the Recast figures and the original figures to Lachwani's criminal conduct. HeadSpin suffered from serious internal management issues, especially with regard to tracking its finances. Many of those issues appear to have stemmed from Lachwani's management, but not all that conduct was necessarily criminal. One key example will suffice to illustrate the point. A very large portion of the overstatement of ARR resulted from the way Lachwani and HeadSpin accounted for "revenue" it received from resellers of its services—the parties call this "Channel ARR." In essence, HeadSpin booked the full revenues payable to the resellers from third parties as HeadSpin's own revenue. Lachwani told others at the company that this was a legitimate way of accounting for reseller revenues. See Okmyanskaya Decl. ¶¶ 7–8 (dkt. 103-3). It is at least possible that he believed this, and the Government has not carried its burden to prove otherwise. This method of accounting for Channel ARR was known to some in the company, and it

---

and thus that reconstructing HeadSpin's valuation with any financial metrics is impossible. He also argues that investors disbelieved the financial metrics anyway, so the portion of those metrics that were inflated by Lachwani's conduct could not have moved the needle on their valuation of the company. These arguments fail because, again, they essentially ask the Court to find that HeadSpin's financial metrics were not material to the investors' decisions, when in fact Lachwani has pled guilty to providing material, false information regarding revenue and ARR to investors. See Plea Agmt. At any rate, the investors may not have produced the round valuation figures, but they obviously did evaluate the offering and determine that those figures were fair valuations of the company. Then they purchased equity at that price. That is a "valuation."

17

GA-141

was apparently approved by one of HeadSpin's accountants. <u>See id.</u> ¶ 8; <u>see</u> Sadarangani Proffer Interview, Hemann Decl. Ex. 7 at 85 (Dkt. 107 at 85). There is also some evidence that HeadSpin may have informed one investor about this practice. <u>See</u> Barczak Decl. Ex. 4 at (dkt. 115). In short, Lachwani's position is that the Channel ARR accounting was at least believed to be a legitimate method of accounting—albeit one that happened to greatly inflate HeadSpin's ARR metrics with moneys that HeadSpin would never see.

The Court has doubts about whether the Channel ARR accounting was in fact innocent, but doubts are not enough; the Court must find the facts underlying its loss calculation by clear and convincing evidence. In support of its own contention that the Channel ARR entries were fraudulent, the Government mainly relies on one paragraph in a declaration by Sana Okmyanskaya, HeadSpin's former bookkeeper, where she says that she later learned "what Mr. Lachwani told me about the reseller arrangements was not true." <u>See</u> Okmyanskaya Decl. ¶ 8. Okmyanskaya's meaning is somewhat ambiguous, and it does not explain away the other evidence to which Lachwani points the Court's attention. Nor did the Government during the loss hearing. The Court is therefore unable to say to a reasonable certainty that the Channel ARR accounting was fraudulent.

In short, then, a large portion of the overstatement of ARR identified by KPMG was due to Channel ARR accounting problems, and the Government has not carried its burden to show that Lachwani is criminally responsible for those problems. This means that the Court cannot assume that Lachwani is criminally responsible for the entire difference between HeadSpin's overstated ARR as reported by Lachwani and HeadSpin's actual ARR as reported by KPMG. Hart's analysis assumes this to be the case. Thus, because the Court's task is to "disentangle the underlying value of the stock, inflation of that value due to the fraud, and either inflation or deflation of that value due to unrelated causes," <u>Zolp</u>, 479 F.3d at 719, the Court cannot simply adopt Hart's loss estimate. <u>See</u> <u>Holmes</u>, 2023 WL 149108, at *3 ("The Ninth Circuit applies a general loss causation principle at sentencing, 'permitting a district court to impose sentencing enhancements only for losses that resulted from the defendant's fraud.'") (quoting <u>Berger</u>, 587 F.3d at 1043).

**GA-142**

1    Nevertheless, while Hart's exact numbers do not sufficiently enable the Court to do

2    the "disentangl[ing]" required by Zolp, Hart's methods—along with other facts available

3    to the Court—still enable a reasonable estimate of the loss.  Lachwani has admitted to

4    making several fraudulent entries in his ARR spreadsheet that were passed along to

5    investors.  These, his counsel conceded, inflated the reported ARR figures by a total of

6    $1.5 million.[12]  These figures can be used to estimate loss using the ARR multiple method

7    applied by Hart.  Unlike the Government's expert, however, the Court will downwardly

8    adjust the overstated ARR figures only for those ARR entries that Lachwani has conceded

9    were overstated because of his fraud.

10    In addition, for evidentiary reasons, the Court will measure loss only for the Series

11    C transaction.  The only version of Lachwani's ARR spreadsheet that is in the record was

12    provided to investors in connection with that transaction.  See Oct. 2019 ARR Spreadsheet,

13    Investor 2 Decl. Ex. A (dkt. 104-5).  This matters because Lachwani's ARR spreadsheet

14    carried different fraudulent entries at different times.  The October 2019 version, for

15    example, contains only two of the three admittedly fraudulent entries.  See id., "Committed

16    Customers" tab, Rows 47, 111; see also PSR ¶ 17.  Thus, the Court only calculates the

17    Series C loss using two fraudulent entries—those for Uber and American Express—which

---

[12] At the hearing, Lachwani's counsel conceded that $1.5 million in ARR was overstated because of Lachwani's misrepresentations:

> THE COURT: Okay. What you are saying to me is the amount of money that you believe can be attributed to the defendant's conduct, reserving all your other arguments about loss, and so forth and so on, you said several million. What are you saying? Is it $2 million, $3 million, $5 million, $8 million? What is it?
> MR. BERNSTEIN: $1.5 million, $900,000 from the Uber account and—
> THE COURT: It's $1.5 million?
> MR. BERNSTEIN: That's the amount, and that represents about 2 percent of the overstatement.

Hearing Tr. at 67:3–67:13.  The $1.5 million figure also appears in Lachwani's sentencing memorandum, which attributes the $1.5 million to the overstatement of the ARR from three specific customers discussed in the PSR.  Def.'s Mem. at 12 n.7; see PSR ¶ 17.

The numbers used by the Court are not exactly equal to the numbers used by Lachwani in his memorandum, which appear to have been rounded.  Instead, the Court uses the overstated values as stated in the Oct. 2019 ARR Spreadsheet and the actual values as reported in the PSR.  See PSR ¶ 17; Oct. 2019 ARR Spreadsheet, "Committed Customers" tab, Rows 47, 111.

**GA-143**

United States District Court
Northern District of California

together overstated ARR reported to Series C investors by a total of $1,078,000.[13]  The

absence in the record of a spreadsheet furnished in connection with the Series B

transaction makes it impossible for the Court to determine with reasonable certainty which

fraudulent entries it contained, so the Court must set the Series B transaction aside.[14]

With these parameters, the Court calculates loss as follows.  The Court's

calculations are intended to mirror those performed by Hart using his ARR method.  See

Hart Report ¶¶ 40–46; see also id. Schedule 4.

**Table 1: Calculations for Fraud-Adjusted ARR Figure**

| Calculation | Schematic | Figure |
|---|---|---|
| Spreadsheet ARR for Q2 2019[15] | [A] | $54,700,000 |
| Amount of Uber Overstatement | [B] | $960,000 |
| Amount of American Express Overstatement | [C] | $118,000 |
| **Fraud-Adjusted ARR** | [D] = [A] – [B] – [C] | **$53,622,000** |

**Table 2: Calculations for Fraud-Adjusted Value of the Series C Offering**

| Calculation | Schematic | Figure |
|---|---|---|
| Series C Multiplier[16] | [E] | 19.0 |
| Fraud-Adjusted ARR (from Table 1) | [D] | $53,622,000 |
| Fraud-Adjusted Enterprise Value | [F] = [D] * [E] | $1,018,818,000 |
| Cash[17] | [G] | $58,200,000 |
| Primary[18] | [H] | $59,999,954 |

[13] That is, $960,000 for the Uber account and $118,000 for the American Express account. PSR ¶ 17; see Oct. 2019 ARR Spreadsheet, "Committed Customers" tab, rows 47, 111.
[14] To be clear, the record supports the finding that Lachwani committed fraud in connection with the Series B transaction, and Lachwani pled guilty to doing so.  But the record simply does not contain sufficient information to allow the Court to reasonably estimate the loss for that transaction.
[15] Hart Report ¶¶ 40–46.  The Oct. 2019 ARR Spreadsheet reports an unrounded figure of $54,658,095.  See Oct. 2019 ARR Spreadsheet, "Forecast" tab, cell N11.  The Court adopts the rounded figure used in the Hart Report—which Hart in turn took from the internal investment memorandum of one of HeadSpin's major investors—because it results in a more conservative loss estimate.  Lachwani's Plea Agreement also states that he sent a slide deck to Series C investors that "stated that HeadSpin's ARR was more than $54 million as of the second quarter of 2019, when [he] knew this number was overstated." Plea Agmt. at 7.
[16] Hart Report ¶ 44, Fig. 9.
[17] Hart Report ¶ 44, Fig. 9.  The amount of cash assets HeadSpin had at the time of the Series C offering.
[18] Hart Report ¶ 44, Fig. 9.  The amount of cash acquired by HeadSpin through the Series C offering.

GA-144

United States District Court
Northern District of California

| Fraud-Adjusted Post-Money Valuation | [I] = [F] + [G] + [H] | $1,137,017,954 |
| Percentage Value of Ownership Offered in Series C[19] | [J] | 5% |
| **Fraud-Adjusted Value of Series C Offering** | **[K] = [I] * [J]** | **$ 56,850,898** |

**Table 3: Loss Calculation**

| Calculation | Schematic | Figure |
|---|---|---|
| Amount Paid by Series C Investors | [L] | $59,999,954 |
| Fraud-Adjusted Value of Series C Offering (from Table 2) | [K] | $56,850,898 |
| **Loss** | **= [L] − [K]** | **$3,149,056** |

Thus, the Court finds that, based on the available evidence, a reasonable estimate of the loss resulting from Lachwani's fraud is $3,149,056. This figure reflects the estimated difference in value between what the Series C investors paid to HeadSpin and what those investors received, insofar as that difference can be attributed to Lachwani's criminal conduct.

To be sure, the Court's estimate is just that—an estimate. But it should be emphasized that this estimate is likely to underate the loss in HeadSpin's value that resulted from Lachwani's criminal conduct. First, and most obviously, it does not account for loss incurred in the Series B offering. Second, the calculations cannot account for the non-financial metrics about which Lachwani misled investors, including the number of devices deployed on HeadSpin's networks and number of customers HeadSpin had. Knowing the truth about these matters may have led investors to use lower ARR multiples to value the company, which would result in a greater loss. See Hart Report ¶¶ 38–39; see also Investor 1 Decl. ¶ 11. Third, the calculations cannot account for the loss from the fraud Lachwani committed to conceal HeadSpin's financial problems, such as the forged invoices Lachwani used to cover up the large volume of "unbilled receivables" that HeadSpin carried in its books.[20] See Tomeno Decl. ¶¶ 4–12 (dkt. 104-7); id. Exs. A–H;

---

[19] Hart Report ¶ 44, Fig. 9.
[20] To the extent that Lachwani objects that this was not what his forged invoices were

**GA-145**

United States District Court
Northern District of California

1  Okmyanskaya Decl. ¶¶ 6–7; <u>see also</u> Okmyanskaya Proffer Interview at 35, Hemann Decl.

2  Ex. 6.  Fourth, the calculations cannot account for the significant reduction in value that

3  would have been assigned to the company by any sensible investor who was aware that

4  Lachwani, HeadSpin's CEO, was committing fraud.  In other words, in endeavoring to

5  carry out its difficult task of making a "reasonable estimate of loss based on the available

6  evidence," the Court has made several assumptions favorable to Lachwani.  This is

7  because the Court's calculations do not account for several factors that had an adverse

8  effect on HeadSpin's value, but which are not susceptible to easy quantification, at least on

9  this record.

10         Under the Guidelines, a loss of $3,149,056 results in a 16-level enhancement.

11  U.S.S.G. § 2B1.1(b)(1).

12         **D.**            **Lachwani's Fraud Had More Than Ten Victims**

13         Section 2B1.1(b)(2)(A)(i) of the Sentencing Guidelines provides for a 2-level

14  enhancement if the offense "involved 10 or more victims."  U.S.S.G. § 2B1.1(b)(2)(A)(i).

15  "Victim" is defined as a person, including a corporation, "who sustained any part of the

16  actual loss determined under subsection (b)(1)."  U.S.S.G. § 2B1.1(b)(1), cmt. n.1.  A

17  district court need only "make a reasonable estimate . . . based on the available

18  information" in counting victims.  <u>United States v. George</u>, 949 F.3d 1181, 1186 (9th Cir.

19  2020), <u>cert. denied</u>, 141 S. Ct. 605 (2020) (quoting <u>Zolp</u>, 479 F.3d at 719).

20         The PSR recommends an enhancement under Section 2B1.1(b)(2)(A), and the

21  parties agree that there were at least 10 investors in the Series B and C funding rounds.

22  Plea Agmt. at 10.  Lachwani argues that none of these investors suffered an actual loss

23  because no investor suffered a loss in the Series B and Series C funding, in accordance

24  with his other arguments addressed above.  But the Court has found that the investors in

25  question did suffer an actual loss, and thus the Court finds that a 2-level enhancement

26  under Section 2B1.1(b)(2)(A)(i) applies.

27

28  designed to do, the Court resolves the factual dispute against him.

22

**GA-146**

## IV. CONCLUSION

For the foregoing reasons, the Court's Guidelines calculations will be, in part, as follows:

a. Base Offense Level, U.S.S.G. §2B1.1(a):                7

b. Specific Offense Characteristics, U.S.S.G. §2B1.1(b)(1)(I)

(loss more than $1.5 million but less than $3.5 million):                +16

c. Specific Offense Characteristics, U.S.S.G. §2B1.1(b)(2)(A)

(more than 10 victims):                +2

The Court will reserve ruling on the remaining Guidelines adjustments recommended in the PSR until sentencing.

The parties are directed to confer and propose a date for sentencing to the Courtroom Deputy.

**IT IS SO ORDERED.**

Dated: January 25, 2024

CHARLES R. BREYER
United States District Judge

23

**GA-147**

ISMAIL J. RAMSEY (CABN 189820)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

LLOYD FARNHAM (CABN 202231)
NOAH STERN (CABN 297476)
Assistant United States Attorneys

     450 Golden Gate Avenue, Box 36055
     San Francisco, California 94102-3495
     Telephone: (415) 436-7200
     FAX: (415) 436-7234
     Lloyd.Farnham@usdoj.gov
     Noah.Stern@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **CASE NO. CR 21-353 CRB** |
|      Plaintiff, | **UNITES STATES' SUPPLEMENTAL SENTENCING SUBMISSION** |
|   v. | Sentencing Dates: April 19, 2024 |
| MANISH LACHWANI, | Time:      10:00 a.m. |
|      Defendant. | Judge:     Hon. Charles R. Breyer |

The United States submits this supplemental sentencing memorandum, in accordance with time limits under Local Criminal Rule 35-2, to address the Court's order dated March 12, 2024. The government does not agree that the Court should impose a shorter prison sentence in conjunction with a larger fine. Doing so would undermine the interest of specific and general deterrence and could appear to be a two-track system of justice, where wealthy defendants able to pay the maximum fines get more lenient prison sentences. It risks sending a message that the worst Silicon Valley fraudsters have to fear are monetary penalties, and risks incentivizing victims of fraud to pursue civil remedies rather than providing information to the government. Further, while a $1 million fine would certainly be warranted in this case given Lachwani's financial status and apparent effort to shield his assets, it is unlikely to have a meaningful impact if not paired with a significant custodial sentence. A minimal or non-custodial sentence is particularly unwarranted here given Lachwani's repeated and forceful efforts to push a false narrative of his conduct on the Court and minimize his own responsibility for his fraud scheme. Finally, the sentence in this case should be consistent with sentences imposed for other similarly situated defendants, and should reflect the seriousness of the offense, promote general deterrence, and account for Lachwani's history and characteristics.

## A. A One Million Fine Would Have a Minimal Impact on Lachwani and is Not Likely to Deter Similar Criminal Conduct

A $1 million fine would have minimal impact on Lachwani, and the Court should not impose such a fine in place of prison. A fine in this case is not likely to effectively support general deterrence. Instead, using a fine in place of prison risks sending a clear message that the wealthy are subject to a different justice system in our country; one in which the ability to pay a large fine decreases either time in prison or the likelihood of prison.

According to the most recent account documents obtained by the government, Lachwani's wife held approximately $39,730,000 in her brokerage accounts as of March 31, 2021, assets that prior to the discovery of the fraud were in Lachwani's own brokerage account.[1] PSR ¶ 85. The Probation Office's financial analysis identified about $24,364,000 in total assets belonging to Lachwani and his wife and

---

[1] Lachwani transferred the assets to an account in his wife's name as "separate property" after the fraud was discovered. PSR ¶¶ 85-86.

**GA-149**

concluded Lachwani's total net worth to be $20,426,300. PSR ¶ 86.[2] Taking the most conservative

number, a 4% return on assets based on Lachwani's net worth of $20,426,300.19 equates to passive

income of $817,052 annually. If the Court were to fine Lachwani $1 million and reduce his net worth to

$19,426,300.19, a 4% return equates to would be $777,052 annually. Therefore, such a fine is nothing

more than a slap on the wrist—it would have minimal impact, at most, on Lachwani's life—leaving him

with a passive annual income (conservatively measured) of $777,052, a reduction of only $40,000 per

year, even if he never works again.[3] Further, if the consequences of criminal prosecution of "fake-it-'til-

you-make-it" fraud are primarily monetary, this may incentivize victims to pursue their own civil

remedies in lieu of reporting crime to the government. A fine of $1 million is also considerably less

than the "upside" that Lachwani pursued with this fraud scheme, in the course of which he successfully

turned his startup into a "unicorn" valued at more than $1 billion by his duped investors. The

government's ability to deter fraud in Silicon Valley, one of the nation's most important economic

markets, depends on the courts appropriately punishing large fraud schemes.

**B.     Lachwani's Lack of Remorse and Presentation of False Narrative to the Court**

A fine in exchange for a shorter prison sentence is particularly unwarranted here because

Lachwani has failed to take full responsibility for his actions; instead, presenting himself as the primary

victim of his own crime. In these sentencing proceedings, Lachwani continues to assert that the

government has not presented evidence of the full extent of his fraud scheme. This is not true. The

government submitted declarations from nine witnesses. Most significantly, the government submitted a

declaration from the person who worked hand-in-hand with Lachwani on Headspin's financial

information, and who continued at the company after Lachwani was forced to leave and thereby

witnessed the extent of what Lachwani had done. The Court should give this declaration and the others

submitted by the government their proper weight. In her sworn declaration, Sana Okmyanskaya

---

[2] This government suspects that this analysis substantially undervalues Lachwani's net worth given the fact that the S&P 500 index has gained approximately 31% in value between March 31, 2021 and the present. Further, Lachwani's financial records show he invested heavily in companies like Advanced Micro Devices, which has gained approximately 117% over the same time period. In other words, the $40 million Lachwani held on March 31, 2021 has likely grown, not shrunk by over $15 million, in that time frame.

[3] If the $40 million Lachwani held on March 31, 2021 were used, a 4% annual passive income of $1.6 million would decrease to $1.56 million.

**GA-150**

1  explained that Lachwani told her directly how much revenue to recognize quarterly for Headspin

2  customers, ¶ 4, failed to provide supporting documentation despite multiple requests, ¶¶ 4-5, and that

3  what Mr. Lachwani told her about channel partner relationships to discuss with a CPA was "not true,"

4  ¶ 9.  Ms. Okmyanskaya also declared that she was involved in KPMG's restatement of the company's

5  revenue and ARR, that during this process Mr. Lachwani was afforded the opportunity to provide

6  information and documents relating to customer relationships, that based on her knowledge of company

7  information she believes KPMG's restatement presented an accurate picture of Headspin's revenue and

8  ARR, and "about three quarters of the revenue in the financial statements [Okmyanskaya] prepared was

9  not included in the revenue amounts in the corrected financial records because the information Mr.

10  Lachwani gave [her] was false."  *Id.* ¶¶ 10-12.  This was not an issue of controls and internal

11  dysfunction.  Lachwani provided information he knew was false to Okmyanskaya and purposefully

12  withheld documentary evidence of customer relationships.  If Lachwani had simply provided

13  Okmyanskaya the customer contracts, Headspin's financial records would have been accurate, and

14  would have shown less than a quarter of the revenue Lachwani instructed Okmyanskaya to recognize.

15  *See* White Decl. Exs. A & B.

16         Lachwani has submitted no declarations in response to or rebutting the facts in Okmyanskaya's

17  declaration.  Instead, he has invented a bogeyman of innocent errors in Headspin's finances based on

18  nothing more than assertions in his brief and citations to stray documents that do not support the

19  conclusion—directly contrary to Okmyanskaya's declaration—that there were financial errors unrelated

20  to his lies.  Lachwani seeks to impose this false narrative on these proceedings.

21         To underscore the extent Lachwani is unremorseful and has presented a false narrative to the

22  Court of his conduct, the government provides the following examples, including through submission of

23  limited additional evidence (long ago produced to Lachwani) and cited below:

24      • Lachwani asserts (in his unsworn briefing) that the ARR spreadsheet he kept was
25        intended to be a forecasting spreadsheet and he made false representations by allowing
           the spreadsheet to be used to populate representations to investors.  This is not an
26        accurate description of his conduct.  It was Lachwani—who had sole control over the
           ARR spreadsheet—who provided the spreadsheet to investors and told them that ARR
27        was based on signed contracts with customers.  Stern Decl. [4] Ex. CC (Lachwani sharing

28

---

[4] Stern Decl. refers to the Declaration of AUSA Noah Stern in Support of the United States'

**GA-151**

access to ARR spreadsheet with Investor 1); Ex. DD (Email from Investor 2 stating "I have attached the latest financial[s] that we received from Manish. We also received access to a google docs sheet with the customer names and revenues a while ago. I have attached the Excel form of that."). Lachwani's unsworn argument to the contrary is belied by the spreadsheet itself, which included the purported customers on a tab entitled "Committed Customers,"[5] included an amount for the "ACV signed" for each customer, and listed the "% likelihood of full deployment" for each customer as 100%. *See* Investor 2 Decl. Ex. A. It was not somebody else who chose these words, it was Lachwani.[6] Further, Lachwani directly and explicitly told investors that ARR reflected customers with "signed contracts." *See, e.g.*, Stern Decl. Ex. EE at 2184 & 2210 (investor presentation sent by Lachwani stating "Signed contracts worth $50M+ as of Q2 2018" and displaying graph of ARR); Stern Decl. Ex. FF (notes of Investor 1 call with Lachwani stating "ARR will be counted only when a deployment is done . . . ARR = deployed ACV"); Stern Decl. Ex. GG at 1259 (Investor 1 notes describing Lachwani explanations for ARR to revenue lag all of which appear to relate to Headspin beginning to recognize revenue in the next calendar month (or more) from when "contract is signed"); Barczak Decl. Ex. 4 (Investor 2 notes indicating Okmyanskaya representation that ARR is recognized after contract signing, but before deployment). Lachwani's unsworn rationalization of his conduct should be rejected by the Court.

- Lachwani argues that the government has "declare[d] . . . by fiat" that when KPMG was unable to find documentation for a deal this was because no deal existed. Def. Reply Mem. at 7. Far from that, the government presented sworn evidence that Headspin employees worked to "locate and provide all relevant documents . . . to KPMG," Lachwani sent "contracts, purchase orders, and invoices" that were provided to KPMG, and Headspin's bank statements were provided to KPMG. Okmyanskaya Decl. ¶ 10. Further, Okmyanskaya was "not aware of any actual large agreements HeadSpin entered into with customers, or any large payments received from customers, that KPMG did not record as revenue based on applicable accounting rules." *Id.* ¶ 12. KPMG also described, in a sworn declaration, how it conducted its review, including the review of bank statements. White Decl. ¶¶ 4-5. The evidence Lachwani submits, a statement in an email from White stating "we are not able to accept any more information," Def. Loss Mem. at 9, does nothing to contradict Okmyanskaya's assertion that KPMG's analysis reflected Headspin's financial reality or the fact that KPMG *reviewed bank statements*, White Decl. ¶ 5, and there were no large sums of cash that were not accounted for based on accounting rules, Okmyanskaya Decl. ¶ 12.

- Lachwani provides an incomplete and misleading narrative to the Court with respect to the American Express and Uber deals. With respect to American Express, Lachwani says he inserted $250,000 in the spreadsheet based on a text he received in November

---

Supplemental Sentencing Memorandum, filed herewith.

[5] In some versions of this spreadsheet, this tab was entitled "Pipeline," but in the version shared with Investor 2, it was entitled "Committed Customers." *See* Investor 2 Decl. ¶ 5 & Ex. A.

[6] As Loukakos explained, only Lachwani had edit access to the spreadsheet. Loukakos Decl. ¶ 5. Underscoring this, as the government has previously explained, Dkt. No. 103 at 21, Headspin produced lengthy videos of the version history of the spreadsheet showing that Lachwani was the only person making edits during the relevant time period.

2018 from the salesperson, Laurent Cordier, projecting the deal would "land" around that amount. Def. Reply at 8-9. Lachwani, however, leaves out the subsequent history and fails to explain why Lachwani kept this deal on the ARR spreadsheet for $250,000 after (1) Cordier clearly informed Lachwani that the deal closed at $132,000, (2) Okmyanskaya raised the discrepancy between the deal size Lachwani provided and the amount of the actual invoice sent to Amex, and (3) Amex terminated the contract. Specifically, on December 21, 2018, Laurent Cordier emailed Lachwani that Amex was in the contract stage for "132 k$" with "expansion possible . . . for an additional (90k$)." Stern Decl. Ex. HH. On January 21, 2019, Cordier emailed Lachwani stating, "Amex – closed : 132 k$ with potential extension of 95 k$ - 1 year contract." *Id.* Ex. II. On February 24, 2019, Lachwani emailed Okmyanskaya in regard to 2018 Q4 revenue, stating that Q4 was the same as Q3 and then listing additions to revenue, including "Annual Deal size . . . AMEX - $220K (To be paid)." *Id.* Ex. JJ. On June 27, 2019, after receiving Amex invoices, Okmyanskaya noted a discrepancy between the invoices and the deal size Lachwani had told her: "Amex – we had them booked at 55K quarterly but actual invoice tracks at 33K quarterly. Which is correct?" Lachwani responded, "yes the first two are small invoices, next two are larger one." *Id.* Ex. KK. On October 6, 2019, Cordier emailed Lachwani, writing "Amex (lost): . . . [t]hey confirmed the termination at this stage." *Id.* Ex. LL. Lachwani responded, "OK on AMEX. Was bound to happen." *Id.* Despite this, in late October 2019, in advance of the Series C, Lachwani had "AMEX" listed on his ARR spreadsheet as a "Committed Customer" with an "ACV signed" of "$250,000" and "ARR" of "$250,000." Investor 2 Decl. Ex. A (row 111). This entry for Amex remained on Lachwani's ARR spreadsheet until the fraud was discovered. Tomeno Decl. Ex. BB (March 10, 2020 version of ARR tracking spreadsheet, row 138).[7] The evidence is clear, Lachwani knew the size of the Amex deal and lied about it to inflate Headspin's ARR. He then knowingly kept the false and inflated figure in Headspin's ARR after the deal was terminated. There were no innocent mistakes.

- Lachwani also misleads the Court with respect to the Uber relationship. Lachwani omits the fact that Ameet Suri clearly told Lachwani the size of the Uber contract in August 2019, yet Lachwani continued to lie about the contract size to Okmyanskaya and investors. On August 16, 2019, after Okmyanskaya had stated that Headspin was booking $360,000 of quarterly revenue for Uber on an email chain involving Lachwani and Ameet Suri, Suri removed Okmyanskaya from the chain and asked Lachwani why Okmyanskaya referred to $360 per quarter. *Id.* Ex. MM. He continued, "Just as FYI . . . Our total billing to uber is $480 for the complete year. In 2018, we billed them $720K, which was $480 for 2018 and 240 for 6 months of 2017." *Id.* Lachwani responded, "i will discuss with [Okmyanskaya], np." *Id.* Nevertheless, on September 9, 2019, when Okmyanskaya again asked Lachwani about recognizing $360,000 in quarterly revenue from Uber and if the $480K invoice she had was an annual invoice, Lachwani lied and said "480K is one invoice for UBER. [S]econd invoice coming up in Q3." Ex. NN at 2024. He also said the invoice "covered 4 months" and ideally they would send three 480K invoices during the year but "i feel they will prune some devices in Q4." *Id.* at 2024-25. Despite clear knowledge of the actual deal size, Lachwani also continued lying

---

[7] According to metadata produced for this document by Headspin, it is entitled 202003100004-Internal - HeadSpin Revenue _ Customer Forecast Model (CONFIDENTIAL).xlsx.

**GA-153**

to investors. In late October 2019, in advance of the Series C financing, Uber remained listed on Lachwani's ARR spreadsheet as a "Committed Customer" with an "ACV signed" of $1,440,000 and "ARR" of $1,440,000. Investor 2 Decl. Ex. A (row 47). This entry for Uber remained on Lachwani's ARR spreadsheet until the fraud was discovered. Tomeno Decl. Ex. BB (row 64). It is clear that Lachwani was knowingly lying about the Uber deal—he did not make an innocent mistake. Indeed, his unsworn contention that he initially did not know the real size of the deal—one of the most substantial for Headspin—or that one of the purchase orders was canceled the day after it had been issued is simply not credible. Most significantly, Lachwani omits the fact that he forged an invoice to match the cancelled purchase order. Tomeno Decl. ¶ 14 & Ex. J (showing same create date as real invoice sent to Uber but different modified date). This forgery shows Lachwani's knowledge the cancelled purchase order was not active; if it had been active, Lachwani could have obtained a real invoice sent to Uber and provided it to Okmyanskaya. Lachwani's credibility with respect to his unsworn argument is also undermined by the fact that he forged two additional Uber invoices that were never sent to Uber representing a renewal period that did not, in fact, exist. *Id.* ¶ 15 & Exs. K & L.

- Lachwani argues the government cited no evidence to carry its burden that Lachwani forged several invoices related to a reseller for which Lachwani inflated ARR by over $10 million. This is wrong. *See* Tomeno Decl. ¶¶ 4-12 & Exs. A-H. As an initial matter, Lachwani *admitted in his plea agreement* that he "sent HeadSpin's accountant invoices I knew were altered to show amounts that were not actually invoiced." Dkt. No. 88 ¶ 2. The government submitted to the Court four real invoices emailed to an Australian reseller, Tomeno Decl. Exs. A-D, and four edited PDFs that Lachwani sent to Okmyanskaya that were never submitted to the reseller. Tomeno Decl. Exs. E-H. For example, on March 25, 2019, a real invoice, entitled INV-0008 was emailed to the reseller—the document metadata shows identical created and modified dates, 3/25/2019 12:25:10 p.m. *Id.* ¶ 4 & Ex. A. On June 18, 2019, Lachwani sent a modified version of this invoice to Okmyanskaya. *Id.* ¶ 9. The modified document has the exact same create date as the real invoice, but has a separate modified date of 6/28/2019 at 10:30:42 a.m., indicating that Lachwani took the PDF for the real invoice and modified it. *Id.* ¶ 11. The modified invoice, also entitled INV-0008, is identical except "AUD" was changed to "USD" and a "3" was placed in front of the amount that appeared on the real invoice, making "81,600" into "381,600."[8] *Id.* Ex. G. The fact that Lachwani emailed this false and altered invoice to Okmyanskaya is sufficient to prove that Lachwani was the person who altered it. In another example, Lachwani took real INV-0019, Ex. D, in the amount of $243,150.00, and edited it to create fake INV-0016 (never sent to the reseller), in the amount of $1,187,150.00. Ex. E. The description of items on the invoices are identical, but the altered invoice has a quantity of 50 for device license fees and support fees, instead of 10, which corresponds in the increase in dollar amount of the fake invoice. *Id.* The fact that it was Lachwani who altered the invoices is underscored by the fact that he blocked Okmyanskaya from directly accessing these invoices. At first, Lachwani told Okmyanskaya that he would give her access to the invoicing system the Australian sales team used, but then claimed technical difficulties, before blocking her request for access from the Australian team by asserting that he had already sent her the invoices. *See* Stern Decl. Ex. OO. Nor was there anyone else at Headspin who had a motive to create

---

[8] The due date was also modified.

fake/altered invoices. The evidence is clear and Lachwani's insistence that the government has failed to submit sufficient evidence on this point makes little sense.

- Further, the evidence is clear that Lachwani's representations about ARR from reseller Wipro in his ARR spreadsheet were knowingly false. Lachwani's ARR spreadsheet in advance of the Series C offering recorded approximately $25.5 million of ARR from Wipro. *See* Investor 2 Decl. Ex. A (rows 6-9, 13-18, 20). Lachwani knew this was false. Indeed, in Summer 2018, Lachwani hired a Wipro employee, Madhu Laxmanrao, to be responsible for Headspin's Wipro relationship. Stern Decl. Ex. PP at 3. According to Laxmanrao, Wipro committed to generating $5.5 million for Headspin, but Wipro was not meeting this target in early 2019 and Lachwani complained to Laxmanrao that Wipro was not meeting its targets. *Id.* at 4-5. Laxmanrao said that Wipro paid Headspin between $2.5 and $3 million over two and a half years. *Id.* at 8. Laxmanrao also told the government that several other deals he was involved in were substantially smaller than what was represented on Lachwani's ARR spreadsheet. For example, Infosys Ally Bank was $25,000,[9] Infosys EON was $120,000,[10] and Wipro Microsoft was less than $400,000.[11] *Id.* at 10-11. Lachwani's complaints to Laxmanrao that Wipro was not meeting targets clearly demonstrate that Lachwani knew that what he recorded in his ARR spreadsheet and provided to investors was false.

- Lachwani accuses the government of providing the Court untrue information when the government stated in its sentencing memorandum that investors may have surrendered restitution claims as part of the recapitalization transaction. Def. Reply Mem. at 10. This is not correct. The release releases Lachwani from, among other things, "all claims" or "damages" under "any . . . theory of recovery" based on "federal law or any rule, regulation or authority." Stern Decl. Ex. QQ ¶ 2.3. Restitution is not excluded as an exception to the released claims, although Lachwani is correct that the release does not prohibit victims from providing the government with information. *Id.* ¶ 2.4 & 2.5. The government has not conducted a full legal analysis of whether the language releases claims for restitution; however, the government expects that victims may be concerned that the language does prevent them from seeking restitution in this criminal case.

## C. A 63-Month Sentence Would Avoid Unwarranted Sentencing Disparities

Lachwani argues that a 63-month sentence finds no analogy in cases involving similar circumstances. The government disagrees. While every case has its own unique circumstances, the government has identified numerous cases that demonstrate that a 63-month sentence is in line with the

---

[9] Lachwani's pre-Series C ARR spreadsheet listed it at $1 million. Investor 2 Decl. Ex. A (row 10).

[10] Lachwani's pre-Series C ARR spreadsheet listed it at $2.5 million. Investor 2 Decl. Ex. A (row 12).

[11] Lachwani's pre-Series C ARR spreadsheet listed it at $4.5 million. Investor 2 Decl. Ex. A (row 17).

**GA-155**

seriousness of Lachwani's offense conduct.  For example, the following sentences were imposed in cases after the defendant pleaded guilty:

| Case Name (Date of Sentence) | Summary of Offense Conduct | Guidelines | Sentence |
|---|---|---|---|
| **United States v. Joey Stanton Dodson**, No. 19-cr-00703-BLF (N.D. Cal. Jan. 24, 2013) | Defendant raised approximately $15 million in funding for oil and gas companies from more than 50 investors based on false representations and misdirected approximately $1.3 million to pay back earlier investors or for personal expenses. | 78 – 97 months | 60 months |
| **United States v. John McEwan**, 17-cr-00545-BLF (N.D. Cal. July 24, 2018) | Defendant kept payroll processing company he operated afloat by misapplying client funds to pay disbursements of other clients, misspending approximately $7 million from more than 10 customers. | 63 – 78 months | 63 months |
| **United States v. Lebnitz Tran**, 21-cr-00269-WHO (N.D. Cal. Nov. 3, 2022) | Defendant submitted false information and documents to obtain approximately $8.5 million in disaster relief funds (PPP and EIDL), receiving $3.6 million and personally netting $1.7 million. | 63 – 78 months | 63 months |
| **United States v. Min Jin Zhao**, 21-cr-00181-VC (N.D. Cal. (Apr. 19, 2023) | Defendant defrauded two individuals of approximately $2.46 million. | 63 – 78 months | 63 months |
| **United States v. Adam Rogas**, 20-cr-539-JPC (S.D.N.Y. Nov. 3, 2022) | Defendant CEO raised $123 million for his company, NS8, by providing false information about customers, revenue, and assets, including false spreadsheets purporting to show customers who were paying for NS8's services, false bank statements, and providing fake documents to auditor.  Defendant also personally obtained $17.5 million through secondary tender offer. | 121 – 151 months | 60 months |
| **United States v. Richard Randolph**, 21-cr-00118-SDG (N.D. Ga. Aug. 6, 2021) | Defendant CEO of two companies that merged provided false asset and other financial information for one of the companies, obtaining a $33 million valuation for the company and obtaining $1.4 million from 14 investors. | 78 – 97 months | 78 months |
| **United States v. Daniel Boice**, 20-cr-00167-TSE (E.D. Va. Mar. 26, 2021) | Defendant CEO raised $18 million from over 250 investors for his company, Trustify, through lies about the company's revenues, finances, and business relationships, as well as the use of a fake e- | 97 – 121 months | 97 months |

**GA-156**

| Case Name (Date of Sentence) | Summary of Offense Conduct | Guidelines | Sentence |
|---|---|---|---|
| | mail account to pose as a prominent potential investors. Defendant spent at least $3.7 million of the funds raised on himself. | | |

Some of the cases described above had aggravating and/or mitigating factors not present here. While a reasonable argument can be made that the 3553(a) factors here warrant a shorter sentence for Lachwani than the defendants in the above cases, there are equally reasonable arguments that the 3553(a) factors require an equal or longer custodial sentence here as compared with multiple of the above cases. All of the cases described above involved higher guidelines ranges for imprisonment than the Court concluded applies here, but the offense conduct here is significantly more serious than the Court's guidelines loss calculation accounts for and the Court should consider that in fashioning its sentence. Apart from the issue of loss amount, in several of the above cases, the guidelines were higher because of enhancements for things such as abuse of position of trust and sophisticated means.[12] The government has not advocated for the technical application of those enhancements here, but that does not mean that the conduct was not similar to the cases above. What respect to position of trust, Lachwani was the CEO of Headspin with fiduciary duties to the shareholders he was defrauding. Whether or not the enhancement technically applies, Lachwani's conduct was more serious because he was CEO and similar to that of defendants in the above cases where the Court applied the enhancement. With respect to sophisticated means, Lachwani created fake documents that he sent to Okmyanskaya in an effort to conceal his scheme and allow it to continue.

In all, Lachwani committed a significant, calculated crime over a number of years. He defrauded investors of $92 million of investments and provided them stock worth less than a quarter of the cash the investors provided the company. Lachwani also proceeded to gamble the majority of the funds investors had infused into Headspin by purchasing stock and options in other technology companies. The fact that Headspin was able to return most of the funds fraudulently obtained from investors was largely because

---

[12] In one of the cases above—*Randolph*—the Court applied a four-point enhancement because the defendant was the CEO of a public company. Lachwani obviously was not—but he was the CEO of a significant privately funded Silicon Valley company with a larger valuation than many public companies.

GA-157

1   this gamble paid off and his fraud was discovered shortly after Headspin received the largest influx of

2   investor funds.  The fact that Lachwani's risky investments paid off does not significantly diminish

3   Lachwani's culpability.  Further, Lachwani personally obtained $2.5 million from an investor through a

4   secondary sale of Headspin stock.  This profit is more than the defendants profited in some of the cases

5   described above.[13]

6           The government's recommended sentence is also in line with other recent sentences handed

7   down in high profile fraud cases.  Lachwani has made much in his sentencing briefing of contrasting his

8   case with the Theranos cases.  The government agrees with Lachwani that Theranos involved a larger,

9   more serious fraud and the government has recommended a comparatively less significant custodial

10  sentence.  Elizabeth Holmes was sentenced to over eleven years in prison and Sunny Balwani was

11  sentenced to over twelve and a half years.  The government's recommended sentence in this case—

12  slightly over five years—is less than half the sentence those defendants received and appropriately

13  accounts for the differences in the cases.

14  **V.      CONCLUSION**

15          For the foregoing reasons, the government recommends that the Court sentence Lachwani to 63

16  months in prison, along with a term of supervised release with the conditions set forth in the PSR.

17  DATED:  April 12, 2024                                    Respectfully submitted,

18                                                            ISMAIL J. RAMSEY
19                                                            United States Attorney

20
                                                            _____/s/_____
21                                                          LLOYD FARNHAM
22                                                          NOAH STERN
                                                            Assistant United States Attorney
23

24

25  _____

26  [13] JSIN data is difficult to use in this case because the guidelines found by the Court do not
    adequately account for the seriousness of Lachwani offense.  The Court is likely to conclude that
    Lachwani's total offense level is 20.  According to JSIN, the average prison sentence for that offense
27  level for §2B1.1 offenders is 25 months, with a median sentence of 27 months, and 94% of offenders
    receiving a sentence of imprisonment.  Offense level 28, which is more representative of Lachwani's
28  offense conduct, has an average prison sentence of 62 months and a median sentence of 60 months, with
    98% of defendants receiving a sentence of imprisonment.

US SENTENCING MEMORANDUM                    10
CR 21-353 CRB                                                               **GA-158**

1   ISMAIL J. RAMSEY (CABN 189820)
    United States Attorney
2
    MARTHA BOERSCH (CABN 126569)
3   Chief, Criminal Division

4   LLOYD FARNHAM (CABN 202231)
    NOAH STERN (CABN 297476)
5   Assistant United States Attorneys

6       450 Golden Gate Avenue, Box 36055
        San Francisco, California 94102-3495
7       Telephone: (415) 436-7200
        FAX: (415) 436-7234
8       Lloyd.Farnham@usdoj.gov
        Noah.Stern@usdoj.gov
9
    Attorneys for United States of America
10
                        UNITED STATES DISTRICT COURT
11
                     NORTHERN DISTRICT OF CALIFORNIA
12
                          SAN FRANCISCO DIVISION
13

14  UNITED STATES OF AMERICA,           )  CASE NO. CR 21-353 CRB
                                        )
15          Plaintiff,                  )  DECLARATION OF AUSA NOAH STERN IN
                                        )  SUPPORT OF UNITED STATES'
16      v.                              )  SUPPLEMENTAL SENTENCING
                                        )  MEMORANDUM
17  MANISH LACHWANI,                    )
                                        )
18          Defendant.                  )
                                        )
19  _____)

20

21      I, Noah Stern, declare and state as follows:

22      1.      I am an Assistant United States Attorney in the Office of the United States Attorney for

23  the Northern District of California.  I respectfully submit this Declaration in Support of the United

24  States' Supplemental Sentencing Memorandum.

25      2.      Attached hereto as Exhibit CC and filed under seal is a true and correct copy of an email

26  from Manish Lachwani (via Google Sheets) to a representative of Investor 1, dated May 27, 2019, which

27  was produced by Investor 1.

28      3.      Attached hereto as Exhibit DD and filed under seal is a true and correct copy of an email

**GA-159**

from Investor 2 to Dottie Wang and Sana Okmyanskaya dated October 25, 2019, along with one of the attachments to the email, produced by Headspin at HS00145959 to HS00145962.

4.      Attached hereto as Exhibit EE is a true and correct redacted copy of an email from Manish Lachwani to a potential investor dated August 7, 2018, along with the attachment to the email, produced by Headspin at HS00012184 and HS0012185.

5.      Attached hereto as Exhibit FF and filed under seal is a true and correct copy of an internal Investor 1 email dated August 30, 2019, which was produced by Investor 1.

6.      Attached hereto as Exhibit GG and filed under seal is a true and correct copy of an internal Investor 1 email dated August 2, 2019, which was produced by Investor 1.

7.      Attached hereto as Exhibit HH is a true and correct copy of an email from Laurent Cordier to Manish Lachwani and Brien Colwell dated December 21, 2018, produced by Headspin at HS00405865.

8.      Attached hereto as Exhibit II is a true and correct redacted copy of an email from Laurent Cordier to Manish Lachwani and Brien Colwell dated January 21, 2019, produced by Headspin at HS00415745.

9.      Attached hereto as Exhibit JJ is a true and correct copy of an email from Manish Lachwani to Sana Okmyanskaya dated February 24, 2019, produced by Headspin at HS00120489.

10.      Attached hereto as Exhibit KK is a true and correct copy of an email from Manish Lachwani to Sana Okmyanskaya dated June 27, 2019, produced by Headspin at HS00128117.

11.      Attached hereto as Exhibit LL is a true and correct redacted copy of an email from Laurent Cordier to Manish Lachwani dated October 7, 2019, produced by Headspin at HS00490532.

12.      Attached hereto as Exhibit MM is a true and correct redacted copy of an email from Manish Lachwani to Ameet Suri dated August 16, 2019, produced by Headspin at HS00132014.

13.      Attached hereto as Exhibit NN is a true and correct excerpt of Manish Lachwani's WhatsApp communications with Sana Okmyanskaya, produced by Headspin at HS00201992.  Pages HS00202024 to HS00202026 are included.

14.      Attached hereto as Exhibit OO is a true and correct redacted copy of an email from Manish Lachwani to Sana Okmyanskaya, copying Paul Velich, dated September 9, 2019, produced by

**GA-160**

1   Headspin at HS00482159.

2       15.     Attached hereto as Exhibit PP is a true and correct copy of an FBI 302 summarizing the

3   government's interview of Madhu Laxmanrao on September 30, 2022.

4       16.     Attached hereto as Exhibit QQ is a true and correct redacted copy of the Mutual Release

5   produced by Headspin at HS00032433.

6       I swear under penalty of perjury that the foregoing is true and correct to the best of my

7   knowledge.  Signed this 12th day of April 2024, in San Francisco, California.

8

9                                              _/s/ Noah Stern_____
                                               NOAH STERN, AUSA

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**GA-161**

# Exhibit QQ

GA-162

## MUTUAL RELEASE

This Mutual Release (this "*Agreement*") is entered into by and between Headspin, Inc., a Delaware corporation (the "*Company*"), and the undersigned, referred to herein as "**Stockholder**." Each is referred to herein as a "**Party**" and collectively referred to herein as the "*Parties*." The effective date of this Agreement shall be the Settlement Date (as defined in the Offer to Purchase and Exchange (as defined below)) (such date, the "*Effective* **Date**").

## RECITALS

**WHEREAS**, Headspin is undergoing a broad restructuring and recapitalization ("**Recapitalization**"), including the transactions outlined in that certain Offer to Purchase and Exchange, dated October 19, 2020 (the "**Offer to Purchase and Exchange**" and such transactions contemplated thereby, the "**Purchase and Exchange Offers**"), and taking other steps to address stockholder concerns;

**WHEREAS**, the background and the terms of the Recapitalization are described in the Offer to Purchase and Exchange and the related materials that have been provided to Stockholder;

**WHEREAS**, pursuant to the Purchase and Exchange Offers, among other things, (a) holders of shares of the Company's Series C Preferred Stock ("**Series C Preferred Stock**") and holders of shares of the Company's Series B Preferred Stock ("**Series B Preferred Stock**") that were purchased at their original issue price are offered an opportunity (i) to recover a portion of their investments by having the Company repurchase such shares of Series C Preferred Stock and Series B Preferred Stock for cash and promissory notes or (ii) to have such shares of Series C Preferred Stock and Series B Preferred Stock repriced to reflect more appropriate valuation at the time they invested, and (b) holders of shares of Series B Preferred Stock that were purchased at a discount to the original issue price pursuant to the conversion of certain convertible promissory notes are offered an opportunity to reprice such shares of Series B Preferred Stock to reflect a more appropriate valuation at the time they invested;

**WHEREAS**, as a result of the Recapitalization, a substantial portion of the outstanding liquidation preferences are being eliminated, and the Company will continue operating with the opportunity to create value for the remaining holders of the Company's Series A Preferred Stock, Series B Preferred Stock, Series B-1 Preferred Stock, Series C Preferred Stock and Series C-1 Preferred Stock, as well as holders of the Company's Common Stock, options and other securities issued by the Company;

**WHEREAS**, Stockholder is participating in the Purchase and Exchange Offer and/or other transactions contemporaneous with the Recapitalization (together with the Recapitalization, the "**Transactions**");

**WHEREAS**, a potential dispute ("**Dispute**") between the Parties exists related to matters arising from, related to or in connection with representations made to Stockholder with respect to the Company's business and financial results, the sale or issuance of Company stock to Stockholder, and the conduct of certain of the Company's officers and directors; and

**GA-163**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material

**WHEREAS**, the Parties desire to resolve the Dispute and all disputes between them, and each Party agrees that this Agreement is entered into in good faith to resolve the disputes between them, and is not an admission of any negligence, wrongdoing, fault or obligation by any of them.

**NOW, THEREFORE**, in exchange for the promises contained herein and for good and valuable consideration, the adequacy of which is hereby acknowledged by the Parties, the Parties agree as follows:

## AGREEMENT

1.      Binding Agreement on Execution.  This Agreement is binding on the Parties starting on the first date when all Parties have executed this Agreement and provided its, his or her signature page to the other Parties and shall become effective on the Effective Date.

2.      Mutual Release of Claims.

2.1      Related Parties.  For purposes of this Agreement, with respect to the Company, the Stockholder or any other entity or person, the term "**Related Parties**" means (as applicable) all of its, her or his present and former officers, directors, employees, stockholders, investors, general partners, limited partners, affiliates, direct or indirect parent entities, direct or direct subsidiaries, predecessors, successors, insurers, representatives, agents, advisors, attorneys, administrators, heirs, executors, trusts, trustees, beneficiaries and assigns.

2.2      Release by the Company.  Except as to obligations created by, acknowledged by or arising out of this Agreement, the Company, for itself and on behalf of all others who may have or purport to have the right assert claims on the Company's behalf, including but not limited to each of its Related Parties (but solely with respect to claims that such Related Parties assert on the Company's behalf) (the "**Headspin Releasing Parties**"), hereby unconditionally, irrevocably, fully and forever waives, releases and discharges Stockholder and each of its, her or his Related Parties and all others acting or purporting to act on behalf of the Stockholder (collectively, with the Stockholder and its Related Parties, the "**Stockholder Released Parties**"), from any and all claims, demands, damages (actual, statutory and punitive), debts, disputes, liabilities, accounts, obligations, costs, expenses, actions and causes of action, of every nature, whether based upon tort, contract, misrepresentation, breach of fiduciary duty, aiding and abetting, or any other theory of recovery, whether at law or in equity, whether under municipal, state, or federal law or any other rule, regulation or authority, whether known or unknown, suspected or unsuspected, contingent or fixed, liquidated or unliquidated, direct or derivative, which the Headspin Releasing Parties have, own or hold or ever had, owned or held against the Stockholder Released Parties based upon, arising out of or relating to the Company or the Dispute, by reason of any facts, circumstances, events or transactions occurring on or before the Effective Date (the "**Headspin Released Matters**").

2.3      Release by Stockholder.  Except as to obligations created by, acknowledged by or arising out of this Agreement or as expressly set forth in Section 2.4, Stockholder, for itself, herself or himself and on behalf of all others who may have or purport to have the right to assert claims on Stockholder's behalf, including but not limited to each of its, her or his Related Parties

2

**GA-164**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material                                                      HS00032434

(but solely with respect to claims that such Related Parties assert on Stockholder's behalf) (the "**Stockholder Releasing Parties**"), hereby unconditionally, irrevocably, fully and forever waives, releases and discharges the Company and each of its Related Parties (including without limitation Manish Lachwani, Redacted , in their capacities as officers or directors of the Company and as individuals, Redacted

and each of their Related Parties) and all others acting or purporting to act on behalf of the Company (collectively, with the Company and its Related Parties, the "**Headspin Released Parties**"), from any and all claims, demands, damages (actual, statutory and punitive), debts, disputes, liabilities, accounts, obligations, costs, expenses, actions and causes of action, of every nature, whether based upon tort, contract, misrepresentation, breach of fiduciary duty, aiding and abetting, or any other theory of recovery, whether at law or in equity, whether under municipal, state, or federal law or any other rule, regulation or authority, whether known or unknown, suspected or unsuspected, contingent or fixed, liquidated or unliquidated, direct or derivative, which the Stockholder Releasing Parties have, own or hold or ever had, owned or held against the Headspin Released Parties based upon, arising out of or relating to the Company or the Dispute, by reason of any facts, circumstances, events or transactions occurring on or before the Effective Date (the "**Stockholder Released Matters**").

2.4    Exceptions to Stockholder Released Matters.    The Stockholder Released Matters shall not include the following:

(a) any rights available (or which may become available) to Stockholder under any agreement entered into by Stockholder in connection with the consummation of the transactions that constitute the Transactions, including any rights to receive amounts payable to Stockholder or securities pursuant to the terms of the Transactions;

(b) if Stockholder is a current employee of the Company on the Effective Date, any rights to receive salaries, bonuses, benefits, expense reimbursements, accrued vacation or other accrued or vested benefits that Stockholder may have, if any, as of the Effective Date under any applicable plan, policy, practice, program, contract or agreement with the Company or otherwise earned in respect of employment with the Company, or any rights embodied in any written employment or other service agreement with the Company (other than any provisions of such contracts or agreements relating to (i) shares of the Company's capital stock, (ii) any options to purchase any shares of the Company's capital stock, and (iii) any securities convertible into, exercisable or exchangeable for or that represent the right to receive shares of the Company's capital stock which are addressed in a separate Tender Offer for Employees and its accompanying release); and

(c) any claims for indemnification and/or advancement of expenses under any applicable written indemnification obligation of the Company.

2.5    Communication with Government Agencies.    Notwithstanding the foregoing, nothing in these mutual releases shall prohibit any Party from (a) filing a charge with, reporting possible violations of federal law or regulation to, participating in any investigation by, or cooperating with any governmental agency or entity or making other disclosures that are protected under the whistleblower provisions of applicable law or regulation and/or (b) communicating directly with, cooperating with, or providing information (including trade

3

**GA-165**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material    HS00032435

secrets) in confidence to, any federal, state or local government regulator for the purpose of reporting or investigating a suspected violation of law, or from providing such information to the undersigned's attorney or in any sealed document filed in a lawsuit or other governmental proceeding.

3.      Unknown Claims; Waiver of Section 1542.  By executing this Agreement, the Parties waive and relinquish any and all rights and benefits afforded by any law of any state or territory of the United States, or principle of common law, which are similar, comparable, or equivalent to Section 1542 of the Civil Code of the State of California with respect to the Parties and/or the Disputes.  The Parties understand that the facts upon which the releases made in this Agreement are given may turn out to be other than or different from the facts now known or believed by the Parties to be true; the Parties accept and assume the risk of the facts turning out to be different and acknowledge that this Agreement shall be and remain in all respects effective and not subject to termination or rescission for any reason including, but not limited to, any such difference in facts.  The Parties understand and agree that this Agreement extends to all claims of every nature and kind, known or unknown, suspected or unsuspected, and all rights under Section 1542 of the California Civil Code and the rights and benefits thereunder are hereby expressly relinquished and waived.

Section 1542 reads as follows:

**A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE AND THAT, IF KNOWN BY HIM OR HER, WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY.**

The Parties further acknowledge that each has consulted or has had the opportunity to consult with an attorney, that each Party understands the breadth of this waiver, and that each Party knowingly and voluntarily consents to it.

The Parties do not intend to release claims that may not be released as a matter of law.

4.      Non-Disparagement.  Each Party agrees that it will not, and it will not authorize or knowingly permit any of its agents to, disparage any of the other Parties, any Stockholder Released Parties or any Headspin Released Parties.  Notwithstanding the prior sentence, nothing in this Section shall prohibit any Party or its agents from communicating with or providing information to any government agency or in response to a subpoena or other legal process.

5.      Covenant Not to Sue.  The Parties agree not to commence, assist, encourage, prosecute, cause or permit in any action in law or equity, any arbitration, or any other proceeding based on any claims, demands, causes of action, damages, obligations, or liabilities, whether or not now known, suspected or claimed, that arises from the Dispute, the Headspin Released Matters, the Stockholder Released Matters or the facts, circumstances or incidents released herein.  If any such action or proceeding is instituted by any Party contrary to the terms herein, this Agreement may be pleaded as a full and complete defense thereto and the prevailing party to

4

**GA-166**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material

HS00032436

such litigation shall be entitled to, in addition to other relief as may be granted by the court, an award of its, his or her reasonable attorneys' fees and full costs and expenses.

6.      Confidentiality.  The Parties agree that each will keep confidential and will not disclose or use for any purpose any information about the terms of this Agreement and the Transactions contemplated hereby and any confidential information obtained from the Company in connection herewith, unless any such information (a) is known or becomes known to the public in general (other than as a result of a breach of this Agreement by the disclosing Party), or (b) is or has been made known or disclosed to the disclosing Party by a third party without a breach of any confidentiality obligations by such third party; provided, however, that any Party may disclose such information:  (i) to his, her or its counsel, financial and/or tax advisors, provided that such persons agree to maintain the confidentiality of such information in accordance herewith; (ii) to any affiliate in the ordinary course of business, provided that such affiliate agrees to maintain the confidentiality of such information in accordance herewith; (iii) as may be required by law, provided that the disclosing Party promptly notifies the other Parties hereto in advance of such disclosure and agrees to cooperate to take reasonable steps to minimize the extent of any such required disclosure; and (iv) to the U.S. Department of Justice, Securities and Exchange Commission or any other governmental agency in connection with any investigation being conducted by those agencies.

7.      Governing Law.  This Agreement shall be governed exclusively by and construed according to the laws of the Delaware, as applied to contracts between Delaware residents entered into and to be performed entirely within Delaware.

8.      Exclusive Forum for Disputes.    The Parties (a) hereby irrevocably and unconditionally submit to the jurisdiction of the Delaware Court of Chancery for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement, (b) agree not to commence any suit, action or other proceeding arising out of or based upon this Agreement except in the Delaware Court of Chancery, and (c) hereby waive, and agree not to assert, by way of motion, as a defense, or otherwise, in any such suit, action or proceeding, any claim that it, she, or he is not subject personally to the jurisdiction of the above named court, that its, her or his property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court.

9.      Attorneys' Fees Upon Breach.  If any Party commences any action or legal proceeding based upon any claim, demand or cause of action that arises from the Dispute, the Headspin Released Matters, the Stockholder Released Matters or the facts, circumstances or incidents released herein, or an action or proceeding is instituted to enforce this Agreement, the prevailing Party shall be entitled to an award of his, her or its actual attorneys' fees and full costs and expenses.

10.     Pleading This Agreement.  The Parties agree that this Agreement, including the covenant not to sue, will be considered breached and a cause of action accrues on that breach immediately upon commencement of any action or proceeding contrary to this Agreement.  In that action or proceeding, this Agreement may be pleaded as a defense, or may be asserted by way of a counterclaim or crossclaim.

**GA-167**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material

HS00032437

11. _A Change in Facts_. The Parties agree that if the facts with respect to this Agreement are found hereafter to be different from the facts now believed to be true, the Parties assume the risk of that possible difference in facts and hereby agree that this Agreement will remain effective, notwithstanding any difference in facts.

12. _Binding Agreement_. This Agreement, the Headspin Released Matters and the Stockholder Released Matters shall be binding and inure to the benefit of all Parties and each of their respective (as applicable) agents, spouses, children, heirs, trustees, executors, beneficiaries, administrators, representatives, successors, parents, affiliated and subsidiary entities and divisions, commonly controlled entities, attorneys, representatives and assigns.

13. _Other Documents_. The Parties to this Agreement shall execute any agreement or other documents that are required in order to effectuate the terms, conditions, purposes and objectives of this Agreement.

14. _Severability_. Should any part, term or provision of this Agreement be declared or determined by any court to be unenforceable, illegal or invalid, such part, term or provision shall be deemed not to be a part of this Agreement and the remainder of this Agreement shall remain valid and enforceable.

15. _No Assignment_. Neither this Agreement nor any rights or obligations in it or created by it shall be assigned or transferred by any Party, directly or indirectly, in whole or in part, by operation of law or otherwise, without the prior written consent of every other Party. Any attempted assignment without such consent shall be void. The Parties each represent and warrant to one another that they have not assigned any claim, debt, liability, demand, obligation, cost, expense, action, or cause of action that is the subject of or released in this Agreement to any other person or entity.

16. _Review of Agreement by Party and Receipt of Advice from Counsel_. The Parties warrant and represent that each is executing this Agreement with full knowledge of any and all rights which it, she or he may have with respect to each other, and that it, she or he is executing this Agreement after having read the entire agreement and after having received independent counsel or having the opportunity to receive independent counsel with regard to the facts and circumstances involved in the controversy herein compromised and with regard to rights and liabilities arising out of such facts and circumstances.

17. _Drafting_. This Agreement shall be deemed to have been drafted jointly by the Parties, and no rule of construction or interpretation shall apply against any particular Party based on the contention that this Agreement was drafted by one of the Parties, including, but not limited to, California Code Section 1654, the provisions of which are hereby waived. This Agreement shall be construed and interpreted in a neutral manner.

18. _Counterparts_. This Agreement may be executed in counterparts. Executed signature pages delivered via email or other electronic means shall be deemed as originals for purposes of this Agreement.

19. _Cooperation_. All Parties agree that it, she or he will execute, acknowledge, and/or deliver to the other, as appropriate, upon written request therefor, any further and additional

**GA-168**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material
HS00032438

documents, and shall perform any other or further acts, which may be reasonably necessary for the consummation of this Agreement.

20.     Captions.  The captions are for convenience only, and none is intended to be any part of the body or text of this Agreement nor is intended to be referred to in construing any of the provisions of this Agreement.

21.     Third-Party Beneficiaries.     The Parties acknowledge and agree that each Stockholder Released Party and each Headspin Released Party is a third party beneficiary of this Agreement and, as such, is entitled to enforce, using any and all available actions, remedies and defenses, all of the rights and benefits conferred upon it under this Agreement.  Except as to any Headspin Released Party or Stockholder Released Party, this Agreement does not create, and shall not be construed as creating, any rights enforceable by any person not a Party to this Agreement.

22.     Integration/Entire Agreement.  This Agreement sets forth the entire agreement among the Parties with regard to its subject matter.  All agreements, covenants, representations and warranties, express or implied, oral and written, of the Parties with regard to its subject matter are contained in this Agreement.  No other agreements, covenants, representations or warranties, express or implied, oral or written, have been made by any Party to another with respect to the subject matter of this Agreement.  All prior and contemporaneous conversations, negotiations, possible and alleged agreements and representations, covenants, and warranties with respect to the subject matter of this Agreement are waived and superseded by the execution of this Agreement.  This is an integrated agreement.

23.     Non-Reliance.  Each of the Parties acknowledges that no other Party or agent or attorney of any other Party has made any promise, representation or warranty whatsoever, express or implied, written or oral, not contained in this Agreement concerning its subject matter to induce it, her or him to execute this Agreement.  Each of the Parties acknowledges that it, she or he has not executed this Agreement in reliance on any promises, representations, or warranties, not contained in this Agreement, or on the completeness or lack of omission of information by or from any Party.

24.     Modification of Terms.  Each Party agrees that this Agreement may not be altered, amended, modified or otherwise changed in any respect or particular whatsoever, except in writing duly executed by the authorized representative of each of the Parties.  The Parties certify that no promise, inducement or agreement not herein expressed has been made by any Party hereto.  The Parties certify that they are executing this Agreement voluntarily, free of any duress or coercion.

[*Signature Page Follows*]

7

**GA-169**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material

HS00032439

IN WITNESS WHEREOF, this Agreement has been executed by each Party as of the respective dates written below and effective as of the Effective Date for the purposes herein contained.

**IT IS SO UNDERSTOOD AND AGREED:**

Read and Agreed:


Dated: _____          _____
                                     Headspin, Inc.
                                     By: Rajeev Butani
                                     Its: Chief Executive Officer

**GA-170**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material

IN WITNESS WHEREOF, this Agreement has been executed by each Party as of the respective dates written below and effective as of the Effective Date for the purposes herein contained.

**IT IS SO UNDERSTOOD AND AGREED:**

Read and Agreed:

**STOCKHOLDER**

Dated: _____

*if entity:*

_____
(print entity name)

By: _____

Print Name: _____

Title:_____

*If individual:*

By: _____

Print Name: _____

Date:_____

**GA-171**

FOIA Confidential Treatment Requested by HeadSpin/Rule 6(e) Material HS00032441

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

# UNITED STATES DISTRICT COURT
## Northern District of California

| | |
|---|---|
| **UNITED STATES OF AMERICA** | **JUDGMENT IN A CRIMINAL CASE** |
| **v.** | |
| Manish Lachwani | USDC Case Number:  CR-21-00353-001 CRB |
| | BOP Case Number:  DCAN321CR00353-001 |
| | USM Number:  61721-509 |
| | Defendant's Attorney:  John H. Hemann, Nanci L. Clarence, Eleanor W. Barczak, Max Bernstein (Retained) |

**THE DEFENDANT:**

☑ pleaded guilty to count(s): <u>Three, Seven and Thirteen of the Superseding Indictment</u>

☐ pleaded nolo contendere to count(s): _____ which was accepted by the court.

☐ was found guilty on count(s): _____ after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1343 | Wire Fraud | 09/18/2018 | 3 |
| 18 U.S.C. § 1343 | Wire Fraud | 11/01/2019 | 7 |
| 15 U.S.C. §§ 78j(b) and 78ff, 17 C.F.R. § 240.10b-5 | Securities Fraud | 04/01/2020 | 13 |
| | | | |

The defendant is sentenced as provided in pages 2 through _7_ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on count(s): _____

☑ Count(s) <u>1, 2, 4-6, 8-12, and 14-16 of the Superseding Indictment</u> are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

4/19/2024
_____
Date of Imposition of Judgment

_____
Signature of Judge

The Honorable Charles R. Breyer
<u>Senior United States District Judge</u>
Name & Title of Judge

Date.  April 24, 2024
_____
Date

**GA-172**

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT:  Manish Lachwani | Judgment - Page 2 of 7 |
| CASE NUMBER:  CR-21-00353-001 CRB | |

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of:
18 months.  This term consists of terms of 18 months on each of Counts Three, Seven, and Thirteen, all counts to be served concurrently.

The appearance bond is hereby exonerated, or upon surrender of the defendant as noted below.  Any cash bail plus interest shall be returned to the owner(s) listed on the Affidavit of Owner of Cash Security form on file in the Clerk's Office.

☐ The Court makes the following recommendations to the Bureau of Prisons:

☐ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ am/pm on _____ (no later than 2:00 pm).

    ☐ as notified by the United States Marshal.

☑ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☑ on 9/2/2024 (no later than 2:00 pm).

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____ at

_____ , with a certified copy of this judgment.

<br>

UNITED STATES MARSHAL

By _____

DEPUTY UNITED STATES MARSHAL

**GA-173**

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT: Manish Lachwani | Judgment - Page 3 of 7 |
| CASE NUMBER: CR-21-00353-001 CRB | |

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of: <u>Three years.</u> This term consists of terms of three years on each of Counts Three, Seven, and Thirteen, all such terms to run concurrently.

## MANDATORY CONDITIONS OF SUPERVISION

1) You must not commit another federal, state or local crime.

2) You must not unlawfully possess a controlled substance.

3) You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

      ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*

4) ☑ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*

5) ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*

6) ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, et seq.) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in which you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*

7) ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

GA-174

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT: Manish Lachwani | Judgment - Page 4 of 7 |
| CASE NUMBER: CR-21-00353-001 CRB | |

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court, and bring about improvements in your conduct and condition.

1) You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of RELEASE, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2) After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3) You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4) You must follow the instructions of the probation officer related to the conditions of supervision.
5) You must answer truthfully the questions asked by your probation officer.
6) You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with, for example), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
7) You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by these and the special conditions of your supervision that he or she observes in plain view.
8) You must work at least part-time (defined as 20 hours per week) at a lawful type of employment unless excused from doing so by the probation officer for schooling, training, community service or other acceptable activities. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
9) You must not communicate or interact with someone you know is engaged in criminal activity. You must not associate, communicate, or interact with any person you know has been convicted of a felony, unless granted permission to do so by the probation officer.
10) If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
11) You must not act as a confidential informant without first notifying the probation officer.
12) You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).

☐ If the probation officer determines that you pose a risk to a third party, the probation officer may require you to notify the person about the risk and you must comply with that instruction. The probation officer may contact the person and confirm that you have notified the person about the risk. *(check if applicable)*

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. I understand that the court may (1) revoke supervision, (2) extend the term of supervision, and/or (3) modify the conditions of supervision upon a finding of a violation of probation or supervised release.

(Signed) _____          _____
                    Defendant                                                                Date

_____          _____
U.S. Probation Officer/Designated Witness                          Date

**GA-175**

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

DEFENDANT: Manish Lachwani                                          Judgment - Page 5 of 7
CASE NUMBER: CR-21-00353-001 CRB

## SPECIAL CONDITIONS OF SUPERVISION

1. You must not maintain a position of fiduciary capacity without the prior permission of the probation officer.

2. You must pay any restitution, fine and special assessment that is imposed by this judgment and that remains unpaid at the commencement of the term of supervised release.

3. You must provide the probation officer with access to any financial information, including tax returns, and must authorize the probation officer to conduct credit checks and obtain copies of income tax returns.

GA-176

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

| | |
|---|---|
| DEFENDANT: Manish Lachwani | Judgment - Page 6 of 7 |
| CASE NUMBER: CR-21-00353-001 CRB | |

## CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments.

| | Assessment | Fine | Restitution | AVAA Assessment* | JVTA Assessment** |
|---|---|---|---|---|---|
| **TOTALS** | $300.00 | $1,000,000 | To Be Determined | N/A | N/A |

☑ The determination of restitution is deferred until <u>7/31/24</u>. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | Total Loss** | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| **TOTALS** | $ 0.00 | $ 0.00 | |

☐ Restitution amount ordered pursuant to plea agreement $ _____

☐ The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐ the interest requirement is waived for the fine/restitution.

☐ the interest requirement is waived for the fine/restitution is modified as follows:

_____

---

\* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
\*\* Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
\*\*\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

**GA-177**

AO 245B (Rev. AO 09/19-CAN 12/19) Judgment in Criminal Case

| DEFENDANT: Manish Lachwani | Judgment - Page 7 of 7 |
|---|---|
| CASE NUMBER: CR-21-00353-001 CRB | |

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows*:

**A** ☐ Lump sum payment of _____ due immediately, balance due

      ☐ not later than _____ , or

      ☐ in accordance with    ☐ C,    ☐ D, or    ☐ E, and/or    ☐ F below); or

**B** ☐ Payment to begin immediately (may be combined with   ☐ C,   ☐ D, or   ☐ F below); or

**C** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

**D** ☐ Payment in equal _____ (e.g., weekly, monthly, quarterly) installments of _____ over a period of _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a term of supervision; or

**E** ☐ Payment during the term of supervised release will commence within _____ (e.g., 30 or 60 days) after release from imprisonment. The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F** ☑ Special instructions regarding the payment of criminal monetary penalties:
It is further ordered that the defendant shall pay to the United States a special assessment of $300 and a fine in the amount of $1,000,000, due immediately. Notwithstanding any payment schedule set by the court, the United States Attorney's Office may pursue collection through all available means in accordance with 18 U.S.C. §§ 3613 and 3644(m). The special assessment, fine, and restitution payments shall be made to the Clerk of U.S. District Court, Attention: Financial Unit, 450 Golden Gate Ave., Box 36060, San Francisco, CA 94102, or via the pay.gov online payment system.

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐ Joint and Several

| Case Number<br>Defendant and Co-Defendant Names<br>(including defendant number) | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐ The defendant shall pay the cost of prosecution.

☐ The defendant shall pay the following court cost(s): _____

☐ The defendant shall forfeit the defendant's interest in the following property to the United States:

☐ The Court gives notice that this case involves other defendants who may be held jointly and severally liable for payment of all or part of the restitution ordered herein and may order such payment in the future, **but such future orders do not affect the defendant's responsibility for the full amount of the restitution ordered.**

---

* Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.

GA-178

1    ISMAIL J. RAMSEY (CABN 189820)
     United States Attorney

2

3    MARTHA BOERSCH (CABN 126569)
     Chief, Criminal Division

4    LLOYD FARNHAM (CABN 202231)
     NOAH STERN (CABN 297476)

5    Assistant United States Attorneys

6           450 Golden Gate Avenue, Box 36055
            San Francisco, California 94102-3495

7           Telephone: (415) 436-7200
            FAX: (415) 436-7234

8           Lloyd.Farnham@usdoj.gov
            Noah.Stern@usdoj.gov

9

     Attorneys for United States of America

10

                         UNITED STATES DISTRICT COURT

11

                      NORTHERN DISTRICT OF CALIFORNIA

12

                           SAN FRANCISCO DIVISION

13

14   UNITED STATES OF AMERICA,              )   **CASE NO. CR 21-353 CRB**
                                            )
15              Plaintiff,                  )   **UNITES STATES' MEMORANDUM**
                                            )   **REGARDING RESTITUTION**
16        v.                                )
                                            )   Restitution Hearing:  August 21, 2024
17   MANISH LACHWANI,                       )   Time:                 1:30 p.m.
                                            )   Judge:                Hon. Charles R. Breyer
18              Defendant.                  )
                                            )
19   _____)

20

21

22

23

24

25

26

27

28

US RESTITUTION MEMORANDUM
CR 21-353 CRB

**GA-179**

The United States submits this memorandum regarding restitution in advance of the restitution hearing scheduled for August 21, 2024 in the above captioned case. The government requests that the Court order restitution as set forth in the attached restitution list and as explained below with reference to supporting materials submitted by five victims of the fraud.[1] The government has met and conferred with counsel for Defendant Manish Lachwani and understands that Lachwani's position is that no restitution should be awarded to victims of his scheme. Lachwani's position is incorrect for the reasons set forth below.

## I.  RELEVANT FACTUAL BACKGROUND

### A.  Lachwani's Agreement to Pay Restitution

Lachwani agreed in his plea agreement to pay restitution to his victims. Specifically, in his plea agreement, Defendant Manish Lachwani agreed to "pay full restitution for all losses caused by all the schemes or offenses with which I was charged in this case." Dkt. No. 88 ¶ 9. The Superseding Indictment charged Lachwani with beginning his scheme to defraud no later than December 2016. Dkt. No. 60 ¶ 13. In his plea agreement, Lachwani admitted to providing false information to investors no later than October 2017. Dkt. No. 88 ¶ 2.

### B.  Recapitalization Transaction

After the discovery of Lachwani's fraud in March 2020, Headspin and its investors negotiated the return of a portion of certain investors' funds and repriced Headspin equity. Dkt. 103-8, Tomeno Decl. Ex. U. Pursuant to the transaction, in approximately November 2020, full-price purchasers of Headspin Series B and C preferred stock were given the option to receive 70% of their cash back, and then either take a note for the remaining 30% or have their remaining equity repriced. *Id.* Investors who had invested in Headspin through convertible notes were not given the opportunity to receive their cash back and, instead, they received additional shares as a result of the repricing of the Headspin stock. *Id.* The recapitalization transaction was also a settlement of civil claims Headspin's investors had against the company and Lachwani and investors who received cash back signed an agreement releasing Lachwani from, among other things, "all claims" or "damages" under "any . . . theory of recovery"

---

[1] The total amount is $6,162,813.16 plus an amount for Victim 1 to be determined by the Court.

**GA-180**

based on "federal law or any rule, regulation or authority." Dkt. 135-1 Ex. QQ. After the transaction, Headspin continued to operate and incurred additional debt. *See* Stern Decl. Ex. RR.

## C. Relevant Proceedings

Lachwani was originally charged by complaint in August 2021, Dkt. No. 1, and ultimately pleaded guilty to multiple counts of the Superseding Indictment on April 27, 2023. In connection with sentencing, the parties heavily litigated the facts of Lachwani's scheme and the Sentencing Guidelines calculation of loss. Dkt. Nos. 103, 105, 113, 122, 128, 131, & 135. On January 25, 2024, the Court issued an order on the application of the sentencing guidelines. Dkt. No. 126. In the order, the Court found that Headspin's investors were induced to part with their money based on Lachwani's fraudulent misrepresentations and they would not have parted with their money had they known about the fraud. *Id.* at 8-9 & n.5 & 6.

In advance of sentencing, a convertible notes investor submitted a restitution claim in the amount of $2,775,000. Stern Decl. Ex. SS. Other victims of Lachwani's scheme participated in the sentencing process by providing declarations to the government. Dkt. No. 103 (Declarations of Victims 1 through 3).

On March 13, 2024, Lachwani filed a sentencing memorandum asserting that Headspin's investors did not release restitution claims against Lachwani in the recapitalization transaction agreements. Dkt. No. 131 at 10.[2] On April 19, 2024, the Court sentenced Lachwani to eighteen months in prison and a $1 million fine. Dkt. No. 138. At the hearing, the government requested that a restitution hearing be set, and the Court scheduled a restitution hearing for July 31, 2024. *Id.* That hearing was subsequently rescheduled to August 21, 2024.

## D. Cancellation of Headspin Notes and Equity

While sentencing briefing was proceeding, Lachwani claimed that Headspin's investors were primed for millions in profits from his inventions and the remaining business of Headspin that existed

---

[2] Lachwani also argued in his sentencing filings, in order to undermine the government's evidence and arguments regarding loss, that far from suffering loss, "investors likely will reap significant profits from their investments when HeadSpin goes public or is acquired in the future . . . [and Lachwani] may well languish [in prison] while the investors at issue in this case realize millions in profits from the technology Mr. Lachwani built." Dkt. No. 122 at 1-2. Lachwani's memo also stated "HeadSpin was (and is) a success." *Id.* at 9.

**GA-181**

1    after the fraud.  In reality, Headspin was negotiating a sale of the company and its assets that would

2    result in equity holders' shares being extinguished without compensation.  In the eventual corporate

3    transaction, which closed on June 4, 2024, Headspin and all of its assets were acquired for

4    approximately $28.2 million, with the proceeds going to pay a portion of Headspin's debt, as well as

5    third party expenses.  Stern Decl. Ex. RR & TT.  Under the terms of the transaction, Headspin stock was

6    cancelled without the payment of any consideration to the holders of the stock—which included Series

7    B and C investors who opted to retain stock in the devalued Headspin.  *Id*.  Investors that received notes

8    in the recapitalization transaction had their notes canceled, but were given the right to receive

9    approximately 50% of their principal, while holders of more recent notes from 2022 received their full

10   principal and most interest.  *Id*.  Noteholders also received a right to a portion of any recovery of the

11   $5.5 million that was advanced to Lachwani for his legal fees.  *Id*.

12   ## II.   LEGAL STANDARD

13           Restitution is considered separately under a different standard than the loss amount used for

14   calculating the Sentencing Guidelines.  *See United States v. Gossi*, 608 F.3d 574, 579-80 (9th Cir. 2010).

15   "Restitution clearly focuses on the *victim,* not the individual defendant.  Restitution seeks to compensate

16   the *victim* for all the *direct and proximate losses* resulting from the defendant's conduct, not only for the

17   reasonable [sic] foreseeable losses.  The purpose of restitution is to put the *victim* back in the position he

18   or she would have been but for the defendant's criminal conduct."  *Id*. at 581 (emphasis in original).

19   The Mandatory Victims Restitution Act ("MVRA") states that district courts "shall order" a defendant to

20   "make restitution to the victim of the offense[.]"  18 U.S.C. § 3663A(a)(1).  This provision of the

21   MVRA applies to certain offenses, "including an offense against property committed by fraud" or

22   deceit.  *United States v. Rizk*, 660 F.3d 1125, 1136 (9th Cir. 2011) (citing 18 U.S.C.

23   § 3663A(c)(1)(A)(ii)).  The MVRA "eliminated the district court's discretion [to consider,] and required

24   restitution regardless of[,] the defendant's financial resources or ability to pay."  *United States v. Grice*,

25   319 F.3d 1174, 1177 (9th Cir. 2003).  Where a defendant is convicted of a fraud offense, "a court must

26   order restitution to each victim in the full amount of the victim's loss."  *United States v. Gagarin*, 950

27   F.3d 596, 607 (9th Cir. 2020) (citing 18 U.S.C. § 3664(f)(1)(A)).  "The government bears the burden of

28   proving [by a preponderance of the evidence] that a person or entity is a victim for purposes of

**GA-182**

restitution, and of proving the amount of the loss[.]" *United States v. Gossi*, 608 F.3d 574, 579 (9th Cir. 2010) (citations and quotation omitted).

The term "victim" refers to "a person directly and proximately harmed as a result of the commission of an offense[.]" 18 U.S.C. § 3663A(a)(2); *see United States v. Swor*, 728 F.3d 971, 974 (9th Cir. 2013) (the defendant's conduct must be an actual and proximate cause of the loss). "Under § 3663A, in a case involving a conspiracy or scheme, restitution may be ordered for all persons harmed by the entire scheme." *United States v. Riley*, 335 F.3d 919, 931–32 (9th Cir. 2003). "Restitution is thus not confined to harm caused by the particular offenses of which [the defendant] was convicted." *United States v. Booth*, 309 F.3d 566, 576 (9th Cir. 2002).

"The purpose of restitution is to put the *victim* back in the position he or she would have been but for the defendant's criminal conduct." *Gossi*, 608 F.3d at 581 (distinguishing causation requirement between restitution amount and loss calculation for purposes of sentencing). Because "[t]he primary and overarching goal of the MVRA is to make victims of crime whole[,] . . . uncertainties [should be] resolved with a view toward achieving fairness to the victim." *Id.* at 580 (quotation omitted). Thus, while "the statute is silent about *how* to value property[,] [w]hat is clear[ ] is that legislative history and case law demonstrates that the purpose of the MVRA is to fully compensate victims for their losses, and to restore victims to their original state prior to the criminal act." *United States v. Kaplan*, 839 F.3d 795, 800 (9th Cir. 2016) (citations omitted).

"Actual loss represents the difference between (1) the loss the victim incurred because of the unlawful conduct, and (2) the loss the victim would have incurred had defendant acted lawfully." *Gagarin*, 950 F.3d at 607 (internal quotation omitted). This Court has held that the plain language mandates "the amount of the victim's loss less the value (as of the date the property is returned) of any part of the property that is returned." *Gossi*, 608 F.3d at 577–78 (quotation omitted); *see also id.* 577 & n.2 (courts may rely on interpretation of predecessor restitution statute given nearly identical language).

Under the plain language of the MVRA for property offenses, the defendant must either return the property or when "return of the property lost by the victim is impossible, impracticable, or inadequate, the offender must pay the victim an amount equal to the value of the property less the value

(as of the date the property is returned) of any part of the property that is returned." *Robers v. United States*, 572 U.S. 639 (2014) (cleaned up) (quoting 18 U.S.C. § 3663A(b)(1)(B)).

Interpreting the same language of the MVRA that governs here, the Supreme Court in *Robers* held that, when a victim has been defrauded of money in exchange for property, only money returned to the victim reduces the proper restitution amount. *Id.* at 640–46. In *Robers*, the defendant fraudulently obtained mortgage loans from two banks, for which he was convicted of conspiracy to commit wire fraud. *Id.* at 641. Subsequently, the banks foreclosed on and sold the properties purchased with the fraudulent loans at a loss. *Id.* The Supreme Court addressed the question "whether 'any part of the property' is 'returned' when a victim takes title to collateral securing a loan that an offender fraudulently obtained from the victim[,]" and answered "that it is not." *Id.* at 640. The Court's rationale was as follows:

> In our view, the statutory phrase "any part of the property" refers only to the specific property lost by a victim, which, in the case of a fraudulently obtained loan, is the money lent. Therefore, no "part of the property" is "returned" to the victim until the collateral is sold and the victim receives money from the sale. The import of our holding is that a sentencing court must reduce the restitution amount by the amount of money the victim received in selling the collateral, not the value of the collateral when the victim received it.

*Id.* at 640–41. First, the Court concluded—based on the plain language of the MVRA—that "the property" lost by the victims due to the defendant's fraudulent conduct was the money lent by the banks. *Id.* at 642–44. Second, the Court held that the "property returned" to the bank-victims (for purposes of reducing the restitution amount) was limited to the cash received from sale of the collateral. *Id.*

The MVRA also requires a defendant to "reimburse the victim for lost income . . . and other expenses incurred during participation in the investigation or prosecution of the offense or attendance at proceedings related to the offense." 18 U.S.C. § 3663A(b)(4). However, victims may only recover expenses for participating in or attending government investigations and criminal proceedings. *United States v. Lagos*, 584 U.S. 577, 579 (2018).

### A.     Victim 1 Claim

Victim 1 has requested restitution in the amount of $528,928.98 for expenses incurred responding to the parallel government investigations that led to Lachwani's conviction in this case. On

June 27, 2024, Victim 1, who co-led Headspin's Series C fundraising, submitted a restitution claim in the amount of $528,928.98 along with redacted copies of billing invoices. Stern Decl. Ex. UU.

As an initial matter Victim 1 is clearly a victim of Lachwani's fraud scheme. *See* Dkt. 103, Investor 1 Decl. Therefore, it is entitled to the expenses it incurred participating in government investigations and criminal proceedings of Lachwani's offense. *Lagos*, 584 U.S. at 579. In this case, the government believes restitution under the MVRA includes expenses that Victim 1 incurred responding to the SEC's investigation, because the DOJ would have requested all the same information from Victim 1 had it not been able to obtain it from the SEC, which would have required all of the same work and expense.

In *Lagos*, the Supreme Court held that the MVRA did not allow for a victim to recover expenses incurred for a private investigation of the defendant's conduct performed on the victim's own accord. *Id.* While the Court held that expenses for participating in "government investigations" were compensable under the MVRA, it did not address whether a SEC investigation—which is obviously a government investigation—qualifies, and the opinion contains languages that could be read to suggest that the "government investigation" must be the government's criminal investigation. *See, e.g.*, 584 U.S. at 581, 582, 584. After *Lagos*, the Second Circuit addressed this issue and, while it found that *Lagos* did not mandate the conclusion that expenses incurred participating in an SEC investigation are not recoverable under the MVRA, it held that such expenses were not recoverable. *United States v. Afriyie*, 27 F.4th 161, 170-172 (2d Cir. 2022). The Second Circuit held that the SEC's investigation was not an investigation of "the offense" and, therefore, expenses incurred by the victim participating in the SEC investigation were not recoverable under the MVRA. *Id.* The Second Circuit also rejected the argument that the fact that the SEC and USAO investigations were coordinated and nearly identical made the entirety of expenses incurred by the victims responding to both recoverable. *Id.* at 172. Instead, the Second Circuit instructed the district court to devise a "reasonable solution" to determine what expenses were attributable to the USAO investigation when considering billing entries that reflected both the SEC and DOJ investigation. *Id.*

The Second Circuit's opinion is not binding on this Court, and this Court should not follow it. When the SEC and USAO investigate essentially identical conduct and bring substantively similar

**GA-185**

charges resulting from parallel investigations, there is no practical reason to attempt to formulaically

distinguish which expenses were incurred in response to one investigation versus the other.  Where both

the SEC and USAO need the same information from the victim, the victim would incur the same

expenses in the absence of the SEC investigation.  It makes little sense to decrease the amount the victim

can recovered simply because the SEC was also involved and it defies common sense that Congress

would have intended that the victim's ability to recover its losses to depend on the formalities of which

government entities sent requests or legal process and what the victim's counsel wrote in their billing

entries.  Here, Victim 1's information—and therefore its work in collecting and producing documents

and information and making a witness available for interviews—was of central importance to the

USAO's investigation and prosecution, as demonstrated by the government's charges in this case, its

exhibit list provided to defense, and the sentencing proceedings.  Victim 1's recovery should not depend

on the formality of which investigative entity issued the requests, and the MVRA does not require that

the Court reduce restitution to Victim 1 for this reason.

The government, however, is not able at this time to determine what amount the Court should

order as restitution for Victim 1.  Victim 1 has asserted that portions of the billing invoices prepared by

its lawyers are protected by the attorney-client privilege.  With the redactions in place, the government is

not able to assess the invoices to determine whether particular expenses were responsive to the

government investigations and subsequent criminal prosecution.  The government understands that

Victim 1 may be willing to provide unredacted copies of the invoices to the Court in camera, if

necessary, for the Court's assessment of Victim 1's restitution request.

## B.    Victim 2 Claim

Victim 2 submitted a restitution claim in the amount of $2,232,542.16 for losses on its

investment in Headspin and for expenses incurred responding to requests made by the USAO during its

investigation and prosecution of Lachwani.  Stern Decl. Ex. VV.  Victim 2 has submitted documentation

in support of its restitution claim, which the government has provided to the Probation Office and the

defense, and the Court should order Lachwani to pay restitution to Victim 2 in this amount.

First, Victim 2 was induced by Lachwani's fraud scheme to invest approximately $15 million in

Headspin.  Dkt. 103, Investor 2 Decl.  Victim 2 received 70% of its cash back in the recapitalization

transaction and received a note for the remainder.  Ex. VV.  Before the note's principal was due, the note was cancelled when Headspin was acquired, with Victim 2 receiving a payoff amount of $2,297.746.65.  Because $12,797,792.37 was returned to Victim 2, Victim 2's loss from its investment for restitution purposes is $2,202,206.06.

Victim 2 also incurred over $200,000 of legal fees responding to the USAO's and SEC's parallel investigations.  Victim 2 analyzed these invoices and determined that $30,336.10 of these fees related to time spent responding specifically to the USAO's investigation and prosecution and has sought restitution for that expense.  The government believes that the documentation submitted by Victim 2 in support of this expense, which has been submitted to the Probation Office and the defense, support this request, and therefore, the Court should order Lachwani pay Victim 2 restitution in the amount of $2,232,542.16.

**C.    Victim 4 Claim[3]**

Victim 4 submitted a restitution claim in the amount of $2,750,000.  *See* Stern Decl. Ex. SS & WW.  Victim 4 made investments in Headspin convertible notes.  On September 20, 2017, Victim 4 invested $1,750,000 through a convertible note.  On November 8, 2017, Victim 4 invested $1,000,000 through another convertible note.  In advance of both investments, Lachwani provided Victim 4 with material false information regarding Headspin.  *See* Stern Decl. Ex. XX, Ex. YY.  Because Victim 4 was a convertible notes investor, Victim 4 did not have the opportunity to have cash returned to it as part of the recapitalization transaction.  Instead, its investment was converted to equity under the terms of the convertible note and that stock was repriced during the recapitaliztion.  Victim 4 continued to hold Headspin equity until its equity was cancelled when Headspin was acquired on June 4, 2024.  Therefore, Victim 4 did not receive any funds back either before or after the discovery of the fraud, and therefore lost $2,750,000 as a result of Lachwani's fraud scheme, and the Court should order that restitution be paid to Victim 4 in that amount.

---

[3] In this memorandum the government uses the same numbering for victims as in its sentencing filings (e.g., Investor 1 in the sentencing filings corresponds to Victim 1 in this memorandum).  Because the victim referred to in the sentencing filings as Investor 3 has not submitted a restitution claim, the government has skipped that number in this memorandum and refers to the next victim seeking restitution as Victim 4.

**D.     Victim 5 Claim**

Victim 5 submitted a restitution claim in the amount of $1,150,271 for its loss in its Headspin Series C preferred stock investment.  Stern Decl. Ex. ZZ.  Between November 2019 and April 2020, Victim 5 purchased Headspin Series C preferred stock for $7,837,717 as a result of Lachwani's fraud scheme.  In the recapitalization transaction, Victim 5 elected to receive 70% of its cash back and a note for the remainder.  The note was subsequently cancelled, and Victim 5 received $1,200,144 of the principal balance on the note.  Because $6,684,446 was returned to Victim 5, Victim 5's loss from its investment for restitution purposes is $1,150,271 and the Court should order Lachwani pay restitution to Victim 5 in that amount.

**E.     Victim 6 Claim**

Victim 6 submitted a restitution claim in the amount of $100,000 for its loss in its Headspin Series C preferred stock investment.  Stern Decl. Ex. AAA.  The government requests that the Court order Lachwani pay Victim 6 thirty percent of this claim, or $30,000.

In March 2020, Victim 6 purchased Headspin Series C preferred stock for $100,000.  In the recapitalization transaction, Victim 6 had the option to sell back 70% of its Series C preferred stock for cash, but Victim 6 elected to have its equity repriced (receiving additional Headspin stock).  Victim 6's equity in Headspin had now been canceled without compensation.  Because Victim 6 had the option to sell 70% of its Headspin shares back for cash, the government believes it is appropriate to reduce the restitution award to Victim 6 by this amount, and order Lachwani pay restitution to Victim 6 in the amount of $30,000.

///

**GA-188**

**V.    CONCLUSION**

For the foregoing reasons, the Court should order Lachwani pay restitution in the amounts set forth on Attachment A.

DATED:  August 7, 2024                                        Respectfully submitted,

                                                             ISMAIL J. RAMSEY
                                                             United States Attorney


                                                             _____/s/_____
                                                             LLOYD FARNHAM
                                                             NOAH STERN
                                                             Assistant United States Attorney

**GA-189**

**ATTACHMENT A**
**RESTITUION LIST**

| Name of Victim | Cross-Reference | U.S. Dollars Invested in Headspin | Expenses | Money Returned | Total Restitution |
|---|---|---|---|---|---|
| Redacted | Victim 1 | Not sought by victim | $528,928.98 | | To be determined by Court |
| | Victim 2 | $14,999,988.43 | $30,336.10 | $12,797,792.37 | $2,232,542.16 |
| | Victim 4 | $2,750,000 | | | $2,750,000 |
| | Victim 5 | $7,834,717 | | $6,684,446 | $1,150,271 |
| | Victim 6 | $100,000 | | | $30,000 |

US RESTITUTION MEMORANDUM          1
CR 21-353 CRB

**GA-190**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

USA,

          Plaintiff,

     v.

LACHWANI,

          Defendant.

Case No. 21-cr-00353-CRB-1

**ORDER DENYING RELEASE
PENDING APPEAL**

Defendant Manish Lachwani pleaded guilty to two counts of wire fraud in violation of 18 U.S.C. § 1343 and one count of securities fraud in violation of 15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5. See Plea Agmt. (dkt. 88). Prior to sentencing, this Court held a hearing on the application of the "loss" enhancement under U.S.S.G. § 2B1.1(b)(1). Lachwani fiercely disputed that the enhancement should apply. He argued at the hearing and throughout extensive briefing that although he defrauded investors, there was no loss. See Hearing Tr. (dkt. 125); Def. Sentencing Memo (dkt. 105); Def.'s Resp. to Gov't Sentencing Mem. (dkt. 113).

The Court rejected Lachwani's argument, concluding that a reasonable estimate of the loss amount was $3,149,056. See Order on Loss (dkt. 126) at 12–21. Based on the loss amount, the Court found an 18-level enhancement, id. at 21–22, and an adjusted offense level of 20, which resulted in a Guidelines range of 33–41 months, see 4/19/24 Tr. at 3:22–25. The Court sentenced Lachwani to a term of 18 months imprisonment. See Judgment (dkt. 141) at 2.

Lachwani now moves for release pending appeal, arguing (again) that the loss amount in his case was zero and that the Court therefore miscalculated his Guidelines

range.  See Mot. (dkt. 153).  The government opposes Lachwani's motion.  Opp'n (dkt. 157).  The Court held a hearing on August 22, 2024.  See Minute Entry (dkt. 169).  The parties' dispute centers on whether Lachwani raises a substantial question of law or fact that is likely to result in a reduced or non-custodial sentence.[1]  See 18 U.S.C. § 3143(b)(1); United States v. Handy, 761 F.2d 1279, 1283 (9th Cir. 1985).  A "substantial question" is one that is "fairly debatable."  Handy, 761 F.2d at 1283.

The Court does not find it "fairly debatable" that there was no actual loss.  As the Court explained in its previous order, HeadSpin's investors were "induced to part with their money based on fraudulent misrepresentations about HeadSpin's prospects for growth—and thus for future returns—and they would not have parted with their money had they known about the fraud."  Loss Order at 8–9.  Therefore, at the time of the transaction, "the investors got something worth less than what they paid."  Id. at 9.  That the company had sufficient assets to reimburse investors after it absorbed the impact of the fraud does not make it "fairly debatable" that there was no actual loss at the time of the investment.  Id.  To adopt Lachwani's position would mean that the Guidelines makes no distinction between a defendant who defrauds victims out of $10 and a defendant who defrauds victims out of $1,000,000, so long as there is enough money to repay the victims after the fraud is discovered.  That cannot be.

Nor does the Court find it "fairly debatable" whether United States v. Ortland, 109 F.3d 539 (9th Cir. 1997) controls the method for calculating loss in Lachwani's case.  The Ninth Circuit decided Ortland before the Sentencing Commission added a comment to U.S.S.G. § 2B1.1 addressing when to apply credit against loss.  See U.S.S.G. § 2B1.1, cmt. n.3(E)(i) (2001 amendments) (explaining that "the amendment resolves a circuit conflict regarding whether and how to credit payments made to victims").  It is telling that Lachwani has not produced any authority in support of his position after this comment was

---

[1] The government initially asserted that Lachwani waived his rights to appeal his sentence on the basis of a miscalculated Guidelines range, see Opp'n at 3–5, but it later withdrew that argument, see Notice Withdrawing Arg (dkt. 168).

GA-192

United States District Court
Northern District of California

United States District Court
Northern District of California

1  added.  The Court explained further reasons why <u>Ortland</u> does not control in its prior

2  order.  <u>See</u> Loss Order at 11.

3     Finally, at the hearing, Lachwani argued that it is "fairly debatable" that he should

4  be credited for the amount returned to investors because he was not involved in the Recap.

5  But as the Court already explained, "the record shows that Lachwani's cooperation was

6  necessary to the success of the Recap."  Loss Order at 9.  Therefore, crediting him for the

7  amount returned to investors would "amount to rewarding him for actions taken to reduce

8  the consequences of his fraud after its discovery."  <u>Id.</u> at 10.  That is contrary to the

9  Guidelines and Ninth Circuit law—and in turn, not a substantial question that is likely to

10  result in a reduced sentence for Lachwani.

11     Because Lachwani fails to meet the standard for release pending appeal, his motion

12  is DENIED.  Lachwani is presently scheduled to self-surrender on or before September 2,

13  2024.  <u>See</u> Minute Entry (dkt. 138).  At the hearing, he requested that the Court continue

14  his self-surrender date by 60 days should his motion be denied.  The Court hereby

15  continues his self-surrender date by 30 days, to October 2, 2024.

16

17     **IT IS SO ORDERED.**

18     Dated:  August 23, 2024

19     CHARLES R. BREYER
      United States District Judge

20

21

22

23

24

25

26

27

28

**GA-193**